IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TEAM SYSTEMS INTERNATIONAL, LLC,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 22-10066 (CTG)<br><br>**Related Docket No. 41** |

**RESPONSE OF BERING STRAITS LOGISTICS SERVICES, LLC TO
MOTION TO DISMISS**

Bering Straits Logistics Services, LLC (**"BSLS"**) responds as follows to *GPDEV, LLC and Simons Exploration, Inc.'s Motion for Entry of an Order Dismissing this Chapter 11 Case with Prejudice* [Docket No. 41] (the "**Motion to Dismiss**"), filed by GPDEV, LLC and Simons Exploration, Inc. (collectively, "**GPDEV/Simons**").

**PRELIMINARY STATEMENT**

1.   BSLS agrees with a number of the arguments made by GPDEV/Simons in their Motion to Dismiss. In particular, BSLS agrees with GPDEV/Simons that there is no possibility of reorganization. With respect to the issue of the possibility of plan confirmation, this case is dead on arrival.

2.   The Motion to Dismiss argues that because Debtor filed this Chapter 11 case in bad faith as a tactical move in a two-party dispute, the case should be dismissed. But Section 1112(b) calls for the court to conduct a two-step inquiry: first determining whether "cause" exists within the meaning of that statute, and second determining whether conversion or dismissal is in the best

---

[1]   The Debtor in this chapter 11 case has a last four digit federal tax ID of 8411. The location of the Debtor's service address in this chapter 11 case is 16192 Coastal Highway Lewes, Delaware 19958.

interests of the creditors and the estate. The Motion to Dismiss completely glosses over this second step.

3.      BSLS is a bona fide creditor completely unrelated to the Debtor. BSLS has filed its proof of claim in the amount $1,516,745.69, and the Debtor has recently amended its schedules to reflect the claim. So the argument that this is a two-party case is simply wrong. The Motion to Dismiss suggests that there may be fraudulent conveyance or other similar creditor remedies in this case. Regardless of the Debtor's bad faith in filing this case, the bankruptcy policies of enhancement of assets available for creditors, and equality of distribution among creditors, call for this case to be converted, not dismissed.

## BACKGROUND

4.      Bering Straits Native Corporation ("**BSNC**") is the regional corporation for northwest Alaska formed pursuant to the Alaska Native Claims Settlement Act, 43 U.S.C. Section 1601 *et seq* ("**ANCSA**"). ANCSA was enacted in 1971 in order to partially resolve aboriginal land claims in Alaska. BSNC is headquartered in Nome, Alaska and has approximately 7,700 Alaska Native shareholders. The Bering Strait region encompasses an area of 23,000 square miles and is home to the Inupiaq, Siberian Yupik, and Central Yup'ik peoples. *Declaration of Krystal Nelson* ("**Nelson Declaration**"), filed contemporaneously herewith, at ¶ 2.

5.      BSLS is a small business subsidiary wholly owned by BSNC. BSLS provides a variety of material support, supply and security services to the federal government, and also acts as subcontractor to other contactors who have federal contracts. Nelson Declaration at ¶ 3.

6.      In September, 2017, in response to the devastation brought by Hurricane Maria, BSLS and the Debtor, Team Systems International, LLC ("**TSI**") entered into a *Basic Ordering Contract* ("**the Subcontract**") under which BSLS would supply bottled water, and transportation of the water to Puerto Rico, pursuant to a prime TSI's prime contract with the Federal Emergency

Management Agency (**"FEMA"**).  The Subcontract provided that TSI and BSLC could enter into "Work Orders" under the Subcontract for specific work to be performed.  On October 5, 2017, TSI and BSLS entered into a Work Order issued under the Subcontract under which BSLS would supply up to 80 million liters of bottled water at $.42 per liter, plus transportation to Puerto Rico at cost plus 6%.  Subsequently, the government reduced TSI's required quantity of water to 12 million liters.  Consequently, BSLS's quantity was also reduced to 12 million liters.  Copies of the Subcontract and the Work Order are Attachments 1 and 2 to the Nelson Declaration.

7. TSI owes BSLS $1,516,745.69 for bottled water supplied and transported under these two agreements.  See Attachments 3 and 4 to the Proof of Claim filed by BSLS in this case.

