## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Team Systems International, LLC, | Case No. 22-10066-CTG |
| Debtor(s). | |

### CREDITORS' MOTION FOR RULE 37 SANCTIONS AGAINST DEBTOR

GPDEV LLC and Simons Exploration, Inc. (each a "**Creditor**," and together, the "**Creditors**"), by and through their undersigned counsel, hereby submit this motion (the "**Motion**"), pursuant to section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 9014(c) and 7037 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**,") and rule 37 of the Federal Rule of Civil Procedure (the "**Federal Rules**"), for entry of an Order: (i) declaring the Debtor in violation of Federal Rule 37; (ii) referring this matter to the United States Attorney for a criminal investigation into bankruptcy fraud, perjury and other crimes; (iii) directing the Debtor to pay all of Creditors' fees and costs associated with Creditors' discovery in this bankruptcy case (past and future); (iv) directing the Debtor to pay all of Creditors' fees and costs associated with this Motion; (v) directing the Debtor to produce bank statements for all accounts without any missing pages or redactions; (vi) directing the Debtor to produce all cancelled checks from 2018 to the present for all accounts; (vii) granting Creditors derivative standing to pursue fraudulent transfer adversary action(s) against the Debtor's insiders; (viii) dismissing the above-captioned bankruptcy case; (ix) temporarily restraining the Debtor's insiders from dissipating/incumbering assets outside of the ordinary course; and (x) imposing other sanctions as this Court deems just and proper.  In support of this Motion, Creditors respectfully state as follows:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.       This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.       The statutory predicates for the relief requested herein are Bankruptcy Rules 9014(c) and 7037, and Federal Rule 37.

## PRELIMINARY STATEMENT

5.       Creditors submit that the Debtor has engaged in serious and intentional misconduct in connection with discovery relating to the contested matter presently pending before this Court, styled as *GPDEV, LLC and Simons Exploration, Inc.'s Motion for Entry of an Order Dismissing Chapter 11 Case with Prejudice* [D.I. 41] (the "**Motion to Dismiss**"), in efforts to mislead and evade Creditors, mislead the Court, and gain tactical advantage in this bankruptcy case.

6.       As set forth in more detail below, the Debtor has: (i) made misrepresentations relating to its delay in producing tax returns and K-1s; (ii) produced false tax returns and K-1s, and made misrepresentations relating thereto; (iii) unlawfully redacted its bank statements before producing same; (iv) failed to produce cancelled checks and gave evasive deposition testimony relating thereto; (v) failed to disclose at least two of its bank accounts - a TD Bank account #3053 and a BBVA account #1186, and failed to produce any bank statements therefor; (vi) purchased multiple pieces of real estate for the benefit of insiders (including a nearly $1 million beach house, a nearly half a million dollar Missouri house, and a Florida house), and made misrepresentations and gave evasive testimony relating thereto; (vii) made misrepresentations relating to its scheduled executory contracts; and (viii) failed to disclose assets and other required information on its schedules and SOFA.

## FACTUAL BACKGROUND

**I.     Creditors' Judgments Against the Debtor for Over $6 Million**

1.      On September 21, 2018, Creditors commenced a breach of contract lawsuit against Team Systems International, LLC (the "**Debtor**") in the United States District Court for the Northern District of Florida (the "**District Court**") styled as *GPDEV, LLC and Simons Exploration, Inc. v. Team Systems International, LLC* (Case No. 18-cv-00442-RH-MAF) (the "**TSI Lawsuit**").

2.      The TSI Lawsuit was tried to a jury.

3.      The jury resolved the disputed factual issues in Creditors' favor and awarded damages.

4.      In sum, the Jury determined that TSI had received net income (profit) from the sales of bottled water of $25,011,788, and had severely underpaid GPDEV and Simons.

5.      GPDEV was awarded a Final Judgment against TSI on September 28, 2021 in the total amount of $3,297,995.32 together with post-judgment interest after August 25, 2021 as provided by law (the "**GPDEV Judgment**").  And, Simons was awarded a Final Judgment against TSI on September 28, 2021, in the total amount of $2,948,080.46 together with post-judgment interest after August 25, 2021 as provided by law (the "**Simons Judgment**," and together with the GPDEV Judgment, the "**Judgments**").  *See* District Court Order for Entry of Judgment [D.I. 305] attached hereto marked as **Exhibit A**.

