| Case | TSI |
|---|---|
| Issue Code | Acosta's Access To Business Records |

| Teams Hearing 3-9-22 | | |
|---|---|---|
| 1 | 219:17 - 220:04 | 219:17    Q    Okay.  Are you familiar with what accounting system 18 the company uses? 19  A    I know the name of it.  I don't have any operating 20 experience on it. 21    Q    Do you have access to it? 22  A    I could have access to it within, I want to say, 48 23 hours. 24    Q    Do you have access to the accounting system?  Have 25 you ever accessed it? 220:01  A    I have not. 02    Q    Do you have access to any of the debtor's --  any 03 of the debtor's bank accounts? 04  A    I do not. |
| 2 | 220:09 - 220:14 | 220:09    Q    Referenced they had an accountant earlier.  What's 10 the name of the accountant that works with TSI? 11  A    As I stated, I don't have the name of the accountant 12 that helped with this. 13    Q    You know where they're located? 14  A    I do not. |
| 3 | 221:14 - 221:16 | 221:14    Q    Do you have access to the debtor's tax accounting 15 software? 16  A    I -- I can go access it.  It's Turbo Tax. |
| 4 | 221:22 - 222:05 | 221:22    Q    Do you know where the assets of the corporation are 23 located? 24  A    We don't have assets. 25    Q    Do you have accounting computer? 222:01  A    We do have an old accounting computer. 02    Q    And where is that located? 03  A    I believe that's in Ormond Beach.  And, may I correct my 04 statement about the Ponte Vedra Beach?  That is a office, a 05 rental office.  It's not a beach house. |
| 5 | 223:18 - 223:21 | 223:18    Q    In what documents would you have demonstrating that 19 fueling occurred in January of this year? 20  A    I believe, we can get a hold -- get a hold of some 21 purchasing orders. |

| 6 | 226:02 - 226:13 | 226:02 | Q   At the time of the filing, the -- there was a |
|---|---|---|---|
| | | 03 | declaration that was prepared by Debbie Mott.  Have you |
| | | 04 | reviewed that declaration? |
| | | 05 | A   I did.  I would have to be -- have it in front of me to |
| | | 06 | be able to speak to it. |
| | | 07 | Q   Do you recall that the declaration stated that TSI |
| | | 08 | sole asset is $164,000 in a bank account at Artesian's Bank? |
| | | 09 | A   I -- I am familiar with that. |
| | | 10 | Q   And do you recall that the declaration stated that |
| | | 11 | the only other asset was the receivable from FEMA? |
| | | 12 | A   I'd have to -- I'd want to see that.  I know we -- I |
| | | 13 | know we put in the receivables for the FEMA. |

| 7 | 227:01 - 227:24 | 227:01 | Q   And the first day declaration did not mention |
|---|---|---|---|
| | | 02 | anything about receiving 1.2 million dollars a year for deep |
| | | 03 | water port contracts.  Can you explain why that would be? |
| | | 04 | A   I believe we just received the information from Lindsey |
| | | 05 | Blee. |
| | | 06 | Q   What information did you receive? |
| | | 07 | A   Our averages.  We called John Canal and asked, you know, |
| | | 08 | what was our -- our average for the past two years and they |
| | | 09 | did the numbers and they averaged about 1.2 per year. |
| | | 10 | Q   That is 1.2 of what? |
| | | 11 | A   1.2 million. |
| | | 12 | Q   1.2 million dollars of gross -- what -- what is |
| | | 13 | that -- what does that number reflect? |
| | | 14 | A   That's -- that's our average income from the DLA fueling |
| | | 15 | contract for the last two years. |
| | | 16 | Q   Is that gross revenue or net revenue? |
| | | 17 | A   I believe it's net. |
| | | 18 | Q   So, your testimony is that the company has received |
| | | 19 | 1.2 million dollars in net revenue over the last two years? |
| | | 20 | A   Best to my knowledge, yes. |
| | | 21 | Q   Your declaration states the company received 1.2 |
| | | 22 | million a year for -- of gross revenue.  Do you know why your |
| | | 23 | declaration would be inaccurate? |
| | | 24 | A   I apologize.  I'm -- I'm dyslexic.  I meant gross. |

| 8 | 228:22 - 229:02 | 228:22 | Q   Why haven't you produced any receipts for fuel |
|---|---|---|---|
| | | 23 | delivery since September of 2021? |
| | | 24 | A   Did you request those? |
| | | 25 | Q   Yes. |
| | | 229:01 | A   Yeah, I -- I -- I didn't see that.  I would have |
| | | 02 | produced them.  I apologize. |

| 9 | 230:23 - 232:12 | 230:23 | Q    Who is TSI Gulf Coast, LLC? |
|---|---|---|---|
| | | 24 | A    That's my company. |
| | | 25 | Q    And what does your company do? |
| | | 231:01 | A    We would do logistics and I would bid on, you know, |
| | | 02 | subcontracts if anybody needed any logistic help.  It didn't |
| | | 03 | pan out. |
| | | 04 | Q    Is that the same business that TSI is in? |
| | | 05 | A    No.  I would -- I -- I subbed to TSI on -- on -- on some |
| | | 06 | movement. |
| | | 07 | Q    What does that mean? |
| | | 08 | A    I subcontracted TSI on movement for containers coming |
| | | 09 | back from the Jackson Port -- Jacksonville Port. |
| | | 10 | Q    Didn't you already get paid for that? |
| | | 11 | A    It's not payment for me. |
| | | 12 | Q    Do you dispute that TSI Gulf Coast received at |
| | | 13 | least $757,000 between 2018 and 2021? |
| | | 14 | A    I'm not going to dispute it.  I'm not going to argue it. |
| | | 15 | Q    And do you dispute that you received approximately |
| | | 16 | $1,276,000 from TSI between 2018 and 2021? |
| | | 17 | A    If that's what the numbers say. |
| | | 18 | Q    Do you have your K1s reflecting the amounts you |
| | | 19 | received from TSI? |
| | | 20 | A    I'm not going to comment on personal taxes. |
| | | 21 | Q    Please answer the question. |
| | | 22 | A    I'd have to see the numbers, but if that's what the |
| | | 23 | taxes say on the -- then, yes. |
| | | 24 | Q    So, your testimony is you received K1s for each |
| | | 25 | year from T -- from TSI? |
| | | 232:01 | A    Yes. |
| | | 02 | Q    Okay.  And your company, TSI Gulf Coast, LLC, did |
| | | 03 | it receive a 1099 or other document from TSI? |
| | | 04 | A    Yes, it did, I believe.  Yes. |
| | | 05 | Q    Okay.  And when -- when did it receive that?  When |
| | | 06 | was the last one -- |
| | | 07 | A    I'm sorry.  I apologize.  I did not get a 1099 from TSI. |
| | | 08 | I apologize. |
| | | 09 | Q    Do you know why you would not have received a 1099 |
| | | 10 | if you were subcontracting from them? |
| | | 11 | A    I -- I couldn't say I wouldn't be able to speak to what |
| | | 12 | was going on with the back office at that point. |
| 10 | 246:03 - 246:04 | 246:03 | Q    You have access to the debtor's books and records? |
| | | 04 | A    I do.  Not in front of me right now. |

| Case | TSI |
|------|-----|
| Issue Code | 1 Ormond Beach Transfer To D. Mott |

| MOTT, DEBORAH 2/7/22 VOL 1 | | |
|---|---|---|
| 1 | 045:19 - 049:05 | 045:19  Q.      Moving to the next page on August 18th,<br>20  there's a transaction with Southern Title, where the<br>21  company transferred $170,100 to a company named<br>22  Southern Title.<br>23  A.      That's correct.  Yep, that's correct.<br>24  Q.      On the right-hand side there's a statement<br>25  that that is a subcontractor.<br>046:01  A.      No.  It says "K-1."<br>02  Q.      Well, it's marked out and then there's a<br>03  "K-1" written next to it.<br>04  A.      Yep.  It says "K-1."  That's correct.<br>05  Q.      And when did the marking out of<br>06  subcontractor and the writing of "K-1" occur here,<br>07  to your knowledge?<br>08  A.      I don't recall exactly, but probably when I<br>09  reviewed it before it was posted.<br>10  Q.      Okay.  On the same page there's a second<br>11  transaction with All Aqua Pools for $24,232.  Do you<br>12  see that?<br>13  A.      I do.<br>14  Q.      And is that also relating to the pool that<br>15  you'd had installed at some property?<br>16  A.      That says "DEM-K-1."  It was properly<br>17  applied to my capital account.<br>18  Q.      Okay.  Apologies.  I'm just looking for<br>19  something real quick.  It will just take a moment.<br>20          (Pause in the proceedings)<br>21          MR. MOODY:  We're ready to continue.<br>22  I'm sorry for the delay.<br>23  BY MR. MOODY:<br>24  Q.      It was your testimony a moment ago that this<br>25  All Aqua Pools was a K-1 expenditure for a pool for<br>047:01  your home; is that right?<br>02  A.      Correct.<br>03  Q.      In the District litigation, the All Aqua<br>04  transaction was presented as a transport truck for<br>05  CLIN 0016.  Can you explain why it was represented |

06    to the federal court that the All Aqua transaction
07    was a transport truck transaction?
08    A.    Mr. Moody I wasn't the corporate
09    representative for the trial in Florida.  I didn't
10    provide any testimony, and I didn't provide any
11    financial reports.  I'm sorry.  I have no firsthand
12    knowledge of this, whatever you've got on the
13    screen.
14    Q.    Again on the next page here is another
15    document that was presented to the federal court
16    representing that the All Aqua transaction was a
17    transport transaction.
18    A.    Same answer.
19    Q.    Who would have created this document?
20    A.    I have no idea.
21    Q.    What is your role -- what is your exact role
22    with the company?
23    A.    I'm a member of the management committee.  I
24    did create this document, however.
25    Q.    Okay.
048:01    A.    And that's correct.
02    Q.    And this document shows a transaction with
03    Southern Title in the amount of $170,000; is that
04    right?
05    A.    That's correct.
06    Q.    In this District Court litigation there was
07    this transaction that added up to the same amount,
08    but it was identified as Tesza Marine.  Do you have
09    any idea why the company would have reflected the
10    Southern Title transactions as Tesza Marine in the
11    district litigation?
12    A.    Mr. Moody, once again, I was not the
13    corporate representative in the Florida litigation.
14    I did not provide any testimony or reports.
15    BY MS. KASEN:
16    Q.    I'm sorry.  Does that -- are you answering
17    that you don't know the answer or that you're just
18    refusing to answer?  Can you please clarify?
19    A.    Mr. Moody's questioning me, Ms. Kasen.
20    BY MR. MOODY:
21    Q.    Can you answer again why there's a
22    discrepancy between what your report -- records
23    reflect and what was presented to the District

|   |   | 24 | Court? |
|---|---|---|---|
|   |   | 25 | A.      Mr. Moody, I was not the corporate |
|   |   | 049:01 | representative.  I did not provide any financial |
|   |   | 02 | documents, and I believe there was a lot of motions |
|   |   | 03 | back and forth.  And it's all over the docket about |
|   |   | 04 | attorney work product versus actual exhibits.  But I |
|   |   | 05 | have no firsthand knowledge of any of it. |
| 2 | 056:09 - 056:18 | 056:09 | Q.      Okay.  Going down to the next page, there is |
|   |   | 10 | a Tropical Fusion -- "Tropicasual Furniture Ormond |
|   |   | 11 | Beach [Florida]," listed for $4,000.  Do you see |
|   |   | 12 | that? |
|   |   | 13 | A.      I do. |
|   |   | 14 | Q.      Is that for furniture at a property that you |
|   |   | 15 | own? |
|   |   | 16 | A.      That is a payment that was appropriately |
|   |   | 17 | booked to my capital account and John Maciorowski's |
|   |   | 18 | capital account. |
| 3 | 057:10 - 058:03 | 057:10 | Q.      Let's go forward a few pages here.  Do you |
|   |   | 11 | see that there was a transaction on April 12th, 2018 |
|   |   | 12 | with Southern Title in the amount of 319,849.91? |
|   |   | 13 | A.      No, I don't know where you are. |
|   |   | 14 |             Oh, I see, yes.  4/12/2018.  I do. |
|   |   | 15 | Q.      Do you recognize that? |
|   |   | 16 | A.      I do. |
|   |   | 17 | Q.      And what was the purpose of this |
|   |   | 18 | transaction? |
|   |   | 19 | A.      It was a K-1 payment, half to me, half to |
|   |   | 20 | John Maciorowski. |
|   |   | 21 | Q.      In the next line it says "Kalinhome |
|   |   | 22 | Furnishings Ormond Beach [Florida], [$3],025, OFFICE |
|   |   | 23 | FURNITURE." |
|   |   | 24 | A.      That's correct.  That was for a TSI office. |
|   |   | 25 | Q.      And where was the TSI office located? |
|   |   | 058:01 | A.      In Ormond Beach. |
|   |   | 02 | Q.      Is that -- was that inside of your home? |
|   |   | 03 | A.      Yes.  Actually, it was two offices. |
| 4 | 065:20 - 067:12 | 065:20 | Q.      Okay.  And this one reflected on |
|   |   | 21 | April 12th of 2018 that there was a transfer to |
|   |   | 22 | Southern Title and there's a "(DM/JM)" next to it, |
|   |   | 23 | and the amount is 319,849.91.  Do you see that? |
|   |   | 24 | A.      I do. |
|   |   | 25 | Q.      What was that money used for? |

| | | |
|---|---|---|
| | | 066:01   A.     That money was transferred to the members' |
| | | 02  capital accounts, and -- it was transferred to the |
| | | 03  members' capital accounts. |
| | | 04   **Q.     Okay.  And when I go into the records that** |
| | | 05  **were presented to the District Court in litigation** |
| | | 06  **that are the exact same day from Account No. 8593 --** |
| | | 07  **this is April 12th of 2018 -- there's a transaction** |
| | | 08  **for the exact same dollar amount, 319,849.91.  Do** |
| | | 09  **you see that?** |
| | | 10   A.     Mr. Moody, there was a lot of litigation in |
| | | 11  that case about records, about the validity of |
| | | 12  records, about the authenticity of records on both |
| | | 13  sides.  So I can't definitively speak to any records |
| | | 14  you're producing from that case.  As I said -- |
| | | 15   **Q.     My question --** |
| | | 16   A.     -- I wasn't the corporate representative.  I |
| | | 17  didn't provide any records.  I didn't -- I was not |
| | | 18  involved other than the deposition at the beginning |
| | | 19  of the filing. |
| | | 20   **Q.     Okay.  But my question to you is:  Do you** |
| | | 21  **see the transaction detail entered at the bottom, it** |
| | | 22  **says "Checking No. 8953"?  Do you see that?** |
| | | 23   A.     I'm sorry, I can't comment on a document |
| | | 24  that I don't have firsthand knowledge about. |
| | | 25   **Q.     You can't comment as to whether this says** |
| | | 067:01  **"Checking Account ending 8953"?** |
| | | 02   A.     No, sir.  I don't have firsthand knowledge |
| | | 03  about this document. |
| | | 04   **Q.     So this document shows a transaction in the** |
| | | 05  **exact same dollar amount that's listed in your** |
| | | 06  **ledger, 319,849.91.  But it says it went to Tesza** |
| | | 07  **Marine instead of Southern Title Holdings Company.** |
| | | 08   A.     I'm comfortable with the documents I |
| | | 09  provided in this bankruptcy case, in the ledger, and |
| | | 10  I have firsthand knowledge off those documents.  I |
| | | 11  have no firsthand knowledge of these documents.  I |
| | | 12  have no idea where they came from. |
| 5 | 095:06 - 095:08 | 095:06             **Do you own property at 705 Riverside** |
| | | 07  **Drive, Ormond Beach, Florida?** |
| | | 08   A.     I'm waiting for my lawyer to object. |
| 6 | 095:12 - 096:08 | 095:12   A.     Yes, I own -- yes. |
| | | 13  BY MR. MOODY: |

|   |   |   |
|---|---|---|
|   |   | 14  Q.      When did you acquire that property? |
|   |   | 15  A.      I don't recall exactly.  I own it with my |
|   |   | 16  husband. |
|   |   | 17  Q.      Do you remember it being on or about April |
|   |   | 18  of 2018 when that property was purchased? |
|   |   | 19  A.      No. |
|   |   | 20  Q.      No, as in that's not -- |
|   |   | 21  A.      I don't recall. |
|   |   | 22  Q.      Okay.  Do you recognize this document? |
|   |   | 23  A.      About a transaction in my personal -- |
|   |   | 24  individual capacity with my husband, yes. |
|   |   | 25  Q.      Okay.  Is this a deed for your purchase of |
|   |   | 096:01  the property at 705 Riverside Drive dated |
|   |   | 02  April 13th of 2018? |
|   |   | 03  A.      Yes. |
|   |   | 04  Q.      Is this your homestead? |
|   |   | 05  A.      I don't know what that means. |
|   |   | 06  Q.      Do you claim -- do you reside in this |
|   |   | 07  property at all? |
|   |   | 08  A.      Yes. |
| 7 | 097:12 - 098:16 | 097:12  Q.      Earlier we were looking at TSI document 938. |
|   |   | 13  It reflects 319,849.91 to Southern Title on |
|   |   | 14  April 12th of 2018.  Do you remember that? |
|   |   | 15  A.      I do. |
|   |   | 16  Q.      Did the money that was transferred from TSI |
|   |   | 17  go to purchase this residence at 705 Riverside |
|   |   | 18  Drive? |
|   |   | 19  A.      No, it wasn't transferred from TSI.  It was |
|   |   | 20  paid for with money my husband and I earned and we |
|   |   | 21  got out of our K-1 and then we paid for it.  That's |
|   |   | 22  why it says "(DM/JM)" and then "K-1." |
|   |   | 23  Q.      So you're telling me that there was not a |
|   |   | 24  withdrawal from account No. 8953, a TSI account in |
|   |   | 25  the amount of 319,849 on April 12th of 2018?  That's |
|   |   | 098:01  what your testimony is? |
|   |   | 02              MR. CROWTHER:  Objection to form. |
|   |   | 03  A.      No.  No.  I'm telling you that it was |
|   |   | 04  properly booked to my capital account and my |
|   |   | 05  husband's capital account and we purchased the |
|   |   | 06  property.  That's what I'm telling you. |
|   |   | 07  Q.      I'm not asking about your capital account. |
|   |   | 08  I'm asking where the money came from that went in to |

| | | |
|---|---|---|
| | | 09  purchase this house.  I'm not asking about your K-1.<br>10  I'm asking whether $319,000 was transferred from<br>11  TSI's bank account to Southern Title to purchase<br>12  this home.<br>13              MR. CROWTHER:  Objection to form.<br>14  A.      Mr. -- Mr. Moody, we earned the money<br>15  through our hard work, and it was booked to our<br>16  capital account and we paid for our home. |
| 8 | 104:08 - 104:24 | 104:08  Q.      Okay.  There's a permit that was pulled for<br>09  a roof on the home for 11,925.  Did the money that<br>10  was paid to the roofing company come from the<br>11  accounts of TSI?<br>12  A.      I don't believe so.  I think my husband put<br>13  that on his credit card.  But I'm not certain.<br>14  Q.      Is this an accurate picture -- although it's<br>15  black and white, is this an accurate picture of your<br>16  home and it's on the corner here?<br>17  A.      I don't -- I don't know.  I can't really<br>18  tell from this picture.  And I own the home with my<br>19  husband, so I have no idea.<br>20  Q.      Okay.  Who resides in this home?<br>21  A.      My husband and I.<br>22  Q.      And is that where you spend most of your<br>23  time?<br>24  A.      I would say so except during the summers. |

| Teams Hearing 3-9-22 | | |
|---|---|---|
| 1 | 081:23 - 084:04 | 081:23  Q.      And in your review did you also note that the debtor<br>24  paid for a property in Florida, in Ormond Beach, Florida?<br>25  A.      I -- I did.  Again, in a similar way of -- of showing<br>082:01  the -- you know a number of different you know transfers and<br>02  -- and representations of -- of expenses, it goes back to the<br>03  Florida case -- the underlying Florida case, for example.<br>04  And -- and I've notated all of the Bates number for the<br>05  Florida case I've added FL underscore, so as to not conflict<br>06  and -- and make clear that they're the Florida case Bates<br>07  number, since there would be certain overlaps.  In -- in<br>08  Florida T.S.I. Bates 22512, which is in exhibit eighty-three,<br>09  there was an -- an expense listed of $319,894.91 detailed in<br>10  that exhibit as Tesza Marine, Inc., which purportedly came<br>11  from checking account number ending 8953.  And the memo was |

12    Marine Transport claim sixteen, which was a claimed expense
13    under the -- the Florida litigation.  However, as it relates
14    to the documents received in Bankruptcy Court in Delaware, at
15    T.S.I. 991, which is in exhibit seventy-four, the expense
16    summary provided shows that this is not a business expense
17    for Tesza Marine as stated in the Florida litigation, but
18    lists this expense as to Southern Title Holdings -- well
19    Hold, which I understand is Holdings.  And, lists D.M., J.M.,
20    which is Deborah Mott and -- and John M. as K-1 in -- in the
21    notes.  So, in the bankruptcy production it's Southern Title
22    and listed as this was K-1 income to -- to Deborah Mott and -
23    - and John Maciorowski.
24         Secondly in the T.S.I. Bates number 108, which is
25    in exhibit three, this $319,894.91 transfer on April 12th of
083:01    2018 to Southern Title.  So, we -- we have you know the
02    detail that it was Southern Title.  We have the -- the
03    listing in the bank statement showing it was transferred to
04    Southern Title and that those -- you in reviewing documents
05    including the -- the warranty deed, which is exhibit sixty-
06    six, these funds were apparently used to acquire 705
07    Riverside Drive in Ormond Beach for $320,000.00.
08    **Q.    Okay.**
09    A.    There's the three nineteen transferred to Southern
10    Title, correct.
11    **Q.    Okay.  And if I look at that, exhibit number three, page**
12    **number -- T.S.I. 108, the 319,894 transfer is listed as going**
13    **to Southern Title Holdings Company; is that right?**
14    A.    Correct.
15    **Q.    But in the District Court the transfer in the exact same**
16    **amount was listed as going to a Tesza Marine, Inc; is that**
17    **right?**
18    A.    Correct.  Correct, which was one of the entities
19    mentioned earlier today.
20    **Q.    Okay.  And, ultimately did you have an opportunity to**
21    **review what we've marked as exhibit sixty-six?**
22    A.    I did.  And, that was the warranty deed for --
23    **Q.    And does that warranty deed state who prepared it?**
24    A.    Yeah, so Southern Title -- was -- was the -- the title
25    company involved in recording that deed.
084:01    **Q.    And, this deed ultimately granted property to -- to**
02    **Deborah Evan Mott and John Maciorowski; is that -- is that**
03    **right?**

