# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TEAM SYSTEMS INTERNATIONAL LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 22-10066 (CTG)<br><br>**Related Docket Nos. 41 & 87** |

## <u>MEMORANDUM OPINION</u>

Team Systems International is, according to the first-day declaration filed in this bankruptcy case, a small business government contractor, founded in 2001, with offices in Lewes, Delaware and Ponte Verde Beach, Florida.[1]  Two of its creditors, GPDEV and Simons, sued TSI in September 2018, in the United States District Court for the Northern District of Florida.[2]  Following a jury trial, the creditors obtained judgments, entered in September 2021, that (including prejudgment interest) totaled almost $6.3 million – about $3.3 million for GPDEV and just less than $3 million for Simons.

TSI was unable to post a bond and its efforts otherwise to obtain a stay pending appeal from the district court and the Eleventh Circuit were unsuccessful.  TSI asserts that it has a meritorious bases to appeal the judgments and that, in any event, amounts that remain due to TSI on its existing contracts will be more than sufficient to satisfy the creditors' judgments.  Upon filing for bankruptcy, TSI explained that

---

[1] D.I. 3 ¶ 3.  The debtor, Team Systems International, LLC, is referred to either as "Team Systems International" or "TSI."

[2] GPDEV, LLC is referred to as "GPDEV."  Simons Exploration, Inc. is referred to as "Simons."  They are referred to together, collectively, as the "judgment creditors."

the principal purpose of the bankruptcy case was to obtain the benefit of the automatic stay, and the breathing spell it provides to distressed businesses, so that it could collect the amounts due to it, pursue its appeal, and then get its contracting business back on its feet.[3]

If that were all there was to this case, the judgment creditors' motion to dismiss for bad faith under § 1112(b) of the Bankruptcy Code would present a question that could plausibly be called either way.  On the one hand, the debtor's story, that the bankruptcy was necessary to give it a breathing spell from its creditors' collection efforts and would permit it to stave off liquidation and thus preserve the going-concern value of an otherwise viable government contracting business, would be eminently defensible.  On the other hand, the judgment creditors would have an at least colorable argument that this was really just a two-party dispute, that the debtor's ongoing business operations were quite scant, and that it is not a good faith use of the bankruptcy process if the only thing the bankruptcy filing really accomplishes is to impose the automatic stay as an end-run around the requirement that an appellant that has suffered an adverse money judgment post a supersedeas bond in order to stay execution on the judgment.

But that turns out to be very far from the whole story.  The rest of the story includes the following facts:  (1) the district court in Florida had expressed serious concerns that documents TSI had produced in that case had been fabricated; (2) evidence unearthed, for the first time, in discovery in this bankruptcy case suggest

---

[3] Jan. 24, 2022 Hearing Tr. at 12.

the debtor engaged in other misconduct in the Florida litigation; (3) evidence produced in this bankruptcy case shows that after the Florida litigation was filed, the debtor's principals moved substantial value from the debtor to themselves; (4) the debtor engaged in litigation conduct during this bankruptcy case that, at the very least, raises very serious concerns; and (5) the evidence provided in this case indicates that both the receivables that TSI says are due for past government contracting work and the prospects for future government contracting work are somewhere between speculative and highly dubious.

In addition, over the course of these proceedings, another creditor, Bering Straits, has appeared.[4]  It asserts that TSI owes it more than $1.5 million.  Bering Straits also contends that there is cause to dismiss or convert the case under § 1112(b).  It argues, however, that in light of circumstances it would be better for creditors and the estate for the case to be converted to one under chapter 7 than for it to be dismissed.  The Office of the U.S. Trustee filed a brief agreeing that the case should be dismissed or converted.

After considering the evidence and arguments presented at a hearing that spanned three days, the Court agrees that the case should be converted.  Under the governing caselaw, the circumstances of this filing were sufficient to at least raise a question of the debtor's good faith.  Once that is fairly put at issue, it becomes the debtor's burden to establish that the case was filed in good faith – which mostly means that the case will serve a valid chapter 11 purpose, such as preserving value

---

[4] Bering Straits Logistics Services, LLC is referred to as "Bering Straits."

that might otherwise be destroyed outside of bankruptcy.  But the good faith test is a holistic one.  Caselaw supports the view (with which this Court agrees) that a debtor's misconduct before and (especially) during a bankruptcy case is also relevant to a determination whether the bankruptcy is serving an appropriate purpose and proceeding in good faith.  Based on the evidence presented, the Court concludes that the debtor has not met its burden on this issue.  The Court accordingly finds that cause exists to dismiss or convert the case.

On the question as between dismissal and conversion, it is significant that all the participating creditors and the U.S. Trustee argue that conversion is better for creditors and the estate than dismissal.  The Court is inclined to agree.  The Court will accordingly convert the case to one under chapter 7.

The judgment creditors also seek sanctions as a result of alleged discovery abuses by the debtor.  While the Court has concerns about the debtor's litigation conduct (that the Court believes are relevant to the question of good faith), the Court does not believe that sanctions are appropriate based on the record before it.  The Court does believe, however, that the work that the judgment creditors have done in establishing cause under § 1112(b), work that may have been made more difficult and more costly as a result of the debtor's conduct in discovery, may turn out to provide a substantial contribution to the debtor's estate.  Accordingly, the denial of the motion for sanctions will be without prejudice to the judgment creditors' ability, once a

trustee has been appointed and come up to speed, to seek an administrative claim for their work under § 503(b)(3)(D).[5]

## Factual and Procedural Background

### 1.    TSI's business

TSI was founded in 2001.  It is a government contractor, serving as a prime contractor and subcontractor for various agencies and projects.[6]  The debtor provides logistical support for government entities, competing with other contractors for an assortment of contract opportunities for the procurement, transport, and delivery of goods and services.[7]

TSI is organized as a Delaware limited liability company, whose four members are Deborah Evans Mott; her son, Christopher Mott; her husband, John Maciorowski; and Steven Acosta.[8]  The work of the company is done by its members, the company

---

[5] This Memorandum Opinion sets out the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable to this contested matter under Fed. R. Bankr. P. 9014(c).  The Court appreciates that 11 U.S.C. § 1112(b)(3) directs the court to "decide [a motion brought under § 1112(b)] not later than 15 days after the commencement of [the] hearing" on the motion "unless the movant expressly consents" or "compelling circumstances prevent the court from meeting the time limits established by this paragraph."  While strict compliance with this statutory provision would have required the court to decide the motion by March 24, 2022, the Court observed following closing argument (on March 16, 2022) that it did not believe it would be able to issue this Memorandum Opinion before the week of March 28.  "Certainly I expect to be within 15 days of now, but not within 15 days of the commencement of the hearing."  Mar. 16, 2022 Hearing Tr. at 156.  Counsel for the judgment creditors expressly consented to that.  *Id.* at 157.

[6] D.I. 3 ¶ 4; D.I. 120 ¶ 4.  Documents that were admitted into evidence during the evidentiary hearing, except for those that were themselves filed on the Court's docket, are cited as "Ex.__".  Materials filed on the Court's docket are cited as "D.I.__".

[7] D.I. 3 ¶ 4.

[8] *Id.* ¶ 18.

thus has no employees.[9]  In the first-day declaration, Mott states that she is Native American, descended from Commander Ernest E. Evans, the first Native American recipient of the Medal of Honor.[10]  She holds a majority stake in the company.[11]

### 2.    The FEMA contract

In September 2017 TSI was awarded a five-year contract from the Federal Emergency Management Agency to provide water bottles on an as-needed basis during emergency operations arising through September 2020.[12]  Shortly after TSI was awarded this contract, Hurricane Maria devasted Puerto Rico and FEMA initiated a request for 80 million liters of water.  FEMA subsequently reduced the order, however, to approximately 13 million liters.[13]

In order to fulfill its obligation to FEMA under the Hurricane Maria contract, the debtor entered into a consulting agreement with GPDEV and Simons for the purchase and transport of water bottles.  GPDEV and Simons were necessary because they had existing relationships with the suppliers TSI would ultimately need to make good on the FEMA contract.  GPDEV and Simons effectively acted as brokers, connecting TSI with the water suppliers – Niagara and Nestle in this case.  Under

---

[9] *Id.* ¶ 19.

