**<u>EXHIBIT A</u>**

No. 21-13662

# In the United States Court of Appeals for the Eleventh Circuit

**GPDEV, LLC and SIMONS EXPLORATION, INC.**,

*Plaintiffs-Appellees*,

v.

**TEAM SYSTEMS INTERNATIONAL, LLC**,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of Florida
Case No. 4:18-cv-00442-RH-MAF

## APPELLANT'S BRIEF

ROBIN I. BRESKY
BRESKY LAW
150 E. Palmetto Park Road, Suite 340
Boca Raton, FL 33432-4832
Telephone: (561) 994-6273
Primary E-mail: Service@Bresky-Law.com
Secondary E-mail: RBresky@Bresky-Law.com

*Attorney for Defendant-Appellant*

**No. 21-13662**

*GPDEV, LLC, et al. v. Team Systems International, LLC*

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to FRAP 26.1 and 11th Cir. Rule 26.1-2, Defendant-Appellant Team Systems International, LLC ("TSI") states that the following persons and entities may have an interest in the outcome of this appeal:

1. Acosta, Steve (member of the Defendant-Appellant, TSI)

2. Bresky, Robin I., Esq. (lead appellate attorney for Appellant TSI)

3. Collins, Leonard M., Esq. (counsel for Plaintiffs-Appellees)

4. Fitzpatrick, Honorable Martin A. (U.S. Magistrate Judge)

5. GPDEV, LLC (a Plaintiff-Appellee; a California LLC with its principal place of business in Irvine, California).

6. Hinkle, Honorable Robert L. (U.S. District Judge)

7. Kozlowski, Steven, Esq. (trial counsel for Defendant-Appellant TSI)

8. Leshin, Randall L., Esq. (trial counsel for Defendant-Appellant TSI)

9. Maciorowski, John (member of Defendant-Appellant TSI)

10. Mott, Christopher (member of Defendant-Appellant TSI)

11. Mott, Deborah Evans (member of Defendant-Appellant TSI)

12. Peterson, George (citizen of California; sole member of Plaintiff-Appellee GPDEV, LLC)

**No. 21-13662**
*GPDEV, LLC, et al. v. Team Systems International, LLC*

13.   Simons, Jordan (managing director of Appellee, Simons Exploration, Inc., d/b/a Archangel International).

14.   Simons Exploration, Inc., d/b/a Archangel International (a Plaintiff-Appellee; a Colorado corporation with its principal place of business in Denver, Colorado).

15.   Smith, Wayne LaRue, Esq. (trial counsel for Defendant-Appellant TSI)

16.   Team Systems International, LLC ("TSI") (the Defendant-Appellant; a Delaware LLC with its principal place of business in Ponte Vedra Beach, Florida).

17.   Turner, M. Stephen, Esq. (counsel for Plaintiffs-Appellees)

<u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to FRAP 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, the Appellant, TSI, certifies that to the best of its knowledge, no publicly traded company or corporation has an interest in the outcome of the case; the entities listed above are not publicly traded and do not have stock ticker symbols.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument as it would provide an opportunity to clarify the issues and answer questions that the Court may have regarding the arguments, thus aiding the decisional process. As oral argument would facilitate the provision of any needed clarification of the record facts or applicable judicial precedents in this matter, oral argument could assist the Court in analyzing the law, resolving the issues, and reaching a decision.

## STATEMENT REGARDING RECORD REFERENCES

Pursuant to 11th Cir. R. 28-5, references to the record are to the document number and page number. Citations to "(ECF [page number])" refer to entries on the civil docket for case number 4:18-cv-00442-RH-MAF in the United States District Court for the Northern District of Florida. The cited record documents are included as attachments to (or an appendix to) this Motion.

Although the transcript documents with the actual official clerk's header are not yet viewable by counsel within the district court's ECF system, references to ECF 309 (Volume I of the official trial transcript), ECF 308 (Volume II), and ECF 307 (Volume III), include citations to page numbers that are believed to match the page numbers in the header generated by the district court's electronic filing system. These citations generally also include a reference to "Trial Tr." with page numbers assigned by the court reporter.

# TABLE OF CONTENTS

Pages

CERTIFICATE OF INTERESTED PERSONS .......................................... C-1, C-2

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

STATEMENT REGARDING RECORD REFERENCES ...................................... ii

TABLE OF CITATIONS ........................................................................................ vi

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION.. xii

STATEMENT OF THE ISSUES .......................................................................... 1

STATEMENT OF THE CASE ............................................................................... 2

    I.  Course of Proceedings and Dispositions in the District Court ........................ 2

   II.  Statement of the Facts ................................................................................... 4

  III.  Statement of the Standard or Scope of Review for Each Contention. .......... 10

SUMMARY OF THE ARGUMENT .................................................................... 11

ARGUMENT AND CITATIONS OF AUTHORITY ........................................... 13

    I.  THE COURT ERRED IN DENYING TSI'S MOTIONS TO DISMISS FOR
        LACK OF SUBJECT-MATTER JURISDICTION DUE TO LACK OF
        COMPLETE DIVERSITY. ............................................................................. 13

   II.  THE COURT ERRED IN DENYING TSI'S MOTION TO AMEND ITS
        AFFIRMATIVE DEFENSES TO INCLUDE THE DEFENSE OF ILLEGAL
        CONTRACT; AND THIS ERROR LED TO AN AWARD OF COMMISSIONS
        THAT SHOULD BE DEEMED ILLEGAL UNDER FEDERAL LAW. ..................... 17

  III.  THE CONSULTING AGREEMENT WAS NOT MODIFIED ORALLY OR BY
        CONDUCT TO INCLUDE NESTLÉ WATER. ..................................................... 21

A.  Plaintiffs failed to plead and prove the stringent elements for an exception for oral or implied modification where the contract expressly requires a writing signed by all parties. ..................................21

B.  Conduct cannot vary the express terms of a written contract, nor can it change any terms of an unambiguous contract. ..................................25

C.  The Parties' communications after the alleged "modification" belied any claim of modification........................................................................27

D.  The Judgment and verdict further err in finding a commission due to GPDEV, LLC on Nestlé water, when Peterson was not involved in procuring Nestlé water. ..........................................................................28

IV. THE CONSULTING AGREEMENT DID NOT PROVIDE FOR A COMMISSION ON INCOME FROM FEMA'S SUBSEQUENT RENTAL OF DROP CONTAINERS IN PUERTO RICO...........................................................29

A.  The court erred in allowing parole evidence as to the meaning of the Agreement and whether it encompasses drop containers. .....................29

B.  The Parties *could not have* contemplated rental of drop containers and they had no meeting of the minds as to a commission for such separate procurement...................................................................................33

C.  The mention of a rate for potential drop trailers in FEMA's Statement of Work or RFP does not support the notion that the Consulting Agreement encompassed rental of drop containers. ...................................................34

D.  The term "Cost of Goods Sold" in the Net Income formula did not allow commissions on anything besides bottled water. ....................................36

E.  TSI did not certify that all payments requested from FEMA were contemplated by the Consulting Agreement. ..........................................37

F.  Plaintiffs' quest for a commission on drop containers is an improper attempt to rewrite the final, limited Consulting Agreement back to Plaintiffs' initial expansive draft...........................................................38

V.  IF, *ARGUENDO*, ANY COMMISSIONS WERE DUE, THE AMOUNTS IN THE
JUDGMENT ARE ERRONEOUS, FOLLOWING PLAINTIFFS' EXPERT'S
MISTAKEN SUMMARY WHICH MISCALCULATED NET INCOME...................40

VI.  THE DISTRICT COURT ERRED IN ASSESSING $991,498.78 OF
PREJUDGMENT INTEREST. ..............................................................44

    A.  Only post-judgment interest should apply as no debt was owed until
entry of a declaratory judgment.................................................44

    B.  Even if this were treated as a contract action, prejudgment interest cannot
be awarded because the date of loss could not be indisputably
determined for a ministerial computation. ...............................45

VII.  THE DISTRICT COURT ERRED IN DENYING TSI'S MOTION TO
RECUSE DUE TO BIAS OR PARTIALITY. ...........................................48

    A.  Legal Principles and Standard of Review ...............................48

    B.  TSI's affidavit and motion demonstrated bias requiring recusal. ..........50

CONCLUSION.........................................................................................53

CERTIFICATE OF COMPLIANCE.........................................................54

CERTIFICATE OF SERVICE .................................................................55

ADDENDUM OF STATUTES AND REGULATIONS ......................................57

    28 U.S.C. § 144  ...............................................................................57

    28 U.S.C. § 455  .........................................................................57-59

    41 U.S.C. § 3901 ...............................................................................60

    Fed. Acquisition Reg. 4.1001...........................................................61

    Fed. Acquisition Reg. 4.1003...........................................................61

    Fed. Acquisition Reg. 52.203-5 .......................................................62

# TABLE OF CITATIONS

**Federal Cases**                                                    Page(s)

*611, LLC v. U.S. Lubes, LLC*,

    2006 U.S. Dist. LEXIS 52727 (D. Md. July 18, 2006)...................... 14, 15, 16

*American Mutual Liability Insurance Co. v. Flintkote Co.*,

    565 F. Supp. 843 (S.D.N.Y. 1983) .......................................................... 15, 16

*Bell v. Chandler*,

    569 F.2d 556 (10th Cir. 1978) ....................................................................... 48

*Czeremcha v. International Ass'n of Machinists & Aerospace Workers*,

    724 F.2d 1552 (11th Cir. 1984) .................................................................... 20

*Dutcher v. Matheson*,

    840 F.3d 1183 (10th Cir. 2016) .................................................................... 14

*Energy Smart Industry, LLC v. Morning Views Hotels-Beverly Hills, LLC*,

    660 F. App'x 859 (11th Cir. 2016) .............................................................. 23

*Fidelity & Deposit Co. of Maryland v. Tom Murphy Construction Co.*,

    674 F.2d 880 (11th Cir. 1982) ...................................................................... 22

*Green v. Murphy*,

    259 F.2d 591 (3d Cir. 1958) ................................................................... 49, 51

*Grupo Dataflux v. Atlas Global Group, L.P.*,

    541 U.S. 567 (2004) ...................................................................................... 16

*Harris v. Garner,

  216 F.3d 970 (11th Cir. 2000) ......................................................... 20

Herrick Co. v. SCS Communications, Inc.,

  251 F.3d 315 (2d Cir. 2001) ........................................................... 13

IBM Poughkeepsie Employees Fed. Credit Union v. Cumis Ins. Soc'y, Inc.,

  590 F. Supp. 769 (S.D.N.Y. 1984) ................................................. 31

In re Moody,

  755 F.3d 891 (11th Cir. 2014) ......................................................... 48

In re Union Leader Corp.,

  292 F.2d 381 (1st Cir. 1961) ........................................................... 53

*Jablonski v. St. Paul Fire & Marine Insurance Co.,

  645 F. Supp. 2d 1101 (M.D. Fla. 2009) ......................................... 47

McWhorter v. City of Birmingham,

  906 F.2d 674 (11th Cir. 1990) ......................................................... 49

Offutt v. United States,

  348 U.S. 11 (1954) ........................................................................... 53

*Quinn v. Gulf & W. Corp.,

  644 F.2d 89 (2d Cir. 1981) .......................................................... 18-19

*Smith v. GTE Corp.,

  236 F.3d 1292 (11th Cir. 2001) ....................................................... 16

*United States v. Partin*,

    312 F. Supp. 1355 (E.D. La. 1970) ................................................ 49

*Webbe v. McGhie Land Title Co.*,

    549 F.2d 1358 (10th Cir. 1977) ...................................................... 53

**State Cases**

\*Acceleration National Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc.*,

    541 So. 2d 738 (Fla. 3d DCA 1989) ...................................... 30, 31

\*Advanzeon Solutions, Inc. v. State ex rel. Florida Dep't of Financial Services*,

