## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Team Systems International, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | |
| George L. Miller, solely in his capacity as the Chapter 7 Trustee of Team Systems International, LLC, | |
| Plaintiff, | Adv. Proc. No. 23-_____(CTG) |
| -against- | |
| Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John S. Maciorowski, Addy Road LLC, Brent Road LLC, Benjamin P. Smith, Jessica M. Smith, and TSI Gulf Coast, LLC, and | |
| John Does 1-100, | |
| Defendants. | |

## COMPLAINT

George L. Miller, solely in his capacity as the chapter 7 trustee (the "Trustee") of the bankruptcy estate (the "Estate") of Team Systems International, LLC (the "Debtor" or "TSI"), by his undersigned counsel, files this Complaint against the above-captioned Defendants and alleges as follows:

## NATURE OF THE ACTION

1.    Defendants Deborah Evans Mott ("Mott") and Steven M. Acosta ("Acosta"), aided and abetted by the other Defendants, perpetrated a brazen scheme to hinder, delay, and defraud the Debtor's Estate and its creditors while systematically looting the Debtor's assets.

2.    TSI bid for and obtained a lucrative government contract as a minority-owned business.  Weeks later, Hurricane Maria devastated Puerto Rico.  FEMA paid TSI more than $37 million to procure bottled water for hurricane victims.  TSI could have paid all of its creditors in full and still would have had millions of dollars for equity holders.  Instead, Mott and Acosta decided to keep the money for themselves and embarked on a campaign of fraud and deceit.

3.    During the four year period prior to the Petition Date, Mott and Acosta caused the Debtor to transfer more than $14.5 million to themselves and to the other Defendants, who are either close family members of Mott or are entities owned or controlled by Mott or Acosta (collectively, as set forth on **Exhibit A**, the "Fraudulent Transfers").

4.    Among other things, Mott transferred at least $3.5 million of the Debtor's funds to acquire or improve four Real Properties (defined below).  Those Real Properties were not titled in the Debtor's name but, instead, were titled in the name of Mott or one of the other Defendants.

5.    In addition, Mott and/or Acosta failed to disclose large transfers of the Debtor's funds.  For example, on February 27, 2020, the Debtor transferred $3 million to Mott's entity, Addy Road LLC.  As discussed below, Mott and/or Acosta attempted to conceal this transfer through the use of a fraudulently altered bank statement.

6.    Mott, Acosta, and others made numerous false statements and engaged in other misconduct to further and conceal their fraudulent scheme and looting of the Debtor's assets. Among other things, Mott made false statements, including under oath; Mott and/or Acosta produced falsified or altered documents; Mott and/or Acosta authorized the filing of court

2

documents that contain false statements; Mott and/or Acosta allowed the Debtor to violate multiple court orders; and Mott and/or Acosta engaged in other acts of bad faith or intentional misconduct, as set forth in this Complaint.

7.      Mott and Acosta, as the Managers and members of the Debtor's Management Committee, repeatedly breached their fiduciary duties owed to the Debtor by engaging in blatant self-dealing and failing to comply with the most basic requirements of corporate governance. Mott's and Acosta's breaches of their fiduciary duties were aided and abetted by each of the other Defendants.

8.      The Trustee brings this action pursuant to Part VII of the Federal Rules of Bankruptcy Procedure, on behalf of the Debtor, its Estate, and/or creditors, seeking the entry of a judgment, among other things: (i) avoiding and recovering the Fraudulent Transfers made by the Debtor to or for the benefit of one or more of the Defendants pursuant to 11 U.S.C. §§ 544, 548, 550 and applicable state law; (ii) imposing liability on each of Mott and Acosta for the numerous breaches of their fiduciary duties owed to the Debtor; (iii) imposing liability on all of the Defendants for aiding and abetting those breaches of their fiduciary duties; (iv) declaring that Mott, Acosta, Addy Road LLC, and Brent Road LLC are each the alter ego of the Debtor and piercing the corporate veil; (v) granting the Trustee a preliminary injunction and a permanent injunction barring the Defendants from selling, assigning, transferring, encumbering or otherwise disposing of the Real Properties and the Fraudulent Transfers; (vi) granting the Trustee equitable relief as requested herein; and (vii) granting the Trustee such other and further relief as may be just and proper.

## JURISDICTION AND VENUE

9.      Subject matter jurisdiction over this adversary proceeding exists pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and the Amended Standing Order of Reference of the United States District Court for the District of Delaware, dated February 29, 2012.

10.     Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a) and (c). This adversary proceeding is related to the above-captioned bankruptcy case pending before this Court under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code").

11.     The predicates for the relief sought herein include sections 105(a), 323, 541(a), 544, 548, 550, and 704 of the Bankruptcy Code, Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and applicable state law.

12.     Pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware, the Trustee consents to the entry of final orders or judgments by a bankruptcy judge.

13.     The District of Delaware has personal jurisdiction over each of the Defendants under Bankruptcy Rule 7004 and/or other applicable law.  In addition, personal jurisdiction exists as certain Defendants were a director, officer, control person, or insider of the Debtor, a Delaware entity; Mott regularly transacts business in Delaware; Addy Road owns real property in Delaware; and each of the Defendants had multiple, meaningful contacts in the State of Delaware relative to business activities and transactions which they availed themselves of and which directly and adversely affected the Debtor and its creditors.

## PARTIES

14.     Plaintiff George L. Miller is the duly qualified and appointed Chapter 7 Trustee of the Estate.

15.     The Debtor is a limited liability company organized under the laws of the State of Delaware.  The Debtor's voluntary petition for relief under chapter 11 indicates that its principal place of business was in Lewes, Delaware.

16.     Defendant Mott is an individual who, upon information and belief, resides at 705 Riverside Drive, Ormond Beach, Florida 32176.  Among other things, Mott is a Managing Member and member of the Debtor's Management Committee, the Debtor's Tax Matters Member, the Debtor's Chief Executive Officer, and a Member of the Debtor who holds 75% of the equity interests in the Debtor.

17.     Defendant Acosta is an individual who, upon information and belief, resides at 3901 Blue Sage Drive, Prosper, Texas 75078.  Among other things, Acosta is a Managing Member and member of the Debtor's Management Committee and is a Member of the Debtor who holds 20% of the equity interests in the Debtor.[1]   In addition, Acosta served as the Debtor's Tactical Training Director, Facility Security Officer, and Director of Operations.

18.     Defendant Christopher Mott ("CM") is an individual who, upon information and belief, is Mott's son and resides at 415 East Pine Street, Orlando, Florida 33801.  Among other things, CM is a Member of the Debtor who holds 4% of the equity interests in the Debtor.  In addition, CM was the Debtor's Director, Business Development & Sales.

19.     Defendant John S. Maciorowski ("JM") is an individual who, upon information and belief, is Mott's husband and resides at 705 Riverside Drive, Ormond Beach, Florida 32176.  Among other things, JM is a Member of the Debtor who holds 1% of the equity interests in the Debtor.

---

[1] The timing and circumstances of when Acosta became a Manager of TSI are unclear and were an issue in the Florida Litigation (defined below).

20.     Defendant Benjamin P. Smith ("BS") is an individual who, upon information and belief, is Mott's son-in-law and resides at 8401 Whitman Drive, Bethesda, Maryland 20817.

21.     Defendant Jessica M. Smith ("JS") is an individual who, upon information and belief, is Mott's daughter and resides at 8401 Whitman Drive, Bethesda, Maryland 20817.

22.     Defendant Addy Road LLC ("Addy Road") was organized on or about May 31, 2019, as a limited liability company under the laws of the State of Florida.  Addy Road's last known address is 705 Riverside Drive, Ormond Beach, Florida 32176.  Mott is the manager of Addy Road.[2]

23.     Defendant Brent Road LLC ("Brent Road") was organized on or about July 20, 2018, as a limited liability company under the laws of the State of Florida.  Brent Road's last known address is 500 E. Broward Blvd., 1820, Fort Lauderdale, Florida 33394.  Upon information and belief, Mott is or was the Manager of Brent Road.  Upon further information and belief, JS is or was the sole member of Brent Road.

24.     Defendant TSI Gulf Coast, LLC ("TSI Gulf Coast") was organized on or about December 20, 2017, as a limited liability Company under the laws of the State of Texas.  TSI Gulf Coast's last known address is 7413 Danbridge Ln., Frisco, Texas 75035.  Upon information and belief, Acosta is the manager and member of TSI Gulf Coast.

25.     Upon information and belief, John Does 1-100 include, among others, transferees of one or more of the Fraudulent Transfers; parties asserting an interest in one or more of the Real Properties; and/or their respective affiliates, successors or assigns.

---

[2] Upon information and belief, on or about November 15, 2021, Mott formed another entity called Addy Road LLC as a Delaware limited liability company.  Discovery may reveal claims against that entity.  The Trustee reserves the right to amend this Complaint to add that entity, or any other person or entity, as a party.

## FACTS COMMON TO ALL COUNTS

26.     Prior to the bankruptcy, TSI served the United States government as a prime contractor and subcontractor for various agencies and projects.  TSI provided logistical support for government entities, including the procurement, transport, and delivery of goods and services. Most significantly to this case, TSI entered into certain agreements with the Department of Homeland Security, Federal Emergency Management Agency ("FEMA"), to supply and deliver bottled water to designated locations in the event of natural disasters.

27.     TSI was managed by its Management Committee, also referred to as Managers, who at all relevant times were Mott and Acosta.

28.     The Members of TSI are Mott, Acosta, Mott's son CM, and Mott's husband JM.

29.     Upon information and belief, the work of TSI was performed by its Members and TSI had no employees.

**A.     The FEMA Contract and Payments**

30.     Effective as of August 16, 2017, TSI entered into a *Consulting Agreement* (as amended or modified, the "Consulting Agreement") with GPDEV, LLC ("GPDEV") and Simons Exploration Inc. d/b/a Archangel International ("Simons").[3]

31.     As set forth in the Consulting Agreement, TSI, with the assistance of GPDEV and Simons, would procure a supply of bottled water from Niagara Bottling, LLC, to sell to FEMA, among others, and, in exchange, TSI agreed to pay GPDEV and Simons a total success fee of 25% of the "net amount of income TSI actually receives from amounts invoiced to and by said agencies

---

[3] The circumstances related to amounts allegedly due and owing to GPDEV and Simons under the Consulting Agreement are the subject of a pending appeal. Nothing contained in this Complaint shall be construed as an admission against the Trustee, the Debtor, or the Estate.  The Trustee reserves all rights.

and or [sic] customers.    Net Income is defined as Gross Revenue less (cost of Goods Sold+Transportation+Direct Labor Expense)."

