**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| Team Systems International, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | **Hearing Date:  [Expedited Hearing Requested]**<br>**Objection Deadline: [Expedited Hearing**<br>**Requested]** |
| George L. Miller, solely in his capacity as the Chapter 7 Trustee of Team Systems International, LLC, | |
| Plaintiff, | Adv. Proc. No. 23-50004 (CTG) |
| -against- | |
| Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John S. Maciorowski, Addy Road LLC, Brent Road LLC, Benjamin P. Smith, Jessica M. Smith, and TSI Gulf Coast, LLC, and | |
| John Does 1-100, | |
| Defendants. | |

**MOTION OF THE CHAPTER 7 TRUSTEE FOR ENTRY OF AN ORDER
(I) EXTENDING THE FREEZE AND GRANTING PRELIMINARY
INJUNCTIVE RELIEF, AND (II) GRANTING RELATED RELIEF,
PURSUANT TO 11 U.S.C. § 105(a) AND FED. R. BANKR. P. 7065**

George L. Miller, solely in his capacity as the chapter 7 trustee (the "Trustee") of the

bankruptcy estate (the "Estate") of Team Systems International, LLC (the "Debtor" or "TSI"), and

Plaintiff in the above-captioned adversary proceeding, by his undersigned counsel, files this

Motion seeking the entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>,

granting injunctive relief to prevent the dissipation of the Real Properties and other Fraudulent

Transfers (each, defined below) and related relief.  Contemporaneously with the filing of this Motion, the Trustee has filed the Complaint[1] commencing the above-captioned adversary proceeding seeking, among other things, to avoid and recover the four Real Properties and other Fraudulent Transfers, as well as injunctive and other relief.  In support of this Motion, the Trustee relies upon and incorporates the Complaint, which is attached hereto as <u>Exhibit B</u>.  The Trustee also relies upon the Declaration of William A. Homony (the "Homony Dec."), filed contemporaneously herewith.  In further support of the Motion, the Trustee respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      As set forth more fully in the Complaint attached thereto, the Debtor's Managers—Deborah Evans Mott ("Mott") and Steven M. Acosta ("Acosta")—aided and abetted by the other named Defendants in the above-captioned adversary proceeding, engaged in scheme to transfer millions of dollars of the Debtor's funds to or for the benefit of one or more of the Defendants with actual intent to hinder, delay, or defraud the Debtor's Estate and its creditors.

2.      Mott and Acosta have attempted to conceal their fraudulent scheme by, among other things, failing and refusing to turn over records and other Estate assets.  This Court has repeatedly directed Mott and Acosta to turn over documents and information that are critical to the Trustee's ongoing investigation of the Debtor's assets and liabilities.  Instead, Mott and Acosta have obstructed the Trustee's investigation, forcing the Trustee to file and prosecute motions, respond to baseless motions and an appeal filed by Mott and Acosta, and seek discovery from Mott, Acosta and other parties pursuant to Bankruptcy Rule 2004, all of which has required substantial time and expense to the Estate.

---

[1] Capitalized terms used but not defined in this Motion have the meanings set forth in the Complaint.

3.      The reason for Mott's and Acosta's obstruction is now <u>abundantly clear</u>:  They have been attempting to hide the fact that they caused the Debtor to transfer more than **$14.5 million** in Fraudulent Transfers to enrich themselves and the other Defendants, who are close family members or entities owned or controlled by Mott or Acosta.  For example, Mott used at least $3.5 million of the Debtor's funds to acquire four Real Properties that are now held by Mott, her family members, or her entity Addy Road LLC.  In addition, Mott and/or Acosta failed to disclose large transfers of the Debtor's funds, including a $3 million transfer to Mott's entity, Addy Road LLC, which they attempted to conceal using a fraudulently altered bank statement.

4.      On July 14, 2022, this Court entered an order [D.I. 222] (the "Contempt Order"), among other things, prohibiting the sale or disposition of three identified Real Properties (the "Freeze").  The Freeze is set to expire on January 14, 2023, unless extended.  The Trustee's investigation recently uncovered a fourth property—the Bethesda Property.

5.      Accordingly, by this Motion, the Trustee seeks preliminary injunctive relief to prevent the sale, transfer, encumbrance, or other disposition of the Real Properties and other Fraudulent Transfers during the pendency of the adversary proceeding and related relief.

## JURISDICTION, VENUE, AND PREDICATES

6.      The District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), which has been referred to this Court.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408; 1409.  The Trustee consents to the entry of a final order by the Court on this Motion.  The predicates for the relief requested herein are section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 65 of the Federal Rules of Civil Procedure (the "Civil Rules").

## RELEVANT BACKGROUND[2]

**General Background**

7.      On January 18, 2022 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy.

8.      At all times relevant hereto Mott and Acosta have been the Managers and the members of the Management Committee of the Debtor.

9.      Defendants Christopher Mott ("CM") and John Maciorowski ("JM") are, together with Mott and Acosta, the Members of the Debtor and are sometimes collectively referred to as the Member Defendants.

10.     The other Defendants are close family members of Mott or are entities owned or controlled by Mott or Acosta.

11.     Prior to the Petition Date, TSI was a defendant in litigation commenced by GPDEV, LLC ("GPDEV") and Simons Exploration Inc. ("Simons") in the U.S. District Court for the Northern District of Florida.  It is alleged that, during the prepetition litigation, TSI's representatives withheld documents, produced documents that were created after the fact, frustrated efforts at judgment enforcement, and/or engaged in other misconduct.

