## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| TEAM SYSTEMS INTERNATIONAL, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | |
| George L. Miller, solely in his capacity as the Chapter 7 Trustee of Team Systems International, LLC, <br> Plaintiff, | **Hearing Date: June 14, 2023 at 10:00 a.m. (ET)** <br> **Obj. Deadline: May 17, 2023 at 4:00 p.m. (ET)** |
| -against- | |
| Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John S. Maciorowski, Addy Road LLC, Brent Road LLC, Benjamin P. Smith, Jessica M. Smith, TSI Gulf Coast, LLC, TSI Education & Training, Inc., and Team Systems International Southeast LLC, and | Adv. Proc. No. 23-50004 (CTG) |
| John Does 1-100, <br> Defendants. | **Re: Adv. D.I. 37** |

### MOTION FOR ENTRY OF ORDERS: (A) STAYING PROSECUTION OF FIRST AMENDED COMPLAINT OR, ALTERNATIVELY, EXTENDING TIME TO ANSWER, MOVE OR OTHERWISE RESPOND; (B) CAPPING RECOVERY, IF ANY, UNDER FIRST AMENDED COMPLAINT; (C) GRANTING RELIEF FROM THE AUTOMATIC STAY TO PERMIT TSI MEMBERS TO FUND APPEAL TO ELEVENTH CIRCUIT, (D) COMPELLING THE TRUSTEE TO ABANDON THE $8.2 MILLION RECEIVABLE; (E) COMPELLING TRUSTEE TO ABANDON DEBTOR'S BUSINESS; AND (F) <u>GRANTING RELATED RELIEF</u>

Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John S. Maciorowski (collectively, the "<u>TSI Members</u>" and, with Addy Road LLC,  the "<u>Defendants</u>"), by and through their undersigned counsel, hereby file this motion for entry of orders: (a) staying prosecution of the first amended complaint or, alternatively, extending time to answer, move or otherwise

respond; (b) capping the Trustee's recovery, if any, under the first amended complaint; (c) granting

relief from the automatic stay to permit TSI Members to fund[1] Appeal to Eleventh Circuit, (d)

compelling the Trustee to abandon the $8.2 million receivables; (e) compelling the Trustee to

abandon Debtor's business; and (f) granting related relief (collectively, (a)-(f), the "Motion"), and

respectfully state as follows:

## PRELIMINARY STATEMENT

1.    The Trustee testified[2] he is experienced collecting accounts receivable from the

federal government and represented that the estate has net income of $11,765,420 and is, therefore,

solvent.[3]  The nearly $22 million in accounts receivable; *i.e.*, *property of the estate,* is nearly 2½

times the amount necessary to pay the asserted claims of all creditors in full before any claims are

reduced or expunged.  That is fortunate for creditors of the estate (and should also be fortunate for

TSI Members) because it should inform the Trustee to administer the estate quickly and at low

cost.  For example:

    (a)    Because there is sufficient property in the estate to pay the maximum amount of estate claims in full, it is not necessary to incur substantial (or perhaps any) professional fees to *augment* the estate; *i.e.*, prosecute the FAC or the First and Second PI.  The Trustee correctly embraced this practical point of view when he was running for election as the permanent trustee.[4]

    (b)    Until the accounts receivable have been collected, the Appeal prosecuted and the claims vetted, there is no need to incur the expenses of administration attendant to the exercise of avoidance powers.  To the extent

---

[1] The TSI Members seek relief from the *Order Regarding the Motion of the Chapter 7 Trustee for Entry of an Order (I) Extending the Freeze and Granting Preliminary Injunctive Relief, and (II) Granting Related Relief, Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7065 with Respect to the Member Defendants and Addy Road LLC* [Bankr. D.I. 299] (the "PI Order") for the limited purpose of funding the Appeal.

[2] *See* June 30, 2023 Hearing Transcript, attached hereto as **Exhibit A**, at 36:16-37:2.

[3] *See* the Debtor's 2021 tax return prepared, filed and signed by the Trustee under penalty of perjury [Bankr. D.I. 282-1] (showing $21.76 million in receivables and net income of $11.76 million).  A copy of the tax return is attached hereto as **Exhibit B**.

[4] *See* June 15, 2022 Hearing Transcript, attached hereto as **Exhibit C**, at 46:13-47:5; *see also* ¶ 35 *infra*.

it is determined the estate has been depleted, the avoidance power sections work in tandem with §550 to restore value to the estate. However, Third Circuit law is clear that the avoidance powers cannot be used to recover transfers for the benefit of the *debtor*.

(c)     But now that he has been elected, the Trustee has abandoned his campaign promise in favor of pursuing expensive, time-consuming litigation. The inevitable consequence is that: (a) flying the fiduciary flag, the Trustee's professionals will engage in *carte blanche* billing; (b) the first amended complaint, seeking to avoid and recover ***surplus***, unnecessarily will prolong the cost of and time for the administration of the case; (c) it is uncertain whether such professional fees are necessary or will add value to the estate, and (d) if, at the conclusion of the case, such billing proved unnecessary, the Trustee will blame the Defendants.

(d)     Even more troubling, the Trustee purposely may not pursue certain appropriate actions in an effort to justify enhanced professional billing; *e.g.,* not prosecute the Appeal and not seek to collect as much as $8.2 million in estate receivables.

(e)     The Trustee should sequence the administration of the estate in a manner calculated to pay § 726(a)(2) creditors in full without § 726(a)(1) creditors preying on TSI Members. Logic and economy of effort should govern. The Trustee *first* should collect all accounts receivables, prosecute the Appeal to conclusion and vet claims *before* incurring professional fees to collect on the first amended complaint or seek injunctive relief. The Trustee is proceeding in reverse order. That maximizes professional billing at a time when it is unclear whether any such billing is even necessary. But, in doing so, the Trustee is violating bedrock bankruptcy law: a Trustee cannot collect surplus just to pay himself.

(f)     Although the Trustee may feign indignation at this charge, suing the TSI Members for $32 million with $22 million in the estate already to pay $8.9 million in claims that may be substantially reduced when (and if!) the Appeal is prosecuted and claims are vetted speaks for itself.

(g)     In addition to a § 550 cap, a companion issue is whether the Trustee has standing to sue TSI Members for $32 million to pay, at most, $8.9 million in estate claims? The TSI Members own 100% of TSI. What creditor's rights is he championing in seeking an ***excess*** recovery? The answer is his own and his professionals. Painting the TSI Members in a very poor light is just cover for a punitive lawsuit that seeks as its true goal high professional fees. But is that what the 7 creditors of the estate want or do they want to be paid in the shortest amount of time with the least amount of associated cost? Should TSI Members, in effect, be forced to pay all the Trustee's professional fees if it turns out the prosecution of the first amended complaint and injunctive relief was not necessary to pay creditors

in full?  Should the Trustee be permitted to, in effect, hide those costs by not prosecuting the Appeal and not seeking to collect $8.2 million in receivables?

