# Exhibit C

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .  Chapter 7
                                .  Case No. 22-10066 (CTG)
TEAM SYSTEMS                    .
INTERNATIONAL, LLC,             .
                                .  Courtroom No. 7
                                .  824 Market Street
        Debtor.                 .  Wilmington, Delaware 19801
                                .
                                .  Wednesday, June 15, 2022
. . . . . . . . . . . . . . . .  3:00 p.m.

                    TRANSCRIPT OF ZOOM HEARING
          BEFORE THE HONORABLE CRAIG T. GOLDBLATT
                UNITED STATES BANKRUPTCY JU

<u>APPEARANCES</u>:

For the Chapter 7
Trustee:                    David W. Carickhoff, Esquire
                            ARCHER & GREINER, PC
                            300 Delaware Avenue
                            Suite 1100
                            Wilmington, Delaware 19801

For the US Trustee:         Richard L. Schepacarter, Esquire
                            OFFICE OF THE UNITED STATES TRUSTEE
                            J. Caleb Boggs Federal Building
                            844 King Street
                            Suite 2207, Lockbox 35
                            Wilmington, Delaware 19801


(APPEARANCES CONTINUED)

Audio Operator:             Sean Moran, ECRO

Transcription Company:      Reliable
                            The Nemours Building
                            1007 N. Orange Street, Suite 110
                            Wilmington, Delaware 19801
                            Telephone: (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1  <u>APPEARANCES (CONTINUED)</u>:

2  For Simons
   Exploration, Inc.,
3  and GPDEV, LLC:              Michael H. Moody, Esquire
                                MICHAEL H. MOODY LAW, P.A.
4                               1881-A Northwood Center Boulevard
                                Tallahassee, Florida 32303
5
                                -and-
6
                                Leonard Collins, Esquire
7                               GRAY ROBINSON, P.A.
                                301 South Bronough Street
8                               Suite 600
                                Tallahassee, Florida 32301
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX

2    MOTIONS:                                              PAGE

3    Agenda
     Item 1:   Creditors' Joint Motion for Resolution of    4
4              Disputed Chapter 7 Trustee Election
               (filed on May 13, 2022) [D.I. 174]
5
               Court's Ruling:                             115
6


7
     WITNESSES CALLED
8    BY THE CREDITORS:                                     PAGE

9          GEORGE PETERSON

10              Direct examination by Mr. Moody             16

11


12         GEORGE MILLER
13
                Direct examination by Mr. Moody             36
14
                Cross-examination by Mr. Carickhoff         50
15
                Cross-examination by Mr. Collins            56
16

17   Transcriptionist's Certificate                       120
18

19

20

21

22

23

24

25

1          (Proceedings commence at 3:00 p.m.)

2          THE COURT:  Good afternoon, everyone.  This is

3    Judge Goldblatt.  We are on the record in In Re Team Systems

4    International, which is Case Number 22-10066.

5          We are proceeding this afternoon by way of Zoom.

6    As a result, let me ask that everyone leave your microphones

7    muted, unless you're addressing the Court; that, when you do

8    address the Court, you introduce yourself for the record each

9    time you address the Court.

10          And finally, my preference is that folks generally

11   leave your cameras off, unless you're either addressing the

12   Court or wish to be recognized because I find it helpful,

13   since I can't see you stand up in front of me, if you turn

14   your camera on as a way of signaling that you'd like to be

15   heard; in which case, I will then recognize you.

16          So, appreciating that there's no real set protocol

17   for how to proceed, why don't I start by passing the baton to

18   Mr. Carickhoff as counsel the interim trustee, to see if he

19   has a proposal on how to proceed for the matters in front of

20   us.

21          MR. CARICKHOFF:  Thank you.

22          THE COURT:  Mr. Carickhoff.

23          MR. CARICKHOFF:  Thank you.  And for the record,

24   David Carickhoff on behalf of George Miller, the Interim

25   Trustee here.

1          With me this afternoon, may it please the Court,

2  is Alan Root of Archer & Greiner, and also Bryan Hall of

3  Archer & Greiner.

4          In terms of the hearing, there were two matters

5  scheduled.  The Court entered an order on the first item on

6  the agenda.  The only thing to be addressed is really this

7  disputed election.  The creditors are the ones who filed the

8  motion.

9          You know, I don't -- I know the case law is --

10  doesn't ask the Court to hold a full-blown evidentiary

11  hearing.  I know there were a number of witnesses listed and

12  a number of exhibits listed.  I don't know how Your Honor

13  would proceed.  It may make sense to ask each side how much

14  time they think they may want, in terms of putting on

15  evidence, and then seeing if we could streamline it from

16  there.

17          THE COURT:  So let me, actually, if I may, begin

18  with a few very preliminary thoughts, which might be helpful

19  to the parties in streamlining matters.  And then I'm happy

20  to hear from each of you about how you propose to proceed.

21          But to me, based on where -- I've read the papers.

22  With respect to the question whether the creditors are

23  entitled to seek an election, it seems to me that, if there

24  isn't a dispute about the -- if the parties would agree to

25  the admissibility of the U.S. Trustee report on what happened

1  at the 341 meeting, that would go an awfully long way.  And

2  I'm not sure I need -- I mean, again, subject to hearing from

3  the parties -- much more evidence about the entitlement to

4  vote.

5          Obviously, the facts of the judgments are subject

6  to judicial notice.  And the way I see it, the question I've

7  got is mostly thereafter on the question of eligibility, the

8  legal argument.  Although, if there's something factual that

9  someone wants to prove, I want to give you a chance to prove

10  it.  But I'm not sure there are other facts that bear on

11  whether -- on the conduct of the election.

12          Obviously, with respect to whether the creditors

13  hold a material adverse interest under 702(a)(2), I think we

14  know what the facts are.  They hold a judgment.  I think the

15  argument for material adverse interest is that they hold a

16  judgment.  So, if someone -- again, if someone wants to

17  explain that there's something more that I need to know to

18  resolve that question, you know, I want to give you that

19  chance.  But it doesn't seem to me that that turns on facts.

20          With respect to if the creditors are entitled to

21  conduct an election, we then have a question of eligibility

22  of Mr. Workman under Section 321.  That probably does require

23  some facts because there are statutory requirements for

24  eligibility and they're either met or they're not.

25          So that's -- and so it doesn't seem to me, based

1  on where I am, that we're talking about something that should

2  involve ten witnesses or gazillion exhibits.  But again, I

3  want to -- I say that in order to help you streamline things,

4  not to dissuade you from presenting evidence that you think

5  is relevant.

6          So let me stop talking there and give each of you

7  a chance to tell me how you propose to proceed.

8          MR. CARICKHOFF:  Sure.

9          THE COURT:  And --

10          MR. CARICKHOFF:  And Your Honor, Dave Carickhoff

11  again for the record.

12          I think I -- the trustee is comfortable with Your

13  Honor accepting the United States Trustee's report of the

14  disputed election, if that helps streamline things.

15          In terms of what I think I think would be useful

16  from an evidentiary standpoint, I did intend to elicit

17  testimony from Mr. Miller in connection with the claim

18  objections.  I believe the standard is very low, and I

19  thought it would be helpful to hear -- for Your Honor to hear

20  the basis, why those claim objections were brought.

21          THE COURT:  That's fair.  I've read the --

22  certainly the case law that suggests there is some standard,

23  some burden, and I'm happy to give you a chance to present

24  that evidence.

25          Mr. Moody, let me ask you.  What do you -- well,

1  before I get there.

2          Mr. Carickhoff, is there anything else?

3          Certainly, we can (indiscernible) is there

4  anything else that you would seek to do on a -- as an

5  evidentiary matter?

6          MR. CARICKHOFF:  It would really be cross-

7  examining Mr. Workman.  I haven't seen anything that --

8  evidentiary wise that would suggest he's eligible, and I

9  expect that's what they'll be presenting today.  So just

10  having the ability to cross-examine --

11          THE COURT:  Okay.

12          MR. CARICKHOFF:  -- any testimony he would put up.

13          THE COURT:  Fair enough.

14          Okay.  Mr. Moody, let me give you a chance.

15          What -- again, and I offer those preliminary

16  thoughts, really, only to the extent they're helpful.  I

17  don't at all mean to hijack the parties' ability to present

18  the case as they see fit.  So let me hear from you.

19          MR. MOODY:  Thank you, Your Honor.

20          The case law on the eligibility issue is --

21  there's certain issues.  The objection that has been filed

22  has to be non-frivolous.  It has to be supported by more than

23  suspicion, in that the objection cannot be interposed for an

24  improper purpose.

25          THE COURT:  Uh-huh.

1          MR. MOODY:  We can present two witnesses -- well,

2     one is Mr. Miller; the other is Mr. Peterson.  And we do

3     intend to be respectful of the Court's time and speed through

4     this as quickly as we can.

5          THE COURT:  That -- all of that -- again, look,

6     I'm here to, you know, do my job, and no concerns about, you

7     know -- it will take as long as it takes.  That's not my --

8     that's not my issue.  I just want to be respectful of

9     everyone's time and the cost to the estate and all of that.

10         Okay.  So, look, it sounds like we're talking

11    about, you know, two witnesses.  And I -- unless someone

12    tells me otherwise, I would think, you know, once the witness

13    is up, they can -- cross can exceed the scope of direct, and

14    so the witness can hit the stand once and not have to come on

15    twice in each side's case.

16         You know, the -- Mr. Carickhoff correctly points

17    out that it is the creditors' motion, so I assume you ought

18    to have the chance to go first.

19         I'm happy to -- why don't we do the following?

20    Let me give each of you a few minutes by way of opening just

21    to tell me briefly -- not extended legal argument -- briefly,

22    what you think the evidence is going to show.  Then we'll do

23    the evidence.  And then, as to the legal argument, there may

24    be a fair amount to talk about.  We can do that after the

25    evidence is in and we know what we're talking about.

1          MR. CARICKHOFF:  Your Honor --

2          THE COURT:  Mr. Carickhoff.

3          MR. CARICKHOFF:  -- before we do that, just kind

4    of a gatekeeping issue.  The creditors issued a trial

5    subpoena for Mr. Miller the other -- June 13th, the evening

6    of June 13th.  We filed a motion to quash this morning.  I

7    have spoken with counsel, Mr. Moody, in an attempt to try and

8    resolve the scope of what that testimony might be.  We

9    haven't really been able to kind of reach an agreement

10   because we haven't -- it wasn't clear to me what specific

11   testimony they were going to seek to elicit from Mr. Miller.

12          So, rather than have Your Honor rule on that

13   motion to quash at this point, when we get to Mr. Miller and,

14   you know, potential areas of testimony, I just want to

15   reserve that opportunity and note that we do have a motion to

16   quash.

17          THE COURT:  Sure.  So, look, it seems to me

18   Mr. Miller is here, he's -- you're calling him.  Mr. Moody is

19   going to have the chance to question him.  You have the right

20   to object to any line of questions that you consider

21   irrelevant, oppressive, burdensome, or mean, and I'll rule

22   those -- rule on those one at a time as they come up.  But I

23   don't think there's anything beyond that, the subpoena to his

24   appearance, that is otherwise live in a world in which he's

25   voluntarily appearing in court.  Do you disagree with that,

1  Mr. Carickhoff?

2          MR. CARICKHOFF:  I think, with respect to the

3  scope of what they want to ask him, yes.  I think that they

4  had certainly an ample opportunity to file that subpoena in a

5  timely fashion, so we'd have an opportunity to prepare for

6  those lines of testimony.  The fact that they filed it as

7  late as they did didn't present us with that opportunity.

8  So, yes, I would not -- I did have an issue with it, and the

9  issue is really timeliness.

10          THE COURT:  Okay.  But and while we're here -- and

11  you're calling him, right?

12          MR. CARICKHOFF:  Yes.

13          THE COURT:  They could cross -- they could ask

14  some questions anyway, and you could object to any question

15  you want to object to.  And it seems like that,

16  essentially -- the ability to resolve objections as they are

17  presented, essentially, seems to create the opportunity to

18  resolve any issues that would be otherwise presented by the

19  subpoena.

20          MR. CARICKHOFF:  Potentially.

21          THE COURT:  Okay.  All right.  Well, look, why

22  don't we proceed that way?  If something comes up that

23  remains live, we'll address it when we get there.

24          THE COURT:  Okay.  So, Mr. Moody, why don't I just

25  give you -- you know, again, I -- you know, I don't think we

1  need long openings, but to the extent you want the

2  opportunity to tell me what the evidence will show, let me

3  give you that chance.

4              MR. MOODY:  Certainly, Your Honor.

5              Abraham Lincoln was famously quoted as saying

6  that, if General McClellan doesn't want to use his army, I

7  would like to borrow it for a time.  In this particular case,

8  the issue that we have is the interim trustee has been

9  unwilling, thus far, to do certain things that would tie up

10  the real estate assets and other assets, which were outlined

11  in the Court's memorandum opinion and that we learned about

12  prior to the conversion of the case.  And because of that

13  unwillingness or inability to do certain things, we are very

14  fearful that our clients are going to be harmed, and we don't

15  believe there's any reason for those (indiscernible) to have

16  to wait.

17              We understand that trustee elections are rare.

18  This is my second opportunity to be involved in a trustee

19  election, and I look to avoid them every opportunity that we

20  can.  But in certain cases, such as this case, the election

21  is necessary in order to best maximize the value of the

22  estate.

23              THE COURT:  Okay.  So, Mr. Moody, to the extent I

24  can help streamline this at all, let me just say the

25  following:

1          The reasons why you want to elect a trustee seem

2   to me not to really bear on anything I have to decide today.

3   So you could be doing it for a good reason or a bad reason,

4   and I don't think that changes the analysis.  So, to the

5   extent you were planning on presenting evidence about the

6   substance of your disagreement with Mr. Miller about what's

7   in the best interests of the estate, I'm not sure -- again,

8   I'll give you a chance to tell me otherwise.  But I'm not

9   sure that the satisfaction of the statutory standards under

10  Section 702 are affected one way or another by whether you or

11  Mr. Miller is right about what's best for the estate.  Again,

12  I say that without prejudice to your rights, but that's my

13  initial reaction.

14          MR. MOODY:  Certainly, Your Honor.  And we bring

15  that up because of the reliance of the trustee on the case of

16  In re Williams opinion out of California.  That was a case

17  that we detailed in our response that had -- first of all,

18  the creditor was asserting a secured, not unsecured claim,

19  did not have an allowable claim, had preference actions that

20  were being litigated against the estate.  There were a whole

21  bunch of creditors.  And at the end of the opinion, they made

22  the observation that the appeal was the driving force behind

23  the desire for the election.  So we felt that that was kind

24  of put at issue, why the --

25          THE COURT:  All right.

1           MR. MOODY:  -- election was (indiscernible)

2           THE COURT:  I do under -- look, I do understand

3    that.  But the materiality of your adverse interest has

4    something to do with the broader context of the case.  I hear

5    that.  You know, it's also true that I sat through a several-

6    day trial, so I know something about that context.

7           So I'll -- let me let you continue.  Fair enough,

8    though.

9           MR. MOODY:  Certainly, Your Honor.

10          So -- and again, this is a case with a very few

11   number of creditors.  The claim objection deadline expired on

12   June 9th.  There were only 7 claims filed.  At the time of

13   the 341 meeting, there were only 4 claims, one of which was

14   by the GPDEV, the others by Simons, the third claim was by

15   Bering Straits, and the fourth was by the IRS.  So this is

16   very different from Mr. Williams' case, where there were 36

17   claims in the claims register, I believe, at the time of the

18   341 meeting.

19          And you know, our clients have spent a lot of

20   money trying to get to where they are and trying to collect

21   their judgments.  And essentially, there's just a difference

22   of opinion as to the administration of the case.  So that's

23   sort of our -- under the unique circumstances here, we think

24   that our clients should be determined to be eligible, even

25   though there is an appeal.  We think that that is not

1   dispositive of the issue as to whether their claim is truly

2   disputed or undisputed.  And we think that Mr. Donald Workman

3   will be found to be imminently qualified and eligible to

4   serve in this case.

5          THE COURT:  Okay.  Thank you, Mr. Moody.

6          Mr. Carickhoff.

7          MR. CARICKHOFF:  Sure, Your Honor.  And just to be

8   clear, I -- the question you asked is what do I think that

9   the evidence is going to elicit.  Is that what the question

10  was?

11         THE COURT:  Exactly.  I mean, to me, it's a

12  traditional opening statement before trial, which is, you

13  know, essentially, a preview of the evidence and not legal

14  argument itself.

15         MR. CARICKHOFF:  Sure, Your Honor.  We think that

16  the evidence will show that the interim trustee had a good

17  basis for filing the preliminary objections to what called

18  the "disputed claimants' claims" here.  And the threshold

19  here is a very low standard and that was set by the case law.

20  It's set by the Code, it's set by Rule 2003.  And it's really

21  does this rise above a mere suspicion threshold.  And we

22  think that will easily be shown by the testimony of

23  Mr. Miller.

24         And we went to great pains in the opposition to

25  their motion to explain why he thought that the appeal had

1  merit (indiscernible) appeal and that it was in front of us.