8. TSI filed this Chapter 11 case on January 18, 2022.  Until Debtor filed amended schedules on February 4, 2022, see Docket No. 56,[2] neither BSLS's existence nor its claim has been referenced in any of the pleadings filed in this case.

9. On January 27, 2022, GPDEV/Simons filed their Motion to Dismiss.  A hearing on that motion is scheduled for February 9, 2022.

## ARGUMENT

**A.    Legal authority**

10. The Motion to Dismiss is based on Section 1112(b)(1) of the Bankruptcy Code, which provides in relevant part that "On request of a party in interest, … the court <u>shall convert</u> a case under this chapter to a case under chapter 7 <u>or dismiss</u> a case under this chapter, <u>whichever is in the best interests of creditors and the estate, for cause</u> …" (emphasis added).

11. The statute calls for the court to make a two-step determination.  *Rollex Corp v. Associated Materials (In re Superior Siding & Window)*, 14 F.3d 240,242 (4th Cir. 1994):

---

[2] The amended schedules refer to the claim as a $1,500,000 claim.  Inexplicably, the claim is listed as contingent.  The amended schedules do state, however, that the claim is not subject to offset.  Docket No. 56.

"A motion filed under [section 1112(b)] invokes a two-step analysis, first to determine whether "cause" exists either to dismiss or to convert the Chapter 11 proceeding to a Chapter 7 proceeding, and second to determine which option is in 'the best interest of the creditors and the estate.' "

12. This second step is important and cannot be overlooked even when a creditor seeks only dismissal under section 1112(b). For example, in *Sullivan v Harnish (In re Sullivan),* 522 B.R. 604 (9th Cir. BAP 2014), the Ninth Circuit Bankruptcy Appellate Panel reversed the bankruptcy court's dismissal of Chapter 11 case for failure to consider whether conversion or dismissal was in best interests of creditors and the estate. Even though the debtor failed to argue to the bankruptcy court that the case should be converted and not dismissed, "the bankruptcy court had an independent obligation under §1112(b) to consider what would happen to all creditors on dismissal and, in light of its analysis, whether dismissal or conversion would be in the best interests of all creditors, not just the largest and most vocal creditor." *Id*. at 613.

**B.     This is not a two-party case**

13. The Motion to Dismiss is premised, in large part, on the assertion that this bankruptcy is really a two-party dispute. It is true that Debtor's schedules [*see* Docket No. 28] show zero secured creditors, zero unsecured priority creditors, and unsecured claims as follows:

*Summary of claims against Debtor, according to Debtor's Schedules*

| | |
|---|---|
| GPDEV/Simons | $6,246,075 |
| Lindsey Blee[3] | $     96,431 |
| Everyone else | $     35,929 |
| Total unsecured debt | $6,378,435 |

14. However, this list excludes BSLS's claim of $1,516,745.69.

---

[3] The Motion to Dismiss explains, in Section V, that this debt was incurred 4 business days after the jury rendered its verdict in the federal district court litigation between Debtor and GPDEV/Simons, and that the owner of Lindsey Bee is owned by the same person, John Canal, who operated a different entity which was found at trial to have received in excess of $1 million for work never performed.

15. Given that Debtor's initial schedules excluded BSLS, and given that the deadline for filing claims has not been set (Docket No. 27, page 2), there may be other bona fide third party creditors other than BSLS.

16. Even if BSLS is the only unlisted creditor of TSI, this case is no longer a two-party dispute. Being the major creditor is not the same thing as being the only creditor. Nor is GPDEV/Simons entitled to the relief it seeks simply because it is the largest creditor, as discussed more fully below.

**C.     There is no reasonable likelihood of reorganization**

17. Section 1112(b)(4) contains a nonexclusive list of situations that constitute "cause" for purposes of conversion or dismissal. First on the list is subsection (A) which is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." There is no question that the Debtor meets this standard.

18. The first day declaration of Deborah Mott (the **"Mott Declaration"**)[Docket No. 3], states at paragraph 19 that Debtor has no employees. The Mott Declaration also states, at paragraph 15, that Debtor is unable to bid on any additional contracts. At paragraph 4, the Mott Declaration explains that Debtor's sole business consists of bidding on government contracts. Putting these admitted facts together leads to the conclusion that it will be impossible, while TSI is a debtor in this Court, to credibly show the feasibility of any reorganization plan, which assumes the existence of post-Chapter 11 business operations.