**II.    The Debtor's Appeal and Failed Efforts to Obtain a Stay Pending Appeal**

6.      The Debtor appealed to the Eleventh Circuit Court of Appeals (the "**Appeal**").

7.      The Appeal was assigned case number 21-13662-AA.

8.      Also, the Debtor filed two motions in District Court seeking a stay of execution on the Judgments pending appeal without posting a supersedeas bond or other security (the "**Stay Motions**") – both of which were denied.

9.      More specifically, on November 8, 2021, the District Court denied the Debtor's Stay Motions and entered and *Order Denying a Stay Pending Appeal*.  A copy of the November 8, 2021 Order Denying a Stay Pending Appeal is attached hereto marked as **Exhibit B**.

10.      Importantly, the November 8, 2021 Order states, among other things, that: (i) the Debtor has a "record of demonstrably false assertions in this litigation[;]" (ii) "the [Debtor] is unlikely to prevail on the merits on appeal. To the contrary, the plaintiffs' case on the merits was strong[;]" and (iii) "the likelihood that the [Debtor] will prevail on appeal on its challenge to the amount of the award—a challenge never made in this court—is [also] low[;]" and (iv) "if a stay is issued, and if , as the [Debtor] asserts, it cannot afford a bond, the risk of loss to the [Creditors] will be substantial – the [Debtor] cannot post a bond, its ability to pay the judgment is in doubt today and will likely be in greater doubt as time passes."

11.      Additionally, the Debtor sought a stay pending appeal from the Eleventh Circuit Court of Appeals (Case No. 21-13662-AA).  But, on January 10, 2022, that request was denied as well.  A copy of the January 10, 2022 Order Denying a Stay Pending Appeal is attached hereto marked as **Exhibit C**.

## III.      The Debtor's Efforts to Evade Post-Judgment Discovery

12.      The Debtor has been egregiously uncooperative with Creditors' efforts to obtain post-judgment discovery in aid of execution.

/181034/1/#46654167 v1

13.     As a result thereof, on December 1, 2021, and December 20, 2021, the District Court entered Orders compelling the Debtors to provide post-judgment discovery in aid of execution to Creditors on or before January 14, 2021.

14.     But, the Debtor failed to comply with the District Court's Orders.

15.     As such, the District Court issued an Order to Show Cause, as to why the Debtor and its principal, Deborah Mott, should not be held in civil contempt for failure to provide the required information by the January 14 deadline. A Copy of the Show Cause Order is attached hereto as **Exhibit D**.

16.     The Show Cause Order required Ms. Mott to appear by telephone for the show cause hearing on January 24, 2022 at 9:00 A.M., and to supply the Court and address were, "if held in civil contempt at a later hearing, the 'principal' and Ms. Mott will be available to be taken into custody by the United States Marshals Service and held until the required information is provided."

## IV.     The Debtor Transferred Millions of Dollars to or for the Benefit of Insiders During the Pendency of the TSI Lawsuit and Appeal

17.     While the TSI Lawsuit and Appeal were pending, from 2018 through 2022, the Debtor transferred many millions of dollars to and for the benefit of insiders – nearly $9 million by Creditors' estimation. *See* Summary of Transfers to or for the Benefit of Insiders attached hereto marked as **Exhibit E**.[1]

---

[1] In addition to the nearly $9 million identified on **Exhibit E**, Creditors' financial expert has determined that at least another $7 million is unaccounted for as a result of the Debtor's deficient document production (ie. producing bank statements with missing pages). Creditors suspect that those sums were likewise transferred to and for the benefit of insiders.

/181034/1/#46654167 v1

**V.      The Debtor's Bankruptcy Filing and Request for a Limited Relief from Stay**

18.      On January 18, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition with this Court under Chapter 11 of the Bankruptcy Code.

19.      On January 26, 2022, the Debtor filed *Debtor's Motion for Limited Relief from the Automatic Stay to Continue the Eleventh Circuit Appeal* (the "Stay Relief Motion") [D.I. 38]. *See* Debtor's Stay Relief Motion attached hereto marked as **Exhibit F**.