**04**   A.   That's correct.

| Case | TSI |
|---|---|
| Issue Code | 2 Bethany Beach Transfer To D.Mott |

| MOTT, DEBORAH 2/7/22 VOL 1 | | |
|---|---|---|
| 1 | 030:09 - 030:25 | 030:09   Q.     I see below that there's a Tunnell & Raysor<br>10   transaction. Who is Tunnell & Raysor?<br>11   A.     They're a law firm in Delaware.<br>12   Q.     And I see the amount that was paid to them<br>13   was $928,843.10; is that right?<br>14   A.     Correct.<br>15   Q.     And it says the reason for that was<br>16   "PROFESSIONAL SERVICES." Is that right?<br>17   A.     Correct.<br>18   Q.     What professional services did they provide<br>19   to TSI?<br>20   A.     Well, they're a Delaware law firm, so they<br>21   did provide a memo on the diversity issues in the<br>22   Florida case, but I don't -- I don't know exactly<br>23   which issues. They've provided contract review<br>24   services, and I'm sure they've provided other<br>25   things. I just can't remember right now. |
| 2 | 031:02 - 033:09 | 031:02   at another exhibit. And that is ... Exhibit No. 53.<br>03                   Can you see Exhibit 53 on your<br>04   screen?<br>05   A.     I do.<br>06   Q.     What is Exhibit 53?<br>07   A.     It's a deed of trust between a non-TSI<br>08   entity and a seller of a property.<br>09   Q.     Does it list on there Tunnell & Raysor,<br>10   P.A.?<br>11   A.     It does.<br>12   Q.     And does it show the consideration paid was<br>13   $930,000?<br>14   A.     It does.<br>15   Q.     And do you own Addy Road, 20 Addy Road in<br>16   Bethany Beach, the Addy Road entity?<br>17   A.     I'm sorry. Say again. I didn't understand<br>18   what you were asking me. You garbled.<br>19   Q.     Do you own Addy Road LLC?<br>20   A.     I do.<br>21   Q.     Personally; is that right? |

| | | 22 | A.      I'm sorry.  Say again? |
|---|---|---|---|
| | | 23 | **Q.      You own 20 Addy Road LLC personally?** |
| | | 24 | A.      As an individual? |
| | | 25 | **Q.      Yes.** |
| | | 032:01 | A.      So a member of a limited liability company |
| | | 02 | member as an individual, yes. |
| | | 03 | **Q.      Did Addy Road LLC do anything for TSI?** |
| | | 04 | A.      I don't believe so, no. |
| | | 05 | **Q.      So there was a transfer from TSI on** |
| | | 06 | **July 10th of 2019 and a purchase of property by your** |
| | | 07 | **LLC using Tunnell & Raysor on July 24th of 2019.  Is** |
| | | 08 | **that --** |
| | | 09 | A.      I'm sorry.  I couldn't -- I couldn't hear |
| | | 10 | you.  Can you go back to what you were first |
| | | 11 | referencing? |
| | | 12 | MR. CROWTHER:  Counsel, you're |
| | | 13 | fading in and out.  That's what seems to be a |
| | | 14 | problem.  I'm not sure why, but you're fading in and |
| | | 15 | out as you're speaking. |
| | | 16 | **Q.      Is it your testimony today that you paid the** |
| | | 17 | **$930,000 to Addy -- to purchase the property in** |
| | | 18 | **Delaware here in the name of Addy Road LLC?  It came** |
| | | 19 | **from your own money?** |
| | | 20 | A.      I'm not testifying about anything in my |
| | | 21 | individual capacity or any other businesses other |
| | | 22 | than TSI.  That's why we are here. |
| | | 23 | **Q.      Did TSI pay the consideration for the** |
| | | 24 | **purchase of this property?** |
| | | 25 | A.      No. |
| | | 033:01 | **Q.      So there is another entity -- you had** |
| | | 02 | **$930,000 that you came up with to purchase this** |
| | | 03 | **property; is that your testimony?** |
| | | 04 | A.      My testimony, Mr. Moody -- and let's be very |
| | | 05 | clear, Mr. Moody and Ms. Kasen -- that I am here to |
| | | 06 | testify about TSI's books and records, not about me |
| | | 07 | and my individual capacity -- the judge already told |
| | | 08 | you no -- and not about any other entities that are |
| | | 09 | not owned by TSI. |
| 3 | 033:16 - 034:16 | 033:16 | **Q.      So it's testimony, if I have this correct,** |
| | | 17 | **it's your testimony that TSI did not pay the** |
| | | 18 | **$930,000 or so in funds to buy the property here** |
| | | 19 | **that's set forth in the deed prepared by Tunnell &** |

|  |  |  |  |
|---|---|---|---|
|  |  | 20 | **Raysor?** |
|  |  | 21 | A.        That's correct. |
|  |  | 22 | **Q.        Okay.  And if we were to subpoena Tunnell &** |
|  |  | 23 | **Raysor, they'll be able to show us where the funds** |
|  |  | 24 | **came from to purchase that property?** |
|  |  | 25 | A.        Once again, let's get back to TSI.  You |
|  |  | 034:01 | asked me.  I answered.  You showed me a transaction |
|  |  | 02 | that was less than the funds to pay the property. |
|  |  | 03 | Let's move on. |
|  |  | 04 | **Q.        Okay.  Moving on to the very next page,** |
|  |  | 05 | **there's a second transaction well Tunnell & Raysor** |
|  |  | 06 | **for $25,000.  Do you see that?** |
|  |  | 07 | A.        I do. |
|  |  | 08 | **Q.        And what was that payment for?** |
|  |  | 09 | A.        It was more -- what's the word I want?  It |
|  |  | 10 | was more attorneys' fees generated by trial counsel |
|  |  | 11 | in Florida on some more issues about limited |
|  |  | 12 | liability company issues.  Just more of the same. |
|  |  | 13 | **Q.        Okay.  And it's your testimony that if we** |
|  |  | 14 | **were to subpoena Tunnell & Raysor, they're going to** |
|  |  | 15 | **say the same thing?** |
|  |  | 16 | A.        I have no idea.  I'm not Tunnell & Raysor. |
| 4 | 104:25 - 105:10 | 104:25 | **Q.        Where do you spend your time in the summers?** |
|  |  | 105:01 | A.        In Bethany Beach, or in northern Virginia. |
|  |  | 02 | We don't like -- I don't like to be in Florida when |
|  |  | 03 | it's really, really hot. |
|  |  | 04 | **Q.        So do you spend your summers at 20 Addy** |
|  |  | 05 | **Road, Bethany Beach, Delaware?** |
|  |  | 06 | THE WITNESS:  Am I supposed to |
|  |  | 07 | answer this, Curtis?  We're going down -- |
|  |  | 08 | MR. CROWTHER:  Go ahead and answer. |
|  |  | 09 | THE WITNESS:  Okay. |
|  |  | 10 | A.        Sometimes, yes. |
| 5 | 105:12 - 106:12 | 105:12 | **Q.        Okay.  And I think we talked about this** |
|  |  | 13 | **before, but there was a transfer from the TSI** |
|  |  | 14 | **accounts to purchase this property for $930,000.  Is** |
|  |  | 15 | **that another situation where you're claiming that** |
|  |  | 16 | **even though the funds came from TSI, somehow you** |
|  |  | 17 | **were still entitled to that?** |
|  |  | 18 | MR. CROWTHER:  Objection to form. |
|  |  | 19 | A.        Yeah, that's not correct.  You showed a |
|  |  | 20 | document for a payment to a law firm we use for less |

| | | 21 | than the purchase price of the home you're |
| | | 22 | mentioning.  So you're incorrect. |
| | | 23 | Q.      So where did the funds come from to purchase |
| | | 24 | this home? |
| | | 25 |                  MR. CROWTHER:  Objection to form. |
| | 106:01 | A.      From my husband's and my assets. |
| | | 02 | Q.      Are you talking about your K-1 account? |
| | | 03 | A.      Oh, no.  No, no. |
| | | 04 | Q.      So you're talking about you paid for this |
| | | 05 | with other assets? |
| | | 06 | A.      With our personal assets, yes.  We've been |
| | | 07 | in business (Indiscernible) |
| | | 08 |                  THE COURT REPORTER:  I couldn't hear |
| | | 09 | you, ma'am. |
| | | 10 |                  THE WITNESS:  Me? |
| | | 11 |                  THE COURT REPORTER:  Yes. |
| | | 12 | A.      We've been in business for 21 years. |
| 6 | 107:01 - 108:11 | 107:01 | Q.      I just want to be clear.  It is your |
| | | 02 | testimony that the 946,000 that went to the same |
| | | 03 | firm that is on the deed for the Addy Beach -- Addy |
| | | 04 | Road property, your testimony is that that money |
| | | 05 | that was paid to that firm did not go to pay for the |
| | | 06 | property; is that right? |
| | | 07 | A.      I don't think that you've got the correct |
| | | 08 | number.  Could we go back to the record and take a |
| | | 09 | look at it, please? |
| | | 10 |                  (Pause in the proceedings) |
| | | 11 | Q.      On ... Okay.  Just to be clear, your account |
| | | 12 | summary for account ending 7965, TSI document |
| | | 13 | No. 859 shows a transfer to the Tunnell & Raysor |
| | | 14 | firm, withdrawal of $928,843.10 on July 10th, 2019. |
| | | 15 | A.      Could you put it up on the screen, please? |
| | | 16 |                  That's correct, for professional |
| | | 17 | services. |
| | | 18 | Q.      So that's here.  On July 10th of 2019. |
| | | 19 |                  And then on July 4th of 2019, |
| | | 20 | there's an additional $25,000 that was paid. |
| | | 21 | A.      That's correct. |
| | | 22 | Q.      And the closing occurred, or the deed was |
| | | 23 | dated July 22nd, 2019, for the Addy Road property. |
| | | 24 | A.      This is 6/4/2019. |
| | | 25 | Q.      And that was 7/10/2019. |

| | | | |
|---|---|---|---|
| | | 108:01 | A.      That's right. |
| | | 02 | Q.      So is it your testimony that money here that |
| | | 03 | was transferred to Tunnell & Raysor shortly before |
| | | 04 | the closing did not go to pay for this property? |
| | | 05 | A.      It went for professional services.  It |
| | | 06 | wouldn't have covered the -- it didn't cover the |
| | | 07 | cost of the property.  And, by the way, it's -- it |
| | | 08 | went for professional services mostly about the |
| | | 09 | diversity issue and the membership issue and all the |
| | | 10 | stuff that Mr. Collins had brought before the Court |
| | | 11 | in his particular volatile actions. |
| 7 | 137:03 - 137:05 | 137:03 | Q.      Did you -- did the debtor transfer any money |
| | | 04 | or property to Addy Road LLC? |
| | | 05 | A.      Not to my knowledge. |

| | | | |
|---|---|---|---|
| **Teams Hearing 3-9-22** | | | |
| 1 | 070:18 - 070:19 | 070:18 | Q.   Did you review records relating to a transfer of funds |
| | | 19 | for a property in Bethany Beach, Delaware? |
| 2 | 071:08 - 072:02 | 071:08 | A.   So, yes, I -- I did in reviewing the -- the full scope |
| | | 09 | of the bank records you know and trying to organize those and |
| | | 10 | understand where significant dollars you know came to and -- |
| | | 11 | or went -- went -- went to and came from, there -- there -- |
| | | 12 | there was notable transfers to a group called Tunnell and |
| | | 13 | Raysor, which ultimately the research identified as a law |
| | | 14 | firm.  And those you know transfers consisted of -- and -- |
| | | 15 | and I have noted them in the report as T.S.I. 244, which is |
| | | 16 | in exhibit four, T.S.I. 164, which is in exhibit two, and |
| | | 17 | T.S.I. 244, again in exhibit four, detailed transfers for |
| | | 18 | twenty-five thousand, $928,843.10, as well as another twenty- |
| | | 19 | five hundred dollar transfer, respectively.  Those total |
| | | 20 | $956,343.10.  It -- it -- I also reviewed and made note of in |
| | | 21 | the report exhibit 58, which is the deed to the Addy Road |
| | | 22 | property for a total consideration of $930,000.00, which was |
| | | 23 | prepared by Tunnell and Raysor, the -- the -- the law firm in |
| | | 24 | question.  So, it -- it seems apparent that the funds that |
| | | 25 | were transferred from T.S.I. accounts were used to acquire |
| | | 072:01 | this Addy Road, Bethany Beach, Delaware property.  I also |
| | | 02 | reviewed and -- and noted -- |
| 3 | 073:17 - 075:24 | 073:17 | Q.   Is this the deed that you looked at in the course of -- |
| | | 18 | of your review, Mr. Orner? |

19  A.   Yes, and I -- I believe I've referenced the -- the deed
20  as exhibit 60.  I think they may be duplicates, but in my
21  report I might have referenced a different exhibit, but this
22  is -- it's the same document, if I'm not mistaken.
23  Q.   Yes, this is exhibit 58.  And, when you -- you mentioned
24  before the dates that -- that funds were -- were transferred
25  to Tunnell and Raysor.  Can you remind us of the dates that
074:01  the money was transferred to Tunnell and Raysor?
02  A.   Yes, so June 4th of 2019, July 19th of 2019, and July
03  19th of 2019 for a total of $956,343.10.
04  Q.   Okay.  And, then this deed reflects that it was made by
05  that firm shortly after then on July 22nd; is that correct?
06  A.   July 22nd, that is correct.
07  Q.   Have you done any research or investigation into Addy
08  Road, LLC is?
09  A.   Yes, so I -- I've reviewed documents that -- that
10  demonstrate that Addy Road, LLC is registered in Florida
11  under the Florida Division of Corporations, you know Sunbiz
12  is the -- name.  The manager of that entity is Deborah Mott,
13  and the address that that entity is registered to is 705
14  Riverside Drive in Ormond Beach, which I'm aware is the
15  residence of -- of Deborah Mott.  And -- and J. Mac (sic),
16  I'll call him.  John -- we'll mess up his last name,
17  Maciorowski, her husband.
18  Q.   Okay.  And I'm -- I'm showing you now what we've marked
19  as exhibit -- 60.  Is this a copy of what you reviewed --
20  A.   Yes.
21  Q.   As the Sunbiz record?
22  A.   Correct.  And I've noted exhibit 60 in my report, as
23  well.
24  Q.   Did you attend the deposition of Deborah Mott on
25  February 2nd of 2022?
075:01  A.   I did.  I listened to the entirety of it.
02  Q.   And, did she testify with respect to the transfers to
03  the Tunnell and Raysor firm?
04  A.   Yes, my recollection specifically on this issue is that
05  she testified that Tunnell and Raysor was a law firm engaged
06  on behalf of T.S.I. with respect to work in the Florida case.
07  And repeatedly mentioned that you know one of the transfers
08  that was discussed at the time of $928,000.00 was
09  insufficient to have purchased a $930,000.00 property.
10  Obviously in total as just detailed, more than $956,000.00
11  was -- was transferred to Tunnell and Raysor, so more than

12    sufficient to have acquired the property, which again the --

13    the comments in the deposition was that Tunnel and Raysor had

14    only done legal work on behalf of T.S.I. for the Florida case

15    and had nothing to do with the -- the property acquisition.

16    **Q.    And, does it appear to you that the transfer to Tunnell**

17    **and Raysor was clearly tied to the purchase of the real**

18    **estate in Bethany Beach, Delaware?**

19    A.    Apparently so, yes it would -- it would be consistent

20    with the -- the -- the totals and the -- the dates of the

21    transfers, as well as Tunnell and Raysor action you know as

22    the agent in the -- the transaction on the property deed, et

23    cetera.  Yes, it seems clear that -- that these funds were --

24    were used to acquire this -- this property.

| Case | TSI |
|------|-----|
| Issue Code | 3 Jackson Missouri Transfer To D. Mott |

| MOTT, DEBORAH 2/7/22 VOL 1 | | | |
|---|---|---|---|
| 1 | 026:06 - 026:20 | 026:06 | Q.      Okay.  On the next page, if you scroll down, |
| | | 07 | there is a transaction with Coffelt Land Title.  Do |
| | | 08 | you recognize -- |
| | | 09 | A.      I do. |
| | | 10 | Q.      -- that transaction? |
| | | 11 |          What was that property? |
| | | 12 | A.      That was a property I purchased.  It was |
| | | 13 | booked to my capital account. |
| | | 14 | Q.      And this was paid for with money from TSI? |
| | | 15 | A.      No.  It was paid for with money from me. |
| | | 16 | Q.      So you put money into TSI to make that |
| | | 17 | payment; is that right? |
| | | 18 | A.      No.  No.  I had excess funds in my capital |
| | | 19 | account, and I withdrew those funds and made that |
| | | 20 | payment. |
| 2 | 027:15 - 028:09 | 027:15 | Q.      Moving forward to the next page of this |
| | | 16 | document there's a transaction on June 11 of 2020 |
| | | 17 | with McBee Custom Homes.  Are you familiar with that |
| | | 18 | transaction? |
| | | 19 | A.      Yes.  That's -- yes, absolutely.  That's why |
| | | 20 | there's a DM next to it and a K-1 in the notes. |
| | | 21 | Q.      Okay.  And what -- what did McBee Custom |
| | | 22 | Homes -- what kind of transaction did you have with |
| | | 23 | McBee Custom Homes? |
| | | 24 | A.      That's -- what are they called?  Not a |
| | | 25 | developer.  That's a general contractor that came in |
| | | 028:01 | and made some changes to the house I purchased. |
| | | 02 | Q.      And did you purchase a home from McBee |
| | | 03 | Custom Homes? |
| | | 04 | A.      I don't recall if that's the name or if it |
| | | 05 | was another name.  But it's -- but, once again, |
| | | 06 | we're -- we've identified the transaction.  We've |
| | | 07 | identified that it's properly booked to my capital |
| | | 08 | account, and now we need to keep -- keep asking |
| | | 09 | questions about TSI. |
| 3 | 061:15 - 062:10 | 061:15 | Q.      Okay.  Do you dispute that TSI paid for |

```
          16   property located in Jackson County, Missouri?
          17   A.      Yes.
          18   Q.      You dispute that TSI paid for property
          19   located in Jackson County, Missouri?
          20   A.      Yes.
          21   Q.      Okay.  Do you dispute that you bought the
          22   property?
          23              THE COURT REPORTER:  I'm sorry.  We
          24   can't hear you.
          25   Q.      Do you dispute that you bought property that
       062:01   TSI transferred $341,117 to Coffelt Land Title in
          02   the year 2020?
          03   A.      You'll have to show me the transaction
          04   you're referencing to show me that it's TSI.  That's
          05   what you're alleging.
          06   Q.      Do you have any knowledge of TSI paying for
          07   property in Jackson County, Missouri, in 2020?
          08   A.      Mr. Moody, you need to show the transaction
          09   that you're referencing before I can answer your
          10   question.
```

| 4 | 093:06 - 095:03 | |
|---|---|---|

```
       093:06   Q.      When we went off the record earlier, we were
          07   discussing the purchase of a property in Missouri.
          08   And I don't think you answered us as to whether you
          09   owned property in Missouri.  If I'm wrong, please
          10   correct me.
          11   A.      I'm sorry.  I couldn't hear.  You said "as
          12   to whether you" something "property in Missouri."
          13   What was the question?
          14   Q.      Do you own property in Missouri?
          15   A.      Yes.
          16   Q.      Do you know where it's located?
          17   A.      In Lees Summit.
          18   Q.      Do you know how much you paid for it?
          19   A.      I don't recall right now.
          20   Q.      Do you know where the money came from that
          21   went to buy the property?
          22   A.      My capital account at TSI.
          23   Q.      So the money came from the bank accounts of
          24   TSI into a title company in Missouri; is that right?
          25   A.      Charged to my K-1, my capital account,
       094:01   that's correct.
          02   Q.      Do you remember the amount of money that was
```