[10] *Id.* ¶¶ 3, 5.

[11] *Id.* ¶ 6.

[12] The contract itself (referred to as the "Contract") is appended to the complaint filed in the Florida Litigation, *GPDEV, LLC v. Team Systems International, LLC*, N.D. Fla. No. 18-00442-RH-MAF, D.I. 1-3.

[13] Ex. 44 at 1 (FEMA contracting officer decision referring to "reduction in quantity of 67,521,600 liters").

the agreement, which the district court aptly described as "astonishingly cryptic,"[14] GPDEV and Simons were entitled to receive a 25 percent commission on "the net income TSI actually realizes from amounts paid by the government agencies"[15] – leaving ambiguous the question of the scope of the payments from the government that would be subject to the 25 percent commission.

As ultimately determined by the district court, the debtor received, over a period running from late-2017 until mid-2019, four payments from FEMA on account of its performance under the contract with FEMA which totaled just less than $37.6 million.[16]  TSI's expenses associated with the contract (also as ultimately determined by the district court) came to just under $12.6 million, yielding net income of approximately $25 million.  The total judgment (between the two judgment creditors) of approximately $5.25 million, before the award of prejudgment interest, was their 25 percent commission on the $25 million of net income ($6.25 million), minus approximately $1 million that TSI had previously paid them.[17]

### 3.    The Florida litigation

The Florida litigation was highly contentious and checkered with allegations of misconduct by TSI.  The central factual dispute in the case was over which services (and thus which payments) were covered by the contract.  As the district court

---

[14] Ex. 33 at 2.

[15] Contract ¶ 1.

[16] The dates and amounts of the payments are set forth as an exhibit to the district court's *Order for Entry of Judgment.  See* Ex. 33 at 11.

[17] *Id.*

explained, "[a]s written, the contract applied to water obtained through Niagara Bottling, LLC."[18] But after Hurricane Maria, FEMA needed more water, and GPDEV and Simons helped TSI procure water from Nestle Waters. "Under Florida law, a contract may be modified by the parties' conduct."[19] The central factual dispute was over whether the conduct of the parties operated to modify the written contract.

TSI sought summary judgment, taking a narrow view of which services (and thus revenues) were covered by the contract. The district court denied that motion and directed TSI to produce documents (whose production GPDEV and Simons had previously requested) related to its revenues and expenses for the broader universe of services that GPDEV and Simons had argued were covered by the contract. When TSI failed to do so, the district court awarded sanctions against TSI.[20]

The district court's impatience with TSI's failure to meet its discovery obligations was clear: "The parties have a legitimate dispute over the scope of covered transactions. It should not be difficult, though, to nail down the amounts paid by FEMA for transactions in various categories and the expenses the defendant will be entitled to deduct if a category is ultimately held to be covered. The defendant now has exhausted its ability to stonewall on issues related to revenue and expenses."[21]

TSI nevertheless failed to produce the required documents, representing that there simply were no documents relating to certain categories of the expenses it

---

[18] Ex.34 at 5.

[19] *Id.*

[20] Ex. 30.

[21] *Id.* at 5.

claimed to have incurred.[22]  Thereafter, following a change of counsel, TSI did (after discovery had closed) produce documents that purported to show the claimed expenses.[23]  The plaintiffs, however, moved the court to hold an evidentiary hearing to establish that the documents were fraudulent, pointing out in its brief a number of peculiar inconsistencies between the documents produced and TSI's previously produced bank records.[24]  While the district court observed that the "plaintiffs made a strong showing that something was amiss,"[25] TSI avoided an evidentiary hearing by stipulating to the plaintiffs' calculation of revenue and expenses, thus putting "all its … eggs in the liability basket."[26]

The jury, however, returned a verdict for the plaintiffs.[27]  Indeed, the district court observed that, based on the evidence before it, the jury "could hardly have reached a contrary conclusion."[28]  As the parties had agreed, the district court calculated prejudgment interest and entered judgment for the plaintiffs in an amount that totaled approximately $6.3 million.[29]

After the entry of judgment, TSI filed a notice of appeal and a motion that sought a stay of the judgment pending appeal.  But as the district court explained,

---

[22] Ex. 32 at 3.

[23] *Id.*

[24] Ex. 31 at 17-24.

[25] Ex. 32 at 3.

[26] *Id.* at 4.

[27] D.I. 33.

[28] D.I. 34 at 5.

[29] D.I. 33.

the way to obtain a stay of a money judgment (as opposed to a stay of an injunction) is to post a supersedeas bond, as Federal Rule of Civil Procedure 62(b) provides. "In this respect, this case is just like the thousands of other cases in which a money judgment has been entered and an appeal has been taken. There is nothing at all unusual about this case—and nothing that calls for different treatment."[30] TSI thereafter sought a stay pending appeal from the Eleventh Circuit, which the court summarily denied.[31]

The judgment creditors then sought post-judgment discovery for the purpose of locating assets against which they could execute to satisfy the judgment. The district court compelled the production of such documents and/or information. After the judgment creditors filed a motion to show cause why TSI and Mott should not be held in civil contempt for failing to provide the required information, the district court, by order dated January 19, 2022, set a hearing on that motion for January 24, 2022.[32] In the order setting that hearing, the district court added that TSI "will be required to provide an address where, if held in civil contempt at a later hearing … Ms. Mott will be available to be taken into custody by the United States Marshals Service and held until the required information is provided."[33]

---

[30] Ex. 34 at 3.

[31] Ex. 38.

[32] Ex. 37 at 3.

[33] *Id.* at 2.

4.      **The bankruptcy filing and subsequent proceedings**

a.      **The petition and first-day motion**

The debtor filed this bankruptcy case on January 18, 2022, the day before the district court's order.[34]  Mott was the first-day declarant.  While the only first-day relief sought was the continued use of the debtor's pre-petition cash management systems,[35] the judgment creditors opposed that relief.[36]

Mott testified in support of the motion at the first-day hearing that was held on January 24, 2022.  When asked about the debtor's ongoing cash needs, she provided specific and detailed answers.  For example:

Q:  The motion also asks that you be able to pay any bank account related fees.  Are you aware of any bank account related fees at the present time?

A:  I don't know, other than the -- the only service fees that we would use would be the bill pay.  I think that's $15.

Q:  The motion also asks that you be permitted to otherwise modify the terms of the bank account and open new debtor-in-possession accounts as may be necessary.  What are you asking the Court for in that respect?

A:  I'm not sure.  We have no intention of opening -- opening any new accounts.

Q:  What specific expenses do you have today or -- for TSI?

A:  We owe the fuel suppliers for the fuel that's delivered under our existing contract for [Defense Logistics Agency] fuels.  We owe Blue Cross and Blue Shield, our current monthly payment will come up in February.  And then we owe Venable, who is collecting the [amounts allegedly due from FEMA].  And I believe we owe the appellate law firm

---

[34] D.I. 1.

[35] D.I. 4.

[36] D.I. 12.

for the appeal.  And then -- and we owe the trial court law firm.  But the big issue is the fuel suppliers.

Q:  The fuel suppliers, tell me more about that.  What specific operations are ongoing today?