    321 So. 3d 911 (Fla. 1st DCA 2021) ............................................ 35

\*Argonaut Insurance Co. v. May Plumbing Co.*,

    474 So. 2d 212 (Fla. 1985) ...................................................... 45, 46

*Arizona Chemical Co., LLC v. Mohawk Industries*,

    197 So. 3d 99 (Fla. 1st DCA 2016) .............................................. 46

*Avatar Development Corp. v. De Pani Construction*,

    834 So. 2d 873 (Fla. 4th DCA 2002) ........................................... 31

*Barakat v. Broward County Housing Authority*,

    771 So. 2d 1193 (Fla. 4th DCA 2000) ......................................... 39

*Broward County v. LaPointe*,

    685 So. 2d 889 (Fla. 4th DCA 1996) ........................................... 31

*Central Properties, Inc. v. Robbinson,

    450 So. 2d 277 (Fla. 1st DCA 1984) .............................................................. 33

*Citizens Property Insurance Corp. v. Alvarez,

    198 So. 3d 45 (Fla. 2d DCA 2015) ............................................................... 47

City of Clearwater v. BayEsplanade.com, Ltd. Liability Co.,

    251 So. 3d 249 (Fla. 2d DCA 2018) ............................................................. 31

*Cox v. CSX Intermodal, Inc.,

    732 So. 2d 1092 (Fla. 1st DCA 1999) .......................................................... 26

*Emergency Associates, P.A. v. Sassano,

    664 So. 2d 1000 (Fla. 2d DCA 1995) ........................................................... 32

*Flagship National Bank v. Gray Distribution Systems, Inc.,

    485 So. 2d 1336 (Fla. 3d DCA) .................................................................... 26

Florida Hurricane Protection & Awning, Inc. v. Pastina,

    43 So. 3d 893 (Fla. 4th DCA 2010) .............................................................. 32

*Indian Harbor Citrus, Inc. v. Poppell,

    658 So. 2d 605 (Fla. 4th DCA 1995) ....................................................... 25-26

Japanese Gardens Mobile Estates, Inc. v. Hunt,

    261 So. 2d 193 (Fla. 2d DCA 1972) ......................................................... 31-32

*Jenkins v. Eckerd Corp.,

    913 So. 2d 43 (Fla. 1st DCA 2005) ............................................................... 32

*Lance v. Wade*,

    457 So. 2d 1008 (Fla. 1984) ........................................................... 24

*MacKenzie v. Super Kids Bargain Store, Inc.*,

    565 So. 2d 1332 (Fla. 1990) ........................................................... 51

*Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*,

    145 So. 3d 989 (Fla. 4th DCA 2014) .................................... 21, 23-24, 24, 25

*Paoli v. Natherson*,

    732 So. 2d 486 (Fla. 2d DCA 1999) ...................................................... 44, 45

*Prewitt Management Corp. v. Nikolits*,

    795 So. 2d 1001 (Fla. 4th DCA 2001) .......................................... 31

*Professional Insurance Corp. v. Cahill*,

    90 So. 2d 916 (Fla. 1956) ............................................................ 22

*Robbie v. Miami*,

    469 So. 2d 1384 (Fla. 1985) ........................................................... 30

*Rowe-Linn v. Berman*,

    601 So. 2d 618 (Fla. 4th DCA 1992) .......................................... 51

*South Florida Beverage Corp. v. Figueredo*,

    409 So. 2d 490 (Fla. 3d DCA 1981) ............................................ 36

*Sugar Cane Growers Cooperative of Florida, Inc. v. Pinnock*,

    735 So. 2d 530 (Fla. 4th DCA 1999) .......................................... 36

*Thompson v. Watts*,

    111 So. 3d 986 (Fla. 1st DCA 2013) ............................................................ 30

**Statutes**

28 U.S.C. § 144 ........................................................................ 12, 48, 49, 50

28 U.S.C. § 455 ...................................................................................... 50

28 U.S.C. § 455(a) ............................................................................ 12, 48, 49

28 U.S.C. § 455(b)(1) ................................................................................ 49

28 U.S.C. § 1291 ................................................................................... xiii

28 U.S.C. § 1332(a) ............................................................................... xiii

41 U.S.C. § 3901(b)(1) ....................................................................... 17, 19

41 U.S.C. § 3901(b)(2) ............................................................................ 19

**Regulations**

32 C.F.R. § 117.3(b) ................................................................................ 13

Fed. Acquisition Reg. 4.1001 ................................................................... 5, 38

Fed. Acquisition Reg. 4.1003 ..................................................................... 38

Fed. Acquisition Reg. 52.203-5 ............................................................ 17, 18, 19

**Rules of Procedure**

Fed. R. Civ. P. 15(a)(2) ........................................................................... 20

Fed. R. Civ. P. 15(b)(2) ........................................................................... 19

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

This case involves a contract under the laws of the State of Florida. Plaintiffs alleged that the federal district court for the Northern District of Florida purportedly had subject matter jurisdiction due to alleged diversity of citizenship pursuant to 28 U.S.C. § 1332(a). However, TSI challenged diversity jurisdiction because there is a citizen of California on both sides. (*See* ECF 21, 47, 61, 277.) TSI maintains in this appeal that the district court erred in failing to dismiss for lack of jurisdiction.

The United States Court of Appeals for the Eleventh Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 from a final order and Judgment. Judgment was rendered on September 28, 2021 (ECF 306) upon a final order of the same date (ECF 305) following a jury trial (*see* ECF 294). TSI then timely filed its Notice of Appeal on October 18, 2021 (ECF 311).

# STATEMENT OF THE ISSUES

I.  The district court erred in failing to dismiss the case for lack of subject matter jurisdiction as there was not complete diversity of citizenship.

II.  The court abused its discretion by declining to allow amendment of TSI's Affirmative Defenses to include a defense of Illegal Contract, ultimately leading to Plaintiffs receiving an award of commissions that should be deemed contrary to the federal law which prohibits a commission for securing a federal contract.

III.  The court erred in finding that the Consulting Agreement was modified by conduct to include Nestlé water and in awarding commissions on Nestlé water.

IV.  The court erred in finding that the Consulting Agreement applied to net income from retention of drop containers in Puerto Rico.

V.  Even if *arguendo* any commissions were due and unpaid, the amounts in the Judgment are erroneous, based on Plaintiffs' expert's summary which erroneously excluded certain expenses and wrongly included commissions on drop containers.

VI.  The court erred by imposing or miscalculating prejudgment interest.

VII.  The district court erred in denying TSI's motion for recusal.

1

## <u>STATEMENT OF THE CASE</u>

### I.  STATEMENT OF THE COURSE OF PROCEEDINGS
### AND DISPOSITION IN THE COURT BELOW

Plaintiffs-Appellees sought a declaratory judgment and equitable accounting as to their rights, under Florida law, to a commission under a Consulting Agreement where they were to procure a supply of bottled water from Niagara Bottling, LLC, for TSI to sell to the government. (ECF 1-3.) TSI ultimately sold the water to FEMA for Hurricane Maria relief in 2017.

The litigation primarily concerned: (**1**) whether the Consulting Agreement was modified orally or by conduct to also encompass Nestlé water; (**2**) whether the Agreement contemplated a commission on FEMA's subsequent procurement for rental of shipping containers ("drop containers") after TSI's delivery of the water to Puerto Rico; and (**3**) whether there was complete diversity of citizenship to support federal subject matter jurisdiction.

<u>Course of Proceedings</u>

<u>Complaint</u>.-- On September 21, 2018, Plaintiffs filed the Complaint (ECF 1) seeking a declaration of rights under Florida law as to the Consulting Agreement. (ECF 1-3.)

<u>Answer & Affirmative Defenses</u>.-- On May 24, 2019, TSI filed its Answer and Affirmative Defenses. (ECF 67.)

First MSJ.-- On November 27, 2019, TSI moved for summary judgment. (ECF 89.) The court concluded that "TSI is not entitled to summary judgment on the plaintiffs' claim that the original contract was modified to extend beyond Niagara water" (ECF 103 at 4) nor "on the plaintiffs' claim based on revenue derived from [drop containers in] … Puerto Rico." (ECF 103 at 5.)

Second MSJ.-- On October 1, 2020, the court directed the Parties to submit motions for summary judgment on the issue of drop containers, *inter alia*. (ECF 201 at 1-2.) TSI's motion showed that the Consulting Agreement did not encompass FEMA's subsequent rental of shipping containers. (ECF 209, 215.)

Order Denying Second MSJ.-- On February 22, 2021, the court denied summary judgment, concluding *inter alia* that the Consulting Agreement is ambiguous and parol evidence is admissible as to whether it encompassed a commission on FEMA's subsequent rental of shipping containers. (ECF 220 at 6.)

### Trial and Jury Verdict

After a trial on August 23-25, 2021, the jury returned a verdict with four findings relevant to this appeal: (1) the Consulting Agreement was modified by conduct to encompass Nestlé water; (2) the Agreement applied to net income from FEMA's retention of "drop containers" in Puerto Rico; (3) the amount due to GPDEV, LLC is $2,770,855.00; and (4) the amount due to Simons Exploration, Inc. is $2,483,722.00. (ECF 294.)

Disposition in the District Court

On September 28, 2021, the district court entered an order directing entry of judgment on the verdict and making rulings on equitable and declaratory matters. (ECF 305.) The same day, the clerk entered the Judgment. (ECF 306.) It awarded GPDEV, LLC $2,770,855 plus $527,140.32 of prejudgment interest, and awarded Simons Exploration, Inc., $2,483,722 plus $464,358.46 of prejudgment interest, together with post-judgment interest. (ECF 306.)

## II. STATEMENT OF FACTS

The Parties.-- Defendant-Appellant Team Systems International, LLC ("TSI"), is a minority- and woman-owned small business serving the federal government as a contractor. (ECF 277 at 2.)

Plaintiff-Appellee GPDEV, LLC is a California company whose principal member is George Peterson ("Peterson"). (ECF 1 at 1.)

Plaintiff-Appellee Simons Explorations, Inc. is a Colorado corporation doing business as Archangel International ("AI"). Its principal director is Jordan Simons ("Simons"). (ECF 1 at 1.)

Subject Matter.-- This case involves a written Consulting Agreement where Defendant-Appellant TSI agreed to pay Plaintiffs-Appellees a commission of 25% of the Net Income realized from TSI's sales of "a supply of bottled water supplied by Niagara Bottling, LLC," which TSI had "procured" purportedly "with the

assistance of [Plaintiffs]." (ECF 1-3 at 1.)

FEMA's RFP.-- On June 9, 2017, a government agency, FEMA, issued a request for proposals ("RFP") seeking bidders for an indefinite delivery, indefinite quantity ("ID/IQ") Multiple Award Task Order Contract ("MATOC") to procure bottled water for disasters. (ECF 89-4.) A MATOC is issued to multiple vendors to give FEMA the ability to quickly respond to emergencies by having multiple vendors ready to bid on time-sensitive contracts. (ECF 209 at 2.)

The RFP included a line item for the bottled water (CLIN 0002) and a potential line item for transportation (CLIN 0003) that could include drop trailers (semi-trailers detached from trucks for unloading at delivery locations). (ECF 89-4 at 3-7.) Pursuant to Federal Acquisition Regulation ("FAR") 4.1001 and 4.1001(a), each Contract Line Item Number ("CLIN") defined a separate "deliverable." (*See* ECF 182-1 at 2.) The RFP required respondents to demonstrate an ability to procure up to 2,700,000 liters of bottled water within 72 hours of FEMA approval. (ECF 89-4 at 54.)

TSI's Proposal.-- When TSI decided to submit a proposal to FEMA, Chris Mott of TSI contacted his friend Simons to discuss the RFP. Simons had said he had connections in the bottled water industry. Simons asked Peterson for assistance with securing a supply of bottled water. Peterson introduced TSI to Niagara Bottling, LLC. (ECF 209 at 5; ECF 89-3 at 8-9.) Niagara provided pricing and

indicated that it could provide sufficient water. (ECF 89-8, 89-9, 89-10, 89-11; 89-8 at 2.) On July 6, 2017, TSI submitted a proposal to FEMA, listing TSI, Niagara, Navajo Express (trucking), and Bering Straits Logistics as the "Contractor Team." Plaintiffs were not part of the team. (ECF 89-12 at 2.)

Discussions About an Agreement.-- After TSI responded to the RFP, but before FEMA awarded a MATOC, TSI and Plaintiffs began discussing a written agreement to reward Plaintiffs for securing a supply of bottled water from Niagara Bottling, LLC. Peterson, with input from Simons, drafted a proposed "Commission Agreement" which would have provided for "a commission for assistance in procuring the [FEMA] contract(s)." (ECF 89-15 at 4.)