32.    Mott executed the Consulting Agreement on behalf of TSI.

33.    On or about September 5, 2017, FEMA awarded TSI a five-year contract to provide water bottles on an as-needed basis.

34.    Shortly thereafter, on September 20, 2017, Hurricane Maria devastated Puerto Rico and FEMA initiated a request to TSI for 80 million liters of water, which was subsequently reduced to approximately 13 million liters.[4]

35.    Upon information and belief, TSI received certain payments from FEMA for the delivery of water bottles, including:

      a.    $18,338,822.81, which was paid on or about November 29, 2017;

      b.    $7,297,500.00, which was paid on or about February 8, 2018;

      c.    $7,301,224.77, which was paid on or about April 16, 2018; and

      d.    $4,645,725.00, which was paid on or about May 21, 2019.

36.    Upon information and belief, during the time period that these FEMA payments were made, November 29, 2017 to May 21, 2019, TSI had no other significant source of revenue.

**B.    The Florida Litigation**

37.    GPDEV and Simons each asserted that TSI significantly underpaid them under the Consulting Agreement.

---

[4] The circumstances related to FEMA's orders, and amounts that may be due and owing to the Estate, are the subject of ongoing litigation between FEMA and the Estate.  Nothing contained in this Complaint shall be construed as an admission against the Trustee, the Debtor, or the Estate.  The Trustee reserves all rights.

38.    On September 21, 2018, GPDEV and Simons filed suit (the "Florida Litigation")[5] against TSI in the United States District Court for the Northern District of Florida (the "Florida District Court").

39.    The dispute in the Florida Litigation centered on, among other things, (i) whether the parties had orally modified the Consulting Agreement and (ii) which contract line item numbers were subject to the 25% commission.

40.    During the Florida Litigation, GPDEV and Simons alleged that TSI's representatives, among other things, withheld documents, produced documents that were created after the fact, and/or engaged in other misconduct.  For example:

    a.    TSI's representatives challenged the Florida District Court's diversity jurisdiction and produced certain documentation purporting to show that Acosta, who said he lived in California (the home state of one of the plaintiffs), had been a Member of TSI since before the Florida Litigation was commenced.  The Florida District Court found "it is more likely than not" that this documentation "was created after the jurisdictional issue arose and it is not authentic."

    b.    TSI's representatives produced a document purporting to show FEMA had paid TSI the sum of $27,303,597.17, while documents produced by FEMA showed it had actually paid TSI a total of $37,579,547.81, a difference of more than $10 million.  TSI's counsel then withdrew its document.

    c.    TSI's representatives attempted to claim millions of dollars in expenses in the Florida Litigation but failed to provide supporting documentation.

    d.    TSI's representatives purported to produce documents in support of expenses incurred by TSI, in spite of the fact that TSI's prior counsel had represented that such documents did not exist.  The Florida District Court observed that GPDEV and Simons "made a strong showing that something was amiss."

41.    Following a trial conducted on August 23-25, 2021, the jury in the Florida Litigation returned a verdict in favor of GPDEV and Simons.  The jury awarded damages in the

---

[5] *GPDEV, LLC and Simons Exploration, Inc. v. Team Systems International, LLC*, No. 18-cv-00442-RH-MAF.

amount calculated by GPDEV and Simons' expert:  $2,770,855 for GPDEV and $2,483,722 for Simons.

42.     On September 28, 2021, the Florida District Court entered a Judgment in favor of GPDEV and Simons, among other things, confirming the jury's award of damages and granting prejudgment interest in the amount of $527,140.32 for GPDEV and $464,358.46 for Simons.

43.     TSI appealed the judgments to the United States Court of Appeals for the Eleventh Circuit.

44.     TSI did not post a bond or obtain a stay pending appeal from either the Florida District Court or the Eleventh Circuit.

45.     GPDEV and Simons commenced discovery in aid of post-judgment enforcement.

46.     GPDEV and Simons alleged that TSI's representatives failed to comply with such discovery and obtained the entry of an Order to Show Cause to compel production.

47.     On January 7, 2022, TSI's counsel filed a motion requesting additional time to comply with the Florida District Court's order on the ground that "TSI's principal and its bookkeeper were both recently diagnosed with significantly symptomatic COVID cases last week and continue to be ill and resting."  The requested extension was denied.

48.     Thereafter, the Florida District Court issued a further Order to Show Cause, among other things, directing TSI to identify the "principal" and "bookkeeper," submit documentation regarding their COVID diagnoses, and provide an address where Mott would be taken into custody by the U.S. Marshal Service if they are held in civil contempt.

## C.     The Chapter 11 Case

49.     On January 18, 2022 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

Mott signed the petition, and Mott and Acosta each signed the resolution authorizing the bankruptcy filing.

50.     Also on the Petition Date, the Debtor filed the *Declaration of Deborah Evans Mott in Support of Debtor's Chapter 11 Petition and First Day Motion*.  In that declaration, among other things, Mott states that "[t]he Management Committee [of TSI] is comprised of Mr. Acosta and Ms. Mott.  There are two additional members – Christopher Mott and John Maciorowski.  TSI does not have any employees."

51.     On January 26, 2022, the Debtor filed its schedules of assets and liabilities and its statement of financial affairs, which Mott signed under penalty of perjury.  Among other things, the Debtor failed to disclose on its statement of financial affairs various transfers of money outside the ordinary course of business or financial affairs during the two years prior to the Petition Date and more than $350,000 in transfers to Mott, personally, within one year prior to the Petition Date.

52.     On January 27, 2022, GPDEV and Simons filed a motion to dismiss the Debtor's Chapter 11 Case (the "Motion to Dismiss Case").

53.     Bering Straits filed a response to the Motion to Dismiss Case, asking the Court to convert the Debtor's case to chapter 7 rather than dismissing it.

54.     In connection with the Motion to Dismiss Case, on February 7, 2022, counsel for GPDEV and Simons, among others, took Mott's deposition (the "February 2022 Deposition").

55.     Among other things, during the February 2022 Deposition:

    a.     Mott testified that a $319,849.91 transfer to Southern Title was a "K-1 payment" and was "transferred to the members' capital accounts," half to Mott and half to JM.  As discussed below, this transfer related to the acquisition of the Ormond Beach Property (defined below).

    b.     Mott testified that a $24,232 transfer by TSI to All Aqua Pools was "applied to my capital account."

Case 22-10066-CTG    Doc 271    Filed 01/10/23    Page 12 of 54

c.   Mott testified that a $1,666,432 transfer to the Maryland law firm of Shulman Rogers Gandal Pordy & Ecker P.A. ("Shulman Rogers") was for "professional services." As discussed below, this transfer related to the acquisition of the Bethesda Property (defined below).

d.   Mott testified that a July 2019 transfer to Defendant BS, an attorney at Shulman Rogers, was for "translation services." BS is Mott's son-in-law and now appears to be the co-owner of the Bethesda Property.

e.   When asked about payments made by TSI relating to automobiles, including Mercedes-Benz, Mott stated, among other things, that "TSI doesn't own any vehicles" and Mott admitted that she drives a Mercedes-Benz.

56.   During the February 2022 Deposition, Mott was asked why portions of the Debtor's bank statements that had been produced, including the portions relating to a $3 million transfer of the Debtor's funds on February 27, 2020, had been redacted and Mott responded "[b]ecause it had handwritten notes on it." As discussed below, that was not accurate.

57.   Also during the February 2022 Deposition, Mott declined to answer various questions about the Florida Litigation, asserting she was "not the corporate representative in the Florida litigation" and stated that Acosta was the corporate representative for that case.

58.   Further, during the February 2022 Deposition, Mott was questioned about the Debtor's tax returns. Among other things, Mott stated that an undated 2018 tax return was a "true and accurate copy" of the Debtor's 2018 tax return filed with the Internal Revenue Service ("IRS").

59.   During the Chapter 11 Case, the Debtor's representatives produced copies of what purported to be the Debtor's 2018 and 2019 tax returns, along with dates that these returns had been filed.

60.   However, the same day as the February 2022 Deposition, the IRS filed a general unsecured proof of claim for penalties arising from the Debtor's failure to file tax returns for the past six tax years, including 2018—the year Mott claimed had been filed.

61.    The IRS proof of claim includes a note for each of the tax years stating, in relevant part, "liability is estimated based on available information **because the return has not been filed**" (emphasis added).  The Trustee has since confirmed with the IRS that the Debtor did not file federal tax returns since at least the 2015 tax year.

62.    On February 16, 2022, GPDEV and Simons filed a motion for sanctions based on Mott's statements made during the February 2022 Deposition and the Debtor's document production.

63.    Two days later, on February 18, 2022, the Debtor's original Chapter 11 counsel filed a motion to withdraw as counsel.

64.    On March 9, 14, and 16, the Court conducted an evidentiary hearing (the "March Hearing") on the Motion to Dismiss Case.

65.    Mott did not appear at the March Hearing.

66.    Acosta testified during the March Hearing, among other things, that he (i) did "not have any operating experience" on the Debtor's accounting system, (ii) never accessed the Debtor's accounting system, (iii) did not have access to any of the Debtor's bank accounts, and (iv) did not know the name of any accountant of the Debtor or where they were located.  Acosta also testified that he received K-1s each year from TSI.

67.    Acosta further testified during the March Hearing that, as a government contractor, if TSI failed to file tax returns, TSI would be "considered untrustworthy" and "not reliable" and could lose its clearance and its ability to bid on certain contracts—in other words, Acosta indicated that it would essentially be impossible for TSI to operate if it did not file its tax returns.  But Acosta added that he had no firsthand knowledge that tax returns were actually filed and, instead, was relying on an unproduced letter from a lawyer in Florida whose name Acosta could not provide.

68.    On March 30, 2022, the Court issued its *Memorandum Opinion* converting the Debtor's case to a case under chapter 7 of the Bankruptcy Code.

69.    Among other things, in the *Memorandum Opinion*, the Court found that:

a.    the "unrebutted evidence suggest[s] that TSI presented fabricated evidence to the district court in the Florida Litigation";

b.    "evidence unearthed, for the first time, in discovery in this bankruptcy case suggest[s] the debtor engaged in other misconduct in the Florida litigation";

c.    there are "serious questions regarding the debtor's prepetition transfers to insiders" and "misleading testimony and records relating to those transfers"; and

d.    "serious questions" were raised "about the debtor's conduct in the bankruptcy case," including the production of undated tax returns for 2018 and 2019, which appear to never have been filed, despite contrary testimony from Mott.