12.     Following the Petition Date, GPDEV and Simons sought to have the Debtor's Chapter 11 Case dismissed.  In connection with their motion, GPDEV and Simons sought discovery from the Debtor, including taking Mott's deposition on February 7, 2022 (the "February 2022 Deposition").

13.     Soon after the February 2022 Deposition, GPDEV and Simons filed a motion for sanctions against the Debtor and, days later, the Debtor's original bankruptcy counsel withdrew.

---

[2] The Trustee respectfully directs the Court and parties to the Complaint for a further discussion of the factual background, which is incorporated by reference into this Motion.

14.     In March 2022, the Court held an evidentiary hearing on dismissal or conversion of the case, following which the Court issued its *Memorandum Opinion* on March 30, 2022 [Main Case D.I. 146] converting the Debtor's case to a case under chapter 7.

15.     On March 31, 2022 (the "Conversion Date"), the Court entered an order [Main Case D.I. 151] (the "Conversion Order"), among other things, (i) converting the Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code, and (ii) directing the Debtor to turn over to the Trustee all records and Estate property.

16.     Also on the Conversion Date, the Trustee was appointed as the chapter 7 trustee.

**Mott and Acosta Obstruct the Trustee's Investigation**

17.     Despite the requirements of the Conversion Order, the Debtor's representatives, in particular Mott and Acosta, failed to turn over all of the Estate's records and property.

18.     On June 9, 2022, the Trustee filed a motion [Main Case D.I. 186] (the "Contempt Motion"), seeking the entry of an order holding the Debtor, Mott, and Acosta in contempt for failing to turn over Estate property, including books and records, and prohibiting them from transferring or encumbering three identified Real Properties, namely the Ormond Beach property, the Bethany Beach Property, and the Blue Springs Property.

19.     On July 14, 2022, the Court entered the Contempt Order, granting in part the Contempt Motion.  Among other things, in the Contempt Order, the Court (i) designated Mott and Acosta to have the duties that the Bankruptcy Code and the Conversion Order impose upon the Debtor and (ii) ordered Mott and Acosta to turn over all assets, documents, and other property of the Debtor to the Trustee, including 14 specified categories of document and information or to identify the Bates numbers of the documents if already produced, or to provide an affidavit signed

by both Mott and Acosta if such documents no longer exist or never existed.  Contempt Order at ¶¶ 1-2.

20.    In the Contempt Order, the Court also prohibited Mott, Acosta, and the Debtor's other members (CM and JM) and their affiliates from "transferring or encumbering the Real Properties for a period of six months from the date upon which this Order is entered without prejudice to the rights of any party to seek to terminate or to extend this prohibition."  Contempt Order at ¶ 3.

21.    Further, in the Contempt Order, the Court denied without prejudice the request for sanctions and preserved the Trustee's right to renew such a request "if the circumstances warrant." Contempt Order at ¶ 5.

22.    Mott and Acosta filed to comply with the Contempt Order.

23.    Instead, on August 18, 2022, they filed a motion seeking to compel the Trustee to file a notice confirming receipt of documents [D.I. 239] (the "Motion to File Notice").

24.    On September 1, 2022, the Trustee filed an objection [D.I. 245] (the "Trustee's Objection") to the Motion to File Notice stating, among other things:

a.    Mott failed to appear either at the 341 meeting or at the hearing on the Contempt Motion.  Acosta served as the Debtor's only witness; however, he had no first-hand knowledge of the Debtor's accounting records;

b.    Mott and Acosta failed to provide an affidavit signed by both of them regarding the documents that were not produced;

c.    Mott and Acosta failed to produce originals and, in certain cases, produced redacted documents and/or emails without the accompanying attachments; and

d.    Mott and Acosta still had not produced a litany of documents, including (i) support for various disbursements between 2017 and 2022; (ii) support for payment of alleged "professionals service"; and (iii) various bank statements, cancelled checks, and other documents.

25.    Among other things, Mott and Acosta failed to produce support for the following:

      a.      $928,843.10 payment on July 10, 2019 from the Debtor's bank account at BBVA ending -7965;

      b.      $100,000.00 payment on May 14, 2018 from the Debtor's bank account at BBVA ending -8956; and

      c.      $3,000,000 bank transfer on February 27, 2020 from the Debtor's bank account at BBVA ending -2888.

26.    As discussed below and in the Complaint, the Trustee has since uncovered that these transfers relate to certain of Real Properties or other Fraudulent Transfers.

27.    Throughout the fall of 2022, the Trustee attempted to obtain copies of these and other missing documents from Mott and Acosta. Ultimately, however, the Trustee could not obtain the documents from Mott or Acosta. As a result, the Trustee was compelled to file motions pursuant to Bankruptcy Rule 2004.

28.    On November 10, 2022, the Trustee filed a motion [D.I. 260] (the "First 2004 Motion") seeking authority to, among other things, issue subpoenas for documents directed to various parties, including TSI Gulf Coast LLC (an entity that Acosta previously identified as his) and Addy Road LLC (an entity Mott previously identified as her), as well as certain third parties.

29.    On December 9, 2022, the Court entered an order granting the First 2004 Motion [D.I. 265].

30.    On November 22, 2022, the Trustee filed a motion [D.I. 262] (the "Second 2004 Motion" and, together with the First 2004 Motion, the "2004 Motions") seeking authority to, among other things, issue subpoenas for documents directed to Mott, Acosta, and the Shulman Rogers law firm, and/or examinations through oral testimony.