2.      The TSI Members collectively are the one hundred percent (100%) owners of TSI. The TSI Members are *not* the fulcrum security and they have no interest in receiving a §726(a)(6) distribution.  If the Trustee makes a §726(a)(6) distribution that confirms he was overzealous in augmenting the estate, a result he should seek to avoid consistent with Third Circuit law.  The TSI Members are the aggrieved parties in this solvent estate, *not* the estate creditors.  The lawful claims of estate creditors will be paid in full.

3.      Every dollar the Trustee or his professionals charge the estate over the amount necessary to pay creditors in full comes at the direct expense of TSI Members.  And it is far from clear he has to charge the estate any amount given the amount of outstanding accounts receivable. The TSI Members seek a practical alternative to the way the Trustee is administering the estate. If not addressed, an absurd result may occur.  The Trustee may end up merely cycling cash:  suing the TSI Members for $32 million[5] and then returning that same money to the TSI Members pursuant to §726(a)(6) minus a very substantial "tax."

4.      The Court should not permit the Trustee to augment the estate beyond what is necessary to pay estate creditors.  The Third Circuit has held that "a debtor is not entitled to benefit from any avoidance."  *Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 761 n.26 (3d Cir. 2013).  Distilled to its essence, the TSI Members do not want to pay their lawyers to defend the FAC and, in effect, pay the Trustee's commission and his lawyers to prosecute the FAC, when other common sense *collaborative* solutions to creditor recoveries exist.  Litigation is an especially expensive and wasteful path for the Trustee to follow

---

[5] Exhibit A to the FAC, setting forth the aggregate amount of alleged fraudulent transfers, totals $32 million.

if even one of the following efforts is successful: (a) collection of the accounts receivable, (b) prosecution of the Appeal or (c) reducing or expunging claims.

5.      This Motion seeks redress from the Trustee's current action and inaction to preserve and protect the rights of the TSI Members.   The TSI Members urge the Trustee to adopt conservatism in his administration of the case: collect all outstanding accounts receivable and prosecute the Appeal.  Both efforts will cost the estate $0.  If the Appeal is successful, the Trustee's burden of making 100% distributions to creditors may be reduced by 70.3 % or more after claims are vetted.  Prosecution of the FAC should be stayed until it is determined estate augmentation is actually necessary.  By this Motion, the Defendants seek such a stay or, alternatively, an extension of time to answer, move or otherwise respond to the FAC.[6]

6.      Logic and practicality suggests that the Trustee should embrace a collaborative effort with TSI Members in seeking to vet claims by, among other things, accepting their long-standing offer to pay the cost of prosecuting the Appeal.  Unfortunately, the Trustee, without explanation, has not accepted that offer.  The Trustee appears in no rush (thirteen months and counting) to prosecute a free Appeal but has no issue with his professionals saddling the estate with substantial professional fees to avoid and recover transfers in case he decides not to prosecute the free Appeal for undisclosed reasons.  This approach makes little sense unless, by way of cynical example, the Trustee wants to keep the amount of estate claims high to justify legal fees pursuing the FAC and/or has an informal deal with the Judgement Creditors.

7.      The Trustee has devoted much time, energy and ink painting the TSI Members in an unfavorable light.  While that branding campaign was underway, the Appeal remained dormant and, as it appears, no effort was made by the Trustee to collect $8.2 million in receivables.  The

---

[6] The request for an extension of time is for **all** defendants captioned in the FAC.

Trustee's alleged inaction on the receivables is consistent with the punitive nature of his estate administration.  The Trustee, no doubt, will blame the TSI Members for *his* failure to preserve and collect estate property.  The Trustee's purposeful lapse of a statute of limitations to collect the receivables, however, cannot justify incurring professional fees pursuing the FAC.

8.     Conservatism and proper estate stewardship suggests a stay of the FAC is appropriate.  If augmentation is necessary, and the FAC is prosecuted, a §550 cap is warranted.  The capped amount should be determined only *after* all receivables have been collected, the Appeal has been fully prosecuted and claims vetted.  The risk that the Trustee incurs excessive legal fees in his zeal to litigate the FAC, and the First and Second PI should be borne by the Trustee's professionals, not the TSI Members.

9.     This Motion is also filed to *preserve* the estate's value.  Subject to discovery, the TSI Members express concern that the Trustee may not be seeking to collect $8.2 million in accounts receivable.  Even worse, his inaction may be *for strategic reasons*.  The Trustee has an affirmative duty to preserve the estate but the statute of limitations for collection on certain receivables is rapidly approaching.  Put bluntly, the Trustee may not wish to collect the $8.2 million receivable preferring instead to rack up fees seeking to collect the same amount under the FAC.  By not collecting the $8.2 million receivable, the Trustee is breaching his fiduciary duty to preserve valuable estate assets and engaging in corporate waste at the expense of the Defendants.  At the same time, it is *unlawful* and *impossible* for TSI Members to collect any receivables.  The receivables are estate property and collection by TSI Members is prevented by the automatic stay.  Further, collection by TSI Members is impossible because the Trustee closed the Artisan's Bank Account, TSI's only SAM-registered bank account.

10.     If the FAC is not stayed, the TSI Members need relief from the PI Injunction and cash to continue to pay professional persons to defend that action.  To the extent discovery reveals the Trustee is not seeking to collect the $8.2 million in receivables, and intends to let the statute of limitations expire, the Court should direct the Trustee to abandon collection of the $8.2 million receivable to the TSI Members.

11.     The Trustee has also elected not to run TSI's business that otherwise is profitable.  For example, as the Trustee knows, the federal government post-petition has been sending over 700 fuel orders for TSI to fulfill.  If the Trustee does not want that work, the TSI Members do.  It should be abandoned to the TSI Members.  Otherwise, it also is corporate waste.

12.     No further shaking is required, the Polaroid picture of the Trustee's intended case administration is quite clear.  The Trustee intends to use the TSI Members, especially Ms. Mott, as the perpetual "whipping boys" as cover for unnecessarily saddling the estate with millions in dollars of professional fees.  The Trustee may make no effort to collect $8.2 million in receivables and slow roll or never prosecute the Appeal.  Keeping the aggregate amount of claims against the estate high and looking past low hanging fruit in favor of pursuing costly litigation does not justify legal fees.  Those fees come at the direct expense of the TSI Members.  It should be entirely unacceptable for the estate to end up burdened with substantial and unnecessary legal fees.  While the Trustee may shrug dismissively and say it "is … your clients' own doing[,]"[7] this Motion is brought to prevent that result.