2  So that's what we expect to show from the evidence.

3           THE COURT:  Okay.  Thank you.

4           So, Mr. Moody, let me let you call your first

5  witness.

6           MR. MOODY:  Thank you, Your Honor.

7           We will call George Peterson.

8           THE COURT:  Okay.  Ms. Barksdale, can you swear in

9  Mr. Peterson?

10          THE ECRO:  Raise your right hand.

11       GEORGE PETERSON, WITNESS FOR THE MOVANTS, AFFIRMED

12          THE ECRO:  Please state your full name and spell

13 your last name for the record.

14          THE WITNESS:  George Peterson, P-e-t-e-r-s-o-n.

15          THE ECRO:  Thank you.

16                       DIRECT EXAMINATION

17 BY MR. MOODY:

18 Q     Thank you, Mr. Peterson.

19       And what is your role with GPDEV?

20 A     I'm a member, the single member/owner.

21 Q     And describe for us just briefly your business

22 background?

23 A     Real estate development.  I have a couple of companies.

24 I've been in commercial and residential real estate for the

25 last 35, 36 years (indiscernible), but go ahead.

1    (Indiscernible.)

2    Q    Exactly, exactly.  We're just establishing a small

3    amount of background before we get into our other

4    questioning.

5    A    Sure.

6    Q    How did you come to know Team Systems International?

7    A    Jordan Simons approached me and said that he had a

8    friend, Debbie Mott, who was looking for water.  We had a few

9    days to respond to an RFP with FEMA.

10        I sit on a board with the owners of Niagara Children's

11   Foundation Board and I knew the owners, and I asked them if

12   they would work with us to participate in delivering water to

13   FEMA, which they responded immediately, Absolutely, you know,

14   George.  And I worked with them to put together the RFP,

15   assembled all their information, and ultimately TSI was

16   successful with the team of Bering Straits, Niagara, TSI, and

17   a trucking company -- Navajo.

18   Q    And, ultimately, after the delivery of water, there was

19   a dispute that arose?

20   A    The dispute arose after we understood that we weren't

21   paid accordingly to what was supplied.

22   Q    Okay.  And was -- and there was litigation that was

23   filed relating to that?

24   A    Yes, there was, 2018.

25   Q    Can you describe the litigation, sort of tactics, that

1   you observed in that litigation.

2   A     The initial tactics were they did a jurisdictional

3   issue to try and change the (audio interference) to a

4   different court.  That was heard by Judge Hinkle.  Judge

5   Hinkle found their documents to be fake, as far as who was

6   really a member at the time, and that was done through

7   depositions and evidence, and he made an opinion that the

8   documents were fake and stated --

9           MR. CARICKHOFF:  Objection, Your Honor.

10           To the extent there's a judgment, the judgment

11   speaks for itself.  The witness should not be testifying as

12   to what the judgment says.

13           THE COURT:  That'll be sustained.  That's -- you

14   know, the documents say what they say and the witness can't

15   testify as to what's essentially hearsay.

16           Mr. Moody, you can continue.

17           So, I'll strike the portion of the answer that

18   purports to describe what Judge Hinkle's judgment says.

19           Mr. Moody, you can continue.

20   BY MR. MOODY:

21   Q     Were you present at the trial?

22   A     Yes, I was.

23   Q     And did the jury render a verdict in favor of the GPDEV

24   and Simons?

25   A     Yes, they did.

1  Q     And how long did it take for the jury to deliberate

2  before rendering that verdict?

3  A     I would say no more than 30 minutes.

4  Q     After the entry of final judgment, did TSI post a bond

5  pending appeal?

6  A     No, they did not.

7  Q     And do you know why they did not?

8  A     Why?

9          MR. CARICKHOFF:  Objection; relevance.

10         THE COURT:  Well, Mr. Moody, what's the -- what's

11 the relevance of that question?

12         MR. MOODY:  Certainly, Your Honor.

13         The main case that is relied upon by Mr. Miller is

14 the Williams opinion that dealt with the appeal and the

15 validity of the appeal, and the fact that the election was

16 done to essentially end the appeal.  And so, we are just

17 asking a few questions about the circumstances surrounding

18 the judgment at issue.

19         THE COURT:  Okay.  So, look, let me -- I'll give

20 you a little bit of latitude here, and I know that the

21 testimony that I heard in the three-day trial is not

22 admissible, necessarily, here, but whatever I found is

23 presumably law of the case.

24         And I do discuss these circumstances in my earlier

25 opinion, and so to the extent you want to prove something

1 that I've already found, don't feel like you need to do that.

2 I've already found it.

3          To the extent you want to challenge any of that,

4 I'll give you a chance to put on witnesses to take issue with

5 it.

6          But, you know, in terms of what actually happened,

7 that's in the background section of my earlier opinion, don't

8 feel like you need new evidence to do that.  You're welcome

9 to keep going.

10          So, with that, let me let you continue.

11          MR. MOODY:  Understood, Your Honor, and thank you.

12 BY MR. MOODY:

13 Q     After the entry of final judgment were there efforts to

14 obtain post-judgment discovery?

15 A     Absolutely.

16 Q     And was the bankruptcy case, here, filed on the eve of

17 that hearing relating to those post-judgment discovery

18 efforts?

19 A     Yes.

20 Q     During the course of the Chapter 11 case, was there

21 litigation between GPDEV, Simons, and the debtor?

22 A     When you say, Is there litigation -- we were in -- they

23 had filed an appeal -- is that what you're considering

24 litigation?

25 Q     Well, ultimately, was there an effort to convert or

1  dismiss the case?

2  A    Oh, yes.  There was an effort to convert or dismiss and

3  we discussed that, and it was converted to Chapter 7.

4  Q    And the judge entered a 46-page-or-so written opinion

5  on this matter?

6  A    44 pages.

7  Q    Okay.

8         THE COURT:  You're not -- you should know that

9  you're not being asked to identify all the typos.

10        (Laughter)

11        MR. MOODY:  I don't think there are any.

12  BY MR. MOODY:

13  Q    Did that opinion observe that there were, you know,

14  troublesome documents in other tax returns exchanged in the

15  course of discovery?

16        MR. CARICKHOFF:  Objection, Your Honor.

17        The opinion speaks for itself.

18        THE COURT:  So, Mr. Moody, you can argue at close

19  from things that the opinion says.  I don't think you need to

20  ask a witness to tell you what an opinion I wrote says as

21  evidence of what I said.

22        MR. MOODY:  Understood.

23  BY MR. MOODY:

24  Q    To your knowledge, Mr. Peterson, did anybody challenge

25  the validity of GPDEV or Simons' judgments in the course of

1  the battle for conversion or dismissal?

2  A      No, not to my knowledge.

3  Q      And in the course of that effort, did you learn of the

4  location where potential assets are located?

5  A      Yes, we did.  And, actually, even the homes.

6         We actually tracked cars down to addresses, which

7  belonged to Abbey Road (phonetic), 20 Abbey Road, which

8  belonged to Abbey Road, LLC, which belonged to Debbie Mott,

9  which just happens to be the same sales date when we looked

10 at the real estate transaction, as the transaction for the

11 money that was sent to an attorney to close the transaction,

12 which then was labeled as a professional expense as part of

13 her tax returns.  So, that's how we discovered that.  We

14 spent a lot of time on those.

15 Q      Understood.

16        And then after the conversion of the case, did you have

17 any telephonic meetings with Mr. Miller?

18 A      Yes.

19 Q      Can you remember the date of the first of those

20 meetings?

21 A      April 6th.

22 Q      And can you tell me what happened during that phone

23 call.

24 A      We were trying to get ahold of Mr. Miller and our

25 attorneys were.  It was basically to introduce we can help

1   Mr. Miller with what we know and what we have learned in the

2   last three or four months, as well as the last three and a

3   half years, and any way maybe we could help (indiscernible)

4   or if he needed special counsel or records or whatever we

5   could do to help him move swiftly to access assets as quick

6   as possible.

7   Q    Do you remember offering -- do you remember

8   (indiscernible) offered to provide summaries to assist with

9   the voluminous evidence or whether Mr. Miller would prefer

10  having all of the documents delivered to him?

11  A    Well, we offered to, you know, get to the point real

12  quick and provide our summaries and our experts and

13  everything.  He thought that that might be a little one-

14  sided, so he wanted all the documents, which our attorneys

15  sent all documents to him, which is huge.

16  Q    During that phone call, do you remember there being a

17  discussion about whether Mr. Miller's a resident of the state

18  of Florida?

19  A    I believe he said he has a plane.  He's a resident of

20  Florida.  He was going to go down to the attorney's offices

21  and collect all the documents which belonged to him.  He was

22  going to go to Debbie Mott's and get whatever he could from

23  her, as far as, computers, software, you know, whatever.

24  Q    Okay.  And do you remember anything else about that

25  meeting?

1  A      Yeah, I mean, he basically -- we were talking about how

2  we could assist.  He hadn't hired general counsel yet.  He

3  was going to look into that.  He was going to get back to

4  us --

5              MR. CARICKHOFF:  Objection, Your Honor.

6              He's getting into hearsay.

7              THE WITNESS:  No, I was in the meeting.

8              MR. CARICKHOFF:  But you're testifying --

9              THE COURT:  But, Mr. Miller is a party to this

10  proceeding, right, so why can't he testify as to statements

11  of a party-opponent?

12              MR. CARICKHOFF:  I think when I asked Mr. Miller

13  what Mr. Miller said, you said, Ask Mr. Miller.

14              THE COURT:  No, I understand.  But as an

15  evidentiary matter, it's not hearsay if it's a statement of a

16  party-opponent and Mr. Miller is the party-opponent for this

17  purpose, so that objection will be overruled.

18              You can continue, Mr. Moody.

19  BY MR. MOODY:

20  Q    Mr. Peterson, as you were saying, is there anything

21  else you recall about that meeting?

22  A      Well, he was -- we were going to get back together

23  after he hired general counsel, send him the information he

24  needed, you know, he was just getting onboard at that time.

25  Q      Okay.  And then there was a second call with

1  Mr. Miller.

2       Do you remember the date of the second call?

3  A    I would go back and just say, as we concluded the first

4  meeting, he was upset that we had talked to the U.S. Trustee

5  and that we should just talk to him directly.  So, that's how

6  we concluded that phone conversation.

7       The second meeting was on April 20th and that was held

8  with our attorneys and Mr. Miller and his attorney.

9  Q    And how would you describe or classify that phone call?

10 A    That phone call was a kind of catch-up to the previous

11 meeting:  What have you done?  Where are you at?  They had

12 introduced his general counsel.

13      We spent most of the time talking about the FEMA claim,

14 which, you know, he had talked to the judge and he said, you

15 know, he wasn't too satisfied that the judge's opinion wasn't

16 that strong for the case for TSI, but he thought, you know,

17 he would pursue it all the way through the higher courts if

18 he needed to, all the way to the end, because in his opinion,

19 he felt it was a valid claim and that he had read the

20 contract and that it held water, and he was going to pursue

21 it.  And if Venable wasn't going to be the attorney, he could

22 find an attorney, because there's plenty of attorneys out

23 there.

24 Q    And was there any discussion an about whether he would

25 pursue insider avoidance actions pending the outcome of those

1    appeals?

2              THE COURT:  So, I'm sorry to interrupt, but just

3    so that there's a -- the record on this is not confusing,

4    Mr. Peterson, when you say, "He spoke to the judge," you're

5    referring to the Mr. Miller?  The judge to whom he spoke was

6    the judge who was presiding over the FEMA claim.

7              Is that your testimony?

8              THE WITNESS:  That's correct.

9              THE COURT:  Okay.  You can continue, Mr. Moody.

10             MR. MOODY:  Thank you, Your Honor.

11   BY MR. MOODY:

12   Q    With respect to the FEMA appeals, was there a

13   discussion of whether other avoidance actions could be

14   pursued, prior to a resolution of those appeals?

15   A    So, the discussion really kind of went into, when we

16   were talking about his real estate and banking records and

17   other things, and he seemed to be more focused on the FEMA

18   appeal and that he had to resolve that first before he could

19   go on to any other actions.

20             And in our opinion, we were like, well, it doesn't

21   really hold merit.  We were there.  I actually ordered water

22   for Niagara -- from Niagara to TSI.  I know what happened

23   there, which is kind of why, even if the other court

24   (indiscernible) called me and wanted me to have testimony of

25   Niagara for that case, which I immediately reported to my

1  attorneys.  They wanted depositions.

2      But we just -- I think our attorney Len used the word

3  "rabbit hole," that he didn't want him to go down a rabbit

4  hole, and that set Mr. Miller off.  And the whole

5  conversation changed that the point and it got very

6  adversarial, where he was, you know, screaming and

7  questioning and going to hang up, and pulled out his hearing

8  aids to yell louder.  He said, I'm pulling out my hearing

9  aids so I can yell louder.  And he didn't want anybody

10 questioning the way that he was doing his job or adding any

11 advice to it, which, then, kind of the relationship to us was

12 kind of broken.

13 Q    And following this call -- well, first of all, is there

14 anything else you recall about the call that's worth noting

15 for today?

16 A    It was completely unprofessional.  It was completely --

17 it lost control.  It seemed very -- it was a crazy call,

18 which ended up with Miller saying, I will not talk to you

19 anymore.  I will never use your services and I am done here.

20     It was just really weird, which made us kind of regroup

21 and say, Who's -- wait, what's this trustee doing?  You know,

22 maybe we need another trustee, because this guy is going to

23 start over from scratch and, again, he wants to start from

24 day one.  We uncovered quite a bit of information.  We have

25 lots of add to it.  He has absolutely no interest in it and

1    we just feel like, here we go again.  We're going to get

2    drained.  This guy is going to monetize this case and we're

3    going to end up with doughnuts.

4    Q    There was some discussion in one of the filings that

5    Mr. Miller made about there being a discussion during one or

6    either of these phone calls about the appeal of GPDEV and

7    Simons' judgment, and how you all were adamant that that

8    appeal not be pursued.

9    A    We --

10   Q    Do you have any recollection of that occurring during

11   any conversation?

12   A    No.  We discussed -- we never said anything about the

13   appeal:  You shouldn't do this or you shouldn't do that, in

14   regard to TSI or an appeal or anything like that.

15         We were focused on getting him information to do his

16   job.  We wanted the assets secured as quick as possible.  If

17   the appeal has merit, that's his choice.  We will fight that,

18   if necessary, but that's not the issue.

19         The issue is there's real estate out there.  There's

20   bank records.  Debbie Mott has never produced financial

21   records for any judge that's been ordered and nobody has the

22   true financial records of TSI (audio interference) make

23   $44 million and we think made 25 to 30 million in profit.

24         And she could have put up a bond, but I don't think she

25   believes in her appeal and that's why she didn't put up a

1   bond.  So, we just want to get to the heart of it.  Collect

2   the money.  We'll deal with the mechanics of everything, but

3   we need to get the money in the trustee's hands.

4   Q     Following this phone call, did you begin looking at

5   options for potential trustees to -- if you were going to

6   pursue an election route?

7   A     Well, the phone call was the trigger where we said, You

8   know, maybe we need somebody else here that is going to

9   pursue this right and fast, and secure assets, and do what's

10  appropriate, you know, in their -- so, we looked for

11  expertise.

12        We thought Donald Workman had -- the attorneys

13  presented him as a trustee.  His resume is amazing.  I've

14  never talked to him, but his resume is very strong.

15  Q     To your knowledge, has anybody from GPDEV, Simons, or

16  your counsel, had any discussions whatsoever regarding the

17  appeal of GPDEV and Simons' judgments with Mr. Workman?

18  A     No, they haven't ever talked to him.

19  Q     To your knowledge, is Mr. Workman the chair of a

20  bankruptcy and reorganization department of a well-known

21  national law firm?

22  A     Yes.

23  Q     And to your knowledge, has he done this sort of work in

24  the past?

25  A     Yes.

1          MR. CARICKHOFF:  Your Honor, objection.

2          Mr. Workman can be called as a witness to testify

3    as to his experience.

4          THE COURT:  That does seem like the best way to

5    get it, but if Mr. Peterson has personal knowledge of it, he

6    can testify as to matters within his personal knowledge.

7          Mr. Moody, you can continue -- are you calling

8    Mr. Workman, Mr. Moody?

9          MR. MOODY:  Your Honor, the -- Mr. Workman is out

10   of the country, so he's not going to be appearing today.  The

11   issue that was raised regarding his qualification was not

12   raised at the election.  It was raised well after, 10 days

13   after the election.  And so, if the Court needs to hear

14   testimony from Mr. Workman, we would like to have a

15   continuance to have him appear after he returns to the

16   country.

17         THE COURT:  All right.  I mean, look, if there

18   actually are factual disputes that relate to Mr. Workman, we

19   can get to that.  I have seen -- the parties have submitted

20   his CV.  I mean, we -- let me get to that later.

21         If the fact -- if the parties all agree that

22   Mr. Workman works in primarily in the Washington office of a

23   law firm that has offices in Delaware and in Philadelphia and

24   that those are the relevant facts and those can be stipulated

25   to, I don't think we need to have testimony to that effect.

1          It would surprise me if those facts were disputed.

2   If there is a dispute, or if there are other facts that I

3   need to know, we can deal with it.