19. Further, this Court can safely assume that GPDEV/Simons and BSLS will vote against any reorganization plan, or any chapter 11 liquidation plan that leaves the debtor or its designees in control. Therefore, the Debtor will be unable to satisfy Section 1129(a)(8)'s requirement of a consenting impaired non-insider class voting to accept any plan. Further, any

plan that gives the Debtor or any of its affiliates anything of value in this case will violate Section 1129(b)'s absolute priority rule.

20. The Motion to Dismiss makes it unmistakably clear that GPDEV/Simons have no confidence whatsoever in Debtor's good faith, honesty, candor, transparency, or ability to act in a fiduciary capacity towards the creditors. BSLS shares that view. Good faith is a confirmation requirement under Section 1129(a)(2).

21. Plan confirmation requires, among other things, that the plan be feasible, that it satisfy the consenting impaired non-insider class requirement, that it satisfy the absolute priority rule, and be proposed in good faith. There is no prospect that Debtor can meet any of these standards, much less all of them.

**D.     There will be "continuing loss to or diminution of the estate" if this case remains in chapter 11**

22. As already noted, the Debtor has no employees. The Debtor's schedules [Docket No. 28], disclose that Debtor neither owns nor leases any inventory, equipment, vehicles, or other tangible assets. Schedule G indicates it has two government contracts that have not yet expired, but nothing in the schedules or elsewhere on the docket indicate that the Debtor has any ability to perform under those contracts. Debtor's motion to use its cash management system [Docket No. 4], makes no mention of carrying on business to generate revenue.

23. Debtor therefore has no intention, or ability, to generate income. The only reason the Debtor wants "breathing room" is to collect on its receivables. *See* Docket No. 3, at ¶16.

24. However, the Debtor appears to be incurring heavy administrative costs in this Chapter 11 case. The animosity between the parties, and the post-judgment discovery disputes in the underlying TSI litigation, have spilled over into this Chapter 11 case. Continuing litigation between the Debtor and GPDEV/Simons has already occurred during the short period this case has

been in Chapter 11 – e.g. fights over Debtor's attorney retention, [4] and fights over production of financial information[5] - indicate that Debtor's attorneys fee applications will seek fees that are much higher than normal, especially for a what is a relatively small case.  It is not necessary to pick sides to decide which party is being more unreasonable. The fact is that, either way, the Debtor's creditors will bear the burden of the Debtor's side of the dispute.  These ongoing costs will disappear immediately once the case is converted.

25.    Another exorbitant cost of this case remaining in Chapter 11 is the Debtor's desire to continue its appeal in the 11th Circuit.  *See* Docket No. 38.  BSLS believes that the appeal may be a waste of time and money, however, an independent Chapter 7 Trustee would be the best person to make any determination on whether to expend estate resources to pursue the appeal. Given the high level of insolvency in this case, any such appeal will be financed by funds that would otherwise be distributed to the pre-petition creditors.  BSLS does not agree that "its" potential recovery be used for this purpose.  Apart from the cost of pursuing the appeal, waiting for the 11th Circuit to render a decision will take many months, during which time the estate's assets will be wasted on pointless litigation in this Court.

26.    In short, BSLS believes that the Debtor is burning through its limited cash resources fighting with GPDEV/Simons, both in this Court and in the 11th Circuit, and that none of those fights will yield a benefit remotely commensurate with their cost.  For this reason, the "continuing loss to or diminution of the estate" requirement in 1112(b)(4)(A) is easily met.

---

[4] Docket Nos. 34, 35, 51, 55.
[5] Docket Nos. 52 (and the ten exhibits thereto), 53, 54.

E.      **Most of the Debtor's assets are illusory**

27.     Debtor's schedules disclose Debtor's assets consist solely of $164,000 in a bank account, plus $21,375,000 in receivables[6]. The receivables listed in the schedules may be summarized as follows:

*Summary of Debtor's claimed receivables*

| | | |
|---|---|---|
| Under 90 days | | $119,000 |
| Over 90 days | $778,000 | |
| | $178,000 | |
| | $13,500,000 | |
| | $ 6,800,000 | |
| | $21,256,000 | $21,256,000 |
| Total receivables | | $21,375,000 |

28.     When the schedules ask the Debtor to adjust downward the face value of its receivables for doubtful or uncollectable accounts, the Debtor's adjustment is zero. But Paragraph 16 of the Mott Declaration says that the $13,500,000 is a claim against FEMA that is on appeal before the U. S. Civilian Board of Contract Appeals, and that the $6,800,000 claim is a change order claim against FEMA that has not even been filed.