20.      Through its bankruptcy filing and Stay Relief Motion, the Debtor seeks to accomplish the exact same relief it was already denied on multiple occasions by the District Court and Eleventh Circuit Court of Appeals – a stay pending appeal without posting a supersedeas bond or other security.

**VI.      The Debtor's Schedules, SOFA and Other Bankruptcy Court Filings**

21.      The first day declaration of Deborah Mott (the "**Mott Declaration**") [Docket No. 3], states, among other things, that: (i) the Debtor's sole business consists of bidding on government contracts; (ii) the Debtor has no employees; and (iii) the Debtor is unable to bid on any additional contracts; (iv) $13,500,000 of the Debtor's scheduled accounts receivable are related to a claim against FEMA that is on appeal before the U. S. Civilian Board of Contract Appeals; and (v) another $6,800,000 of the Debtor's scheduled  accounts receivable are related to a change order claim against FEMA that has not even been filed. *See* Mott Declaration attached hereto marked as **Exhibit G**.

22.      The Debtor's schedules A/B [Docket No. 28], indicate that Debtor neither owns nor leases any inventory, equipment, furniture, supplies, vehicles, or other tangible assets.  Rather, the Debtor's schedules A/B [Docket No. 28], indicate that the Debtor's assets consist only of: (i) $164,000 on deposit at Artisans' Bank #2968; and (ii) $21,375,000 of accounts receivable, all but

$119,000 of which is over 90 days old.  *See* Debtor's Schedules attached hereto marked as **Exhibit H.**

23.    Also, Schedule G indicates the Debtor has two government contracts that have not yet expired – a fuel contract and a Mexico contract.  But, nothing in the schedules or elsewhere on the docket indicate that the Debtor has any ability to perform under those contracts.  *See Id.*

24.    The Debtor's Schedule E/F, and amended Schedule E/F (together "**Schedule E/F**") indicate that the Debtor has eight (8) creditors, and owes a total of $7,895,181 thereto comprised of the following: (i) a total of $30,000.00 in legal fees; and (ii) $102,359.67 in trade debt; (iii) $6,246,075.78 as a disputed debt owed to Creditors; and (iv) a $1,516,745.69 contingent debt to Bering Straits Logistics Services, LLC.  *See Id.*; *see also* Debtor's amended Schedule E/F attached hereto marked as **Exhibit I**.

25.    The Debtor's SOFA # 1 shows the Debtor's gross revenues have declined significantly in recent years.  Specifically, the Debtor's SOFA #1 says: (i) in 2020, the Debtor had gross revenues of $5,406,199; and (ii) in 2021, the Debtor had gross revenues of only $543,888.33.  *See* Debtor's SOFA attached hereto marked as **Exhibit J**.

26.    The Debtor's SOFA #7 states that the Debtor has not been involved in any legal actions within the year before the filing of this case.  *See Id.*

27.    And, the Debtor's motion to use its cash management system [D.I. 4], makes no mention of carrying on business to generate revenue.  See Debtor's Cash Management Motion attached hereto marked as **Exhibit K**.

## VII.    The Bankruptcy Court's Order for Discovery

28.    In this bankruptcy case, Creditors requested, and the Court Ordered, that the Debtor produce certain documents to Creditors, including tax returns, K-1s and bank statements (including copies of cancelled checks) for all accounts from 2018 to the present.

## VIII.   The Debtor's Misconduct in Connection with Discovery in this Bankruptcy Case

29.    On January 27, 2022, when Creditors asked when the production would be made, the Debtor represented that production would be made by Wednesday, February 2, 2022.  *See* Emails between counsel attached hereto marked as **Exhibit L** at pgs. 1-3.

30.    In reliance thereon, Creditors scheduled the Debtor's deposition for Friday, February 4, 2022.

31.    Thereafter, on Wednesday, February 2, 2022, the Debtor produced over 800 pages of documents.

32.    But importantly, tax returns and K-1s were not included as part of the Debtor's February 2, 2022 production.

33.    Also, notably, the Debtor's February 2, 2022 production included bank statements, with missing pages and practically invisible redactions made in whiteout for seven (7) different bank accounts: (i) Artisans #2968; (ii) TD #3512; (iii) BBVA #7965; (iv) BBVA # 8953; (v) BBVA # 9759; (vi) BBVA #1519; and (vii) BBVA #2888.