| | | |
|---|---|---|
| | | 03   conveyed? |
| | | 04   A.      I don't. |
| | | 05   **Q.      Do you remember --** |
| | | 06   A.      This is -- this is my personal information, |
| | | 07   which I didn't review. |
| | | 08   **Q.      Do you remember there being a $341,117** |
| | | 09   **transferred to Coffelt Land Title, according to your** |
| | | 10   **transaction summary records?** |
| | | 11   A.      No, I don't.  But if you'd like to show it |
| | | 12   to me. |
| | | 13   **Q.      Do you remember there being $341,000** |
| | | 14   **transferred to Coffelt Land Title in 2020 by TSI?** |
| | | 15   A.      I do not, but if you put the document up on |
| | | 16   the screen, I'll be happy to answer your question. |
| | | 17   I am sure that it was properly charged against my |
| | | 18   K-1. |
| | | 19   **Q.      Do you remember there being a transfer of** |
| | | 20   **$75,000 to McBee Custom Homes?** |
| | | 21   A.      I do not, but if you put the transaction |
| | | 22   document up on the screen, I'll be happy to comment |
| | | 23   on it.  And, once again, I'm sure it was properly |
| | | 24   charged to my K-1 |
| | | 25   **Q.      Do you remember there being -- do you** |
| | | 095:01   **remember the seller of the property that you bought** |
| | | 02   **in Missouri?** |
| | | 03   A.      No, I don't remember. |
| 5 | 100:03 - 100:12 | 100:03   **Q.      When the purchase of the Missouri property** |
| | | 04   **occurred, were there any meetings of the management** |
| | | 05   **or any other corporate meetings relating to approval** |
| | | 06   **of that transaction?** |
| | | 07                    MR. CROWTHER:  Objection to form. |
| | | 08   A.      I can't -- I can't answer that question |
| | | 09   because the basis is incorrect.  I've already |
| | | 10   established that that property was purchased through |
| | | 11   earnings and booked to my K-1.  It's not a TSI |
| | | 12   property. |

| | | |
|---|---|---|
| Teams Hearing 3-9-22 | | |
| 1 | 075:25 - 079:08 | 075:25  **Q.   All right.  Moving on, did you review documents relating** |
| | | 076:01  **to a purchase of property in Jackson County, Missouri by --** |
| | | 02  **by T.S.I.?** |
| | | 03  A.  I did, and I also referenced that in the report.  You |
| | | 04  know there -- T.S.I. 272, which is in exhibit two, detailed a |
| | | 05  transfer of just over $75,000.00 on June 11th of 2020 to |
| | | 06  McBee Custom Homes.  T.S.I. 50, which is in exhibit four |
| | | 07  detailed a $141,000.00 transfer on the 8th of August, 2020 to |
| | | 08  Coffelt Land Title, and T.S.I. 276, which is in exhibit two |
| | | 09  details a $200,000.00 transfer to the same Coffelt Land Title |
| | | 10  on the 10th of August of 2020. |
| | | 11       MS. ENGLAND:  Your Honor, just -- just for |
| | | 12  clarification for the record -- I'm not sure what exhibits |
| | | 13  this witness is referring to, because the exhibit list that I |
| | | 14  have lists exhibit number two as a bank statement.  So, I -- |
| | | 15  I -- |
| | | 16       THE COURT:  Okay.  That's -- that's -- that's a |
| | | 17  fair objection.  Mr. Moody, could you have the witness |
| | | 18  clarify what the antecedent exhibits is that -- that form the |
| | | 19  basis of his testimony? |
| | | 20       MR. MOODY:  Yes, Your Honor.  And, I believe that |
| | | 21  is correct, he is referring to the bank statement, which was |
| | | 22  marked as Bates label T.S.I. 000272, which is in exhibit |
| | | 23  number two.  And, I'm coming down to it here on my computer. |
| | | 24       THE COURT:  Okay.  Mr. Orner, just for clarity when |
| | | 25  you're referring to a doc -- to a Bates number, if you could |
| | | 077:01  make clear that you're -- you're referring to -- to the Bates |
| | | 02  number, as opposed to just calling it the document number? |
| | | 03  Because I think it -- |
| | | 04       MR. ORNER:  Okay. |
| | | 05       THE COURT:  I think the listener may be confused as |
| | | 06  between the exhibit number and the page number.  So, if you |
| | | 07  could just be clear in describing what you're referring to, I |
| | | 08  think that would be helpful for all of us? |
| | | 09       MR. ORNER:  Certainly, happy to do it.  I apologize |
| | | 10  for any ambiguity there.  I was trying to refer to the Bates |
| | | 11  number and then the exhibit within that lies, which would as |
| | | 12  shown as the screen, you we were referring to just a moment |
| | | 13  ago, T.S.I. 272, so that's the Bates number 272, which is |
| | | 14  within the bank record exhibit two that's being shown on the |
| | | 15  screen, and there's T.S.I. 272 Bates number page.  So, I was |

16    trying to refer to both for completeness, it might not have

17    been clear.  My apologies.

18              THE COURT:  Okay.  Okay.  I -- Ms. England, does

19    that address your concern?

20              MS. ENGLAND:  That -- that does, Your Honor.  Thank

21    you.

22              THE COURT:  Okay.  Mr. Moody, you can proceed.

23    **Q.    Sure, and just to -- to kind of clear this up, with**

24    **respect to the Jackson County, Missouri real estate purchase,**

25    **can you summarize for us again what -- with the exhibit**

078:01  **number first and then the Bates label of the pages relating**

02    **to the transfer of funds to purchase that property --**

03    A.    Certainly.

04    **Q.    So, that we can have a complete record?  Thank you.**

05    A.    So, within exhibit two, which is shown on the screen,

06    Bates number T.S.I. 272 is the particular page, there's a

07    $75,072.00 transfer on June 11th of 2020 to McBee Custom

08    Homes.  It's highlighted on the screen.  Secondly, there's

09    exhibit four -- within exhibit four, T.S.I. 50 Bates number

10    details a $141,117.44 transfer on the 10th of August, 2020 to

11    Coffelt Land Title.  Separately on the day, August 10th of

12    2020, within exhibit two and on the page Bates number T.S.I.

13    276 there's a $200,000.00 to Coffelt Land Title.  Those

14    transfers total $416,189.44.  And in reviewing the Jackson

15    County, Missouri real estate sales records, which is in

16    exhibit sixty-three, those funds were apparently used to

17    acquire 1509 South West Conch Circle, Blue Springs, Missouri

18    for $414,172.00 on the 10th of August 2020 in the name of

19    Deborah Evans Mott -- well Mott, Deborah Evans; excuse me --

20    **Q.    I'm showing on the screen exhibit sixty-three.  Is this**

21    **the document that you reviewed that showed the owner's name**

22    **of the property as Deborah Evans Mott?**

23    A.    Correct, and I referenced the exhibit sixty-three in my

24    report, as well.

25    **Q.    Okay.  And -- let's see real quick.  Did you also review**

079:01  **docket -- document number sixty-four, which is the deed for**

02    **the Jackson, Missouri property?**

03    A.    I -- I did, and my report referenced it as well as the

04    warranty deed filed on August 12th of 2020 and reflecting a

05    transaction between McBee Custom Homes and Deborah Evans

06    Mott, and has a file number 20040134, Coffelt Land Title,

07    Inc.  So, it does tie each of those entities that received

| | | 08 | funds together in the warranty deed, exhibit sixty-four. |

| Case | TSI |
|---|---|
| Issue Code | 4 Missing Funds Due To Manner Of Productions |

| Teams Hearing 3-9-22 | | | |
|---|---|---|---|
| 1 | 094:10 - 098:03 | 094:10 | Q.   In your report did you find -- did you come up with a |
| | | 11 | analysis of the -- the missing funds or how much is missing |
| | | 12 | in each account for the debtor in total? |
| | | 13 | MS. ENGLAND:  Objection, Your Honor.  -- again, we |
| | | 14 | -- we haven't qualified this witness as an expert.  I -- I'm |
| | | 15 | not really sure that -- and actually quite frankly, given the |
| | | 16 | fact that we received his report fifteen minutes prior to |
| | | 17 | this hearing commencing, we haven't had -- we haven't had a |
| | | 18 | chance to go through any of this.  And -- and his summary |
| | | 19 | really I think is inappropriate at this time.  He can testify |
| | | 20 | to facts that he's seen, but I don't feel that a summary |
| | | 21 | being given at this point is appropriate. |
| | | 22 | THE COURT:  So, I will reserve judgment about any |
| | | 23 | opinion, but to the extent the witness can testify as to |
| | | 24 | facts about transactions, again -- reserving the judgment |
| | | 25 | about the admissibility of his opinion about the -- about |
| | | 095:01 | whether the transactions are questionable or not.  If -- if - |
| | | 02 | - if the witness -- look, what I will permit is an answer to |
| | | 03 | the question based on your review of the records.  What -- |
| | | 04 | what's the total amount of transactions where you couldn't |
| | | 05 | map the amount out to an amount in, essentially, within the - |
| | | 06 | - the -- the records produced?  I take it -- Mr. Moody, is |
| | | 07 | that essentially the question that you're -- that you're |
| | | 08 | asking? |
| | | 09 | MR. MOODY:  Yes -- yes, Your Honor.  A much more |
| | | 10 | articulate way to ask it.  That's exactly what I was |
| | | 11 | attempting to ask.  Thank you, Your Honor. |
| | | 12 | THE COURT:  I'm -- my questions are better than |
| | | 13 | they used to be in the same way that I'm taller and my jokes |
| | | 14 | are funnier.  But, I will permit the witness to answer that |
| | | 15 | question. |
| | | 16 | A.   Certainly, thank you.  In terms of kind of unknowns, |
| | | 17 | which I guess is the point ultimately here, you know there |
| | | 18 | are bank records that show a variety of in and out flows. |
| | | 19 | And there are certain outflows that are destination or |
| | | 20 | individual unknown.  And so the -- the -- I've tried to |
| | | 21 | quantify those particular outflows that didn't have a |

22  canceled check or a detailed you know wire transfer

23  information, and that's a total of $7,148,000. -- or

24  $7,148,056.96 that are unknown checks, wires, and transfers.

25  Now, there are -- in addition to that seven point million

096:01  there are other transfers that are known to insiders or other

02  entities, some of which we've detailed already, that may or

03  may not be legitimate business purposes, which require

04  further you know detail and investigation.  Which is you know

05  a separate set of -- of -- of answers.  But, you know I can

06  list as I did in my report you know each of those -- those

07  unknown check wires and transfers totaling the seven one --

08  seven point one million.

09          THE COURT:  All right.  And --

10  A.   But, that -- include -- yep.

11          THE COURT:  I'm sorry, go -- go -- you -- I'm going

12  to let you finish your sentence.

13  A.   Sure.  So -- so to the extent that we received a check

14  that showed the $2.5 million check that showed that the

15  destination was in fact another T.S.I. account that was newly

16  revealed, we still don't know the ultimate disposition of

17  that $2.5 million from T.D. 3053.  So, it remains on the list

18  as you know unknown check wire and -- and transfer.  So, that

19  --

20          THE COURT:  Okay.  So --

21  A.   That check is included in the 7.148 million.

22          THE COURT:  Got it.  Okay.  That's my question.

23  So, Mr. Orner -- so I think this is -- this is -- I take it -

24  - I view this as just factual testimony and not opinion

25  testimony.  Am I understanding your testimony correctly that

097:01  after having reviewed the books and records you found a total

02  of $7.148 million give or take where the payment out -- it's

03  -- the records don't reveal as far as you can tell who the

04  recipient of those funds was --

05          MR. ORNER:  That is correct.

06          THE COURT:  Is that right?

07          MR. ORNER:  Exactly, Your Honor.

08          THE COURT:  And that includes -- and that includes

09  the $2.5 million that you testified to earlier?

10          MR. ORNER:  That is correct, Your Honor.

11          THE COURT:  Okay.  So, you're not -- you're not in

12  a position to testify that this money was paid to an insider

13  or wasn't paid to an insider, you just don't know from the

14  books and records?

```
      15            MR. ORNER:  That is correct.  It's -- it's unknown
      16  based on the -- the documentation provided.  And separately I
      17  have summarized the amounts to insiders and entities known,
      18  and that summary is also attached to my -- my report, and
      19  it's -- the -- I call it Report Exhibit 1 is the summary of
      20  all of those you know insider and significant -- you know
      21  transactions that -- that were known to the -- the -- you
      22  know the group of insiders and others, law firms, or Tunnell
      23  and Raysor, you know Southern Title, et cetera.  So, there's
      24  roughly $26 million, almost $27 million of those total
      25  insider personal expenditure other things that were detailed
098:01  in the bank records that I've summarized.  Again, just a
      02  numerical accumulation of what were many years of disparate
      03  bank records.
```

| Case | TSI |
|---|---|
| Issue Code | 5 Orner's Summary of Voluminous Transfer Data |

| Teams Hearing 3-9-22 | | | |
|---|---|---|---|
| 1 | 101:07 - 102:19 | 101:07 | Q.    Mr. Orner, when we were -- before we left we were |
| | | 08 | starting to discuss what's been marked as exhibit one to your |
| | | 09 | preliminary expert report.  And my first question to you is |
| | | 10 | did you review each of the bank statements or each of the |
| | | 11 | banking records produced to the debtor relating to BBBA |
| | | 12 | accounts and the T.D. Bank accounts listed and the Artesian |
| | | 13 | Bank account listed in the exhibit? |
| | | 14 | A.    I -- I did thoroughly.  And, you know you're asking |
| | | 15 | about how I produced this -- this summary.  It was in fact |
| | | 16 | going line item by line item, date by date, to list in a |
| | | 17 | voluminous spreadsheet each of the -- the -- the in and |
| | | 18 | outflows.  And this is the summary of the out by person, and |
| | | 19 | by date, and by account.  And then accumulating that data |
| | | 20 | into summaries by account and by year, as shown here.  But |
| | | 21 | behind this is by date and by -- by person, and by account |
| | | 22 | data, which matches the -- the underlying bank records from |
| | | 23 | which I drew it. |
| | | 24 | Q.    Okay.  And, if we move onto exhibit two, is this what |
| | | 25 | you're referencing as the summary of the -- of the bank |
| | | 102:01 | account statements?  Explain what this document is. |
| | | 02 | A.    This is a -- slightly different view of the bank records |
| | | 03 | where I've detailed sort of the summary level of them showing |
| | | 04 | in different colors, I tried to color code to -- to sort of |
| | | 05 | describe functionally what was going on.  So, the green are |
| | | 06 | linked transfers.  So, you'll see for example the $4.5 |
| | | 07 | million inflow -- |
| | | 08 |          MS. ENGLAND:  Your Honor, I -- I'm sorry to |
| | | 09 | interrupt, but I have to object to this.  We don't have |
| | | 10 | colored versions of this.  All we have is a black and white |
| | | 11 | version, so it's kind of hard to follow along with what is |
| | | 12 | going on when he's referring to different colors. |
| | | 13 |          THE COURT:  -- |
| | | 14 |          MR. MOODY:  Your Honor, I'm sorry.  I'm looking at |
| | | 15 | the version filed in the record that I just opened from the |
| | | 16 | docket and it has the colors in it.  So -- |
| | | 17 |          THE COURT:  Ms. -- Ms. England, can you -- |
| | | 18 |          MS. ENGLAND:  I'll -- I'll see if my office can |

| | | | |
|---|---|---|---|
| | | 19 | print a better copy for me while we're -- |
| 2 | 106:22 - 111:11 | 106:22 | Q    Mr. Orner, when we stepped off the record before you |
| | | 23 | were describing what has been presented as Exhibit Number 2 |
| | | 24 | to your expert report.  Can you again explain how this |
| | | 25 | document was created, and what it represents? |
| | | 107:01 | A    Certainly.  So this is a different view of the bank |
| | | 02 | records that were provided than the last, which was -- that |
| | | 03 | we walked through.  This one is more summary level, and was |
| | | 04 | meant to show the large inflows and outflows, sometimes among |
| | | 05 | -- between accounts and sometimes from sources unknown, and |
| | | 06 | sometimes to destinations unknown, and I tried to create a |
| | | 07 | little bit of a, you know, color coding to draw attention to |
| | | 08 | those as I put it together for my own, you know, use.  But |
| | | 09 | for everyone's indulgence here, for example, you know, in |
| | | 10 | Account 7965, in February of 2018 there is a four-and-a-half |
| | | 11 | million dollar inflow which is in green, and that ties in |
| | | 12 | green to the four-and-a-half million dollar outflow from BBVA |
| | | 13 | 8953, also on February '18 a couple rows below.  And so what |
| | | 14 | I've tried to do is match and pair off the TSI to TSI account |
| | | 15 | transactions so that then what becomes more obvious are the |
| | | 16 | ones that are to, you know, unknown inflows and unknown |
| | | 17 | outflows, which I have identified in red largely.  So, for |
| | | 18 | example, in that same February of '18 there were 2,088,571.48 |
| | | 19 | of checks which, you know, from the record I'm aware are |
| | | 20 | handwritten checks to Ayala (phonetic).  So, just -- but |
| | | 21 | there was no, in the underlying Florida case, you know, no |
| | | 22 | invoices or record as to why those checks were written to |
| | | 23 | Ayala.  So those are, you know, unknown -- known destination |
| | | 24 | but unknown reason.  And so this, you know, is an attempt to |
| | | 25 | take the summary level data from the bank accounts and show |
| | | 108:01 | in total inflows and outflows, and again, try and match the |
| | | 02 | pairs of account to account transactions, and have a running |
| | | 03 | total.  Again, with incomplete account data, the running |
| | | 04 | total will be incorrect, but based on data available have a |
| | | 05 | running total at the bottom for all accounts known and |
| | | 06 | balances available from all accounts known running across the |
| | | 07 | bottom there as shown. |
| | | 08 |      Where there was incomplete data from the bank |
| | | 09 | records, say there was a page missing, or no bank record, I |
| | | 10 | just did an orange kind of highlight to show that those are |
| | | 11 | segments of data that were incomplete or not provided, and |
| | | 12 | where in a bank statement it shows where the beginning |

13  balance was I know what the ending balance was for the period

14  prior, but I don't have the period prior's data.  So for

15  December '17 -- December 2017, for example, I have some bank

16  records for January that show what the ending balance for

17  December was, but I don't have the December data.  It was not

18  provided in discovery.  So, those are orange shaded, as well

19  as others throughout the document, show that they were not

20  presented, or I had some data that was incomplete for those

21  bank record periods.

22          So fundamentally this just shows, you know, the

23  larger inflows and outflows, and, you know, some questions

24  obviously arise from it where there is large outflows that

25  are to areas unknown, many of which are summarized as we just

109:01  discussed in that 7.148 million of wires or checks that were

02  to unknown destination.  And some of that was revealed by

03  putting this analysis together.  It just showed what we know

04  and what we don't know.

05  Q   Mr. Orner, there's a couple of markings in blue.  Can

06  you explain what those are?

07  A   So those were unknown inflows.  You know, so for example

08  there are the highlighted -- the cells that are highlighted

09  in green are U.S. -- you know, they came from U.S. Treasury

10  so it was inflows from federal contracts.  There were other

11  inflows that I have highlighted in the blue, which were

12  unknown, you know, a deposit from somewhere with, you know, a

13  wire from somewhere, unknown reason or origin.  Those were

14  the inflows for -- to these accounts that were of unknown

15  origin, or unknown purpose if the account listed who it was

16  from didn't know why, for example.

17  Q   Okay.  And just to make sure this is clear from your

18  testimony, the green -- everything that's green has been

19  matched up, and you can tell where it came from and where it

20  went.  But the red depicts funds that we don't know either

21  the inflow or the outflow, where they went to, and they may

22  have been from checks that we haven't received copies of.  Is

23  that an accurate summary of your testimony?

24  A   That is an accurate summary.  The green are all matched

25  pairs, so you'll see the commensurate inflow and outflow in

110:01  green matched, so again, these kind of net out among the

02  totals of the accounts.  So that is correct.  The green are

03  all matched pairs, where the red are wires or transfers or

04  checks that were to unknown destinations.

05  Q   Okay.  And the -- again, these big blocks of orange or

06   yellow or whatever kind of color this is, that's -- either

07   we're missing the bank statements or missing pages of the

08   bank statements, is that accurate?

09   A    That is correct.

10   Q    Okay.

11   A    And where data from some other source was available I

12   was able to plug in, as you just scrolled past, for example,

13   a number of green items in that large orange field, I think

14   it was up one further.  There's green items in the large

15   orange field, so I had a bank account that showed an out --

16   you know, that showed the outflow or the inflow, but I didn't

17   have the other piece of -- I didn't have the rest of the data

18   for that account, so I know monies went from an account to

19   this account, but I don't know the rest of the account data

20   for that period because it was not provided.

21   Q    Okay.  And to your knowledge were all of these missing

22   statements requested from the debtor?

23   A    I understood that all of their accounts had been

24   provided until we received a check showing the addition of

25   the TD 3053 account, plus through review -- thorough review

111:01   of the record, including the Florida case, there was an

02   additional account listed in the Florida case that was not

03   provided, and clearly there's INT transfers to accounts that

04   we don't see a matched pair for, which means there are other

05   accounts, theoretically at BBVA, that we don't have.

06          So as I understood that the full bank record was

07   presented, I understood it was to include canceled checks and

08   other data, that was not the case, unfortunately, so this

09   record is incomplete, and there clearly are some other

10   accounts and other data of bank accounts that are still

11   outstanding and not part of the record as yet.

| 3 | 112:06 - 115:04 | 112:06 | Q    Mr. Orner, can you walk us through back again on Exhibit |

07   Number 1 your ultimate conclusion as to the monies received

08   by the key individuals in the case in the years, you know,

09   2018, 2019, 2020 in total, which is summarized I believe in

10   your chart?

11          MS. ENGLAND:  Your Honor, I'm not sure what kind of

12   conclusion he is going to make.  If he is just going to read

13   from the chart I think we have the chart.