A:  We have a contract to deliver marine fuel for the U.S. Navy in the UAE.  That contract expires in 2023, and it has a one-year extension.  And we have a fuel supplier in the UAE, and we need to pay them.  And then -- then, when they deliver continuing fuel, we need to pay [them] in the future.[37]

Mott was also spirited and at times combative as a witness.  For example, when asked a question about the Florida proceedings, she claimed not to know the answer and offered her own relevancy objection to the question: "I mean, respectfully, Mr. Moody, if you're asking me to re-litigate everything that's going on in the -- in the … trial in Florida, I can't do that.  I was not the corporate representative, I did not attend the trial.  And I was -- gave one deposition.  So I have no idea.  But the Appeals Court is handling all of that.  What does that have to do with [the cash management motion]?"[38]  The Court ultimately granted the (standard and customary) first-day relief sought by the debtor, with minor modifications.[39]

### b.    The motion to dismiss and related discovery disputes

Because the judgment creditors' opposition to the cash management motion raised the question of the debtor's good faith and the creditors represented that they would, "as soon as practicable," file a motion to dismiss the case under § 1112(b),[40]

---

[37] Jan. 24, 2022 Hearing Tr. at 28-29.

[38] *Id.* at 27.

[39] D.I. 33.  *See also* Jan. 24, 2022 Hearing Tr. at 42-52.

[40] D.I. 12 at 5.

the Court sought to establish a prompt schedule for the consideration of such a motion.  At the January 24, 2022 first-day hearing, the Court set the hearing on the motion to dismiss for February 9, 2022 so long as the judgment creditors filed the motion by January 27, 2022.[41]

Discovery disputes erupted almost immediately.  At a hearing held on January 26, the Court directed the debtor to produce, in response to the judgment creditors' discovery requests, specific information related to their financial condition, including bank statements, tax returns, significant government contracts, and other information.[42] After some contentious back-and-forth between the parties and limited intervention by the Court,[43] certain documents were ultimately produced and the judgment creditors took Mott's deposition on February 7, 2022 (in response to a notice the judgment creditors served on TSI seeking to depose a corporate representative, pursuant to Fed. R. Civ. P. 30(b)(6), on specified topics).

On February 8, 2022, the parties reached out to the Court to indicate that they believed that the February 9, 2022 hearing should be adjourned in light of issues that arose at Mott's deposition.  The judgment creditors argued that Mott's testimony provided evidence of improprieties that the judgment creditors required additional time to investigate.[44]  The debtor agreed that an adjournment of the hearing was

---

[41] Jan. 24, 2022 Hearing Tr. at 63.

[42] *See* Jan. 26, 2022 Hearing Tr. at 15-18.

[43] *See* D.I. 52, 53, 54.

[44] D.I. 78.

appropriate under the circumstances.  The Court accordingly re-set the hearing on the motion to dismiss for March 9, 2022.[45]

### c.    Motion for sanctions and withdrawal of counsel

On February 16, 2022, the judgment creditors filed a motion seeking sanctions against the debtor on account of alleged discovery abuses.  The motion alleges that, during discovery in the bankruptcy case, the debtor produced documents purporting to be its tax returns that had been fabricated and that Mott falsely testified that the documents had been filed with the IRS.  The motion further alleges that the debtor made misrepresentations about corporate funds that were used to purchase real estate for the benefit of insiders, including Mott.  And the motion alleges that certain documents produced in discovery had been surreptitiously altered to redact certain information.[46]  Upon review of the motion, and in light of the seriousness of the allegations and the shortness of time until the March 9 hearing, the Court issued a minute order, on February 17, 2022, directing that the debtor respond to the motion by February 22, 2022.[47]

On the following day, February 18, 2022, the law firm of Robinson & Cole LLP, which had been hired by the debtor immediately before the bankruptcy filing and whose motion to be retained as debtor's counsel was set for hearing on March 9, 2022, moved to withdraw from its representation.[48]  The motion recited that the debtor had

---

[45] D.I. 82.

[46] D.I. 87.

[47] D.I. 88.

[48] D.I. 91.

14

failed "to fully cooperate as is necessary to enable the Firm to properly discharge its responsibilities and obligations," failed "to promptly communicate necessary information," and that there were "significant differences of opinion between the Debtor and the Firm that makes continuing the representation unnecessarily difficult."[49] The motion included a statement from the debtor itself disputing those assertions.

Under the circumstances, the Court thought it appropriate to grant Robinson & Cole's motion.[50] But in view of the approaching deadline to respond to the sanctions motion and in order to ensure that the debtor not be prejudiced by the withdrawal of counsel, the Court extended the response deadline until February 25, 2022.

The debtor failed to respond by the February 25, 2022 deadline. But on that date, Bering Straits did respond to the motion.[51] It argued that it was also a creditor of the debtor, owed more than $1.5 million. Bering Straits pointed out that any award of sanctions against the debtor's bankruptcy estate would only serve to dilute the recoveries of other creditors. It argued that under the circumstances of the case, it would be more appropriate to convert the case to one under chapter 7 than to dismiss it.[52]

---

[49] *Id.* at 2.

[50] D.I. 92.

[51] D.I. 98.

[52] *Id.*

On February 28, 2022, in the absence of a response from the debtor to the sanctions motion, the Court issued an order to show cause.[53]  The order recited that the debtor had failed to respond to the sanctions motion by the (revised) deadline of February 25, 2022 and that replacement counsel had not yet appeared in the case. The Court accordingly directed the debtor to show cause why the case should not be dismissed or converted.  The debtor was also directed, in its response, to address the issues raised in the judgment creditors' motion for sanctions.  The Court stated that the response to the order would be due by March 2, 2022, when all parties' pre-trial briefs in advance of the March 9 hearing were otherwise due.[54]  The show cause order added that the judgment creditors and Bering Straits should address, in those submissions, the question whether dismissal or conversion is "in the best interests of creditors and the estate" under § 1112(b).[55]

The debtor did not respond to the order by March 2, 2022.  But in the meantime, the U.S. Trustee filed a brief suggesting that the case should be dismissed or converted.[56]  On March 2, Bering Straits filed a brief arguing that conversion would better serve the interests of creditors and the bankruptcy estate than would dismissal.[57]  The judgment creditors also responded.[58]  In light of the Bering Straits

---

[53] D.I. 99.

[54] *See* D.I. 85 ¶ 2(a).

[55] D.I. 99 at 3.

[56] D.I. 102.

[57] D.I. 103.

[58] D.I. 105.

position, the judgment creditors "consent to and begrudgingly recommend that this case be converted to a case under Chapter 7 of the Bankruptcy Code."[59]

### d.    Retention of replacement counsel and the hearing on the motions

No further substantive pleadings were filed on the Court's docket until March 8, 2022 when TSI sought authority to retain the law firm of Gellert Scali Busenkell & Brown, LLC as debtor's counsel.[60]  The motion was accompanied by a motion to approve a $200,000 DIP loan that was going to be made by a company owned by Acosta, one of the four members of TSI, to finance the law firm's retainer.[61] Significantly, the loan provided that it would be fully subordinated to all allowed unsecured claims against the debtor, meaning that the loan would not be repaid unless and until all otherwise valid creditors were paid in full.  And the debtor also filed a substantive brief that responded to the motions to dismiss or convert, along with a motion for leave to file late objections.[62]  In addition, the debtor indicated that it intended to call two witness at the hearing – Acosta and Mark St. Moritz, a government contracting expert whom the debtor had engaged in connection with its efforts to recover amounts allegedly due from the government.[63]  Mott was not listed as a witness whom the debtor intended to call.

---

[59] *Id.* at 3-4.

[60] D.I. 115.

[61] D.I. 116.

[62] D.I. 119, 121.

[63] D.I. 122.

The hearing on the motions began the next morning – on March 9, 2022. The Court indicated that, in view of the subordination provisions, it would grant the DIP financing motion on an interim basis.[64] At the helpful suggestion of the Office of the U.S. Trustee that the interim relief be limited to the relief the debtor required before the motion could be heard on appropriate notice and on a final basis, the amount that could be drawn on an interim basis was reduced to $75,000. The motion to retain counsel was also set to be heard on the standard 21-days' notice.[65]

In view of the fact that the debtor had only filed its opposition to the motion the day before, the Court offered the judgment creditors, Bering Straits and the U.S. Trustee the choice between adjourning the hearing for a week so that they would have the opportunity to file a reply brief and prepare for the hearing or proceeding directly to an evidentiary hearing, which would address both the motion to dismiss and the motion for sanctions.[66] All three of the moving parties elected to proceed that morning.[67]

The evidentiary hearing thus began on March 9 and continued on March 14.[68] The judgment creditors presented the testimony of Ryan Orner, who was offered as a

---

[64] Mar. 9, 2022 Hearing Tr. at 28-29; D.I. 141.