Formalization of the Consulting Agreement.-- TSI sent Plaintiffs revisions to the proposed agreement and renamed it the Consulting Agreement. (*See* ECF 89-17 at 2-3; ECF 299-1.) TSI rejected substantial portions of Plaintiffs' draft, including the language contemplating a commission "for assistance in procuring the [FEMA] contract(s)." (*See* ECF 299-1.) TSI also included a formula for calculating the Net Income and commissions on TSI's sales of the Niagara "bottled water." (*See* ECF 1-3 at 1; ECF 299-1.) Plaintiffs accepted TSI's revisions and confirmed that the Consulting Agreement accurately reflected their agreement. (ECF 89-17 at 2; ECF 89-2 at 12.) On August 16, 2017, Plaintiffs and TSI signed the Consulting Agreement. (ECF 1-3 at 3.)

<u>Terms of the Agreement</u>.-- The Consulting Agreement provided for a 25% commission on Net Income from TSI's sales of a supply of "bottled water" purportedly procured by Plaintiffs from Niagara Bottling, LLC. (ECF 1-3 at 1.) The Agreement did not require Plaintiffs to do anything but utilize their claimed relationship with Niagara to secure a supply of "bottled water" for TSI. (ECF 1-3 at 1.) It did not create a joint venture or business partnership. (*See* ECF 89-19 at 2, where Simons wished it had been a joint venture.)

The Consulting Agreement, by terms drafted by Plaintiffs, constituted the entire agreement between the Plaintiffs and TSI and declared that any other understanding or alleged modification would be void if not in a writing signed by all parties. (ECF 1-3 at 2 ¶¶ 3-4.)

<u>The MATOC</u>.-- On September 5, 2017, FEMA awarded TSI a five-year MATOC, thus prequalifying TSI to bid for task orders related to time-sensitive emergencies. (ECF 209 at 8.)

<u>First Task Order</u>.-- On September 28, 2017, FEMA issued a task order to TSI for delivery of 80 million liters of bottled water to Puerto Rico under Contract Line Item Number ("CLIN") 0002AA, but Plaintiffs could not obtain water directly from Niagara to timely fulfill the requirements. (ECF 209 at 10-11.)

TSI then worked with Bering Straits to obtain Niagara water for TSI at a cost of $0.42 per liter (which was higher than the $0.165 quoted directly by Niagara

because Bering Straits' price included a profit markup and transportation to the staging area in Jacksonville or Savannah). (ECF 209 at 12.)

Bering Straits Also Obtains Nestlé Water.-- Niagara was able to supply only 6,589,147 liters of water. As Niagara could not supply the required 80 million liters, TSI obtained approval from FEMA to additionally use some other brand. Around September 6, 2017, Simons voluntarily began cold-calling other water suppliers. (*See* ECF 293-4 at 16 [ECF 96-4 at 1].) On September 10, 2017, Simons asked if TSI needed help with anything, and TSI replied that Simons could help by "[g]etting more water suppliers[.] The more the better." (ECF 293-4 at 29). The text message did not mention Nestlé water or state that the Consulting Agreement would be modified. TSI averred in its sworn interrogatories that were admitted into evidence at trial:

> Non-party Jordan Simons, <u>individually</u>, and Defendant, separate and apart from the Consulting Agreement, agreed that if TSI was able to secure water from Nestle with Mr. Simons' assistance, TSI would pay Mr. Simons a total success fee of 12.5% of the net income TSI actually received….

(ECF 295-3 at 23.) Pursuant to that side agreement, Simons identified Nestlé water available for acquisition by Bering Straits. (ECF 209 at 12.)

However, the available supply of Niagara and Nestlé water combined was only 12,479,040 liters. (ECF 209 at 12.)

FEMA Makes a Separate Procurement for Containers.-- TSI delivered the

8

12,479,040 liters of bottled water to Puerto Rico in 695 shipping containers by November 6, 2017; then, effective November 7, FEMA issued Amendment P00001 which reduced the face value of CLIN 0002AA by approximately 80% to reflect the available 12,479,040 liters, and also added a separate contract line item ("CLIN 0016") for FEMA to rent the shipping containers ("drop containers") at a rate equal to the "drop trailer rate" previously set forth in the RFP. (ECF 293-5 at 6.) FEMA ended up retaining the drop containers for about six months (ECF 209 at 13) and paid TSI $19,240,725.00 for the rental. (*See* Exh. D-4 to ECF 123.)

Payment to Plaintiffs.-- After FEMA paid $18,338,823 gross for water and delivery under CLIN 0002AA (ECF 244-1 at 8), TSI paid Plaintiffs $711,237.39 as 25% of net income on Niagara water as agreed in the Consulting Agreement. (ECF 209 at 11.) TSI also paid Simons 12.5% of net income on Nestlé water pursuant to the side agreement. (ECF 293-5 at 19; ECF 295-3 at 23.)

Plaintiffs' Complaint.-- On September 21, 2018, Plaintiffs filed a Complaint for a declaration and equitable accounting under Florida law, claiming that TSI had not paid all commissions due. (ECF 1.)

Result.-- The district court found for Plaintiffs. (ECF 294, 305, 306.) On October 18, 2021, TSI timely filed a Notice of Appeal. (ECF 311.)

### III.  STATEMENT OF THE STANDARD OR SCOPE OF REVIEW

I.  The district court erred in applying a rule of law as to diversity jurisdiction.

II.  The district court abused its discretion in declining to allow amendment of TSI's Affirmative Defenses, thus ultimately allowing the jury to award commissions that should be deemed illegal under federal procurement law.

III.  The district court erred in applying a rule of law as to whether the Consulting Agreement was modified by conduct to include Nestlé water; and there was insufficient evidence to support the jury's finding of modification.

IV.  The district court erred in formulating or applying a rule of law as to whether the Consulting Agreement applied to net income from retention of drop containers in Puerto Rico; and there was insufficient evidence to support the verdict finding that the Agreement so applied.

V.  There is insufficient evidence to support the verdict as to the amounts of commissions awarded in the Judgment, which also erred in applying a rule of law by allowing commissions that should be deemed unlawful.

VI.  The court erred in applying a rule of law in imposing prejudgment interest.

VII.  The district court erred in applying a rule of law and/or abused its discretion in denying TSI's motion for recusal.

## SUMMARY OF THE ARGUMENT

**I.** The suit should have been dismissed for lack of subject matter jurisdiction because Plaintiffs failed to carry their burden to prove complete diversity of citizenship. There are citizens of California on both sides. (*See* ECF 21, 47, 61, 277.) The district court focused on an inapposite technicality regarding an LLC membership resolution, but acknowledged the "significant possibility" that it did not have jurisdiction. (ECF 57 at 18:12-14.)

**II.** TSI should have been allowed to amend its Affirmative Defenses to include a defense of Illegal Contract because it became clear during trial that Plaintiffs interpret the Agreement in a way that makes it illegal and unenforceable under federal law by claiming a commission for merely helping TSI secure a FEMA contract. The denial of leave to amend ultimately allowed the jury to return a verdict for commissions that Plaintiffs had no right to receive under the law.

**III.** Commissions under the Consulting Agreement are expressly limited to TSI's sales of Niagara-brand bottled water. It prohibits any modification unless in writing and signed by all parties. The court misapplied a rare legal exception to allow an oral or implied modification in spite of that clause; and there was insufficient evidence to support any modification.

**IV.** The Consulting Agreement provides for commissions only on "bottled water." (ECF 1-3 at 1.) The order denying summary judgment erred in ruling that

11

parol evidence would be allowed as to the meaning of the Consulting Agreement and whether it provides for a commission on drop containers. (ECF 220 at 6.) There is no ambiguity that would require parol evidence, and under the circumstances it would have been impossible for the parties to contemplate anything besides bottled water. The issue never should have gone to the jury. Summary judgment should have been granted.

**V.** Assuming *arguendo* that Plaintiffs are entitled to any amount, the amounts in the Judgment are erroneous. They were based on a summary by Plaintiffs' expert (ECF 293-6 at 12-19) that erroneously excluded over $1 million of expenses paid to Coakley Logistics for transporting the water to Puerto Rico and over $1 million of expenses related to Bering Straits. It also reflected an unlawful commission for doing nothing more than securing a federal contract. (ECF 289.)

**VI.** The Court should reverse the award of $991,498.78 of prejudgment interest. TSI showed that only post-judgment interest should apply or that any pre-judgment interest should accrue from the date of the verdict. (ECF 298.)

**VII.** Based on TSI's Affidavit and Motion to Recuse (ECF 155), which must be taken as true, the judge was required to recuse under 28 U.S.C. § 144 and 28 U.S.C. § 455(a) or (b)(1) because a reasonable person would perceive bias or prejudice. This Court should reverse the order denying recusal (ECF 161) as well all adverse rulings and the Judgment.

## ARGUMENT AND CITATIONS OF AUTHORITY

I. **THE COURT ERRED IN DENYING TSI'S MOTIONS TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION DUE TO LACK OF COMPLETE DIVERSITY.**

The lawsuit should have been dismissed for lack of subject matter jurisdiction because Plaintiffs-Appellees failed to carry their burden to prove complete diversity when there are citizens of California (Steve Acosta and George Peterson) on both sides. (*See* ECF 6, 21, 47, 61, 277.) Plaintiffs' failure to prove diversity by the preponderance of the evidence "is fatal to [their] arguments that [they] and [the defendant] are diverse." *See Herrick Co. v. SCS Communs., Inc.*, 251 F.3d 315, 324 (2d Cir. 2001). Plaintiffs erroneously tried to shift the burden to TSI by arguing technicalities under Delaware law to cast doubt on Acosta's membership in the LLC, such as the technicality of a resolution not having been signed for Steve Acosta's membership in the LLC; and the court erroneously accepted Plaintiffs' mistaken arguments. (*See* order at ECF 58.)

But the LLC's operating agreement did not require that a written resolution be signed *before* membership could be effective; it allowed a procedure "*acceptable to the Management Committee*." (ECF 44-1 at 112.) Here, the *acceptable* procedure was to make Acosta's membership effective upon his acceptance of the Facility Security Officer ("FSO") position because 32 C.F.R. § 117.3(b) designates the FSO as a Key Management Personnel and he testified that

13

NISPOM rules require that he be either an employee or member. (ECF 44-1 at 48:2-7.) He testified that he accepted membership seven months before Plaintiffs filed suit (*see* ECF 61 at 5-6) and his acceptance is reflected in TSI's records (*see* ECF 21-3 at 1; ECF 44-1 at 119) per Delaware law. (*See also* ECF 47; 61; 277.)

TSI's renewed motion to dismiss (ECF 277) cited substantial case law requiring dismissal when there is any doubt about jurisdiction. Courts must "*presume no jurisdiction exists* absent an adequate showing by the party invoking federal jurisdiction that jurisdiction exists; that showing must be made by a preponderance of the evidence." *Dutcher v. Matheson*, 840 F.3d 1183, 1189 (10th Cir. 2016) (emphasis added; citations and internal quotes omitted).

The district court was obligated to deem Acosta's membership effective for purposes of the lack of jurisdiction, as in *611, LLC v. U.S. Lubes, LLC*, 2006 WL 2038615, 2006 U.S. Dist. LEXIS 52727 (D. Md. July 18, 2006), where a federal court held that a party was a member of an LLC "for the purposes of diversity in this litigation" in light of the ambiguities in the LLC's operating agreement and in light of the course of conduct where the LLC "acted in *a manner consistent with*" the party's "perceived status as a member." And "considering the burden of demonstrating subject matter jurisdiction," the party opposing diversity jurisdiction by arguing membership in an LLC "has advanced a *reasonable basis* for contending that it is a member of [the LLC]." *Id*. at *18-*19 (emphasis added).

Likewise, TSI advanced a reasonable basis for contending that Acosta was a member and acted in a manner consistent with his membership, such as voting to make him a member (*see* ECF 44-1 at 119), appointing him to the management committee along with the other three members (ECF 44-1 at 40:19-25), and paying him as a member via distributions with a K-1 (*see* ECF 44-1 at 33:5 to 34:17; 65-70). He testified unequivocally that he is a member (ECF 44-1 at 27-28; 49:7-17; 69:17-24; 71:3-6) and that he became a member on February 15, 2018 (ECF 44-1 at 23:2-3; ECF 44-1 at 121) and would sign papers at the annual meeting (ECF 44-1 at 65:2-16). Like the party in *611, LLC*, Acosta plainly *was* a member of the LLC "for the *purposes of diversity* in this litigation" regardless of any inapposite technicalities. *See 611, LLC* 2006 U.S. Dist. LEXIS 52727 at *19.