**D.    Chapter 7 Case**

70.    On March 31, 2022 (the "Conversion Date"), the Bankruptcy Court entered an Order (i) converting the Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code, and (ii) directing the Debtor to turn over to the Trustee all records and Estate property.

71.    On the Conversion Date, the Trustee was appointed as the interim Chapter 7 Trustee of the Estate.

72.    Thereafter, following a contested election, the Trustee was duly qualified and appointed as the permanent Chapter 7 Trustee of the Estate.

73.    Since his appointment, the Trustee has undertaken an investigation of the Debtor's prepetition transfers and transactions.

74.    Despite professing that they wish to cooperate with the Trustee, Mott and Acosta have actively obstructed the Trustee's investigation.  Among other things:

a.    Mott and Acosta have failed to turn over complete and accurate books and records;

     b.     Mott, Acosta and/or their agents have failed to accurately and completely respond to questions from the Trustee and his professional advisors;

     c.     Mott and Acosta have opposed the Trustee's efforts to obtain documents from them and from third parties; and

     d.     Mott and Acosta failed to preserve the Debtor's records and computer equipment and, instead, turned over a laptop computer they claim was broken.  In fact, it appears this laptop computer was intentionally wiped of all data before it was turned over to the Trustee.

75.     On June 9, 2022, the Trustee filed a motion seeking the entry of an order holding the Debtor and the Member Defendants in contempt for their failure to turn over Estate property, including books and records, and for sanctions.

76.     On July 14, 2022, the Court entered an order (the "Contempt Order") granting in part the Trustee's motion.

77.     Among other things, the Contempt Order prohibited Mott, Acosta, and their affiliates from "transferring or encumbering the Real Properties for a period of six months from the date upon which this Order is entered without prejudice to the rights of any party to seek to terminate or to extend this prohibition."

78.     On September 12, 2022, counsel for the Trustee took Mott's deposition (the "September 2022 Deposition").

79.     During the September 2022 Deposition, Mott was evasive and repeatedly claimed not to recall information.

80.     For example, during the September 2022 Deposition, Mott was asked who controls Addy Road, to which she responded, "I have no recollection at this point in time."  Similarly, Mott claimed not to recall what business Addy Road was in or why TSI would have transferred millions of dollars to Addy Road.

81.     Notwithstanding her lack of recollection, Moot uses an email address with a domain name of "addyroad.com," which Mott's counsel provided as her email address the day after the deposition.

82.     At another point during the September 2022 Deposition, immediately following a break, Mott was asked whether she had discussed her testimony with anyone during the break, to which she responded, "to the best of my knowledge right now, I do not recall," even though the break had just ended.

83.     Despite her evasiveness, Mott acknowledged several important facts during the September 2022 Deposition, including without limitation the following:

      a.     Mott was primarily responsible for the Debtor's internal accounting during the last five years;

      b.     The Debtor's accounting was done on one laptop computer that Mott had personally used and which subsequently was damaged with the information not recoverable;

      c.     Mott claimed to have no "specific recollection" of any Management Committee meetings having been held in the last five years but that, if such meetings were held, "it would have been Mr. Acosta" who was responsible for keeping the minutes of any such meetings;

      d.     Mott acknowledged that she would have been responsible for preparing and filing the Debtor's tax returns;

      e.     Mott again testified that the Debtor filed tax returns for 2018 and 2019;

      f.     Mott confirmed that she would have seen all of the Debtor's bank statements for the last five years; and

      g.     Mott confirmed that she had check signing authority for the Debtor.

84.    While the Trustee's investigation remains ongoing, it has already revealed numerous avoidable transfers and instances of wrongdoing by Mott, Acosta, and the Defendants, which are set forth in following sections.[6]

## E.    Fraudulent Transfers to Defendants

85.    During the four year period prior to the Petition Date, Mott and/or Acosta caused the Debtor to make at least $14,507,245.10 in Fraudulent Transfers to themselves, to entities they own or control, to the other Member Defendants, or to members of Mott's immediate family.

86.    The Fraudulent Transfers to or for the benefit of each of the Defendants are set forth on **Exhibit A** to this Complaint.

87.    The Fraudulent Transfers include, without limitation, payments to acquire the Real Properties, unauthorized and improper distributions to the Member Defendants, unsupported expense reimbursements, payments to various members of Mott's family without proper support or justification, and payments for automobiles, furniture, landscaping and other personal expenses of one or more of the Defendants, among other things.

88.    Despite the Trustee's repeated requests for invoices or other supporting documentation regarding the Fraudulent Transfers, Mott and Acosta generally have failed to produce invoices or other supporting documents that would indicate the Debtor received any consideration for the Fraudulent Transfers.

89.    While Mott and Acosta have produced certain documents, they lack credibility. For example, they produced an invoice bearing the name of Addy Road LLC, in the amount of $2,999,998.60 for "Logistics and Fuel Services." That invoice is dated January 4, 2019. As

---

[6] Because the Trustee's investigation is still ongoing, and because the Defendants or their agents have actively obstructed that investigation, the Trustee reserves the right to amend or supplement this Complaint.

discussed above, Addy Road was not formed until May 31, 2019, five months <u>after</u> the date of this invoice.  Upon information and belief, Addy Road is a holding company that holds title to the Bethany Beach Property.

90.    Accordingly, by this Complaint, the Trustee seeks to avoid and recover all avoidable transfers made and obligations incurred by the Debtor to or for the benefit of one or more of the Defendants.

91.    The following sections of this Complaint describe certain of the Fraudulent Transfers that were either made to acquire the Real Properties and/or fraudulently concealed.

**F.    Mott Diverted the Debtor's Funds to Acquire the Real Properties**

92.    Mott, her close family members, and/or entities she owns or controls acquired multiple residential real properties using funds transferred from TSI's bank accounts.[7]

### i.    The Ormond Beach Property

93.    On April 12, 2018, TSI transferred the sum of $319,849.91 from its bank account at BBVA ending -8953 to Southern Title Holdings.[8]

94.    On April 13, 2018, Mott and JM acquired certain real property located at 705 Riverside Drive, Ormond Beach, Florida 32176 (the "Ormond Beach Property") for approximately $320,000.  Southern Title Holdings handled the closing.

---

[7] Discovery may reveal additional real properties or other assets that were acquired using TSI's funds.  For example, it appears that, on August 10, 2018, Mott caused TSI to acquire a residential real property located at 106 Northbrook Lane, Ormond Beach, Florida for approximately $170,000.  It appears that TSI sold the property on March 24, 2021, but the Trustee has not yet traced the proceeds of that sale.  This transaction raises several red flags, including that Mott executed an affidavit dated March 24, 2021 in which her name is repeatedly misspelled as "Motts," the affidavit states Mott is the sole member of the limited liability company but later states that it has more than one member, and the affidavit identifies TSI as a Florida limited liability company when, in fact, TSI is a Delaware limited liability company and the Florida Department of Corporations' website does not list TSI as a domestic Florida limited liability company.

[8] Thereafter, on or about August 8, 2018, TSI transferred the sum of $170,100.00 to Southern Title Holdings and listed the transfer as a "K1" distribution to JM.

95.     During the February 2022 Deposition, Mott testified that the $319,849.91 transfer to Southern Title was a "K-1 payment" and was "transferred to the members' capital accounts," half to Mott and half to JM.

96.     However, during the Florida Litigation, Mott, Acosta, and/or their agents represented that this $319,849.91 payment was an expense that TSI incurred in connection with the provision of water bottles to FEMA and should claim that expense as a deduction from the amount owed to GPDEV and Simons.

97.     Specifically, during discovery in the Florida Litigation, Mott, Acosta, and/or their agents produced certain documents, including a document that bears bates # TSI 452, which is excerpted below:

| 03/22/2018 | Direct labor - Marine Crane CLIN 0016 | $ (50,000.00) |
| 03/26/2018 | TRBR Transport CLIN 0016 | $ (31,511.55) |
| 04/12/2018 | Transport (Tesza) CLIN 0016 | $ (319,849.91) |
| 04/16/2018 | Logistics (COAKLEY) | $ (588,000.00) |
| 04/24/2018 | TRBR Transport CLIN 0016 | $ (4,658.50) |

98.     In addition, during discovery in the Florida Litigation, Mott, Acosta, and/or their agents produced a document which bears bates # D022512, which is excerpted below:

**Transaction Detail**

| | | |
|---|---|---|
| From: | Checking *8953 **To:** | TEZA MARINE INC |
| Amount: | 319849.91 **Send Date:** | 4/12/2018 |
| Delivery Speed: | Same Day **Delivery/Effective Date:** | 4/12/2018 |
| Originator: | JEN **Reference Number:** | |
| Status: | POSTED **Memo:** | MARINE TRANSPORT CLIN 0016 |

99.     While these two documents include slightly different descriptions, they each indicate that the $319,849.91 payment by TSI on April 12, 2018, was made to an entity called Tesza/Teza for transport services.  Neither document discloses that the transfer was actually made to Southern Title Holdings to fund the acquisition of the Ormond Beach Property.

### ii.   All Aqua Pools

100.   During the Florida Litigation, Mott, Acosta, and/or their agents attempted to claim expenses paid to "All Aqua" were transport costs.

101.   Below is an excerpt of a document bearing bates # D022485 that was produced during the Florida Litigation:

| Transaction Detail | | | |
|---|---|---|---|
| From: | Checking *7965 | **To:** | ALL AQUA |
| Amount: | 24232.50 | **Send Date:** | 8/21/2018 |
| Delivery Speed: | Same Day | **Delivery/Effective Date:** | 8/21/2018 |
| Originator: | JEN | **Reference Number:** | |
| Status: | POSTED | **Memo:** | TRANSPORT TRUCK CLIN 0016 |

102.   As set forth above, this document purports to show that TSI paid $24,232.50 to All Aqua for "TRANSPORT TRUCK" services.

103.   Similarly, during the Florida Litigation, Mott, Acosta, and/or their agents claimed that an additional payment of $19,232.50 to "All Aqua" was a business expense of TSI.

104.   Below is an excerpt of a document bearing bates # D022533 that was produced during the Florida Litigation:

| Transaction Detail | | | |
|---|---|---|---|
| From: | Checking *9759 | **To:** | ALL AQUA |
| Amount: | 19232.50 | **Send Date:** | 9/25/2018 |
| Delivery Speed: | Same Day | **Delivery/Effective Date:** | 9/25/2018 |
| Originator: | JEN | **Reference Number:** | |
| Status: | POSTED | **Memo:** | MARINE TRANSPORT CLIN 0016 |

105.   In fact, All Aqua Pools is a company hired to install a pool at the Ormond Beach Property, as Mott later admitted during the February 2022 Deposition.