31.    On December 5, 2022, Mott and Acosta filed an objection [D.I. 265] to the Second 2004 Motion.

32.    On December 14, 2022, following a hearing before the Court, the Court entered an order [D.I. 268] granting the Second 2004 Motion [D.I. 268].

33.    In late-December 2022, the Trustee began issuing subpoenas pursuant to the 2004 Orders and has begun receiving documents from certain parties.

**The Trustee's Investigation to Date**

34.    While the Trustee's investigation remains ongoing, it has already identified numerous unauthorized "distributions," payments of unsupported "expense reimbursements" or personal expenses including luxury automobiles, a fourth Real Property acquired using the Debtor's funds, and evidence that Mott, Acosta and/or their agents attempted to conceal large transfers—all in an effort to hinder, delay, or defraud the Estate and creditors.

**The Real Properties**

35.    As set forth in the Complaint, Mott diverted at least $3.5 million of the Debtor's funds into four residential Real Properties that are currently titled in the name of Mott, Addy Road LLC (Mott's entity), or her close family members.  *See* Complaint ¶¶ 92-137.

36.    Among other things:

  a.    **Ormond Beach Property** – On April 12, 2018, TSI transferred the sum of $319,849.91 from its bank account at BBVA ending -8953 to Southern Title Holdings.  *See* Homony Dec., Ex. A.  The next day, Mott and her husband, JM, acquired the Ormond Beach Property.  *See* Homony Dec., Ex. B. Southern Title Holdings handled the closing.  *See id.*  As set forth more fully in the Complaint, during the Florida Litigation, Mott, Acosta and/or their agents falsely claimed that the transfers to pay for the acquisition and improvement of Ormond Beach Property were TSI business expenses.

  b.    **Bethany Beach Property** – Between June 4, 2019 and July 19, 2019, TSI transferred a total of $956,343.10 to the Tunnell & Raysor law firm.  *See* Homony Dec., Ex. C, D, E, F, G & H.  On July 22, 2022, Mott caused Addy Road LLC to acquire the Bethany Beach Property, and Tunnell & Raysor handled the closing.  *See* Homony Dec., Ex. I.  As set forth in the Complaint, during the February 2022 Deposition, Mott falsely claimed that TSI's payments to Tunnell & Raysor were for "professional services."  In fact, Tunnell & Raysor did not provide any legal services to TSI.

    c.    **Blue Springs Property** – On June 11, 2020, TSI transferred the sum of $75,072 to McBee Custom Homes LLC ("McBee") and on August 10, 2020, TSI transferred a total of $341,117.04 to Coffelt Land Title, Inc. ("Coffelt").  *See* Homony Dec., Ex. J, K & L.  Also on August 10, 2020, Mott Acquired title to the Blue Springs Property in her own name.  *See* Homony Dec., Ex. M.  McBee was the seller and Coffelt handled the closing.  *See id.*

    d.    **Bethesda Property** – Between May 14, 2018 and August 22, 2018, TSI transferred a total of $1,788,432.84 to the Shulman Rogers law firm or one of its attorneys, Benjamin P. Smith, who is Mott's son-in-law.  *See* Homony Dec., Ex. N, O, P & Q.  On August 30, 2018, Mott caused Brent Road LLC to acquire the Bethesda Property.  *See* Homony Dec., Ex. R.  Approximately ten months later, Brent Road LLC transferred title to the Bethesda Property to Jessica M. Smith, Mott's daughter.  *See* Homony Dec., Ex. S.

## Fraudulent Transfers

37.    As set forth in the Complaint, the Trustee has identified at least $14,507,245.10 in Fraudulent Transfers that were made by the Debtor to or for the benefit of Mott, Acosta, and/or the other Defendants during the four year period prior to the Petition Date.

38.    The Fraudulent Transfers include, without limitation, unauthorized and improper distributions to the Member Defendants, unsupported expense reimbursements, payments to various members of Mott's family without proper support or justification, and payments for automobiles, furniture, landscaping and other personal expenses of one or more of the Defendants, among other things.

## Fraudulently Concealed Transfers

39.    As set forth in the Complaint, Mott, Acosta, and/or their agents took steps to conceal certain of the Fraudulent Transfers from the Debtor's creditors and from the Trustee.

40.    For example, on February 27, 2020, TSI transferred the sum of $3,000,000.00 from TSI's account at BBVA ending -2888.

41.    Mott, Acosta, and/or their agents actively attempted to conceal this transfer.

42.    On or about February 2, 2022, representatives of the Debtor produced a document purporting to be the February 2020 bank statement for the Debtor's account at BBVA ending -2888.  That document bears the bates # TSI000180.  Following is an excerpt from that document:

Transaction History

| Date * | Check/Serial # | Description | Deposits/Credits | Withdrawals/Debits | End of Day Balance |
|--------|----------------|-------------|------------------|--------------------|--------------------|
| 2/3 | | IOD INTEREST PAID | $5,265.46 | | $3,821,675.54 |
| 2/18 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $500,000.00 | $3,321,675.54 |
| 2/27 | | INT. TRANSFER TO ACCOUNT | | $3,000,000.00 | $321,675.54 |
| Ending Balance on 2/29 | | | | | $321,675.54 |
| Totals | | | $5,265.46 | $3,500,000.00 | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

*See* Homony Dec., Ex. T.