## JURISDICTION

13.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).  The statutory predicates for relief are

---

[7] *See* email from Trustee's counsel dated April 6, 2023, attached hereto as **Exhibit D.**

§§105, 550, and 554 of the Bankruptcy Code, Rule 5009 of the Fed. R. Bankr. P. and Local

Bankruptcy Rules 5009-2(a) and (b) and 9006-2.

## RELEVANT BACKGROUND

### A.    TSI's Governmental Business.

14.    The Debtor was formed as a LLC under the laws of the State of Delaware in 2001.

The LLC has four members – Debbie Mott, Steve Acosta, John Maciorowski, and Chris Mott.

Prior to the Conversion Date (later defined), the Debtor was engaged in the business of serving the

United States government as a contractor.  TSI has performed government projects as a prime

contractor and subcontractor in the areas of program development, financial and contacts

management, tactical and specialized military training development, naval ordinance engineering,

information systems design and integration, and military firearms training.  TSI was awarded the

role of a prime contractor on the US Navy Seaport-E contract, as well as the Uniformed Services

University DoD Training and Simulation $51M IDIQ MATOC.  TSI has contracted with numerous

agencies, including the FBI, U.S. Army, U.S. Navy, U.S. Customs, Border Protection, and Defense

Logistics Agency and the Federal Emergency Management Agency ("FEMA").  TSI follows all

regulations of the National Industrial Security Program Operating Manual for sensitive contracts

and cleared members, and maintains a cost accounting system that has been approved by the

Defense Contract Audit Agency.

15.    The Debtor operated profitably for over 22 years, and paid its valid creditors

consistently and on time.  The Debtor has no secured debt.

### B.    TSI Set Up a SAM-Registered Account with Artisan's Bank.

16.    All federal contractors **must** be registered in SAM.gov, a US Government database.

To access and register in SAM, all contractors are assigned a Cage Code and a Unique Identifier

Number.  All Contractor POC (Point Of Contact) are issued login credentials **in their individual**

**capacity**.  They are individual specific, not company specific.[8]    Controlled Unclassified

Information (CUI) policy prohibits sharing credentials to access SAM.  Violations are a criminal

act.[9]

17.     TSI set up a SAM-registered bank account with Artisan's Bank (the "<u>SAM</u>

<u>Account</u>").  The SAM Account is TSI's only SAM registered account.  Many times in this case,

the Trustee and/or his counsel have requested Ms. Mott or Mr. Acosta's personal login credentials.

As noted, however, their respective logins are personal and not estate property.  It is also a

confusing request because, upon information and belief, both the Trustee and his counsel have

their own SAM login credentials.  Further, both Ms. Mott and Mr. Acosta hold S/TS clearances

with access to databases that are **not** open to the Trustee without higher level clearance.  Lacking

the requisite clearance, each request by the Trustee to gain access to a higher clearance database

may be a criminal violation of federal law.  Accordingly, Ms. Mott and Mr. Acosta cannot share

their credentials without risking criminal prosecution.

18.     The TSI Members repeatedly have advised the Trustee and his counsel that the

SAM login credential *is Ms. Mott's personal login* and cannot be shared as set forth above.  It does

not belong to TSI and is not property of the estate.  Still, thirteen months since the Conversion

Date, the Trustee still is demanding Ms. Mott's personal credentials.  *See* Ex. D ("We have been

asking since the conversion to be provided with any necessary credentials.  As of this writing, we

have not been provided with TSI's credentials to SAM.  Those credentials need to be provided to

the trustee and he can update the bank information.").

---

[8] Upon information and belief, it is a federal crime to use another person's credentials.  *See* 32 CFR Part 2002 and GSA Order CIO 2103.2 CUI Policy.  *See also* screenshot attached hereto **Exhibit E**.

[9] The Trustee and his counsel are well aware of this.  They each have a unique identifier and a cage code to be able to bid for and perform work for the United States Federal Government.

19.     This claim rings hollow for several reasons.  <u>First</u>, the Trustee closed the Artisan's bank account so there is no bank information to update.  And without the SAM Account, the TSI Members have no way to collect any accounts receivable even if they were permitted to do so (which they are not pursuant to §362).  <u>Second</u>, as the Trustee and his counsel both know (because they both have SAM accounts in their own/their firm's names), when logging on to SAM there is a US Government warning that states *anyone sharing their personal credentials risks criminal prosecution.  See* Ex. E.[10]  <u>Third</u>, upon information and belief, both the Trustee and his counsel are registered with and knowledgeable about SAM.  Both the Trustee and his counsel have the requisite log in credentials to submit a claim and collect accounts receivable from the federal government.

### C.     TSI is Owed Accounts Receivable from the Federal Government in Excess of $21.7 Million, More than Enough to Pay Estate Creditors in Full.

20.     There are two sets of account receivables owed to the estate.  The first receivable, in the amount of $13.5 million, is owed by FEMA for nonpayment of TSI's invoice for FEMA's reduction in the initially ordered quantity of bottled water (the "$13.5 Million Receivable").  The law firm Venable LLP was retained by the Trustee to collect this receivable for the benefit of the estate.  That claim, not unexpectedly, was denied by the U.S. Civilian Board of Contract Appeals.  The next step in the collection process is for the Trustee to file an appeal with the District Court.  As of the date hereof, it is unknown whether the Trustee has yet filed that appeal.

21.     The second set of receivables, in the aggregate amount of $8.2 million, comprise the following items:

- The amount of $6.8 million concerning a change order claim against FEMA;

---

[10] Ms. Mott previously has shown this warning to the Trustee.

- The amount of $198,000 concerning the DLA Aviation cable firing harness order; and

- The amount of $1.2 million concerning the DLA Energy Fuel RME contract.

(collectively, the "$8.2 Million Receivables").[11]

22.     The $8.2 Million Receivables are dated.  The deadline[12] to file a claim to collect some or all of the $8.2 Million Receivable is fast approaching.[13]  The TSI Members advise that, given the slow collection process, the $8.2 Million Receivable may be collected in approximately 120-150 days.  Upon information and belief, the Trustee has not yet submitted any claim.

**D.     The TSI Members have Provided the Trustee with all Documents and Information Necessary to Collect $8.2 Million in Accounts Receivable.**

23.     For the $6.8 receivable owed by FEMA, all information concerning expenses were maintained by Bering Straits, TSI's "designated subcontractor" on the FEMA task order.  The TSI Members have produced to the Trustee all Bering Straits documents needed to collect on this receivable.  The TSI Members also repeatedly informed the Trustee that such information was also contained in the Bering Straits proof of claim.  *See* Claims Register at Claim No. 1;  *see also* June 30, 2022 Hrg. Tr. (Ex. A):

Mr. Mann:     Since Mr. Miller filed the sanction motion, have you provided him any additional documents?