4          But why don't -- I don't think asking Mr. Peterson

5   about -- where Mr. Workman, who he's never met, works and

6   lives, is the best way to establish those facts.

7          MR. MOODY:  Understood, Your Honor.

8   BY MR. MOODY:

9   Q    Just a final question about Mr. Workman.

10        Did he confirm to you and your team that he has offices

11  in Delaware and Pennsylvania?

12  A    Yes, he did.

13  Q    Circling back --

14        MR. CARICKHOFF:  Objection; hearsay, Your Honor.

15        THE COURT:  Yeah, I'm going to strike that -- that

16  is hearsay -- unless, Mr. Moody, you can explain to me why

17  that's not hearsay.

18        MR. MOODY:  Your Honor, I think the facts as you

19  described them earlier are pretty much the facts and we were

20  going to stipulate to that.

21        THE COURT:  All right.  Well, when we get there,

22  we can see if there's a dispute as to those facts or not, and

23  if there are, we'll have an evidentiary record.  And if those

24  facts are agreed among the parties and if everyone agrees

25  that's all I need to know, we'll decide it based on such a

1  stipulation, if there is one.

2          So, why don't we let you continue and we'll come

3  back to that.

4          MR. MOODY:  Thank you.

5  BY MR. MOODY:

6  Q    After the judgments, why -- as the 341 meeting came up,

7  did you instruct your counsel to inform the U.S. Trustee's

8  Office that an election would be called at the 341 meeting?

9  A    Yes.

10 Q    And on the morning of the 341 meeting, were objections

11 filed to all potentially eligible claims?

12 A    Yes, I was made aware of that.

13 Q    Do you believe that Mr. Miller has filed objections to

14 eliminate any potential vote?

15         MR. CARICKHOFF:  Objection, Your Honor;

16 speculation.

17         THE COURT:  I'm going to sustain that objection,

18 unless you have a -- unless you have knowledge beyond just

19 your speculation about why Mr. Miller did what he did.

20     (No verbal response)

21         THE COURT:  All right.  The objection is

22 sustained.

23         You can continue, Mr. Moody.

24         MR. MOODY:  Understood.

25 BY MR. MOODY:

1  Q     When you reviewed the objection of Mr. Miller to the

2  claim of GPDEV and Simons, did it state that there was an

3  objection solely because of the existence of an appeal or did

4  it evaluate particular issues on appeal?

5            MR. CARICKHOFF:  Objection.  The objections speak

6  for themselves, Your Honor.

7            THE COURT:  That's sustained also.

8            Mr. Moody, you can continue.

9  BY MR. MOODY:

10 Q    Mr. Peterson, do you believe that Mr. Miller contacted

11 other creditors in an effort to convince them, either not to

12 vote or to --

13           MR. CARICKHOFF:  Objection, Your Honor; calls for

14 speculation.

15           THE COURT:  You can -- the question, as phrased,

16 calls for speculation.

17           You can ask the witness if he has knowledge of any

18 such calls, but you can't ask the question you just did.  So,

19 why don't you proceed.

20           MR. MOODY:  Certainly.

21 BY MR. MOODY:

22 Q    Mr. Peterson, do you have knowledge of whether

23 Mr. Miller contacted any creditors in an attempt to persuade

24 them to vote in his favor or not to vote in favor of

25 Mr. Workman?

1  A      I have the knowledge from my attorney who talked to the

2  Bering Straits attorney, that there (indiscernible) call such

3  as that.

4           THE COURT:  So, Mr. Moody, if you want to have

5  your witness continue with this, you're going to deal with

6  the consequences of a privilege waiver.  So, you can make

7  your own decision whether you want him to continue to testify

8  as to what his attorney told him.

9           MR. MOODY:  No, thank you, Your Honor.

10          That's all we have for Mr. Peterson at this time.

11 Thank you.

12          THE COURT:  Okay.  Thank you, Mr. Moody.

13          Mr. Carickhoff, let me give you the opportunity to

14 cross-examine the witness.

15          MR. CARICKHOFF:  Your Honor, I don't have any

16 questions for Mr. Peterson.

17          THE COURT:  Okay.  Is there any other party in

18 interest that would like the opportunity to examine

19 Mr. Peterson; if not, Mr. Peterson, thank you for your

20 testimony.  You can step off the virtual stand.

21      (Witness excused)

22          THE COURT:  And, Mr. Moody, you can call your next

23 witness.

24          THE WITNESS:  Thank you.

25          MR. MOODY:  Thank you, Your Honor.

1            For our next witness, we'd call George Miller.

2            THE COURT:  Mr. Miller, if you could turn on your

3    camera.

4            And Ms. Barksdale, if you could swear the witness,

5    please.

6            THE CLERK:  Raise your right hand.

7       GEORGE L. MILLER, CREDITORS' WITNESS, AFFIRMED

8            THE WITNESS:  I will.

9            THE CLERK:  Please state your full name and spell

10   your last name for the record.

11           THE WITNESS:  My name is George Miller,

12   M-i-l-l-e-r.

13           THE CLERK:  Thank you.

14           THE WITNESS:  And, Your Honor, I would just like

15   to put on the record, that I am hard of hearing.  I do wear

16   two hearing aids.  I have a tendency to speak loud because I

17   have to hear myself.  I am not yelling.

18           If I'm speaking too loud, I would appreciate it if

19   you'd say, Calm it down, and I'll lower my voice.  But this

20   is my normal voice.  This is the issue that raised -- you

21   know, the counsel raised in the phone call that I explained

22   to them.  So, I just want you to know that I do speak loud.

23           THE COURT:  Okay.  We can hear you.  And if the

24   volume is uncomfortable, we will let you know.

25           And Mr. Moody, you can proceed.

1          MR. MOODY:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3   BY MR. MOODY:

4   Q    Mr. Miller, do you reside in Jupiter, Florida?

5          MR. CARICKHOFF:  Objection; relevance.

6          THE COURT:  I'm going to permit the questioning.

7          You can answer the question.

8          THE WITNESS:  Yes.

9   BY MR. MOODY:

10  Q    How long -- how many days a year do you spend in

11  Florida?

12  A    Oh, I don't know, probably less than half.

13  Q    You claimed on a phone call with GPDEV and Simons that

14  you are a resident of the state of Florida; is that right?

15  A    Yeah, I go down most weekends.

16  Q    Do you, for tax purposes, claim residency in Florida?

17  A    I do.

18  Q    Okay.  So, that means that you need to spend more than

19  180 days per year in Florida; is that right?

20  A    That is incorrect.

21  Q    What is your understanding for residency in Florida?

22          MR. CARICKHOFF:  Objection, Your Honor; relevance.

23          THE COURT:  Yeah, so, Mr. Moody, what is the --

24          MR. MOODY:  He's the -- he's a panel trustee, Your

25  Honor, and his eligibility is not an issue.

1        THE COURT:  I was going to give it a little bit of

2   latitude, but I think I've given as much as I need to,

3   Mr. Moody.  If you've got a reason why, beyond what you've

4   asked is necessary, let me give you a chance to tell me why

5   it's necessary.

6        MR. MOODY:  Your Honor, that was pretty much the

7   end of our limited questioning on that topic, so we'll --

8        THE COURT:  All right.  So, continue.

9   BY MR. MOODY:

10  Q    Mr. Miller, did you file objections to all claims,

11  other than the claim of the IRS, sort of minutes before the

12  time of the scheduled 341(a) meeting of creditors in this

13  case?

14  A    I filed three claims.  I thought there were more than

15  three claims.

16  Q    Do you dispute that there were four claims filed at the

17  time of the 341 meeting?

18  A    I don't know.  I just filed against three claims.  I

19  don't know how many claims were filed.

20       I think there were other creditors in attendance at the

21  341 meeting.

22  Q    And you objected to the claim of Bering Straits on

23  several grounds, including that the claim was contingent, due

24  to your reading of the Bering Straits contract; is that

25  right?

1   A      That, and the way that -- yeah, I think it was also in

2   the motion to dismiss.

3   Q      You objected to the claim of GPDEV and Simons only

4   because of an appeal being in existence; is that right?

5   A      And the incomplete documents and the lack of

6   cooperation from them when I was trying to review the

7   information to test the veracity of their claim.

8   Q      So, you're saying that your objection to claim said

9   something about GPDEV and Simons not being cooperative?

10  A      No.  I asked, like you testified -- Mr. Peterson

11  testified, I asked for all the documents.  I didn't get all

12  the documents.

13         And then when I asked for explanations, Mr. Collins

14  seemed to get very upset and I was not getting the

15  cooperation that I needed to answer the questions.  And so,

16  there are a lot of issues that were raised in the appeals

17  that are very similar to where I was having the questions and

18  I needed to resolve those questions.

19  Q      Can you point me in your claim objection to where those

20  issues were stated.

21  A      I don't have it in front of me.

22         Do you have it?

23              MR. MOODY:  Your Honor, may I share my screen?

24              THE COURT:  You may.

25              MR. MOODY:  Host disabled participant --

1          THE COURT:  Oh, hold on.  When I said you may,

2   that was over-promising, perhaps.  Let me -- that was --

3   we'll let you know when you've gotten the technical

4   authority, which we believe you now have.

5          MR. MOODY:  Okay.

6   BY MR. MOODY:

7   Q     Is this the objection to the proof of claim you filed

8   to GPDEV's claim?

9   A     That's the top half of it or the first page.

10  Q     Okay.  And you'd agree this was filed on April 28th,

11  2022?

12  A     Yes.

13  Q     As I scroll through this, is there any part of this

14  document you can point to that says you're objecting to their

15  claim based on a failure to provide documents and other

16  information as you just described to the Court.

17  A     I don't think that's what I said.

18         I said that I read the document that was the basis of

19  the appeal and I had questions on the same stuff that they

20  had in the appeal that were not responded to.  And so,

21  therefore, it has the appeal in there, which I said is a

22  reasonable basis for the appeal, because I -- you know, the

23  dispute, the documentation just doesn't add up, that I was

24  given.  Now, there might be another document out there where

25  or explanations could have been given to me by your clients,

1  but that was not offered.

2  Q     Did you ever send an email or other correspondence

3  asking for such information from (indiscernible)?

4  A     I didn't know you were going to file an appeal.  You

5  did it, like, you know, after business hours the day before

6  the -- I mean, not the appeal -- you filed your proofs of

7  claim and asked for an election 24 hours before the

8  election -- or I don't know how many hours it was, but it was

9  right before the election.  So, I was just doing the review

10 of your claim in the ordinary course of business.

11 Q     Okay.

12 A     And the bar date had not come yet, so I usually don't

13 do anything with any of the claims until after the bar date,

14 as a Chapter 7 trustee.

15 Q     And so, you disagree with me that the document says

16 what it says.  The objection to claim says what it says,

17 correct?

18 A     The objection to claim, I approved what it says, yes.

19 Q     Okay.  Prior to the 341 meeting, did you -- let me stop

20 this share -- I hope I have stopped sharing my screen at this

21 point.

22          THE COURT:  You have.

23 BY MR. MOODY:

24 Q     Prior to the 341 meeting, did you or did you direct

25 your counsel to reach out to any parties to discuss the

1  pending, the upcoming election that --

2          MR. CARICKHOFF:  Objection, Your Honor.

3          It calls for attorney-client privilege.

4          THE COURT:  I think that that's a fair objection.

5          To the extent you're asking him what he directed

6  his counsel to do, that calls for a privileged communication.

7  You might be able to get at it another way, but not that way.

8          MR. MOODY:  Thank you, Your Honor.

9  BY MR. MOODY:

10 Q     Prior to the 341(a) meeting, did you call any creditor

11 to discuss the upcoming trustee election?

12 A     I did not.

13 Q     Did you have -- do you have any knowledge of anybody

14 else, including your counsel, calling parties to discuss the

15 upcoming trustee election?

16 A     I do not.

17 Q     Are you aware that Bering Straits was called and told

18 that it you would not go easily in the event that another

19 trustee was elected?

20 A     I would never make that threat.  I have been elected

21 out once before.  It's part of a job.  I accept my job.  I'm

22 criticized all the time.  That's the basis for being a

23 Chapter 7 trustee.  I mean, I got blamed Donald Trump was

24 president because that was the only time I wasn't criticized

25 for everything in the world.

1  Q    To your knowledge, did yourself or your counsel reach

2  out to the debtor or its counsel to discuss the upcoming

3  trustee election.

4  A    Could you repeat that question.  You had your hand in

5  front of your mouth and I couldn't hear you.

6  Q    To your knowledge, did you or your counsel, reach out

7  to the debtor or its counsel to discuss the upcoming trustee

8  election?

9  A    Well, I did not speak to debtor's counsel about the

10  trustee -- I didn't talk to any attorneys.  The debtor's a

11  corporation, so I couldn't have any discussions with a

12  corporation.  I did not have any discussions about the

13  election with a trustee -- a debtor representative, that was

14  identified to me, Mr. Acosta.

15  Q    Okay.  And to your knowledge, neither did your counsel?

16  A    I -- my counsel has talked to debtor's counsel on many

17  different matters.  I do not know if they discussed the

18  election.

19  Q    Okay.  When did you first learn about the request for a

20  341(a) meeting -- an election at the 341(a) meeting?

21  A    When it was filed.

22  Q    Did you learn from the U.S. Trustee's Office in the

23  days leading up to the 341(a) meeting that a request would be

24  made at the 341(a) meeting for an election?

25  A    Yes, I did from Mr. Schepacarter.  I believe it was

1  Mr. Schepacarter.  It may have been -- he -- I don't know the

2  exact date I found out about the election.  I know that

3  Mr. Schepacarter had surgery.  I may have talked to a

4  different attorney prior to Mr. Schepacarter and was told

5  that it may occur, but it had not -- it was not definitively

6  going.  It was being considered.

7  Q    Are you aware that this bankruptcy case was filed on

8  the eve of the order to show cause hearing relating to post-

9  judgment discovery in the underlying District Court lawsuit?

10 A    I did not know that.

11 Q    Have you taken the time to look through and read the

12 opinion of the Court converting the case from a case under

13 Chapter 11 to a case under Chapter 7?

14 A    I did.

15 Q    At one point in the -- in your response, you say

16 that -- you characterize it as the debtor's lost their effort

17 to convert or dismiss the case.

18      Do you recall saying that in your response?

19 A    Well my reading of the documents, I think I also read

20 the transcript, was that, you know, your clients wanted the

21 case -- well, first of all, they said -- you know, they tell

22 the judge they're secured creditors, okay.  So, now they're a

23 secured creditor and they said to the debtor -- they said to

24 the judge -- and, Judge, I'm referring to you as "Judge

25 Goldblatt," I'm sorry -- so, they said to Judge Goldblatt --

1  and I'm just paraphrasing from my reading of the transcripts

2  and the documents were, they said to Judge Goldblatt, We're

3  secured creditors and we want the case dismissed so that we

4  can go out and try to marshal assets.

5       But the judgment is against the corporation and a

6  corporation only had assets, you know, readily available

7  assets, against the FEMA contracts.  The document also, from

8  my recollection, said that Bering Straits said that if they

9  don't pursue the FEMA contract, then their proof of claim or

10  their claims, you know, may not be paid.

11       And so, that's my recollection of the documentations

12  and the transcript of the hearing.

13  Q    Okay.  And I think we sort of just hit the nail on the

14  head, that in your view, the FEMA claims are the source of

15  recovery for this case?

16  A    It is one source of recovery, yes.  It's the, you know,

17  the quickest source of recovery because the trial is imminent

18  and these types of claims are resolved in a number of days.

19       My experience is, you know, your clients wanted to file

20  fraudulent conveyances, which, you know, which are

21  problematic at this point in time, in my opinion.  But also,

22  you know, I have several fraudulent conveyances that are

23  taking like two to three years.  So, that's not the quickest

24  way, you know, to adjudicate.

25       The liquidation of the FEMA claims, if I was able to

1  resolve that quickly with the United States Government -- and

2  I said this to your client on the phone, and they got upset

3  about it.  That's why they said, I don't need you chasing

4  rats -- you know, chasing these assets down a rathole.

5       But I think, you know, I think the hearing is coming

6  up, like, in a couple of weeks and, you know, the resolution

7  of that could have your clients paid in full in a couple of

8  weeks and that's what I told -- a couple of weeks from now,

9  which would be July -- and that's what I said to your clients

10 in the April 20th hearing -- I mean, April 20th meeting, that

11 I think that's the quickest way.

12      Because the -- you know, your resolution of claims

13 takes a long time, and so the collection of those assets

14 could pay your client.  I also could sell those assets to

15 third party, and some people have expressed interests --

16 that's how I liquidate a lot of those litigation assets --

17 and that's the way I think your clients would have been

18 readily paid.

19      However, you know, my opinion came through the

20 telephone quite clearly, they would rather me torture the

21 debtor's, you know, former officers, than worry about

22 collecting their assets.

23 Q    Is it correct to say that the last opinion from the

24 Contract Board of Appeals said, effectively, that TSI or that

25 you, on behalf of TSI, would have to come up with evidence of

1  restocking fees that were actually paid in order to prevail

2  on the FEMA claim?