29.     The disconnect between valuing a $13.5 million claim at full face value, even though the claim has been rejected and is on appeal, and the disconnect between valuing a $6.8 million stale claim (i.e., that has yet to be filed but is nevertheless over 90 days old) at full face value, are examples of Debtor's unrealistic assessment of its financial situation.

30.     The exhibit to GPDEV/Simon's objection to retention of Robinson & Cole, LLP (the **"Robinson Objection"**)[Docket No. 51], is a January 27, 2022 decision of the U.S. Civilian Board of Contract Appeals denying FEMA's and the Debtor's cross motions for summary

---

[6]  It is interesting to note that the Debtor does not attribute any value to causes of action it has or may have against insiders for fraudulent transfers. It is imperative that an independent fiduciary, like a Chapter 7 Trustee, investigate and pursue these types of claims.

judgment with respect to the $13,500,000 claim. This decision demonstrates the fallacy of valuing the claim at full face value. In fact, the decision suggests that the claim may be worthless: Debtor's $13.5 million claim was based on a per-liter restocking fee for 67.5 million liters of water that was due regardless of its actual restocking or cancellation costs, but the decision concludes that "to recover restocking fees, TSI must prove that the fees were actually incurred and explain the chain of events leading up to them being paid." *See* Robinson Objection at pages 10-12. BSLS – the entity who actually supplied the water – confidently predicts that Debtor will be unable to meet that standard.

31. If, as BSLS predicts, Debtor is unable to meet this standard set by the Board of Contract Appeals, and if one assumes that the $6.8 million claim that has not yet been filed is unlikely to have any value, then Debtor is hopelessly insolvent. The consequence of this is that every dollar the Debtor spends on its attorneys, or on other Chapter 11 administrative costs, is one less dollar that could go to the unsecured creditors or to fund a Chapter 7 Trustee to investigate and pursue all cause of action, including fraudulent transfers and preference claims that are likely to bring real value into this estate for creditors as discussed below.

**F.    Cause exists within the meaning of Section 1112(b)**

32. With no prospect of reorganization, and with no creditor desiring that Debtor remain in control of the few remaining assets in this case, there is ample reason to find that "cause" exists for this Court to terminate the Chapter 11 phase of this case. The next step is for this Court to decide whether conversion or dismissal is "in the best interest of the creditors and the estate."

**G.    This case should be converted, not dismissed**

33. In *Rollex Corp v. Associated Materials (In re Superior Siding & Window)*, 14 F.3d 240 (4th Cir. 1994) the Fourth Circuit reversed the district court's affirmance of the bankruptcy

court's dismissal of a chapter 11 case, where the bankruptcy court dismissed the case simply because a majority of the creditors favored dismissal. The seven creditors favoring dismissal favored dismissal (led by creditor Associated Materials) all had judgments in place, whereas the creditor favoring conversion (Rollex) did not have a judgment. The Fourth Circuit held that:

> "…this policy of equality among creditors, fundamental to the bankruptcy law, is one of the factors to be considered in determining the 'best interest of the creditors' under §1112(b), **and it is not serviced by merely tallying the votes of the unsecured creditors and yielding to the majority interest.**"

14 F.3d at 242 (emphasis added). The Fourth Circuit went on to say that

> "Rollex properly notes that if the Chapter 11 proceeding were to be converted to a Chapter 7 … all eight unsecured creditors would thereafter share in the assets of the estate on a pro rata basis … One the other hand, Rollex argues, under dismissal, the assets of the debtor would be seized under state law by the first to act, and that party, Associated Materials in this case, would probably obtain all the assets. **This scenario is precisely the kind of unequal access to assets which the bankruptcy laws intend to forestall**."

(emphasis added).