### a.    The Debtor's Delay in Producing Tax Returns and K-1s, and its Misrepresentations Relating Thereto

34.    Thereafter, on Thursday, February 3, 2022, when Creditors asked for an explanation for the Debtor's failure to produce its tax returns and K-1s, the Debtor represented that its scanner stopped working and that the debtor was "actively trying to find a workaround including

8

getting a new scanner…" *See* Emails between counsel attached hereto marked as **Exhibit L** at pgs. 4-8.

35.     In reliance thereon, Creditors re-scheduled the Debtor's deposition to Monday, February 7, 2022.

36.     On February 4, 2022, the debtor produced tax returns and K-1s for 2018 and 2019. Copies of the 2018 and 2019 tax returns and K-1s produced are attached hereto marked as **Exhibit M** and **Exhibit N**, respectively.

37.     Notably, the production was made two days later than when the Debtor represented production was expected to be made.

38.     And, because of the Debtor's delay in production, Creditors were forced to postpone the Debtor's deposition, which, in turn, forced the postponement of the hearing on the motion to dismiss by a month (from February 9, 2022 to March 9, 2022).

39.     Creditors have since learned, however, that the debtor's scanner issues were, in fact, resolved well before the originally scheduled deposition, and that the debtor's tax returns and k-1s could therefore have easily been produced in advance of the originally scheduled deposition, without the need for any postponements. *See* Emails between counsel attached hereto marked as **Exhibit L** at pgs. 20-23.

>   **b.     The Debtor's Falsified Tax Returns and K-1s, and its Misrepresentations Relating Thereto**

40.     The tax returns that the Debtor produced were not dated.

41.     And, when Creditors asked for confirmation that the tax returns were, in fact, complete and filed with the IRS, the Debtor represented that the tax returns produced were indeed filed with the IRS, that they were filed on September 3, 2019 and October 12, 2020, respectively,

and that they are "printout[s] of… exactly what was filed [with the IRS]." *See* Emails between counsel attached hereto marked as **Exhibit L** at pgs. 9-12.

42.    The Debtor also testified at its deposition held on February 7, 2022 that the tax returns and K-1s produced were filed with the IRS. *See* Deposition transcript attached hereto marked as **Exhibit O** at pgs. 57 – 60.

43.    Creditors have since learned, however, that the tax returns and K-1s produced were, in fact, never filed with the IRS.  *See* IRS Proof of Claim #2 attached hereto marked as **Exhibit P**; *see also* Emails between counsel attached hereto marked as **Exhibit L** at pgs. 9-13.

    **c.**    **The Debtor's Unlawful Redaction of its Bank Statements Before Producing Same**

44.    The Debtor testified at its deposition held on February 7, 2022 that it redacted its bank statements before they were produced to my clients. *See* Deposition transcript attached hereto marked as **Exhibit O** at pg. 113-115.

45.    The redactions were made with whiteout, making it impossible for Creditors to see all redactions made by the Debtor.  Of the redactions visible to Creditors, it appears as though the Debtor redacted recipient account names and numbers for several transfers.

46.    Also, the Debtor failed to provide any sort of privilege log or other valid legal explanation for the redactions made.

    **d.**    **The Debtor's Failure to Produce Cancelled Checks, and Evasive Deposition Testimony with Respect Thereto**

47.    The Debtor failed to produce cancelled checks from 2018 to the present, despite being Ordered by the Court to do so.

48.    The failure to produce checks, wire transfer receipts, and other information has concealed the whereabouts of an approximate $7.3 million.

/181034/1/#46654167 v1

49.     And then, the Debtor testified at its deposition held on February 7, 2022 that it could not answer certain of Creditors' questions without looking at cancelled checks. *See* Deposition transcript attached hereto marked as **Exhibit O** at pg. 36 – 37.

e.     **The Debtor's Failure to Disclose at Least Two Bank Accounts, and Failure to Produce any Bank Statements Therefor**

50.     On February 10, 2022, days after the Debtor's deposition, the Debtor produced a Cashier's check dated September 18, 2019 in the amount of $2.5 million that was drawn on and deposited into previously undisclosed accounts of the Debtor (BBVA #1186 and TD #3053). *See* Emails between counsel attached hereto marked as **Exhibit L** at pgs. 20-23.