14          THE COURT:  He -- I think this is the kind of, you

15   know, summary testimony that I think a witness can provide

16   about what the punch line of -- of -- he found after

17    conducting this review, so I'll permit this.  I think that
18    there's no -- it's cumulative of what the document says, and
19    I think it's harmless.  So you can proceed.
20            THE WITNESS:  Certainly.  Thank you, Your Honor.
21    So with regards to the totals, I -- instead of going by year
22    I'll just do the sort of total total for each of the named
23    people, if that is sufficient?
24            MR. MOODY:  That's fine.
25            THE WITNESS:  Okay.  So, for -- and I have them
113:01    listed -- this does not list them in order of dollars, just -
02    - just however it became the -- the order that they were in
03    the documents for me.  John Masarowski (phonetic), the total
04    across the 2017 to 2022 period identified transactions for
05    him were $1,646,000.  For Christopher Piedmont (phonetic),
06    across the same time period the transactions identified,
07    specifically under Christopher Piedmont as a name was
08    $668,330.  For Debra Evans-Mott (phonetic), again, detailed
09    in that name $1,502,900.  Separately Debra Mott (phonetic),
10    listed in that forum, received over that same period
11    $453,000.  There was an account labeled XXXX5941, Mott, which
12    in deposition testimony we understood was related to
13    Christopher Mott's travel potentially.  That received -- that
14    account received $34,000 over this period.  TSI Gulf Coast
15    over the period received $757,062.50.  Allison Mott,
16    $46,686,000, Jennifer Orcutt (phonetic), $106,700 over the
17    same period.  And Steven Matthew Acosta (phonetic) received
18    1.276,027 -- I'm sorry -- $1,76,027.15 over the same period.
19    And Tyler Evans a total of $37,426.61.
20            Also, to summarize there were cleared -- checks
21    cleared that are to unknown destinations of $4,652,923.42.
22    Transfers, and we just walked through those, of $3,050,000,
23    transfers to unknown destinations.  That was the INT
24    transfer, in particular those two totaling $3,050,000.  Other
25    wires that were unknown destinations of 250,000 and other,
114:01    quote, debits, of a total of $1,268,056.96.  Those were just
02    listed on the accounts as debits.  So an unknown destination
03    for those.  There was a couple of others, and I would just
04    highlight that Louis Ayala Colon (phonetic), which was a
05    service provider in the underlying case, for which we had
06    invoices in the amount of -- I can't remember the exact
07    number, but I'll say in the order of magnitude $250,000 of
08    invoiced -- you know, detail, there's checks written to Ayala
09    for a total of $2,368,571.48 that were unknown, uninvoiced,

| | | | |
|---|---|---|---|
| | | 10 | you know, with no detail to support those.  And in the |
| | | 11 | underlying case we also discussed the $1,036,000.34 across |
| | | 12 | two checks to Coakley Logistics, and Coakley Logistics having |
| | | 13 | a Florida and a Delaware entity separately received in total |
| | | 14 | the $1,036,000. |
| | | 15 | Those are kind of some key, you know, summaries. |
| | | 16 | If you'd like me to read some others, I know there were some |
| | | 17 | other questions, you know, in terms of what some of these |
| | | 18 | additional costs were for, Shulman Rogers, for example, |
| | | 19 | $1,873,432.86.  National Financial, there was an outflow and |
| | | 20 | I guess a corresponding inflow of 224,000.  And we've gone |
| | | 21 | through McAfee & Taft.  There's -- Tunnell & Raysor is listed |
| | | 22 | here for the 956,000, Southern Title $956,343.10, Southern |
| | | 23 | Title Holdings for the $489,949.91, Coffelt Land Title, |
| | | 24 | again, the total there $341,117.04, and E (sic) Custom Homes, |
| | | 25 | which is the remainder of that Missouri property, $75,072. |
| | | 115:01 | Those are the significant -- All Aqua Pools and some of these |
| | | 02 | other are also listed, again, summary across all of the |
| | | 03 | accounts per person by day, by account, and this is the |
| | | 04 | summary of all of those totals. |
| 4 | 122:19 - 125:25 | 122:19 | **Q     Okay.  Just briefly, I have a couple of questions on** |
| | | 20 | **your -- the exhibits that we had to get color printed.** |
| | | 21 | A     Sure. |
| | | 22 | **Q     These are lists of transactions on a monthly basis,** |
| | | 23 | **correct?** |
| | | 24 | A     I'm sorry.  Which are you referring to? |
| | | 25 | **Q     I'm sorry.  I'm looking at -- I'm going to start with** |
| | | 123:01 | **Exhibit 2.** |
| | | 02 | A     Okay. |
| | | 03 | THE COURT:  Ms. England, just to follow your -- so |
| | | 04 | that we're all (indiscernible) together and looking at the |
| | | 05 | same documents.  This is Exhibit 2 to the expert -- to the |
| | | 06 | report? |
| | | 07 | MS. ENGLAND:  To Document Number 126.  I guess the |
| | | 08 | document number is 126-1, and yes, to what has been set forth |
| | | 09 | as an expert report. |
| | | 10 | THE COURT:  Okay.  So -- |
| | | 11 | MS. ENGLAND:  And I am on Page 11 of the exhibit. |
| | | 12 | THE COURT:  So it's 11 of 37?  Is that marked at |
| | | 13 | the top that way? |
| | | 14 | MS. ENGLAND:  Eleven -- I'm sorry, Your Honor. |
| | | 15 | Eleven of 16. |

```
16            THE COURT:  Hold on.  I'll find it.  I just want to
17   make sure that I'm -- I see.  Page -- I see.  So it's 126-1,
18   Page 11 of 16.  Okay.  I'm there.  Thank you.  I appreciate
19   it.
20            THE WITNESS:  Let me get there.  One moment.  Page
21   11 of 16.  Yes.  I have that page.
22            MS. ENGLAND:  Okay.
23   BY MS. ENGLAND:
24   Q    All right.  And I'm looking at Page 1 of what is a six-
25   page report, and I'm assuming that it's a six-page report
124:01  from the page numbers at the bottom of this?
02   A    Correct.
03   Q    And I just want to make sure from my own -- and I'm
04   sorry, I apologize.  This would normally be done during a
05   deposition where we could get through this, but just for my
06   own -- you know, as we're meeting for the first time here
07   today, I feel that I kind of need to make sure that I'm sure
08   as to what's going on here.
09   A    Of course.
10   Q    So on the first page, there are about nine months worth
11   of transactions, and what I'm saying is inflows, outflows,
12   and I guess a balance at the end of the month, correct?
13   A    Correct.  For each --
14   Q    Okay.
15   A    -- account for each month, and then summarized at the
16   bottom what that total running balance based on what was
17   available.
18   Q    Let's skip down to Line Number 5, which is BBVA Account
19   Number 2888.
20   A    Okay.
21   Q    On this first page there is no information about that
22   account, correct?
23   A    Correct.
24   Q    And it actually doesn't pop up until March of 2019.
25   A    Correct.
125:01  Q    Is that correct?
02   A    Yes.
03   Q    Is that because the account wasn't opened until March of
04   2019?
05   A    I believe I'd have to go back and look at that record to
06   confirm, but I believe that that account was opened with
07   those deposits, the 20,000 and three and a half million in
08   March of '19.  I believe that was a newly created account at
```

| | | | |
|---|---|---|---|
| | | 09 | that time. |
| | | 10 | **Q     Okay.  So not every blank in here, blank space,** |
| | | 11 | **represents something that is necessarily missing?  It may** |
| | | 12 | **just be that there were no -- there was nothing going on in** |
| | | 13 | **the accounts at the time, correct?** |
| | | 14 | A    That's correct.  I tried to illustrate something that |
| | | 15 | was missing to an account that I knew was open at the time by |
| | | 16 | the orange blocks.  So those represent -- |
| | | 17 | Q    Okay. |
| | | 18 | A    -- to me accounts that there was partial or no |
| | | 19 | information, but I knew the account existed because of other |
| | | 20 | flows to it at the time, or I received, you know, a record |
| | | 21 | from the following month that showed there was a balance the |
| | | 22 | month prior, but I did not receive a record for the month |
| | | 23 | prior.  So the orange blocks -- |
| | | 24 | Q    That's (indiscernible). |
| | | 25 | A    -- were meant to show that. |
| 5 | 126:16 - 127:09 | 126:16 | **Q    I am looking here, and it looks like in 2018 there was a** |
| | | 17 | **little bit over $11 million that went out of TSI, correct?** |
| | | 18 | A    That's not total.  That was to these named entities. |
| | | 19 | There were other dollars that, you know, a variety of |
| | | 20 | different smaller denominations, if you will, and other |
| | | 21 | things that I did not total, these were the totals for, if |
| | | 22 | you will, insider significant, you know, transfers to |
| | | 23 | entities for reasons that maybe were not known, for example, |
| | | 24 | that needed to be totaled and highlighted, and so, you know, |
| | | 25 | if you will, questionable insider personal transactions, as |
| | | 127:01 | well as a summary of significant unknown, so unknown checks, |
| | | 02 | unknown wire, unknown cleared checks, for example.  So this |
| | | 03 | is not every dollar that went out of the accounts, but this - |
| | | 04 | - the total of significant dollars to notable -- you know, |
| | | 05 | the summary of those significant dollars to notable, you |
| | | 06 | know, destinations and/or notable question, unknown |
| | | 07 | destinations. |
| | | 08 | Q    Okay. |
| | | 09 | A    Not every dollar. |
| 6 | 128:25 - 130:11 | 128:25 | **Q    So, to be clear, this chart, everything that is on this** |
| | | 129:01 | **chart are not necessarily improper transactions.  They are** |
| | | 02 | **just transactions that you need more information to clarify** |
| | | 03 | **what was actually what was going on?** |
| | | 04 | A    I think that's a fair assessment.  This is not meant to |
| | | 05 | be -- this is a summary of significant totals, some of which, |

06    you know, may be perfectly justified, you know, some of the

07    lawyers in the case and so on, you know, understand what have

08    been paid.  So this was a summary of those -- you know, those

09    transactions from the bank record.  Clearly the -- a number

10    of these transactions, you know, need further exploration and

11    investigation because of the unknown nature of the

12    destination, or because they were in conflict or inconsistent

13    with other documentation, for example pay ones or et cetera.

14    So this was meant to be a summary analysis from which to

15    compare, and also, you know, ask additional questions because

16    we now, you know, have an accumulation of data that says

17    something that needs to be looked further into.

18    Q    All right.  And just -- I just have one final question,

19    and I know that you have to get on a call.  In 2021 there

20    were about -- and this is my very rough math, again, about

21    $150,000 worth of transfers to insiders.  Is that correct?

22    A    Well, the total here for 2021 is almost $470,000.  But

23    there are, you know, law firms and experts and others that

24    were part of those transfers.  There is a  -- you know, wires

25    of $250,000, destination unknown, and then there is named

130:01    insiders, you know, for the, you know, 10, 18, 10, 80 and

02    $24,000.  So the total of those I could get you.

03    Q    Okay.

04    A    You know, there's wires for $250,000 that year that are,

05    you know, unknown destination that just was  --

06    Q    Okay.

07    A    So --

08    Q    But the direct transfers -- I think you'll agree with me

09    that there was a serious drop off within the year of filing

10    the bankruptcy petition, correct?

11    A    Yes.  I think that's -- the numbers bear that out.

| Case | TSI |
|---|---|
| Issue Code | 6 Orner Background With TSI |

| Teams Hearing 3-9-22 | | | |
|---|---|---|---|
| 1 | 069:07 - 070:17 | 069:07 | **Q.    And -- and how did you come to know or become aware of** |
| | | 08 | **the GPDEV and Simons litigation in Florida?** |
| | | 09 | A.    I was introduced to it by Len Collins, an acquaintance |
| | | 10 | in Tallahassee, and he asked if I would you know be |
| | | 11 | interested in looking at it as a -- as an expert, and -- and |
| | | 12 | I -- I did. |
| | | 13 | **Q.    And, did you testify in that case as an -- as an expert** |
| | | 14 | **at trial?** |
| | | 15 | A.    I did.  I was admitted as an expert in the -- the |
| | | 16 | Florida case in -- in Federal Court, Northern District of |
| | | 17 | Florida. |
| | | 18 | **Q.    And, since that time have you reviewed the documents** |
| | | 19 | **that have been obtained in the course of discovery from the** |
| | | 20 | **debtor in bankruptcy case?** |
| | | 21 | A.    I -- I have.  I've reviewed all of the documents and |
| | | 22 | I've stipulated to the list of them in the report, which |
| | | 23 | largely in the bankruptcy case in Delaware consists of the -- |
| | | 24 | you know bank statements and some descriptions thereof.  And |
| | | 25 | you that in addition to the probably thirty thousand pages of |
| | | 070:01 | documentation in the Florida case, you know I'm I think fully |
| | | 02 | versed in -- in the -- the scope of production across this -- |
| | | 03 | this issue. |
| | | 04 | **Q.    As part of your review of documents, did you review the** |
| | | 05 | **-- the banking records that were produced by the debtor in --** |
| | | 06 | **we just asked that.** |
| | | 07 | A.    Yes, I did.  And, you know noted that they were in some |
| | | 08 | cases inconsistent -- incomplete, there were some pages |
| | | 09 | missing, and even months missing from -- from the record. |
| | | 10 | But, I did review the bank record and -- and have worked to |
| | | 11 | organize those and understand the -- the inflows and outflows |
| | | 12 | to -- to each of those accounts, whether it be internal |
| | | 13 | transfers between the company to other company accounts, or |
| | | 14 | external and identified a significant number of kind of open |
| | | 15 | questions as to where funds you know originated or -- or |
| | | 16 | destinations of funds, since the bank records were as I noted |
| | | 17 | incomplete. |

| Case | TSI |
|------|-----|
| Issue Code | 6.8 Mill New FEMA Claim |

| Teams Hearing 3-9-22 | | |
|---|---|---|
| 1 | 208:10 - 208:24 | 208:10    Q   And then -- and we have forecast in June the 6.8<br>11  million.  Is that the 6.8 million FEMA claim we talked about<br>12  a little earlier?<br>13  A   Yes.<br>14    Q   Is that -- is that something that you're intending<br>15  to submit in the near future?<br>16  A   We want to have it submitted by the end of this week.<br>17    Q   How -- how long after submission until you are<br>18  supposed to hear back from FEMA on that?<br>19  A   It -- that's -- within 30 days we'll hear -- hear back<br>20  an answer from FEMA.<br>21    Q   And so, is that why that's projected for, you know,<br>22  out -- out a couple months from now?<br>23  A   Right.  You know, we gave 30 to 60 days, which is, you<br>24  know, a normal -- normal period. |

| Case | TSI |
|---|---|
| Issue Code | 7 Redacted And Incomplete Bank Record Productions By TSI |

| Teams Hearing 3-9-22 | | | |
|---|---|---|---|
| 1 | 089:06 - 094:09 | 089:06 | Q.   There are references in our motions for sanctions that |
| | | 07 | T.S.I. bank record production was deficient.  Can you |
| | | 08 | summarize for the Court some of the deficiencies in the |
| | | 09 | production of -- of the bank records? |
| | | 10 | A.   Sure, a number of deficiencies.  So, the records were |
| | | 11 | produced in -- in a number of instance had pages missing for |
| | | 12 | the documents that were produced, so it might have had page |
| | | 13 | one, three, and four, but missed page two; or pages one, two, |
| | | 14 | and four, missing page three for example.  So, there were |
| | | 15 | pages missing which had the relevant data in order to |
| | | 16 | understand where the -- the dollars were coming from and |
| | | 17 | going to.  That's one component of it.  Secondly, there were |
| | | 18 | months that were missing within the data set that was |
| | | 19 | provided.  In addition there were accounts that were excluded |
| | | 20 | that we were unaware of at one point and later became aware |
| | | 21 | of.  For example there was a two and a half million dollar |
| | | 22 | check that a question was raised as to you know what that was |
| | | 23 | for.  In the expense summary listing the company provided it |
| | | 24 | said that that two and a half million check was for quote |
| | | 25 | subcontractor.  And, I'm referring to exhibit six for the |
| | | 090:01 | BBBA account ending in 288.  This T.S.I. Bates number 895, |
| | | 02 | the check in exhibit seventy-two, the two and a half million |
| | | 03 | dollar check was listed to subcontractor.  But, importantly |
| | | 04 | when the check was subsequently produced -- and this didn't |
| | | 05 | have a Bates number, it was just the -- the name of the |
| | | 06 | document was scanned documents_2_8_2022.  On page one that |
| | | 07 | check that was ultimately produced showed that in fact the |
| | | 08 | two and a half million dollars was not to a quote |
| | | 09 | subcontractor, but was actually a transfer from T.S.I. to |
| | | 10 | T.S.I., but importantly it was to an -- a previously unknown |
| | | 11 | T.S.I. bank account, which is listed elsewhere now as T.D. |
| | | 12 | 305 -- bank, 3053 are the last four.  So -- so there was |
| | | 13 | incomplete bank records, incomplete set of bank accounts that |
| | | 14 | -- that were produced, and you know within that production |
| | | 15 | there were redactions, there were you know a lot of markings, |
| | | 16 | there were no checks -- cancelled checks provided, except for |
| | | 17 | this one subsequently, which then revealed a new account that |

18   had not been provided.  So, there were a number of

19   inconsistencies and/or incompletions, if you will, within the

20   bank records that -- that were produced.

21   **Q.   I'm showing you now what's been marked as exhibit 6,**

22   **that is T.S.I. Bates label 180.**

23   A.   Yes.

24   **Q.   Have you reviewed this -- this document before?**

25   A.   I certainly have.

091:01   **Q.   And it's -- did you note anything interesting about --**

02   **about it?**

03   A.   Yes.  So, there are actually two instances where this

04   same situation applies, and it was the transfer made on the

05   same day, interestingly.  So, in -- in this instance you'll

06   notice that it's INT. transfer to account.  And there's some

07   -- what looks to be some smudging and a significant blank

08   space to the right side and below that INT. transfer to

09   account detail.  And -- and in other instances in the same

10   document you'll see that whenever there is an INT transfer to

11   account, it lists the account number and the payee next to

12   and below.  So, there's clearly you know a redaction and you

13   can kind of see the smudging here of the account information

14   for the account number that it went to and the payee.  This

15   is the $3 million one.  There's also on for $50,000.00 on the

16   same day, February 27, '20, also an INT. transfer to account.

17   And the smudging actually goes over the line, so it's -- it's

18   even more visible that there was a -- a redaction of that

19   data.  And that's -- that was T.S.I. 180.

20        UNIDENTIFIED MALE:  Was that 180?

21        UNIDENTIFIED MALE:  That was what we --

22   A.   Yeah, the fifty thousand one is on T.S.I. 34 within

23   exhibit four.

24   **Q.   I'm showing you what is marked as exhibit T.S.I. 230 and**

25   **this another INT. transfer.**

092:01   A.   Correct.

02   **Q.   Do you note anything different about how this one**

03   **appeared?**

04   A.   Yeah, so as noted there's the internal transfer to

05   account.  It lists the account number and -- and payee.  So,

06   in this case it's -- you know the account XXXX, but 5941 are

07   the last four and Mott is detailed as the -- the -- the payee

08   on the account.  Whereas this other, there is no account

09   information or payee listed.

10   **Q.   Okay.  And, just compare the two, again, here is the --**

11   the one that looks as if there's a redaction following the

12   INT. account, versus the -- versus the other?

13   A.   Yeah, and I -- I might refer you to again T.S.I. Bates

14   34, which is in exhibit four, and page thirty-four of that.

15   Q.   Okay.  Exhibit four --

16   A.   I --

17   Q.   Well, we don't have that.  Wait.

18   A.   And I think they were out of numerical order, because of

19   the way they were produced.

20   Q.   Oh, I --

21   A.   Yes, so page thirty-four is about three quarters of the

22   way, page sixty-three of that document.

23   Q.   All right.

24   A.   So, you're -- you're in -- in four, so it's page -- pdf

25   page sixty-three.

093:01  Q.   And -- and -- and in general were the records kind of

02   produced like in -- in kind of disorganized format?

03   A.   I -- I think this was -- I guess to some extent there

04   were pages that were shifted around, but I think this was an

05   attempt to organize them by account per year, and so it came

06   out in a different -- a different way.  But, in general --

07   sixty-three I believe was the pdf page number.

08        UNIDENTIFIED MALE:  You're looking at the pdf page

09   number, not this?

10   A.   Yeah, you're -- you're at sixty-four.  Two more up, I

11   think.