[65] Mar. 9, 2022 Hearing Tr. at 6-10, 18-23.

[66] *Id.* at 30-31.

[67] *Id.* at 31-33.

[68] On March 14, 2022, the Court received and docketed a letter, which was undated, from the Management Committee of TSI. The letter stated that the company had not been able to find counsel since the withdrawal of Robinson & Cole and sought a 30-day extension to find Delaware counsel to represent it in the bankruptcy. D.I. 136. That request had been mooted by the time the Court received the letter.

finance expert and who testified about his analysis of the financial records the debtor produced in discovery,[69] and George Peterson, who is a principal of GPDEV. The debtor presented the testimony of Acosta and St. Moritz. The parties offered closing arguments on March 16.

Mott did not appear at trial. Acosta is (along with Mott) a member of the TSI Management Committee. He has held positions working for the State Department and other governmental agencies providing diplomatic security in the Middle East.[70] His role at TSI had been more operational than financial.[71] He testified that Mott contracted Covid-19 in December 2021 (which was before the bankruptcy case was filed) and as a result was suffering from cognitive impairment and was having issues with memory.[72] Since that time, he has begun learning about the company's finances.[73]

The judgment creditors and Bering Straits offer a different explanation for Mott's absence from the trial. They say that in light of her deposition testimony,

---

[69] The judgment creditors served and filed, on the day of the hearing, a report that Orner had prepared. D.I. 126. While the report by its terms appears to comply with the requirements of Fed. R. Civ. P. 26(a)(2), the failure to provide reasonable notice to the debtor potentially prejudicial. The debtor, however, objected to the report principally on relevance grounds. Mar. 9, 2022 Hearing Tr. at 67, 72, 84. The Court finds that Orner's testimony was relevant within the meaning of Fed. R. Evid. 401. In view of the absence of notice, the Court concluded that it would permit Orner to testify as to the content of the financial records produced, but not offer his opinion or conclusions drawn from that review. Mar. 9, 2021 Hearing Tr. at 94 (counsel for debtor stating that Orner can "testify to facts that he's seen"); *id.* at 68 (Court observing that report does not purport to offer opinion testimony).

[70] Mar. 9, 2022 Hearing Tr. at 190; D.I. 120 ¶ 3.

[71] Mar. 9, 2022 Hearing Tr. at 191.

[72] Mar. 9, 2022 Hearing Tr. at 191, 237; Mar. 14, 2022 Hearing Tr. at 51-54.

[73] Mar. 9, 2022 Hearing Tr. at 191.

much of which they say is demonstrably false, the debtor made a calculated decision that they could not afford to subject Mott to cross-examination that would reveal that she simply lied under oath at her deposition. They also suggest that it is at least curious that the debtor presented Mott as the first-day declarant in January 2022 and as a Rule 30(b)(6) witness in February 2022 if she were suffering from cognitive impairment as a result of having suffered from Covid-19 in December 2021, only for it to turn out that her cognitive impairment prevented her from testifying at an evidentiary hearing in March 2022.

In the end, this is a mystery that the Court does not believe needs to be solved to decide the pending motions. The caselaw makes clear the burden of demonstrating good faith, in a case like this one in which it has legitimately been put at issue, is on the debtor. For the reasons described below, the debtor has failed to carry its burden and the Court will enter an order converting the case to one under chapter 7. As further described below, the Court concludes that the current record does not warrant the imposition of Rule 37 sanctions. The Court does not believe that it is either necessary or appropriate for it to opine further on the reason why Mott did not testify at the evidentiary hearing.

## Jurisdiction

A motion to dismiss a bankruptcy case arises under § 1112(b) of the Bankruptcy Code, and as such falls within the district court's "arising under" jurisdiction provided in 28 U.S.C. § 1334(b). The district court has referred cases within that jurisdiction to this Court pursuant to 28 U.S.C. §157(a) and the *Amended*

*Standing Order of Reference* dated February 29, 2012.  The motion to dismiss the bankruptcy case is a core matter under 28 U.S.C. § 157(b)(2)(A).[74]

## Analysis

### I.    The debtor has failed to meet its burden of showing good faith.

Section 1112(b)(1) of the Bankruptcy Code provides that, upon a showing of "cause," a court "shall" dismiss or convert a case under chapter 11 to one under chapter 11, whichever is in the best interests of creditors and the estate.[75]  Section 1112(b)(4) contains an enumeration of 16 factors that constitute "cause," including the "gross mismanagement of the estate," the "failure to comply with an order of the court," and the "inability to effectuate substantial consummation of a confirmed plan."[76]  This enumeration of factors, however, is "non-exhaustive."[77]

Although the lack of "good faith" is not expressly enumerated as a basis for finding "cause," the Third Circuit held in *SGL Carbon* that such a requirement was implicit.[78]  The court explained that the Bankruptcy Code hands a debtor in possession in a chapter 11 case a powerful set of tools.  When put to their proper purpose, these tools allow an otherwise viable company burdened with too much old debt to de-lever its balance sheet and emerge as a going concern in a manner that is

---

[74] The court likewise has the authority to resolve the motion for sanctions, which arises under Fed. R. Civ. P. 37 (and is made applicable here by Fed. R. Bankr. P. 9014 and 7037), in connection with this contested matter.

[75] 11 U.S.C. § 1112(b)(1).

[76] *Id.* § 1112(b)(4)(B), (E), and (M).

[77] *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 161 (3d Cir. 2012).

[78] 200 F.3d 154, 160 (3d Cir. 1999).

fair to its creditors and leaves all parties better off than they would have been had the company been liquidated.[79]  At the same time, the tools are ones that could also be put to misuse – deployed to obtain tactical advantage over litigation opponents. The "good faith" requirement is intended to ensure that the tools of the Bankruptcy Code are being used only as a means towards an appropriate end.  "[T]he perimeters of this potential," the Third Circuit said, referring to the potential to preserve value in an appropriate manner, "mark the borderline between fulfillment and perversion; between accomplishing the objectives of rehabilitation and reorganization, and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this statutory policy."[80]

Accordingly, determining whether "the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'"[81]  The ultimate touchstone is whether the case is being used to accomplish one of the basic purposes of chapter 11 – to preserve a going concern and/or maximize the property available to satisfy creditors' claims.[82]  Where it does not accomplish one of those purposes, one is

[79] *Id.* at 165-166 (the Bankruptcy Code vests debtors-in-possess with "considerable powers," such as the imposition of the automatic stay, that "can impose significant hardship on particular creditors"; the exercise of those powers is not justified where a debtor's "aims lie outside those of the Bankruptcy Code.").

[80] *Id.* at 161 (quoting *In re Victory Constr. Co., Inc.,* 9 B.R. 549, 558 (Bankr. C.D. Cal. 1981)).

[81] *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004) (quoting *In re SGL Carbon*, 200 F.3d at 162).

[82] *Id.* at 119.

left to infer that it is instead being used improperly "to obtain tactical litigation advantage."[83]

The Third Circuit has explained that once good faith is "at issue," the "burden falls upon the bankruptcy petitioner to establish that the petition has been filed in 'good faith.'"[84] And while the fact that a bankruptcy case was filed to take advantage of a provision of the Bankruptcy Code does not, in and of itself, show either good faith or bad faith – it is a truism every voluntary case is filed because the debtor sees an advantage to filing[85] – the circumstances of that filing can give rise to an inference in either direction. Here, the bankruptcy filing made immediately prior to a hearing at which the debtor faced the prospect of being held to account for its failure to comply with an order granting post-judgment discovery to the judgment creditors, coupled with the filing of the motion to dismiss, is more than sufficient to put the question of good faith "at issue."[86] It is therefore the debtor's burden to establish its good faith.