The district court acknowledged "that there is at least a *significant possibility* that the Eleventh Circuit will say I got it wrong; *there's no federal jurisdiction*." (ECF 57 at 18:12-14.) "It would therefore ill behoove us to retain the action if there is the *slightest doubt* as to our power to entertain it, and then face the possibility of jurisdictional dismissal by a higher court after the litigation had been fully concluded." *American Mut. Liab. Ins. Co. v. Flintkote Co.*, 565 F. Supp. 843, 850 (S.D.N.Y. 1983). "[W]here the basis for jurisdiction is doubtful, the court should resolve such doubt in favor of remand [or dismissal]." *Id*.

Plaintiffs argued that it was inappropriate to raise the jurisdictional issue

15

again in a renewed motion five weeks before trial, but "[c]hallenges to subject-matter jurisdiction can of course be raised *at any time* prior to final judgment." *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 571 (2004) (emphasis added). The district court was at all times obligated to "zealously insure that jurisdiction exists over a case, and should *itself* raise the question of subject matter jurisdiction *at any point in the litigation* where a *doubt* about jurisdiction arises. A federal court not only has the power but also the obligation *at any time* to inquire into jurisdiction whenever the *possibility* that jurisdiction does *not* exist arises." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001) (emphasis added; citation and internal quotes omitted).

As the district court had acknowledged the "*significant possibility*" that it did not have jurisdiction (ECF 57 at 18:12-14), and the LLC Operating Agreement did not require a *signed, written* agreement or signed resolution *before* membership could be effective, and TSI voted to make Mr. Acosta a member with an oral agreement eight months before Plaintiffs filed suit, and he testified that his membership was consummated the next month, and that procedure was *acceptable to the management committee*, the district court was obligated to dismiss. *See 611, LLC*, 2006 WL 2038615 at *5; *Am. Mut. Liab. Ins. Co.*, 565 F. Supp. at 850.

Accordingly, this Court should reverse the Judgment and order vacatur of the rulings of the district court because it lacked diversity jurisdiction.

16

## II. THE COURT ERRED IN DENYING TSI'S MOTION TO AMEND ITS AFFIRMATIVE DEFENSES TO INCLUDE THE DEFENSE OF ILLEGAL CONTRACT; AND THIS ERROR LED TO AN AWARD OF COMMISSIONS THAT SHOULD BE DEEMED ILLEGAL UNDER FEDERAL LAW.

TSI should have been allowed to amend its Affirmative Defenses to include a defense of Illegal Contract because it became clear during trial that Plaintiffs interpreted and applied the Consulting Agreement in a way that makes it illegal and unenforceable under federal law—by claiming a commission merely for helping TSI secure a government contract. (ECF 289; ECF 308 at 255:10 to 257:21 [Trial Tr. 419:10 to 421:21]; ECF 307 at 108:15 to 109:3 [Trial Tr. 538:15 to 539:3].) The court's denial of leave to amend was harmful because it allowed the jury to return a verdict awarding Plaintiffs millions of dollars of commissions—primarily on income from FEMA's post-hoc procurement of drop containers under CLIN 0016—which Plaintiffs had no right to receive under federal law.

A federal statute prohibits any person from "secur[ing] the contract on an agreement or understanding for a commission, percentage, brokerage, or contingent fee…." 41 U.S.C. § 3901(b)(1). Yet Plaintiffs' representatives testified they are entitled to a percentage commission on every activity under the MATOC just for securing the MATOC by obtaining a water supplier for TSI's application.

Federal Acquisition Regulation ("FAR") 52.203-5 likewise prohibits such contingent fees, defined as "any commission, percentage, brokerage, or other fee

17

that is contingent upon the success that a person or concern has in securing a Government contract." Contracts must warrant that no person has been retained to obtain the contract upon an agreement for a contingent fee. FAR 52.203-5(a). The FAR was incorporated into FEMA's RFP and MATOC. (*See* ECF 89-4 at 34.)

The proposed "Commission Agreement" drafted by Plaintiffs would have violated those laws by requiring "a commission for assistance in procuring the [FEMA] contract(s)." (ECF 89-15 at 4.) TSI rejected that unlawful language, and all parties signed a Consulting Agreement that allowed a success fee only on actual sales of Niagara water procured by Plaintiffs. (ECF 1-3 at 1; ECF 299-1.)

At trial, Plaintiffs argued and testified that the Consulting Agreement should be interpreted and applied in line with their rejected draft: that they should receive a commission for assisting with procuring a government contract. The Plaintiffs testified that their work was finished under the Consulting Agreement when the MATOC was issued because they believed they were entitled to a commission just for helping TSI procure the MATOC. (*See* ECF 308 at 37:12-16; ECF 308 at 38:4-20; ECF 308 at 128:12-18;  [Trial Tr. 201:12-16; 202:4-20; 292:12-18].)

Thus, it became clear at trial that Plaintiffs' interpretation of the Consulting Agreement would make it an illegal and unenforceable contract with an unlawful contingent fee. *See Quinn v. Gulf & W. Corp*., 644 F.2d 89, 92 (2d Cir. 1981) ("It is well established that a contract between private parties for a contingent fee, in

18

violation of Federal Procurement Regulations, will not be enforced."). "For the breach or violation …, the Federal Government may annul the contract … or deduct from the contract price or consideration the full amount of the commission, percentage, brokerage, or contingent fee." 41 U.S.C. § 3901(b)(2).

TSI had "expressly reserve[d] the right to amend the … Affirmative Defenses to include any additional defenses … including but not limited to any facts which, at trial … may reveal such additional defenses…." (ECF 67 at 6-7 ¶ 9.) Thus, at the close of Plaintiffs' case, TSI made an ore tenus motion before the judge (ECF 308 at 255:7 to 261:24 [Trial Tr. 419:7 to 425:24]; ECF 307 at 94:9-19 [Trial Tr. 524:9-19]), and promptly filed a written motion during trial (ECF 289), for leave to amend its Affirmative Defenses to include:

> NINTH AFFIRMATIVE DEFENSE: Plaintiffs' claims are barred because they depend on an interpretation of the Consulting Agreement (that Plaintiffs are entitled to a success fee on all income under the MATOC merely for succeeding in helping to obtain the contract) which renders it an illegal contract with an unlawful contingent fee in violation of 41 U.S.C. § 3901(b)(1) and FAR 52.203-5, and thus the Consulting Agreement is unenforceable.

The judge, based on an erroneous recollection of Plaintiffs' testimony and without checking the rough transcript (*see* Trial Tr. 421:22 to 422:14; 524:17-18), denied the motion. (ECF 307 at 108:15 to 109:3 [Tr. 538:15 to 539:3]; ECF 302 at 1.)

That denial was contrary to the principle that "[a] party may move—at any time, even after judgment—to amend the pleadings to conform them to the

evidence…." Fed. R. Civ. P. 15(b)(2). Amendments should be granted liberally. *Czeremcha v. Int'l Ass'n of Machinists & Aerospace Workers*, 724 F.2d 1552, 1556 (11th Cir. 1984). "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Justice plainly required the amendment here because the jury needed to know that Plaintiffs' application of the Consulting Agreement made it illegal and unenforceable because federal law prohibits TSI from giving Plaintiffs a commission for doing nothing but securing the MATOC.

The jury needed to know that the illegality especially affects commissions on drop containers since Plaintiffs did no work towards obtaining shipping containers and the Consulting Agreement expressly provided for commissions only on "bottled water." The district court's denial of the amendment resulted in an award of millions of dollars of commissions that Plaintiffs have no right to receive, in contravention of federal law. "[C]ourts should allow amendments to conform the pleadings to the evidence both during trial, and even after judgment, as long as the opposing party cannot prove that he is thereby prejudiced[.]" *Harris v. Garner*, 216 F.3d 970, 996 (11th Cir. 2000). Plaintiffs did not prove any prejudice here.

Accordingly, this Court should reverse the Judgment and direct the district court to allow amendment of TSI's Affirmative Defenses and hold a new trial featuring the Illegal Contract defense, or simply direct the district court to rule as a matter of law that any commissions on drop containers are prohibited.

### III. THE CONSULTING AGREEMENT WAS NOT MODIFIED ORALLY OR BY CONDUCT TO INCLUDE NESTLÉ WATER.

The Consulting Agreement was expressly limited to TSI's sales of "a supply of bottled water supplied by Niagara Bottling, LLC," which TSI had "procured" "with the assistance of [Plaintiffs]." (ECF 1-3 at 1.) It prohibits any modification unless in writing and formally signed by all parties. The district court misapplied a rare legal exception to allow an oral or implied modification in spite of that contract clause; and there was insufficient evidence to support any modification.

#### A. Plaintiffs failed to plead and prove the stringent elements for an exception for oral or implied modification where the contract expressly requires a writing signed by all parties.

The Consulting Agreement prohibits any oral or implied modification: "The Parties agreed that *any* amendment and/or modification or change in terms of this Agreement shall *only* be effective if *in writing and <u>signed</u> by <u>all</u> of the Parties* hereto;" and "any other understandings and/or agreements not set forth herein are of *no force or effect whatsoever*." (ECF 1-3 at 2 ¶¶ 4 and 3 (emphasis added).)

In the face of an express provision prohibiting informal modification, courts are generally obligated to enforce the contract as written. *Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*, 145 So. 3d 989, 993 (Fla. 4th DCA 2014). The district court should have done so, as TSI requested in its first motion for summary judgment. (ECF 89 at 14-20; ECF 101 at 3-12.)

21

There is a rare possible exception, which Plaintiffs did not plead and certainly did not prove: there must be "*clear and <u>unequivocal</u> evidence* of a *mutual agreement*" to modify the contract, *Fidelity & Deposit Co. of Maryland v. Tom Murphy Const. Co*., 674 F.2d 880, 885 (11th Cir. 1982) (emphasis added) and that the modification "has been accepted and acted upon by the parties in such a manner as would *work a fraud* on either party to refuse to enforce it," *Professional Ins. Corp. v. Cahill*, 90 So. 2d 916, 918 (Fla. 1956) (emphasis added). Plaintiffs did not claim a fraud, and the evidence was insufficient to find a modification.

Plaintiffs primarily relied on a text message of September 10, 2017 where Jordan Simons voluntarily asked if TSI needed help with anything, and TSI replied that Simons could help by "[g]etting more water suppliers[.] The more the better." (ECF 293-4 at 29). The text message did not mention Nestlé water. It did not suggest that Plaintiffs would be paid for anything outside of the Agreement. It did not say that the Agreement would be modified.

Plaintiffs also relied on an e-mail to Simons on December 6, 2017, transmitting a payment of $642,751.26 (including a commission to Plaintiff Simons Explorations, Inc., on Niagara, and a commission to Simons individually on Nestlé water sales): "Will add the other 12.5% for Nestlé when we get paid for the containers in January." (ECF 293-5 at 19.) It did not state any agreement to modify the Consulting Agreement; and the "other 12.5%" was never paid because

22

Peterson was not involved with Nestlé water and TSI had not made a side-agreement with him as the evidence showed TSI made with non-party Simons individually regarding Nestlé water. (ECF 293-5 at 23; ECF 308 at 40:15-17.)

The text and e-mail message were far from "clear and unequivocal" proof of a mutual *agreement* accepted by all parties to modify the Consulting Agreement without the required formal writing. The Agreement's express prohibition of modification except by a writing signed by all parties was drafted by Plaintiffs themselves and must be construed against them; so it is remarkable that there was not even a text message or e-mail reflecting a modification. Yet, the district court found that it was "modified by conduct." (ECF 305 at 8.) This Court likely will not be persuaded. *Cf. Energy Smart Indus., LLC v. Morning Views Hotels-Beverly Hills, LLC*, 660 F. App'x 859, 864 (11th Cir. 2016) ("*We are not persuaded* that the … Agreement was modified by the parties' conduct…. Energy Smart has not met its burden of showing by *clear and unequivocal* evidence that the parties mutually agreed [to modified terms]." (emphasis added)).

"*Cahill* requires that a party pursuing such a claim allege and prove more—indeed <u>much more</u>—than just a 'mutual agreement,' *or* just 'detrimental reliance,' *or* just 'subsequent conduct,' *or* just generalized 'inequitable conduct.' Rather, a plaintiff must again allege—and eventually prove—that the oral amendment was *accepted* and acted upon *by [all] the parties* in such a manner as

23

would <u>work a fraud</u> on either party to refuse to enforce it." *Okeechobee Resorts, L.L.C.*, 145 So. 3d at 995 (underlining added; other emphasis in original). "The elements for actionable fraud are (1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party." *Lance v. Wade*, 457 So. 2d 1008, 1011 (Fla. 1984).