106.   TSI transferred at least $75,450.00 to All Aqua Pools, which transfers were listed as "K1" distributions to Mott and/or JM.

### iii.    The Bethesda Property

107.    On May 10, 2018, Mott caused TSI to enter into a sales contract for certain residential real property located in Potomac, Maryland (the "May Sales Contract").

108.    On or about May 11, 2018, Mott engaged Shulman Rogers, where Mott's son-in-law, BS, works, to conduct the settlement of the May Sales Contract.

109.    On May 14, 2018, TSI transferred the sum of $100,000.00 by wire transfer from its bank account at BBVA ending -8953 to Shulman Rogers.

110.    On or about May 18, 2018, the parties terminated the May Sales Contract and released the $100,000.00 earnest money deposit to Shulman Rogers for TSI.

111.    On July 12, 2018, TSI transferred the sum of $22,000.00 by wire transfer from its bank account at BBVA ending -9759 directly to Defendant BS.

112.    As stated above, during the February 2022 Deposition, Mott stated that this $22,000 transfer to BS was for "translation services."  However, this wire transfer was made to BS personally, not to his law firm.

113.    On July 13, 2018, Mott caused TSI to enter into a sales contract for certain residential real property located in Potomac, Maryland (the "July Sales Contract").  The July Sales Contract identifies the buyer as "Team Systems International by Debbie Mott, and any future assignee."

114.    On or about July 19, 2018, Shulman Rogers transferred TSI's $100,000.00 deposit to the new file for the July Sales Contract.

115.    On or about August 3, 2018, the parties terminated the July Sales Contract.

116.    Upon information and belief, at some point after entering into the July Sales Contract, Mott gave verbal direction to Shulman Rogers to move TSI's $100,000.00 deposit to the file of Defendant Brent Road at Shulman Rogers.

117.    On August 22, 2018, TSI transferred the sum of $1,666,432.86 by wire transfer from its bank account at BBVA ending -9759 to Shulman Rogers.  Upon information and belief, as of this date, Shulman Rogers had <u>no</u> active matters for TSI as the July Sales Contract had already been terminated.

118.    On August 30, 2018, Brent Road acquired certain residential real property located at 8401 Whitman Drive, Bethesda, Maryland 20817 (the "Bethesda Property") from Mid-Atlantic Custom Builders LLC for $1,840,000.  Shulman Rogers handled the closing for the Bethesda Property.  Mott signed the deed on behalf of Brent Road, as grantee.

119.    During the February 2022 Deposition, Mott stated that the $1,666,432 transfer to Shulman Rogers on August 22, 2018 was for "professional services."  Also during the February 2022 Deposition, Mott identified Shulman Rogers as TSI's "outside general counsel."

120.    However, upon information and belief, TSI only paid Shulman Rogers approximately <u>$23,000</u> for legal services during the period from May 2018 through the Petition Date.

121.    Approximately 10 months after Brent Road acquired title to the Bethesda Property, title was transferred to Mott's daughter, JS, for no consideration to TSI.

122.    Specifically, on or about July 19, 2019, JS filed Articles of Dissolution for Brent Road with the Florida Secretary of State, stating, in part, that Brent Road's assets would be distributed to JS.

123.    The Brent Road Articles of Dissolution signed by JS refer to Florida Statute § 605.0701(2), which permits the dissolution of a Florida limited liability company with the consent of all members.  JS is the only signatory on the Articles of Dissolution, thus suggesting she was the sole member of Brent Road.

124.    Three days later, on July 22, 2019, Brent Road transferred title to the Bethesda Property to JS.  JS signed the deed both on behalf of Brent Road, as grantor, and on her own behalf, as grantee.

125.    According to Maryland public records, the Bethesda Property is currently held in the name of JS and BS.

126.    JS and BS were not members of TSI and had no right to receive any of the Debtor's funds, which were converted into the Bethesda Property.

### iv.    Bethany Beach Property

127.    Between June 2019 and July 2019, TSI made three transfers to the Delaware law firm of Tunnell & Raysor, P.A. ("T&R"):

   a.    on June 4, 2019, TSI transferred $25,000.00 to T&R by wire transfer from its BBVA account ending -7965;

   b.    on July 10, 2019, TSI transferred $928,843.10 to T&R by wire transfer from its BBVA account ending -7965; and

   c.    on July 19, 2022, TSI transferred $2,500 to T&R by wire transfer from its BBVA account ending -9759.

128.    During the February 2022 Deposition, Mott testified that the $928,843.10 payment to T&R was for "professional services," stating, "they're a Delaware law firm, so they did provide a memo on the diversity issues in the Florida case, but I don't -- I don't know exactly which issues. They've provided contract review services, and I'm sure they've provided other things."

129.    In its *Memorandum Opinion*, the Court found Mott's testimony to be not credible.

130.    In fact, T&R did not provide any legal services to TSI.

131.    Rather, the transfers to T&R listed above were made to fund the acquisition of a beach house located at 20 Addy Road, Bethany Beach, Delaware 19930 (the "Bethany Beach

Property"), which was acquired on July 22, 2019 by Defendant Addy Road—an entity owned and controlled by Mott.

### v.    The Blue Springs Property

132.    On June 11, 2020, TSI transferred the sum of $75,072.00 from its BBVA account ending -7965 to McBee Custom Homes LC ("McBee").

133.    On August 10, 2020, TSI transferred the sum of $200,000.00 from its BBVA account ending -7965 to Coffelt Land Title, Inc. ("Coffelt").

134.    Also on August 10, 2020, TSI transferred the sum of $141,117.44 from its BBVA account ending -9759 to Coffelt.

135.    In addition, on August 10, 2020, Mott acquired in her own name certain residential real property located at 1509 SW Conch Circle, Blue Springs, Missouri (the "Blue Springs Property") for the sum of $416,172.

136.    The deed reflects that McBee was the seller of the Blue Springs Property and that Coffelt handled the closing.

137.    Collectively, the Ormond Beach Property, the Bethesda Property, the Bethany Beach Property, and the Blue Springs Property are referred to in this Complaint as the "Real Properties."

### G.    Fraudulently Concealed Transfers

138.    During the four year period prior to the Petition Date, the Debtor made numerous transfers between its own accounts or to one of the Defendants that either were not properly disclosed or were actively concealed.

139.    For example, on February 27, 2020, TSI transferred the sum of $3,000,000.00 from its account at BBVA ending -2888.

140.    Mott, Acosta, and/or their agents actively attempted to conceal this transfer.

141.    On February 2, 2022, representatives of the Debtor produced a document purporting to be the February 2020 bank statement for the Debtor's account at BBVA ending -2888.  That document bears the bates # TSI000180.  Following is an excerpt from that document:

Transaction History

| Date * | Check/Serial # | Description | Deposits/Credits | Withdrawals/Debits | End of Day Balance |
|---|---|---|---|---|---|
| 2/3 | | IOD INTEREST PAID | $5,265.46 | | $3,821,675.54 |
| 2/18 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $500,000.00 | $3,321,675.54 |
| 2/27 | | INT. TRANSFER TO ACCOUNT | | $3,000,000.00 | $321,675.54 |
| Ending Balance on 2/29 | | | | | $321,675.54 |
| Totals | | | $5,265.46 | $3,500,000.00 | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

142.    As reflected above, the text following "INT. TRANSFER TO ACCOUNT" appears to have been obscured using white-out or some other means to conceal information.

143.    During the February 2022 Deposition,  Mott testified that this bank statement had been redacted "[b]ecause it had handwritten notes on it."

144.    Below is an excerpt from the same February 2020 bank statement without the redaction:

## Transaction History

| Date * | Check/Serial # | Description | Deposits/Credits | Withdrawals/Debits | End of Day Balance |
|---|---|---|---|---|---|
| 2/3 | | IOD INTEREST PAID | $5,265.46 | | $3,821,675.54 |
| 2/18 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $500,000.00 | $3,321,675.54 |
| 2/27 | | INT. TRANSFER TO ACCOUNT XXXXXX4075 ADDY ROAD LLC | | $3,000,000.00 | $321,675.54 |
| Ending Balance on 2/29 | | | | | $321,675.54 |
| Totals | | | $5,265.46 | $3,500,000.00 | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

145.    As the unredacted copy of this bank statement makes clear, the redacted information identifies that the $3 million was transferred to Addy Road, Mott's entity.

146.    The $3 million transfer was not listed in the Debtor's monthly transaction report for account ending -2888 for February 2020.

147.    Mott, Acosta, and/or their agents attempted to conceal other transfers.

148.    For example, below is an excerpt of the February 2020 bank statement for the Debtor's account at BBVA ending -9759, which was produced during the Chapter 11 Case and bears bates # TSI000034.  Note the third transaction from the top dated February 27, 2020 in the amount of $50,000:

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|---|---|---|---|---|---|
| 2/24 | | ONLINE OR MOBILE WIRE TRANSFER REF 20200224F2QCZ60C003652  BNF Steven Matthew Aco | | $25,000.00 | $470,319.91 |
| 2/25 | | DEBIT FOR CHECKCARD XXXXXX204202/24/20 JON HALL CHEVROLET    DAYTONA BEACHFL | | $4,121.55 | $466,198.36 |
| 2/27 | | INT. TRANSFER TO ACCOUNT | | $50,000.00 | $416,198.36 |
| 2/28 | | ONLINE OR MOBILE WIRE TRANSFER REF 20200228F2QCZ60C000806   BNF DEBORAH MOTT | | $100,000.00 | $316,198.36 |
| Ending Balance on 2/29 | | | | | $316,198.36 |
| **Totals** | | | **$500,000.00** | **$482,898.76** | |

149.    Below is an excerpt from the same February 2020 bank statement without the redaction:

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|---|---|---|---|---|---|
| 2/24 | | ONLINE OR MOBILE WIRE TRANSFER REF 20200224F2QCZ60C003652 BNF Steven Matthew Aco | | $25,000.00 | $470,319.91 |
| 2/25 | | DEBIT FOR CHECKCARD XXXXXX2042 02/24/20 JON HALL CHEVROLET    DAYTONA BEACHFL | | $4,121.55 | $466,198.36 |
| 2/27 | | INT. TRANSFER TO ACCOUNT XXXXXX3168 ADDY ROAD LLC | | $50,000.00 | $416,198.36 |
| 2/28 | | ONLINE OR MOBILE WIRE TRANSFER REF 20200228F2QCZ60C000806 BNF DEBORAH MOTT | | $100,000.00 | $316,198.36 |
| Ending Balance on 2/29 | | | | | $316,198.36 |
| **Totals** | | | **$500,000.00** | **$482,898.76** | |

150.    Again, this appears to have been a deliberate attempt to conceal a transfer made by the Debtor to Addy Road.

151.    In addition, in March 2018, Mott and/or Acosta caused the Debtor to make significant transfers by check from its account at BBVA ending -8953 for automobiles, including the following:

| Check # | Check Date | Check Amount | Clear Date | Payee |
|---------|-----------|--------------|-----------|-------|
| 2391 | 3/19/2018 | $112,228.80 | 3/20/2018 | Mercedes-Benz of North Florida |
| 2392 | 3/19/2018 | $74,766.86 | 3/21/2018 | Audi South Orlando |
| 2393 | 3/25/2018 | $31,511.55 | 3/26/2018 | Volkswagen of St. Augustine |

152.    In its monthly transaction report, the Debtor listed these payments for automobiles as "subcontractor" payments.

153.    During the February 2022 Deposition, Mott stated that "TSI doesn't own any vehicles."  Mott also admitted that she drives a Mercedes-Benz.