43.    As reflected above, the text following "INT. TRANSFER TO ACCOUNT" appears to have been obscured using white-out or some other means to conceal information.

44.    During the February 2022 Deposition, Mott testified that this bank statement had been redacted "[b]ecause it had handwritten notes on it."

45.    The Trustee has obtained an unredacted copy of the February 2020 bank statement for the Debtor's account at BBVA ending -2888, which is excerpted below:

## Transaction History

| Date * | Check/Serial # | Description | Deposits/Credits | Withdrawals/Debits | End of Day Balance |
|--------|----------------|-------------|------------------|--------------------|--------------------|
| 2/3 | | IOD INTEREST PAID | $5,265.46 | | $3,821,675.54 |
| 2/18 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $500,000.00 | $3,321,675.54 |
| 2/27 | | INT. TRANSFER TO ACCOUNT XXXXXX4075 ADDY ROAD LLC | | $3,000,000.00 | $321,675.54 |
| Ending Balance on 2/29 | | | | | $321,675.54 |
| Totals | | | $5,265.46 | $3,500,000.00 | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

*See* Homony Dec., Ex. U.

46.    As the unredacted copy of this bank statement makes clear, the redacted information identifies that the $3 million was transferred to Addy Road, Mott's entity.

47.    This $3 million transfer was not listed in the Debtor's monthly transaction report. *See* Homony Dec., Ex. V.

48.    Mott, Acosta, and/or their agents attempted to conceal other transfers.

49.    For example, below is an excerpt of the February 2020 bank statement for the Debtor's account at BBVA ending -9759, which was produced during the Chapter 11 Case and bears bates # TSI000034.  Note the third transaction from the top dated February 27, 2020 in the amount of $50,000:

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|---|---|---|---|---|---|
| 2/24 | | ONLINE OR MOBILE WIRE TRANSFER REF 20200224F2QCZ60C003652   BNF Steven Matthew Aco | | $25,000.00 | $470,319.91 |
| 2/25 | | DEBIT FOR CHECKCARD XXXXXX2042 02/24/20 JON HALL CHEVROLET    DAYTONA BEACHFL | | $4,121.55 | $466,198.36 |
| 2/27 | | INT. TRANSFER TO ACCOUNT | | $50,000.00 | $416,198.36 | ← |
| 2/28 | | ONLINE OR MOBILE WIRE TRANSFER REF 20200228F2QCZ60C000806   BNF DEBORAH  MOTT | | $100,000.00 | $316,198.36 |
| Ending Balance on 2/29 | | | | | $316,198.36 |
| **Totals** | | | **$500,000.00** | **$482,898.76** | |

*See* Homony Dec., Ex. W.

50.    Below is an excerpt from the same February 2020 bank statement without the redaction:

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|---|---|---|---|---|---|
| 2/24 | | ONLINE OR MOBILE WIRE TRANSFER REF 20200224F2QCZ60C003652 BNF Steven Matthew Aco | | $25,000.00 | $470,319.91 |
| 2/25 | | DEBIT FOR CHECKCARD XXXXXX2042 02/24/20 JON HALL CHEVROLET    DAYTONA BEACHFL | | $4,121.55 | $466,198.36 |
| 2/27 | | INT. TRANSFER TO ACCOUNT XXXXXX3168 ADDY ROAD LLC | | $50,000.00 | $416,198.36 | ← |
| 2/28 | | ONLINE OR MOBILE WIRE TRANSFER REF 20200228F2QCZ60C000806 BNF DEBORAH  MOTT | | $100,000.00 | $316,198.36 |
| Ending Balance on 2/29 | | | | | $316,198.36 |
| **Totals** | | | **$500,000.00** | **$482,898.76** | |

*See* Homony Dec., Ex. X.

51.     This again appears to have been a deliberate attempt to conceal a transfer made by the Debtor to Addy Road.

52.     In addition, in March 2018, Mott and/or Acosta caused the Debtor to make significant transfers by check from its account at BBVA ending -8953 for automobiles, including the following:

| Check # | Check Date | Check Amount | Clear Date | Payee |
| --- | --- | --- | --- | --- |
| 2391 | 3/19/2018 | $112,228.80 | 3/20/2018 | Mercedes-Benz of North Florida |
| 2392 | 3/19/2018 | $74,766.86 | 3/21/2018 | Audi South Orlando |
| 2393 | 3/25/2018 | $31,511.55 | 3/26/2018 | Volkswagen of St. Augustine |

*See* Homony Dec., Ex. Y.

53.     In its monthly transaction report, the Debtor listed these payments for automobiles as "subcontractor" payments.  *See* Homony Dec., Ex. Z.

54.     During the February 2022 Deposition, Mott stated that "TSI doesn't own any vehicles."  Mott also admitted that she drives a Mercedes-Benz.

55.     Further, on May 10, 2021, the Debtor made two transfers to Mott in the amounts of $100,000.00 and $150,000.00, respectively, from its account at BBVA ending -2888, which Mott, Acosta and/or their agents attempted to conceal.