---

[11] *See* Debtor's Schedules of Assets and Liabilities [Bankr. D.I. 28, Schedule A/B, Part 3, Question 11, pp. 2-3 of 11] (these three receivables are listed on Schedule A/B).  Notably, due to clerical error, the amount of the second ($198,000) and third ($1.2 million) receivables were incorrectly listed on the Schedules.  Ms. Mott requested in writing twice that counsel to the Debtor file an amended schedule, correcting many errors, including the correct amount. However, no amended schedules were filed.

[12] Pursuant to Section 33.206 (Initiation of a Claim) of the Federal Acquisition Regulation, governmental contractors like TSI have a six-year statute of limitation to submit claims for payment against the government.  *See* 48 C.F.R. § 33.206(a) ("Contractor claims shall be submitted, in writing, to the contracting officer for a decision **within 6 years after accrual of a claim**, unless the contracting parties agreed to a shorter time period") (emphasis added).

[13] *See also* March 14, 2022 Hearing Transcript, attached hereto as **Exhibit F**, at 106:13-15 (Mr. Mark St. Moritz, the Debtor's expert witness, testified: "The actual clause is FAR 33206, which is claims.  And that says that they have -- **you have six years to make a claim against the government**.") (**emphasis** added).

> Mr. Acosta:    We have.  We provided Bering Straits – so, Bering Straits was our subcontractor on the MATOC and I sent over all of Bering Strait's books and records.  That was their part, or their job as a subcontractor was taking care of all books and records.  I submitted all email, everything that has to do with the claim, the change order, and we've given the contracts for the DLA.

*Id.* at 88:4-12.

> Mr. Carickhoff:    Okay.  And would the company have maintained those records to be able to properly litigate those claims?
>
> Mr. Acosta:    Like I said, Bering Straits was our subcontractor, they kept all our books, the books and records on that past order and I've sent everything to you.
>
> Mr. Carickhoff:    Did you ever provide invoices from Lindsay Blee to the trustee?
>
> Mr. Acosta:    I think we did because they're a creditor.

*Id.* at 101:18-102:2.

## E.    The Appeal.

24.    The TSI Members assume the Court's familiarity with the Florida litigation that has been described several times in this case.  TSI **and the Trustee** both dispute the damages awarded to GPDEV ($2,770,855) and Simons ($2,483,722).  TSI timely appealed to the United States Court of Appeals for the Eleventh Circuit (the "Appeal") and retained appellate counsel who, upon information and belief, filed an opening brief.  It is undisputed that the only way to contest the claims filed by the Judgement Creditors in the bankruptcy case is to prosecute the Appeal.  Ms. Mott has volunteered to fund the cost of the Appeal.  Without explanation, the Trustee has not accepted Ms. Mott's offer.

25.    A motion for stay relief to prosecute the Appeal was filed.  *See* Bankr. D.I. 38.  The Court also approved, by Order dated February 8, 2022, the retention of the Bresky law firm to prosecute the Appeal.  *See* Bankr. D.I. 75.  The stay relief motion was never heard.

**F.      The Chapter 11 Bankruptcy Filing.**

26.      On January 18, 2022 (the "Petition Date"), TSI commenced its voluntary case under Chapter 11 of the Bankruptcy Code.  The Debtor's chapter 11 case never had the chance to get off the ground.  Shortly after the Petition Date, Debtor's counsel abruptly withdrew leaving the Debtor without counsel for several weeks at a critical juncture in its case.

27.      On March 31, 2022 (the "Conversion Date"), following a hearing on dismissal or conversion of the case, an order was entered converting the case from chapter 11 to chapter 7. George L. Miller (the "Trustee") was appointed as the interim chapter 7 trustee.

**G.      The Trustee Election**

28.      The chapter 7 case is solvent and, not surprisingly, a trustee election ensued.  In connection with the disputed election the Trustee objected to the claims asserted by the Judgment Creditors and represented to the Court that the Judgement Creditors held "disputed" claims "as to both liability and amount" that are subject to a "compelling" appeal (the "Trustee's Objection to the Judgment Creditors' Claims").  *See* Bankr. D.I. 164 at ¶ 8 ("By the Appeal, the Debtor continues to dispute both the Debtor's liability on, and the amount of, the Judgments on various grounds. . . .  The Opening Brief [filed in the Appeal] details the Debtor's various disputes with respect to the Judgments and the Trustee incorporates the Opening Brief into this Preliminary Objection by reference."); *see also* June 15, 2022 Hrg. Tr. (Ex. C) at 55: 4-16 (The Trustee testified that he "think[s] [the Appeal] has merit," that he "could probably resolve these [by] settling with the creditors," and "absolutely" agree that issues on appeal should be further explored "because the mistakes are so large, you know, we're talking several million dollars."); Bankr. D.I. at 177 at ¶ 29 ("Despite the [Judgment Creditors'] efforts to undermine the arguments raised by the Debtor in the Appeal and Opening Brief, the Appeal is compelling").  By order dated July 28, 2022, Mr.

Miller was appointed to serve as permanent chapter 7 trustee (the "Trustee") of Teams Systems International, LLC ("TSI" or "Debtor").   That was more than eight (8) months ago, and the Trustee's interest in prosecuting the Appeal (for free) unexplainably has waned.

**H.    There are Seven (7) Filed Proofs of Claim against the Estate.**

29.    Only seven (7) creditors filed proofs of claim in this case and those claims mostly relate to the Florida litigation.   The aggregate amount of filed proofs of claim is $8,878,066.67 before the objection-allowance process.   The Trustee disputes the claims asserted by the Judgment Creditors.   So do the TSI Members.   The reversal on Appeal of the Judgement Creditors' claims aggregating $6,246,075.78 might drastically change the administration of the estate.   Such a reduction in claim amount might obviate the need for the Trustee to prosecute the FAC or seek injunctive relief.   The only way to object to the claims of the Judgement Creditors is to prosecute the Appeal which, to date, the Trustee has not done.