3          MR. CARICKHOFF:  Your Honor, the -- whatever order

4  that came from that court speaks for itself.

5          THE COURT:  So, Mr. Moody, I do think -- I mean,

6  there's a best evidence issue, but in addition, I'm not sure

7  that -- I understand what you're trying to establish.  I

8  think you've established enough for me to understand the --

9  this set of issues and I'm not sure that you need to belabor

10 this particular point.  So, why don't you continue.

11         MR. MOODY:  Certainly.

12 BY MR. MOODY:

13 Q    During one or both of the phone calls, there was some

14 discussion of the fact that you didn't believe you could

15 pursue the insider transfers prior to the resolution of the

16 FEMA claims.

17      Is that still your belief?

18 A    I never said that.  I could pursue the insider claims,

19 but it would be premature.  And the reason it's premature is

20 because we have approximately $23 million in claims against

21 FEMA and if you collect $23 million of claims against FEMA

22 and your judgment, you know, your judgment -- your client's

23 judgments are about $6 million.  So, I've got $23 million in

24 the bank, I'm writing you a check for $6 million and you're

25 paid off.

1    And so, that's the quickest way, as a trustee -- and

2    the cheapest way, because I have now engaged a client -- an

3    attorney, who's going do it all on a contingency basis.  So,

4    there's no need for any money to recover fees and expenses,

5    you know, chasing assets throughout the United States.

6        In addition to that, as I tried -- as I explained to

7    you -- you know what?  I see that Mr. Robles is on the phone,

8    so I don't want to go down what I said to you on the phone,

9    because, personally, that would be a defense for his clients

10   against any actions that you may, you know, want to bring.

11   Q    Certainly.

12       And, Mr. Miller, I talked about this with

13   Mr. Carickhoff this morning.  We certainly don't mean to ask

14   you any questions that would imperil your ability to collect

15   from others in this case.  That is not our goal here.  We are

16   just trying to ask a few questions related to --

17   A    You don't want me to collect against them.  You were

18   very clear.  You were -- you didn't say it, but Mr. Collins,

19   who's very clear and adamant -- and that's when, you know, he

20   said that I was yelling at him.

21       I wasn't yelling.  You can tell that I talk loud, okay.

22   And he was the one that got upset and he says, I don't need a

23   trustee to climb down a rathole, you know, collecting assets.

24   Well, unfortunately, I'm very proud of what I have done as a

25   Chapter 7 trustee.  I have collected over a half a billion

1  assets.  I've collected over $300 million in unscheduled

2  assets.  I'm an asset locator and I can collect assets.

3       That's what I do for my living, and I always brag that

4  I think I'm the best one in the District of Delaware and much

5  better than Mr. Workman, who, in his CV, at least online,

6  does not say that he's ever acted as a trustee, which

7  contradicts what you said earlier.

8  Q    You said something earlier about how avoidance actions

9  are problematic.  Do you mind --

10            THE COURT:  Mr. Moody, if I can interrupt?

11            So, look, as I said at the outset, I appreciate

12 that there's a disagreement between you and your clients on

13 the one hand and Mr. Miller on the other about the path that

14 is in the best interests of the estate.  I mentioned at the

15 outset that I don't think that to resolve the dispute in

16 front of me, I need to adjudicate or even ought to adjudicate

17 that question.

18            You made the point fairly in response that, Well,

19 look, in order to understand the relative importance of the

20 appeal, *vis-a-vis*, everything else, you need to explore the

21 context of the case somewhat.

22            That was a fair point and I think you've done

23 that.  So, to the extent you want to have an argument with

24 Mr. Miller about what's best -- what business strategy is in

25 the best interests of the estate, there may or may not be

1  time for it.  I'm not sure as to the matters before me today

2  that you need to go further into this line of questioning,

3  unless you want to persuade me there's something I'm missing

4  as to why I need to hear this.

5          MR. MOODY:  All right.  Let's see.

6          I'm going to take a few moments, if I might, Your

7  Honor, to confer with my co-counsel?

8          THE COURT:  Certainly.

9          MR. MOODY:  Thank you.

10      (Pause)

11          MR. MOODY:  I appreciate that time, Your Honor.

12  Thank you.

13  BY MR. MOODY:

14  Q    After the call on April 20th, have there been any

15  further phone calls with anyone for GPDEV or Simons?

16  A    By me?

17  Q    Yes, sir.

18  A    No, as I told them, I'm always available if they have

19  any questions and I really hadn't heard from them.  But I

20  also said that I would appreciate hearing from the clients.

21  I don't really need the lawyers on the phone.

22  Q    And just one additional question about the FEMA claims.

23  It's my understanding that you're seeking to employ counsel

24  on a contingency basis, but with the estate reimbursing all

25  costs; is that right?

1  A     I don't think it's all costs; I think we have limit of

2  $2,000.

3  Q     Okay.  And have you obtained any other funds since the

4  conversion of the case?

5  A     I've gotten -- I've got money in the bank, if that's

6  what your question is.

7  Q     Is that new money or money from the Chapter 11 estate?

8  A     It's from the Chapter 11.

9  Q     Okay.

10         MR. MOODY:  That's all the questions I have for

11  this witness.  Thank you, Your Honor.

12         THE COURT:  Okay.  Thank you, Mr. Moody.

13         Mr. Carickhoff, as I have said before, no need to,

14  you know, just cross-examine Mr. Miller and then do a

15  separate direct.  If you want to proceed with respect to

16  whatever questions, whatever questions you have of

17  Mr. Miller, you can proceed with those at this point.

18         MR. CARICKHOFF:  Thank you, Your Honor.  I

19  appreciate that.

20                    CROSS-EXAMINATION

21  BY MR. CARICKHOFF:

22  Q     Mr. Miller, could you please state your educational

23  background.

24  A     I'm a graduate of the University of Pennsylvania at the

25  Wharton School of Commerce is -- Finance and Commerce, sorry.

1  Q      Sure.  And do you have any professional certifications?

2  A      Yes, I'm a certified tort examiner.  I'm a certified

3  fraud examiner.  I'm a certified insolvency and restructuring

4  advisor.  And a CPA in Pennsylvania and in the state of

5  Florida.

6  Q      Okay.  And have you ever been qualified as an expert?

7  A      Yes, many, many times; in excess of 50 times.

8  Q      Okay.  And in what capacity have you before qualified

9  as an expert?

10  A      Prior to becoming a trustee, my primary emphasis in

11  work was to work for Chapter 7 trustees and also work for

12  Chapter 11 debtors.  And I was also appointed a Chapter 11

13  trustee.  I've also been a liquidating trustee.  And those

14  are the areas where I was providing expert testimony.  I've

15  been qualified as an expert in accounting matters and tax

16  matters, especially in bankruptcy tax matters.

17  Q      And how long have you been a CPA, Mr. Miller?

18  A      I've been a CPA since May of 1977.

19  Q      And how long have you been a Chapter 7 trustee?

20  A      I've been a Chapter 7 trustee since November of 2003.

21  Q      And through the course of your professional career, how

22  many litigations did you have to evaluate?

23  A      Litigations, well in excess of 10,000.

24  Q      And in terms of proofs of claim over the course of your

25  professional career, how many have you had to review and

1  analyze?

2  A    Well over a hundred thousand.

3  Q    All right.  Thank you.

4        Did you have an opportunity to review the three-page

5  consulting agreement that forms the basis of, or at least one

6  of the bases of the GPDEV and Simons claims?

7  A    I did.

8  Q    Did you review -- you had talked about getting

9  litigation documents from Mr. Collins in connection with

10  their Northern District of Florida litigation.

11        Did you have an opportunity to review those documents?

12  A    There were thousands of pages of documents and I -- no,

13  I didn't review 100 percent of them, but I reviewed a

14  substantial portion of them.

15  Q    All right.  And about how many hours of your time did

16  you spend reviewing those documents?

17  A    Approximately 65, between the two meetings.

18  Q    Okay.  And did you review the debtor's opening brief,

19  filed in connection with their appeal of GPDEV and Simons'

20  judgments?

21  A    I did.

22  Q    And based on your professional experience and your

23  review of the various documents that I just mentioned, do you

24  have any concerns about the proofs of claim filed by GPDEV

25  and Simons?

1  A      I do.  I think they're overstated.  The interest issue

2  is -- I've lost that many times; as a matter of fact, I've

3  never won.  So, I think that there's at least a million-

4  dollar issue there; it is raised in those claims.  And then

5  there are other issues that are raised.

6        The expert report, I've got a lot of problems with the

7  expert report.  It was done by a financial analyst.  It was

8  not done by a CPA.  It's not prepared in accordance with

9  Generally Accepted Accounting Principles.  It was done on a

10  cash basis.  It was not done on an accrual basis, so,

11  therefore, if you look at the claims in the calculation of

12  the amount of the claims of the creditors, you'll see that it

13  did not have the accrual calculation for the Bering Straits

14  cost, which the actual cash payments of those weren't allowed

15  the deduction, but the expert made a mistake and did not,

16  and -- and allow for the deduction of Bering Straits' unpaid

17  bills.

18        And amongst other things that are in there.  He flip-

19  flopped right away.  The contract under discussion has what

20  is called a "transportation fee" and a transportation fee is,

21  in that industry, based on my, you know, talking to clients

22  who are in that industry, that transportation fee is, you

23  know, the cost of transportation, which was an allowable cost

24  in the contract as a deduction in, you know, with the

25  contract with the two creditors.

1    Now, that was in excess of a million dollars.  It was

2  excluded in the transportation fee and he didn't discuss it

3  as a transportation fee.  He called it a "financing cost."

4    And nowhere in the document does it say it's a

5  financing cost.  So, basically, the expert report misleads

6  the jury, because it's actually a transportation fee.

7    He could have argued it's a transportation fee, but,

8  you know, I'm going to treat it something different than what

9  the contract says, but that's not what's in his expert report

10  as I read his expert report.  So, think there's a lot of

11  issues in there that are raised by, you know, the Bresky Law

12  Firm, which, if given anything, given some additional input,

13  may be credible.

14    Now, with that being said, I have asked for the

15  documentation and explanations and things like that from the

16  creditors and all they wanted to talk about is how I should

17  not go after the FEMA claims, but that I should go after, you

18  know, again, go after the fraudulent conveyances, which I

19  then pointed out that the expert report causes problems for

20  their fraudulent conveyance and they didn't want to hear

21  that.

22  Q    All right.  And just to be clear, you had mentioned the

23  Bresky Firm.

24    Were you referring to the Bresky Firm, which is the

25  debtor's appellate firm?

1  A     Yes, the Bresky Firm.  I mispronounced it.  I'm sorry.

2  Q     That's okay.  I just wanted to make sure for the record

3  that it's clear.

4        Based on your professional experience and your review

5  of the documents we discussed, do you think that the debtor's

6  appeal in their opening brief raises issues that you think

7  need to be explored further?

8  A     I think it has merit, but I also think I could probably

9  resolve these with the -- settling with the creditors.

10 Q     Okay.  But --

11 A     But it never got to that level.

12 Q     Okay.  But, again, in terms of the opening brief and

13 the issues raised in there, do you think that those are

14 issues that need to be further explored by the trustee?

15 A     Oh, absolutely, because the mistakes are so large, you

16 know, we're talking several millions of dollars.

17 Q     Okay.  And did you review the preliminary objections to

18 the GPDEV and the Simons' claims?

19 A     I did.

20 Q     And did you review them before they were filed?

21 A     (No verbal response.)

22 Q     Did you approve the preliminary objections before they

23 were filed in court?

24 A     Yes, I did.

25 Q     Okay.  And do you agree with those statements made in

1  the preliminary objections?

2  A      Yes, I do.

3  Q      Okay.

4          MR. CARICKHOFF:  I don't have any further

5  questions for Mr. Miller.

6          THE COURT:  Okay.  Mr. Moody, anything by way of

7  sort of redirect/cross?

8          MR. MOODY:  Your Honor, my colleague Len Collins

9  is far more familiar with the underlying case and he asked if

10 he could do the correct cross-questioning for Mr. Miller?

11         THE COURT:  Under the circumstances, I will permit

12 that.

13         So, Mr. Collins, you can cross-examine Mr. Miller.

14         MR. COLLINS:  All right.

15                    CROSS-EXAMINATION

16 BY MR. COLLINS:

17 Q      Mr. Miller, good afternoon.

18 A      How are you?

19 Q      I'm good.

20 A      That's good.

21 Q      So, my understanding is that you testified on direct

22 that you spent about 65 hours on this case; is that fair to

23 say?

24 A      That's not true.  That's not what I testified to.

25 Q      Well, help me understand what you testified to.

1  A      So, I --

2  Q      Well, just a moment.  Let me ask the question.

3  A      Okay.  I thought you did.

4  Q      So, as I understand -- sir --

5  A      I thought you said, "What did you testify to?"

6  I was going to answer your question.  I'm sorry.

7  Q      Okay.  Let's just take it one question at a time.

8         So, my understanding from your testimony is that you

9  spent 65 hours, but I'm not exactly sure on what.  So, can

10 you tell us what those 65 hours that you spent --

11 A      Reviewing those documents you spent to me.

12 Q      Okay.

13 A      I've spent over a hundred -- about a hundred and fifty

14 hours, a hundred and fifty-some hours.

15 Q      So, about a month?  You spent a full month on this

16 case?

17 A      Yeah.  There's a lot of documents to review -- 65 hours

18 of reviewing documents.

19 Q      Okay.  So, did you review the entire case file?

20 A      No, I did not -- what do you mean by "the entire case

21 file"?

22 Q      Well, are you familiar with the ECF system and the way

23 documents are logged into the ECF system?

24 A      Are you talking about the bankruptcy's ECF system?  I

25 don't understand your question.

1  Q    No, I'm talking about the trial court's ECF system.

2      Have you reviewed the trial's -- the trial court's

3  file?

4  A    I do not have access to that.

5  Q    Okay.  So, you reviewed the initial brief that was

6  filed by TSI, correct?

7  A    I reviewed the documents you gave me and the documents

8  that Mr. Gellert gave to me, with respect to the litigation.

9  Q    With all due respect --

10 A    And I can't tell you -- there's certain documents I

11 can't say which specific documents I reviewed.

12 Q    With all due respect, I sent you more than 35,000 pages

13 in records, right?

14 A    Okay.  I knew it was a lot.

15 Q    Okay.  And you didn't review all of those records, did

16 you?

17 A    I did not.

18 Q    Okay.  And you wouldn't have context to review those

19 records in the first place, would you?

20 A    I wouldn't have what -- I couldn't hear that word.

21 Q    Context.  You wouldn't have context to review those

22 records.

23 A    No, I expected to review the records and then get the

24 context from you and I never got that context --

25 Q    Did you ever ask --

1  A      -- if I had questions.

2  Q      Sir, did you ever put those questions in writing?

3  A      I did not.

4  Q      Okay.  And so, you say that you asked those questions

5  during your telephone calls with us?

6  A      No.  I wanted to go down that path.  I started to ask

7  those questions after we talked about your rathole comment

8  and then it got quickly -- you didn't really want to get

9  involved in that.  We'll do it later.

10          THE COURT:  All right.  So, I'm going to

11  interrupt.  I'm going to interrupt -- both of you -- I'm

12  going to interrupt you now.

13          Mr. Moody [sic], I'm going to give you some amount

14  of latitude to conduct cross-examination, but I want you to

15  give careful thought to whether the questions you're asking

16  actually bear on any question that's in front of me today.

17          I understand that sometimes in litigation, parties

18  get angry with each other -- that's okay -- and you get some

19  latitude for cross-examination, but I do want to be mindful

20  that there has to be some bearing on a dispute that is before

21  me in order for it to be properly part of your examination.

22  BY MR. COLLINS:

23  Q      Just so that I understand, Mr. Miller, you raised -- I

24  believe you raised in one of the filings, in a more recent

25  filing, a claim that the appeal discusses a jurisdictional

1  issue.

2       Do you remember that?

3  A    I do.

4  Q    Okay.  Are you aware that Judge Hinkle found that the

5  jurisdictional issue turned on documents that were, in his

6  words, "inauthentic"?

7  A    I am not aware of that.

8  Q    Okay.  Isn't that something that you would need to be

9  aware of in order to make a determination as to the validity

10 of the appeal?

11 A    If one item gets denied in an appeal, it doesn't make

12 the entire appeal invalid.

13      The things that I am an expert on and that I would have

14 knowledge about -- I am not a lawyer --

15 Q    Okay.

16 A    -- as I testified, I'm a CPA --

17 Q    Okay.

18 A    -- (indiscernible), a CFE --

19 Q    So --

20 A    -- fraud, and things of that nature, that's my area of

21 expertise.  I'm a CPA --

22 Q    Are --

23 A    -- that's what I testified to when I reviewed the

24 appeal --

25 Q    All right.  That's not -- sir, you're not being

1  responsive to my question.

2  A     Can you let me answer my question?

3  Q     Well, you're not responding to the question.

4  A     I think I am.

5  Q     I just asked you if you were aware.  You said you were

6  not.  That's the answer.

7            THE COURT:  All right.  So, I think I understand

8  that much.