34. The fact that GPDEV/Simon's Motion to Dismiss sought only dismissal, not conversion, is not an impediment to this Court converting the case at the conclusion of the February 9, 2022 hearing on the motion. In *In re Graphic Trade Bindery, Inc., 2012 Bankr. LEXIS 1598 (Bankr. D. Md. Apr. 12, 2012)*, creditor Cellmark sought conversion to Chapter 7 under Section 1112(b). At the hearing on the motion, dismissal was discussed but no order was entered. When the debtor and the creditors were unable to agree on the form of the order, Cellmark argued that dismissal could not occur because the conversion motion and notice thereof did not mention dismissal. The bankruptcy court disagreed with Cellmark on this procedural point, stating:

> "… the mere fact that a section 1112(b) motion seeks conversion is no bar to dismissal if the court determines that dismissal is in the best interest of the creditors and the estate. **The opposite is also true.** The task of the bankruptcy court is to determine which option is the better choice."

(emphasis added). 2012 Bankr.LEXIS 1598, *17.

35. Conversion and dismissal are built into Section 1112(b) as the possible outcomes, once "cause" is established.[7] As the *Graphic Trade* court explained:

> "Cellmark's approach – that where a motion is filed that asks for only one form of relief, once the court finds that cause exists under section 1112(b), the court must take the action requested by the movant – leads to a result that is contrary to the express holding of *Superior Siding*. Under Cellmark's approach, the court would be required to adopt the relief requested by the creditor who filed the motion (*i.e.* the majority view) even if the court determines that the alternative form of relief is in the best interests of the creditor or the estate.

*Id.* at *18.

### H. There appear to be avoidance actions that a chapter 7 trustee could successfully pursue

36. The Motion to Dismiss alleges at page 19 that Debtor received the following amounts from FEMA on the following dates:

| Date | Amount |
|---|---|
| 11/29/17 | $18,338,823 |
| 2/8/18 | $ 7,297,500 |
| 4/6/18 | $ 7,297,500 |
| 5/21/19 | $ 4,645,725 |
| Total | $37,579,548 |

37. The obvious question is, where did this money go? If the answer is that the money went to affiliates or cronies of the debtor, and if GPDEV/Simons are correct that "TSI has been pilfered by its members and an empty shell entity has been left behind," Motion to Dismiss at page 10, then a chapter 7 trustee has the power to investigate, obtain the necessary financial records,

---

[7] And that two limited exceptions do not apply: if the court finds that appointment of an examiner is in the best interests of the creditors and the estate, Section 1112(b), or if the court "finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of the creditors and the estate." Neither exception applies in this case.

and bring preference, fraudulent conveyance, illegal dividend or other avoidance actions to unwind those transactions.

38. The Motion to Dismiss goes on to assert, at page 11, that GPDEV/Simons "should be permitted to secure their judgment by moving after the fraudulent transfers that surely took place utilizing the proceedings supplementary statute and Florida law." If there are indeed viable fraudulent conveyance actions that are available under Florida law, a bankruptcy trustee can do as good, or better, a job pursuing those state law remedies, by utilizing Section 544(b)'s strong arm powers to borrow GPDEV/Simon's state law rights – on top of the trustee's formidable Section 548 fraudulent conveyance provisions.

39. The Motion to Dismiss also argues, on page 9, that three of the seven law firms listed as unsecured creditors "received what appear to be avoidable preferential payments." If GPDEV/Simon's suspicions are correct, then conversion is superior to dismissal for all creditors, including GPDEV/Simons, because preference law, Section 547, applies only in the context of a bankruptcy case.

40. Part IV of the Motion to Dismiss argues that this is a single asset case, namely $164,000 in cash. But elsewhere in the motion, GPDEV/Simons make it clear that there are other potential assets in the form of fraudulent conveyance and other actions. Finally, if the case is converted instead of dismissed, there may be preference actions as well that would benefit all of the creditors and the estate.

## CONCLUSION

WHEREFORE, the bankruptcy policies of enhancement of assets available for creditors, and equality of distribution among creditors, call for this case to be converted, not dismissed. Accordingly, BSLS requests that this Court convert this case to a chapter 7 case, immediately.

Dated: February 7, 2022
      Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ William E. Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:   (302) 295-0191
Email:       chipman@chipmanbrown.com

-and-

Cabot Christianson, Esq. (*pro hac vice* pending)
Law Office of Cabot Christianson, P.C.
911 West 8th Ave., Suite 201
Anchorage, AK 99501
Telephone: (907) 230-8160
Email: cabot@cclawyers.net

*Counsel to Bering Straits Logistics Services, LLC*