51.     The TD Bank account #3053 and BBVA account #1186 were not previously disclosed to Creditors.  And, to date, the Debtor has not produced any bank statements or copies of cancelled checks for either of those two bank accounts.

f.     **The Debtor's Purchase of a Nearly $1 Million Beach House for the Benefit of Insider(s), and its Misrepresentations Relating Thereto**

52.     Upon information and belief, the Debtor committed perjury in its deposition regarding nearly $1 million of transfers to Tunnell & Raysor, P.A.

53.     The debtor's bank statements reflect that the debtor transferred a total of $956,343.10 to the law firm Tunnell & Raysor, P.A. between June 4, 2019 and July 19, 2019. *See* Debtor's BBVA #7965 Bank Statements attached hereto marked as **Exhibit Q**.

54.     And, Delaware land records show that: (i) a few days later, Addy Road LLC, an entity owned by the Debtor's principal, Deborah Mott, purchased a property located at 20 Addy Road, Bethany Beach, DE 19930 (the "**Bethany Beach Property**"); (ii) Tunnell & Raysor, P.A. assisted Addy Road LLC in the closing; and (iii) the purchase price was $930,000 exclusive of

other closings costs. *See* Sussex County Land Records, book 5094, page 150 attached hereto marked as **Exhibit R**.

55.    The Debtor testified at its deposition held on February 7, 2022 that its payment to Tunnell & Raysor, P.A. were unrelated to Addy Road LLC's purchase of Bethany Beach Property, and that rather that transfer was for professional services provided to the Debtor and related to the TSI Lawsuit. *See* Deposition transcript attached hereto marked as **Exhibit O** at pgs. 30-34, 107 - 108.

56.    However, since the deposition, Creditors' counsel, Michael Moody, Esq. contacted Tunnell & Raysor, P.A.  And, Tunnell & Raysor, P.A. represented that they have never provided any legal services for the Debtor.  Instead, Tunnell & Raysor, P.A.'s only connection with the Debtor, if any, appears to be that they assisted Addy Road, LLC and Deborah Mott with the purchase of the Bethany Beach Property.

   **g.    The Debtor's Purchase of a Missouri House for the Benefit of Insider(s), and its Misrepresentations Relating Thereto**

57.    Upon information and belief, the Debtor made misrepresentations in its deposition regarding a transfer of $341,117.04 to Coffelt Land Title and a transfer of $75,072.00 to a McBee Custom Homes.

58.    The Debtor's bank statements reflect that the Debtor transferred $75,072.00 to McBee Custom Homes on June 11, 2020.  *See* Debtor's BBVA #7965 Bank Statements attached hereto marked as **Exhibit Q**;

59.    The Debtor's bank statements reflect that the Debtor transferred a total of $341,117.04 to Coffelt Land Title on August 10, 2020.  *See* Debtor's BBVA #7965 Bank Statements attached hereto marked as **Exhibit Q**; *see also* Debtor's BBVA #9759 Bank Statements attached hereto marked as **Exhibit S**.

60.     And, Missouri land records show that, also on August 10, 2020, the Debtor's principal, Deborah Mott, purchased a property located at 1059 SW Conch Circle, Lees Summit, MO 64064 (the "**Missouri Property**") from McBee Custom Homes for a purchase price of $416,172.00 exclusive of other closings costs.  *See* Jackson County Land Records attached hereto marked as **Exhibit T** and **Exhibit U**.

61.     During its deposition, however, the Debtor refused to admit/was extremely evasive in acknowledging: (i) that its principal, Deborah Mott, owns the Missouri Property; and (ii) that the funds used to purchase the Missouri Property were paid by the Debtor.  *See* Deposition transcript attached hereto marked as **Exhibit O** at pgs. 61-62, 88 -95.

**h.      The Debtor's Purchase of a Florida House for the Benefit of Insider(s), and its Misrepresentations Relating Thereto**

62.     Upon information and belief, the Debtor made misrepresentations in its deposition regarding a transfer of $319,849.91 to Southern Title.