12   Q.   We're getting there.  I apologize.

13   A.   No, no problem.  So, if you look here, again that's --

14   it's kind of -- it's -- it's been obscured a little bit

15   because of the multiple scanner pdf nature of this, but on

16   227 kind of the -- the -- the third of four lines of detail

17   there, it's 227 same date, INT. transfer to account.  It's a

18   little obscured because the -- the highlighting, but you'll

19   notice that the -- the line below it is obscured because of

20   redaction or Whiting out.  So, that's a $50,000.00 transfer

21   on the same day to another account that we -- we don't if --

22   what account that is, and -- and through all of my analysis

23   of all the accounts that were produced, there is no other

24   accounts that we have possession of data for that show the

25   inbound of that fifty thousand or the inbound of that three

094:01  million.  So, there's clearly another set of accounts that

02   were not produced that those -- those monies were transferred

03   to.  So, it reveals yet further question as to the

|  |  | 04 | completeness of the set of -- of bank records that were |
|---|---|---|---|
|  |  | 05 | provided in addition to the revelation of the -- the T.D. |
|  |  | 06 | 3053 account, there are yet other BBBA accounts it seems with |
|  |  | 07 | the INT. transfer -- the internal transfer nomenclature here, |
|  |  | 08 | other BBBA accounts that we are not in possession of, as |
|  |  | 09 | well. |

| Case | TSI |
|---|---|
| Issue Code | 8 Ayala Transfer And Other Misrepresentations |

| Teams Hearing 3-9-22 | | | |
|---|---|---|---|
| 1 | 087:21 - 089:05 | 087:21 | **Q.    Thank you.   And, did you also review transactions that** |
| | | 22 | **were to a company named Ayala -- represented in the Trial** |
| | | 23 | **Court to be a company named Ayala?** |
| | | 24 | A.    I -- I did.   There -- there were a number of |
| | | 25 | transactions related to Ayala and a number of claimed |
| | | 088:01 | expenses that were also related to Ayala.  In particular, as |
| | | 02 | it relates to information that was then revealed here in the |
| | | 03 | bankruptcy case, the -- in the Florida case T.S.I. D022484, |
| | | 04 | which is in exhibit eighty-two.  We're looking at ninety. |
| | | 05 | That -- that will be in a moment.  There was a $192,612.98 |
| | | 06 | claimed expense to Ayala, and the memo there was Marine |
| | | 07 | Terminal clin sixteen.  However, in T.S.I. -- Florida T.S.I. |
| | | 08 | Bates 245, which is exhibit seventy-nine, this was listed as |
| | | 09 | Logistics, which in another Florida T.S.I. 454, in exhibit |
| | | 10 | eighty, it was detailed different as Ayala clin sixteen. |
| | | 11 | However -- and you just had on the screen exhibit ninety, |
| | | 12 | T.S.I. 258 Bates number showed that these were not related to |
| | | 13 | Ayala, but in fact we had a check in the Florida case that |
| | | 14 | showed that it was to Bering Straits Logistic Service with |
| | | 15 | the memo FEMA CQ payment.  That expense was -- was a |
| | | 16 | legitimate expense in the Florida case.  However, you know |
| | | 17 | it's been represented differently in each of these other |
| | | 18 | respects. |
| | | 19 | **Q.    And -- and for the convenience of the Court, we don't** |
| | | 20 | **want to belabor each and every error that we found and -- and** |
| | | 21 | **mischaracterization, but were there other similar** |
| | | 22 | **transactions that were categorized in one way in the District** |
| | | 23 | **Court and differently once you got the bank records in** |
| | | 24 | **bankruptcy?** |
| | | 25 | A.    There -- there were.  And there were inconsistencies |
| | | 089:01 | between a number of other expenses from what had been |
| | | 02 | presented in the -- the -- the Trial Court to the bank |
| | | 03 | records presented in -- in the bankruptcy.  Because we did |
| | | 04 | not have those records in -- in the Trial Court to compare |
| | | 05 | to, we -- we ultimately were able to do so here. |

| Case | TSI |
|------|-----|
| Issue Code | 9 Swimming Pool Transfer To D. Mott |

| MOTT, DEBORAH 2/7/22 VOL 1 | | |
|---|---|---|
| 1 | 044:24 - 045:14 | 044:24 Q.    Okay.  Moving down to the September time |
| | | 25 frame, on September 25th of 2018, there's a |
| | | 045:01 transaction with All Aqua Pools for $19,232.  Do you |
| | | 02 see that? |
| | | 03 A.    I do. |
| | | 04 Q.    And what was that transaction for? |
| | | 05 A.    That's -- you see the "DEM-K-1"? |
| | | 06 Q.    I do. |
| | | 07 A.    That was assigned to my capital account. |
| | | 08 Q.    Is that a pool that was installed at a |
| | | 09 property? |
| | | 10 A.    I'm sorry.  I'm not answering questions |
| | | 11 about my individual financials or anything else, |
| | | 12 unless it has to do, like this does, where it shows |
| | | 13 up on a transfer from TSI to make sure that it's a |
| | | 14 proper transfer. |
| 2 | 045:19 - 049:05 | 045:19 Q.    Moving to the next page on August 18th, |
| | | 20 there's a transaction with Southern Title, where the |
| | | 21 company transferred $170,100 to a company named |
| | | 22 Southern Title. |
| | | 23 A.    That's correct.  Yep, that's correct. |
| | | 24 Q.    On the right-hand side there's a statement |
| | | 25 that that is a subcontractor. |
| | | 046:01 A.    No.  It says "K-1." |
| | | 02 Q.    Well, it's marked out and then there's a |
| | | 03 "K-1" written next to it. |
| | | 04 A.    Yep.  It says "K-1."  That's correct. |
| | | 05 Q.    And when did the marking out of |
| | | 06 subcontractor and the writing of "K-1" occur here, |
| | | 07 to your knowledge? |
| | | 08 A.    I don't recall exactly, but probably when I |
| | | 09 reviewed it before it was posted. |
| | | 10 Q.    Okay.  On the same page there's a second |
| | | 11 transaction with All Aqua Pools for $24,232.  Do you |
| | | 12 see that? |
| | | 13 A.    I do. |
| | | 14 Q.    And is that also relating to the pool that |

15  you'd had installed at some property?

16  A.     That says "DEM-K-1."  It was properly

17  applied to my capital account.

18  Q.     Okay.  Apologies.  I'm just looking for

19  something real quick.  It will just take a moment.

20              (Pause in the proceedings)

21              MR. MOODY:  We're ready to continue.

22  I'm sorry for the delay.

23  BY MR. MOODY:

24  Q.     It was your testimony a moment ago that this

25  All Aqua Pools was a K-1 expenditure for a pool for

047:01  your home; is that right?

02  A.     Correct.

03  Q.     In the District litigation, the All Aqua

04  transaction was presented as a transport truck for

05  CLIN 0016.  Can you explain why it was represented

06  to the federal court that the All Aqua transaction

07  was a transport truck transaction?

08  A.     Mr. Moody I wasn't the corporate

09  representative for the trial in Florida.  I didn't

10  provide any testimony, and I didn't provide any

11  financial reports.  I'm sorry.  I have no firsthand

12  knowledge of this, whatever you've got on the

13  screen.

14  Q.     Again on the next page here is another

15  document that was presented to the federal court

16  representing that the All Aqua transaction was a

17  transport transaction.

18  A.     Same answer.

19  Q.     Who would have created this document?

20  A.     I have no idea.

21  Q.     What is your role -- what is your exact role

22  with the company?

23  A.     I'm a member of the management committee.  I

24  did create this document, however.

25  Q.     Okay.

048:01  A.     And that's correct.

02  Q.     And this document shows a transaction with

03  Southern Title in the amount of $170,000; is that

04  right?

05  A.     That's correct.

06  Q.     In this District Court litigation there was

07  this transaction that added up to the same amount,

```
08  but it was identified as Tesza Marine.  Do you have
09  any idea why the company would have reflected the
10  Southern Title transactions as Tesza Marine in the
11  district litigation?
12  A.      Mr. Moody, once again, I was not the
13  corporate representative in the Florida litigation.
14  I did not provide any testimony or reports.
15  BY MS. KASEN:
16  Q.      I'm sorry.  Does that -- are you answering
17  that you don't know the answer or that you're just
18  refusing to answer?  Can you please clarify?
19  A.      Mr. Moody's questioning me, Ms. Kasen.
20  BY MR. MOODY:
21  Q.      Can you answer again why there's a
22  discrepancy between what your report -- records
23  reflect and what was presented to the District
24  Court?
25  A.      Mr. Moody, I was not the corporate
049:01  representative.  I did not provide any financial
02  documents, and I believe there was a lot of motions
03  back and forth.  And it's all over the docket about
04  attorney work product versus actual exhibits.  But I
05  have no firsthand knowledge of any of it.
```

| 3 | 099:08 - 099:24 | |
|---|---|---|

```
099:08  Q.      Did you have TSI pay for the installation of
09  a pool at that property?
10              MR. CROWTHER:  Objection to form.
11  Q.      Answer the question.
12  A.      I can't because the -- the basis of your
13  question is incorrect.
14  Q.      So it's your testimony that TSI did not pay
15  for the pool that was installed at 7050 Riverside
16  Drive?
17              MR. CROWTHER:  Objection to form.
18              You can answer, Ms. Mott.
19  A.      Yes, that's my contention.  My husband and I
20  paid for it through money we earned from our hard
21  work and booked to our capital account.
22  Q.      So it was money paid from a bank account
23  that you have in your own individual name?
24  A.      Part of it, that's correct.
```

| | | |
|---|---|---|
| | | Teams Hearing 3-9-22 |

| 1 | 084:05 - 087:20 | 084:05 | Q.   Okay.  Did you review documents relating to -- well, let |
|---|---|---|---|

084:05  Q.   Okay.  Did you review documents relating to -- well, let
06  me back up.  Strike that question.  Were there documents
07  presented in the Trial Court relating to a -- a company
08  called All Aqua?  (phonetic)
09        MS. ENGLAND:  Objection, Your Honor.  I -- I -- I'm
10  not sure what the Trial Court documents -- what the relevancy
11  of those are in this matter today.
12        THE COURT:  Mr. Moody, can you tell us what the
13  relevant -- what how these will become relevant?
14        MR. MOODY:  Yes, Your Honor.  They presented in the
15  Trial Court documents that were falsified to show that the
16  debtor had paid -- in -- in the case of Southern Land Holding
17  Company they had paid Tesza Marine, but in fact the money
18  went to Southern Title Holding Company according to bank
19  records produced in the bankruptcy case.  The same thing is -
20  - is the All Aqua pool -- the All Aqua purchase, which was
21  represented at Trial Court to be for a company called All
22  Aqua, which sounded as if it was related to the bottled water
23  contract.  But, the banking records that we're going to ask
24  the debtor -- the witness testify to showed that those monies
25  actually went to put in a pool at Deborah Mott's home in
085:01  Ormond Beach, Florida.
02        THE COURT:  All right.  So, Ms. England, I'm
03  inclined to give him a chance to present this evidence.
04  You'll have the opportunity after it's been presented to
05  explain to me why I should strike it on the ground that it's
06  irrelevant.
07        MS. ENGLAND:  All right.  Thank you.
08        THE COURT:  Okay.  So, Mr. Moody, you should
09  proceed.
10  Q.   Okay.  Do you see what's on my screen here?  It's --
11  it's been marked as exhibit eighty-two.  Can you explain to
12  the Court what this document is?
13  A.    Yeah, so in the -- the Florida case this set of
14  documents was presented as the bank records for T.S.I.
15  establishing claimed expenses for the company, which -- you
16  know which in the Florida case would have reduced the net
17  income of the company in Florida and you know was part of the
18  -- the litigation there as to the share of net income among
19  the litigants.  So, this is the quote bank records presented
20  at the time establishing claimed expenses.  And on -- on this

21  T.S.I. bates number D022485, this reflects the expense to All

22  Aqua on the -- in -- in -- on the screen -- on the 21st of

23  August, 2018 for $24,232.50.  And it was referred to in the

24  memo as transport truck clin sixteen, and the clin was one of

25  the -- in the contract in the Florida case, one of the line

086:01  items under which revenues and -- and -- and expenses were --

02  were flowing.  So, exhibit eighty-two, which is on the screen

03  -- T.S.I. Bates 22485 you know shows that $24,000.00 as going

04  to All Aqua for Marine for -- for transport clin sixteen.

05  However, T.S.I. 870 Bates number, which is in exhibit

06  seventy-five, which is the expense summary provided by -- by

07  T.S.I. in this case, which in -- in her deposition Deborah

08  Mott said that she had prepared, listed all All Aqua Pools

09  D.M./J.M., which is Deborah Mott and Jim Maciorowski (sic),

10  and K-1 in the notes.  So, this was detailed as a K-1

11  distribution in the -- the bankruptcy case in Delaware.

12  However, it -- it's now clear from a couple pieces of data

13  that All Aqua Pools is a custom pool contractor that Deborah

14  Mott and John Maciorowski used for the Ormond Beach home.

15  And it's noted on the warranty deed, which we referred to a

16  moment ago in exhibit sixty-six, that there was permitted

17  allowed for up to $70,000.00 for an in-ground pool and spa,

18  which All Aqua Pools was the contractor for.  So, again, the

19  -- the discrepancy here between what was stated in the

20  Florida case as expenses for All Aqua and the reality from

21  the bank records and bankruptcy court testimony and

22  deposition, that this was K-1 income for -- for the pool.

23  Q.   Okay.

24  A.   And, if -- if I just might separately and similarly,

25  there's another $19,232.50 expense that that tracks very

087:01  similarly to this one, and I'm -- I'm happy to -- to walk

02  through the -- the Bates numbers and exhibits for that, as

03  well.

04  Q.   Yes, if you please could.

05  A.   Certainly.  So, in the Florida case Bates number

06  D022533, which is in exhibit eighty-four, there is a -- an

07  expense listed, you know a claimed expense in the Florida

08  case of $19,232.50 for All Aqua, which came from checking

09  9759.  The memo there is Marine Transport clin 16, again

10  similar memo to the -- to the prior one.  However, in the

11  T.S.I. Bates number 911, which is in exhibit seventy-five,

12  this is expense summary which is the -- the detailed listing

13  from T.S.I. as to what each of these expenses and their bank

14  records are for, it lists All Aqua Pools and again D.E.M.,

15  which is Deborah Evans Mott, K-1 in the notes.  However, as

16  stated a moment ago, All Aqua Pools is the custom pool

17  contractor for Deborah Mott and John Maciorowski Ormond

18  Beach, Florida home.  And there was permitting, as we just

19  referred to in exhibit sixty-six reflecting up to $70,000.00

20  for an in-ground pool and spa for that home and address.

| Case | TSI |
|---|---|
| Issue Code | D. Mott Evasiveness |

| MOTT, DEBORAH 2/7/22 VOL 1 | | | |
|---|---|---|---|
| 1 | 010:20 - 011:20 | 010:20 | Q.    Yes.  Have you ever been deposed before? |
| | | 21 | A.    Yes. |
| | | 22 | Q.    When were you deposed? |
| | | 23 | A.    I'm sorry.  Say again? |
| | | 24 | Q.    When were you deposed? |
| | | 25 | THE COURT REPORTER:  Sorry.  It's |
| | | 011:01 | very difficult to hear you.  Can you speak louder, |
| | | 02 | Mr. Moody? |
| | | 03 | MR. MOODY:  Yes, I will. |
| | | 04 | THE COURT REPORTER:  Thank you. |
| | | 05 | BY MR. MOODY: |
| | | 06 | Q.    In what cases were you deposed in the past, |
| | | 07 | Ms. Mott? |
| | | 08 | A.    I recall that Mr. Collins deposed me in the |
| | | 09 | case in Florida. |
| | | 10 | Q.    Other than that deposition, have you ever |
| | | 11 | been deposed before? |
| | | 12 | A.    I have, but I don't recall each instance |
| | | 13 | right now. |
| | | 14 | Q.    So there were multiple different occasions |
| | | 15 | when you were deposed aside from Mr. Collins' prior |
| | | 16 | deposition? |
| | | 17 | A.    Yes, that would be correct. |
| | | 18 | Q.    And do you remember the nature of those |
| | | 19 | occasions? |
| | | 20 | A.    No, I'm sorry. |
| 2 | 012:07 - 012:19 | 012:07 | Q.    Okay.  And where are you physically located? |
| | | 08 | A.    Today? |
| | | 09 | Q.    Yes. |
| | | 10 | A.    I'm physically located in a house that I own |
| | | 11 | that I keep for my disabled son in Haymarket, |
| | | 12 | Virginia. |
| | | 13 | Q.    And what is the address to that property? |
| | | 14 | A.    15750 Ryder Cup Drive, Haymarket, Virginia, |
| | | 15 | 20169. |
| | | 16 | Q.    Okay.  What other addresses do you own? |
| | | 17 | A.    Now you're delving into my personal |

| | | | |
|---|---|---|---|
| | | 18 | information, and I'm here as a representative for |
| | | 19 | TSI. |
| 3 | 015:10 - 015:16 | 015:10 | Q.     Ms. Mott, the last question I asked you was |
| | | 11 | what other residential addresses you own.  And I |
| | | 12 | think you refused to answer the question.  Is that |
| | | 13 | right? |
| | | 14 | A.     Because it's about my personal information, |
| | | 15 | not TSI's business, books or records, that's |
| | | 16 | correct. |
| 4 | 015:25 - 018:22 | 015:25 | Q.     Do you understand that you've been offered |
| | | 016:01 | to testify as a corporate witness with respect to |
| | | 02 | the debtor's financial affairs? |
| | | 03 | A.     That's correct. |
| | | 04 | Q.     And bankruptcy schedules? |
| | | 05 | A.     I'm sorry.  Was that -- was that one |
| | | 06 | question or multiple questions? |
| | | 07 | Q.     Yes.  You've been offered as a corporate |
| | | 08 | witness.  I'm listing the categories that you've |
| | | 09 | been offered as a corporate witness, and I want to |
| | | 10 | understand if you understand that you are the person |
| | | 11 | who is to speak on behalf of the debtor with respect |
| | | 12 | to these subjects. |
| | | 13 | A.     Correct. |
| | | 14 | Q.     The debtor's financial affairs? |
| | | 15 | A.     In the bankruptcy proceeding, correct. |
| | | 16 | Q.     In general. |
| | | 17 | A.     Define "In general." |
| | | 18 | Q.     All of the debtor's financial affairs. |
| | | 19 | A.     Correct. |
| | | 20 | Q.     You have been offered to testify as a |
| | | 21 | corporate representative with respect to the |
| | | 22 | debtor's bankruptcy schedules and statement of |
| | | 23 | financial affairs.  Correct? |
| | | 24 | A.     I'm sorry.  Is that a question or were you |
| | | 25 | ... |
| | | 017:01 | Q.     Yeah.  Do you agree or disagree? |
| | | 02 | A.     Could you restate it?  I'm having difficulty |
| | | 03 | hearing you. |
| | | 04 | Q.     Have you been offered -- do you know what |
| | | 05 | the debtor's statement of financial affairs is? |
| | | 06 | A.     Yes. |
| | | 07 | Q.     Are you going to be able to testify today |

08  about the contents of it?

09  A.      Yes.

10  Q.      Are you familiar with the debtor's

11  bankruptcy court filings?

12  A.      Yes.

13  Q.      And you are going to speak on behalf of

14  those to us today; is that correct?

15  A.      Yes.

16  Q.      You've been offered to speak as the debtor's

17  representative with respect to its litigation with

18  creditors; correct?

19  A.      Define "litigation with creditors."

20  Q.      That's the category that was in the notice

21  of deposition.

22          Are you saying that you have no

23  knowledge of any litigation with creditors?

24  A.      Define which matter you're -- which

25  litigation?

018:01  Q.      I'm asking the questions, Ms. Mott.  If you

02  don't know the answer, just say that you're not here

03  today to testify with respect to that, and I'll ask

04  who is going to testify with respect to the

05  litigation with creditors.

06  A.      I can testify with respect to the litigation

07  in the Bankruptcy Court with creditors.

08  Q.      What litigation in the Bankruptcy Court has

09  there been with creditors?

10  A.      I'm not a lawyer, so I'm just referencing

11  all of these proceedings.

12  Q.      So you're not being offered today to testify

13  about litigation with GPDEV and Simons Exploration,

14  are you?

15  A.      No, I'm not.

16  Q.      Okay.  We noticed the deposition, and we

17  asked for a 30(b)(6) representative be present who

18  has knowledge about all of the debtor's litigation

19  with creditors.  Who is -- who will it be that will

20  be testifying with respect to that today?