In considering the question of good faith, the District Court for the District of Delaware has identified a series of factors that courts commonly consider, referred to

---

[83] *Id. See also In re Rent-A-Wreck of America, Inc.*, 580 B.R. 364, 383 (Bankr. D. Del. 2018) ("Debtors' purpose in filing these cases is nothing more than a straightforward attempt to take value that belongs to Mr. Schwartz and give it to Bundy. The filing of the petition does not create (or preserve) value that is lost outside of bankruptcy.").

[84] *In re SGL Carbon*, 200 F.3d at 162 n.10; *In re Rent-A-Wreck*, 580 B.R. at 374.

[85] *Integrated Telecom*, 384 F.3d at 127.

[86] *See In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 299 (Bankr. D. Del. 2011) ("The petition was filed on the eve of foreclosure, solely to obtain the benefit of the automatic stay."); *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007) (the "suspicious timing" of a bankruptcy petition is "an appropriate factor for a court to consider in the bad faith analysis").

as the *Primestone* factors, which are set out in the margin below.[87] While *Primestone* and a number of other cases expressly identify a debtor's prepetition misconduct as a factor in the good faith analysis,[88] in this Court's view it follows *a fortiori* from that proposition that a debtor's post-petition misconduct is also relevant to the good-faith analysis.[89]

Based on the record before this Court, the debtor has not met its burden of establishing good faith. While that conclusion is based on the Court's consideration of all of the evidence presented at the hearing, five specific factors figure prominently

---

[87] *In re Primestone*, 272 B.R. 554, 557 (D. Del. 2002) ("a. Single asset case; b. Few unsecured creditors; c. No ongoing business or employees; d. Petition filed on eve of foreclosure; e. Two party dispute which can be resolved in pending state court action; f. No cash or income; g. No pressure from non-moving creditors; h. Previous bankruptcy petition; i. Prepetition conduct was improper; j. No possibility of reorganization; k. Debtor formed immediately prepetition; l. Debtor filed solely to create automatic stay; and m. Subjective intent of the debtor.") *See also* 7 *Collier on Bankruptcy* (16th ed. 2021) ¶ 1112.07[2] (setting forth a similar enumeration of factors).

[88] *See In re Picacho Hills Utility Co., Inc.*, 518 B.R. 75, 82 (Bankr. D. N.M. 2014) (relying, for a finding of bad faith, on the fact that the debtor "has consistently flouted laws, regulations, court orders, Commission Rules, and the rights of creditors in order to preserve Debtor's property for himself"); *In re Tarquinio*, No. 17-01917 (PGS), 2017 WL 5707538, , at *5 (D. N.J. Nov. 27, 2017) ("Here, the Court finds persuasive Debtor's prior misconduct in the underlying state litigation, which involved fraudulent attempts to disgorge assets from the brothers' business and defiant behavior towards the state court's discovery orders."). Note that in the context of a corporate chapter 11 case, the role of prepetition misconduct can be mitigated by the debtor's taking appropriate steps, as a matter of corporate governance, to address the alleged misconduct. The Court appreciates, however, that such governance measures may be, as a practical matter, effectively unavailable in the case of a closely held corporation whose identity is closely linked with that of a principal whose own conduct is at issue.

[89] *See In re Charfoos*, 979 F.2d 390 (6th Cir. 1992) (relying on misstatements of fact in the bankruptcy case as a basis for a finding of bad faith); *In re ABEPP Acquisition Corp.*, 191 B.R. 365, 368-369 (Bankr. N.D. Ohio 1996) (finding conversion of the bankruptcy case warranted for "cause" under § 1112(b) based on the debtor's making unauthorized post-petition severance payments to officers); *In re Premier Golf Properties, LP*, 564 B.R. 710, 725 (Bankr. S.D. Cal. 2016) (relying on debtor's unauthorized post-petition transfers in support of finding of bad faith). *See also SGL Carbon*, 200 F.3d at 159 n.8 (addressing application of good faith standard to cases involving misconduct by the debtor).

24

in that determination: (1) evidence came to light in the bankruptcy case that, in the Florida litigation, the debtor claimed that an expense related to the installation of a custom swimming pool at Mott's beach house was represented to be a cost associated with the delivery of water to the victims of Hurricane Maria; (2) it appears that, in the period after the judgment creditors had initiated litigation, the debtor made substantial transfers to insiders; (3) there are very serious questions about the debtor's conduct in the bankruptcy case, including misleading testimony by Mott about prepetition transfers and the debtor's tax returns; (4) the prepetition receivables that provide the basis for the debtor's assertion that it will be able to satisfy all creditors in full appear to be dubious, at best; and (5) the balance of the debtor's ongoing business, while not non-existent, appears to be minimal. The evidence relating to each of these factors is addressed below.

### A.    Evidence produced in the bankruptcy case shows that the debtor engaged in misconduct in the Florida litigation.

As described above, the GPDEV and Simons were entitled to a 25 percent commission on the net profits that TSI earned from the delivery of water to FEMA. Accordingly, the expenses associated with the water delivery were directly relevant to the commissions. The higher the expenses were, the lower the profits – and thus the commissions – would be. That is why GPDEV and Simons were insistent, in the Florida litigation, on obtaining documentation for the expenses TSI claimed to have incurred and why the district court (several times) ordered TSI to produce them.

One of the expense items that TSI claimed to have incurred in connection with the delivery of water to FEMA, for the aid of hurricane victims, were amounts paid

to a company called "All Aqua." Documents produced in the Florida litigation indicated that these expenses related to "CLIN 016." In the world of government contracting, CLIN is an acronym for "Contract Line Item Number." St. Moritz, a government contracting specialist, testified at trial that each CLIN is for a "separate unique thing[] that will be bought or provided under [the] contract."[90] Documents provided in the Florida litigation describe two checks written on TSI's bank account to All Aqua, totaling more than $43,000, as being associated with "Transport Truck CLIN 016" and "Marine Transport CLIN 016," suggesting that the payee on those checks was involved in the transport of bottled water.[91] The import of that contention was that every dollar spent served to reduce TSI's net profits by a dollar, and thus GPDEV and Simon's commission by 25 cents.

All Aqua, however, is not in the business of transporting bottled water. In fact, All Aqua actually designs and installs custom swimming pools. Documents produced in the bankruptcy case show payments to All Aqua, in amounts that match the expenses claimed in the Florida litigation. These documents indicate that the payments were made for the benefit of Mott and her husband, Maciorowski.[92] When Mott was deposed in the bankruptcy case, she acknowledged that the invoices that TSI paid to All Aqua went towards the installation of a swimming pool at her house.[93] Indeed, the permit summary appended to the deed to the home in Ormond Beach,

---

[90] Mar. 14, 2022 Hearing Tr. at 85.

[91] Ex. 82 at D022485; Ex. 84 at D022533.

[92] Ex. 75 at TSI000870.

[93] Ex. 18 at 46-47.

Florida that Mott and Maciorowski purchased in 2018, which was admitted into evidence, shows a permit for the installation of a $70,000 "inground pool and spa."[94] When she was deposed, Mott commented that this payment "was properly applied to my capital account" as a K-1 distribution.[95] But the issue (at least at the moment) is not whether Mott was entitled to take a distribution of profits out of TSI on account of her ownership interest (though that issue is explored under Part I.B, below). The issue is that TSI produced documents in the Florida litigation falsely suggesting that these expenses related to the transport of bottled water under the FEMA contract.

When asked at her deposition about the discrepancy, Mott stated "I wasn't the corporate representative for the trial in Florida. I didn't provide any testimony, and I didn't provide any financial reports. I'm sorry. I have no firsthand knowledge of this[.]"[96] The problem for TSI, however, is that it bears the burden of proving its good faith. And even after GPDEV and Simons presented this evidence in support of their motion to dismiss, TSI did not present the testimony of either Mott or any other witness who could (or who even tried) to explain this discrepancy. This strong and wholly unrebutted evidence suggesting that TSI presented fabricated evidence to the district court in the Florida litigation is the type of prepetition misconduct that, under the caselaw described above, counsels against a finding of good faith.