> This requires that a plaintiff <u>plead</u> (and again eventually <u>prove</u>): (**a**) that the parties agreed upon and accepted the oral modification (i.e., mutual assent); and (**b**) that both parties (or at least the party seeking to enforce the amendment) performed consistent with the terms of the alleged oral modification (not merely consistent with their obligations under the original contract); *and* (**c**) that due to plaintiff's performance under the contract as amended the defendant received and accepted a benefit that it *otherwise was not entitled to* under the original contract (i.e., *independent consideration*).

*Okeechobee Resorts, L.L.C.*, 145 So. 3d at 994-95 and 993 (emphasis added).

Plaintiffs failed to plead, let alone prove, those elements or the elements of fraud. Plaintiffs only suggested in an Interrogatory answer that the Consulting Agreement was unilaterally "modified and or clarified in writing by [TSI] on September 10, 2017, via text message" and that Simons "then proceeded to communicate with other bottled water suppliers…." (ECF 89-18 at 3.) In reality, Simons had already been voluntarily contacting and cold-calling other water suppliers at least *four days prior to* that text message. (*See* ECF 293-4 at 16 [96-4

24

at 1].) Nothing about the facts could remotely work a fraud on Plaintiffs.

TSI was entitled to be paid by FEMA for *any* water that it sold to FEMA; but Plaintiffs agreed to receive a commission only on TSI's sales of the supply of the *Niagara* water that Plaintiffs had purportedly procured for TSI before signing the Consulting Agreement. (ECF 1-3 at 1.)

Through the no-oral-modifications clause, "[t]he parties bargained for the right not to be entangled in vexatious and prolonged litigation based upon alleged oral [or implied] modifications of their agreement…." *Id*. at 996 n.2. Plaintiffs' "claims are barred by the terms of the contract itself." *Id*. The district court "was obligated to enforce the contract as plainly written." *Id*.

## B. Conduct cannot vary the express terms of a written contract, nor can it change any terms of an unambiguous contract.

The verdict and Judgment fundamentally conflict with the express terms of the Agreement, which explicitly and unambiguously allows a commission solely on "bottled water supplied by Niagara Bottling, LLC." (ECF 1-3 at 1.) Nothing is ambiguous about those terms. (*See* ECF 101 at 3-6.)

By alleging an implied modification to include Nestlé water, Plaintiffs sought to fundamentally transform the express terms of the unambiguous narrow, limited Consulting Agreement into a broad and unlimited joint venture.

Course of dealing "cannot be used to vary the terms of an unambiguous

25

contract" and "cannot operate to contravene express instructions or to contradict an express contract to the contrary." *Indian Harbor Citrus, Inc. v. Poppell*, 658 So. 2d 605, 606 (Fla. 4th DCA 1995) (citations and internal quotes omitted). *See also Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092 (Fla. 1st DCA 1999) (declining to find a modification through course of dealing where the purported modification would conflict with an express contract term); *Flagship Nat'l Bank v. Gray Distribution Systems, Inc.*, 485 So. 2d 1336, 1340 (Fla. 3d DCA) (good faith and course of dealing cannot override express contract terms).

These principles of Florida law are especially critical where the contract expressly prohibits any modification except by a writing signed by all parties and voids any other understandings. Such express terms preclude a modification by course of dealings. *Cf. Cox*, 732 So. 2d at 1097 (citations omitted).

There was no genuine dispute as to any material fact for the jury to determine, and the verdict finding a modification by conduct was unsupported by the evidence. In fact, it was contrary to the evidence and the law. TSI was plainly entitled to judgment as a matter of law. The court erred in failing to grant summary judgment pursuant ECF 89 and 101.

The final Judgment subsequently entered upon an unsupported verdict, and contrary to Florida law, must be reversed.

26

## C. The Parties' communications after the alleged "modification" belied any claim of modification.

Plaintiffs admitted in the record that the Consulting Agreement was not orally modified, and the record evidence, such as correspondence from Simons, long after the supposed modification occurred, belies any claim of modification. (*See* ECF 89 at 14; ECF 89-18 at 4 (Plaintiffs' Interrogatory 2, alleging a "written [not oral] modification … whereby Plaintiffs were instructed to assist in finding other bottled water suppliers"); ECF 89-2 at 12 (Peterson depo. at 40, admitting that there was no written modification signed by all the parties); ECF 89-3 at 29-30 (Simons depo. at 109:19 to 110:10, admitting that there was no written modification signed by all the parties); ECF 89-19 at 2 ("[the Consulting Agreement] *should've been* a teaming agreement or joint venture"); ECF 89-26 at 2 (e-mail from Simons to TSI in May 2018, "we helped you get this and we deserve *something*"); ECF 89-22 at 2 (discussing potential *new* consulting agreements in June of 2018 for Nestlé water); ECF 89-19 at 2 (Simons telling TSI in May 2018, "Please let me know if you would like for me to take a crack at [modifying] the contract because it does need to be fixed….").

These communications show that Plaintiffs knew that the Consulting Agreement had not been modified. Thus, where the only discussions of a modification to the Consulting Agreement or the prospect of new agreements

occurred roughly nine months after the supposed text-message modification and showed that there *had been no modification*, the jury's finding that the Agreement was modified in September 2017 was contrary to the evidence.

### D. The Judgment and verdict further err in finding a commission due to GPDEV, LLC on Nestlé water, when Peterson was not involved in procuring Nestlé water.

Even if, *arguendo*, a modification by conduct could lawfully be inferred as to Simons, there clearly was no modification by conduct concerning GPDEV, LLC (Mr. Peterson's company). The September 10, 2017 text message was solely between Simons and TSI. (ECF 293-4 at 29.) Plaintiffs made a jury argument that "when you reach out to one of them, you've reached out to both" of the Plaintiffs. (ECF 307 at 120:17-19 [Trial Tr. 550:17-19].) But the record evidence shows that only Simons was invited to seek other water, and only Simons was involved in procuring Nestlé water. Peterson admitted he had nothing to do with Nestlé water. (ECF 308 at 40:15-17 [Trial Tr. 204:15-17].)

Thus, the verdict is unsupported by the evidence. There is no ground for finding any commission due to GPDEV when Peterson was not invited to procure Nestlé water and did not help with it and there was no separate agreement with Peterson as with Simons. (*See* ECF 101 at 11.)

Accordingly, even if, *arguendo*, any commission were due on Nestlé water, it would be due only to Simons individually; and he was already paid in 2017.

28

## IV. THE CONSULTING AGREEMENT DID NOT PROVIDE FOR A COMMISSION ON INCOME FROM FEMA'S SUBSEQUENT RENTAL OF DROP CONTAINERS IN PUERTO RICO.

Section 2(c) of the verdict found that the Consulting Agreement applied to "net income from ... [r]etention of drop containers in Puerto Rico." (ECF 294 at 1.) This finding related to net income from Contract Line Item 0016 of the MATOC. (*See* ECF 307 at 170:1 [Trial Tr. 600:1].) However, the Consulting Agreement expressly encompasses only the sale of "bottled water." (ECF 1-3 at 1.) The district court erred in deeming the Consulting Agreement to be ambiguous and in admitting parol evidence; and there was insufficient evidence to support the jury's finding that the Agreement encompassed income from drop containers.

### A. The court erred in allowing parole evidence as to the meaning of the Agreement and whether it encompasses drop containers.

Where the Consulting Agreement provides for commissions solely on "bottled water," the order denying summary judgment erred in ruling that parol evidence would be allowed as to whether it provides for a commission on rental of drop containers. (ECF 220 at 6.) There is no ambiguity that could justify admitting parol evidence, and under the circumstances it would have been impossible for the parties to have contemplated anything besides bottled water. The issue never should have gone to the jury, and the verdict and Judgment are erroneous as a matter of law.

29

1. The plain language of the contract is the best evidence of intent.

"[A] contract depends … not on the parties having *meant* the same thing but on their having *said* the same thing" by signing it. *Robbie v. Miami*, 469 So. 2d 1384, 1385 (Fla. 1985) (emphasis added; citation and internal quotes omitted). "[T]he actual language used in the contract is the *best evidence of the intent* of the parties, and the plain meaning of that language controls." *Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc*., 541 So. 2d 738, 739 (Fla. 3d DCA 1989) (emphasis added; citations omitted). The actual language of the Consulting Agreement limits commissions to "bottled water." (ECF 1-3 at 1.)

2. The Agreement is not ambiguous.

The lower court erred in deeming the Consulting Agreement "ambiguous." (ECF 220 at 6.) It has no patent ambiguity. It unmistakably expresses that TSI would pay Plaintiffs a "success fee" on income from "a supply of **_bottled water_** supplied by Niagara Bottling, LLC" procured "with the assistance of [Plaintiffs]." (ECF 1-3 at 1.) That language is clear and intelligible with but a single meaning.

There is also no latent ambiguity, as the Agreement does not "fail[ ] to specify the rights or duties of the parties in certain situations" within its scope. *Thompson v. Watts*, 111 So. 3d 986, 989 (Fla. 1st DCA 2013) (internal quotes and citations omitted). The scope of the contract specifies solely "bottled water supplied by Niagara Bottling, LLC." And "when certain persons or categories are

30

specified in a contract, an intention to exclude all others may be inferred." *IBM Poughkeepsie Emps. Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 590 F. Supp. 769, 773 n.19 (S.D.N.Y. 1984). *See also Prewitt Mgmt. Corp. v. Nikolits*, 795 So. 2d 1001, 1005 (Fla. 4th DCA 2001) ("an inference must be drawn that what is not included by specific reference was intended to be omitted or excluded").

    3. <u>Error in Admission of Parol Evidence</u>

"The interpretation of a contract is a matter of law for the court…." *Avatar Dev. Corp. v. De Pani Constr.*, 834 So. 2d 873, 876 n.2 (Fla. 4th DCA 2002). "Because the construction of a contract is a matter of law, this [appellate] court may properly reassess the meaning of the … agreement and arrive at a conclusion different from that of the trial court." *Broward County v. LaPointe*, 685 So. 2d 889, 892 (Fla. 4th DCA 1996) (citations omitted).

As the face of the Consulting Agreement "is not ambiguous, … it was error for the trial court to go beyond the face of the contract to consider extrinsic circumstances." *Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc.*, 541 So. 2d 738, 739 (Fla. 3d DCA 1989). *See also City of Clearwater v. BayEsplanade.com, Ltd. Liab. C*o., 251 So. 3d 249, 255 (Fla. 2d DCA 2018) (the trial court erred in determining that a document was ambiguous and therefore erred in admitting parol evidence to construe it).

Parol evidence at trial created an ambiguity where none existed. *See*

*Japanese Gardens Mobile Estates, Inc. v. Hunt*, 261 So. 2d 193, 196 (Fla. 2d DCA 1972) ("Clearly and unequivocally [the deed restriction] means what it says…; and to admit extrinsic evidence as to some other meaning, or to show by parol that it means [something else], would be both to *create* an ambiguity and to rewrite the contract of the parties. Neither is permissible." (emphasis in original)).

In allowing parol evidence, the district court contravened the merger clause that excludes and invalidates any other understandings besides what is expressly stated. (ECF 1-3 at 2 ¶ 3.) Such a merger clause shows that "the parties to a written contract intended *that writing* to be the *sole expositor* of their agreement." *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 53 (Fla. 1st DCA 2005) (emphasis added; internal quotes and citations omitted).

Plaintiffs may regret the deal they made; but "when the terms of a voluntary contract are clear and unambiguous, as here, … a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." *Emergency Assocs., P.A. v. Sassano*, 664 So. 2d 1000, 1003 (Fla. 2d DCA 1995) (citation omitted).

"Simply put, the [Agreement] means what it says and says what it means; nothing more, nothing less." *See Fla. Hurricane Prot. & Awning, Inc. v. Pastina*, 43 So. 3d 893, 895 (Fla. 4th DCA 2010).

## B.  The Parties *could not have* contemplated rental of shipping containers and they had no meeting of the minds as to a commission for such separate procurement.

When the Parties signed the Consulting Agreement in August 2017, they *could not have* contemplated rental of containers under Contract Line Item 0016 ("CLIN 0016"), which *did not exist*.

Drop containers were not even part of the RFP in June 2017 (ECF 293-2 at 13) nor the Statement of Work (293-2 at 2). Nor did FEMA's MATOC of September 5, 2017 include any line item for rental of containers. (ECF 293-3 at 3.) It was not until two months later, after the water was delivered to Puerto Rico, that FEMA added a new and distinct contract line item for rental of drop containers, effective November 7, 2017. (ECF 293-5 at 6.)