154.    Further, on May 10, 2021, the Debtor made two transfers to Mott in the amounts of $100,000.00 and $150,000.00, respectively, from its account at BBVA ending -2888, which Mott, Acosta and/or their agents attempted to conceal.

155.    Below is an excerpt of the May 2021 bank statement for that account, which was produced during the Chapter 11 Case and bears bates # TSI000138:

Transaction History

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|--------|-----------------|-------------|-------------------|---------------------|---------------------|
| 5/3 | | IOD INTEREST PAID | $41.96 | | $604,342.27 |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF 2C?10510F2QCZ60C000563 | | $100,000.00 | |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF '20210510F2QCZ60C000564 | | $150,000.00 | $354,342.27 |
| 5/24 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $100,000.00 | $254,342.27 |
| Ending Balance on 5/31 | | | | | $254,342.27 |
| Totals | | | $41.96 | $350,000.00 | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
 * The Date provided is the business day that the transaction is processed.

156.   Below is an excerpt from the same May 2021 bank statement without the redaction:

## Transaction History

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|--------|-----------------|-------------|-------------------|---------------------|---------------------|
| 5/3 | | IOD INTEREST PAID | $41.96 | | $604,342.27 |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF 20210510F2QCZ60C000563 BNF DEBORAH EVANS MOTT | | $100,000.00 | |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF 20210510F2QCZ60C000564 BNF DEBORAH  MOTT | | $150,000.00 | $354,342.27 |
| 5/24 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $100,000.00 | $254,342.27 |
| Ending Balance on 5/31 | | | | | $254,342.27 |
| Totals | | | $41.96 | $350,000.00 | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
 * The Date provided is the business day that the transaction is processed.

157.   Once again, this appears to have been a deliberate attempt to conceal transfers made by the Debtor, this time to Mott.

158.   In the Debtor's monthly transaction report, the May 10, 2021 transfers are listed as payments to "subcontractor," not to Mott.

159.   Notably, the May 10, 2021 transfers to Mott listed above were made within one year prior to the Petition Date.  As discussed above, the Statement of Financial Affairs, which Mott signed under penalty of perjury, does not list any transfers to Mott during the year prior to the Petition Date.

### H.    Undisclosed Bank Account

160.    Mott and Acosta have failed to properly disclose the Debtor's bank accounts.

161.    For example, on July 18, 2019, Mott withdrew the sum of $2,500,000.00 from TSI's account at BBVA ending -2888 in the form of a cashier's check.

162.    The next day, July 19, 2019, the cashier's check in the amount of $2,500,000.00 was deposited into an account at TD Bank ending -3053.

163.    This account at TD Bank was not disclosed in the Florida Litigation.  It was not disclosed on the Debtor's bankruptcy schedules.  Mott and Acosta have failed to produce any bank statements for this account, nor have they produced any monthly transaction reports for this account.  Plainly, Mott and Acosta do not want the Trustee and creditors to know how the funds deposited into this account were used.

164.    Because Mott and Acosta have failed and refused to cooperate with the Trustee's investigation, as of the filing of this Complaint, the Trustee has been unable to trace various prepetition transfers made by the Debtor, including the transfers discussed above.  The Trustee reserves the right to amend this Complaint based upon information obtained in discovery.

### I.    Mott and Acosta Abuse the Debtor's Corporate Form to Conceal Their Fraudulent Scheme

165.    As set forth above, at all times relevant hereto, Mott and Acosta were the Managers and the only two members of the Debtor's Management Committee.

166.    In furtherance of their fraudulent scheme, Mott and Acosta intentionally mismanaged or were grossly negligent in mismanaging the Debtor's business and financial affairs in a manner that enriched themselves and the other Defendants at the expense of the Debtor's Estate and its creditors.

167.    For example, Mott and Acosta each failed to maintain and preserve the Debtor's assets and records, including allowing the Debtor's records to be maintained on a single laptop computer that was damaged to a point that the Debtor's records could not be recovered.

168.    Mott and Acosta each made, or allowed to be made, significant transfers of the Debtor's money and property to or for the benefit of themselves or the other Defendants, each of whom is an affiliate of Mott or Acosta.  Among other things:

    a.    The Fraudulent Transfers to or for the benefit of Mott, Acosta, and/or another Defendants were not properly authorized, documented, or reported.

    b.    Acosta abdicated his fiduciary responsibilities and effectively gave Mott unfettered control of the Debtor's funds with grossly inadequate oversight.

    c.    Mott engaged in numerous acts of self-dealing, including by causing the Debtor to fund the acquisition or improvement of the Real Properties.

    d.    Mott issued checks, withdrawals, and/or wire transfers without the proper authorization or notice.

    e.    Mott caused the Debtor to enter into transactions with its Managers, Members and/or their affiliates without proper authorization.

    f.    Mott and Acosta caused or allowed the Debtor's funds to be commingled with the funds of other persons or entities.

    g.    Mott failed to properly categorize or record the cash distributions made to the Member Defendants.

    h.    Mott recorded certain transfers to the Member Defendants as "K-1" distributions.  However, as discussed below, the Debtor did not file tax returns and these alleged "K-1" distributions were improper.

    i.    Mott and/or Acosta caused the Debtor to make transfers for automobiles, credit cards, and/or other personal expenses of one or more of the Defendants.

    j.    Mott also failed to prepare any calculations of the Debtor's net cash flow or any other measure of profitability necessary to appropriately evaluate and consider making so-called "Profit Distributions" to the Member Defendants.

    k.    In fact, it appears no reporting was prepared to evaluate the appropriateness of the distributions to the Member Defendants, the financial condition of

the Debtor's business, or the impact of such distributions on the Debtor's ability to meet its obligations to creditors.

169.    Mott and Acosta each failed to comply with the most basic principles of corporate governance and internal controls.  Among other things:

      a.    Mott and Acosta failed to hold meetings of the Management Committee.

      b.    Acosta failed to maintain minutes of any such Management Committee meetings that may have been held.

      c.    Mott and Acosta failed to conduct or document votes, corporate resolutions, or written consents.

      d.    Mott and Acosta failed to keep, or cause to be kept, accurate, complete and property books, records and accounts pertaining to the Debtor's affairs. Even the most basic documentation was not properly prepared or kept, including without limitation monthly bank reconciliations, supporting documentation for payments by the Debtor (e.g., bank statements, cancelled checks, wire advices, calculations, invoices, contracts, expense reimbursements), or documentation relating to accounts receivable.

      e.    Mott and Acosta failed to prepare, or cause to be prepared, monthly, quarterly, and annual financial reports.

      f.    Mott and Acosta failed to establish appropriate internal controls to mitigate against the misappropriation of the Debtor's funds.

      g.    Mott and Acosta failed to ensure that the Debtor's tax returns were properly prepared and filed.

      h.    Mott, the Tax Matters Member, misrepresented that the 2018 and 2019 tax returns had been filed.  In fact, the Debtor did not file returns for six tax years.

      i.    Mott also failed to calculate the Debtor's estimated tax liability for purposes of making the so-called "Tax Distributions" to the Member Defendants.

170.    During the tax years 2017 through 2019, in particular, the Debtor earned significant taxable income.  Thus, if the Debtor had properly prepared and filed its federal tax returns, those returns would likely have reported significant taxable income that would have passed-through to Mott, Acosta, and the other Member Defendants to be reported on their own individual income tax

returns.  As a result, the Debtor's failure to file tax returns for several years in a row concealed and furthered the fraudulent scheme.

171.    In addition, Acosta, as the Debtor's corporate representative in the Florida Litigation, grossly mismanaged that litigation by, among other things, allowing the Debtor or its representatives to produce and file false or inaccurate documents and causing the Debtor to incur substantial unnecessary and avoidable legal fees, costs, and expenses.

172.    Similarly, Mott and Acosta grossly mismanaged the Debtor's Chapter 11 Case by, among other things, providing false or inaccurate testimony, allowing the Debtor or its representatives to produce and file false or inaccurate documents, and causing the Debtor to incur substantial unnecessary and avoidable fees, costs, and expenses.

173.    Further, upon information and belief, Mott also exercised complete dominion and control over Defendants Addy Road and Brent Road, two shell companies of which Mott was the sole Manager.  It appears that Addy Road and Brent Road had no material source of revenue other than the Fraudulent Transfers each received from TSI, had no legal or independent significance other than as extensions of Mott, and were used by Mott to syphon off millions of dollars of the Debtor's money.

> **J.      Badges of Fraud and Facts Supporting a Direct Inference of Fraudulent Intent**

174.    There are numerous badges of fraud and facts supporting a direct inference of actual intent to hinder, delay, and defraud the Debtor's Estate and its creditors.  For example, and without limitation:

> a.      The Fraudulent Transfers were made to or for the benefit of insiders of the Debtor.
>
> b.      The Fraudulent Transfers were concealed.  As a private company, the Debtor's transfers and transactions with its insiders were not known to creditors.  Moreover, during the Florida Litigation and during the Chapter

11 Case, Mott and Acosta, or their agents acting at their direction and on their behalf, concealed certain Fraudulent Transfers.

c.    The vast majority of the Fraudulent Transfers were made after demand had been made or the Debtor had been sued in the Florida Litigation.

d.    The Fraudulent Transfers, in the aggregate, were substantially all of the Debtor's assets. Among other things, the Debtor received more than $37 million from FEMA between 2017 and 2019 and failed to pay its creditors, but entered bankruptcy with only approximately $164,000 in the bank.

e.    Mott and Acosta used the Debtor to move and conceal assets, including through the use of alleged distribution payments to themselves and the other Member Defendants. Mott also moved and concealed assets through the use of her affiliated entities—Addy Road and Brent Road—and through the use of the transactions to acquire and improve the Real Properties.

f.    The Debtor did not receive any value, let alone reasonably equivalent value, for any of the Fraudulent Transfers.