56.     Below is an excerpt of the May 2021 bank statement for that account, which was produced during the Chapter 11 Case and bears bates # TSI000138:

Transaction History

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|---|---|---|---|---|---|
| 5/3 | | IOD INTEREST PAID | $41.96 | | $604,342.27 |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF 2C?10510F2QCZ60C000563 | | $100,000.00 | |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF 90210510F2QCZ60C000564 | | $150,000.00 | $354,342.27 |
| 5/24 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $100,000.00 | $254,342.27 |
| Ending Balance on 5/31 | | | | | $254,342.27 |
| Totals | | | $41.96 | $350,000.00 | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

*See* Homony Dec., Ex. AA.

57.     Below is an excerpt from the same May 2021 bank statement without the redaction:

## Transaction History

| Date * | Check/ Serial # | Description | Deposits/ Credits | Withdrawals/ Debits | End of Day Balance |
|---|---|---|---|---|---|
| 5/3 | | IOD INTEREST PAID | $41.96 | | $604,342.27 |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF 20210510F2QCZ60C000563 BNF DEBORAH EVANS MOTT | | $100,000.00 | |
| 5/10 | | ONLINE OR MOBILE WIRE TRANSFER REF 20210510F2QCZ60C000564 BNF DEBORAH  MOTT | | $150,000.00 | $354,342.27 |
| 5/24 | | ONLINE BANKING TRANSFER TO ACCT *9759 | | $100,000.00 | $254,342.27 |
| Ending Balance on 5/31 | | | | | $254,342.27 |
| Totals | | | $41.96 | $350,000.00 | |

Please note, certain fees and charges posted to your account may relate to services and/or activity from the prior statement cycle.
* The Date provided is the business day that the transaction is processed.

*See* Homony Dec., Ex. BB.

58.     Once again, this appears to have been a deliberate attempt to conceal transfers made by the Debtor, this time to Mott.

59.     In the Debtor's monthly transaction report, the May 10, 2021 transfers are listed as payments to "subcontractor," not to Mott.  *See* Homony Dec., Ex. CC.

60.     Notably, the May 10, 2021 transfers to Mott listed above were made within one year prior to the Petition Date.  As discussed above, the Statement of Financial Affairs, which Mott

signed under penalty of perjury, does not list any transfers to Mott during the year prior to the Petition Date.

61.     On May 10, 2021, the Debtor made two transfers to Mott in the amounts of $100,000.00 and $150,000.00, respectively, from its account at BBVA ending -2888, which Mott, Acosta and/or their agents attempted to conceal.

62.     As set forth in the Complaint, there are other instances where Mott and/or Acosta attempted to conceal transfers to the Defendants, failed to disclose bank accounts, and hid or altered evidence.

## RELIEF REQUESTED AND BASIS THEREFOR

63.     By this Motion, the Trustee seeks the entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), (i) extending the existing Freeze with respect to the Ormond Beach Property, the Bethany Beach Property and the Blue Springs Property and expanding the Freeze to also include the Bethesda Property; (ii) prohibiting the Defendants from selling, assigning, transferring, encumbering, or otherwise disposing of the Real Properties; (iii) prohibiting the Defendants from transferring or disposing of the Fraudulent Transfers, as to each Defendant, in the amounts set forth on Exhibit A to the Complaint; (iv) directing the Defendants to account to the Trustee for the Real Properties and the Fraudulent Transfers; and (v) granting related relief as set forth herein.

## I.     Preliminary Injunctive Relief

64.     Bankruptcy Rule 7065 provides that "Rule 65 F.R.Civ.P. applies in adversary proceedings, except that a temporary restraining order or preliminary injunction may be issued on

application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)."[3]
Fed. R. Bankr. P. 7065.

65.    A party is entitled to injunctive relief upon a showing of (i) reasonable probability
of success in the litigation and (ii) more likely than not irreparable injury absent such relief.  If a
party succeeds in making those showings, the court then conducts an overall balancing in
consideration of two additional factors: (iii) the possibility of harm to other interested persons from
the grant or denial of the injunction, and (iv) the public interest.  *See*, *e.g.*, *Urban Commons
Queensway, LLC v. EHT Asset Mgmt., LLC  (In re EHT US1, Inc.)*, No. 21-10036, 2021 WL
3828556, at *1 (Bankr. D. Del. Aug. 27, 2021) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173,
179 (3d Cir. 2017)).

66.    A preliminary injunction is appropriate where the defendants may dissipate or
transfer assets before the entry of a final judgment.  *See*, *e.g.*, *Elliott v. Kiesewetter*, 98 F.3d 47,
55-56 (3d Cir. 1996) (affirming preliminary injunction imposing an asset freeze where plaintiffs
sought equitable relief); *EHT US1*, 2021 WL 3828556, at *1-2 (granting preliminary injunction to
freeze defendants' assets); *In re Soundview Elite Ltd.*, 543 B.R. 78, 81-83 (Bankr. S.D.N.Y. 2016)
(same); *In re Am. Tissue, Inc.*, No. 01-10370 KG, 2006 WL 3498065, at *1 (Bankr. D. Del. Dec.
4, 2006) (same).[4]

67.    In *EHT US1*, the Debtor filed a complaint alleging that, prior to the petition date,
its former principals had taken $2.4 million in Paycheck Protection Program loan proceeds that

---

[3] Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the
movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any
party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not
required to give security." Fed. R. Civ. P. 65(c).