30.    At least three of the filed proof of claims in an aggregate amount over $2.5 million are facially objectionable.   First, according to the Trustee, the claim of Bering Straits Logistics Services ("BSLS") in the amount of $1,516,745.69 is objectionable.   *See Preliminary Objection of the Chapter 7 Trustee to Proof of Claim Filed by Bering Straits Logistics, LLC* [Bankr. D.I. 166]; *see also Objection Of Deborah Mott, Steven Acosta, Christopher Mott and John S. Maciorowski To Motion Of The Chapter 7 Trustee and For Entry Of An Order (I) Extending The Freeze And Granting Preliminary Injunctive Relief, And (Ii) Granting Related Relief, Pursuant To 11 U.S.C. § 105(A) and Fed. R. Bankr. P. 7065* [Bankr. D.I. 282].   Second, the claim of Lindsay Blee Americas LLC in the amount of $1,050,198.50 is objectionable.   Lindsey Blee's proof of claim is *contingent* on TSI collecting a $1.2 million account receivable from DLA Fuels.   Third,

the IRS proof of claim for a late filing fee in the amount of $24,360 is disputed because it was paid. *See* **Exhibit G** attached hereto.

**I.      TSI has a Viable and Profitable Business.**

31.    TSI historically and consistently paid its valid creditors in the ordinary course and was never insolvent.[14]  The fact that the FAC seeks to recover $32 million allegedly transferred out of TSI in the last four years only serves to confirm its profitability.[15]  Post-petition, pursuant to section 721 of the Bankruptcy Code, the Trustee is authorized to run the Debtor's business if he so chooses.  During the post-petition period, the federal government has offered TSI fuel fulfillment orders that could have generated in excess of $1 million for creditors of the estate.[16]  The Trustee, however, has not allowed the members of TSI to take on *any* business.  *See* February 8, 2023 email from undersigned to Trustee's counsel, attached hereto as **Exhibit H** ("I advised that TSI has an active contract (or maybe it was rejected through the Trustee's inaction) with the Defense Logistics Agency and, to date, has received over 100 orders for fuel worth in aggregate over $1 million.  That is corporate waste, and needs to be remedied.  That revenue could have been realized and helped solve problems.  We need to solve that loss of value going forward and all

---

[14] The 2021 tax return filed by the Trustee shows a $21 million receivable that may be used to pay **all** creditors in full. *See* Ex. B.  The fact that the Debtor entered bankruptcy with a $21 million receivable is entirely inconsistent with the hyperbole of the FAC, "Defendants Deborah Evans Mott ("Mott") and Steven Acosta ("Acosta"), aided and abetted by the other Defendants, perpetrated a brazen scheme to hinder, delay, and defraud the Debtor's Estate and its creditors while systematically looting the Debtor's assets."  FAC at 1. What part of the Defendants' repeated offer to pay for the Appeal and collect the $8.2 million receivable is the alleged "brazen scheme"?

[15] Defendants in no way admit any liability for the amount sought to be avoided and recovered by the FAC or even that the amount is correct.

[16] Between March 2022 and March 2023, TSI received approximately 700 requests for the sale of fuel, which TSI could have bid on and profited by approximately $1,000,000.  The Trustee was fully informed of these business opportunities, but took no action.  *See* exchange of emails (nearly 600 pages) between Steven Acosta and counsel to Trustee, attached hereto as **Exhibit I**.  *See also* **Exhibit J**, an email exchange between TSI Member Steve Acosta and the Trustee concerning fulfilling a fuel order for the USS Sirocco on the DLA energy MATOC.

rights are reserved."). Despite many requests from TSI Members, the Trustee has indicated he is not interested in running TSI's business or allowing the TSI Members from doing so.

### J.    The First Amended Complaint

32.    Although the Trustee has no interest in running TSI's business to augment the estate, he is very interested in suing the TSI Members (and incurring expenses of administration) for that purpose. To that end, the Trustee filed a First Amended Complaint against the TSI Members, among others. The Complaint contains thirteen (13) causes of action and seeks recovery of **over $32 million** from the TSI Members, among others.

### RELIEF REQUESTED

33.    By this Motion, the TSI Members seek the following relief:

(a)    A stay of prosecution of the FAC or, alternatively, extending the time to answer, move or otherwise respond to the FAC,

(b)    A cap, pursuant to §550, on the Trustee's recovery, if any, under the FAC determined at the conclusion of the case,

(c)    Relief from the Automatic Stay (and Preliminary Injunction) to Permit TSI Members to Fund the Appeal to Eleventh Circuit,

(d)    Compelling the Trustee to Abandon the $8.2 Million Receivable,

(e)    Compelling Trustee to Abandon Debtor's Business, and

(f)    Granting Related Relief.

### ARGUMENT

### I.    Prosecution of the FAC Should be Stayed or, Alternatively, the Time to Answer, Move or Otherwise Respond Should be Extended.

34.    Although the existence of a solvent estate coupled with a cost-free path of administration suggests the cooperative approach is best, the Trustee instructed his professionals to seek injunctive relief and draft a 65 page, 343-paragraph First Amended Complaint filed on April 6, 2023 (the "FAC"). The FAC seeks to avoid and recover $32 million, more than 3½ times

necessary to pay § 726(a)(2) creditors in full.  The preparation of the requests for injunctive relief and FAC no doubt required the Trustee and his counsel's firm to incur very substantial expenses of administration.  Those fees and expenses come directly at the expense of TSI Members.[17]

35.    The Trustee did not always believe running up expenses of administration was in the best interests of creditors or the way to administer a solvent estate.  At the hearing on the contested election, a question was posed about his proposed administration of the case:

> Q:    During one or both of the phone calls, there was some discussion of the fact that you didn't believe you could pursue the insider transfers prior to the resolution of the FEMA claims.  Is that still your belief?
>
> A:    I never said that.  I could pursue the insider claims, but it would be premature.  And the reason it's premature is because we have approximately $23 million in claims against FEMA and if you collect $23 million of claims against FEMA and your judgment, you know, your judgment -- your client's judgments are about $6 million.  So, I've got $23 million in the bank, I'm writing you a check for $6 million and you're paid off.
>
> And so, that's the quickest way, as a trustee – and the cheapest way, because I have now engaged a client – an attorney, who's going do it all on a contingency basis.  So, there's no need for any money to recover fees and expenses, you know, chasing assets throughout the United States.

*See* June 15, 2022 Hrg. Tr. (Ex. C) at 46:13-47:5.

36.    The TSI Members respectfully request that the Court exercise its powers under section 105 of the Bankruptcy Code to stay prosecution of the FAC until all receivables are collected, the Appeal is a final order either allowing or disallowing the claims held by the Judgment Creditors and the claims that are subject to obvious objection have been vetted. At that juncture in the case, the Trustee will know whether there are sufficient estate funds to pay § 726(a)(2) creditors in full.  The Trustee's proposed avoidance and recovery of funds through the FAC may be excess,

---

[17] The TSI Members reserve the right to contend that all estate professional fees incurred in connection with preparation and prosecution of the requests for injunctive relief and the FAC provided no value to the estate.

in which case they are only necessary to pay professionals' fees.  The Trustee should not be free to choose the litigious route just to earn fees for his professionals.