9            Mr. Moody [sic], why don't you -- let's do this

10 one at a time.  Mr. Moody, why don't you ask a question and

11 then we'll give Mr. Miller the chance to answer.

12           MR. COLLINS:  And, Your Honor, just so the record

13 is clear, this is Leonard Collins.  I know it's --

14           THE COURT:  Oh, I apologize, Mr. Collins.  My

15 fault.  I --

16           MR. COLLINS:  It's okay.

17           THE COURT:  That one's on me.  My apologies.

18           Go ahead, Mr. Collins.  Let me give you another

19 chance.

20           MR. COLLINS:  It is confusing.  It's got

21 Mr. Moody's name on the screen.

22           THE COURT:  It's -- I should know -- well,

23 nevertheless, I should be able to know the difference, so my

24 apologies there.

25 BY MR. COLLINS:

1  Q     Mr. Miller, are you aware that TSI's accounting expert

2  did not testify at trial?

3  A     Who was his expert?  Who was their expert?

4  Q     The expert who's referred to in the appellate brief, he

5  never testified at trial.

6        Are you aware of that?

7  A     Who is he?  I mean, I can't answer that question unless

8  you give me a name.

9  Q     He's an individual from KPMG.  I can go back through

10  the records.  I would be shocked if you knew the record well

11  enough to know which witness was which.

12  A     I knew that KPMG was -- their accounting expert, I knew

13  someone did testify, but he did not work at KPMG.  So, now

14  that you've identified KPMG, I can answer, yes, he did not

15  testify, or he or she.  I don't even know if it was a male or

16  female.

17  Q     The gentleman from KPMG did not testify, correct?

18  A     That's what I understand.

19  Q     And the expert report that TSI prepared was not issued

20  or offered to the jury at trial, correct?

21            THE COURT:  If he knows.

22            THE WITNESS:  Well, I wasn't -- I didn't read the

23  trial transcript, so I don't know what was offered.

24            THE COURT:  Okay.

25            THE WITNESS:  But if I can see the transcript --

1   BY MR. COLLINS:

2   Q     Fair enough.  Fair enough.  Fair enough.

3         But the appeal acts as if those documents were actually

4   entered into the record; isn't that right?

5   A     The appeal -- I read the appeal.  I believed it --

6   Q     Correct.

7   A     -- was a factual appeal.  I didn't sit there and audit

8   it.

9   Q     Correct.

10        But the appeal refers to documents that were never ever

11  offered into evidence at trial, correct?

12  A     I don't know that.

13  Q     The appeal suggests that --

14        MR. CARICKHOFF:  Your Honor, he's testifying at

15  this point.

16        THE COURT:  Yeah, so, Mr. Collins, let me suggest

17  that I think I can take judicial notice of what the appellate

18  brief says and so, therefore, to the extent the parties want,

19  at argument, to argue whatever they want about that brief,

20  they're welcome to.

21        But I'm not sure that -- what's relevant here, I

22  think, if it is, but at most of what's relevant is the nature

23  of Mr. Miller's examination before he filed the objection.  I

24  think I've heard about that and I understand, in broad

25  strokes, what he did and didn't do.

1          And I don't want to -- I want to give you a fair

2    chance to put on an appropriate record, but I believe that I

3    understand what I need to understand in order to get to the

4    bottom of that question.

5    BY MR. COLLINS:

6    Q     Sir, is it uncommon for a party to file an appeal and

7    then file for bankruptcy?

8    A     Could you repeat that question again.

9    Q     Is it uncommon for a party to -- who goes into

10   bankruptcy as a result of litigation, to file an appeal and

11   then file bankruptcy?

12   A     I don't think it's uncommon.

13   Q     Okay.  In your experience, have -- well, let me take a

14   step back.

15         Have you taken any is steps to pursue the appeal in

16   this case?

17   A     I have spoke -- I have not personally spoken -- my

18   attorney's spoken to the Bresky Law Firm.

19   Q     Okay.  Have you moved to lift the stay of the appeal?

20   A     Not yet.  And I don't know if -- right now, you know,

21   I'm more concerned about collecting $30 million.  If I

22   collect $30 million, your client is paid.

23   Q     Sir, in terms of the appeal, what other steps have been

24   taken to pursue that appeal?

25              MR. CARICKHOFF:  Your Honor, this is irrelevant.

1              The appeal has been stayed.  There's nothing that

2    needs to be done with respect to the appeal right now.  I'm

3    not really sure where this is going.

4              THE COURT:  So, Mr. Collins, you've asked whether

5    he's filed the motion to lift the stay.  He believe he

6    testified the answer to that is no, and whether he testified

7    to that or not, I can get the answer to that from my docket.

8              If there's anything else that you need to ask

9    about the status of the appeal, I'll give you a chance, but

10   I'm not sure what else you need.

11   BY MR. COLLINS:

12   Q    Mr. Miller, do you agree that there's a dispute, a *bona*

13   *fide* dispute between yourself and creditors, GPDEV and Simons

14   Exploration?

15             MR. CARICKHOFF:  Objection, Your Honor; calls for

16   a legal conclusion.

17             THE COURT:  I actually don't -- in fairness, it

18   depends on what the question is.

19             Do you -- Mr. Moody [sic], why don't you ask that

20   question in a way in which I think it's clearer what you're

21   referring to.

22             MR. COLLINS:  Sure.

23             THE COURT:  Let me -- look, here's the -- to the

24   extent you're asking him, is there a *bona fide* dispute about

25   your proof of claim, that calls for a legal conclusion.

1          MR. COLLINS:  I'm not.

2          THE COURT:  To the extent you're asking him if

3   there's a disagreement about business strategy, that strikes

4   me as basically irrelevant, but if you've got a question that

5   matters, let me give you a chance to ask it.

6   BY MR. COLLINS:

7   Q    Well, Mr. Miller, you suggested in your filing, in an

8   attempt to oppose the trustee election that, essentially --

9   and you can correct me if I'm wrong -- Mr. Simons and

10  Mr. Peterson were doing it because they were concerned about

11  the appeal; is that fair to say?

12  A    Well, you first said that I didn't file the objection

13  because of the trustee election.  I was -- you know, I have

14  to file that objection, if you call for an election and a

15  claim is filed.

16         If you didn't file a claim, then I wouldn't have filed

17  an objection to your proof of claim.  And the issue is --

18  Q    That's not what I'm talking about --

19  A    Pardon?

20         Well, you asked such a long question, so now let's go

21  to the second part of your question.  What was it?

22  Q    I just want to be sure you understand the question.

23         So, would you agree that a document was filed on your

24  behalf as the interim trustee, challenging Simons and

25  Peterson -- GPDEV and Simons Exploration's right to vote?

1  A      I don't think we filed a document challenging your

2  right to vote; we filed an objection to your claim.

3  Q      Let me try and clarify and you tell me if you're aware

4  of it, but my understanding is that before this proceeding,

5  there were several documents filed by creditors and by the

6  interim trustee with regard to this particular hearing.

7         Are you familiar with those documents?

8  A      You'd have to show me the documents if you're going to

9  test my familiarity with a specific document.

10  Q      Well --

11  A      And I'll -- I can answer questions on this specific

12  document.

13  Q      Well, wouldn't you agree that Mr. Peterson for GPDEV

14  and Mr. Simons for Simons Exploration, have a genuine dispute

15  with you about how to proceed?  Wouldn't you agree that they

16  really disagree with what you're doing?

17  A      No, I think you do, but I don't think they did.  They

18  seemed like reasonable people on the phone.  They didn't get

19  upset when I was going after the fee and the claim.

20              THE COURT:  All right.  So --

21              THE WITNESS:  They knew I was trying to help

22  Bering Straits.  They know because of the business, that that

23  would be the quickest way to resolve this.

24              THE COURT:  So, Mr. Collins, I'm inclined to --

25  look, I understand where you're going.  And I actually think

1  the facts you need to make the argument you need to make are

2  in the record.  I don't want to interfere with reasonable

3  cross-examination, but it's not clear to me that you need to,

4  you know, continue further, unless, again -- again, I want to

5  with respectful of the parties' rights to put on their case,

6  but it's not clear you need to keep going.

7        MR. COLLINS:  I appreciate the Court's indulgence.

8  If it's okay, I'd like to confer with counsel and we may

9  conclude.  I just want to be sure --

10        THE COURT:  Certainly.

11        MR. COLLINS:  -- leaving on the table.

12        Just a moment.

13     (Pause)

14        MR. CARICKHOFF:  Your Honor, while they're

15  conferring, can you give me a minute to get a glass of water?

16        THE COURT:  Certainly.  Why don't we recess for

17  three minutes and come back at 4:27.

18        MR. CARICKHOFF:  Thank you.

19        THE COURT:  So, with that, we stand in recess.

20     (Recess taken at 4:24 p.m.)

21     (Proceedings resumed at 4:27 p.m.)

22        THE COURT:  Okay.  This is Judge Goldblatt.

23        We are back on the record.  I think where we left,

24  Mr. Collins was conferring about whether he had further

25  questions for Mr. Miller.

1    Mr. Collins, do you?

2          MR. COLLINS:  I -- I apologize.  Hopefully -- no,

3    no, no -- wait.  I'm sorry.

4          I'm trying to -- all right.  I'm trying to

5    manipulate Mr. Moody's (indiscernible) and I ran into some

6    difficulty, but I think we're okay now.

7          We have a couple of other questions for

8    Mr. Miller, but not -- maybe five minutes, maybe less.

9          THE COURT:  Okay.  You can proceed.

10          MR. COLLINS:  Sure.

11                CROSS-EXAMINATION (CONTINUED)

12    BY MR. COLLINS:

13    Q    Mr. Miller, will you agree that you did not raise

14    objections to the qualifications of Mr. Workman at the 341

15    meeting?

16          MR. CARICKHOFF:  Objection, Your Honor.

17          I think that's noted in the U.S. Trustee's report

18    of election.  Those issues as to the eligibility of

19    Mr. Workman were raised at the election and they were noted

20    by the U.S. Trustee in their report.

21          Mr. Workman was not there and was not available to

22    be questioned.

23          THE COURT:  In any event, it seems to me whether

24    those issues were raised at the meeting or not are -- it's

25    not clear to me that that makes a particular difference,

1 given where we are.

2          So, you can answer the question, but I'm not sure

3 that the answer makes a ton of difference.

4          MR. COLLINS:  Well, let me strike the question and

5 ask another one.

6          THE COURT:  Okay.

7 BY MR. COLLINS:

8 Q     Sir -- Mr. Miller, you're the trustee on many, many

9 cases currently; is that correct?

10 A     Yes.

11 Q     How many cases do you currently have?

12 A     I could look it up if you want.  I don't think I have

13 the paperwork here.

14 Q     Is it more than 20?

15 A     Oh, yeah.  It's -- yeah, more than 20, sure.  You can

16 have more than 20 individuals open at any one point in time.

17 Q     Okay.  And how many new cases do you get over the

18 course of a month?

19 A     Are you talking corporate cases or are you talking

20 individual cases?

21 Q     Both.

22 A     Okay.  Individual cases, because of the pandemic and

23 things of that nature, we're averaging about eight a month

24 and they usually get resolved within the month.  I mean, a

25 couple may turn into a massive case.

1      You know, coincidentally, or just prior to the

2  conversion of this case, I got six corporate cases from the

3  same 341 meeting, and so -- yeah, the 341 date, which was the

4  same date as this one, but they were the only corporate cases

5  that I received in 2022.

6  Q     Okay.  During the 341 meeting on April 28th, where this

7  case was addressed, personally, do you recall that meeting?

8  A     I do.

9  Q     Okay.  And wouldn't you agree that the meeting was

10  scheduled to begin at 10:00 a.m.?

11  A     Well, that was what the calendar was, yes, but there

12  was many -- like I said, there were six corporate cases on

13  the calendar that day.

14  Q     Right.  And which case went last?

15  A     Which was scheduled for being last was this case.

16  Q     Okay.  And would you agree that it took at least four

17  hours to get to this case?

18  A     I don't know how long we took.  We had six cases and,

19  you know, whatever it took, it took.

20  Q     Five hours?  Could it have taken six hours?

21  A     I don't know how long we took.

22  Q     Would you expect everyone associated with the 341

23  meeting to remain on hold for six hours, without notice as to

24  when they were going to be called?

25  A     The only person I heard that left, allegedly left, was

1  Workman.

2  Q      Right.

3  A      And that's because you said he was there and got off

4  the phone, but I did not see -- you know, I did not have

5  anything on the -- on my computer saying that he had actually

6  called in or anything like that.  He may have.  I just don't

7  know.  But I don't know if he was there or not there.

8         But if he was interested in being a trustee, you know,

9  one of the primary things of a trustee is you treat your

10 cases importantly.  That's why I have 150 hours into this

11 case and he's missed two meetings now.

12 Q      Help me understand this.  You've got 150 hours into

13 this case, but you're holding 40 other cases?

14 A      Yeah.

15 Q      So, how do you -- do you not spend time on your other

16 cases?

17 A      I do.

18 Q      So, how much -- how many hours are you billing a month?

19 A      I don't know, in a month, I bill over 2,000 in a year

20 and it's not billed; it's recorded.

21 Q      So, you recorded -- you record 2,000 hours in a year,

22 so that's, what, 180 a month?

23 A      No, it's more than that, then, like, probably 200 --

24 2,000 -- four -- I mean, I'm just guessing at this point

25 (indiscernible) guess.  But it's a lot.  I work hard.  I work

1  really hard.

2  Q     Okay.  But as hard as you work, there are major facts

3  that you're unaware of in this case; isn't that right?

4           MR. CARICKHOFF:  Objection, Your Honor.

5           He's being belligerent at this point.

6           THE COURT:  Well, it's not -- look, the -- my

7  concern here isn't -- it's, frankly, more relevance than

8  belligerence.

9           The question before me isn't:  Who would do a

10 better job and who's more dedicated?

11          I've got a much more specific statutory question,

12 so I'm not sure this contest of who's harder-working, bears

13 on anything before me.

14          So, with that, Mr. Collins, you can continue if

15 you've got things that are germane to the things in front of

16 me.

17 BY MR. COLLINS:

18 Q     Would you agree that Mr. Workman has an office in

19 Delaware?

20 A     No.

21 Q     Would you agree that the law firm does?

22 A     I would agree that the same lawyers who are in

23 Philadelphia are listed as a Delaware office, but I have not

24 been able to find any permanent employees in Delaware.

25 Q     I'm sorry, you went looking to see what employees the

1  law firm BakerHostetler has in Delaware?

2  A      BakerHostetler -- I should have qualified -- bankruptcy

3  employees.  BakerHostetler, the lawyers that are assigned to

4  the Delaware office are intellectual property lawyers and the

5  same four intellectual property lawyers seem to be actually

6  working in Philadelphia.

7        But you don't have that for Mr. Workman.  Workman is

8  the head of the office in Washington, D.C.  Everything that

9  I've been able to find searching on the internet says he just

10  works solely out of Washington, D.C.  He may be a partner in

11  a multinational firm, but as I see in another cases, that is

12  not -- unless he has an office there, and staff, and all the

13  requirements of the trustee, like, this office here is a

14  Trustee's Office.

15        The United States Trustee comes and looks at this

16  office.  They meet with me.  They come in for surprise visits

17  and say, Oh, we're here, and I've got to be here.  I have

18  trustee offices with locks on them.  They have to have locks.

19  A      trustee has to get, you know, audited or investigated

20  by the FBI.  And I will say that, you know, even if the

21  trustee -- if I'm not the trustee, it's going to be another

22  60 to 80 days before the FBI says that Mr. Workman can be the

23  trustee and I'll have the case for 60 or 80 days.

24        So, I will administer some of the things that I think

25  need to be administered in the next 60 days or whatever.

1  Q    Okay.  Even though you spend a significant amount of

2  time in Florida, the FBI issue hasn't been a problem for you?

3  A    It hasn't been since 2003.

4  Q    Right.  Thank you very much.

5  A    My office is in Philadelphia, primary office.

6         THE COURT:  Okay.  So, Mr. Collins, any further

7  questions for Mr. Miller?

8         MR. COLLINS:  No, Your Honor.

9         THE COURT:  Okay.  Mr. Carickhoff, any redirect,

10 as it were?

11        MR. CARICKHOFF:  No, Your Honor.

12        THE COURT:  Okay.  So, Mr. Miller, you can step

13 down.  Thank you for your testimony.

14        THE WITNESS:  Thank you, Your Honor.

15        I apologize if I was very loud.

16    (Witness excused)

17        THE COURT:  No issues with the volume.  Thank you,

18 Mr. Miller.

19        Mr. Carickhoff, do you have any further witnesses

20 to call?

21        MR. CARICKHOFF:  I do not, Your Honor.

22        THE COURT:  Okay.  So, let's -- I just want to see

23 if we can make sure we dotted our Is, with respect to the

24 evidence.

25        Mr. Carickhoff, you said you at the outset you had

1   no concerns about the admission of the U.S. Trustee report.

2          Mr. Moody, any objection to the admissibility of

3   that report?

4          MR. COLLINS:  No, Your Honor.

5          THE COURT:  Okay.  So, we'll treat that as

6   admitted.