63.     The Debtor's bank statements reflect that the Debtor transferred $319,849.91 to Southern Title on April 12, 2018.  *See* Debtor's BBVA #8953 Bank Statements attached hereto marked as **Exhibit V**.

64.     And, Florida land records show that: (i) the very next day, on April 13, 2018, the Debtor's principals, Deborah Mott and her husband, John S. Maciorowski, purchased a property located at 710 Riverside Drive, Ormond Beach, FL 32176 (the "**Florida Property**"); (ii) Southern Title assisted Ms. Mott and Mr. Maciorowski in the closing; and (iii) the purchase price was $320,000.00 exclusive of other closings costs.  *See* Volusia County Land Records, book 7533, page 3497 attached hereto marked as **Exhibit W**.

65.     During its deposition, however, the Debtor refused to admit/was extremely evasive in acknowledging: (i) that its principals, Deborah Mott and her husband, John S. Maciorowski,

/181034/1/#46654167 v1

own the Florida Property; and (ii) that the funds used to purchase the Florida Property were paid by the Debtor. *See* Deposition transcript attached hereto marked as **Exhibit O** at pgs. 95 – 100, 137-139.

66.     Also notably, in the TSI Lawsuit, the Debtor made false representations to Creditors that the Debtor's transferr of $319,849.91 to Southern Title on April 12, 2018 was to "TEZA MARINE INC" for "MARINE TRANSPORT CLIN 0016."

i.      **The Debtor's Misrepresentations Relating to its Scheduled Executory Contracts**

67.     The Debtor testified at its deposition held on February 7, 2022 that both contracts listed on its Schedule G have the potential to generate revenues for the Debtor. *See* Deposition transcript attached hereto marked as **Exhibit O** at pgs. 165-168 and pgs. 207- 210.

68.     But, Creditors also learned at the Deposition, from representations made by counsel to the Department of Justice, that the Mexico contract listed on the Debtor's schedule G was actually terminated by the government in 2019. *See* Deposition transcript attached hereto marked as **Exhibit O** at pg. 210.

j.      **The Debtor's Failure to Disclose Assets and Other Required Information on its Schedules and SOFA**

69.     As noted above, the Debtor's schedule A/B reflects that the debtor has no office furniture, fixtures, equipment or machinery. *See* Debtor's Schedules attached hereto marked as **Exhibit H.**

70.     However, the Debtor's bank statements reflect that the Debtor purchased furniture. And, the Debtor testified at its deposition held on February 7, 2022 that the furniture purchased was office furniture for the Debtor. *See* Deposition transcript attached hereto marked as **Exhibit O** at pg. 57.

14

71.     Also, the debtor testified at its deposition that the debtor has a "financial computer."  *See* Deposition transcript attached hereto marked as **Exhibit O** at pg. 83.[2]

## IX.     Creditors' Counsels' Multiple Emails and Phone Calls Alerting Debtor's Counsel of the Foregoing Misconduct and Creditors' Contemplated Requested for Rule 37 Sanctions

72.     Creditors' counsel has alerted Debtor's counsel of the foregoing misconduct, in great detail, and on numerous occasions, through both e-mails and phone calls.   In those communications Creditors' counsel made clear that it sought a substantive response from the Debtor and supporting documentation in explanation of the Debtor's apparent misconduct. *See* Emails between counsel attached hereto marked as **Exhibit L** at pgs. 13 – 27.

73.     But, to date, the Debtor has failed to provide any additional document, information or explanation to Creditors.

## LEGAL DISCUSSION

74.     Through this Motion, Creditors seek an Order, pursuant to Bankruptcy Code section 105(a) and Federal Rule 37, made applicable to Creditors' Motion to Dismiss through Bankruptcy Rules 9014(c) and 7037: (i) declaring the Debtor in violation of Federal Rule 37; (ii) referring this matter to the United States Attorney for a criminal investigation into bankruptcy fraud, perjury and other crimes; (iii) directing the Debtor to pay all of Creditors' fees and costs associated with Creditors' discovery in this bankruptcy case (past and future); (iv) directing the Debtor to pay all of Creditors' fees and costs associated with this Motion; (v) directing the Debtor to produce bank statements for all accounts without any missing pages or redactions; (vi) directing the Debtor to produce all cancelled checks from 2018 to the present for all accounts; (vii) granting

---

[2] The Debtor specifically testified that it operates Pinnacle Accounting Software on this computer. It is Creditors' understanding that the Pinnacle software is a powerful accounting solution capable of producing thousands of detailed, organized reports.  In the process of discovery, not a single document has been produced by the Debtor from the Pinnacle system.