21  A.      I'm not sure I understand the question.  I'm

22  not a lawyer.

| 5 | 020:05 - 020:13 | 020:05 | Q.      Are you qualified today to testify with |
| | | 06 | respect to the debtor's pre-petition conduct? |

| | | | |
|---|---|---|---|
| | | 07 | A.      I'm sorry.  I don't know what that means. |
| | | 08 | **Q.      Are you qualified today to testify as to the** |
| | | 09 | **debtor's pre-petition conduct which led to the** |
| | | 10 | **bankruptcy filing?** |
| | | 11 | A.      That's a broad category.  I'm not -- could |
| | | 12 | you define it a little narrower? because I'm not |
| | | 13 | sure how to answer that question. |
| 6 | 021:11 - 021:21 | 021:11 | **Q.      Are you aware of any transfers of money or** |
| | | 12 | **property to an insider of the company during the** |
| | | 13 | **last four years?** |
| | | 14 | A.      Well, that would be a yes, because we're a |
| | | 15 | limited liability company.  So we're a pass-through |
| | | 16 | entity.  So that's a normal business operation for |
| | | 17 | us. |
| | | 18 | Q.      Okay.  And are you aware of the debtor |
| | | 19 | **paying for any real estate assets that are in your** |
| | | 20 | **name?** |
| | | 21 | A.      No, I'm not. |
| 7 | 036:13 - 037:12 | 036:13 | **Q.      Going forward to the page we're looking at** |
| | | 14 | **now, which is TSI871, there's a whole bunch of** |
| | | 15 | **cleared check transactions between July 2nd and** |
| | | 16 | **July 27th, 2018, but there's no indication as to who** |
| | | 17 | **these checks were paid to.  Can you tell us who any** |
| | | 18 | **of these checks were paid to?** |
| | | 19 | A.      Without the canceled checks in front of me, |
| | | 20 | I'm afraid I don't recall. |
| | | 21 | **Q.      You were asked to produce canceled checks,** |
| | | 22 | **both here and in the District Court.  What steps did** |
| | | 23 | **you take to obtain copies of canceled checks?** |
| | | 24 | A.      I believe the judge in the Delaware court |
| | | 25 | asked us to produce bank statements, which we |
| | | 037:01 | produced.  On those statements that produced |
| | | 02 | canceled checks, we produced them; and then I |
| | | 03 | believe our lawyers requested a list from you of the |
| | | 04 | canceled checks that you wanted us to go to the bank |
| | | 05 | and get.  And we are open to do that. |
| | | 06 | **Q.      Before the filing of the bankruptcy case,** |
| | | 07 | **did you take any steps to try and obtain canceled** |
| | | 08 | **checks as required by the post-judgment discovery in** |
| | | 09 | **the District Court?** |
| | | 10 | A.      I was not the corporate representative on |
| | | 11 | that case.  So I'm afraid I don't have anything to |

| | | | |
|---|---|---|---|
| | | 12 | add. |
| 8 | 041:10 - 041:18 | 041:10 | Q.      Going over to March 23rd of 2018 on TSI926, |
| | | 11 | there's a payment to a Mercedes-Benz Orlando.  Do |
| | | 12 | you recognize that payment? |
| | | 13 | A.      Yeah.  We disputed that. |
| | | 14 | Q.      Do you drive a Mercedes-Benz? |
| | | 15 | A.      I do. |
| | | 16 | Q.      And does Christopher Mott drive a |
| | | 17 | Mercedes-Benz? |
| | | 18 | A.      He does, but not in 2018. |
| 9 | 044:09 - 044:23 | 044:09 | Q.      Are you familiar with -- we just talked a |
| | | 10 | moment ago about Choice Landscapes with whom you |
| | | 11 | paid $10,000.  The website for this company states |
| | | 12 | that it is an Ormond Beach landscape design |
| | | 13 | installation company. |
| | | 14 |          Were your containers delivered to |
| | | 15 | Ormond Beach? |
| | | 16 | A.      You're conflating two companies. |
| | | 17 | Q.      So that your testimony is you contracted |
| | | 18 | with Choice Landscapes that was not this company? |
| | | 19 | A.      I'm sorry.  What do you mean "this company"? |
| | | 20 | Q.      Is it your testimony you've never contracted |
| | | 21 | with Ormond Beach Landscape Designer and |
| | | 22 | Installation Company? |
| | | 23 | A.      The TSI has never contracted or -- yes. |
| 10 | 051:17 - 052:16 | 051:17 | Q.      All right.  Moving on to page 895 of this |
| | | 18 | document, do you see that there's a 7/18/2019 check |
| | | 19 | cleared in the amount of $2,500,000? |
| | | 20 | A.      I do. |
| | | 21 | Q.      Do you know who that $2.5 million was paid |
| | | 22 | to? |
| | | 23 | A.      I'm not positive, but given it's 2019, I'm |
| | | 24 | guessing it was probably Ayala. |
| | | 25 |          Could we get the Bates number off of |
| | | 052:01 | this piece of paper? because the check should have a |
| | | 02 | check number next to "CHECK CLEARED." |
| | | 03 | Q.      Correct.  And it's No. 895.  We found it |
| | | 04 | strange as well that there's no check number listed, |
| | | 05 | but it says "CHECK CLEARED" for a very large amount |
| | | 06 | of money. |
| | | 07 | A.      Is there a check number? |
| | | 08 | Q.      No.  This is a document that you produced to |

| | | | |
|---|---|---|---|
| | | 09 | us.  Simply says "CHECK CLEARED." |
| | | 10 | A.      There should be a check number.  There must |
| | | 11 | be a check number on the statement that we produced |
| | | 12 | as well. |
| | | 13 |          And what was that Bates number |
| | | 14 | again, Mr. Moody? |
| | | 15 | Q.      895. |
| | | 16 | A.      Okay.  Thank you. |
| 11 | 053:20 - 054:16 | 053:20 | Q.      **Moving in order to Exhibit 70, do you** |
| | | 21 | **recognize this payment here on October 5th of 2018,** |
| | | 22 | **to Audi of Chantilly?** |
| | | 23 | A.      Something's wrong.  What's the Bates number |
| | | 24 | on this page? |
| | | 25 | Q.      934. |
| | | 054:01 | A.      I think you've already showed this to me |
| | | 02 | but -- with the entire document, and I told you that |
| | | 03 | we disputed that.  It looks like you've cropped part |
| | | 04 | of the document off. |
| | | 05 | Q.      **This is a new exhibit.  It's the first I've** |
| | | 06 | **asked you about it.** |
| | | 07 | A.      No, I don't think so.  We disputed that. |
| | | 08 | Q.      **Is anybody in your family drive an Audi?** |
| | | 09 | A.      Not in 2018. |
| | | 10 | Q.      **Does anybody in your family drive an Audi?** |
| | | 11 | A.      I'm not in this case. |
| | | 12 | Q.      **So you're refusing to answer?** |
| | | 13 | A.      I told you no one in 2018 drove an Audi |
| | | 14 | because the date on here is 2018.  Then you took it |
| | | 15 | a step further to ask me about my personal |
| | | 16 | information, and I'm declining to answer. |
| 12 | 061:15 - 062:10 | 061:15 | Q.      **Okay.  Do you dispute that TSI paid for** |
| | | 16 | **property located in Jackson County, Missouri?** |
| | | 17 | A.      Yes. |
| | | 18 | Q.      **You dispute that TSI paid for property** |
| | | 19 | **located in Jackson County, Missouri?** |
| | | 20 | A.      Yes. |
| | | 21 | Q.      **Okay.  Do you dispute that you bought the** |
| | | 22 | **property?** |
| | | 23 |          THE COURT REPORTER:  I'm sorry.  We |
| | | 24 | can't hear you. |
| | | 25 | Q.      **Do you dispute that you bought property that** |
| | | 062:01 | **TSI transferred $341,117 to Coffelt Land Title in** |

|    |                 |        | 02 | the year 2020? |
|    |                 |        | 03 | A.      You'll have to show me the transaction |
|    |                 |        | 04 | you're referencing to show me that it's TSI.  That's |
|    |                 |        | 05 | what you're alleging. |
|    |                 |        | 06 | Q.      Do you have any knowledge of TSI paying for |
|    |                 |        | 07 | property in Jackson County, Missouri, in 2020? |
|    |                 |        | 08 | A.      Mr. Moody, you need to show the transaction |
|    |                 |        | 09 | that you're referencing before I can answer your |
|    |                 |        | 10 | question. |

| 13 | 063:15 - 067:12 | 063:15 | Q.      Looking back at Exhibit 70, when you were |
|    |                 |    16  | looking at transfers that occurred in April of 2018. |
|    |                 |    17  | Do you remember that? |
|    |                 |    18  | A.      No, but I'm sure, you know, I'll be happy to |
|    |                 |    19  | look at the document and answer your questions, if |
|    |                 |    20  | I'm able. |
|    |                 |    21  | Q.      Just so we're clear, all of these documents, |
|    |                 |    22  | these -- there's one for each of the bank |
|    |                 |    23  | accounts -- these are business records; would you |
|    |                 |    24  | agree? |
|    |                 |    25  | A.      I'm sorry, Mr. Moody.  You have to show me, |
|    |                 | 064:01 | please, what you're referencing so I can see it. |
|    |                 |    02  | Q.      Right.  Each of the documents that have an |
|    |                 |    03  | account number at the top and a listing like this -- |
|    |                 |    04  | I believe you called it a transaction history -- |
|    |                 |    05  | these are documents you created, each of those; |
|    |                 |    06  | correct? |
|    |                 |    07  | A.      Well, I can't answer the question until you |
|    |                 |    08  | show me the documents you're referencing, and I'll |
|    |                 |    09  | be happy to look and answer the question. |
|    |                 |    10  | Q.      How about this one? |
|    |                 |    11  |         MR. CROWTHER:  We're not seeing a |
|    |                 |    12  | document. |
|    |                 |    13  | A.      I don't see anything. |
|    |                 |    14  |         MR. CROWTHER:  We can't see the |
|    |                 |    15  | document.  Sorry. |
|    |                 |    16  |         MR. MOODY:  Sorry about that. |
|    |                 |    17  | Didn't realize we weren't sharing. |
|    |                 |    18  | BY MR. MOODY: |
|    |                 |    19  | Q.      This is the document that I'm talking about. |
|    |                 |    20  | These are -- I believe you called them transaction |
|    |                 |    21  | summaries, and you have one for each of the bank |
|    |                 |    22  | accounts. |

23            What I'm trying to confirm or just

24   determine is are each of these business records, are

25   these created contemporaneously with when the

065:01  transactions occurred?

02   A.        Could you list the Bates numbers, please,

03   for the record?

04   Q.        I mean, is this -- this document that you're

05   looking at here for BBVA 8593, my question is, is

06   this one of the transaction summaries that we've

07   been looking at today, is this something that you

08   created -- that was created at or around the time of

09   the events that are depicted inside of the document?

10   A.        Once again, Mr. Moody, could you please list

11   the Bates number?  And then I can comment on the

12   documents.

13   Q.        Sure.  This one is Bates No. 938.

14   A.        Okay.

15            So your question is, are these

16   business records?

17   Q.        Yes.  Are these records that are created in

18   the ordinary course of business for TSI?

19   A.        Yes.

20   Q.        Okay.  And this one reflected on

21   April 12th of 2018 that there was a transfer to

22   Southern Title and there's a "(DM/JM)" next to it,

23   and the amount is 319,849.91.  Do you see that?

24   A.        I do.

25   Q.        What was that money used for?

066:01  A.        That money was transferred to the members'

02   capital accounts, and -- it was transferred to the

03   members' capital accounts.

04   Q.        Okay.  And when I go into the records that

05   were presented to the District Court in litigation

06   that are the exact same day from Account No. 8593 --

07   this is April 12th of 2018 -- there's a transaction

08   for the exact same dollar amount, 319,849.91.  Do

09   you see that?

10   A.        Mr. Moody, there was a lot of litigation in

11   that case about records, about the validity of

12   records, about the authenticity of records on both

13   sides.  So I can't definitively speak to any records

14   you're producing from that case.  As I said --

15   Q.        My question --

| | | | |
|---|---|---|---|
| | | 16 | A.      -- I wasn't the corporate representative.  I |
| | | 17 | didn't provide any records.  I didn't -- I was not |
| | | 18 | involved other than the deposition at the beginning |
| | | 19 | of the filing. |
| | | 20 | Q.      Okay.  But my question to you is:  Do you |
| | | 21 | see the transaction detail entered at the bottom, it |
| | | 22 | says "Checking No. 8953"?  Do you see that? |
| | | 23 | A.      I'm sorry, I can't comment on a document |
| | | 24 | that I don't have firsthand knowledge about. |
| | | 25 | Q.      You can't comment as to whether this says |
| | | 067:01 | "Checking Account ending 8953"? |
| | | 02 | A.      No, sir.  I don't have firsthand knowledge |
| | | 03 | about this document. |
| | | 04 | Q.      So this document shows a transaction in the |
| | | 05 | exact same dollar amount that's listed in your |
| | | 06 | ledger, 319,849.91.  But it says it went to Tesza |
| | | 07 | Marine instead of Southern Title Holdings Company. |
| | | 08 | A.      I'm comfortable with the documents I |
| | | 09 | provided in this bankruptcy case, in the ledger, and |
| | | 10 | I have firsthand knowledge off those documents.  I |
| | | 11 | have no firsthand knowledge of these documents.  I |
| | | 12 | have no idea where they came from. |
| 14 | 088:06 - 089:02 | 088:06 | Q.      Did you purchase the house on or about |
| | | 07 | August 10th, 2020, at 1059 Southwest in Jackson |
| | | 08 | County, Missouri? |
| | | 09 | A.      Can you show me what document you're |
| | | 10 | reading? |
| | | 11 | Q.      No. |
| | | 12 | A.      Well, then, I can't answer you.  I'm sorry. |
| | | 13 | Q.      You can't -- you don't know whether you |
| | | 14 | purchased a property in Jackson County, Missouri -- |
| | | 15 | A.      Well. |
| | | 16 | Q.      -- in August -- |
| | | 17 | A.      I'm not sure about the county and I'm not |
| | | 18 | sure about the date.  And if you could just show me |
| | | 19 | what you're referencing, then I could read it and it |
| | | 20 | would help me recall. |
| | | 21 | Q.      You can't recall whether you own a property |
| | | 22 | at 1059 Southwest Conch Circle, Lees Summit, |
| | | 23 | Missouri 64064? |
| | | 24 | A.      I don't know the address by heart, no, I |
| | | 25 | don't.  And I don't know the dates you're stating. |

| | | | |
|---|---|---|---|
| | | 089:01 | If you could just show me what you're referencing, I |
| | | 02 | can look at it and answer your question. |
| 15 | 089:07 - 089:20 | 089:07 | Q.      So it's your testimony today that you don't |
| | | 08 | know whether you purchased a home in August of 2020 |
| | | 09 | at 1059 Southwest Conch Circle in Missouri; is that |
| | | 10 | correct? |
| | | 11 | A.      No, that's not correct. |
| | | 12 | Q.      So you do know that you purchased a property |
| | | 13 | at that address in Missouri in August of 2020? |
| | | 14 | A.      Mr. Moody, you're obviously reading from a |
| | | 15 | record and there are dates on it.  And I don't |
| | | 16 | recall the dates right now.  If you would just show |
| | | 17 | the record to me, I can answer your question. |
| | | 18 |            And, by the way, this is a |
| | | 19 | personal -- this is my personal information, not |
| | | 20 | TSI's. |
| 16 | 090:17 - 090:21 | 090:17 | Q.      You do know you own a home at 1059 Southwest |
| | | 18 | Conch Circle, Lees Summit, Missouri 64064? |
| | | 19 | A.      Just show the record to me.  I don't |
| | | 20 | understand what the problem is.  Just show the |
| | | 21 | record to me. |
| 17 | 091:15 - 091:21 | 091:15 | Q.      Ms. Mott, when you purchased the property in |
| | | 16 | Missouri, did you use a bank loan to purchase it? |
| | | 17 | A.      About my individual purchase?  You mean when |
| | | 18 | I purchased in my individual capacity we're now |
| | | 19 | discussing? |
| | | 20 | Q.      Yes. |
| | | 21 | A.      Yeah.  I don't feel comfortable. |
| 18 | 106:15 - 106:19 | 106:15 | Q.      Did you declare bankruptcy in 2013 |
| | | 16 | personally? |
| | | 17 | A.      No, I did not.  That was a fraud. |
| | | 18 | Q.      What can you tell us about that? |
| | | 19 | A.      I don't recall -- |
| 19 | 108:19 - 108:22 | 108:19 | Q.      Would you agree with me that you purchased |
| | | 20 | this home on or about July 24th for $930,000? |
| | | 21 | A.      I don't recall.  I'm sure you have a piece |
| | | 22 | of paper to show me that can refresh my memory. |
| 20 | 123:04 - 124:01 | 123:04 | Q.      Subsection 4.1(c) of the operating agreement |
| | | 05 | for TSI says, "The Management Committee shall act by |
| | | 06 | resolution duly adopted at [the] meeting of the |
| | | 07 | Management Committee or by consent in writing of all |

|  |  | 08 | Managers.  Managers may vote or give their consent |
|  |  | 09 | in person or by proxy." |
|  |  | 10 | I asked earlier whether the |
|  |  | 11 | management committee acts by resolution or with the |
|  |  | 12 | consent of all the managers, and you said no. |
|  |  | 13 | A.    Oh.  I'm sorry.  I misunderstood you.  I |
|  |  | 14 | thought you meant members. |
|  |  | 15 | Q.    Okay.  So do you have any resolutions or |
|  |  | 16 | consents in writing? |
|  |  | 17 | A.    No.  Just because -- it doesn't say we have |
|  |  | 18 | to do it in writing.  It says or by consent in |
|  |  | 19 | writing. |
|  |  | 20 | Q.    It says, "The Management Committee shall act |
|  |  | 21 | by resolution duly adopted at a meeting of the |
|  |  | 22 | Management Committee or by consent in writing of all |
|  |  | 23 | Managers." |
|  |  | 24 | A.    Right.  So we have the resolution when we |
|  |  | 25 | added Steve as a member, but there's been no events |
|  |  | 124:01 | to trigger another resolution. |
| 21 | 124:06 - 124:21 | 124:06 | Q.    Were there any resolutions authorizing the |
|  |  | 07 | transfer of funds to Coffelt Land Title for the |
|  |  | 08 | purchase of the property in Missouri? |
|  |  | 09 | A.    The basis of your question is not correct. |
|  |  | 10 | Q.    Were there any resolutions for the transfer |
|  |  | 11 | of money from Southern Title Holdings for the |
|  |  | 12 | purchase of property in Florida? |
|  |  | 13 | A.    The premise of your question is incorrect. |
|  |  | 14 | You continue to make the premise that TSI purchased |
|  |  | 15 | these properties, and we've told you repeatedly that |
|  |  | 16 | is not true. |
|  |  | 17 | Q.    Any resolutions passed when money was |
|  |  | 18 | transferred to the law firm in Delaware for the |
|  |  | 19 | purchase of the Addy Road property? |
|  |  | 20 | A.    Once again, the premise of your question is |
|  |  | 21 | incorrect. |
| 22 | 125:06 - 126:05 | 125:06 | Q.    Who authorized the transfers of funds that |
|  |  | 07 | you say are K-1 distributions? |
|  |  | 08 | A.    That would be the management committee. |
|  |  | 09 | Q.    Was there -- |
|  |  | 10 | A.    But in reality, but in reality, all the |
|  |  | 11 | members meet at the end of the year, and we have a |
|  |  | 12 | meeting and discuss who really did what and who's |

|    |    |    |    |
|----|----|----|----|
|    |    | 13 | working on what and then we proceed. |
|    |    | 14 | **Q.      Okay.** |
|    |    | 15 | A.      We're a small business. |
|    |    | 16 | **Q.      So is there -- there's nothing in writing** |
|    |    | 17 | **authorizing the amounts you decided to take as your** |
|    |    | 18 | **K-1 distributions?** |
|    |    | 19 | MR. CROWTHER:  Objection to form. |
|    |    | 20 | A.      I don't -- |
|    |    | 21 | MR. CROWTHER:  Go ahead. |
|    |    | 22 | THE WITNESS:  I'm sorry.  Go ahead, |
|    |    | 23 | Curtis? |
|    |    | 24 | MR. CROWTHER:  Objection to form. |
|    |    | 25 | You can answer, though. |
|    |    | 126:01 | A.      I don't think there needs to be under our -- |
|    |    | 02 | if you read the rest of the operating agreement, I |
|    |    | 03 | don't believe there needs to be, as long as the |
|    |    | 04 | members are of like mind and the management |
|    |    | 05 | committee agrees. |
| 23 | 127:24 - 128:05 | 127:24 | **Q.      Do you have an interest in any business that** |
|    |    | 25 | **has exchanged money, property, or funds with TSI?** |
|    |    | 128:01 | A.      So different -- that was an -- do I have a |
|    |    | 02 | business interest in other businesses that have |
|    |    | 03 | exchanged assets with TSI; is that the question? |
|    |    | 04 | **Q.      Any money, property, or assets.** |
|    |    | 05 | A.      Yeah, no. |
| 24 | 137:03 - 137:05 | 137:03 | **Q.      Did you -- did the debtor transfer any money** |
|    |    | 04 | **or property to Addy Road LLC?** |
|    |    | 05 | A.      Not to my knowledge. |
| 25 | 137:19 - 139:12 | 137:19 | Did the debtor transfer any money |
|    |    | 20 | between 2017 and today in connection with the |
|    |    | 21 | purchase of real estate? |
|    |    | 22 | MR. CROWTHER:  Objection to form. |
|    |    | 23 | A.      Not that I recall. |
|    |    | 24 | **Q.      Okay.  So it's your position that the debtor** |
|    |    | 25 | **did not transfer any money for the purpose of** |
|    |    | 138:01 | **705 Riverside Drive in Ormond Beach, Florida.** |
|    |    | 02 | MR. CROWTHER:  Objection to form. |
|    |    | 03 | A.      We've gone through this ad nauseam, and the |
|    |    | 04 | premise of your allegation is not correct. |
|    |    | 05 | **Q.      You can answer the question.** |
|    |    | 06 | A.      I just did. |
|    |    | 07 | **Q.      So ... So it's your position that the debtor** |

| | | | |
|---|---|---|---|
| | | 08 | did not transfer any sums in conjunction with the |
| | | 09 | purchase of the 705 Riverside Drive address. |
| | | 10 | MR. CROWTHER:  Objection to form. |
| | | 11 | A.     Mr. Moody, I've already answered you. |
| | | 12 | Q.     Okay. |
| | | 13 | A.     My husband and I worked very hard for many |
| | | 14 | years.  The money was transferred -- the money was |
| | | 15 | assigned and booked to our capital account, and we |
| | | 16 | used that money to purchase our home in Florida. |
| | | 17 | Q.     Did it come from the bank accounts of the |
| | | 18 | debtor? |
| | | 19 | MR. CROWTHER:  Objection to form. |
| | | 20 | A.     That's the wrong question.  The more -- the |
| | | 21 | correct question and the correct premise would be is |
| | | 22 | how was the money booked and was it an appropriate |
| | | 23 | transfer based on the LLC's books and records and |
| | | 24 | the tax code. |
| | | 25 | Q.     We're not asking about that.  We're asking |
| | | 139:01 | whether there was a transfer of money from the |
| | | 02 | debtor's accounts to help purchase these properties. |
| | | 03 | MR. CROWTHER:  Objection to form. |
| | | 04 | A.     We've already gone through that.  Your |
| | | 05 | position I don't agree with. |
| | | 06 | My position is -- or not mine, |
| | | 07 | excuse me, but TSI's position is those transfers |
| | | 08 | were booked -- properly booked to our capital |
| | | 09 | accounts.  Therefore, that's our money.  We worked, |
| | | 10 | and we're entitled to the net income and the fruits |
| | | 11 | of our labor.  As long as it complies with the |
| | | 12 | membership agreement and federal law. |
| 26 | 139:24 - 141:07 | 139:24 | Q.     Is there any reason that there is never a |
| | | 25 | K-1 for Christopher Mott? |
| | | 140:01 | A.     I'm sorry?  The basis of your question is |
| | | 02 | incorrect. |
| | | 03 | Q.     Okay.  Is there any reason you haven't |
| | | 04 | produced any K-1s for Chris Mott? |
| | | 05 | A.     That's incorrect.  We have produced them. |
| | | 06 | You just passed it. |
| | | 07 | Q.     I'm looking at the year 2018, and I don't |
| | | 08 | see a K-1 for Christopher Mott. |
| | | 09 | A.     You did have -- you passed it very quickly. |
| | | 10 | Keep going. |

| | | | |
|---|---|---|---|
| | | 11 | Q.     That's 2019. |
| | | 12 | A.     Keep going.  No.  Keep -- keep going. |
| | | 13 |            There you go. |
| | | 14 | Q.     All right.  That's 2019.  I'm asking about |
| | | 15 | 2018. |
| | | 16 | A.     Yep.  Go to 2018, you'll find it. |
| | | 17 | Q.     Okay.  Here's 2018. |
| | | 18 | A.     The K-1s are down the other way, gentlemen. |
| | | 19 | You're at the L and M schedules. |
| | | 20 | Q.     This is K-1 we're looking at right now for |
| | | 21 | John Maciorowski, is it not? |
| | | 22 | A.     Right. |
| | | 23 |            So Christopher Mott, I believe, is |
| | | 24 | at the top. |
| | | 25 | Q.     I see one for Steven Acosta -- |
| | | 141:01 | A.     Keep going. |
| | | 02 | Q.     -- John Maciorowski. |
| | | 03 | A.     Keep going. |
| | | 04 |            Keep going. |
| | | 05 | Q.     That's it. |
| | | 06 | A.     No.  He's in there. |
| | | 07 | Q.     It hasn't been produced if there is one. |
| 27 | 144:01 - 145:20 | 144:01 | Q.     Were any funds of TSI used for the purchase |
| | | 02 | of vehicles since 2017? |
| | | 03 | A.     TSI doesn't own any vehicles. |
| | | 04 | Q.     Not my question. |
| | | 05 | A.     That's my answer to your question. |
| | | 06 | Q.     All right.  I'm just going to keep asking |
| | | 07 | over and over again.  We can take all night. |
| | | 08 |            Were any sums of money from TSI |
| | | 09 | accounts used in connection with the purchase of any |
| | | 10 | vehicles? |
| | | 11 |            MR. CROWTHER:  Objection to form. |
| | | 12 | A.     TSI didn't purchase any vehicles.  They |
| | | 13 | don't own any vehicles. |
| | | 14 | Q.     Were any funds of TSI used to help pay for |
| | | 15 | any vehicles since 2017? |
| | | 16 |            MR. CROWTHER:  Objection to form. |
| | | 17 | A.     My answer's going to be the same, Mr. Moody. |
| | | 18 | Q.     You haven't answered the question. |
| | | 19 | A.     I have answered the question.  If you don't |
| | | 20 | own any vehicles and you haven't paid for any |

21  vehicles, how could you have any money go to buy

22  vehicles?