---

[94] Ex. 66 at 2.

[95] Ex. 18 at 46.

[96] *Id.* at 5.

**B.     There are serious questions regarding the debtor's prepetition transfers to insiders.**

The record in this case includes a number of substantial prepetition transfers from the debtor to its owners.  As counsel for the debtor argued,[97] there is nothing inherently improper about that.  "Solvent and financially healthy debtors are perfectly free to make gifts or other transfers for inadequate consideration, without their creditors having reason to complain."[98]  Even where a debtor is insolvent (or its solvency is uncertain), a distribution to an owner on account of its ownership interest (such as a dividend) may be the basis for an avoidance action but is unlikely, in and of itself, to be strong evidence that a bankruptcy filing was not made in good faith. When the circumstances of such transfers, however, suggest that the debtor has been "secret[ing]" assets or seeking to "frustrate the rights of creditors,"[99] such transfers may be relevant to a good faith determination.

The circumstances of the transfers at issue here, and the misleading testimony and records relating to those transfers, at least raise questions about the propriety of the debtor's conduct.  For example, documents produced by the debtor during the bankruptcy case list a payment for $928,843.10 to a law firm by the name of "Tunnell and Raysor."  The records show that the payment was for "professional services"

---

[97] Mar. 16, 2022 Hearing Tr. at 135.

[98] Charles Jordan Tabb, *Law of Bankruptcy* 592 (4th ed. 2016).

[99] 7 *Collier on Bankruptcy* ¶ 1112.07[2].

provided to TSI.[100]  At her deposition, Mott testified that the firm provided services to TSI in connection with the Florida litigation.  "[T]hey did provide a memo on the diversity issues in the Florida case…. They've provided contract review services, and I'm sure they've provided other things."[101]

Other documents admitted into evidence at the hearing, however, demonstrate that this testimony was inaccurate.  Exhibit 58 is a deed, prepared by Tunnel and Raysor, for the acquisition, in July 2019, of a house in Bethany Beach, Delaware by an entity known as "Addy Road LLC."  And Exhibit 60, a public record from the Florida Department of State, Division of Corporations, shows that "Addy Road LLC" is an entity that was registered by Mott.[102]  At her deposition, Mott acknowledged that she owned the Bethany Beach home, but stated that the home was not purchased by TSI, but that she instead bought it with "personal assets."[103]

That testimony is not credible, and the debtor presented no documentary or other evidence at the hearing in support of Mott's contention.  To be sure, it is possible that Mott simply misspoke as a result of a memory lapse that was a lingering effect of her Covid-19 diagnosis from December.  But she was TSI's corporate designee at a deposition noticed under Federal Rule of Civil Procedure 30(b)(6).  Her testimony is thus binding on TSI, which has taken no action to supplement, correct, or otherwise

---

[100] Ex. 75 at TSI000859.  Other documents show additional transfers of $27,500 to Tunnel and Raysor, for a total payment of $956,343.10.  *See* Ex. 4 at TSI000244 ($2,500 payment); Ex. 75 at TSI000860 ($25,000) payment.

[101] Ex. 18 at 30.

[102] *See* Ex. 60.  *See also* Mar. 9, 2022 Hearing Tr. at 73-74; D.I. 126-1 at 3.

[103] Ex. 18 at 106.

respond to the fact that its designee testified falsely in response to questions that were relevant to the question before the Court.[104]  As such, even if one were to accept that Mott had no intention to mislead, these circumstances counsel against a finding that TSI has met its burden of establishing good faith.[105]

### C.    There are, at the very least, serious questions about the debtor's conduct in the bankruptcy case.

As described above, from the earliest stages in this bankruptcy case the judgment creditors sought the production of the debtor's tax returns as evidence relevant to the debtor's financial condition.  While the Court narrowed the judgment creditors' requests, at a hearing held on January 26, 2022, the Court directed the debtor to produce three years' worth of tax returns.[106]  The debtor did, in fact, produce documents that purported to be its tax returns for 2018 and 2019.  At her deposition, Mott testified that TSI's 2020 tax return was due, as a result of an extension of time provided as a result of the pandemic, in the "fourth quarter of 2021."  "[A]s soon as

---

[104] *Crawford v. George & Lynch, Inc.*, 19 F. Supp. 3d 546, 554 (D. Del. 2013).

[105] In addition to the purchase of the Bethany Beach house, the record also reveals that, after the initiation of the Florida litigation, TSI also purchased a property in Jackson County, Missouri that was titled in Mott's name.  *See* D.I. 126-1 at 3-4 and materials cited therein. The report by Ryan Orner, the judgment creditor's expert, also details other substantial transfers to insiders, as well as millions of dollars in transactions that cannot be explained based on the books and records provided in discovery.  To be clear, nothing in this Memorandum Opinion constitutes a finding of fact regarding the intent of the transferor of any of these transfers.  The question whether any of these transactions may be avoided can be taken up, if and when appropriate, by the chapter 7 trustee who is to be appointed in this case.  For the purpose of this Memorandum Opinion, the Court's only finding is that the presence of these unexplained or insufficiently explained transfers counsels against a finding of the debtor's good faith.

[106] Jan. 26, 2022 Hearing Tr. at 17.

we can meet with our tax attorney," she said at her February 7, 2022 deposition, "we'll file 2020, which I expect will be in the next 30 days."[107]

But as for the years 2018 and 2019, Mott testified that the versions produced in discovery were the versions that TSI filed.[108]  When shown the document that purports to be the 2018 return and asked if it was a "true and accurate copy of your 2018 tax return as it was filed with the IRS," she answered: "Yes."[109]

The IRS, however, filed a proof of claim for unpaid taxes, for the tax years from 2016 through 2021.[110]  The proof of claim lists each of those six tax years separately, with each entry stating that the amount is "Estimated – see note."  And the footnote to which those entries refer states that the amount of the claim ($24,360) is "estimated based on available information because the return has not been filed."

At the hearing, Acosta testified on behalf of the debtor (consistent with Mott's deposition testimony) that "I believe we're finishing up 2020 right now and everything else has been filed to my knowledge."[111]  He added that as a government contractor, it would essentially be impossible for the business to operate had it not filed its taxes. "Besides owing taxes," he said that a government contractor that fails to file tax

---

[107] Ex. 18 at 70.

[108] These documents were admitted into evidence as exhibits 69 and 70.

[109] Ex. 18 at 58-59.

[110] *See* Claims Registry, Claim 2-1, filed by the Department of the Treasury.

[111] Mar. 9, 2020 Hearing Tr. at 212.

returns is "considered untrustworthy."[112]  The federal government "remove[s] your clearance and it hampers you from your ability to bid on certain contracts."[113]

Even so, when asked what the basis was for his belief that TSI had filed tax returns, Acosta answered that it was based on "[d]ocuments filed and a letter that we received from a lawyer down in Florida who does tax specialty."[114]  But Acosta did not know the name of the lawyer and TSI never produced the letter about which he testified.  It is also true, as the judgment creditors argue, that the tax returns the debtor did produce are undated.  While that omission hardly shows that the document is not authentic, it is certainly irregular.

Based on the record before it, the Court is not prepared to make a finding (as the judgment creditors urge) that the documents the debtor produced and represented to be its tax returns were fabricated and/or that Mott testified falsely when she said at her deposition that TSI filed its tax returns for the 2018 and 2019 tax years.  But the claims registry shows that the IRS filed its proof of claim on February 7, 2022.  On February 16, the judgment creditors filed a motion for sanctions, charging that TSI "produced false tax returns" and "made misrepresentations related thereto."[115]  And it is at least odd that the documents produced are undated.

---

[112] *Id.* at 216.

[113] *Id.*

[114] *Id.* at 220.