In August 2017, no one could have contemplated that FEMA would end up renting shipping containers, and certainly not for six months or more. (The last of the containers was returned in 2019. (ECF 307 at 18:12-13 [Trial Tr. 448:12-13].))

"[A] meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract…." *Central Properties, Inc. v. Robbinson*, 450 So. 2d 277, 280 (Fla. 1st DCA 1984). There *could not have been* a meeting of the minds for any commission on drop containers. The Agreement encompassed only "bottled water."

33

## C. The mention of a rate for potential drop trailers in FEMA's Statement of Work or RFP does not support the notion that the Consulting Agreement encompassed drop containers.

At trial (ECF 307 at 112:12 to 113:2 [Trial Tr. 542:12 to 543:2]), Plaintiffs illogically argued that the Consulting Agreement allegedly encompassed FEMA's post-hoc rental of shipping containers (after TSI delivered the water) because FEMA's Statement of Work mentioned the possibility of "drop trailers" (ECF 293-2 at 4-5) or the RFP mentioned the possibility of a CLIN 0003AA for drop trailers (ECF 89-4 at 5). But shipping containers are not drop trailers; and FEMA did not include drop trailers in TSI's task order award.

TSI's government contracting expert, Mark St. Moritz, explained that the possibility of drop trailers in those documents was separate from the water:

> … FEMA contracted for bottled water to be delivered to specific locations and an additional contract requirement for drop trailers to be separate line items that could be bought <u>separately</u> when needed. Had FEMA intended the [potential] drop trailer requirement to be an integral part of the bottled water deliveries, it would have included this [as] a Sub CLIN (SLIN) under the bottled water CLINs and, in fact, would have been required to do so by regulation….
>
> TSI agreed to pay [Plaintiffs] a fee for assistance in procuring bottled water. Nowhere in the agreement does it state that bottled water includes drop trailers which **is in fact a <u>separate procurement</u>** under the FAR as shown above.

(ECF 182-1 at 3.) Likewise, at trial, the expert testified that separate CLINs are independent procurements for separate deliverables. Thus, the drop container procurement was separate from the water procurement. (ECF 307 at 46:4-16 [Trial

34

Tr. 476:4-16].)

These government contracting principles vitiate Plaintiffs' argument. The existence of a potential "drop trailer" item in the RFP—which would have been a separate procurement—could not translate into the Parties contemplating an unexpected rental of shipping containers as a source of income for the Consulting Agreement which was exclusively designed to reward Plaintiffs for having arranged a source of Niagara-brand "bottled water."

Anything beyond the actual bottled water was not only expressly excluded from the Consulting Agreement, it was also excluded by the fact that the Parties did not discuss or negotiate drop containers; they were not included in FEMA's task order; and no procurement for containers existed until months later after FEMA's unilateral amendment creating CLIN 0016.

Even the proposed draft by Peterson referred solely to "bottled water." (ECF 89-15.) The Parties purposefully omitted mention of anything else. "[C]ourts should not, under the guise of construction, impose on the parties contractual rights and duties which *they themselves omitted*. This would impermissibly write a new contract that the parties themselves could have, *but did not*, write." *Advanzeon Sols., Inc. v. State ex rel. Fla. Dep't of Fin. Servs.*, 321 So. 3d 911, 915 (Fla. 1st DCA 2021) (emphasis added; citations and internal quotes omitted).

35

### D. The term "Cost of Goods Sold" in the Net Income formula did not allow commissions on anything besides bottled water.

Plaintiffs argued at trial that the Consulting Agreement encompassed more than water because the expenses in the Net Income calculation included "Cost of Goods Sold" along with Transportation and Direct Labor Expenses. (ECF 1-3 at 1.) They argued that "Cost of Goods Sold" is "more than water" and could mean drop containers. (ECF 307 at 153:19 to 154:8 [Trial Tr. 583:19 to 584:8].) That argument is absurd. The Net Income formula uses three accounting terms of art, and "Cost of Goods Sold" is simply a term of art meaning the expense TSI incurred in procuring the water[1] which is the subject of the entire contract.

"In construing a contract, the legal effect of its provisions should be determined from the words of the entire contract." *Sugar Cane Growers Coop. of Fla., Inc. v. Pinnock*, 735 So. 2d 530, 535 (Fla. 4th DCA 1999). "[T]he individual terms of a contract are not to be considered in isolation, but as a whole and in relation to one another, with specific language controlling the general." *South Fla. Bev. Corp. v. Figueredo*, 409 So. 2d 490, 495 (Fla. 3d DCA 1981) (citations omitted). Bottles of water are the only goods mentioned in the Agreement, and all throughout the Agreement. They were the only goods sold. TSI never sold containers. FEMA simply paid a fee to retain them temporarily.

---

[1] *See* https://www.AccountingTools.com/articles/2017/5/4/cost-of-goods-sold

36

### E.  TSI did not certify that all payments requested from FEMA were contemplated by the Consulting Agreement.

Plaintiffs confused the jury by arguing that when Ms. Mott of TSI signed vouchers for payment from FEMA, she supposedly "certified" that "all of the money … that was paid from the government was part and parcel of *this agreement*…." (ECF 307 at 114:25 to 115:6 [Trial Tr. 544:25 to 545:6].) Plaintiffs argued that "each time [TSI] sent a bill to the government, each time she swore that all of the costs included were under the contract, that language tracks with the language of the *consulting agreement*." (ECF 307 at 155:8-11 [Trial Tr. 585:8-11].) Plaintiffs argued that "[CLIN 0016 is] the same contract…. Hold her to her word. She certified that all of these payments are under the same contract." (ECF 307 at 161:18-21 [Trial Tr. 591:18-21].) Those arguments misled the jury with a spurious impression that TSI had certified that all moneys received from FEMA were part of the Consulting Agreement. It actually did no such thing.

TSI never certified that any payment was under the "same contract" as any other payment. The actual language of the certification was: "I certify that all payments requested are for appropriate purposes and in accordance with the agreements set forth in the contract." (Ex. D-1 to ECF 123.) TSI simply certified that it had done the work for which it sought payment under the MATOC.

Further, although FEMA eventually added Contract Line Item 0016 to the

task order under the MATOC, different contract line items are independent procurements for distinct deliverables—essentially akin to separate contracts. *See* FAR 4.1001 and 4.1003 (requiring separate line items for deliverables that are separately identifiable or separately deliverable). FEMA's need for the containers was legally independent of the bottled water under Contract Line Item 0002AA. It was also independent of the private Consulting Agreement that predated Contract Line Item 0016 by three months and was exclusively limited to "bottled water."

### F. Plaintiffs' quest for a commission on drop containers is an improper attempt to rewrite the final, limited Consulting Agreement back to Plaintiffs' initial expansive draft.

The proposed "Commission Agreement" drafted by Peterson with input from Simons (ECF 89-15) reflected a very broad scope with a commission on everything under the MATOC—any task order and any contract line item—based on Plaintiffs' doing nothing but introducing TSI to Niagara so that TSI would qualify for the MATOC. Plaintiffs' draft expressly called for "a commission for assistance in procuring the [government] contract(s)." (ECF 89-15 at 4.)

That expansive scope was specifically rejected by TSI, and for good reason: such language would have made it an illegal contract (*see* Point II above). In the final Consulting Agreement, a commission does not flow from the mere fact that Plaintiffs helped TSI obtain the MATOC, nor does every conceivable activity under the MATOC generate a commission. The commission is limited to sales of

"bottled water" and encompasses only "contracts [in] which TSI uses the supply of *bottled water* through Niagara Bottling, LLC." (ECF 1-3; ECF 299-1.) No other product and no other brand of water was allowed.

All parties agreed to that final version and executed it, including a prohibition on oral or implied modification and declaring that "any other understandings and/or agreements not set forth herein are of no force or effect whatsoever." (ECF 1-3 at 2.)

Yet, Plaintiffs sued TSI in an after-the-fact attempt to rewrite the final, executed Consulting Agreement back to Peterson's proposed draft. The jury was led into error and the court effectively rewrote the Consulting Agreement to give Plaintiffs a better deal than what they bargained for by signing the final Consulting Agreement. "It is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties or to relieve a party from what [allegedly] turns out to be a bad bargain." *Barakat v. Broward County Housing Authority*, 771 So. 2d 1193, 1195 (Fla. 4th DCA 2000) (citations omitted).

In sum, the Consulting Agreement did not encompass drop containers. The jury's verdict is contrary to the evidence and the law. This issue never even should have gone to the jury; TSI's second motion for summary judgment (ECF 209) should have been granted as there was no genuine dispute of material fact and TSI was entitled to judgment as a matter of law.

39

## V.   IF, *ARGUENDO*, ANY COMMISSIONS WERE DUE, THE AMOUNTS IN THE JUDGMENT ARE ERRONEOUS, FOLLOWING PLAINTIFFS' EXPERT'S MISTAKEN SUMMARY WHICH MISCALCULATED NET INCOME.

Assuming *arguendo* that Plaintiffs-Appellees are entitled to any amount, the amounts found by the jury are erroneous. They followed the summary by Plaintiffs' expert, Mr. Orner (ECF 293-6 at 12-19), which improperly included millions of dollars of income from drop containers and wrongly excluded valid expenses.

The summary also excluded $1,036,000.34 of expenses that TSI paid to Coakley Logistics because he was not sure what service Coakley provided and he unilaterally assumed that there was no contract with Coakley. (ECF 308 at 212:24 to 217:22 [Trial Tr. 376:24 to 381:22]; ECF 293-6 at 17.) However, the jury did not make any finding that there was no contract with Coakley; and what matters is not the presence of a written contract, but the presence of invoices. (*See* ECF 228 at 12; ECF 186 at 186:13 to 187:24; ECF 186 at 189:18-21.) Steve Acosta testified that Coakley transported the water on barges to Puerto Rico and that Coakley had everything to do with the logistics. (ECF 307 at 17:5-22 [Trial Tr. 447:5-22].)

And while it is not necessary to TSI's case, Coakley and TSI obviously must have had an understanding that Coakley would be paid for its services when TSI brought Coakley in to perform the barge transportation. (*Cf.* ECF 307 at 186:4-22 [Trial Tr. 616:4-22].) Coakley Logistics' services were essential. The record includes e-mails demonstrating the amount of work Coakley did to merit the

payments. (ECF 135 at 9; ECF 135-1 & 135-2.)

Thus, TSI's Net Income should have been reduced by the $1,036,000 paid to Coakley for the barge shipping, before calculating a commission. (ECF 308 at 225:23 to 226:10; ECF 308 at 231:20 to 237:4; ECF 307 at 142:4-8 [Trial Tr. 389:23 to 390:10; 395:20 to 401:4; 572:4-8]; ECF 299-2.)

Orner also erroneously excluded certain Bering Straits logistics expenses (the difference between Bering Straits' wholesale cost and its price of 42 cents per bottle—including transportation—in the first phase of CLIN 0002AA, and a 6% transportation fee markup for the second phase). Orner mistakenly assumed this expense was a "bridge financing." Orner erroneously rejected over a million dollars ($1,162,568 or $1,303,750) of expenses by mistakenly calling them "financing fees" (ECF 293-6 at 16), mistakenly claiming that TSI "used Bering Straits [like a] bank as their financing arm." (ECF 181-1 at 7.)

If Orner's incredible theory had been true, the annualized interest on that alleged "financing" would have been about 62%—an outrageous and usurious amount that no company would agree to pay for a loan. (*See* ECF 308 at 221:14-21 [Trial Tr. 385:14-21].) It was actually an ordinary cost-plus subcontracting arrangement, comparable to a markup from wholesale to retail—which actually worked in Plaintiffs' favor by virtually guaranteeing a profit. (*See* ECF 244-1 at 11-12; ECF 308 at 212:24 to 221:21 [Trial Tr. 376:24 to 385:21].) TSI's

41

accounting expert determined and reported that "such fees meet the requirements … to be included as Cost of Goods Sold or Transportation expenses for purposes of calculating Net Income." (ECF 244-1 at 12.) This cost-plus subcontracting expense—the Cost of Goods—should have been applied to reduce Net Income before calculation of any commissions. (*See* ECF 307 at 145:15 to 146:1 [Trial Tr. 575:15 to 576:1].)