175.    Mott and Acosta, or their agents, engaged in other over acts of fraud or dishonesty, including without limitation the following:

a.    wrongfully withholding documents and information in violation of the Florida District Court's orders and this Court's orders;

b.    producing fabricated or misleading documents regarding, among other things, the payments TSI received from FEMA for procurement of bottled water and the expenses incurred in connection therewith;

c.    making, allowing to be made, or receiving transfers of property of the Debtor, which transfers were made with intent to hinder, delay, or defraud the Debtor's creditors; and

d.    making false, misleading, or evasive statements, including under oath.

176.    Other indicia of fraud in this case include, without limitation, the following:

a.    Mott signed under penalty of perjury the Schedules and Statement, which contain numerous inaccurate statements;

b.    Mott falsely stated under oath that the Debtor had filed its 2018 and 2019 tax returns, relying on undated tax returns that bear Mott's signature; and

c.    Mott and Acosta have failed and refused to turn over books and records and continue to obstruct the Trustee's investigation.

177.    As further evidence of fraudulent intent, Addy Road and Brent Road—two limited liability companies owned or controlled by Mott—received millions of dollars in transfers of the Debtor's funds for no consideration.  Mott then used Addy Road to acquire title to the Bethany Beach Property for herself and used Brent Road to acquire the Bethesda Property.

178.    Then, JS, purporting to act as the sole member of Brent Road, signed the Articles of Dissolution for Brent Road and transferred title to the Bethesda Property to herself and her husband, BS, for no consideration to the Debtor.

179.    The fraud, breaches of fiduciary duty, and other misconduct by Mott, Acosta, and others, which were aided and abetted by the other Defendants, were part of one fraudulent scheme that began in or about 2017 and continued after the Petition Date, all to enrich the Defendants at the expense of the Debtor's Estate and its creditors, including the Internal Revenue Service.

### FIRST COUNT – ACTUAL FRAUDULENT TRANSFERS
#### Pursuant to 11 U.S.C. § 544;  and Applicable State Law, Including 6 Del. Code § 1304(a)(1) and Fla. Stat. § 726.105(1)(a) Against All Defendants

180.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

181.    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation, among other things, with actual intent to hinder, delay or defraud any creditor of the debtor.

182.    As set forth in detail in this Complaint, the Trustee seeks to avoid the Fraudulent Transfers set forth on **Exhibit A** and to recover the value thereof from the Defendants.

183.    Each of the Fraudulent Transfers was a "transfer" within the meaning of 6 Del. Code § 1301(12), Fla. Stat. § 726.102 (14), and 11 U.S.C. § 101(54).

184.     Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtor to and/or for the benefit of the Defendants.

185.     Each of the Fraudulent Transfers was made on or within four years prior to the Petition Date.

186.     Each of the Fraudulent Transfers was made with actual intent to hinder, delay, or defraud the Debtor's Estate and its creditors.  As set forth in detail in this Complaint, there are numerous badges and indicia of fraud.

187.     Among other things, each of the Fraudulent Transfers was made as part of a scheme to defraud the Debtor's Estate and its creditors by systematically looting the Debtor's assets for the benefit of the Defendants and to actively conceal and further that fraudulent scheme.

188.     None of the Defendants took any of the Fraudulent Transfers in good faith.

189.     The Debtor did not receive a reasonably equivalent value for any of the Fraudulent Transfers.

190.     At all times relevant hereto, the Debtor had at least one general unsecured creditor (the "Predicate Creditor") holding an allowable claim who, but for the Debtor's bankruptcy filing, would have standing to bring claims to avoid and recover the Fraudulent Transfers.   The Predicate Creditors include, without limitation, GPDEV, Simons, Bering Straits, and the Internal Revenue Service.

191.     Therefore, the Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 544 and applicable state law, including without limitation 6 Del. Code § 1304(a)(1) and Fla. Stat. § 726.105(1)(a).

**SECOND COUNT – ACTUAL FRAUDULENT TRANSFERS**
**Pursuant to 11 U.S.C. § 548(a)(1)(A)**
**Against Defendants Deborah Evans Mott, Steven M. Acosta, Christopher Mott,**
**John S. Maciorowski, Addy Road LLC, and TSI Gulf Coast, LLC**

192.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

193.    A trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two years before the petition date with actual intent to hinder, delay, or defraud any entity to which the debtor was or became indebted on or after the date such transfer was made or such obligation was incurred.

194.    As set forth in detail in this Complaint, the Trustee seeks to avoid the transfers listed on **Exhibit A** to the Complaint that were made within two (2) years prior to the Petition Date (collectively, the "Two Year Transfers") and to recover the value thereof from Defendants Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John S. Maciorowski, Addy Road LLC, and TSI Gulf Coast, LLC.

195.    Each of the Two Year Transfers was a "transfer" within the meaning of 11 U.S.C. § 101(54).

196.    Each of the Two Year Transfers was a transfer of property, or of an interest in property, of the Debtor to and/or for the benefit of the above-named Defendants.

197.    Each of the Two Year Transfers was made with actual intent to hinder, delay, or defraud the Debtor's Estate and its creditors.  As set forth in detail above, there are numerous badges and indicia of fraud.

198.    None of the above-named Defendants took any of the Fraudulent Transfers in good faith.

199.    The Debtor did not receive value for any of the Fraudulent Transfers.

200.    Therefore, the Two Year Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(A).

## THIRD COUNT – RECOVERY OF AVOIDABLE TRANSFERS
### Against All Defendants

201.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

202.    As set forth in detail in this Complaint, including on **Exhibit A** hereto, the Debtor made one or more Fraudulent Transfers to or for the benefit of each Defendant.

203.    The Defendants are the initial transferees, or the immediate, mediate, or subsequent transferee, of one or more of the Fraudulent Transfers.

204.    The Trustee may recover, and intends to recover, the Fraudulent Transfers and benefits therefrom from any and all mediate, intermediate, or subsequent transferees.

205.    Accordingly, the Trustee is entitled to avoid and recover the Fraudulent Transfers from the Defendants pursuant to pursuant to 11 U.S.C. § 550 and applicable law, including without limitation 6 Del. Code § 1307 and Fla. Stat. § 726.108.

## FOURTH COUNT – BREACH OF FIDUCIARY DUTY CLAIMS
### Against Defendants Deborah Evans Mott and Steve M. Acosta

206.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

207.    As set forth in detail in this Complaint, Mott and Acosta each were a Manager, a member of the Management Committee, and a fiduciary of the Debtor.

208.    Mott and Acosta owed the Debtor fiduciary duties of care, loyalty, and good faith.

209.    The duty of loyalty obligated Mott and Acosta each to commit themselves to the business of the Debtor with the attitude of promoting the interests of the Debtor and not themselves.

210.    The duty of loyalty is breached, *inter alia*: (a) when a fiduciary fails to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities; (b) when a fiduciary "abdicates" their fiduciary responsibilities; (c) when a fiduciary acts in bad faith; and/or (d) when a fiduciary engages in self-dealing.

211.    The duty of care is breached, *inter alia*: (a) when a fiduciary engages in an irrational decision-making process; and (b) when the conduct of a fiduciary rises to the level of "gross negligence."

212.    Without limiting the foregoing, Mott breached her fiduciary duties to the Debtor by, among other things:

> a.    making, or allowing to be made, significant unauthorized or improper transfers;
>
> b.    issuing checks, withdrawals, and/or wire transfers without the proper authorization or notice;
>
> c.    causing the Debtor to enter into transactions with its Managers, Members and/or their affiliates without proper authorization;
>
> d.    engaging in numerous acts of self-dealing, including in connection with the Real Properties;
>
> e.    causing or allowing the Debtor's funds to be commingled with the funds of other persons or entities;
>
> f.    using or allowing to be used the Debtor's funds to pay for automobiles and personal expenses of herself and/or other Defendants;
>
> g.    failing to maintain and preserve the Debtor's assets and records, including among other things the laptop computer;
>
> h.    failing to properly categorize or record the cash distributions made to herself, to Acosta, and to the Member Defendants;

i.      failing to hold meetings of the Management Committee;

j.      failing to conduct or maintain written records of votes, corporate resolutions, or written consents;

k.      failing to keep, or cause to be kept, accurate, complete and property books, records and accounts pertaining to the Debtor's affairs;

l.      failing to prepare, or cause to be prepared, monthly, quarterly, and annual financial reports;

m.      failing to establish appropriate internal controls to mitigate against the misappropriation of the Debtor's funds;

n.      failing to ensure that the Debtor's tax returns were properly prepared and filed for multiple tax years and then misrepresenting that the 2018 and 2019 tax returns had been filed;

o.      grossly mismanaging the Debtor's Chapter 11 Case; and

p.      engaging in other acts of fraud, gross negligence, or other material breaches of her fiduciary duties.

213.    Without limiting the foregoing, Acosta breached his fiduciary duties to the Debtor by, among other things:

a.      making, or allowing to be made, significant unauthorized or improper transfers;

b.      abdicating his fiduciary responsibilities and effectively gave Mott unfettered control of the Debtor's funds with grossly inadequate oversight;

c.      using or allowing to be used the Debtor's funds to pay for automobiles and personal expenses of herself and/or other Defendants;

d.      failing to maintain and preserve the Debtor's assets and records, including among other things the laptop computer;

e.      failing to hold meetings of the Management Committee and/or failing to maintain minutes of any such meetings;

f.      failing to conduct or maintain written records of votes, corporate resolutions, or written consents;

g.      failing to keep, or cause to be kept, accurate, complete and property books, records and accounts pertaining to the Debtor's affairs;

      h.      failing to prepare, or cause to be prepared, monthly, quarterly, and annual financial reports;

      i.      failing to establish appropriate internal controls to mitigate against the misappropriation of the Debtor's funds;

      j.      failing to ensure that the Debtor's tax returns were properly prepared, even though Acosta testified during the March Hearing that it would essentially be impossible for TSI to conduct business as a government contractor and not file tax returns;

      k.      grossly mismanaging the Florida litigation and the Debtor's Chapter 11 Case; and

      l.      engaging in other acts of fraud, gross negligence, or other material breaches of her fiduciary duties.

214.    The conduct of Mott and Acosta, as alleged in this Complaint, was intentional, reckless, and/or grossly negligent.