[4] There is no question that this Court has the authority to issue an asset-freezing preliminary injunction in appropriate
circumstances, such as those presented in this case, where the Trustee asserts fraudulent transfer and equitable claims.
*See*, *e.g.*, *In re Owens Corning*, 419 F.3d 195, 208 n.14 (3d Cir. 2005); *Rubin v. Pringle (In re Focus Media, Inc.)*,
387 F.3d 1077, 1085 (9th Cir. 2004).

belonged to the Debtor and filed a motion "for preliminary injunctive relief to freeze sufficient funds of the defendants to ensure that the $2.4 million . . . will be returned to Plaintiff if it succeeds in its litigation against the Defendants." *EHT US1*, 2021 WL 3828556, at *1. The court found there was a "more than 50% likelihood that absent a preliminary injunction, the Defendants' assets will dissipate and Plaintiff will not recover" and granted the preliminary injunction. *Id.* at *2.

68.    In this case, the Trustee is entitled to the entry of an asset-freezing injunction to prevent the dissipation of assets by the Defendants.

**A.    Likelihood of Success on the Merits.**

69.    The Trustee is seeking to avoid and recover the Real Properties (or the value thereof) and at least $14 million in Fraudulent Transfers made by the Debtor to Mott, Acosta, and the other Defendants with actual intent to hinder, delay, or defraud creditors, pursuant to 11 U.S.C. §§ 544; 548(a)(1)(a); 550 and state law (6 Del. Code § 1301, *et seq.*; Fla. Stat. § 726.101, *et seq.*).

70.    As set forth in the Complaint, there are numerous badges of fraud[5] as well as facts that support a direct inference of fraudulent intent, including without limitation the following:

a.    The Fraudulent Transfers were made to or for the benefit of insiders of the Debtor. Mott and Acosta are Managers of the Debtor and each of the other Defendants is a close family member or entity owned or controlled by Mott or Acosta.[6]

b.    The Fraudulent Transfers were concealed. The Debtor as a private company and its transfers and transactions with the Defendants were not known to creditors. Moreover, during the Florida Litigation and during the Chapter 11 Case, Mott, Acosta, and/or their agents took steps to actively conceal their fraudulent scheme.

---

[5] As this Court has observed, "debtors rarely announce their fraudulent intentions for the world to hear. Accordingly, courts commonly will determine whether fraudulent intent can be inferred from the presence or absence of various 'badges of fraud.'" *In re MTE Holdings LLC*, No. 19-12269 (CTG), 2022 WL 3691822, at *3 (Bankr. D. Del. Aug. 24, 2022) (internal quotations omitted). *See* 6 Del. Code § 1304(b) (setting forth a nonexclusive list of factors); Fla. Stat. § 726.105(2) (same).

[6] *See* 11 U.S.C. 101(31) (defining "insider" to include, *inter alia*, a control person of the debtor or relative or affiliate thereof); 6 Del. Code. § 1301(7) (same); Fla. Stat. § 726.102(8) (same).

c.    The vast majority of the Fraudulent Transfers were made after demand had been made or the Debtor had been sued in the Florida Litigation.

d.    The Fraudulent Transfers represented, in the aggregate, substantially all of the Debtor's assets.  The Debtor received more than $37 million from FEMA between 2017 and 2019 and failed to pay its creditors, but entered bankruptcy with only approximately $164,000 in the bank.

e.    Mott and Acosta used the Debtor to move and conceal assets, including through the use of alleged distribution payments to themselves and the other Member Defendants.  Mott also moved and concealed assets through the use of her affiliated entities—Addy Road and Brent Road—and through the use of the transactions to acquire and improve the Real Properties.

f.    The Debtor did not receive any value, let alone reasonably equivalent value, for any of the Fraudulent Transfers.  Similarly, the Debtor received no value for the Real Properties, which were acquired using the Debtor's funds but are now held in the names of Mott, her husband, her daughter and son-in-law, and her entity Addy Road.

71.    As also set forth in detail in the Complaint, Mott, Acosta, and/or their agents, engaged in other overt acts of fraud or dishonesty, including without limitation the following:

a.    wrongfully withholding documents and information in violation of the Florida District Court's orders and this Court's orders;

b.    producing fabricated or misleading documents regarding, among other things, the payments TSI received from FEMA for procurement of bottled water and the expenses incurred in connection therewith;

c.    making, allowing to be made, or receiving transfers of property of the Debtor, which transfers were made with intent to hinder, delay, or defraud the Debtor's creditors; and

d.    making false, misleading, or evasive statements, including under oath.

72.    In addition, as set forth in detail in the Complaint:

a.    Mott signed under penalty of perjury the Debtor's schedules of assets and liabilities and statement of financial affairs, which contain numerous inaccurate statements, in particular, regarding undisclosed transfers to Mott, among others;

b.    Mott falsely stated under oath that the Debtor had filed its 2018 and 2019 tax returns, relying on undated tax returns that bear Mott's signature; and

   c. Mott and Acosta have failed and refused to turn over books and records and continue to obstruct the Trustee's investigation.

73. As further evidence of fraudulent intent, Addy Road and Brent Road—two limited liability companies owned or controlled by Mott—received millions of dollars in transfers of the Debtor's funds for no consideration. Mott then used Addy Road to acquire title to the Bethany Beach Property for herself and used Brent Road to acquire the Bethesda Property for her daughter and son-in-law, JS and BS, again, for no consideration to the Debtor.[7]

74. As set forth in the Complaint, including Exhibit A thereto, the Debtor made one or more Fraudulent Transfers to or for the benefit of each of the Defendants. Each of the Defendants is the initial, immediate, or mediate transferee of one or more Fraudulent Transfers and the Trustee can recover the asset transferred or the value thereof from the Defendants. *See* 11 U.S.C. § 550; 6 Del. Code § 1307; Fla. Stat. § 726.108.