37.    There are four factors courts evaluate before staying an action: (1) the likelihood that the movant will prevail on the merits, (2) whether the movant will suffer irreparable harm if the court denies the stay, (3) that the non-movant will not be harmed if the stay is imposed and (4) granting the stay will serve the public interest. *Republic of Philippines v. Westinghouse Elec. Corp.,* 949 F. 2d 653, 658 (3d Cir. 1991) (stay denied pending interlocutory appeal using four factor review). *See also Halperin v. Moreno (In re Green Field Energy Servs.),* 2017 Bankr. LEXIS 1739 (Bankr. D. Del. June 23, 2017).

## A.    Success on the Merits.

38.    The Trustee has already testified under oath that the most expeditious and cost-effective way to administer the TSI bankruptcy estate is to collect the accounts receivable first.[18] The Court should hold the Trustee to his campaign promise.  It is self-evident and a matter of common sense to pick the low hanging fruit first before racking fees.  It makes no sense to seek to augment the estate before it is determined that augmentation is necessary or whether a combination of collecting the receivables and prosecuting the Appeal is sufficient.  Developing the FAC at high cost to recover $32 million to pay (at most) $8.9 million in claims is excess.  One cynical

---

[18] *See* June 15, 2022 Hrg. Tr. (Ex. C) at 44:13-21 (Cross of Mr. Miller):

Q    Okay.  And I think we sort of just hit the nail on the head, that in your view, the FEMA claims are the source of recovery for this case?

A    It is one source of recovery, yes.  It's the, you know, the **quickest source of recovery** because the trial is imminent and these types of claims are resolved in a number of days.

My experience is, you know, your clients wanted to file fraudulent conveyances, which, you know, which are problematic at this point in time, in my opinion.

conclusion to be drawn is that the Trustee is prosecuting the FAC to pay unnecessary professionals' fees.

39.     There is a likelihood of success on the merits because the TSI Members are requesting relief that is practical, and a course of action the Trustee initially (and correctly) proposed.  If granted, the relief may save the estate substantial money.  The TSI Members do not reasonably expect the Trustee should have any opposition to prosecution of the Appeal for free unless he has an undisclosed understanding with the Judgement Creditors about their ending claim amount.  As for abandonment, it makes no sense to let the collection of estate assets; *i.e*., the receivables, go to waste or for someone not to capitalize on TSI's business opportunities from the federal government.

**B.      The TSI Members Will be Irreparably Harmed if a Stay is Not Granted.**

40.     The TSI Members will be irreparably harmed if the FAC is not stayed.  Third Circuit law does not permit the Trustee to avoid and recover surplus money for the Debtor; *i.e.*, the TSI Members.  Every dollar the Trustee incurs for professional fees is, in effect, being paid by the TSI Members.  In addition, if the Trustee elects not to collect the $8.2 million receivable, that is both irreparable harm to both creditors of the estate and the TSI Members and constitutes corporate waste.  The FAC is not a collection backstop because the Trustee chooses not to collect certain receivables or fails to reduce claims by not prosecuting the Appeal.

**C.      The Trustee and Estate Will Not be Irreparably Harmed if a Stay is Granted.**

41.     The Trustee and estate will not be irreparably harmed (or even harmed) if the Trustee does what he already testified he would do; *i.e.,* collect the receivables first.  To the contrary, the estate will benefit by having lower expenses of administration.  This is the most sensible and economical course of action, as is prosecuting the Appeal for free.  Any other activity, such as prosecuting the FAC and seeking injunctive relief, serves another agenda with a different

motive.  If the Trustee does not intend to collect certain receivables or pursue federal work orders, they should be abandoned.

### D.    The Issuance of the Stay is in the Public Interest.

42.    The public has a strong interest in bankruptcy estates being administered at low cost, expeditiously and in accordance with Third Circuit law.  The public has an equally strong interest in estates being administered for the benefit of creditors with allowed claims, and no other purpose. The law does not permit the Trustee to seek to avoid and recover surplus.  The Trustee's failure to prosecute the Appeal is punitive in nature, and can only benefit the Judgment Creditors whose claim should be tested, especially if that may be accomplished at no cost to the estate.

43.    If a stay is not granted, pending disposition of this Motion, **all** the defendants in the captioned adversary proceeding seek a thirty (30) day extension of their time to answer, move or otherwise respond to the FAC[19] from and after the date the Court enters an order either denying or granting the requested stay.  An extension is also warranted because the litigator retained to defend the Second PI and FAC withdrew.  *See* Adv. D.I. 57.

## II.    The Trustee's Recovery Under the FAC, if any, Should be Capped.

44.    As noted, there are seven (7) claims asserted in the Debtor's chapter 7 case and they aggregate approximately $8.9 million.  That amount may be substantially reduced after the Appeal is prosecuted and a claims-objection process occurs – possibly to as low as $0 - 1 million.  The Trustee is not entitled to augment the estate in an amount that is more than necessary to satisfy allowed creditor claims against the Debtor.  *See Giuliano v. Schnabel (In re DSI Renal Holdings,*

---

[19] *See* Local Rule 9006-2 Bridge Orders Not Required in Certain Circumstances. Unless otherwise provided in the Code or in the Fed. R. Bankr. P., if a motion to extend the time to take any action is filed before the expiration of the period prescribed by the Code, the Fed. R. Bankr. P., these Local Rules or Court order, the time shall automatically be extended until the Court acts on the motion, without the necessity for the entry of a bridge order.

*LLC*), Nos. 11-11722 (KBO), 14-50356 (KBO), 2020 Bankr. LEXIS 283 (Bankr. D. Del. Feb. 4, 2020) ("*DSI*").

45.     In *DSI*, the Delaware Bankruptcy Court determined that any recovery obtained by a chapter 7 trustee on account of an avoidance action pursuant to § 550 must be limited to the total amount of allowed creditor claims and administrative expenses in the bankruptcy case.  The trustee in *DSI* sought to avoid a multiple of the amount necessary to pay creditors in full.  In approving the "capping motion", the Court agreed that if the chapter 7 trustee were successful, the debtors would impermissibly receive the excess after the creditors and administrative expenses were paid.  Any other result is punitive in nature, a result not envisioned by the Bankruptcy Code.  That is exactly the result the Trustee seeks here, and the holding in *DSI* should be applied with full force to prevent that result.