7       (Exhibit received into evidence)

8          THE COURT:  And let me ask this, I had thrown out

9   what I thought were facts that were not actually disputable

10  as they relate to Mr. Workman, which is that, essentially,

11  what Mr. Miller said, that his principal office is in

12  Washington, D.C. and that he's a partner at a firm that has

13  offices in Delaware and Philadelphia.

14         Can those facts be treated as agreed among the

15  parties or do we need evidence as to those facts?

16         MR. MOODY:  Your Honor, I believe that those facts

17  are accurate.  And our contention is that what he has

18  constitutes having an office in the judicial --

19         THE COURT:  Right.  No, I understand.

20         There's a legal question that I need to decide --

21         MR. MOODY:  Certainly.

22         THE COURT:  -- and I want to make sure I

23  understand, you know, as against what's facts.

24         Mr. Carickhoff, anything -- any dispute as to

25  those facts?

1          MR. CARICKHOFF:  I just want to be crystal clear

2    of what those facts are that you're asking me to agree to.  I

3    agree that Mr. Workman's office is in Washington, D.C. and I

4    agree that BakerHostetler looks to have a physical presence

5    in Philadelphia and Wilmington.

6          THE COURT:  Okay.  That -- those are the facts.

7          And, Mr. Moody, you're not -- you haven't, and

8    aren't proffering any evidence about how much time

9    Mr. Workman, in fact, spends in any of those offices or about

10   where his residence is or anything like that, right?  I

11   mean -- is that right?

12         MR. MOODY:  Correct, Your Honor.

13         THE COURT:  Okay.  All right.  So, I think I

14   can -- if that's the record, I think I can address the

15   question whether that's sufficient as a matter of law.

16         And I take it, just so that we're all on the same

17   page, in terms of -- I mean, are there other documents beyond

18   the things that we've talked about, that anyone wants to move

19   into evidence, just so everyone has a fair opportunity?

20       (No verbal response)

21         THE COURT:  We've talked about the Eleventh

22   Circuit brief that was filed, of which I can take judicial

23   notice.  Obviously, the pleadings that were previously filed

24   in the earlier hearing are before me and I can take notice of

25   them.

1  Mr. Carickhoff?

2          MR. CARICKHOFF:  Sure.  With respect to the

3  exhibit list that we filed, I think all but the items

4  regarding BakerHostetler, the Court could take judicial

5  notice of.  You could probably take judicial notice of what's

6  on BakerHostetler's webpage, but, basically, with the parties

7  agreeing to what those facts were, I don't think those three

8  items on my exhibit list matter.

9          THE COURT:  Okay.

10          MR. CARICKHOFF:  And so, I would just ask the

11  Court to take judicial notice of the documents and our

12  exhibits.

13          THE COURT:  Mr. Moody, do you have any objection

14  to that?

15          MR. MOODY:  We do not, Your Honor.

16          THE COURT:  Okay.  And are there other documents

17  that you want to be moved in for any purpose?

18          MR. MOODY:  Yes, Your Honor.

19          We conferred with Mr. Carickhoff yesterday and we

20  filed an amended witness and exhibit list, found at

21  Docket 80, because it didn't print out on my version.

22          We had conferred and I believe we thought that the

23  Court could -- we didn't have any objections to anything

24  other than Exhibits 44 through 47, I believe, and 55 and 56.

25          And these are all just documents that relate to

1    the underlying litigation.  I don't think they're key or

2    critical for the Court's analysis.

3              We would just move to enter the exhibits that have

4    not been subject of objection.

5              THE COURT:  Okay.  Mr. Carickhoff, any objection

6    to what you haven't objected to?

7         (Laughter)

8              MR. CARICKHOFF:  I just want to be -- I just want

9    the record to be clear, right.

10             So, what we -- what Mr. Moody and I talked about

11   the other day were the items that were available on the

12   various courts' dockets that Your Honor could take judicial

13   notice of.

14             I said with respect to the things that Your Honor

15   wasn't going to take judicial notice of, I had an issue with.

16   So, if those are not being offered into evidence, then I'm

17   okay and I don't have any issues.

18             THE COURT:  All right.  So, why don't we just --

19   just so that we get clarity -- make sure that we are all

20   talking about the same documents.

21             So, with respect to the witness list that, or the

22   exhibit list that, Mr. Moody, you submitted -- let me pull

23   that up.  Okay.  So, I have in front of me, Docket 196, and

24   that's the amended creditors' witness and exhibit list.

25             Is that what we're talking about?

1        MR. MOODY:  Yes, Your Honor.

2        THE COURT:  Okay.  And with respect to the

3   exhibits on the list, you're saying that the parties agree to

4   the admissibility of all of them except for which ones?

5        MR. CARICKHOFF:  Your Honor, can you just -- I

6   apologize -- I'm just trying to find that document.  Just

7   bear with me.

8        THE COURT:  Yeah, absolutely.  Take a minute.

9        You're entitled to be -- for us all to be looking

10  at the same things.  Let me give you a minute.

11      (Pause)

12       MR. CARICKHOFF:  Okay.  And it's Docket 196?

13       THE COURT:  Yes, it is.

14       MR. CARICKHOFF:  Okay.

15       THE COURT:  And so, just looking at it, Mr. Moody,

16  where you talking about Documents 49 through 56 being the

17  ones that are not agreed to?

18       MR. MOODY:  I thought we were agreeable to all

19  being entered, other than Documents 44 to 47 and 55 and 56.

20       THE COURT:  Okay.  Mr. Carickhoff, is that

21  consistent with your understanding?

22       MR. CARICKHOFF:  Hey, Rick, can you please repeat

23  that, please.

24       MR. MOODY:  44 through 47 and then 55 and 56; I

25  think those were the ones that I had marked as you guys

 1  having an objection to.

 2          MR. CARICKHOFF:  That's correct.

 3          THE COURT:  Okay.  So, those will not be admitted.

 4  All of the others will be deemed admitted.

 5          MR. CARICKHOFF:  I'm sorry, are you taking

 6  judicial notice of?

 7          THE COURT:  Yes.  These are all -- the others are

 8  all documents that are on various other pleadings, so they're

 9  subject to judicial notice.

10          Is there anything else that is evidentiary that

11  the parties would like to present?

12      (No verbal response)

13          THE COURT:  Okay.  Hearing nothing --

14          MR. MOODY:  On behalf --

15          THE COURT:  I'm sorry, go ahead.

16          MR. MOODY:  On behalf of the creditors, no, Your

17  Honor.

18          THE COURT:  Okay.  Mr. Carickhoff?

19          MR. CARICKHOFF:  No, Your Honor.

20          THE COURT:  Okay.  So, now we have the record that

21  we have.  Mr. Moody, it's your motion.  Let me give you the

22  chance to make your argument.

23          MR. MOODY:  Certainly.

24          Your Honor, this case presents a situation in

25  which the largest creditors of the estate who had spent quite

1   a bit of money in order to fight for the debtor leading up to

2   this point, have the most to lose and they have significant

3   investment in making sure that the best path going forward is

4   done.

5          The evidence elicited demonstrated the difference

6   of opinion between the trustee and creditors, who believe

7   that the factually fraudulent, insider transfers should be

8   pursued, at least until the *lis pendens* can be filed in order

9   to protect potential disposition of assets.

10          Section 702 of the Code was allowed -- created, in

11   order to allow for elections in limited situations.  The

12   creditors, GPDEV and Simons, are both holders of unstayed,

13   final judgments that were decided by a jury.

14          It's not uncommon, as Mr. Miller admitted, it's

15   not uncommon for someone who loses at a trial to file an

16   appeal and then to later file for bankruptcy.  The existence

17   of the appeal, itself, we don't think is enough to render our

18   claim disputed.

19          THE COURT:  So, Mr. Moody, Mr. Carickhoff cites to

20   some cases that say, Look, the question is just as of the

21   time of the 341 meeting, was there a pending objection or

22   not?

23          And if there was a pending objection, there's

24   nothing else for you to do, Judge, and so, your job, Judge,

25   is really simple:  You have to answer the question whether

1   there was an objection filed at the time of the election.

2   I'm interested in your argument as to why that legal position

3   is incorrect.

4            MR. MOODY:  Certainly, Your Honor.

5            In the case of In re Amherst Tech, LLC, at 335

6   B.R. 502, 509.  That was a Bankruptcy District of New

7   Hampshire opinion in 2000 --

8            THE COURT:  Yep, Judge Deasy's opinion.

9            MR. MOODY:  Yes, Your Honor.

10           It was noted that it's not enough to merely file

11  an objection to a claim in order to disqualify a creditor

12  from participation in an election.  The objection cannot be

13  frivolous.  It would be supported by more suspicion -- more

14  than mere suspicion and may not be interposed for an improper

15  purpose.

16           THE COURT:  Okay.  And what language in the Code

17  or Rules supports that statement of law?

18           MR. MOODY:  What language in the Code or the

19  Rules?

20           Section 702 requires an allowable, undisputed

21  claim.  Rule 2003 requires the filing of a proof of claim,

22  and then states that the claim must not be subject of an

23  objection by the time of the meeting.

24           I don't know if there's any section of the Code

25  that spells out that the claim -- that the objection must not

1  be frivolous.  I think, as a general matter, objections to

2  claims may not be frivolous or interposed for an improper

3  purpose.

4          THE COURT:  Can I ask you this question,

5  Mr. Moody:  Is your suggestion that I conclude that there is

6  no objection to your claim or is it that what I should do is,

7  centrally, as a means of resolving the disputed election, is

8  to resolve the claim objection and say, There's an unstayed

9  judgment.  It's an allowed claim and that'll be that.

10         Do you understand my question?  I'm trying to wrap

11 my head around what's the right analytic framework for what

12 my job is here, and I'm just looking for your help in

13 understanding that.

14         MR. MOODY:  Certainly.  I think it's the same

15 analysis that would be undertaken for any objection to claim.

16 The "objection to claim" filing, itself, is not enough; it

17 must rise -- you know, if the claim has *prima facie* validity,

18 the objection must -- the objecting party bears the burden to

19 defeat the *prima facie* validity of the claim.

20         And our position here is that because of the

21 manner in which objections were filed, the U.S. Trustee

22 notified the interim trustee of the upcoming election and

23 immediately, all of the claims that (indiscernible) were

24 subject of an objection.

25         We can't -- we don't believe that the Code was

1  written so that an interim trustee could stay in, just by

2  objecting to all the claims.  And in this -- and, in fact,

3  that's evidenced that there was an improper purpose; the

4  improper purpose being that Mr. Miller wanted to stay in the

5  role in this case against the will of the largest creditors.

6              THE COURT:  Okay.  All right.

7              So, I understand your position there.  Let me let

8  you continue.

9              MR. MOODY:  So, we had just said that GPDEV and

10  Simons are holders of final judgments that are unstayed.  No

11  party claimed they were invalid in the course of litigation

12  about the conversion or dismissal.  If they were, you know,

13  bogus claims, that certainly would have come up.  The debtor

14  would have been the first to raise it.  The only time that

15  it's been raised that these claims are invalid is on the eve

16  of the election that we notified everyone would take place.

17             The case law, we agree, is scant.  The only case

18  that they point to is the In re Williams opinion.  But if you

19  read the facts of that case, it was far different.  There was

20  a large number of creditors that were -- would have been

21  harmed if the one creditor who was being sued for

22  preferential transfers and other -- and had filed a secured

23  claim -- had prevailed in electing a true.  We just think

24  that was a far different factual circumstance.

25             In this case, it's like a -- as we said at the

1  beginning of the conversion argument or trial, it's

2  effectively a two-party dispute.  There are other creditors.

3         Most of them are lawyers for the debtor, most of

4  whom received preferential transfers right before the filing.

5  So -- but the real main parties are GPDEV, Simons.  Bering

6  Straits may have a claim.  And there's another party called

7  "Lindsay Blee" that may have a claim.  The claims register

8  only reflects seven claims.

9         If -- no matter which way the Court decides in

10  this case, very different from Williams, if the Court finds

11  in favor of the interim trustee, who the debtor supported and

12  voted in favor of, the Court's finding that they're, you

13  know, enabling the choice of the debtor.

14         And if you side in favor of the creditors, GPDEV

15  and Simons, then you're deciding in favor of the creditors

16  and we believe the Court has an obligation to -- the trustee

17  has an obligation to work on behalf of the creditors and not

18  the debtor.  And we'd love to see a trustee inserted who

19  would file insider actions to title -- potential assets.

20         Thank you, Your Honor.

21         THE COURT:  Actually, Mr. Moody, before you go,

22  let me ask you something else.

23         Assuming you're entitled to conduct an election,

24  let me tell you why I have concerns about Mr. Workman's

25  eligibility.  And let me say, you know, Mr. Workman is a

1  well-known bankruptcy lawyer.  I know him, myself.

2          My questions are not about anyone's competence

3  or -- not about his competence -- I don't think the question

4  in front of me is who will do the better job or who will

5  paycheck the right strategy.  I think I've got a pretty

6  technical, statutory question.

7          And as I see it, there's very little case law on

8  having to make sense of the requirements of 321 about

9  resident or principal place (indiscernible) -- not the

10  place -- the language of 321 is:

11          "Resides or has an office in the judicial district

12  within which the case is pending, or in any judicial district

13  adjacent to such district."

14          And what we have is this Ninth Circuit pre-Code

15  case, In re Drummond, about Section 45 of the old Act.  And

16  there, the Ninth Circuit said, someone who spends a few hours

17  a month in an office doesn't satisfy the requirements.

18          Now, I'm not here to engage in a conversation

19  about whether -- what Section 321 requires, if it makes any

20  sense, is good policy, or should be amended in light of the

21  modern realities.  That's -- those are interesting questions,

22  but they're not for me.  I've got the statute I have.

23          And, you know, there's this presumption that when

24  Congress enacts a statute against the background of a prior

25  judicial decision construing the prior statute, that it

1  mostly carries with it the judicial gloss that was put on the

2  language before.  So, what we've got is essentially the same

3  language and a judicial gloss that says spending a few hours

4  a month in a place isn't sufficient.

5          And, here, the record I've got is not even that

6  Mr. Workman spends a few hours a month in either,

7  Philadelphia or Wilmington, and so, I'm interested in hearing

8  why, in light of that, if you are right, that you get to --

9  so, let me ask you two questions:  If you're right that you

10  get to choose a trustee, what's the case, in light of the

11  questions I have, as to why Mr. Workman is qualified?

12          And, again, just to be clear, that's not about

13  whether I think he'd do a good job, but whether he satisfies

14  the statutory requirements.

15          And, second, if I conclude that you are entitled

16  to make an election, but that you haven't elected a qualified

17  trustee, do you get another chance and why?

18          So, those are my questions, if they make any

19  sense.

20          MR. MOODY:  Thank you, Your Honor.

21          You're absolutely right; there's a dearth of

22  recent or modern case law on interpretation of

23  Section 322(a)(1).  A competent person to perform the duties,

24  I don't think that that is really a question.  I think

25  Mr. Workman is very competent and having worked with him on

1 other similar cases in the past, I think he'd do a great job.

2 He doesn't reside in the judicial district in which the case

3 is pending, or in an adjacent district.  I believe he resides

4 in D.C., but he has a nationwide practice.

5 　　　　　And the language in Section 321 does just say,

6 "has an office in the judicial district."  It is my

7 understanding that Mr. Workman helped to set up the Delaware

8 office and works out of there as an equity partner in the

9 firm and that --

10 　　　　　MR. CARICKHOFF:  Objection.

11 　　　　　He's offering testimony.

12 　　　　　THE COURT:  Well, the record is what it is, and

13 it's true that there is no evidence to that effect.

14 　　　　　MR. MOODY:  Right.  I would say that, you know,

15 the Drummond case was sort of before the modern day age of

16 multinational law firms, where in my former firm, we could

17 work out of any office that we wish to, depending on the

18 case.  And we would argue that being a member in that, in a

19 firm with offices that, you know, that that qualifies.

20 　　　　　THE COURT:  All right.  I understand that.

21 　　　　　Okay.  So, can you turn to -- if I disagree with

22 you about that, can you turn to my next -- the -- the, what

23 if you lose that?  What if you win on being allowed to elect

24 a trustee, but lose on the election of Mr. Workman?

25 　　　　　MR. MOODY:  Yes, Your Honor.

1          I believe we should be allowed to have an

2  opportunity to name another trustee who meets the

3  requirements of the Code if Mr. Workman is deemed ineligible.

4  We have had discussions with other backup, potential trustees

5  who would also be very qualified.

6          THE COURT:  Okay.  Thank you, Mr. Moody.

7          Anything else from you?

8          MR. MOODY:  No, Your Honor.  Thank you for your

9  time.

10          THE COURT:  Thank you.

11          Okay.  Mr. Carickhoff?

12          MR. CARICKHOFF:  Sure, Your Honor.

13          And just let me -- I don't know if you wanted to

14  start on the 321 issue or if you want to go to --

15          THE COURT:  I'm happy to let you start wherever

16  you'd like and then I'll rudely interrupt you and take you

17  off of what you were trying to talk about and bring you

18  somewhere else.

19      (Laughter)

20          MR. CARICKHOFF:  That's all right.

21          THE COURT:  That's what I do all the time, so

22  there's no reason that I should treat you differently.