Creditors derivative standing to pursue fraudulent transfer adversary action(s) against the Debtor's insiders; (viii) dismissing the above-captioned bankruptcy case; (ix) temporarily restraining the Debtor's insiders from dissipating/incumbering assets outside of the ordinary course; and (x) imposing other sanctions as this Court deems just and proper.

75.    Federal Rule 37, made applicable to bankruptcy contested matters through Bankruptcy Rules 9014(c) and 7037 states, in relevant part:

> (2) *Sanctions Sought in the District Where the Action Is Pending.*
> (A) For Not Obeying a Discovery Order. If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).

76.    Federal Rule 37 is designed to address misconduct on the part of a party to the litigation.

77.    Rule 37 sets forth a non-exclusive list of sanctions available.  The type of sanctions awarded for a Rule 37 violation is committed to the "sound discretion" of the court. *See, DiGiegorio v. First Rediscount Corp.*, 506 F. 2d 761, 788 (3rd Cir. 1974).

78.    Courts have long recognized their own inherent power to protect themselves and other parties from various forms of bad faith litigation, including the falsification of evidence.

79.    In *Hazel Atlas Glass Co. v. Hartford-Empire Co.*, the Supreme Court emphasized that this inherent power is a crucial mechanism for protecting the integrity of the judicial process. Specifically, the Supreme Court said:

> tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944) (*superseded in part by statute on other grounds*).

80.    And, the inherent power to "fashion appropriate sanction[s] for conduct which abuses the judicial process" was also reaffirmed by the Supreme Court in *Chambers v. NASCO, Inc.* 501 U.S. 32, 44 (1991).

81.    The type of sanctions awarded must be just, and must specifically relate to the claim or claims at issue within the discovery order. See, *Ins. Corp. of Ireland, Ltd. V. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).

82.    Courts have dealt with litigants who fabricated evidence harshly and with dismissal. *See*, *Gilmer v. Colorado Institute of Art*, No. 00-1192, 12 Fed. Appx. 892 (10th Cir. 2001) (unpublished opinion affirming dismissal for fabrication of evidence); *McDowell v. Seaboard Farms of Athens, Inc.*, No. 95-609-CIV-ORL-19, 1996 WL 684140, (M.D. Fla. 1996) (dismissing plaintiff's discrimination claim where a diary claimed to have been contemporaneously maintained

17

was shown not to align with the days of the week for the year in which the occurrences were alleged to have taken place); *Pope v. Fed. Express Corp.*, 138 F.R.D. 675 (W.D. Mo. 1990) (dismissing sexual harassment complaint where plaintiff fabricated a document to support claim), *aff'd in part, vacated in part on other grounds*, 974 F.2d 982 (8th Cir. 1992); *Munshani v. Signal Lake Venture Fund II, LP*, 805 N.E. 998 (Mass. App. Ct. 2004) (e-mail created to overcome statute of frauds defense).

83.    The most common form of monetary sanction is an award of the attorney fees and expenses incurred by the other side of the case.   *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017).

84.    Once a party sets out on a course of bad faith litigation, it taints the entire litigation, and the court may vindicate itself by requiring the bad faith litigator to pay all of its opponent's attorney fees and expenses. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 56 (1991); *see also Synanon Found., Inc. v. Bernstein*, 517 A.2d 28, 43 (D.C. 1986) (once a party embarks on a "pattern of fraud," and "[r]egardless of the relevance of these [fraudulent] materials to the substantive legal issue in the case," this is enough to "completely taint [the party's] entire litigation strategy from the date on which the abuse actually began").

85.    A court also may impose additional monetary sanctions—in the form of fines or punitive damages— above and beyond the specific amount of the innocent party's fees and expenses. *Jemison v. Nat'l Baptist Convention*, 720 A.2d 275, 285 (D.C. 1998) (punitive damages may be imposed if court finds that bad faith litigator acted with malice).