23  Q.    Has TSI -- has any money from TSI ever gone

24  to pay Mercedes-Benz or Audi?

25           MR. CROWTHER:  Objection to form.

145:01  A.    No.  That would be our -- our personal

02  purchases.

03  Q.    Okay.  So it's your testimony that if

04  there's a outflow of cash to Mercedes-Benz or Audi,

05  it didn't happen?

06           MR. CROWTHER:  Objection to form.

07  A.    Well, why don't you show me what you're

08  looking at and we can discuss it.

09        But the firm doesn't buy members'

10  vehicles.  It doesn't lease members' vehicles.

11  Members are responsible for their own vehicles.  And

12  if they want to charge mileage, they can, or they

13  can just take it as an unreimbursed partnership

14  expense.

15  Q.    Okay.  But my question was:  Has any money

16  from TSI gone toward the payment of vehicles,

17  whether they're in its name or anybody else's?

18           MR. CROWTHER:  Objection to form.

19  A.    I've already answered the question.  I don't

20  know what else I could say.

| 28 | 146:22 - 147:04 | 146:22  Q.    Deborah, did TSI ever pay a restocking fee |
| | | 23  for water? |
| | | 24           MR. CROWTHER:  Objection to form. |
| | | 25  A.    I'm not going to get into that because |
| | | 147:01  that's an active case and we have counsel at |
| | | 02  Venable.  And that counsel is not here.  So I'll |
| | | 03  have to decline to answer based on our counsel, |
| | | 04  who's handling the matter's recommendation. |
| 29 | 147:13 - 147:24 | 147:13           MR. BALASKO:  The Department of |
| | | 14  Justice would also object to that being an |
| | | 15  instruction not to answer in that I believe -- that |
| | | 16  we believe is relevant to the debtor's prospect of |
| | | 17  reorganization. |
| | | 18  Q.    Has the debtor ever paid a restocking fee |
| | | 19  for water? |
| | | 20           MR. CROWTHER:  Objection to form. |
| | | 21  Q.    You can answer. |

| | | |
|---|---|---|
| | | 22  A.      Once again, we have counsel at Venable that |
| | | 23  is requested we not discuss the case unless counsel |
| | | 24  is present. |
| 30 | 148:07 - 150:10 | 148:07              **MR. SCHEPACARTER:  Richard** |

**Schepacarter, United States Trustee.  We'd also**
08  **object to the nonanswering of that question, given**
09  **the fact that this is definitely an asset of the**
10  **estate and something that goes to the assets and**
11  **liabilities of the estate.  The fact that counsel's**
12  **not here, counsel is here, Mr. Crowther is here.**
13  **So --**
14
15              THE WITNESS:  Well --
16              MR. SCHEPACARTER:  Put that on the
17  record.  You don't need to comment.
18              MR. CROWTHER:  I'll put this on the
19  record, Counsel, since you want to make a speech.
20  The question of whether a restocking fee is
21  dependent upon a number of factors, including legal
22  conclusions as to what that actually is, how it's
23  actually determined, and that's subject to
24  litigation.
25              So the witness cannot really answer
149:01  that question because it's the subject of privileged
02  issues relating to their legal theories in the case
03  and how to approach them.
04              MR. BALASKO:  Zak Balasko on behalf
05  of the United States Department of Justice.  We take
06  the position that the witness can answer the factual
07  questions as to what was and wasn't charged.
08  Obviously, anything that would be privileged or work
09  product or litigation strategy decisions, we
10  understand that there may be privilege there.  But
11  the fact of whether or not a disbursement was made
12  for a restocking fee to a vendor I think is a
13  factual question that is entirely appropriate.
14              MR. CROWTHER:  Disbursement or
15  charge?  You used both terms, and they're different.
16              MR. BALASKO:  I believe a ... Let me
17  look at what the Board said.  Whether the fees "were
18  actually incurred" is the language that the Board
19  used.  So whether the fee was incurred to the debtor
20  I think is a factual question.

21          MR. CROWTHER:  Fact is not a factual

22   question.  Whether it's incurred is a legal question

23   under contract interpretation.  I believe there

24   might be someone else on this who actually has such

25   a claim.

150:01          MR. MOODY:  All right.

02   BY MR. MOODY:

03   Q.      Ms. Mott, to your knowledge, were any fees

04   ever incurred with respect to returning bottled

05   water?

06          MR. CROWTHER:  Objection; calls for

07   a legal conclusion.

08   Q.      Please go ahead and answer.

09          MR. CROWTHER:  Objection; calls for

10   a legal conclusion.  She can't answer it.

| Case | TSI |
|---|---|
| Issue Code | Feasibility Of Plan |

| MOTT, DEBORAH 2/7/22 VOL 1 |
|---|

| 1 | 170:09 - 170:18 | 170:09 | Q.      And so from what I understand from your |
|---|---|---|---|
| | | 10 | testimony, you have no idea what your gross and net |
| | | 11 | profits could be expected to be in the near future |
| | | 12 | or going forward. |
| | | 13 | A.      Well, that's not really a fair statement. |
| | | 14 | We have some idea of where -- of what we need to add |
| | | 15 | in terms of our WRAP rate.  But you asked me for a |
| | | 16 | pro forma type future estimate, and I don't feel |
| | | 17 | comfortable that I can do that right now with any |
| | | 18 | level of accuracy. |

| 2 | 175:04 - 175:17 | 175:04 | Q.      I think this is stuff that was already |
|---|---|---|---|
| | | 05 | decided at the trial.  So we don't need to |
| | | 06 | relitigate it here today.  That's not the point of |
| | | 07 | my line of questioning. |
| | | 08 |               I note that in your petition you say |
| | | 09 | you have gross revenue of 76,311 in 2022.  Is that |
| | | 10 | an accurate figure as of today? |
| | | 11 | A.      I'm not sure because we've had more payments |
| | | 12 | from DLA because we've been consistently delivering |
| | | 13 | bunker fuel.  So I haven't -- I haven't had a chance |
| | | 14 | to check the statements. |
| | | 15 | Q.      All right.  And so you don't have a |
| | | 16 | projected income for the year 2022; is that right? |
| | | 17 | A.      Not yet.  Not with all this volatility. |

| 3 | 188:12 - 188:21 | 188:12 | Q.      What are you going to do to propose a plan |
|---|---|---|---|
| | | 13 | to pay creditors in this case? |
| | | 14 | A.      We're going to collect the money that's owed |
| | | 15 | to us and continue to bid on contracts that have no |
| | | 16 | default risk, because even though -- even though the |
| | | 17 | money's owed to us, it's owed to us by the federal |
| | | 18 | government.  And there are very specific rules and |
| | | 19 | regulations that govern the payment to |
| | | 20 | subcontractors and primes, particularly |
| | | 21 | Native American small businesses. |

| 4 | 209:01 - 213:07 | 209:01 | Q.      And then the contract that's listed at 2.2, |
|---|---|---|---|
| | | 02 | which is the Mexico contract, you testified -- |

03  A.      Right.

04  Q.      **-- that that contract is funded to**

05  **9.2 million?**

06  A.      That's correct.

07  Q.      **What does that mean?**

08  A.      When we get a contract -- I'm trying to

09  think how to explain it.

10          It's not a MATOC, because we're not

11  bidding against anyone.  It's an indefinite

12  delivery/indefinite quantity contract for a specific

13  period of time funded to a specific amount, which

14  allows the contracting officer at any point in time

15  to contact us and place whatever order they wish to

16  place for whatever size, whatever OPTEMPO.

17          I mean, let's just assume Venezuela

18  invaded Colombia.  So the OPTEMPO on that contract

19  would -- the volume would increase.  It means, I

20  think -- I'm not a -- I'm not a government

21  contract -- but it means that it's funded to this

22  amount.  But the government always reserves the

23  right to increase the funding and add option years.

24  Q.      **So is it fair to characterize it -- again,**

25  **I'm just a bankruptcy lawyer -- as a cap, like, the**

210:01  **government can order a certain amount of fuel to**

02  **this cap and it can increase the cap if they decided**

03  **to do that?  Is that a fair characterization?**

04  A.      Yes, that's exactly right.  That's exactly

05  right.  There has to be some paperwork involved to

06  exceed the funding limit.

07  Q.      **And you testified earlier that there have**

08  **been orders under this contract?**

09  A.      I think there have been.  But, honestly, I

10  don't -- I don't recall because I didn't really

11  brush up on that contract because it's not active.

12  Q.      **What do you mean "it's not active"?**

13  A.      Well, I mean, we're not getting a lot of

14  orders on it.  It doesn't mean I couldn't wake up

15  tomorrow and all of a sudden we're getting orders on

16  it.

17  Q.      **Do you handle the communication with the**

18  **contracting officer under this contract?**

19  A.      No.  My son does, Christopher.  I will

20  handle the communication with the fuel suppliers.

```
21  Q.      Are you aware that the government terminated
22  this contract for convenience in 2019?
23  A.      I'm not aware of that at all.  We received
24  no notice.
25  Q.      Okay.  I'm going to share another document
211:01  which I will circulate by e-mail to the -- this
02  group.  Kate may be able to do it while I'm asking
03  questions.
04              MS. AIZPURU:  Yeah, I'll send it.
05              (Pause in the proceedings)
06  Q.      You see this as a document that is titled
07  "AMENDMENT OF SOLICITATION/MODIFICATION OF
08  CONTRACT"?
09  A.      I do.
10  Q.      And it's issued by DLA to TSI?
11  A.      I do.  I see that.
12  Q.      And you see the modification of contract
13  No. is SPE608-18-D-0351?
14  A.      I see that.
15  Q.      Which matches the contract listed at 2.2 on
16  the schedules.  But you may not be able to see right
17  now because I don't have --
18  A.      Yeah, I can't see it.
19  Q.      And it's dated -- you can see the date it
20  was signed was July 22nd, 2019 in the lower
21  right-hand corner?
22  A.      Diana Knight.
23  Q.      And then if you look at the -- the text of
24  this modification -- I'll zoom in on that a little
25  bit, but I want to make sure you can still it -- the
212:01  description of the modification of this award
02  states:  "In accordance with FAR Clause 52.2124 (1)
03  -- TERMS AND CONDITIONS-- COMMERCIAL
04  ITEMS--TERMINATION FOR THE GOVERNMENT'S CONVENIENCE:
05  this modification is issued to rescind the
06  contract because the terms of the contract awarded
07  to Team Systems International LLC did not mirror the
08  terms of the merchant's proposal."
09              See where it says that?
10  A.      Yeah.  But I've never seen this.
11  Q.      So you're not aware of ever having received
12  this modification?
13  A.      No.
```

| | | | |
|---|---|---|---|
| | | 14 | Q.        Would Christopher Mott be the one who had |
| | | 15 | received it from the contracting officer? |
| | | 16 | A.        Maybe, but he would have sent it to me. |
| | | 17 | Q.        But, to your knowledge, you've never seen |
| | | 18 | this document before. |
| | | 19 | A.        No, I have not. |
| | | 20 | Q.        Have you had any communication with the |
| | | 21 | contracting officer under the Mexico contract since |
| | | 22 | July 22nd, 2019? |
| | | 23 | A.        I never had any communication with her to |
| | | 24 | begin with other than her sending the contract and |
| | | 25 | then when we were looking for the contracts we went |
| | | 213:01 | into DIBBS and pulled an active contract out.  So, |
| | | 02 | you know ... |
| | | 03 | Q.        When this modification says that "... the |
| | | 04 | terms of the contract awarded ... [do] not mirror |
| | | 05 | the terms of the merchant's proposal," do you know |
| | | 06 | what that could be referring to? |
| | | 07 | A.        I have absolutely no idea. |

**Teams Hearing 3-9-22**

| | | | |
|---|---|---|---|
| 1 | 246:18 - 247:17 | 246:18 | Q    Okay.  Based on this budget, when I look at the |
| | | 19 | forecasted revenue and then the operating expenses, it |
| | | 20 | appears that you're projecting about $10,000 in net revenue |
| | | 21 | for April; is that right? |
| | | 22 | A    Yeah.  Just over -- just -- the operating expenses? |
| | | 23 | Q    Forecasting (indiscernible) revenue versus your |
| | | 24 | expenses. |
| | | 25 | A    Yeah, just a little over, yeah. |
| | | 247:01 | Q    Okay.  And what -- and it's, kind of, the same if I |
| | | 02 | look at those two line items for the next month, it's just |
| | | 03 | roughly over 10 grand; is that right? |
| | | 04 | A    It would be just under 20, yeah. |
| | | 05 | Q    And for the final month it's roughly your -- your |
| | | 06 | revenue is roughly the same as your expenses, your -- your |
| | | 07 | receipts revenue; is that -- |
| | | 08 | A    That -- that is correct, within a thousand dollars it |
| | | 09 | looks. |
| | | 10 | Q    Okay.  And how do you plan -- plan to prepare a |
| | | 11 | plan, a confirmable plan if that is your projected cash |
| | | 12 | receipts and your operating expenses? |

| | | | |
|---|---|---|---|
| | | 13 | A    Again, we're going off of what we had for the last few |
| | | 14 | years with Lindsey Blee and fueling DLA.  These are not, you |
| | | 15 | know, these are just -- this is a projection.  These are not |
| | | 16 | hard numbers and we don't have, you know, it's what we have. |
| | | 17 | We don't have our receivables for FEMA in there. |
| 2 | 248:15 - 249:04 | 248:15 | **Q    So, you sell the fuel for -- in June of 2022 you'll** |
| | | 16 | **be selling fuel for $85,000, receipt revenue in your expenses** |
| | | 17 | **for the fuel suppliers are 66,000; is that the correct way to** |
| | | 18 | **read this?** |
| | | 19 | A    And, again, on the projection of $87,000, again, it |
| | | 20 | could be plus or minus, but with the receivables, from -- |
| | | 21 | that we prior had filled -- the ships that we filled prior, |
| | | 22 | this is on average of what we -- we have. |
| | | 23 | **Q    On the fuel contract is your price with the** |
| | | 24 | **government fixed at a certain level?** |
| | | 25 | A    I wasn't involved with the negotiation of the contract, |
| | | 249:01 | but I believe it is a firm fixed price. |
| | | 02 | **Q    And as the fuel prices increase will your revenues** |
| | | 03 | **decline on a fixed price contract?** |
| | | 04 | A    It could and that's why we did not put a high number in. |

| Case | TSI |
|------|-----|
| Issue Code | Lack Of Corp Formalities |

| MOTT, DEBORAH 2/7/22 VOL 1 | | | |
|---|---|---|---|
| 1 | 237:13 - 237:22 | 237:13 | **Q.      So let me ask you this:  In terms of meeting** |
| | | 14 | **minutes, does TSI maintain meeting minutes at all?** |
| | | 15 | A.      We do, but we haven't since my father passed |
| | | 16 | away in 2017. |
| | | 17 | **Q.      Okay.  And so from 2017 forward, there are** |
| | | 18 | **no meeting minutes for any meetings that TSI may** |
| | | 19 | **have conducted.** |
| | | 20 | A.      No.  We had a resolution, and I don't recall |
| | | 21 | if we had meeting minutes or not when we added Steve |
| | | 22 | Acosta as a partner. |

| Case | TSI |
|---|---|
| Issue Code | Mott Medical Condition |

| MOTT, DEBORAH 2/7/22 VOL 1 | | | |
|---|---|---|---|
| 1 | 011:21 - 012:06 | 011:21 | Q.      Is there anything today that would keep you |
| | | 22 | from answering my questions truthfully? |
| | | 23 | A.      No. |
| | | 24 | Q.      Are you on any sort of medications or under |
| | | 25 | any -- have any kind of medical condition that would |
| | | 012:01 | alter your ability to testify truthfully? |
| | | 02 | A.      Oh, that's a very -- yeah, that's a very |
| | | 03 | good point.  I had a monoclonal antibody transfusion |
| | | 04 | on December 30th.  So there is some impairment in |
| | | 05 | terms of multitasking and vocabulary recall.  And |
| | | 06 | I'm also on blood pressure medication. |
| 2 | 190:24 - 191:15 | 190:24 | Q.      Zak Balasko on behalf of the DoJ, Ms. Mott. |
| | | 25 | I'm going to hopefully get right to it and not |
| | | 191:01 | prolong this any more than is necessary, because |
| | | 02 | we've all been here a long time. |
| | | 03 | A.      It's okay. |
| | | 04 | Q.      I'm here with my colleague Kate Aizpuru. |
| | | 05 | We're representing the United States, including FEMA |
| | | 06 | and DLA, in this bankruptcy case.  And we have a |
| | | 07 | little bit less background than the other parties to |
| | | 08 | this case. |
| | | 09 |          So can you explain to me what your |
| | | 10 | role is in the day-to-day operations of the debtor? |
| | | 11 | A.      I do the back-office and financial |
| | | 12 | administration, and I'm a member of the management |
| | | 13 | committee, and I assist with the written material |
| | | 14 | for bid and proposal.  I don't go out on-site |
| | | 15 | visits. |

| Teams Hearing 3-9-22 | | | |
|---|---|---|---|
| 1 | 053:18 - 054:04 | 053:18 | want to -- in full disclosure, reference Mrs. Deborah Mott. |
| | | 19 | She is -- she's not in appearance today.  She actually is |
| | | 20 | suffering from certain cognitive issues, and I -- I am going |
| | | 21 | to mess up the medical stuff, but what I understand it's a |
| | | 22 | neurological deficit causing -- memory loss.  And in fact I |

| | | |
|---|---|---|
| | | 23  think this was loosely referred to in her deposition, so it's |
| | | 24  not entirely new news.  But, in fact she actually |
| | | 25  involuntarily fell asleep during her deposition because of |
| | | 054:01  her cognitive issues.  So, we felt that she wasn't going to |
| | | 02  be capable of providing good testimony today, so Mr. Acosta |
| | | 03  and Mr. St. Moritz will provide the -- the evidence on -- on |
| | | 04  our behalf. |
| 2 | 222:23 - 223:05 | 222:23     Q    Okay.  And why was Debbie offered for deposition |
| | | 24  and in the first day declaration if you're being offered as a |
| | | 25  witness today? |
| | | 223:01  A    Well, Deborah, obviously, has a better handle of our |
| | | 02  finances, that's what she's done for 20 years for her |
| | | 03  company, and I want to say another 20 for the government. |
| | | 04  But, you know, she got sick and, you know, she did -- she |
| | | 05  can't recall somethings.  She's having some memory issues. |
| 3 | 237:12 - 239:08 | 237:12     Q    What is Deborah Motts role in the company now that |
| | | 13  she has cognitive issues? |
| | | 14  A    Right now it's very limited to just to get better and |
| | | 15  how you doing.  She's, kind of, taking a backseat. |
| | | 16     Q    And why would the -- without Debbie being around, |
| | | 17  why would the company be better off operating in a Chapter 11 |
| | | 18  than in a Chapter 7? |
| | | 19  A    Because -- |
| | | 20        MR. LEHMAN:  I'm going to object to asking him |
| | | 21  legal conclusions about which Chapter of the Bankruptcy Code |
| | | 22  his company is better off under. |
| | | 23        MR. MOODY:  Let me restate the question. |
| | | 24        THE COURT:  Yeah, go ahead. |
| | | 25  BY MR. MOODY: |
| | | 238:01     Q    How can the company be properly run with Debbie |
| | | 02  having cognitive issues? |
| | | 03  A    Operations still stay the same, Chris has stepped up and |
| | | 04  he understands the billing for Sea Card and also DLA Energy, |
| | | 05  Christopher Mott. |
| | | 06     Q    Do you have any knowledge about the operation of a |
| | | 07  native American woman-owned business, what's required in |
| | | 08  order to have that designation? |
| | | 09  A    Vaguely. |
| | | 10     Q    And what does it require? |
| | | 11  A    That -- for -- to be -- you have to prove that you're a |
| | | 12  native American and you have to be a woman, but -- or |
| | | 13  identify as a woman, I don't, you know, he see here, but |

14  identify as a woman, a native -- have native American

15  background that you can prove.