[115] D.I. 87 ¶¶ 6, 87.

At the very least, in the face of all of this, it is incumbent on a party that bears the burden of showing its good faith to take the steps necessary, before the evidentiary hearing that began on March 9, 2022, to be in a position to prove that it filed its tax returns – whether by producing the transcript of its tax return, obtaining the testimony of the lawyer whom Acosta mentioned, or at the very least producing the letter from the lawyer on which Acosta relied as evidence that the returns were filed.  That the debtor chose to do none of the above, against the context of the other problematic conduct and irregularities, also counsels against a finding that the debtor is proceeding in good faith.

### D.    The debtor's prospects of recovering from FEMA are uncertain at best.

When the debtor filed the petition, a central theme was that it was owed millions of dollars from FEMA, and a short breathing spell from its creditors' collection activity would permit it to collect on this receivable, pay its creditors in full, and resume running its government contract business in the manner it had operated for more than 20 years.  In the first-day declaration, for example, Mott states that "FEMA owes two payments to TSI."[116]   The first of those payments was for $13.5 million "for nonpayment of TSI's invoice for FEMA's reduction in the initial ordered quantity of bottled water.  That claim is pending before the U.S. Civilian Board of Contract Appeals.  The parties have completed cross motions for summary judgment and the Board is expected to issue a decision in approximately two-four months."[117]

---

[116] D.I. 3 ¶ 16.

[117] *Id.*

The second payment is a "change order claim" for approximately $6.8 million that the debtor intended to file as a result of the reduction of FEMA's order.[118]  The breathing spell created by the bankruptcy "will allow for the collection of proceeds from the FEMA claims on each of these claims, providing TSI the funds to resolve the Judgment, if necessary, and emerge from this chapter 11 case as a healthier enterprise, continuing to serve the United States as a reliable contractor to important government agencies."[119]

If either (or both) of these multi-million-dollar payments appeared likely to be received in the short term, that would counsel in favor of giving the debtor a reasonable opportunity to take advantage of the breathing spell provided by the Bankruptcy Code in order to see if it might be in a position to pay its creditors in full and continue its business.  This Court does not purport to make findings with respect to either of these claims brought by TSI against the government, which are subject to a specialized jurisdictional regime that appears to exclude the exercise of this Court's related-to jurisdiction.[120]  But even without adjudicating these claims, this Court may consider evidence relating to these claims to the extent relevant to resolving a matter

---

[118] *Id.*

[119] *Id.* ¶ 17.

[120] *See* 28 U.S.C. § 1346(a)(2) (the "district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to [sections 8(g)(1) and 10(a)(1) of the Contract Disputes Act of 1978]"); *Texas Health Choice, L.C. v. Office of Personnel Mgmt.*, 400 F.3d 895, 898-899 (Fed. Cir. 2005) (the Contract Disputes Act "exclusively governs Government contracts and Government contract disputes" and "provides the exclusive mechanism for dispute resolution").

that *is* within the Court's jurisdiction, such as whether there is cause to dismiss or convert these bankruptcy cases under § 1112(b) of the Bankruptcy Code.

Based on the evidence that was submitted, neither claim appears likely, at least in the short term, to generate a substantial recovery that will permit the debtor to confirm a plan that pays its creditors in full. As for the $13.5 million payment, during the course of this bankruptcy case the Civilian Board of Contract Appeals denied the parties' cross-motions for summary judgment.[121] The Board's decision holds that the mere decrease in the order is insufficient to entitle it to a restocking fee under the contract. Rather, TSI is required to prove that it actually incurred costs for restocking the water.[122] And while, to repeat, this Court does not purport to make any sort of finding with respect to this issue, TSI did not present any evidence at the hearing before this Court suggesting that it actually incurred such a cost. That does not mean that the TSI bankruptcy estate might not succeed in its pursuit of this claim. But it does mean that TSI has failed to persuade this Court that it should be allowed to remain a debtor in possession on the basis that it is on the verge of confirming a plan that will pay creditors in full out of the $13.5 million that FEMA will soon be paying.

And the debtor's $6.8 million claim against FEMA fares even worse. In a declaration filed on the eve of trial, Acosta testified that TSI "imminently intends to

---

[121] *See* Ex. 49.

[122] *Id.* at 6 ("[I]n order for TSI to recover restocking fees, more must occur than FEMA simply decreasing or cancelling the number of liters ordered. There must be proof that the supplies were actually restocked and a fee was charged for that restocking.")

submit" a "change order claim" of $6.8 million "on account of a FEMA change order which reduced the overall value of TSI's 2017 bottled water contract … from $117,566,730.00 to $25,636,352.37."[123]  At the hearing on March 9, Acosta testified that TSI would be submitting this claim for the change order "I believe, this week."[124]

When he was cross examined on March 14 (the next week) he was asked whether "the $6.8 million claim [has] been presented to the contracting officer."[125] Acosta responded that "[w]e believe that's going in this week," and confirmed that it had not yet been submitted.[126]  Counsel for the debtor, however, wrote to the Court on March 24, 2022 to correct that statement.  Counsel explained that the debtor's government contracting lawyers had not been retained as ordinary course professionals and therefore have not engaged in post-petition work relating to this $6.8 million claim.  "[W]e remain hopeful that it will be prepared and submitted in the near term."[127]

---

[123] D.I. 120 ¶ 9.

[124] Mar. 9, 2022 Hearing Tr. at 207.

[125] Mar. 14, 2022 Hearing Tr. at 40.

[126] *Id.*

[127] D.I. 144.  At the end of closing argument, the Court thanked debtor's counsel for taking on the representation of the debtor following the withdrawal of prior counsel.  While lawyers may have an understandable reluctance to take on a representation in such circumstances, the Court emphasized that the administration of justice depends on capable counsel answering that call.  *See* Mar. 16, 2022 Hearing Tr. at 157-158.  The Court likewise appreciates counsel's letter correcting the trial testimony, which the Court believes fully discharges counsel's duty of candor to the tribunal.  *See* Del. Rule of Prof'l Conduct 3.3(3) (disclosure to tribunal required when witness "has offered material evidence and the lawyer comes to know of its falsity").

It bears emphasis, however, that this claim arises out of events that took place in 2017 and 2018. And as of the end of March 2022, TSI, which has suffered a $6.3 million judgment for which it was unable to post a bond, still has not asserted a claim for $6.8 million owed to it dating back more than four years. None of that makes much sense. On this record, the Court cannot and will not conclude that it is sufficiently likely that TSI will recover on the $6.8 million claim that this potential recovery provides a basis for the debtor to remain a debtor in possession. Again, in the circumstances of this case it is the debtor that has the burden of proving that the case was filed in good faith to achieve an appropriate chapter 11 purpose. Parties meet burdens of proof by coming forward with admissible evidence that establishes the fact they need to prove. Offering unsubstantiated speculation about one's hopes and dreams, as the record suggests the debtor has done here, will not suffice to meet that burden.

### E.    The debtor's future business prospects render it highly unlikely that it will be able to propose a confirmable plan of reorganization.

In the end, the argument the debtor principally advanced at trial was that even without the FEMA receivables, the effort to reorganize and salvage the balance of its government contracting business was a sufficient basis for these cases to serve a valid chapter 11 purpose. But even here, the debtor was unable to articulate with any clarity which government contracts were active or present convincing evidence that the debtor was likely to win future government business.

Counsel for the United States, at closing argument, effectively summed up the record on this issue: "We're two months into this bankruptcy case. They filed their

initial schedules before the deadline, but it's clear from the testimony both in Ms. Mott's deposition and in this trial that the debtor is not capable of producing an accurate list of their active government contracts.  Every time that the debtors have testified in this case they've come up with a different list of what their contracts are."[128]

For example, Acosta stated in his declaration that TSI provides fuel for use in sea vessels through the Defense Logistics Agency under a particular contract that Acosta identified in his declaration.[129]  Under cross-examination, Acosta at first stood by his declaration, claiming that the contract at issue remained live.[130]  "I believe it's active," Acosta testified.[131]  When confronted, however, with a publicly available government record showing that the contract had been terminated,[132] Acosta had no choice but to reverse his position.  "So, do you agree that this contract, [SPE602-18-D-0457] has now been closed and is no longer active?," counsel for the United States asked Acosta.  "Yes, ma'am.  With the information you've shown me now, yes," he responded.[133]

At the end of the day, the record in this case does not support a finding that a few stray government contracts – ones that the debtor was unable to identify or

---

[128] Mar. 16, 2022 Hearing Tr. at 119.