TSI's demonstrative exhibit at trial (ECF 299-2) showed that, if expenses were properly deducted, TSI actually overpaid Plaintiffs by $95,032 based on the Consulting Agreement for Niagara water. It also showed that the maximum commission TSI could possibly owe—if *arguendo* drop containers were applicable—would be $4,616,390. (ECF 299-2 at 1.) On cross examination, Orner admitted that, if all documented expenses were included, and the drop container rental income excluded, the most that Plaintiffs could properly claim is $146,010.00, not the $5,254,577 the jury awarded. (ECF 308 at 234-240; ECF 299-2.) As such, Orner's calculation of a total of $5,254,577 as commissions due and owing ($2,770,855 to GPDEV, LLC and $2,483,722 to Simons Exploration, Inc.) was erroneously inflated by *at least* $638,187 and more likely by millions.

The largest part of the amounts in Orner's calculations came from the drop container rental income that he should not have included at all because the Agreement clearly did not contemplate it, and federal law prohibits a commission

42

for securing a federal contract. (*See* ECF 289 and pp. 17-20, *supra*.) Plaintiffs testified that they were entitled to commissions on all payments under the MATOC solely because they secured the MATOC for TSI—not because of any modification of the clear, unambiguous, unequivocal language of the Consulting Agreement that limited commissions to "bottled water." (*See* ECF 308 at 37:12-16; ECF 308 at 38:4-20; ECF 308 at 128:12-18; [Trial Tr. 201:12-16; 202:4-20; 292:12-18].)

The only way the jury could have concluded that Plaintiffs were entitled to compensation on the drop container rental was because the jury accepted Plaintiffs' assertion that they were entitled to a commission on all income under the MATOC. Plaintiffs testified that TSI would never have been awarded the MATOC without Plaintiffs having secured Niagara water and, therefore, they were entitled to a commission on all MATOC payments irrespective of whether they did anything more after the MATOC was awarded. Thus, the only evidentiary ground for Orner's calculations based on the drop container rental income is Plaintiffs' assertion that they are entitled to the commission simply for securing the MATOC. But such a commission is unlawful as explained at pp. 17-20, *supra*, and ECF 289.

The jury blindly followed Orner's erroneous summary (trial exhibit 19) and the verdict was not supported by sufficient evidence because his calculations were mistaken and inconsistent with federal law. If anything were due, it would be far less than the Judgment found. Thus, the Judgment should be reversed.

43

## VI. THE DISTRICT COURT ERRED IN ASSESSING $991,498.78 OF PREJUDGMENT INTEREST.

This Court should reverse the award of $991,498.78 of prejudgment interest. Plaintiffs are entitled only post-judgment interest. Alternatively, any prejudgment interest began to accrue on the date of the verdict. (*See* ECF 298.)

### A. Only post-judgment interest should apply as no debt was owed until entry of a declaratory judgment.

An award of prejudgment interest is inapplicable because Plaintiffs did not plead any count for breach of contract and, thus, there were no "damages" until the court entered a declaratory judgment regarding the Consulting Agreement, at which time post-judgment interest would accrue on the amount declared.

The counts in the Complaint were for Declaratory Judgment as to the scope of the Consulting Agreement (Counts I, II, III, and IV), and an Equitable Accounting (count V). (ECF 1.) There was no claim for breach of contract, nor did the jury find any breach or damages for a breach of contract. (*See* ECF 294). In essence, what the jury did was to find that the Consulting Agreement covers certain items and conduct a simple accounting as to what is allegedly owed.

Thus, no debt was due until the court entered the declaratory judgment on September 28, 2021. (ECF 305, 306.) *See Paoli v. Natherson,* 732 So. 2d 486, 487 (Fla. 2d DCA 1999) (reversing an award of prejudgment interest in a judgment involving a declaratory judgment and accounting). In *Paoli*, without a claim for

44

breach of contract, Mr. Paoli's partners sought a declaratory judgment that Paoli owed the partnership money and sought an accounting as to the amount. The appellate court reversed the award of prejudgment interest:

> Finally, we reverse the portion of the amended counterclaim judgment that granted Natherson and Gallagher prejudgment interest…. *Natherson's and Gallagher's counterclaim for breach of contract was dismissed* and not refiled. <u>Their only counterclaims were equitable, and sought a declaratory judgment and an accounting.</u> As such, **no debt was due until the accounting was completed or the declaration entered**. If, in the accounting on remand, the circuit court determines that Paoli owes any sum to Natherson and Gallagher, the court <u>shall not award prejudgment interest on that sum.</u>

*Paoli,* 732 So. 2d at 488 (emphasis added).

As in *Paoli*, Plaintiffs did not plead a claim for breach of contract, and interest can run only from date of the declaratory judgment.

## B. Even if this were treated as a contract action, prejudgment interest cannot be awarded because the date of loss could not be indisputably determined for a ministerial computation.

Even assuming that the Complaint should be treated like an action for breach of contract as the district court erroneously concluded (ECF 305 at 5), to support prejudgment interest, a verdict must either fix a date of loss or have "the effect of fixing damages as of a prior date." *Argonaut Ins. Co. v. May Plumbing Co.,* 474 So. 2d 212, 214 (Fla. 1985). The verdict here did neither.

Even if the parties had an "agreement prior to trial that the court would determine prejudgment interest" (ECF 305 at 4), any such determination by the

45

court would be possible only within the standards established by the Florida Supreme Court, where there is no factual dispute as to the dates of loss:

> Once a verdict has liquidated the damages as of a date certain, computation of prejudgment interest is merely a mathematical computation…. Thus, it is a purely *ministerial duty* of the trial judge or clerk of the court to add the appropriate amount of interest to the principal amount of damages awarded in the verdict.

*Argonaut Ins. Co. v. May Plumbing Co.,* 474 So. 2d at 214 (emphasis added).

The Plaintiffs' alleged entitlement to pre-judgment interest prior to the date of the verdict would depend on the court's or clerk's ability to indisputably determine the date or dates when payment was due as a ministerial function without further findings. Here, the record was not clear as to the dates or method to apply. Any of four methods could be used. (*See* ECF 298 at 6-8.) The court acknowledged that there was still a "question about how to calculate interest in this case [namely] how to match expenses with revenues." (ECF 305 at 6.)

Further, the jury did not determine when any payments were due in the past. The jury was only asked to perform an accounting as to what is allegedly due today. Where the jury does not determine the date, prejudgment interest can accrue from a date of loss or a date when a contract payment was due, if the same can be determined indisputably from the evidence. *See Arizona Chem. Co., LLC v. Mohawk Indus.,* 197 So. 3d 99, 102-03 (Fla. 1st DCA 2016). Here, the trial exhibits are disputable and subject to varying reasonable interpretations as to when payment

might have been due, making it impossible for the court or clerk to properly determine any particular date as a ministerial function. (ECF 298 at 6-8.)

Accordingly, prejudgment interest should not commence until the date of the jury's verdict. *See Citizens Prop. Ins. Corp. v. Alvarez,* 198 So. 3d 45, 46 (Fla. 2d DCA 2015) (reversing a prejudgment interest award because the jury only found a damages amount as of the time of the verdict, and "[t]here simply is no factual determination establishing an earlier 'fixed date of loss' from which to calculate prejudgment interest").

Plaintiffs could have requested that the jury fix the date or dates of loss, but they did not; and they should have known that any "agreement" to have the judge calculate prejudgment interest required Plaintiffs to prove and ask the jury to fix the date of loss. *See Jablonski v. St. Paul Fire & Marine Ins. Co*., 645 F. Supp. 2d 1101, 1105-06 (M.D. Fla. 2009) (ruling that prejudgment interest was not available because there was no factual finding as to when the loss occurred; "Jablonski could have asked the jury to determine a date on which his loss became ascertainable. In the absence of such a factual finding, it is inappropriate for this Court to substitute its own best estimate as to what that date might be.").

The district court erred in awarding $991,498.78 of prejudgment interest based on dates when FEMA made payments. Any interest must start to accrue from the date of the verdict or, more correctly, from the date of the Judgment.

## VII. THE DISTRICT COURT ERRED IN DENYING TSI'S MOTION TO RECUSE DUE TO BIAS OR PARTIALITY.

Based on the averments in TSI's Affidavit and Motion to Recuse (ECF 155), the district judge was required to recuse under 28 U.S.C. § 144 and 28 U.S.C. § 455(a) or (b)(1) because a reasonable person would perceive bias or prejudice from the facts stated, which must be taken as true. This Court should reverse the order denying recusal (ECF 161), the subsequent rulings, and the Judgment.[2]

### A.  Legal Principles and Standard of Review

Under 28 U.S.C. § 144, a district judge must recuse himself if a party makes a timely and sufficient showing by affidavit for the belief that the judge "has a personal bias or prejudice" against her. "Section 144 requires that where an affidavit of personal bias or prejudice is filed, the judge must cease to act in the case and proceed to determine the legal sufficiency of the affidavit." *Bell v. Chandler*, 569 F.2d 556, 559 (10th Cir. 1978). Although this Court generally reviews a district judge's decision not to recuse for abuse of discretion, *In re Moody*, 755 F.3d 891, 898 (11th Cir. 2014), a disqualification order under section 144 *should be issued* when "a reasonable man would conclude on the facts stated [in the affidavit] that the district judge had a special bias against defendant." *Bell*, 569 F.2d at 559

---

[2] TSI reasserts the issues previously raised in a petition for mandamus in this Court in case 20-12322-G, as the standard is different here on appeal.

(internal quotes and citations omitted).

Under 28 U.S.C. § 455(a), a district judge is required to recuse himself "in any proceeding in which his impartiality might reasonably be questioned." *Id*. A district judge is likewise required to recuse himself under section 455(b)(1) where "he has a personal bias or prejudice concerning a party." *Id*.

Absent a showing of pervasive bias and prejudice, a judge's bias or prejudice must be personal in nature and extrajudicial, and derive from something other than what the judge learned by virtue of properly participating in the case. *McWhorter v. City of Birmingham*, 906 F.2d 674, 678 (11th Cir. 1990).

The sufficiency of TSI's Affidavit and Motion to Recuse is a legal question because the allegations must be accepted as true. "If the affidavit complies with the statutory standards set forth in Section 144, i.e., timeliness and sufficiency, then the judge against whom it is directed is obligated to recuse himself even though he may know for a certainty that the allegations of bias and prejudice made against him are false." *United States v. Partin*, 312 F. Supp. 1355, 1359 (E.D. La. 1970) (citations omitted). "There can be no dispute either in the district court or on appeal as to the truth or falsity of the allegations of the affidavit." *Green v. Murphy*, 259 F.2d 591, 593 (3d Cir. 1958) (citation omitted). "It follows, therefore, that only questions of law are presented by the respondent judge's refusal to disqualify himself." *Id.*

49

**B.  TSI's affidavit and motion demonstrated bias requiring recusal.**

The affidavit accompanying TSI's Motion to Recuse showed that TSI held an objective, reasonable fear that the district court's repeated, erroneous remarks about the trial court case allegedly starting with "absolutely false documentation" and a "fraudulent document," were indicative of personal bias or prejudice against TSI and/or a member, Ms. Mott, pursuant to 28 U.S.C. § 144; and a reasonable observer would conclude that such suspicion and distrust of Ms. Mott led to biased rulings; and the judge's impartiality would reasonably be questioned due to such apparent bias or prejudice under 28 U.S.C. § 455. (ECF 155-1.)

A reasonable observer would conclude that the Judge's remarks, point of view, and skepticism of TSI and Ms. Mott emanated from a source outside the scope of facts that a jurist would properly learn from the filings of the parties. The judge acknowledged that he had listened to some unknown person describe a purported accusation of alleged "fraud" (which the judge believed to have been allegedly perpetrated by Ms. Mott) in "another case [in] another court." (ECF 35 at 9:19-22.) The judge stated that an allegation of "fraud" had been "described to [him]" by some unidentified source. (ECF 35 at 13:1-2.) Thus, TSI's Affidavit (ECF 155-1) averred that the district judge apparently heard allegations about Ms. Mott or TSI from a source other than the parties' filings in this case, and such hearsay skewed his perception of their integrity. The prejudice directly led to

50

unwarranted rulings (*see* ECF 155 and 155-1) and later led to the judge offering inappropriate litigation tips to Plaintiffs (*see* ECF 260 at 12 n.1, 16).