215.    At all times relevant hereto, Mott and Acosta each engaged in self-dealing, prioritizing their own interests and the interests of their affiliates over the interests of the Debtor.

216.    Accordingly, the business judgment rule does not apply and Mott and Acosta are subject to the entire fairness standard.

217.    Moreover, any applicable statute of limitations period was tolled because, at all times relevant hereto, Mott and Acosta were the Managers and the only members of the Management Committee, and the Debtor's resolutions and financial records were not available to creditors. Mott, in particular, exercised dominion and control over the Debtor's financial affairs and Acosta abdicated his fiduciary duties and acquiesced in Mott's dominion and control. As such, prior to the Petition Date, Mott and Acosta were the only individuals in a position to or with the information necessary to sue on behalf of the Debtor.

218.    As a result of the many breaches of fiduciary duties by Mott and Acosta as set forth herein, the Debtor has suffered damages in an amount to be determined at trial.

Case 22-10066-CTG   Doc 271   Filed 01/10/23   Page 41 of 54

## FIFTH COUNT – AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY
### <u>Against All Defendants</u>

219.     The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

220.     As set forth in detail in this Complaint, at all times relevant hereto, Mott and Acosta each was a Manager and member of the Management Committee of the Debtor and owed the Debtor fiduciary duties of care, loyalty and good faith.

221.     As also set forth in detail in this Complaint, Mott and Acosta each repeatedly breached his or her fiduciary duties of care, loyalty and good faith owed to the Debtor.

222.     Each of the Defendants aided and abetted these breaches of fiduciary duty.

223.     Each of the Defendants had knowledge that Mott's and Acosta's conduct was a breach of his or her fiduciary duties owed to the Debtor.

224.     Each of the Defendants substantially assisted and/or encouraged Mott and Acosta to breach his or her fiduciary duties owed to the Debtor.

225.     Mott aided and abetted Acosta's breaches of fiduciary duty by, among other things, (i) causing the Debtor to make significant unauthorized or improper transfers to or for the benefit of Acosta or one or more entities Acosta owned or controlled; (ii) failing to establish and implement proper internal controls or to follow basic corporate governance and recordkeeping, thereby concealing Acosta's breaches; (iii) failing to prepare and file tax returns for the Debtor, which would have reported significant taxable income passed-through to Acosta, thereby concealing Acosta's breaches; (iv) failing to take any steps in response to Acosta's breaches of fiduciary duty; and (v) numerous other acts and omissions as alleged in this Complaint.

226.     Acosta aided and abetted Mott's breaches of fiduciary duty by, among other things, (i) giving Mott unfettered control of the Debtor's funds and property and acquiescing in or

allowing the Debtor to make significant unauthorized or improper transfers to or for the benefit of Mott or one or entities Mott owned or controlled; (ii) failing to establish and implement proper internal controls or to follow basic corporate governance and recordkeeping, thereby concealing Mott's breaches; (iii) failing to take any steps in response to Mott's breaches of fiduciary duty; and (iv) numerous other acts and omissions as alleged in this Complaint.

227.    CM aided and abetted Mott's and Acosta's breaches of fiduciary duty by, among other things, (i) accepting significant unauthorized or improper transfers as part of the fraudulent scheme; (ii) failing to take any action to ensure that the Debtor's business and financial affairs were properly managed; and (iii) numerous other acts and omissions as alleged in this Complaint.

228.    JM aided and abetted Mott's and Acosta's breaches of fiduciary duty by, among other things, (i) accepting significant unauthorized or improper transfers as part of the fraudulent scheme; (ii) failing to take any action to ensure that the Debtor's business and financial affairs were properly managed; and (iii) numerous other acts and omissions as alleged in this Complaint.

229.    In addition, CM and JM, as Members of the Debtor, could have examined the Debtor's books and records and taken steps in response to Mott's and Acosta's gross mismanagement, blatant self-dealing, and other breaches of their fiduciary duties.  Instead, CM and JM did nothing to prevent the continuing harm to the Debtor and accepted their share of the fruits of the fraud.

230.    Addy Road is a limited liability entity that is owned and controlled by Mott.  Addy Road aided and abetted Mott's breaches of fiduciary duty by, among other things, (i) accepting significant unauthorized or improper transfers as part of the fraudulent scheme in the form of the transfers that paid for the Bethany Beach Property; (ii) being used as an instrumentality of that fraudulent scheme; and (iii) numerous other acts and omissions as alleged in this Complaint.

231.    Brent Road is a limited liability entity that was controlled by Mott.  Brent Road aided and abetted Mott's breaches of fiduciary duty by, among other things, (i) accepting significant unauthorized or improper transfers as part of the fraudulent scheme; (ii) being used as an instrumentality of that fraudulent scheme; and (iii) numerous other acts and omissions as alleged in this Complaint.

232.    Benjamin P. Smith aided and abetted Mott's breaches of fiduciary duty by, among other things, (i) accepting significant unauthorized or improper transfers as part of the fraudulent scheme in the form of the transfers that paid for the Brent Road Property; (ii) assisting and causing others to assist Mott with her fraudulent scheme and breaches of duty, in particular, with respect to the transfers that paid for the Brent Road Property, for which the Debtor received no consideration; and (iii) numerous other acts and omissions as alleged in this Complaint.

233.    Jessica M. Smith aided and abetted Mott's breaches of fiduciary duty by, among other things, (i) accepting significant unauthorized or improper transfers as part of the fraudulent scheme in the form of the transfers that paid for the Brent Road Property; (ii) assisting and causing others to assist Mott with her fraudulent scheme and breaches of duty, in particular, with respect to the transfers that paid for the Brent Road Property, for which the Debtor received no consideration; (iii) executing a deed to the Bethesda Property on behalf of Brent Road; (iv) executing and filing Brent Road's articles of dissolution; and (v) numerous other acts and omissions as alleged in this Complaint.

234.    TSI Gulf Coast is a limited liability entity that is owned and controlled by Acosta. TSI Gulf Coast aided and abetted Acosta's breaches of fiduciary duty by, among other things, (i) accepting significant unauthorized or improper transfers as part of the fraudulent scheme to

enrich Acosta; (ii) being used as an instrumentality of that fraudulent scheme; and (iii) numerous other acts and omissions as alleged in this Complaint.

235.    As a result of each Defendant's aiding and abetting of the breaches of fiduciary duty by Mott and/or Acosta as set forth herein, the Debtor has suffered damages in an amount to be determined at trial.

## SIXTH COUNT – DECLARATORY RELIEF (PIERCING THE CORPORATE VEIL)
### Against Defendants Deborah Evans Mott, Steven M. Acosta, Addy Road LLC, and Brent Road LLC

236.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

237.    As set forth in detail in this Complaint, the corporate form should be disregarded as between Defendants Mott, Acosta, Addy Road, and Brent Road and the Debtor because Mott and Acosta ignored corporate boundaries in favor of their own interests and the interests of the other Defendants over the interests of the Debtor and its creditors, as part of a scheme to defraud the Debtor's Estate and its creditors.

238.    Among other things:

a.      Mott and Acosta siphoned millions of dollars of the Debtor's funds to themselves and to the other Defendants, including using the Debtor's funds to (i) acquire the Real Properties in the name of Mott, her close family members and/or entities, (ii) make unauthorized and improper "distributions" to Mott, Acosta, and the other Member Defendants, (iii) pay unsupported expense reimbursements, and/or (iv) pay personal expenses of themselves or one or more of the other Defendants.

b.      Mott and Acosta failed to observe corporate formalities between the Debtor, on the one hand, and themselves and the other Defendants, on the other hand.  Among other things, Mott and Acosta failed to hold meetings or maintain minutes, failed to maintain books and records, failed to file tax returns, and commingled the Debtor's assets.

c.      Mott and Acosta were the only Managers and members of the Management Committee and exercised dominion and control over the Debtor.

d.      Upon information and belief, the Debtor had no officers or employees other than Mott, Acosta, and the other Member Defendants.

e.      The Debtor was undercapitalized relative to its corporate undertakings because of Mott and Acosta diverting the Debtor's funds to themselves and to the other Defendants.

f.      Mott and Acosta used the Debtor's corporate form as a facade for their individual interests, routinely engaging in unfair transactions that were in violation of the fiduciary duties owed to the Debtor.

g.      It would be unjust and unfair to allow Mott and Acosta to retain the financial benefits they received through their disregard of the Debtor's corporate form and interests, while saddling the Debtor's Estate and its creditors with millions of dollars in claims and other liabilities.

239.    In short, the Debtor had no legal or independent significance of its own and the Debtor's corporate form was a sham and existed for no other purpose than as a vehicle for the fraudulent scheme perpetrated by Mott, Acosta, and others.

240.    Further, upon information and belief, Mott also exercised complete dominion and control over Defendants Addy Road and Brent Road, two shell companies of which Mott was the sole Manager.  It appears that Addy Road and Brent Road had no material source of revenue other than the Fraudulent Transfers each received from TSI, had no legal or independent significance other than as extensions of Mott, and were used by Mott to syphon off millions of dollars of the Debtor's money.

241.    Accordingly, the Trustee seeks the entry of a judgment piercing the corporate veil, declaring that Mott, Acosta, Addy Road, and Brent Road are the alter egos of the Debtor and holding them jointly and severally liable for all liabilities of the Debtor's Estate.

## SEVENTH COUNT – UNJUST ENRICHMENT
### Against All Defendants

242.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

243.    In the alternative, the Trustee asserts claims for unjust enrichment against each of the Defendants.

244.    As set forth in this Complaint, each of the Defendants was enriched and received economic benefits without justification as a result of, but not limited to, the Fraudulent Transfers set forth on **Exhibit A** to this Complaint.

245.    Defendants have unjustly retained the sums received by each of them to the detriment of the Debtor's Estate and its creditors.

246.    The Debtor was impoverished as a result of the Fraudulent Transfers.  Without limitation, the Debtor did not receive a reasonably equivalent value for any of the Fraudulent Transfers, which resulted in substantially all of the Debtor's assets being syphoned off and the Estate being left with millions of dollars in unpaid claims and other liabilities.

247.    There is a direct relationship between the enrichment of the Defendants and the impoverishment of the Debtor's Estate, as the Fraudulent Transfers were made directly from the Debtor's bank account to or for the benefit of one or more of the Defendants.

248.    There is no justification at all for the Fraudulent Transfers, which were the product of self-dealings and other misconduct and are not supported by reasonably equivalent value.

249.    Accordingly, the Trustee is entitled to a judgment against each of the Defendants compelling them to disgorge and return the amounts by which they were unjustly enriched.