75. This Court has observed that "a fraudulent conveyance claim, at its core, is one that alleges a debtor's transfer of assets that impairs a creditor's ability to collect the debt. The heartland of the activity to which the law of fraudulent conveyance is directed are efforts to hide assets from creditors by giving them to one's family, friends, or associates." *MTE Holdings*, 2022 WL 3691822, at *3 (quoting *Husky Inter'l Elec., Inc. v. Ritz*, 578 U.S. 356, 360-61 (2016)) (cleaned up). That is **_precisely_** what happened here.

76. While the other claims set forth in the Complaint have varying legal standards, at bottom, they all require the Trustee to demonstrate that the Defendants acted fraudulently or inequitably for their own benefit and to the detriment of the Debtor, its Estate, and creditors. For all the same reasons that the Trustee is likely to succeed on his actual intent fraudulent transfer

---

[7] Further, JS, purporting to act as the sole member of Brent Road, signed the Articles of Dissolution for Brent Road and transferred title to the Bethesda Property to herself and her husband, BS, even though Mott was the sole Manager of Brent Road.

claims, the Trustee it is also likely to succeed on his claims for breaches of fiduciary duty, aiding and abetting such breaches, veil piercing, unjust enrichment, constructive trust, and for an accounting.

### B.      Irreparable Harm to the Trustee

77.      A trial court has the equitable power in appropriate circumstances to issue an asset-freezing injunction to protect a future damages remedy.  *See*, *e.g.*, *Elliott v. Kiesewetter*, 98 F.3d at 55-56 (affirming preliminary injunction imposing an asset freeze where plaintiffs sought equitable relief).

78.      A party may establish "irreparably injury by showing that the freeze is necessary to prevent the consumption, dissipation or fraudulent conveyance of the assets that the party pursuing the asset freeze seeks to recover in the underlying litigation.  The fact that the assets subject to the Freeze Order are primarily money assets does not preclude entry of a freeze order enjoining the use of those assets."  *Id.* at 58; *see Gerardi v. Pelullo*, 16 F.3d 1363, 1373-74 (3d Cir. 1994) (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 205-06 (3d Cir. 1990)) ("[T]here is ample authority for the proposition 'that the unsatisfiability of a money judgment can constitute irreparable injury' for the purposes of granting a preliminary injunction," in particular, where "'the injunction is reasonably necessary to preserve the status quo, and thus to ensure the satisfaction of a potential future judgment ordering the transfer of money from defendants to plaintiffs.'"); *EHT US1*, 2021 WL 3828556, at *2 (granting preliminary injunction to freeze defendants' assets where the defendants had "a history of wrongful acts and have proven that they are capable of shuffling assets" and the defendants had "knowingly or recklessly made false statements").

79.      "In the bankruptcy setting, the Court should be especially sensitive to situations which could result in the dissipation of estate assets, . . . and the Court's responsibility to prevent

a wrongful taking of the bankrupt's assets provides it with a broader equitable power." *American Tissue*, 2006 WL 3498065, at *3 (granting preliminary injunction where the trustee showed that, absent such relief, there would be little, if any money remaining to recover for the wrongful disposition of the estate's assets).

80.    Here, as set forth above and in the Complaint, the Defendants, in particular Mott and Acosta, have a documented history of moving or concealing assets using undisclosed bank accounts and shell companies.  The Trustee's investigation to date has identified four Real Properties into which at least $3.5 million of the Debtor's funds were wrongfully converted.  The Trustee has also identified, among other things, two large Fraudulent Transfers totaling $5.5 million that were either (i) transferred into an undisclosed account or (ii) transferred to Mott's entity and that fact was concealed through the use of falsified documents and false testimony.

81.    The Trustee believes that, absent the relief requested herein, there is a high likelihood that Mott, Acosta, and the other Defendants will continue to move and/or conceal assets, thereby frustrating efforts to track down and recover fraudulently obtained property and funds. [8]

### C.    No Unreasonable Harm to Defendants

82.    Where a plaintiff has already lost its interests in property due to a "blatant fraud," courts generally find that the balance of the harms weighs in favor of the plaintiff." *Elliott v. Kiesewetter*, 98 F.3d at 59.  The standard is not <u>no</u> harm to the defendant.  Rather, courts apply a balancing of harms a preliminary injunction may limit the defendant's ability to use funds, even to pay living expenses, if the injunction "inflicts no more harm than reasonably necessary to prevent plaintiffs who are likely to prevail on the merits from suffering an irreparable injury." *Id.*

---

[8] Injunctive relief is also necessary to prevent the dissipation of assets because certain states do not recognize a notice of *lis pendens* for a lawsuit filed in a different jurisdiction. *See, e.g.*, *Permanent Fin. Corp. v. Taro*, 71 Md. App. 489, 495, 526 A.2d 611, 613 (Md. App. 1987) ("[T]he doctrine of *lis pendens*, as applied in Maryland, will operate against only real or leasehold property that is located in this State and that is the subject of an action pending in this State.").

at 58; *see, e.g., American Tissue*, 2006 WL 3498065, at *5 (allowing a sale of assets to proceed but granting injunctive relief to require that the proceeds of certain assets be held in escrow pending the outcome of litigation).