46.     The conclusion reached in *DSI* is built on binding precedent.  The Third Circuit held that "a debtor is not entitled to benefit from any avoidance."  *Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 761 n.26 (3d Cir. 2013); *accord, e.g.*, *In re Messina*, 687 F.3d 74, 82 (3d Cir. 2012).   Rather, as the court explained in *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, "courts have limited a debtor's exercise of avoidance powers to circumstances in which such actions would in fact benefit the creditors, not the debtors themselves.  Rather than improving the debtor's own bottom line, empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors.   The use of this authorization for the *benefit of creditors* is at the heart of the avoiding powers."   226 F.3d 237, 244 (3d Cir. 2000) (*emphasis* added). *See also Wellman v. Wellman*, 933 F.2d 215, 219 (4th Cir. 1991) (debtor could not pursue

fraudulent transfer claim that would result in a surplus beyond what was necessary to satisfy creditor claims).

47.    The conclusion reached in *DSI* also results from a plain reading of the interaction between the avoidance powers and § 550(a).  The avoidance powers seek to remedy a pre-petition depletion of the estate but only up to the amount necessary to pay creditors of the estate with allowed claims.  *See* 11 U.S.C. § 550(a) (permitting avoidance and recovery only "for the benefit of the estate.").  That limitation bars the Trustee's obvious litigation overreach here and his strategy to create a need for avoidance by not collecting the $8.2 million receivable and, therefore, more litigation.  There is $22 million in property of the estate.  The aggregate claims pool may vastly be reduced by the Appeal or otherwise.  There is a better solution than litigation and litigation should only commence if there is a demonstrated need for it.

48.    The FAC seeks to augment the estate by a recovery of $32 million.  If successful, the Trustee will have succeeded in collecting ***at least*** $23 million more than necessary to pay creditors in full.  The Trustee should be limited in his collection efforts and permitted only to collect what is necessary to pay valid claims of creditors.  That amount could be $0.  This also will (hopefully) curb substantial expenses of administration being incurred primarily to pay the Trustee and his professionals.[20]  *See Allonhill, LLC v. Stewart Lender Servs., Inc. (In re Allonhill, LLC)*, 2019 WL 1868610, at *52 (Bankr. D. Del. Apr. 25, 2019) ("to the extent a [bankruptcy estate]

---

[20] The TSI Members reserve the right to object to fee applications submitted by the Trustee's professionals. Professional Fees are not expenses of administration if they do not provide value to the estate.  For example, in the administration of the case, the Trustee could have requested a consensual freeze on the Real Properties and then sought to collect the difference between the value in the properties and the asserted claims against the estate which is not a large amount, if any, and no admission as to value is hereby made.  The receivables alone should cover that difference, if not much more.  By simultaneously prosecuting the Appeal and vetting claims, the Trustee could release properties from the freeze as additional receivables are received and/or the aggregate claim amount is reduced.  Instead, the TSI Members are faced with having to pay for their lawyers and the Trustee's lawyers, the Appeal is not being prosecuted, the Trustee has turned his back on $8.2 million receivable and their once profitable business (which is still profitable) is ruined.

prevails on its avoidance claims, it cannot recover in excess of outstanding creditor claims") .   The Bankruptcy Code provides that after satisfying all administrative expenses and allowed creditor claims, the remainder of the litigation proceeds are disbursed to the TSI Members.    11 U.S.C. § 726(a)(6).  The TSI Members are the aggrieved parties by each dollar unnecessarily collected by the Trustee.

49.    The conclusion reached in *DSI* is common sense.  The only true beneficiaries from cycling cash are the Trustee and his professionals.  Suing equity to create a return for equity makes no sense.  The impractical consequence is to impose an enormous "tax" of professional fees and Trustee's commissions on the TSI Members.  The Trustee would be running the case primarily for himself and his professionals in violation of the Chapter 7 Trustee Handbook.

50.    The TSI Members clearly have standing to seek redress under § 550.  Pursuant to section § 726, after the estate's creditors' claims are paid all remaining cash is distributed to the Debtor.  Of course, TSI Members have no interest in receiving a distribution *of their own cash*. To that end, the TSI Members request that the FAC be stayed until all receivables are collected, the Appeal has been prosecuted to conclusion and the claims objection-allowance process is concluded.  In other words, before racking up any more fees, the Trustee should be directed to gather the low hanging fruit, pursue the free Appeal and pursue objections to claims to see how much money he needs to collect, if any, to pay creditors in full.  It is obviously not $32 million.

51.    For the foregoing reasons, the TSI Members respectfully request that the Court enter an order staying prosecution of the FAC.  If the FAC is not stayed, the Trustee's recovery on the FAC, if any, shall not exceed the amount required to pay allowed creditor's claims at the conclusion of the case and only after full prosecution of the Appeal, collection of all receivables and the completion of the claims allowance process.

**III.    Relief from the Automatic Stay Should be Granted to Allow the Appeal to Proceed.**

52.    There is a filed motion for relief from the automatic stay dated January 26, 2022 on the docket to allow the Appeal to move forward. *See* Bankr. D.I. 38. The TSI Members adopt it, incorporate it herein by reference, and respectfully request it be added to the Notice of Agenda for the hearing on this Motion.

53.    The Trustee has a duty to review and, if appropriate, reduce claims against the estate. The Trustee is of record objecting to the claims asserted by the Judgment Creditors when it served his purpose; *i.e.*, to secure his election as the permanent trustee over a solvent estate. The Trustee has previously stated that "prosecution of the Appeal may be in the best interests of the other creditors," *see* Bankr. D.I. 177 at ¶ 28, and noted that "[i]f the Debtor's arguments in the Appeal are successful, the Debtor actually overpaid [Judgment Creditors] by at least $95,032 and would have an affirmative claim against them to recover such overpayment[,]" *id.* at ¶ 31. The Trustee testified as follows:

Q    Okay. Have you moved to lift the stay of the appeal?

A    Not yet. And I don't know if -- right now, you know, I'm more concerned about collecting $30 million. If I collect $30 million, your client is paid.

June 15, 2022 Hrg. Tr. (Ex. C) at 64:19-22.

54.    That was then this is now. The Trustee secured his appointment as permanent Trustee but appears now to have little or no interest in collecting $8.2 million in receivables or moving the Appeal forward. This is particularly disturbing because the TSI Members have offered to pay the full freight on the Appeal[21] which offer was not extant at the time the Trustee testified

---

[21] The undersigned has requested, on several occasions, by email and by phone, that the Trustee agree to stay relief so the Appeal may proceed. *See, e.g.*, February 8, 2023 email (Ex. H) at p. 2, March 24, 2023 email, attached hereto as **Exhibit K**, and March 28, 2023 email, attached hereto as **Exhibit L**.

above.  Further, the interests of the Trustee and the TSI Members are completely aligned for purposes of prosecuting the Appeal.  The Trustee should jump at the possibility of knocking out claims aggregating $6,246,075.78 *for free*.  There is no legal or legitimate business reason for the delay in moving the Appeal forward.  A cynical view is that the Trustee seeks to maintain the aggregate amount of claims against the estate high to justify professional fees incurred in connection with seeking injunctive relief and prosecution of the FAC or has an undisclosed arrangement with the Judgement Creditors.  The Trustee's failure to move forward with the Appeal is prejudicial to both the TSI Members and creditors with valid claims against the estate.