23          MR. CARICKHOFF:  I appreciate that.

24          So, why don't we stay on the topic of Section 321

25  and the case law that interprets 321.  As Your Honor pointed

1    out, the Drummond case was determined under the Bankruptcy

2    Act.  Much of that same language continued into the

3    Bankruptcy Code.

4        So, you'd have Drummond, which was decided in

5    1969, which said that the purpose of that residential or

6    office requirement was to assure that the trustee would be

7    present and available in the judicial district for

8    consultation and advice.  That's what Drummond says and that

9    was 1969.

10        Then, you get to the, we'll call it the "Martech

11   case," which was the Ninth Circuit, 1996.  And many years

12   have passed, technologies kind of improved, and the Martech

13   Court says:

14        "Congress' directive concerning a location of a

15   trustee's office must be complied with not just technically,

16   but so as to serve the spirit of the rule; the rule is not to

17   be probed for loopholes."

18        And in reaching its decision, Martech noted that,

19   because:

20        "The Drummond court emphasized the trustee's

21   physical availability in a judicial district, the fact that

22   the new technology has made communication and travel easier

23   is not significant."

24        And that's at 852 in Martech.

25        THE COURT:  Okay.  But Mr. Carickhoff, just -- let

1  me just -- can we just -- I want to be clear on what I'm

2  deciding and not deciding.

3         If I were to conclude that Mr. Workman doesn't

4  reside in Delaware or in an adjacent district, and if I were

5  to conclude that his firm's having an office in Delaware or

6  in an adjacent district was insufficient, and I thought, I'm

7  highly confident he's going to be perfectly available; it's

8  not a problem, he could be here all the time, would that make

9  him eligible?

10        MR. CARICKHOFF:  No, it would not.

11        THE COURT:  Okay.  So, the way I'm -- I just want

12  to make sure that we're all thinking about it the same way,

13  because there's all this discussion about whether he showed

14  up here or didn't show up there, and there's case laws about

15  the reasons for the requirement.  But it seems to me the

16  requirement is either met or it's not met, and there's

17  neither, you know, occasion, nor necessity for me to make any

18  finding one way or the other about whether Mr. Workman would

19  be able to be present in the jurisdiction and do the job

20  well, if I think the statutory requirements, on their face,

21  aren't met.

22        Am I thinking about that wrong?

23        MR. CARICKHOFF:  No, you're not; you're thinking

24  about it the right way.

25        And the cases that interpret it, Your Honor, look

1  at the point in time before the election starts.  It's not

2  sufficient that you show up, once the election has commenced,

3  and say, I'm here, thanks for the job.

4           THE COURT:  Okay.  And so --

5           MR. CARICKHOFF:  You have to have established that

6  before the election.

7           THE COURT:  Right.  And so while we're on the

8  topic, if I were to find -- and I'm not prejudging it -- but

9  if I were to find that the creditors were entitled to make an

10 election and elected someone who was not eligible, do you

11 dispute that they be given -- that they'd been entitled to

12 another chance to elect someone who is?

13          MR. CARICKHOFF:  Yes, I do.  I do dispute that,

14 Your Honor.

15          THE COURT:  Okay.  What's the basis?

16          MR. CARICKHOFF:  I think the case law indicates

17 that they to have the candidate at the time of the election

18 that's eligible.  And if they fail, they don't get a do-over.

19          And the whole point of the election process and

20 the reason there's such a low standard for what is a disputed

21 claim.  Is to make this a "quick and dirty" process so that

22 the Chapter 7 case can proceed with a permanent trustee.

23          And having a second bite at the apple, after this

24 has already dragged on for a substantial amount of time, just

25 flies in the face of that.

1           THE COURT:  Okay.  And so, what's the case law

2    that supports the view that they don't get a second bite at

3    the apple?

4           MR. CARICKHOFF:  I didn't realize that this was

5    going to be a question, Your Honor.  I don't have it at my

6    fingertips.  I'm happy to submit something after the

7    hearing --

8           THE COURT:  Okay.

9           MR. CARICKHOFF:  -- if the Court would like?

10          THE COURT:  That's fine.

11          MR. CARICKHOFF:  That's no problem.

12          THE COURT:  I am interested.  Again, I don't know

13   if I'm going to get to that question, but I'm interested.

14          So, why don't I let you continue, Mr. Carickhoff.

15          MR. CARICKHOFF:  Sure.  So, I think that

16   addresses 321; again, while, you know, BakerHostetler may

17   have offices in Wilmington and Philadelphia, and Workman, his

18   office is in Washington, D.C., and there's nothing in the

19   record that tends to suggest anything other than that.  So,

20   on that basis, he fails 321 because he's not here.  When I

21   say, "not here," he doesn't have that office in this district

22   or in an adjacent district, okay.

23          With respect to whether or not the disputed

24   claimants have the ability to vote, I think 702(a) is clear.

25   It has Section 1, 2, and 3, under it.  Basically, Section 1

1   says you can vote as long as you have a disputed and

2   unsecured claim.  Section 2 says, you can't have a material,

3   adverse interest of the creditors.  And Section 3 says you

4   can't be an insider.

5           We're not oh -- nobody is fighting over Number 3.

6           THE COURT:  Right.  Right.

7           So, let's talk about both, (1) and (2).  And,

8   look, can I ask you:  Can we start with (1), and, in

9   particular -- and, look, there's also the language of the

10  rule, of Rule 2003, that has something to do with how I

11  resolve the dispute when there's a contested election.

12          MR. CARICKHOFF:  Sure.

13          THE COURT:  In your view, is the extra -- right.

14          You so, you say on the one hand, Look, the

15  question is just whether it was disputed at the 341 and if

16  the creditor -- if there's an objection filed at the 341,

17  that's the beginning and end of the analysis and we're done.

18          But you all -- and there are some cases that say

19  that, but even the cases that say that don't seem to mean it,

20  right?

21          Because they all go on to say, Yeah, unless it's,

22  you know, as you say, unfounded, or, you know, frivolous or

23  something like that -- and I have no idea what the basis for

24  that qualification is.  It seems, frankly, just made up.

25          But, so why don't you explain to me what you think

1   the relevant, legal rule is here.

2          MR. CARICKHOFF:  Sure, Your Honor.

3          I think the relevant, when we're talking about

4   whether something is disputed or not, I think the relevant

5   rule is Bankruptcy Rule 2003(b)(3), and that basically says

6   that a creditor is entitled to vote at a meeting if they file

7   a proof of claim or are writing in advance, unless an

8   objection is made to the claim.

9          And there was an objection made to that claim, so,

10  under Bankruptcy Rule 2003(b), they're not entitled to vote.

11         It's disputed.

12         And then kind of getting into the case law, Your

13  Honor, where Your Honor had mentioned courts say this or

14  that, I think it's -- and we cite the Yip v Frank [sic]

15  decision in our case --

16         THE COURT:  Uh-huh.

17         MR. CARICKHOFF:  -- which says that it is the

18  beginning and the end.  If there's an objection pending, and

19  you acknowledge that it's disputed, you don't have a right to

20  vote, and then the Court's -- to what Your Honor's point is,

21  they say, No, you know, they set a very low bar, because they

22  don't want the Court to engage in a minitrial or an

23  evidentiary trial.

24         And what they look at is they look to see if the

25  objection was groundless or frivolous.

1          THE COURT:  Okay.  So, Mr. Carickhoff, let me --
2    I've got a couple of questions here.

3          MR. CARICKHOFF:  Sure.

4          THE COURT:  First, Mr. Moody makes the point, when
5    Congress adopted 702 nondebtor to give creditors the
6    opportunity to elect a trustee, at least sometimes, and he
7    says, essentially, it would be crazy to read this to say that
8    an incumbent trustee, an interim trustee, can essentially
9    insulate themselves and defeat the right that Congress meant
10   to give creditors, if what he does is -- if the interim
11   trustee just shows up and files objections right before
12   the 341 meeting and says, Therefore, I get to keep my job.
13   You have no rights.

14          And I'll tell you the record of what happened in
15   this case is, to my mind, somewhat unbecoming.  And I'm
16   interesting in hearing why your reading wouldn't operate to
17   nullify the creditor's right under Section 702.

18          MR. CARICKHOFF:  Sure, Your Honor.

19          And I think that the -- an interim trustee is --
20   and there's cases that say that -- is in the best position to
21   be able to object to claims.  And in terms of putting the
22   creditor body on notice as a whole as to what the potential
23   issues are --

24          THE COURT:  Okay.  But, Mr. Carickhoff, let me cut
25   you off.

1        MR. CARICKHOFF:  Sure.

2        THE COURT:  Sure, the interim trustee is in the

3   best position to object to claims, but is there any reason to

4   file them for the purposes of the estate, as opposed to the

5   purposes of the interim trustee?  Any reason to file them

6   right before the 341 meeting, other than to protect his own

7   job?

8        MR. CARICKHOFF:  It's to allow the other creditors

9   to know if there are potential issues with proofs of claim

10  that are filed.  The other creditors aren't going to go

11  through that task.

12        It's to let the Office of the United States

13  Trustee know what potential issues are with the potential

14  creditors that may be voting at the election.  So, it's, I'll

15  call it more of a "gatekeeping" function, Your Honor.

16        THE COURT:  Okay.  Let me let you continue.

17        MR. CARICKHOFF:  Okay.  I thought I answered you.

18        THE COURT:  Okay.  I mean, continue your argument.

19        But, actually, let me ask you my next question --

20        MR. CARICKHOFF:  Sure.

21        THE COURT:  -- which is, so the -- well, let me

22  try to ask it in the simplest way.

23        The Rule says, essentially, if there's a dispute

24  with respect to an election, the Court should resolve it.

25        And my question is, do I have the authority, in

1   your view, to resolve the dispute by making a determination

2   as to the allowance of the claims if I think that's an easy

3   thing to do?  Is that within my discretion?

4            MR. CARICKHOFF:  No.

5            THE COURT:  Why not?

6            MR. CARICKHOFF:  I think the way the Bankruptcy

7   Code and Rule used to be written, was to allow the Court to

8   do some kind of temporary claim allowance.  That was written

9   out of the Code and the Rules, and because it was written out

10  of the Code and the rules, it should be instructive to Your

11  Honor that you don't have the ability to do that --

12           THE COURT:  So --

13           MR. CARICKHOFF:  -- in this context, and this is a

14  "quick and dirty" process.

15           THE COURT:  So, Mr. Carickhoff, let me suggest a

16  different inference from the same legislative fact.

17           It is true that the Rules used to say you could

18  temporarily allow for voting purposes only.  That was

19  stricken out, as you say.

20           That was stricken out, because that's inconsistent

21  with the rule, with the statute, because the statute says

22  that if it's disputed, it can't vote.  If and if you allow it

23  only for voting purposes, that's an acknowledgment that it's

24  disputed, right?  That's why it's only interim allowance or

25  temporary allowance, is because it remains disputed.

1          So, doing that would be inconsistent with the

2   statute; on the other hand, if I can make a final decision,

3   simply as a matter of law, like, for example, by application

4   of ordinary preclusion principles, then there's nothing

5   temporary about it and there's no longer a dispute.

6          So, why can't I do that?

7          MR. CARICKHOFF:  Why can't you do that?

8          Well, first of all, our objection was couched as

9   preliminary.  As Your Honor is aware, in this court, when you

10  file objections, you're supposed to make all of them at one

11  point, which is why we were careful to call this a

12  "preliminary objection."  So, we would want the opportunity

13  to supplement that.

14         So, (a), I think it's premature, and, (b), I don't

15  think that's what the -- I don't think that's what the

16  Bankruptcy Rules allow you to do on a 2003(a), and I don't

17  think that's what the spirit of 702 does.

18         THE COURT:  Okay.

19         MR. CARICKHOFF:  And I think the cases are pretty

20  consistent in that regard, Your Honor.

21         THE COURT:  Okay.  I understand that.

22         MR. CARICKHOFF:  And then, just -- if I could

23  just -- I just want to be clear.  There is a lot of this, you

24  know, the trustee rushed to file these claim objections, you

25  know, at the last minute.

1        Before the 341 meeting, as Mr. Miller indicated,

2   that they had held themselves out as "secured creditors" and

3   it wasn't until the day before the trustee election, because

4   they wanted to have an election, that they filed unsecured

5   proofs of claim.  So, in terms of the timing, they're the

6   ones that waited until the day before the 341 meeting to file

7   their proofs of claim and we did file timely objections to

8   those claims before the 341 meeting.  Just -- a lot was made

9   over the timing, again, that the claims were not filed until

10  the day before the 341 meeting.

11        THE COURT:  Okay.  I understand that.

12        MR. CARICKHOFF:  All right.  So, I --

13  (indiscernible) I don't know if Your Honor has any other

14  questions for me.  I'm happy to kind of walk through kind of

15  what -- where we are.

16        You know, I think we kind of touched on what I

17  think the cases are.  And having the objection in place makes

18  it disputed.  I also want to kind of go through the Williams

19  case, because I think that's important, and I know that

20  Mr. Moody had touched on the Williams decision.

21        THE COURT:  Uh-huh.

22        MR. CARICKHOFF:  And, really, when you get to the

23  heart of a lot of these cases, Your Honor, the focus is

24  really, is there -- if the creditors have the ability to

25  elect the trustee, is it -- is there a potential that there's

1 really a conflict of interest?  Are they picking their

2 opponent, right --

3          THE COURT:  Okay.  Now, can I ask you this

4 question, Mr. Carickhoff?

5          MR. CARICKHOFF:  -- on this docket.

6          THE COURT:  I understand that --

7          MR. CARICKHOFF:  Surely.

8          THE COURT:  -- as it relates to the 702(a)(2)

9 consideration, do they have a materially adverse interest?

10          MR. CARICKHOFF:  Yes?

11          THE COURT:  Williams talks about that as an (a)(1)

12 point, and that doesn't make any sense to me.  That seems to

13 render (a)(2) meaningless.  It seems that's exactly what

14 (a)(2) is there to address.

15          Do you agree with me?

16          MR. CARICKHOFF:  Can you repeat that?

17          THE COURT:  Yes.  So, Williams talks about not

18 picking your opponent in the context of an appeal.  But, you

19 know, an appeal from a claim is just one of many ways in

20 which over the course of a -- in the bankruptcy estate, a

21 particular creditor could have an interest that is adverse to

22 the estate, where they could find themselves opposite the

23 trustee.  They could have a -- they could have been paid a

24 preference.  They could have received a fraudulent

25 conveyance.  They could have a disputed claim.  They could be

1  parties to an appeal.

2              And it seems to me that the way that that cluster

3  of issues is addressed is through (a)(2), which says, Look,

4  if it's material, then you can't vote, and the judge makes a

5  determination about materiality based on the whole record.

6              And it seems to me that's the mechanism for

7  dealing with choosing your opponent, is the materially

8  adverse requirement of (a)(2), not the, is it disputed under

9  (a)(1), which is about, essentially, is this person really a

10  creditor or not?

11              MR. CARICKHOFF:  Okay.  So --

12              THE COURT:  Do you agree with that way of

13  thinking, that that (indiscernible)?

14              MR. CARICKHOFF:  Well, here's what I will say.  I

15  understand the point Your Honor is trying to make.  And part

16  of my argument was going to be, you know, I think that we get

17  to the claim is disputed on one of two grounds under 702(a):

18  one, there were claim objections that were filed in advance

19  of the 341 meeting, okay?

20              THE COURT:  Uh-huh.

21              MR. CARICKHOFF:  -- and we don't think they were

22  frivolous.  You heard from the trustee, who spent over 60

23  hours reviewing --

24              THE COURT:  Okay.  Let me ask you about that,

25  Mr. Carickhoff.  Can I stop you for a second?

1           MR. CARICKHOFF:  Sure.

2           THE COURT:  There's a judgment -- there's a

3   judgment against the debtor.

4           MR. CARICKHOFF:  Yes.

5           THE COURT:  That judgment, it is unstayed, and

6   it's an appeal, but the appeal doesn't interfere with the

7   binding force of the judgment.  So, in view of that, why

8   isn't the objection, for my purposes, frivolous, which is,

9   I've got a controlling judgment.  I've got to give it effect.

10  You can appeal that, as long -- and just like any other time

11  there's a judgment, that's subject to an appeal, the

12  preclusive effect could be reversed.

13          But for purposes of what I've got to do, I've got

14  a binding judgment.  You know, the Supreme Court has said

15  perfectly clearly in Heiser v Woodruff, that ordinary

16  preclusion applies in claims allowance proceedings.  And so,

17  for my purposes, this counts -- this is essentially

18  frivolous.  There's -- it's is a binding judgment.  The

19  debtors -- if you stand in the shoes of the debtor, you lost.

20  You can appeal.  Fine.  If you get the appeal -- the decision

21  reversed on appeal, then the allowed decision can be

22  reversed, too.  But unless and until that happens, this is

23  frivolous.

24          MR. CARICKHOFF:  Well, how are you going to get to

25  that appeal if the other side is able to pick the trustee,

1  who's going to decide whether or not to pursue the appeal?

2          THE COURT:  So, then the question is:  Is it

3  material?