86.    Here, as detailed above, the Debtor has engaged in serious and intentional misconduct in connection with discovery relating to Creditor's Motion to Dismiss, in efforts to

mislead and evade Creditors, mislead the Court, and gain tactical advantage in this bankruptcy case.

87.    More specifically, the Debtor has: (i) made misrepresentations relating to its delay in producing tax returns and K-1s; (ii) produced false tax returns and K-1s, and made misrepresentations relating thereto; (iii) unlawfully redacted its bank statements before producing same; (iv) failed to produce cancelled checks, and gave evasive deposition testimony relating thereto; (v) failed to disclose at least two of its bank accounts - a TD Bank account #3053 and a BBVA account #1186, and failed to produce any bank statements therefor; (vi) purchased multiple pieces of real estate for the benefit of insiders (including a nearly $1 million beach house, a nearly half a million dollar Missouri house, and a Florida house), and made misrepresentations and gave evasive testimony relating thereto; (vii) made misrepresentations relating to its scheduled executory contracts; and (viii) failed to disclose assets and other required information on its schedules and SOFA.

88.    Creditors' counsel has alerted Debtor's counsel of the foregoing misconduct, in great detail, and on numerous occasions, through both e-mails and phone calls.  In those communications Creditors' counsel made clear that it sought a substantive response from the Debtor and supporting documentation in explanation of the Debtor's apparent misconduct.

89.    But, to date, the Debtor has failed to provide any additional document, information or explanation to Creditors.

## **CONCLUSION**

The depth and breadth of the Debtor's misconduct is only summarily addressed here.  The Debtor has engaged in serious and intentional misconduct in connection with discovery relating to Creditor's Motion to Dismiss, in efforts to mislead and evade Creditors, mislead the Court, and

gain tactical advantage in this bankruptcy case.  The Debtor must be appropriately sanctions by the Court.

WHEREFORE, Creditors respectfully request that the Court enter an Order, pursuant to Federal Rule 37: (i) declaring the Debtor in violation of Federal Rule 37; (ii) referring this matter to the United States Attorney for a criminal investigation into bankruptcy fraud, perjury and other crimes; (iii) directing the Debtor to pay all of Creditors' fees and costs associated with Creditors' discovery in this bankruptcy case (past and future); (iv) directing the Debtor to pay all of Creditors' fees and costs associated with this Motion; (v) directing the Debtor to produce bank statements for all accounts without any missing pages or redactions; (vi) directing the Debtor to produce all cancelled checks from 2018 to the present for all accounts; (vii) granting Creditors derivative standing to pursue fraudulent transfer adversary action(s) against the Debtor's insiders; (viii) dismissing the above-captioned bankruptcy case; (ix) temporarily restraining the Debtor's insiders from dissipating/incumbering assets outside of the ordinary course; and (x) imposing other sanctions as this Court deems just and proper.

Dated:  February 16, 2022          KASEN & KASEN, P.C.

                                   */s/ Jenny R. Kasen*_____
                                   Jenny R. Kasen, Esquire (DE Bar No. 5849)
                                   The Brandywine Building
                                   1000 N. West Street, Suite 1200
                                   Wilmington, DE 19801
                                   Telephone: (302) 652-3300
                                   Facsimile: (856) 424-7565
                                   E-Mail: jkasen@kasenlaw.com

                                        -and-

                                   MICHAEL H. MOODY LAW, P.A.

                                   */s/ Michael H. Moody*_____
                                   Michael Moody, Esq.

/181034/1/#46654167 v1

1881-A Northwood Center Blvd
Tallahassee, FL 32303
Telephone: (850) 739-6970
E-Mail: Michael.Moody@michaelhmoodylaw.com

-and-

GRAYROBINSON, P.A.

*/s/ Leonard M. Collins*
Leonard M. Collins, Esq. (FBN 423210)
301 S. Bronough Street, Suite 600
Tallahassee, FL 32301
Telephone: (850) 577-9090
E-Mail: Leonard.Collins@gray-robinson.com

*Counsel to GPDEV, LLC and*
*SIMONS EXPLORATION, INC.*