16      Q     The -- who is Galiean Logistics?

17  A     That's the company that I formed to do service-disabled

18  veteran-owned business.

19      **Q     The debtor in possession motion provides for**

20  **Galiean Logistics to obtain equity in TSI, I suppose,**

21  **confirmation; is that -- is that right?**

22  A     I believe so, yes.

23      **Q     And are you a native American woman?**

24  A     I am not.

25      **Q     And so will the company -- I mean, I guess it would**

239:01  **lose that designation in that event; is that true?**

02  A     If it's -- if I -- if Galiean were to take over 51

03  percent, yes.

04      **Q     Has Debbie handed over any signatory authority or**

05  **banking control to Chris or Steve?**

06  A     Steve who?

07      **Q     You.**

08  A     Oh.  No.  It was in discussion.

---

| 4 | 248:05 - 248:14 | 248:05      **Q     Why did Deborah Motts sign the first day affidavit** |
|---|---|---|

06  **if she was having cognitive problems?**

07  A     And it's only my guess, ego?  You know, when you're --

08  you operate at that level and, you know, when you start

09  getting -- answering questions and mixing things up, she -- I

10  think she quickly realized that -- what a deficit she was.

11  But, again, I -- I'm just assuming.

12      **Q     And is it -- is it your testimony that Deborah Mott**

13  **prepared the budget that's on the screen right now?**

14  A     She -- yes, her and I believe her personal lawyer.

| Case | TSI |
|------|-----|
| Issue Code | No Collections Pressure From Other Creditors |

| MOTT, DEBORAH 2/7/22 VOL 1 | | |
|---|---|---|
| 1 | 187:05 - 187:24 | 187:05    Q.      Okay.   What other creditors were pressuring<br>06    or taking any collection activity against you at the<br>07    time the bankruptcy case was filed?<br>08    A.      Well, I guess Bering Straits counts, and<br>09    Lindsay Blee wasn't happy.   They wanted to be paid<br>10    their hundred thousand dollars' worth of fuel or<br>11    close to that amount.<br>12    Q.      And did they send collection letters or file<br>13    lawsuits?<br>14    A.      No.<br>15    Q.      You just --<br>16    A.      No, no.   They sent a past due notice on the<br>17    four invoices we owed to them.<br>18    Q.      Can you produce that?<br>19    A.      We already did.   We can produce it again, if<br>20    you'd like; but we did with the whole package of<br>21    invoices and the statement of account to show that<br>22    they've been performing fuel over 2. -- 2 1/2<br>23    million dollars' worth of fuel for us over the past,<br>24    I don't know how many years. |

| Case | TSI |
|---|---|
| Issue Code | Post-Judgment Moving $$ To Delaware |

| MOTT, DEBORAH 2/7/22 VOL 1 | | |
|---|---|---|
| 1 | 181:11 - 182:08 | 181:11  Q.      At what point did you open your bank<br>12  accounts in Delaware and close your accounts with<br>13  ... BBVA?<br>14  A.      Initially began the process in August, and<br>15  culminated it in September and October.<br>16  Q.      And is that roughly at the same time as the<br>17  trial?<br>18  A.      I don't know.  I don't recall when the trial<br>19  was.<br>20  Q.      The trial was on August 25th of 2021.<br>21  A.      So, yeah, over that time.  It takes awhile<br>22  to transition accounts when you have to go through<br>23  SAM.<br>24  Q.      And why did you decide to transition<br>25  accounts to a Delaware bank?<br>182:01  A.      Because one of my other businesses, I have<br>02  an ongoing project in that area, and I'm there every<br>03  week or every other week.  So it just was more<br>04  convenient.  And we weren't thrilled with PNC.  They<br>05  jacked up the small business rates.  They took out a<br>06  lot of on-line capability and on-line data, saving<br>07  capability for the -- we just weren't happy with<br>08  them. |

| Case | TSI |
|---|---|
| Issue Code | Tax Returns |

| MOTT, DEBORAH 2/7/22 VOL 1 | | |
|---|---|---|
| 1 | 026:21 - 027:04 | 026:21  Q.      Are you familiar with the tax returns that<br>22  you produced to us in this case?<br>23  A.      I am.<br>24  Q.      And on your 2020 -- there's no 2020 tax<br>25  return that was produced to us.  Why is that?<br>027:01  A.      It's not finished yet.  It wasn't due until<br>02  fourth quarter 2021.  And with COVID and all of the<br>03  issues with our service providers, just hasn't been<br>04  finished yet.  We'll get it done this quarter. |
| 2 | 057:07 - 057:09 | 057:07  Q.      And when did you file your taxes for 2018?<br>08  A.      I don't recall exactly.  I don't have the<br>09  date in front of me. |
| 3 | 058:10 - 061:11 | 058:10  Q.      Apologies.  We're now looking at<br>11  Exhibit No. 66, which purports to be your 2018 tax<br>12  return.  Is this a true and accurate copy of your<br>13  2018 tax return?<br>14  A.      What's the Bates number, please?<br>15  Q.      TSI000983.<br>16  A.      Through what -- what's the rest of the Bates<br>17  number?<br>18  Q.      Ending 989.<br>19          (Pause in the proceedings)<br>20  Q.      Are you going to answer the question?<br>21  A.      I'm sorry.  What was the question?  I --<br>22  Q.      Okay.  Is this a true --<br>23  A.      -- I dozed off.<br>24  Q.      Is this a true and accurate copy of your<br>25  2018 tax return as it was filed with the IRS?<br>059:01  A.      Yes.<br>02  Q.      Why is there not a date on it?<br>03  A.      It's a copy.<br>04  Q.      Why would the copy not have a date on it?<br>05  A.      I have no idea.<br>06  Q.      When I scroll down to the K-1 for you, it<br>07  lists distributions of 400,000.  Is that a true and<br>08  accurate amount of distributions you took from the |

09   company in the year 2018?

10   A.      You have to stop scrolling and let me see

11   what you're looking at, please.

12              Still can't see it.

13              Still can't see the numbers you

14   referenced.  You need to scroll down.

15   Q.      **You produced to us these documents, and this**

16   **one is Bates-labeled 986.  Is this a true copy of**

17   **your K-1 for the year 2018?**

18   A.      I'm -- Mr. Moody, you keep scrolling up and

19   down.  You need to scroll down to the area that

20   you're referencing so I can look at it, please.

21              You need to keep going.  I need to

22   see the capital account at the bottom that tells me

23   what's available for distribution.

24              So the beginning capital account is

25   245.  The increase is 387,630.  There were

060:01   distributions from a prior year at 400,000.  So that

02   would be a total of about $700,000.

03   Q.      **Okay.  And when we pull up a copy of your**

04   **2019 tax return --**

05   A.      Uh-huh.

06   Q.      **Give me a moment.**

07              **(Continuing) -- which is marked as**

08   **Exhibit 67, same question.  Is this a true and**

09   **accurate copy that was produced to us of your 2019**

10   **return?**

11   A.      Once again, if you could please read the

12   Bates numbers into the record, I would appreciate

13   it.

14   Q.      **This is TSI990 through 1004.**

15   A.      Now you're kind of making me nauseous a

16   little here.

17   Q.      **In the year 2019, there's a K-1 statement**

18   **attached to the return that was produced to us at**

19   **Bates label 997.  Do you see this document?**

20   A.      Is that my K-1?  I didn't -- you flipped by

21   it so quickly I couldn't see the name.

22   Q.      **It is.**

23   A.      Okay.  That's -- thank you.

24              Could you go down, please?

25              Okay.  That's my K-1.

061:01   Q.      **All right.  And so when we've been looking**

|   |   |   |   |
|---|---|---|---|
|   |   | 02 | through all of these different documents and they |
|   |   | 03 | reflect "K-1" in the NOTES section for 2019, it |
|   |   | 04 | appears you had gotten no distributions based on |
|   |   | 05 | your K-1; is that correct? |
|   |   | 06 | A.      No, that's not right. |
|   |   | 07 | Q.      Okay.  Then explain to us what you received |
|   |   | 08 | as far as distributions in 2019. |
|   |   | 09 | A.      My beginning capital account was 235,655 |
|   |   | 10 | [thousand].  The net income was 237,827.  And the |
|   |   | 11 | end was 470.  On a tax -- on an accrual tax basis. |
| 4 | 069:09 - 069:16 | 069:09 | Q.      Let me ask you one other question before we |
|   |   | 10 | move on. |
|   |   | 11 |          So do you see this G line has |
|   |   | 12 | absolutely nothing checked on it? |
|   |   | 13 | A.      Right. |
|   |   | 14 | Q.      Why does it not have anything checked on |
|   |   | 15 | that line? |
|   |   | 16 | A.      I have no idea. |
| 5 | 070:09 - 070:25 | 070:09 | Q.      The last tax return we have is for the |
|   |   | 10 | year 2019.  Are you familiar with the requirements |
|   |   | 11 | of the United States Trustee with being current with |
|   |   | 12 | your tax returns when filing a Chapter 11 petition? |
|   |   | 13 | A.      I'm not a lawyer.  Our 2020 was due with the |
|   |   | 14 | COVID issues fourth quarter of 2021.  And as soon as |
|   |   | 15 | we can meet with our tax attorney, we'll file 2020, |
|   |   | 16 | which I expect will be in the next 30 days. |
|   |   | 17 | Q.      What I don't understand is that each of the |
|   |   | 18 | tax returns you provided to us, there's no tax |
|   |   | 19 | attorney that's listed.  It says "Self-Prepared." |
|   |   | 20 | A.      Right, because we -- |
|   |   | 21 | Q.      Self-prepared 2021? |
|   |   | 22 | A.      Right.  Because we want to convert from an |
|   |   | 23 | accrual basis to cash basis.  And I'm not sure what |
|   |   | 24 | the rules are, particularly since the Trump tax |
|   |   | 25 | legislation on how to do that. |
| 6 | 084:15 - 085:02 | 084:15 |          We'll just keep going here.  By our |
|   |   | 16 | calculations, during the years 2018 to 2022 thus |
|   |   | 17 | far, Mr. Maciorowski has received in excess of |
|   |   | 18 | $1.646 million in cash distributions from TSI.  Do |
|   |   | 19 | you have any reason to doubt that number? |
|   |   | 20 | A.      Yeah, that sounds excessive.  I don't think |
|   |   | 21 | that's correct. |

|   |   | 22 | Q.      Okay.  Do you have an idea what you think |
|---|---|---|---|
|   |   | 23 | the right number is? |
|   |   | 24 | A.      No.  I haven't prepared for it yet -- that |
|   |   | 25 | yet, and we haven't done our 2020.  And then we |
|   |   | 085:01 | can -- and we haven't received our 1099 from the |
|   |   | 02 | federal government yet for 2021. |
| 7 | 102:24 - 103:12 | 102:24 | Q.      Ms. Mott, I think ... I think I understand |
|   |   | 25 | your testimony to say that it's your understanding |
|   |   | 103:01 | that you're permitted to use TSI's accounts for |
|   |   | 02 | whatever you want, as long as -- |
|   |   | 03 |              MR. CROWTHER:  Objection to form. |
|   |   | 04 | Q.      -- you have it paid on the K-1. |
|   |   | 05 | A.      No, that's not my testimony, Mr. Moody. |
|   |   | 06 | Q.      So how did you determine what amounts to |
|   |   | 07 | allow yourself to be paid on this K-1? |
|   |   | 08 | A.      That's evident from our tax returns. |
|   |   | 09 | Q.      How is it evident from your 2020 tax return |
|   |   | 10 | when it hasn't been filed yet? |
|   |   | 11 | A.      Once again, it's evident on our tax returns |
|   |   | 12 | for TSI. |
| 8 | 139:24 - 141:07 | 139:24 | Q.      Is there any reason that there is never a |
|   |   | 25 | K-1 for Christopher Mott? |
|   |   | 140:01 | A.      I'm sorry?  The basis of your question is |
|   |   | 02 | incorrect. |
|   |   | 03 | Q.      Okay.  Is there any reason you haven't |
|   |   | 04 | produced any K-1s for Chris Mott? |
|   |   | 05 | A.      That's incorrect.  We have produced them. |
|   |   | 06 |              You just passed it. |
|   |   | 07 | Q.      I'm looking at the year 2018, and I don't |
|   |   | 08 | see a K-1 for Christopher Mott. |
|   |   | 09 | A.      You did have -- you passed it very quickly. |
|   |   | 10 | Keep going. |
|   |   | 11 | Q.      That's 2019. |
|   |   | 12 | A.      Keep going.  No.  Keep -- keep going. |
|   |   | 13 |              There you go. |
|   |   | 14 | Q.      All right.  That's 2019.  I'm asking about |
|   |   | 15 | 2018. |
|   |   | 16 | A.      Yep.  Go to 2018, you'll find it. |
|   |   | 17 | Q.      Okay.  Here's 2018. |
|   |   | 18 | A.      The K-1s are down the other way, gentlemen. |
|   |   | 19 | You're at the L and M schedules. |
|   |   | 20 | Q.      This is K-1 we're looking at right now for |

| | | |
|---|---|---|
| | | 21   John Maciorowski, is it not? |
| | | 22   A.      Right. |
| | | 23            So Christopher Mott, I believe, is |
| | | 24   at the top. |
| | | 25   Q.      I see one for Steven Acosta -- |
| | | 141:01  A.      Keep going. |
| | | 02   Q.      -- John Maciorowski. |
| | | 03   A.      Keep going. |
| | | 04            Keep going. |
| | | 05   Q.      That's it. |
| | | 06   A.      No.  He's in there. |
| | | 07   Q.      It hasn't been produced if there is one. |
| 9 | 143:12 - 143:17 | 143:12  Q.      I mean, another thing we note on these tax |
| | | 13   returns, they're not signed and there's no EIN |
| | | 14   listed.  Is there any reason for that? |
| | | 15   A.      I'm sorry.  I'm looking at a signature, and |
| | | 16   the EIN is on the first page of Form 1065.  I have |
| | | 17   no idea what you're talking about. |

| Teams Hearing 3-9-22 | | |
|---|---|---|
| 1 | 081:08 - 081:22 | 081:08  Q.   Okay.  Did you review the documents that were produced |
| | | 09   in the course of discovery purporting to be the debtor's tax |
| | | 10   returns for the years 2018 and 2019? |
| | | 11   A.   I did see those.  I did review them. |
| | | 12   Q.   And, did they attach -- were there any K-1 statements |
| | | 13   that you reviewed? |
| | | 14   A.   There -- there we a number of K-1s attached to both of |
| | | 15   the sets of tax returns, yes. |
| | | 16   Q.   Were there any K-1s that -- that were -- regarding the |
| | | 17   Tunnell and Raysor firm or Coffelt Land Title? |
| | | 18   A.   No.  There were a number of individuals.  In fact I |
| | | 19   think there might have been an individual missing who's an |
| | | 20   owner of the company, but there were no -- no K-1s or |
| | | 21   transfers outlined in the -- in the tax returns to -- to |
| | | 22   those entities, no. |
| 2 | 115:09 - 116:17 | 115:09  Q    Okay.  Thank you, Mr. Orner.  I just have one final |
| | | 10   question.  In the course of reviewing documents did you |
| | | 11   review the documents that were purporting to be tax returns |
| | | 12   and K-1's produced by the debtor? |
| | | 13   A    I did.  I reviewed that. |
| | | 14   Q    Did those in any way conform to or tie with the number, |

15   the outflow numbers that you observed?

16   A    No.  It seems that the -- what was detailed as

17   distributions or income to a number of the key individuals

18   were well in excess of what the K-1s detailed, and did not

19   conform in the period of 2018 or 2019.  Specifically that's

20   what we're referring to.  Those dollar, you know, listed as

21   K-1 of distributions in the bank accounts to those

22   individuals, Tom Ostrowski (phonetic), Debra Evans-Mott and

23   Steven Acosta in particular did not conform with -- and I

24   think we were missing a Christopher Mott (phonetic) K-1, so

25   we couldn't compare it, but no, the amounts listed in the

116:01  accounts or transfers and distributions were far in excess of

02   what was listed as the K-1s from the -- from the tax returns

03   that were presented as filed, although it was

04   (indiscernible).

05   Q    And did you see any K-1s or, you know, 1099s or anything

06   relating to the -- you know, any of these other entities that

07   received, you know, well in excess of the number that you

08   would have to issue a 1099 or K-1?

09   A    No.  There was no other detailed support for any of

10   these.  They are -- and, in fact, you know, incomplete bank

11   records to even -- so this is an incomplete summary because

12   the bank records themselves are incomplete.  But despite

13   having an incomplete record even this was not justified in

14   form or substance by, you know, invoices or 1099s, or K-1s,

15   or, you know, other detailed, you know, summary support for

16   any of these items or individuals or entities.  So no is the

17   answer, it was not supported by --

| 3 | 221:14 - 221:16 | 221:14   Q    Do you have access to the debtor's tax accounting |
|---|---|---|
|   |   | 15   software? |
|   |   | 16   A    I -- I can go access it.  It's Turbo Tax. |
| 4 | 242:01 - 243:09 | 242:01   Q    Thank you.  Back to the issue of the tax returns. |
|   |   | 02   Do you have any personal knowledge that tax returns were |
|   |   | 03   filed? |
|   |   | 04   A    Again, I read the letter that the tax attorney down in |
|   |   | 05   Florida sent. |
|   |   | 06   Q    Can you -- I mean, is that something that you can |
|   |   | 07   reveal to us? |
|   |   | 08   A    Yes. |
|   |   | 09   Q    What was -- |
|   |   | 10   A    I'd be more than happy to have it sent over. |
|   |   | 11   Q    To your knowledge, I mean, did the attorney file |

12    the tax return?

13    A    No.    He -- he kept to make sure that our tax returns had

14    been filed and true.

15         Q    Have you tried to obtain a transcript of    your tax

16    return filings?

17    A    We have.    It's -- it's -- takes a little bit to get

18    through.    The IRS is, you know, pretty busy, and when you

19    call it's -- it's -- it's a six-hour wait, almost, it seems

20    like.

21         Q    Are you aware that you can submit that over the

22    internet?

23    A    Yes.    And the turn around time of that is, what, six to

24    eight weeks.

25         Q    So, as you sit there today, do you have any proof

243:01    that anything has been filed with the IRS as far as tax

02    returns for TSI?

03    A    Just the tax returns that we've submitted and the

04    statement from the lawyer down in Florida.

05         Q    And do you have any proof other than the letter

06    from the lawyer, I guess?    You have no other proof that the

07    tax return has been filed?

08    A    Just the tax returns that we've submitted to the court

09    and the statement from the lawyer down in Florida.

| Case | TSI |
| --- | --- |
| Issue Code | TSI's Cancelled Contracts |

| Teams Hearing 3-9-22 | | |
| --- | --- | --- |
| 1 | 234:06 - 236:12 | 234:06    Q    Okay.  I'm showing you what was filed at Docket<br>07  Entry 119, this is Exhibit D.  Your declaration states that<br>08  TSI provides fuel to the US government for use in sea vessels<br>09  for the Defense Logistics Agency, a true and correct copy of<br>10  which is attached to opposition Exhibit D.  Is this the<br>11  document you're referring to?<br>12  A   I -- can you scroll down?  Stop right there.  Yes, I<br>13  believe so.<br>14    Q    Attached to this document is another contract,<br>15  SPE602-18D-0457.  Are you familiar with this contract?<br>16  A   Can you scroll down for me, please?  Stop.  The Diego<br>17  Garcia, not off the top of my head, I cannot say.<br>18    Q    All right.  And there's one additional contract<br>19  referenced here, SPE602-19F-C955.  Are you familiar with that<br>20  contract?<br>21  A   You know what, sir, I -- that's Singapore, we --  we<br>22  filled an order and  the government canceled and we are  -- I<br>23  believe we submitted a 1.4 million dollar claim on that RMA,<br>24  return merchandise.<br>25    Q    Do you know when this order was -- was made or<br>235:01  filled or anything like that?<br>02  A   Yes.  So, Exxon filled it in Singapore, government was<br>03  going -- I was going to fly out to meet the government to<br>04  make sure that the fuel was going to be on -- on board and<br>05  the inspection went well and the order was canceled.  I<br>06  remember that.<br>07    Q    And do you have any knowledge of this other<br>08  contract SPE602-19FC955?<br>09  A   No, not that port.<br>10    Q    Would you be surprised to learn that there's been<br>11  no activity on either of these two contracts in over three<br>12  years?<br>13  A   I believe -- yes, I do.<br>14    Q    And why is that?<br>15  A   You'd have to ask the government.<br>16    Q    So, to your knowledge has there been any activity<br>17  on either of these two contracts within the last three years? |

```
18   A    Well, December 2018 --

19        Q    That's over three years ago, correct?

20   A    -- for Singapore.

21        Q    Right.  So, that would have been nearly four years

22   ago, correct?

23   A    18, 19, 20, 21, so just over three years.

24        Q    So, the only contract that we have that could

25   potentially still be in existence, it appears is the contract
```
```
236:01   that's the first exhibit on Exhibit D.  Do you have reason to

02   believe there are other contracts that you could point us to

03   that are in effect for TSI?

04   A    I don't see the Sea Card on there.

05        Q    And is there a contract that -- that relates to the

06   Sea Card?

07   A    I believe so.

08        Q    And why -- why would it not have been attached to

09   your Exhibit D?

10   A    I -- I believe our acceptance letter was submitted.  If

11   it's not, we'll get it to you.  But, it was discussed

12   yesterday.
```