[129] D.I. 120 ¶ 5.

[130] The relevant contract was contract number SPE602-18-D-0457.  *See* Mar. 14, 2022 Hearing Tr. at 34.

[131] *Id.* at 33.

[132] The document at issue is the only exhibit the government had admitted into evidence, and is a print-out of a record from an official website called USASpending.gov.

[133] Mar. 14, 2022 Hearing Tr. at 36.

describe with any clarity – amount to a business around which the debtor can successfully reorganize.  At the very best, if one were to exclude the projected recovery on the FEMA claim (as described above), the debtor's own DIP budget shows a business that would operate at only slightly better than a break-even basis.[134]

Acosta did testify during cross-examination on March 14, 2022 that he learned (since he testified under direct examination the week before) of an additional contract for fueling airplanes and drones.  Acosta explained on March 14 that the contract is "currently active" but that he "forgot about it until it was just emailed to me last week."  The Court, however, is disinclined to credit this alleged contract in its analysis.  Despite the Court's direction (as counsel for the debtor had volunteered) that the debtor produce its government contracts,[135] it does not appear that the debtor produced documents related to the so-called Air-Card contract.  No documents related to any such contract were moved into evidence at the evidentiary hearing.  And no party had an effective opportunity to examine a representative of the debtor about, and the Court has no ability to assess, the economics of this alleged contract.  If the duty to comply with discovery obligations is to mean anything, it means that one cannot ignore the obligation to produce documents to one's litigation opponent and then appear at trial and offer testimony about what those documents provide.

---

[134] *See* D.I. 116-1 at 21.

[135] *See* Jan. 26, 2022 Hearing Tr. at 11 (debtor's counsel states that "I also think it's important that the ongoing contracts be provided, which we're doing"); *id.* at 16-17 (Court directs that the "five largest government contracts" be produced).

Indeed, it bears note that at the very outset of the case, the debtor's position was that the judgment that GPDEV and Simons had obtained would doom their government contract business unless that judgment were either paid or reversed on appeal.    "Because of the Judgment against it," Mott stated in her first-day declaration, "TSI is unable to bid on any additional government contracts."[136]  But by the time of trial, less than two months later, the debtor's position had flipped 180 degrees.  The debtor now asks the Court to conclude that this ability to service current and obtain future government contracts, even without satisfying or obtaining a reversal of the judgment, would preserve value and thus serve an appropriate chapter 11 purpose.  While that point may be a perfectly valid one as a matter of bankruptcy theory, the story the debtor has told, and the evidence presented to support it, is just too incomplete, contradictory, and (for want of a better word) garbled to meet its burden of proof on this issue.

*  *  *

Accordingly, after considering the record established at the evidentiary hearing, the totality of the circumstances, and the factors set forth in *Primestone*, the Court concludes that the debtor has failed to meet its burden of demonstrating that this case serves a valid chapter 11 purpose and therefore has been filed in good faith. Finding that "cause" exists under § 1112(b), the Court accordingly turns to the question whether the case should be dismissed or converted to one under chapter 7.

---

[136] D.I. 3 ¶ 15.

## II.     The Court believes that the interests of creditors and the estate would be better served by conversion than dismissal.

Section 1112(b) states that in deciding between dismissal and conversion, the court should choose the option that is "in the best interests of creditors and the estate."[137]  Here, each of the parties in interest to have addressed the issue – the judgment creditors, Bering Straits, and the U.S. Trustee – has taken the position that conversion is superior to dismissal.

The Court agrees.  A chapter 7 trustee would have the authority to pursue the debtor's claim against FEMA.  And the trustee would also have the authority, if he or she were to conclude it appropriate, to pursue any estate causes of action, including any potential avoidance actions the estate may have.  While there are costs attendant to a chapter 7 case, the Court is persuaded that, in light of the powers the Bankruptcy Code vests in a chapter 7 trustee, conversion is better for creditors and the estate than dismissal – in which case the debtor's current management would retain control over the debtor's assets and creditors would be left to state-law creditor remedies. The Court accordingly concludes that the case should be converted to one under chapter 7.

## III.    GPDEV and Simons have not met their burden of showing conduct that is sufficiently egregious to warrant the imposition of sanctions.

While the Court acknowledges that it harbors some nagging questions, at the end of the day the record does not demonstrate the type of misconduct by the debtor that would warrant the imposition of sanction sunder Rule 37 of the Federal Rules of

---

[137] 11 U.S.C. § 1112(b).

Civil Procedure.  The Court will accordingly deny the judgment creditors' motion for sanctions.

The premise of the motion is that the debtor produced false tax returns and made misrepresentations about the returns, made false statements about transfers to insiders, and otherwise engaged in misconduct in meetings its obligations in this case.

As the discussion above sets forth, while the Court does have concerns that certain documents produced in the Florida litigation may not have been authentic, the imposition of sanctions on account of such misconduct would fall within the exclusive province of the District Court for the Northern District of Florida rather than this Court.

As for the production of documents in this Court, as also described above, the Court does not believe that the judgment creditors have proven that the tax returns the debtor produced were fabricated.  There are, without doubt, unanswered questions about those returns, including discrepancies between those returns and the internal business records the debtor has produced.  But the imposition of discovery sanctions under Rule 37 is inappropriate in cases in which the record is as uncertain and ambiguous as it is here.

The Court will note that of all the (various) allegations of impropriety the judgment creditors have leveled at the debtor, the one that the Court views as the most substantial involves the claim that the debtor had secretly redacted certain information from the documents it produced without indicating that it had made

redactions (such as by simply covering the information it sought to conceal with white-out).

The production of an altered document (other than where a redaction is conspicuously labeled) could, without doubt, be the basis for the imposition of sanctions. And the judgment creditors make a colorable case that the debtor engaged in precisely this conduct. They point to a check for $2.5 million, written from one TSI account to another in July 2019, in which information that one might expect to present that identifies the transferee account is absent.[138]

Indeed, it remains uncertain what became of this $2.5 million. That is a serious matter, and one that a chapter 7 trustee may well choose to pursue. The Court does not believe, however, that the actual evidence of misconduct is (on the current record) sufficient to justify the imposition of sanctions.

But while the evidence of actual misconduct may be too inconclusive or uncertain (on the current record) to warrant the imposition of Rule 37 sanctions, there is little doubt that the debtor's conduct in the bankruptcy case made it more costly than it might have been for the judgment creditors to present their motion. Accordingly, in denying the motion to dismiss, the Court does so without prejudice to the right of the judgment creditors to file an appropriate motion, under section 503(b)(3)(D), for an administrative claim for making a substantial contribution in a chapter 11 case.[139]

---

[138] *See* Ex. 17 at 22-23.

[139] *See Lebron v. Mechem Financial Inc.*, 27 F.3d 937 (3d Cir. 1994) (holding that while a substantial contribution claim is not available, under the text of § 503(b)(3)(D), in a case

## Conclusion

For the foregoing reasons, the Court will enter an order converting the case to one under chapter 7. The Court will deny the motion for sanctions. Counsel for GPDEV and Simons are directed to settle an appropriate order, on certification of counsel, after consulting about the form of order with the debtor, the Office of the U.S. Trustee, Bering Straits and the United States.

Dated: March 30, 2022

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

under chapter 7, such a claim may be asserted after conversion to chapter 7 by a creditor that made such a contribution while the case was proceeding under chapter 11).