Further, even though the judge was required to take all averments as true and simply determine the legal sufficiency of the affidavit (whether a reasonable observer would view the remarks as indicative of bias), the judge tried to refute the allegations at a status conference, seeking to justify his remarks about "fraud." (ECF 158 at 17-19.) A judge's decision not to recuse should be subject to reversal if he disputes the allegations in any way—even if, *arguendo*, the motion were legally insufficient on its face. *See, e.g., MacKenzie v. Super Kids Bargain Store, Inc.*, 565 So. 2d 1332, 1339 (Fla. 1990) (persuasive authority); *Rowe-Linn v. Berman*, 601 So. 2d 618 (Fla. 4th DCA 1992) (persuasive authority). "There can be no dispute either in the district court or on appeal as to the truth or falsity of the allegations of the affidavit." *Green*, 259 F.2d at 593 (citation omitted).

The order denying recusal (ECF 161) likewise inappropriately tried to recast TSI's concern about bias as being a mere dissatisfaction with rulings the judge had made. Rather than taking the averments of TSI's affidavit as true, the order tried to refute the averments by asserting that TSI "misunderstood one of my comments." (ECF 161 at 2.) The order asserted that the judge was not actually biased. (ECF 161 at 1.) The order should have only analyzed whether, as a matter of law, a reasonable person would fear bias, taking TSI's averments as true.

51

The denial order asserted that the judge's suspicions came from a footnote in a 2018 filing of the Plaintiffs (ECF No. 23 at 2 n.2) rather than from any reading of the inadmissible case cited in the footnote. (*See* ECF 161 at 2.) However, the order did not explain why the judge deemed the Plaintiffs' footnote to be a reference to Ms. Mott when the footnote did not name her or mention the person's gender. (*See* ECF 35 at 13:1-4; ECF 158 at 18:1-6.)

Even if (as the judge speculated at ECF 158 at 18:7-14) the "descri[ption]" he heard might have possibly been from a law clerk mentioning the case cited in the Plaintiffs' footnote, it would have been improper for a law clerk to rely on that inadmissible extrajudicial material or to describe the Plaintiffs' skewed allegations about it; and the judge still would have been relying on the Plaintiffs' slanted hearsay description about an inadmissible case in another court.

The order denying recusal asserted that the judge "cited the [*Aquate*] decision [mentioned in the Plaintiffs' footnote].... to impress on [TSI] that it must comply with the discovery rules and must meet the other obligations attendant to litigation" (ECF 161 at 2), but the judge expressed skepticism regarding the TSI's LLC membership resolution for Steve Acosta because of the court's reliance on Plaintiffs' inaccurate, hearsay allegations in Plaintiffs' footnote. A reasonable observer would conclude that the judge had a personal bias.

Although the judge asserted that he is not actually prejudiced, "justice must

satisfy the *appearance* of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954) (emphasis added). The "appearance of impartiality is virtually as important as the fact of impartiality." *Webbe v. McGhie Land Title Co.*, 549 F.2d 1358, 1361 (10th Cir. 1977). And "the right to be tried before an unbiased judge is also basic in our judicial system." *In re Union Leader Corp.*, 292 F.2d 381, 384 (1st Cir. 1961) (emphasis added). Thus, this Court should reverse the "Order Denying the Motion to Disqualify" (ECF 161) and all adverse rulings, including the Judgment.

## CONCLUSION

This Court should reverse the Judgment and other orders discussed above and direct that the case be dismissed for lack of jurisdiction. Alternatively, the Court should remand to a different judge with directions to hold a new trial or, more appropriately, to simply enter judgment in favor of TSI as a matter of law.

WHEREFORE, Appellant, Team Systems International, LLC, respectfully requests that this Honorable Court reverse the Judgment and the other orders discussed above, and remand to the district court with directions to dismiss for lack of jurisdiction; or alternatively, to hold a new trial with directions to deny commissions on Nestlé water and FEMA's retention of drop containers and to credit TSI's expenses that Appellees' expert failed to credit as shown at ECF 299-2 and to deny prejudgment interest; or, more appropriately, to simply enter judgment in favor of TSI on all counts as a matter of law.

53

Dated: December 29, 2021          Respectfully submitted,

                                  /s/ *Robin Bresky*
                                  Robin I. Bresky, Esq.
                                  Fla. Bar No. 179329
                                  BRESKY LAW
                                  150 East Palmetto Park Road, Suite 340
                                  Boca Raton, FL 33432
                                  Telephone (561) 994-6273
                                  Facsimile: (561) 880-6900
                                  Service@Bresky-Law.com
                                  RBresky@Bresky-Law.com
                                  *Counsel for Defendant-Appellant,*
                                  *Team Systems International, LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), (C), undersigned counsel certifies that this brief complies with the Court's type-volume limitation of 13,000 words. Based upon the word-count function of Microsoft Word including the text, footnotes, headings, and quotations using the formula stated in FRAP 32(a)(7)(B)(iii) and excluding the items excluded by FRAP 32(f), 11th Cir. R. 32-4, and 11th Cir. R. 28-1(a), (b), (c), (d), (e), (f), (g), (m) and (n) (and any addendum containing statutes, rules, or regulations), the word count is 12,885. The brief complies with the type-style requirements of FRAP 32(a)(6) as it uses proportionally-spaced Times New Roman 14-point or larger font.

                                  /s/ *Robin Bresky*
                                  Robin I. Bresky, Esq.

# CERTIFICATE OF SERVICE

The undersigned certifies that on this  29th  day of December, 2021, a true and correct copy of the foregoing has been filed with the Clerk of the Court using its CM/ECF system. I also certify that the forgoing document is being served this day on all counsel of record on the service list in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner such as electronic mail for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing:

Leonard M. Collins, Esq. (*via CM/ECF*)
GrayRobinson, P.A.
301 South Bronough St., Ste. 600
P.O. Box 11189 (32302-3189)
Tallahassee, FL 32301
Leonard.Collins@gray-robinson.com
*Attorney for Appellees*

M. Stephen Turner, Esq. (*via CM/ECF*)
M. Stephen Turner, P.A.
215 South Monroe Street, Suite 400
Tallahassee, FL 32301
mstephenturner.pa@gmail.com
*Attorney for Appellees*

Wayne LaRue Smith, Esq. (*via CM/ECF*)
The Smith Law Firm
509 Whitehead Street
Key West, FL 33040
wsmith@thesmithlawfirm.com
court-filings@thesmithlawfirm.com
*Trial Co-counsel for Team Systems International, LLC*

Steven R. Kozlowski, Esq. (*via e-mail or CM/ECF*)
Kozlowski Law Firm P.A.
4300 Biscayne Boulevard, Suite 203
Miami, FL 33137
steven@klfpa.com
*Trial Co-counsel for Team Systems International, LLC*

Randall L. Leshin, Esq. (*via CM/ECF*)
Randall Leshin, P.A.
1975 East Sunrise Blvd., Suite 504
Ft. Lauderdale, FL 33304
rleshin@leshinlawfirm.com
email@leshinlawfirm.com
*Trial Co-counsel for Team Systems Int'l, LLC*

/s/ *Robin Bresky*
Robin I. Bresky, Esq.

56

# ADDENDUM OF STATUTES AND REGULATIONS

### A. 28 U.S.C. § 144

§ 144. Bias or prejudice of judge

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term [session] at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

———————————

### B. 28 U.S.C. § 455

§ 455. Disqualification of justice, judge, or magistrate [magistrate judge]

**(a)** Any justice, judge, or magistrate [magistrate judge] of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

**(b)** He shall also disqualify himself in the following circumstances:

**(1)** Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

**(2)** Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

**(3)** Where he has served in governmental employment and in such

57

capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

**(4)** He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

**(5)** He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

　**(i)** Is a party to the proceeding, or an officer, director, or trustee of a party;

　**(ii)** Is acting as a lawyer in the proceeding;

　**(iii)** Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

　**(iv)** Is to the judge's knowledge likely to be a material witness in the proceeding.

**(c)** A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

**(d)** For the purposes of this section the following words or phrases shall have the meaning indicated:

**(1)** "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

**(2)** the degree of relationship is calculated according to the civil law system;

**(3)** "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

**(4)** "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

　**(i)** Ownership in a mutual or common investment fund that holds

securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

**(ii)**  An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

**(iii)**  The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

**(iv)**  Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

**(e)**  No justice, judge, or magistrate [magistrate judge] shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

**(f)**  Notwithstanding the preceding provisions of this section, if any justice, judge, magistrate [magistrate judge], or bankruptcy judge to whom a matter has been assigned would be disqualified, after substantial judicial time has been devoted to the matter, because of the appearance or discovery, after the matter was assigned to him or her, that he or she individually or as a fiduciary, or his or her spouse or minor child residing in his or her household, has a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the justice, judge, magistrate [magistrate judge], bankruptcy judge, spouse or minor child, as the case may be, divests himself or herself of the interest that provides the grounds for the disqualification.
faith.

———————————

59

## C. **41 U.S.C. § 3901**

§ 3901. Contracts awarded using procedures other than sealed-bid procedures

**(a)** Authorized types.   Except as provided in section 3905 of this title [41 USCS § 3905], contracts awarded after using procedures other than sealed-bid procedures may be of any type which in the opinion of the agency head will promote the best interests of the Federal Government.

**(b)** Required warranty.

**(1)**   Content. Every contract awarded after using procedures other than sealed-bid procedures shall contain a suitable warranty, as determined by the agency head, by the contractor that no person or selling agency has been employed or retained to solicit or secure the contract on an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except for bona fide employees or bona fide established commercial or selling agencies the contractor maintains to secure business.

**(2)**   Remedy for breach or violation. For the breach or violation of the warranty, the Federal Government may annul the contract without liability or deduct from the contract price or consideration the full amount of the commission, percentage, brokerage, or contingent fee.

**(3)**   Nonapplication. Paragraph (1) does not apply to a contract for an amount that is not greater than the simplified acquisition threshold or to a contract for the acquisition of commercial products or commercial services.

———————————————

**D. Fed. Acquisition Reg. 4.1001**

4.1001 Policy

In order to improve the accuracy, traceability, and usability of procurement data, procurement instruments shall identify the supplies or services to be acquired as separately identified line items and, as needed, subline items.

**(a)** Line items are established to define deliverables or organize information about deliverables. Each line item describes characteristics for the item purchased, e.g., pricing, delivery, and funding information.

**(b)** Each line item may be subdivided into separate unique subsets (called subline items) to ease administration. If a line item has deliverable subline items, the line item is informational. Subline items differentiate between or among certain characteristics of the line item, such as colors or sizes, dates of delivery, destinations, or places of performance. Subline items are established to define deliverables or organize information about deliverables.

(https://www.acquisition.gov/far/4.1001)

———————————————

**E. Fed. Acquisition Reg. 4.1003**

4.1003 Establishing line items

Establish separate line items for deliverables that have the following characteristics except as provided at 4.1005-2:

**(a)** Separately identifiable.

**(1)** A supply is separately identifiable if it has its own identification (*e.g.*, national stock number (NSN), item description, manufacturer's part number).

**(2)** Services are separately identifiable if they have no more than one statement of work or performance work statement.

61

**(3)** If the procurement instrument involves a first article (see subpart 9.3), establish a separate line item for each item requiring a separate approval. If the first article consists of a lot composed of a mixture of items that will be approved as a single lot, a single line item may be used.

**(b)** Single unit price or total price.

**(c)** Single accounting classification citation. A single deliverable may be funded by multiple accounting classifications when the deliverable effort cannot be otherwise subdivided.

**(d)** Separate delivery schedule, destination, period of performance, or place of performance.

**(e)** Single contract pricing type (e.g., fixed-price or cost-reimbursement).

(https://www.acquisition.gov/far/4.1003)

———————————————

## F. <u>Fed. Acquisition Reg. 52.203-5</u>

52.203-5 Covenant Against Contingent Fees.

As prescribed in 3.404, insert the following clause:

Covenant Against Contingent Fees (May 2014)

**(a)** The Contractor warrants that no person or agency has been employed or retained to solicit or obtain this contract upon an agreement or understanding for a contingent fee, except a bona fide employee or agency. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or, to deduct from the contract price or consideration, or otherwise recover, the full amount of the contingent fee.

**(b)** "Bona fide agency," as used in this clause, means an established commercial or selling agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence.

*Bona fide employee*, as used in this clause, means a person, employed by a contractor and subject to the contractor's supervision and control as to time, place, and manner of performance, who neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds out as being able to obtain any Government contract or contracts through improper influence.

*Contingent fee*, as used in this clause, means any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.

*Improper influence*, as used in this clause, means any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter.

(End of clause)

(https://www.acquisition.gov/far/52.203-5)