### EIGHTH COUNT – PRELIMINARY AND PERMANENT INJUNCTION
### Against All Defendants

250.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

251.    Pursuant to section 105(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules, the Trustee seeks preliminary injunctive relief enjoining each of the Defendants

and their agents and assigns from selling, assigning, transferring, encumbering or otherwise disposing of (i) the Real Properties and (ii) the Fraudulent Transfers, as to each Defendant, in the amounts set forth on **Exhibit A** to this Complaint and directing each Defendant to account to the Trustee for same.

252.    Section 105(a) provides that this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

253.    Bankruptcy Rule 7065 provides that "Rule 65 F.R.Civ.P. applies in adversary proceedings, except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)." Fed. R. Bankr. P. 7065.[9]

254.    A party is entitled to injunctive relief upon a showing of (i) reasonable probability of success in the litigation and (ii) more likely than not irreparable injury absent such relief.  If a party succeeds in making those showings, the court then conducts an overall balancing in consideration of two additional factors: (iii) the possibility of harm to other interested persons from the grant or denial of the injunction, and (iv) the public interest.

255.    As set forth in detail in this Complaint, there is a reasonable probability—in fact, there is a high probability—that the Trustee will succeed on the merits of his claims against the Defendants.

256.    As also set forth in detail in this Complaint, there is a real threat of irreparable harm if the Trustee is not granted an injunction.  Among other things, the Defendants have a well-documented history of efforts to hinder, delay, and frustrate judgment enforcement.

---

[9] Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security." Fed. R. Civ. P. 65(c).

257. For example, prior to the Conversion Date, Mott and Acosta, on behalf of themselves and the other Defendants, engaged in numerous overt acts to hinder, delay, and frustrate the Debtor's creditors, such as submitting false documents, altering documents, providing false, misleading or evasive testimony, and moving funds through shell companies, real estate, and third parties.

258. Following the Conversion Date, Mott and Acosta, on behalf of themselves and the other Defendants, have continued their efforts to hinder, delay, and frustrate the Trustee's investigation of the Debtor's assets and liabilities.

259. The balance of equities weighs in favor of granting the injunctive relief requested by the Trustee.

260. The Defendants will not suffer any true prejudice as they have no legal right to the Real Properties and/or the Fraudulent Transfers. Moreover, the injunctions would only remain in effect until the Trustee's money judgment has been satisfied.

261. The public interest would be served by granting the injunctive relief, as the Defendants have improperly diverted or received millions of dollars in transfers that were made with actual intent to hinder, delay, and defraud the Debtor's creditors and have gone to great lengths to conceal those ill-gotten funds transfers and to frustrate efforts to untangle their fraudulent scheme.

262. Absent the injunctive relief requested herein, the Trustee would suffer manifest prejudice as he would be compelled to repeat the "cat and mouse" game that the creditors were forced to undertake prior to the Petition Date in an effort to recover the Fraudulent Transfers and other damages to which the Trustee is entitled.

263.    Finally, no security should be required pursuant to Bankruptcy Rule 7065 and Rule 65(c), as the Trustee is seeking injunctive relief simply to prevent the diversion or dissipation of funds that have already been diverted and to recover such funds for the benefit of the creditor-victims of the fraudulent scheme perpetrated by Mott and Acosta for the benefit of themselves and the other Defendants.  The harm to the Defendants as a result of any preliminary or permanent injunctive relief would be minimal, if any harm exists at all.  No security bond is necessary or appropriate in this case.

264.    As set forth above, on July 14, 2022, the Court entered the Contempt Order, among other things, prohibiting the Member Defendants and their affiliates from transferring or encumbering three of the Real Properties for a period of six months, "without prejudice to the rights of any party to seek to terminate or to extend this prohibition."  The Contempt Order is set to expire on January 14, 2023 and does not cover the Bethesda Property.

265.    Accordingly, the Trustee is entitled to the entry of a preliminary injunction and a permanent injunction on the terms requested herein.

### NINTH COUNT – CONSTRUCTIVE TRUST
### Against All Defendants

266.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

267.    A constructive trust is an equitable remedy to redress a wrong.  When one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty, a constructive trust will be imposed.

268.    As set forth in detail in this Complaint, Mott, Acosta, and others—acting on their own behalf and on behalf of each of the Defendants—engaged in conduct that were fraudulent, unfair, and/or unconscionable.

269.    Among other things, Mott, Acosta, and/or their agents made knowing misrepresentations, concealed material facts, and/or made reckless misrepresentations, all in order to induce the Debtor's creditors to act to their detriment.

270.    In addition, Mott, Acosta, and/or their agents, among other things, engaged in unconscionable dealings, including the unfair use of their positions as Managers and members of the Management Committee and their control over TSI.  Mott and Acosta showed absolutely no regard for conscience and affronted the sense of justice, decency, and reasonableness.

271.    Mott and Acosta were each fiduciaries of the Debtor at the time of such conduct.

272.    As set forth in detail in this Complaint, each of the Defendants was directly and materially enriched was enriched by virtue of such fraudulent, unfair, and/or unconscionable conduct.

273.    Each of the Defendants received the Fraudulent Transfers and/or the Real Properties, as applicable, by fraud.

274.    Accordingly, each of the Defendants is the involuntary trustee of the Fraudulent Transfers and/or the Real Properties, as applicable, for the benefit of the Trustee in his capacity as Chapter 7 Trustee of the Estate.

275.    Accordingly, the Trustee seeks the entry of a judgment (a) declaring a constructive trust with respect to the Real Properties and the Fraudulent Transfers and (b) directing each of the Defendants, as applicable, to convey to the Trustee (i) title to the Real Properties and (ii) the Fraudulent Transfers, as to each Defendant, in the amounts set forth on **Exhibit A** to this Complaint.

## TENTH COUNT – AN ACCOUNTING
## Against Deborah Evans Mott and Steven M. Acosta

276.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if set forth at length.

277.    An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result.

278.    As set forth in detail in this Complaint, Mott and Acosta failed to maintain complete and accurate books and records of the Debtor's transfers to and transactions with Mott, Acosta, and the other Defendants.

279.    Upon information and belief, Mott and Acosta possess financial books and records relating to the Debtor.

280.    However, Mott and Acosta have each failed and refused to turn over the Debtor's complete books and records and/or actively concealed or destroyed the Debtor's books and records.

281.    At all times relevant hereto, Mott and Acosta each owed the Debtor fiduciary duties of care, loyalty, and good faith because they were the only Manages and the only members of the Management Committee of the Debtor.

282.    As set forth in detail above, Mott and Acosta each breached his or her fiduciary duties owed to the Debtor.

283.    As a result of Mott's and Acosta's breaches of his or her fiduciary duties, the Estate has suffered and will continue to suffer injury and irreparable harm as set forth in detail in this Complaint.

284.    The Trustee requires and is entitled to an accounting setting forth all of the Debtor's transfers to and transactions with Mott, Acosta, and the other Defendants, each of whom is an affiliate of Mott and/or Acosta.

285.    Accordingly, the Trustee seeks the entry of a judgment directing Mott and Acosta to perform a full and accurate accounting of all of the Debtor's transfers to or for the benefit of the Defendants for the period of August 1, 2017 through the date of entry of the judgment and to remit to the Trustee all funds owed to the Estate.

## ATTORNEY'S FEES

286.    Based upon egregious misconduct, bad faith, numerous breaches of duty, and other misconduct by Mott, Acosta and others, as set forth in this Complaint, which should be imputed to each of the other Defendants, who are family members, affiliated entities or otherwise directly benefited from such misconduct, the Trustee seeks an award of his reasonable attorney's fees and expenses incurred in connection with investigating, filing, and prosecuting this action.

## RESERVATION OF RIGHTS

287.    During the course of this proceeding, the Trustee may learn through discovery or otherwise of additional claims or causes of action that are actionable under the provisions of the Bankruptcy Code or other applicable law.  The Trustee reserves all rights to amend this original Complaint to, among other things, (i) modify of and/or revise to Defendants' names; (ii) add defendants; and/or (iii) add claims or causes of action, if applicable (collectively, the "Amendments"), that may become known to the Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to the filing of this original Complaint.

## CONCLUSION

WHEREFORE, Plaintiff George L. Miller, solely in his capacity as the Chapter 7 Trustee of the Estate of Team Systems International, LLC, demands judgment in his favor and against each of the Defendants, as follows:

a. The entry of a judgment in favor of the Trustee and against each of the Defendants avoiding and recovering the Fraudulent Transfers, in an amount to be determined at trial;

b. The entry of a judgment in favor of the Trustee and against Defendants Deborah Evans Mott and Steven M. Acosta holding them liable for their breaches of fiduciary duty, in an amount to be determined at trial;

c. The entry of a judgment in favor of the Trustee and against each of the Defendants holding them liable for aiding and abetting the breaches of fiduciary duty by Mott and/or Acosta;

d. The entry of a judgment piercing the corporate veil and declaring that Defendants Deborah Evans Mott, Steven M. Acosta, Addy Road LLC, and Brent Road LLC are each the alter ego of the Debtor and are jointly and severally liable for all of the liabilities of the Debtor's Estate;

e. The entry of a judgment in favor of the Trustee and against each of the Defendants the extent that they were unjustly enriched at the expense of the Debtor;

f. The entry of preliminary and permanent injunctions prohibiting and enjoining each of the Defendants from selling, assigning, transferring, or otherwise disposing of any of the Real Properties and the Fraudulent Transfers, as to each Defendant, in the amounts set forth on **Exhibit A** to this Complaint;

g. The entry of a judgment imposing a constructive trust upon each of the Defendants with respect to Real Properties and the Fraudulent Transfers, as to each Defendant, in the amounts set forth on **Exhibit A** to this Complaint;

h. The entry of a judgment Defendants Deborah Evans Mott and Steven M. Acosta to perform an accounting, as set forth above;

i. An award of reasonable attorneys' fees and costs;

j. An award of pre- and post-judgment interest; and

k.      Such additional relief as this Court deems just and equitable.

Dated: January 10, 2023                          **ARCHER & GREINER, P.C.**

                                                 */s/ Bryan J. Hall*
                                                 David W. Carickhoff (No. 3715)
                                                 Bryan J. Hall (No. 6285)
                                                 300 Delaware Ave., Suite 1100
                                                 Wilmington, DE 19801
                                                 (302) 777-4350
                                                 (302) 777-4352 (fax)
                                                 dcarickhoff@archerlaw.com
                                                 bjhall@archerlaw.com

                                                 *Counsel to George L. Miller,*
                                                 *Solely in his capacity as the*
                                                 *Chapter 7 Trustee of*
                                                 *Team Systems International, LLC*