83.    Here, the requested injunctive relief would cause no more harm than is reasonably necessary to prevent the Estate from suffering irreparable injury.  On the contrary, the requested relief will preserve the status quo by preventing the sale or dissipation of the Real Properties pending the outcome of litigation.

84.    Similarly, the request to enjoin the Defendants from disposing of the Fraudulent Transfers, as to each Defendant, in the amounts set forth on Exhibit A of the Complaint is similarly appropriate and will not cause Defendants any unreasonable harm.  Mott and Acosta, in particular, have failed and refused to produce records and to account for a substantial portion of the Debtor's funds.  Notably, as set forth in the Complaint, the Debtor received over $37 million from FEMA between 2017 and 2019, and Mott and Acosta have failed to account for millions of dollars.  The amount of funds that the Trustee is requesting be frozen is a fraction of the funds that Mott, Acosta and/or the other Defendants have received and failed to account for.

### D.    The Public Interest

85.    "The public interest is served when the Court imposes relief which maintains integrity in financial and business dealings and protects bankrupt estates from misappropriation of assets." *American Tissue*, 2006 WL 3498065, at *5; *In re Soundview Elite Ltd.*, 543 B.R. 78, 120 (Bankr. S.D.N.Y. 2016) ("it is in the public interest that commercial obligors not dissipate their assets—or, when they have already done so, that they not do it again").

86.    Here, the public interest is particularly acute given that Mott and Acosta have brazenly defrauded the Debtor's Estate and creditors, made numerous false statements in

furtherance of their fraudulent scheme, and flouted court orders to provide documents and information that would enable the Trustee to investigate and recover the Estate's assets.

87.     In summary, the Trustee has established that he is entitled to the injunctive relief requested in the Motion.

### E.     No Security or Bond is Necessary

88.     Bankruptcy Rule 7065 incorporates Civil Rule 65's standard for injunctive relief and added a specific bankruptcy proviso that "a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)."  Fed. R. Bankr. P. 7065.

89.     Here, the Debtor entered bankruptcy with approximately $164,000 in the bank while more than $8.8 million in claims have been filed against the Estate.  The Defendants have seen to it that the Estate lacks meaningful resources to post a bond or other security.  Moreover, requiring a bond or other security would be tantamount to rewarding the Defendants for their fraud, systematic looting of Estate's assets, and other misconduct.

90.     The Trustee respectfully submits that the Court should exercise its discretion under Bankruptcy Rule 7065 and not require a bond or other security.

## II.     <u>Section 105(a) Relief</u>

91.     Section 105(a) of the Bankruptcy Code provides that "the court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 105 further authorizes this Court to take any action "necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."  *Id.*

92.     Pursuant to section 105 of the Bankruptcy Code and the Court's inherent authority, this Court has the power and jurisdiction to enforce its own lawful orders, *Travelers Indem. Co. v.*

*Bailey,* 557 U.S. 137, 151 (U.S. 2009), and to impose sanctions, *In re Vaso Active Pharmaceuticals, Inc.,* 514 B.R. 416, 421 (Bankr. D. Del. 2014).

93.    "Additionally, where, as here, the plaintiff is a bankruptcy estate trying to recover its assets for [distribution to creditors] . . . , there is an additional basis for injunctive relief preserving the property to be recovered." *Soundview*, 543 B.R. at 118.

94.    Section 105(a) provides a further basis for the relief requested by the Trustee in this Motion, either as injunctive relief or as a further sanction for Mott's and Acosta's continued violations of this Court's orders, as set forth above.  In addition, pursuant to section 105(a), the Trustee seeks an accounting from each of the Defendants as to the Real Properties and the Fraudulent Transfers.

## RESERVATION OF RIGHTS

95.    The Trustee's investigation remains ongoing and he expressly reserves the right to seek injunctive and/or other relief with respect to other parties, transfers, or real or personal property.  Nothing contained in this Motion or in the Complaint shall be construed as an admission against the Trustee, the Debtor or the Estate in any other matter or proceeding.  To the extent there is any inconsistency between this Motion and the Complaint, the Complaint (which is incorporated herein by reference) shall control.  On behalf of himself and the Estate, the Trustee expressly reserves all rights.

## BRIDGE ORDER

96.    The Trustee asserts that, pursuant to Del. Bankr. L.R. 9006-2, the Freeze imposed by the Contempt Order is extended until the Court acts on this Motion, without the need for the entry of a bridge order.  *See* Del. Bankr. L.R. 9006-2.

**PRIOR REQUEST**

97.     As set forth above, the Trustee previously sought and obtained the entry of the relief granted in the Contempt Order.

**NOTICE**

98.     Notice of this Motion will be served upon (i) each of the Defendants; (ii) counsel for Mott and Acosta in the main case; and (iii) the Office of the United States Trustee for the District of Delaware.   In light of the relief requested, the Trustee submits no further notice is required.

WHEREFORE, the Plaintiff Trustee requests entry of the proposed order, attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: January 10, 2023

**ARCHER & GREINER, P.C.**

*/s/ Bryan J. Hall*
David W. Carickhoff (No. 3715)
Bryan J. Hall (No. 6285)
300 Delaware Ave., Suite 1100
Wilmington, DE 19801
(302) 777-4350
(302) 777-4352 (fax)
dcarickhoff@archerlaw.com
bjhall@archerlaw.com

*Counsel to George L. Miller,*
*Chapter 7 Trustee*