### IV.  The Trustee Should be Compelled to Abandon the $8.2 Million in Accounts Receivable.

55.    During his thirteen-month tenure as interim and now permanent Trustee, the Trustee, upon information and belief, and subject to discovery, has taken no affirmative steps to collect the $8.2 million receivable. To the contrary, he has closed the only SAM Account TSI maintained to collect accounts receivable from the federal government.  But it appears from a recent email exchange that the Trustee may have an alternative strategy with respect to the $6 million receivable that better serves his true purpose.  By email dated April 6, 2023, the Trustee's counsel claimed:

> "We have been asking for months about the alleged $6m A/R due from FEMA in connection with the containers and the support for same.  No support has been provided.  **Any risk of running out of time to submit such claim(s) is by your client's own doing**.
>
> We have been asking since the conversion to be provided with any necessary credentials.  As of this writing, we have not been provided with TSI's credentials to SAM.  Those credentials need to be provided to the trustee and he can update the bank information."

*See* Ex. D (**emphasis** added).

56.    The TSI Members dispute a number of the statements asserted by the Trustee.  <u>First</u>, there is no "bank information" to update, because the Trustee already closed Artisan's Bank, TSI's sole SAM registered account.  <u>Second</u>, the login credentials are not property of the estate.  They are personal to Ms. Mott and she is prohibited from sharing them with anyone.  *See* Ex. E.  In any event, upon information and belief, both the Trustee and his counsel have SAM registered accounts in their own names[22] and do not need and are not entitled to Ms. Mott's personal credentials.  <u>Third</u>, the Trustee has in his possession, since the bar date or earlier, all the information he needs to submit the claim to FEMA.

57.    The buck stops with the Trustee.  The $8.2 million receivable is property of the estate and the Trustee, not Ms. Mott, has the affirmative *duty to preserve and collect it*.  The Trustee had more than thirteen months to take action to collect the $8.2 million receivable and a Court available to assist on short notice.  He took no action because he wants the $8.2 million receivable to lapse, and blame Ms. Mott as a justification for more litigation fees. [23]  Unfortunately, the TSI Members are prohibited from seeking to collect the receivable by reason of the automatic stay.  From his email, however, it appears that the Trustee is content with taking no action and allowing the statute of limitation for submitting a claim to lapse.  The Court should not permit the Trustee to let the statute of limitations for collection lapse and forfeit a $8.2 million receivable *for*

---

[22] Upon information and belief, both the Trustee and his counsel are registered in SAM and as government contractors. The Trustee, himself, and the CFO of Archer are the points of contact for SAM.  Therefore, the Trustee and his team have their own credentials to access SAM and are equally aware that it is a federal crime to use another entity's credentials pursuant to 32 CFR Part 2002 and GSA Order CIO 2103.2 CUI Policy.  Notwithstanding, they continue to demand Ms. Mott's and Steve Acosta personal credentials.

[23] Discovery will provide a factual record of what actions, if any, the Trustee has taken to date.

*the Trustee's strategic reasons*.  It also appears the Trustee is slow-rolling Venable's collection of the $13.5 million owed by FEMA.[24]

58.    There are ample cases compelling a chapter 7 trustee to abandon accounts receivable that are fully pledged because collection provides no value to the estate.  For the same reason, a receivable that the Trustee is not seeking to collect for whatever reason has no value to the estate and should be abandoned.  Here, the TSI Members seek to compel the Trustee to abandon the $8.2 million receivable to them.

59.    If the Court directs the Trustee to abandon the $8.2 million in accounts receivable, the TSI Members will need to discuss the matter with Mark St. Moritz, the former director of contracting, special operations command, and James Boland, Esq., an attorney with the law firm Venable.  The TSI Members need to confer with Mr. St. Moritz on which FAR applies to billing and calculations.  Venable reviews the draft submissions to ensure compliance with applicable US Code provisions.  The TSI Members run a final review on the numbers and FARs.  The TSI Members add their personal certification, sign and submit.  Any abandonment order should provide for such relief.

**V.    The Trustee Should be Compelled to Abandon TSI's Fuel Business.**

60.    Although value may be derived in operating TSI's business, the Trustee has no interest in doing so, and cannot be forced to do so.  The Trustee instead has focused on suing the TSI Members, freezing their assets, including their Real Properties and cash.  *See* PI Order [Bankr. D.I. 299].  This puts the TSI Members in the awkward position of needing cash to defend themselves but at the same watch the business they founded and ran successfully for over 22 years waste many corporate opportunities *i.e.,* fulfilling the fuel requests received from DLA.  They need

---

[24] The TSI Members reserve the right to take discovery on the Trustee's efforts to date.

to raise cash to continue to pay their attorneys to defend against the FAC.  One obvious source of cash is for the TSI Members to re-take operation of their fuel business.  There are several reasons to permit this relief.

61.     First, the Trustee has no intention of running the Debtor's business so the business is of no value to the estate.  Pursuant to 11 U.S.C. §554(a), "after notice and a hearing," the Chapter 7 Trustee "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  "In carrying out his statutory duty to maximize the bankrupt's estate, the Trustee may abandon his claim to any asset . . . he deems less valuable than the cost of asserting the claim or administering the property."  *Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654 (3rd Cir. 1974).

62.     Second, there is an attractive symmetry to abandonment.  The Trustee does not want to run TSI's lucrative business that allegedly allowed TSI Members to receive $32 million in distributions in the last 4 years and the TSI Members want to again run their lucrative business to pay the Trustee, if necessary.  Abandonment of the TSI business would involve the same considerations as abandonment of the $8.2 million in receivables.

**WHEREFORE**, the TSI Members respectfully request the Court grant the Motion and such other and further relief as is just and proper.

Dated: May 3, 2023
        Wilmington, Delaware

**THE ROSNER LAW GROUP LLC**

*/s/ Frederick B. Rosner*
Frederick B. Rosner (DE 3995)
824 N. Market Street, Suite 810
Wilmington, DE 19801
Tel: (302) 777-1111
Email:  rosner@teamrosner.com

*Counsel to Deborah Evans Mott, Steven M. Acosta, Christopher Mott, John S. Maciorowski and Addy Road LLC*