4          And then the question is, when I look at the whole

5  record, do I think that these arguments are such, based on

6  what I know about the record, that this is a material adverse

7  interest, such that they shouldn't be allowed to vote

8  under (a)(2).

9          And I've read the Eleventh Circuit brief and I

10 have some preliminary views of that, but to me, that's

11 the (a)(2) question, and that's how I think -- that's how --

12 that's what I think of as the analytic framework for thinking

13 about this.

14         I'm happy to hear that I've got that wrong, but

15 that, just to be straightforward, that's how I see the

16 question.

17         MR. CARICKHOFF:  Okay.  That's helpful to help me

18 better frame my ongoing argument, if you will, Your Honor?

19         THE COURT:  Certainly.

20         MR. CARICKHOFF:  So, if you -- well, you're not

21 really in disagreement.  So, you're shifting it.  You're

22 saying, you don't view that as making it disputed.  You view

23 it as, well, not disputed for (a)(1), but you're looking at

24 it under the (a)(2) lens.

25         So, we do think it weighs in connection with

1   whether or not there's a material, adverse interest to other

2   creditors that they hold.  At some point, a decision is going

3   to have to be made whether to use the estate's resources and

4   to prosecute the appeal, which would -- which could

5   potentially eliminate over $6 million worth of claims and

6   enable other creditors to receive a greater recovery.

7           In connection with this material adverse interest,

8   we'd also note that, you know, if the appeal is successful,

9   the nature -- the very nature of their claim is, is it

10  adverse to other creditors?

11          Their claim is premised on a (audio interference),

12  here, right.  So, the value of their claim, and in order for

13  their claim to be X, it -- they're incentivized to eliminate

14  the expenses.  So, if you were to look at the expert report

15  that was used in the Northern District of Florida litigation,

16  a lot of what the expert said was, We don't think this is a

17  legitimate expense.  We don't think this is a legitimate

18  expense.  And because of that, their -- what was determined

19  to be net income, (indiscernible) and so did their claims.

20          So, their claim kind of rises on eliminating the

21  net expenses.  So, the very nature of their claim, I think,

22  puts them at an adverse -- material, adverse position as to

23  other claims.

24          In the opening brief that was filed in the

25  Eleventh Circuit, there's also a statement that the debtor --

1  if the debtor is right in its appeal, they overpaid the

2  claimants by at least $95,000.  We think that potential

3  affirmative claim against the disputed claimants also kind of

4  puts them under the totality of circumstances.  That's

5  another factor to look at as to whether or not they have a

6  material, adverse interest to the other creditors in this

7  case.

8          The other thing that should be noted, at the 341

9  meeting, the disputed claimants indicated that they may seek

10 an administrative expense claim in connection with their

11 efforts prior to the conversion, and that's at the reported

12 disputed election at paragraph 28.

13         If they decide to press their administrative

14 claims, which they explicitly reserve the right to do, those

15 claims may give them, again, a material, adverse interest

16 sufficient to disqualify them from the 702 process.

17         And that's what the San Diego Symphony case talked

18 about, and I think that was, like, one of six cases that they

19 cited in both of their papers.  In there, the Court said to

20 the extent that the musicians press their claims for post-

21 petition wages, which is a separate type of claim than held

22 by the balance of the pre-petition unsecured creditors, that

23 component of their claims may give them material, adverse

24 interest sufficient to disqualify them from the 702 process.

25         THE COURT:  Uh-huh.

1           MR. CARICKHOFF:  So, again, they'll have the

2   strong interest in electing someone who's not going to

3   challenge that administrative expense claim.  And, again, it

4   goes to the focus of this conflict of interest that you have

5   with the appeal --

6           THE COURT:  Right.  I understand that.

7           MR. CARICKHOFF:  -- (indiscernible) had mentioned.

8           THE COURT:  Right.  I understand that.  Okay.

9           MR. CARICKHOFF:  All right.  And then we talked

10  about their case strategy.  I think they kind of -- you know,

11  that's been, like the dead horse has been beaten.  I don't

12  need to get into that.

13          But if they're successful and they do get their

14  candidate, and they convince their candidate not to pursue

15  it, despite the fact that the trustee has contingency counsel

16  that's -- you know, to do it almost, you know, effectively

17  free to the estate, these are potential valuable claims that

18  may not be pursued and lost.

19          And then I'll also note that, you know, again,

20  they previously referred to themselves as "secured creditors"

21  and then, you know, the day before the 341 meeting, filed

22  unsecured proofs of claim.  There's nothing to say that they

23  could withdraw those claims and file secured claims later --

24  I don't know.

25          THE COURT:  Right.  But Mr. Carickhoff, that gets

1  to sort of the question that I have and, frankly, the

2  concerns I have about the practice of just objecting to

3  claims before the 341, because right -- the 341 happened at

4  the beginning of the case.  Lots of stuff happens afterwards.

5          There's a sense in which every creditor is

6  potentially adverse to the estate, right, because we're

7  talking about, you know, the relative size of each slice of

8  pie, and every time one's is larger, everyone else's is

9  smaller.  And in the ordinary course, all that would play out

10 later in the case.

11         So, the possibility that that kind of adversity

12 can exist can't be the basis for saying someone has a

13 material, adverse interest, because otherwise, 702 would mean

14 nothing, because everyone's got a potentially adverse

15 interest in that respect.  It seems to me, the question has

16 got to be, based on what we have in front of us now, is it

17 obvious that this creditor is really a target of the estate?

18         And I understand your argument as to why maybe

19 they do.  Candidly, of the things you've said, the

20 administrative claim strikes me as the strongest of them, but

21 that's just my initial reaction.  I'm happy to, you know --

22         But just -- am I misunderstanding the -- I mean,

23 in the -- I know that elections of trustees under Section 702

24 are rare, but just as I think about, as a practical matter,

25 of what Congress must have met, do you disagree that, you

1 || know, the possibility that maybe the estate will have a

2 || dispute with this creditor can't be enough.  Because if they

3 || were true, then 702 would mean nothing.

4 ||          MR. CARICKHOFF:  And, again, I think, then, that

5 || you look at the dispute and you look to see whether it was

6 || frivolous.  You look to see whether it rises above the level

7 || of suspicion.

8 ||          I think we've met that low threshold, with respect

9 || to the claim objections, and then with respect to the appeal,

10 || just to be clear, so, basically, the judgment that was

11 || obtained in the Northern District of Florida was a proceeding

12 || to look at the GPDEV and Simons claims against the debtor,

13 || and that's effectively a process that would be akin to,

14 || they're saying, hey, you know, Bering Straits, we didn't

15 || count your claim in the expert report so, you know, you get

16 || nothing and because of that, their claims are higher.

17 ||          You had a process in the Northern District of

18 || Florida where creditors were not involved to say whether

19 || their expenses were good or bad.  It was a fight between the

20 || disputed claimants here and the debtor.  And they didn't have

21 || a say into whether their claims should be counted or not.

22 ||          And as a result, at the end of the day, we think

23 || that they got an inflated claim and that inflated claim hurts

24 || every creditor in this bankruptcy case because it's inflated

25 || and, really, they shouldn't be allowed to then say, Well,

1  here's our trustee, you know, you guys are good with this.

2          And to be clear, I think in dealing with the

3  motion to dismiss, Bering Straits was not cool with them

4  being able to pick whoever they wanted.  And Bering Straits

5  made it clear in their motion to dismiss that there should be

6  an independent trustee that's put into place to evaluate the

7  appeal and whether it has merit.

8          It may not have merit, but there should be an

9  independent trustee to do that.  And having them handpick

10 who's going to do that is not an independent trustee.

11         So, that concern was flagged (indiscernible), and

12 the fact that you had four other creditors that were at the

13 election and showed up and did not vote, the only people who

14 voted for Workman were the people --

15         THE COURT:  Right.

16         MR. CARICKHOFF:  -- who are subject to the appeal.

17         THE COURT:  Right.  But Mr. Carickhoff, when

18 Congress wants to take account of both, numerosity and

19 amount, right, in Section 1129, they do that expressly,

20 right?

21         MR. CARICKHOFF:  That's --

22         THE COURT:  Right?  And Section 702 doesn't?

23         MR. CARICKHOFF:  That's right.

24         And the same analysis, then, applies to a *bona*

25 *fide* dispute and just a dispute.

1          THE COURT:  Right.

2          MR. CARICKHOFF:  So, when Congress wanted to use

3   *bona fide*, they knew how to do it (indiscernible) --

4          THE COURT:  Oh, yes, that's right.  That's right.

5          There's a difference between the -- I think that

6   the language "*bona fide*" clearly has to have -- is different

7   from just a dispute and the question is nevertheless -- to

8   me, I've got to say, to me, the question that I have is

9   whether I have the authority in resolving -- I believe --

10  look, let's put our cards on the table.

11         I believe that the judgment is preclusive and that

12  if we had a claims allowance hearing, you wouldn't be allowed

13  to relitigate the matter.  You'd have an allowed claim and if

14  you want, let's stay relief to bring the appeal, then -- and

15  you got it reversed, you'd get the claim reconsidered.

16  That's not how I think the claims-allowance process in

17  bankruptcy works.

18         And the question is whether I may decide to

19  resolve the dispute by essentially issuing that kind of order

20  and saying the new trustee -- whoever the trustee is, is

21  going to be a fiduciary -- whether they should make their own

22  judgment about how to proceed, but whether ruling that way is

23  more consistent with giving effect to Congress' decision that

24  creditors would, at times, be allowed to elect a trustee

25  rather than a reading that would effectively render it a

1  nullity by allowing an interim trustee to file objections at

2  any time and make the right go away.

3         That's what I'm struggling with.  I don't know the

4  answer.  And if I conclude that the answer to that is, yes,

5  they may, then my next problem is, what if I think the person

6  they've elected is ineligible, then what?

7         And that's the question that I'm interested in

8  your follow-up on.  That's how I'm thinking about it.

9         MR. CARICKHOFF:  Okay.  Do you want me to submit

10 something after this hearing on that, on that open issue?

11        THE COURT:  If you would, and I'm happy to hear

12 from Mr. Moody, as well.  But if anyone has any authority on

13 that question, that would be helpful to me.

14        MR. CARICKHOFF:  Okay.

15        MR. MOODY:  Thank you, Your Honor.

16        THE COURT:  And, again, I should say, before I --

17 I don't mean to shut anyone down.  That's how I'm thinking

18 about it.  That's not to say that I am not open to hearing

19 why I'm thinking about it wrong.  So, to the extent, after

20 hearing that you want to tell me that I've got this wrong

21 for, you know, and anything about that, that you have that I

22 haven't adequately considered, I, you know, I want to

23 consider your arguments fairly.

24        MR. CARICKHOFF:  Thank you, Your Honor.

25        We're happy to submit a supplemental brief on that

1  issue of what would happen in the event of the determination

2  of Mr. Workman is ineligible.

3          I just wanted to make two points.  They keep --

4  there's continued references to our assertion that we had a

5  secured claim.  I think that was, in part, of some briefing,

6  because there was a final judgment in Florida, which informal

7  would constitute a secured claim, but there were no assets

8  for which that judgment could attach.  So, unfortunately,

9  they're not a secured claim.

10         And then just the one other issue on the

11  materially adverse interests, we discussed briefly, the

12  concept of the administrative claim, placing GPDEV and Simons

13  in an adverse interest to the estate, as the Court may

14  recall, that was sort of like after dealing with all the

15  document and discovery debacles kind of leading up to the

16  conversion or dismissal hearing, the Court kind of invited us

17  to potentially file that claim.

18         It's not been filed.  There's no reason to file it

19  until there are assets potentially available for

20  administration.  And I just --

21         THE COURT:  Okay.  Well, let me ask you this

22  question, Mr. Moody, if I were to conclude that your

23  retaining that right were to constitute a material, adverse

24  interest, is it something that in order to void that problem,

25  you would disclaim?

1         MR. MOODY:  We need to speak to the clients, but I

2    think so, Your Honor.

3         THE COURT:  Well, when you get back to me with

4    your authority, if you could answer that question, that would

5    be helpful.

6         MR. MOODY:  Yes, Your Honor.  Thank you.

7         THE COURT:  Okay.  I've been annoying to all of

8    you for long enough today.

9         Is there anything else that any -- that either

10   party would like to be heard on that I -- where I rudely cut

11   you off in the middle of a point or disrupted you or were,

12   otherwise, to annoying for words?

13        MR. MOODY:  Your Honor, just to clarify, I did

14   hear from the clients.  They would be willing to waive the

15   potential administrative claim.  Thank you.

16        THE COURT:  Okay.  Mr. Carickhoff?

17        MR. CARICKHOFF:  Sure.  And we'll submit

18   supplemental briefing on the point that Your Honor had

19   raised.

20        But, again, in terms of kind of fundamentally due

21   process, I just don't understand how it's due process to let

22   them select a totally different and unannounced trustee, kind

23   of after the fact.  When the 341 meeting happened, they had

24   their chance and, you know, they had plenty of time to

25   explore this with Mr. Workman before the --

1          THE COURT:  That might be the right answer.

2   That's what I asked for both parties to give your views on.

3          I don't know the answer to that and what you say

4   may well be right.

5          Let me be unfair for a moment.

6          Mr. Schepacarter, I see you're here.  If your

7   office has a position on -- and I'm not asking you to, off

8   the top of my head, you know, freelance, and I'm not

9   directing you or your office to do anything, but while the

10  parties are addressing these questions, since your office

11  does administer the process, if you would like to be heard on

12  that question -- can we set a date for folks.

13         I don't want elaborate briefs.  I think if there

14  are cases that answer this question or that speak to it, that

15  would be helpful to know.  I just need, you know, a short

16  letter with citations.  I don't want to create a lot of steps

17  for anybody.

18         So, if those could be submitted a week from now,

19  is that -- look, I'd like to resolve this promptly, because I

20  think part of the point here is to get disputes like this

21  resolved promptly and not delay the administration of the

22  case.  So, I'm hoping to get this resolved, you know, next

23  week, at the latest.

24         So, if there are -- if folks have something on

25  this topic that you could get me by Wednesday -- is that

1  unreasonable, of next week?

2           MR. CARICKHOFF:  I'm sorry, 4:00 on Wednesday,

3  Your Honor?

4           THE COURT:  Perfect.  4:00.

5           So, if the parties want to submit anything on this

6  topic, if you could do so by 4:00 on Wednesday, and, again,

7  that would be the consequences if it turns out that the

8  creditors are entitled to make an election and the person

9  they've chosen is ineligible, if that means, on the one hand,

10 they get to make another election, or on the other, the

11 interim trustee remains with the trustee.

12          And, Mr. Schepacarter, all I wanted to invite was,

13 to the extent that your office would like to be heard on that

14 issue, I'd be interested in your office's position.  I don't

15 mean to put you on the spot and not -- obviously, not

16 requiring the United States to do anything, but I'd been

17 interested -- if you have a view, I'd be interested in it.

18          MR. SCHEPACARTER:  Thank you, Your Honor.

19          We'll -- I don't want to say we'll take it under

20 advisement, but I'll take a look at it.

21          THE COURT:  Okay.  That's fine.

22          And either submit something or don't.  That's --

23          MR. SCHEPACARTER:  Right.

24          THE COURT:  Okay.  Is there anything else that any

25 party in interest would like the chance to be heard on?

 1            MR. MOODY:  Your Honor, just compliments to the

 2   U.S. Trustee's Office on the reported disputed election.

 3            I've been part of two disputed elections.  Those

 4   reports are always extremely difficult.

 5            I think probably everybody shares in thanking the

 6   U.S. Trustee for spending the time to prepare that.  Thank

 7   you.

 8            MR. SCHEPACARTER:  Thank you, Mr. Moody.

 9            I would just give that credit to Ms. Linda Casey

10   for filing that report.  She took over for me while, I think

11   Mr. Miller was correct, I was having some surgery and I'm

12   still kind of recovering from, so, hopefully, that'll -- that

13   recovery will be quick, but I will pass along the comments to

14   Ms. Casey.

15            MR. MOODY:  Thank you.

16            THE COURT:  Okay.  And Mr. Carickhoff, anything

17   further?

18            MR. CARICKHOFF:  No.  Thank you for your time,

19   Your Honor.

20            THE COURT:  Okay.  Thank you.

21            Mr. Moody, anything further on your end?

22            MR. MOODY:  No, Your Honor.  Thank you for your

23   time.

24            THE COURT:  Okay.  Thank you.

25            Look, I want to thank the parties.  This is

1   complicated and tricky and I think this has been well-

2   presented and I appreciate it.  And we'll look forward to

3   seeing the supplemental filings and we'll try to get this

4   issue resolved as promptly as I can.

5            So, with that, and thanks to the parties, we're

6   adjourned.  Thank you.

7            COUNSEL:  Thank you, Your Honor.

8        (Proceedings concluded at 5:32 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2            We certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of our

5   knowledge and ability.

6

7   /s/ William J. Garling                    June 22, 2022

8   William J. Garling, CET-543

9   Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Coleen Rand                           June 22, 2022

13  Coleen Rand, CET-341

14  Certified Court Transcriptionist

15  For Reliable

16

17

18

19

20

21

22

23

24

25