**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| TEAM SYSTEMS INTERNATIONAL, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | **Hearing Date: 7/19/23 at 1:00 p.m. (ET)**<br>**Obj. Deadline: 7/12/23 at 4:00 p.m. (ET)** |

**MOTION FOR ENTRY OF ORDER GRANTING TSI MEMBERS STANDING TO:**
**(A) PROSECUTE THE APPEAL AND (B) FILE CLAIMS AND COLLECT CERTAIN**
**ACCOUNTS RECEIVABLE ON BEHALF OF THE DEBTOR'S ESTATE**

Deborah Evans Mott ("Mott"), Steven M. Acosta ("Acosta"), Christopher Mott and John

S. Maciorowski (collectively, the "TSI Members"), by and through their undersigned counsel,

hereby submit this motion (the "Motion") for entry of an order, pursuant to sections 105 and

1109(b) of Title 11 of the United States Code (the "Bankruptcy Code"): (i) granting the TSI

Members standing to prosecute the Appeal and (ii) file claims or otherwise collect certain A/R,

and respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.      Before it filed for bankruptcy, and the chapter 11 case was converted to chapter 7,

TSI was a solvent, very profitable company engaged in federal contracting that, for over 22 years,

paid its lawful debts as they became due.  In the course of conducting its business pre-petition,

FEMA and certain other governmental agencies became indebted to TSI for work performed or

other reasons. When TSI filed for bankruptcy these governmental agencies owed TSI $22 million.

The Trustee knows this.  During his campaign for election as the permanent trustee, he testified to

the total amount owed to TSI.  He also, under oath, prepared and filed a Form 1065 tax return for

TSI for year 2021 confirming the estate was more than solvent.

2.      Even after TSI stopped operating in chapter 7, the Defense Logistics Agency still

presented TSI with over 800 opportunities to bid on fuel fulfillment contracts. Conservatively, those opportunities were worth over $1 million to TSI. Of the $22 million in claims/receivables, the Trustee and his special counsel are seeking to collect $13.5 million from FEMA. That amount alone will be more than sufficient to pay all creditors in full even before the total amount of filed claims is reduced in the claims disallowance process.

3.      But at some point in the administration of the TSI estate, the Trustee pivoted. He made the conscious and fictitious decision to disbelieve the $8.2 million in claims/receivables. He closed TSI's only SAM-registered bank account. He elected not to pursue the Appeal (for free) to potentially reduce claims against the estate by over 70% or vet and object to other claims that he previously claimed were objectionable. He made the remarkable decision, notwithstanding the $13.5 million receivable owed by FEMA, to treat the estate as *insolvent*. This change in position is evidenced by the original complaint, which does not allege that TSI was insolvent, and the FAC, which does. Simply put, there is more money *for the Trustee and his professionals* if the estate is insolvent because it justifies litigation to augment the estate. To create the appearance of insolvency, the Trustee is: (a) not objecting to filed proofs of claim even though he previously stated they were objectionable, (b) not prosecuting the Appeal for free even though he believes the Appeal has merit; (c) not collecting the A/R even though he previously recognized the claims/receivables as estate assets and (d) painting the TSI Members as bad actors as cover for litigation.

4.      The Trustee is not collecting the A/R or objecting to claims to prolong the administration of this case and incur more professional fees. Choosing litigation, over A/R collection, also ensures a longer case duration and more fees. Similarly, enjoining the TSI Members and others from transferring their Real Properties even though there was no evidence

any transfer was imminent, is not estate money well-spent.  Absent gamesmanship, the prosecution

of the FAC most likely will not bring a single penny into the estate.  That is because, as the Trustee

knows, collection of the $13.5 million receivable (and collection of $1 million from a recent

settlement achieved) is more than sufficient to pay creditors in full.  Simply put, the Trustee's

baseless allegation of estate insolvency serves only his and his counsel's (also a panel trustee)

agenda:  legal fees.

5.      The TSI Members believe creditors of the estate, after their claims have been fully

vetted, should be paid in full.  After the allowed claims are paid, and the Trustee's administration

of the estate is concluded, the TSI Members fully intend to re-take and re-start TSI's business.  The

TSI Members, however, presently face two substantial problems: (i) the Trustee not pursuing the

Appeal and allowing the claims of the Judgment Creditors to stand or, alternatively, agreeing to a

compromise amount[1] and (ii) the Trustee (for strategic reasons) not seeking to collect $8.2 million

in A/R before the statute of limitations for doing so expires.  The bottom line is that every dollar

the Trustee over-pays with respect to unlawful claims; *i.e.,* not pursuing the Appeal among other

claim objections, and every dollar the Trustee chooses not to collect; *i.e.,* the A/R, comes at the

direct expense of the TSI Members and their business.

6.      But instead of taking the required and necessary actions, the Trustee has: (a) left

the Appeal remain dormant, (b) kept the amount of claims against the estate high as cover for

equally high professional fees and (c) spewed much ink accusing the TSI Members of being "bad

actors" to justify the injunctive relief.  But painting people in a poor light is no substitute for good

business judgment, and the metric for awarding legal fees is not the quality or quantity of prose

---

[1] The TSI Members would prefer the Trustee provide cash collateral for the Judgment Creditors from a portion of
the $13.5 million FEMA recovery and let the TSI Members prosecute the Appeal.

disparaging the TSI Members.  The Bankruptcy Code requires that professional services add value to the estate.  Here, they do not.

7.      The TSI Members have sought to address their concerns through the Substantive Motion[2] and this Motion.  The Substantive Motion seeks stay relief so the TSI Members can prosecute the Appeal and to compel abandonment of the A/R.  This Motion hedges that relief. Here, the TSI Members seek derivative standing to do both in the name of the estate.  In so doing, the TSI Members present the Trustee with options. He either can preserve the A/R by timely filing a claim with FEMA.  He can allow the TSI Members to do so in the name of the estate.  He can abandon the A/R to the TSI Members.  Or he can be held accountable for his failure to act at a later date if all or a portion of the A/R is lost due to the expiration of the statute of limitations.

8.      The time for the Trustee to act is now.  The TSI Members have made demand on the Trustee to (a) prosecute the Appeal and (b) file a claim for or otherwise seek to collect the A/R. A true and correct copy of the Demand Letter is attached hereto as **Exhibit 1**.  The TSI Members are willing to work through a mutually agreeable agreement to resolve the issues raised by both the Substantive Motion and this Motion prior to the July 19 hearing date.

## JURISDICTION

9.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

10.     The statutory predicates for the relief requested herein are sections 105 and 1109(b) of the Bankruptcy Code, and 6 Del. §18-1002.

---

[2] *See Motion for Entry of Orders: (A) Staying Prosecution of First Amended Complaint or, Alternatively, Extending Time to Answer, Move or Otherwise Respond; (B) Capping Recovery, if Any, Under First Amended Complaint; (C) Granting Relief from the Automatic Stay to Permit TSI Members to Fund Appeal to Eleventh Circuit, (D) Compelling the Trustee to Abandon the $8.2 Million Receivable; (E) Compelling Trustee to Abandon Debtors Business; and (F) Granting Related Relief* [Bankr. D.I. 310] (the "Substantive Motion").

**RELEVANT FACTS**

**A.**     **General Background**

11.     Prior to the Conversion Date (later defined), the Debtor was engaged in the business of serving the United States government as a contractor. TSI has contracted with numerous agencies, including the FBI, U.S. Army, U.S. Navy, U.S. Customs, Border Protection, and Defense Logistics Agency ("DLA") and the Federal Emergency Management Agency ("FEMA"). The Debtor operated its business profitably for over 22 years, and paid its valid creditors consistently and on time. The Debtor has no secured debt.

12.     The TSI Members own 100% of the interests of TSI. By order [Bankr. D.I. 222] dated July 14, 2022—*i.e.*, post-Conversion Date—Mott and Acosta were "designated to have duties that the Bankruptcy Code and the Conversion Order [D.I. 151] impose on the Debtor" for post-petition purposes.

13.     As a federal contractor, TSI is registered in SAM.gov, a US Government database. TSI set up a SAM-registered bank account with Artisan's Bank (the "SAM Account"). The SAM Account is TSI's only SAM registered account. TSI must maintain the SAM Account in order to receive payment from the various government agencies for which it provides goods or services. However, upon information and belief, the Trustee without explanation or notice, swept all monies from and closed TSI's only SAM Account. Without a SAM-registered account, the Trustee may not be able to collect the A/R or any amount owed to TSI by the Federal Government.

**B.**     **The Chapter 11 Bankruptcy Filing.**

14.     On January 18, 2022 (the "Petition Date"), TSI commenced its voluntary case under Chapter 11 of the Bankruptcy Code. The Debtor's chapter 11 case never had the chance to get off the ground. Shortly after the Petition Date, Debtor's counsel abruptly withdrew leaving the Debtor

without counsel for several weeks at a critical juncture in its case.

15.     On March 31, 2022 (the "Conversion Date"), following a hearing on dismissal or conversion of the case, an order was entered converting the case from chapter 11 to chapter 7. George L. Miller (the "Trustee") was appointed as the interim chapter 7 trustee.

**C.      The Appeal**

16.     The TSI Members assume the Court's familiarity with the Florida litigation. The Florida litigation resulted in two Judgment Creditors being awarded claims against TSI totaling $6,246,075.78. The judgments are the subject of an appeal pending before the United States Court of Appeals for the Eleventh Circuit (the "Appeal").

17.     The Appeal is filed and launched. TSI's appellant counsel, the Bresky law firm, filed an opening brief in the Appeal and is ready to move forward. The Bresky law firm was retained by this Court for that purpose. From early on in the bankruptcy case, the TSI Members repeatedly offered to fund the entire cost of prosecuting the Appeal provided the TSI Members retain sole authority to settle the Appeal (the "Offer"). The Offer remains open.[3]

18.     A motion for stay relief to prosecute the Appeal was filed. *See* Bankr. D.I. 38. That stay relief motion was never heard. A second motion, seeking stay relief among other relief, was filed on May 3, 2023 as part of the Substantive Motion. *See* Bankr. D.I. 310.

19.     The Appeal is the only way to contest the claims of the Judgement Creditors. The TSI Members *and the Trustee* both dispute the damages awarded to GPDEV ($3,297,995.32) and Simons ($2,483,722). The Trustee previously has acknowledged that "prosecution of the Appeal

---

[3] The undersigned has requested, on many occasions, by email and by phone, that the Trustee agree to stay relief so the Appeal may proceed. *See, e.g.,* February 8, 2023 email, attached hereto as **Exhibit 2**, March 24, 2023 email, attached hereto as **Exhibit 3**, and March 28, 2023 email, attached hereto as **Exhibit 4**. To date, despite repeated requests, the Trustee has not even responded to the Offer.

may be in the best interests of the other creditors," *see* Bankr. D.I. 177 at ¶ 28, and noted that "[i]f the Debtor's arguments in the Appeal are successful, the Debtor actually overpaid [Judgment Creditors] by at least $95,032 and would have an affirmative claim against them to recover such overpayment[,]" *id.* at ¶ 31.  The Trustee, however, without explanation, has not accepted the Offer, and the Appeal remains dormant.

> **D.    The Trustee Election.**

20.    The chapter 7 case is solvent and, not surprisingly, a trustee election ensued.  In connection with the disputed election, the Trustee objected to the claims asserted by the Judgment Creditors and represented to the Court that the Judgement Creditors held "disputed" claims "as to both liability and amount" that are subject to a "compelling" appeal (the "Trustee's Objection to the Judgment Creditors' Claims").  *See* Bankr. D.I. 164 at ¶ 8 ("By the Appeal, the Debtor continues to dispute both the Debtor's liability on, and the amount of, the Judgments on various grounds. . . .  The Opening Brief [filed in the Appeal] details the Debtor's various disputes with respect to the Judgments and the Trustee incorporates the Opening Brief into this Preliminary Objection by reference."); *see* Transcript of June 15, 2022 Hearing, attached hereto as **Exhibit 5**, at 55: 4-16 (The Trustee testified that he "think[s] [the Appeal] has merit," that he "could probably resolve these [by] settling with the creditors," and "absolutely" agree that issues on appeal should be further explored "because the mistakes are so large, you know, we're talking several million dollars."); Bankr. D.I. at 177 at ¶ 29 ("Despite the [Judgment Creditors'] efforts to undermine the arguments raised by the Debtor in the Appeal and Opening Brief, the Appeal is compelling").  By order dated July 28, 2022, Mr. Miller was appointed to serve as permanent Trustee.

21.    At the hearing on the contested trustee election, a question was posed about the Trustee's proposed administration of the case:

Q    During one or both of the phone calls, there was some discussion of the fact that you didn't believe you could pursue the insider transfers prior to the resolution of the FEMA claims.  Is that still your belief?

A    I never said that.  I could pursue the insider claims, but it would be premature.  And the reason it's premature is because we have approximately $23 million in claims against FEMA and if you collect $23 million of claims against FEMA and your judgment, you know, your judgment -- your client's judgments are about $6 million.  So, I've got $23 million in the bank, I'm writing you a check for $6 million and you're paid off.

And so, that's the quickest way, as a trustee – and the cheapest way, because I have now engaged a client – an attorney, who's going do it all on a contingency basis.  So, there's no need for any money to recover fees and expenses, you know, chasing assets throughout the United States.

*See* June 15, 2022 Hrg. Tr. (Ex. 5) at 46:13-47:5.

22.    That was nearly one year ago.  Rather than contemporaneously seeking to reduce the aggregate amount of claims asserted against the estate by, among other things, moving forward with the Appeal, and seeking to file claims and collect receivables, the Trustee's focus has been entirely on preparing and prosecuting litigation including seeking  injunctive relief against the TSI Members, among others.  The TSI Members repeatedly have requested that the Trustee not pursue a path of aggressive litigation which carries with it substantial attorney's fees but instead focus on filing claims for or otherwise collect existing property of the estate; *i.e.,* the A/R.  In other words, there is no need to augment the estate when there is sufficient property of the estate to pay all valid claims.

### E.    There are Only Seven (7) Filed Proofs of Claim Filed against the Estate.

23.    Only seven (7) creditors filed proofs of claim in this case and those claims mostly relate to the Florida litigation.  The aggregate amount of filed proofs of claim is $8,878,066.67 *before* the objection-allowance process.  The Trustee has disputed the claims asserted by the Judgment Creditors, as do the TSI Members.  *See* Bankr. D.I. 164, 165.  The reversal on Appeal

of the Judgement Creditors' claims aggregating $6,246,075.78 drastically would change the administration of the estate.  Such a reduction in total claim amount might obviate the need for the Trustee to prosecute the FAC or continue the injunctive relief.  The only way to object to the claims of the Judgement Creditors is to prosecute the Appeal which, to date, the Trustee has not done.

24.     At least three of the filed proof of claims in an aggregate amount over $2.5 million are facially objectionable.  First, according to the Trustee, the claim of Bering Straits Logistics Services ("BSLS") in the amount of $1,516,745.69, is objectionable.  *See Preliminary Objection of the Chapter 7 Trustee to Proof of Claim Filed by Bering Straits Logistics, LLC* [Bankr. D.I. 166]; *see also Objection Of Deborah Mott, Steven Acosta, Christopher Mott and John S. Maciorowski To Motion Of The Chapter 7 Trustee and For Entry Of An Order (I) Extending The Freeze And Granting Preliminary Injunctive Relief, And (Ii) Granting Related Relief, Pursuant To 11 U.S.C. § 105(A) and Fed. R. Bankr. P. 7065* [Bankr. D.I. 282].  Second, the claim of Lindsay Blee Americas LLC, in the amount of $1,050,198.50, is objectionable.  Lindsay Blee's proof of claim is expressly *contingent* on TSI collecting a $1.2 million account receivable from DLA Fuels.  Third, the IRS proof of claim for a late filing fee, in the amount of $24,360, is disputed because it was paid.  *See* **Exhibit 6** attached hereto.

**F.     The Trustee Stated that TSI is Solvent Under Penalty of Perjury.**

25.     The Trustee prepared and filed a Form 1065 dated September 10, 2022, a true and correct copy of which is attached hereto as **Exhibit 7.**  The Form 1065 is a U.S. Return of Partnership Income for year 2021.  The name of the partnership is Team Systems International LLC c/o George Miller, Trustee.   The Form 1065 list total assets of $21,417,007 (trade notes and accounts receivable) and total gross non-farm income of $21,763,683.  Form 1065 at 14c.

**G.      TSI is Owed $21.7 Million in Accounts Receivable by the Federal Government.**

26.      As the Trustee previously testified, *see* ¶ 21 *supra*, property of the TSI estate includes "approximately $23 million in claims against FEMA."  One claim is the $13.5 million owed for FEMA's reduction in the initially ordered quantity of bottled water (the "$13.5 Million Receivable").  The law firm Venable LLP was retained by the Trustee to collect this receivable for the benefit of the estate.

27.      The Trustee, however, has not sought, and is *not* now seeking, to either file a claim or collect other receivables in the aggregate amount of $8.2 million.  At the same time, however, Ms. Mott has *volunteered* to collect the A/R.[4]  The A/R are as follows:

      a.      The $6.8 million+ FEMA Change Order Receivable.

      b.      The $1.2 Million DLA Bulk Fuels RME Receivable.

      c.      The $198,000 US DLA Aviation Receivable.

      d.      The $32,140 DLA USMC Receivable.

(collectively, (i) – (iv), the "A/R").[5]  A fuller description of the A/R is set forth in the Demand Letter.

**H.      The TSI Members have Provided the Trustee with all Documents
    and Information Necessary to Collect $8.2 Million in Accounts Receivable.**

28.      As set forth in the Demand Letter and in Ms. Mott's deposition testimony from February 7, 2022, the Trustee is well aware of the Change Order Receivable.

---

[4] Ms. Mott offered to do so as early as September 2022 and repeatedly relayed the offer through counsel in the last five months.  *See* various email exchanges between undersigned and Trustee's counsel (Exs. 2-4).

[5] *See* Debtor's Schedules of Assets and Liabilities [Bankr. D.I. 28, Schedule A/B, Part 3, Question 11, pp. 2-3 of 11] (these three receivables are listed on Schedule A/B).  Notably, due to clerical error, the amount of the second ($198,000) and third ($1.2 million) receivables were incorrectly listed on the Schedules.  Ms. Mott requested in writing twice that counsel to the Debtor file an amended schedule, correcting many errors, including the correct amount.  However, no amended schedules were filed.

Q. TSI intends to assert a $6.8 million change order under FAR 52.243 Changes Fixed Price.  What's the basis for that $6.8 million change order?

A. When we initially received the task order from CLIN 002, containers were not part of the logistics plan that we bid on.  We bid break bulk.

We put a price in for break bulk.  We had a logistics plan to move break bulk.  And 30 days into it, FEMA came to us and changed the logistics plans requirements to containers.  They also reduced the contract to 12 million.

The problem with that is 30 days into a hurricane on -- in the Southeast and the East Coast, there were no containers available.  We had to pay to go get the containers in Chicago, St. Louis, I mean, just all over, bring the containers back, in some instances take them to the water plant in New Jersey where we had staged the water to be moved to Puerto Rico because Holt terminals in New Jersey handles all of the Fiji water that comes into the United States.  So they had equipment specifically designed to handle bottles of water.

When FEMA changed the logistics plan, it meant we had to go get containers halfway across the country, truck them back -- now, mind you, this is a hurricane.  So the trucking charges were out of sight because there were -- there was a scarcity of trucks.

We then had to take some of those containers to hold terminals.  They had to put the water in the containers.  Then we had to find chassis, which were also a scarce resource and very expensive, load the containers on the chassis, and the chassis had to drive down to the Port of Jacksonville so that those containers could be taken by barge to the Ayala terminal because the Crowley terminal was completely backed up.

In addition to that, we had to get containers to the terminal in Savannah because we had 53-foot trucks with bottled water heading to the terminal in Savannah that had to be cross-stocked, taken out of the 53-foot trucks and put into the 40-foot containers in Savannah.  And then we had to get dray, which is taking it from a laydown terminal area to the barge that was also being loaded in Savannah.  The cost was enormous.

Then they barged them down to the Ayala terminal.  The Ayala terminal then unloaded all of it, and there was a FEMA representative at the dock because they took possession of the water immediately, but they issued a CLIN 16 contract to us where they rented the containers with a daily rate.

But the problem is, even though they took custody and control of the containers, we were still paying for the containers, the storage.  All of those fees.  And they were supposed to take it out of our daily rate, but we were upside-down on the daily rate.  And once FEMA took all of the containers out of the terminal, they

continued to pay that daily rate, so we were able to catch up to cover the downside.

So then FEMA brought the containers back to the terminal in Ayala and left them. And at that point we had 685 containers, plus or minus some because they lost them, that we weren't getting paid for. We had to pay for those containers, to store them while we fed them back into the United States. And at that time, because there was such a glut of containers in the Jacksonville area, we couldn't send them all at once. We had to feed them in at 50, 150, 75 every other week until the backup subsided. It cost us millions and millions and millions of dollars.

That's the basis of our change order.

*See* Transcript of Deposition of Deborah Evans Mott dated February 7, 2022, attached hereto as

**Exhibit 8,** at 197:20-200:22.

29.    TSI Member Steven Acosta again brought the issue of timely filing a claim to collect the Change Order Receivable to the attention of the Trustee and his counsel in June 16, 2022. *See* **Exhibit 9** attached hereto. The Trustee, however, never met with Acosta nor did he take any action to file a claim for the Change Order Receivable. Further, for the Change Order Receivable, all the documents and information necessary to file a claim with FEMA is set forth in the Bering Strait's proof of claim on file since February 7, 2022. As the Trustee knows from his own review of the Bering Strait's proof of claim, Bering Straits served as TSI's "designated subcontractor" on the FEMA task order. As such, Bering Straits was required to track all expenses that resulted from the change order. The TSI Members have produced to the Trustee all Bering Straits documents needed to file a claim. The TSI Members also repeatedly have pointed the Trustee to such information set forth in the Bering Straits' proof of claim. *See* Claims Register at Claim No. 1; *see also* Transcript of June 30, 2022 Hearing, attached hereto as **Exhibit 10**:

| Mr. Mann: | Since Mr. Miller filed the sanction motion, have you provided him any additional documents? |

Mr. Acosta:          We have.  We provided Bering Straits – so, Bering Straits was our subcontractor on the MATOC and I sent over all of Bering Strait's books and records.  That was their part, or their job as a subcontractor was taking care of all books and records.  I submitted all email, everything that has to do with the claim, the change order, and we've given the contracts for the DLA.

*Id.* at 88:4-12.

Mr. Carickhoff:     Okay.  And would the company have maintained those records to be able to properly litigate those claims?

Mr. Acosta:          Like I said, Bering Straits was our subcontractor, they kept all our books, the books and records on that past order and I've sent everything to you.

Mr. Carickhoff:     Did you ever provide invoices from Lindsay Blee to the trustee?

Mr. Acosta:          I think we did because they're a creditor.

*Id*. at 101:18-102:2.

## I.    TSI has a Viable and Profitable Business that the TSI Members Intend to Re-Start After the Chapter 7 Case is Fully Administered.

30.    Post-petition, pursuant to section 721 of the Bankruptcy Code, the Trustee is authorized to run the Debtor's business if he so chooses.  During the post-petition period, the federal government, through DLA, has offered TSI over 800 opportunities to bid on spot fuel fulfillment orders.  The TSI estate is not only solvent, it could be operating as a profitable business today.  Conservatively, those opportunities could have generated in excess of $1 million for TSI and creditors of the estate.  The Trustee, however, has elected not to run TSI and not allowed the TSI Members to take on *any* business.

## J.    The Trustee has Two Principal Fiduciary Duties: Preserve the Estate and Vet Claims for Allowance.

31.    The two principal fiduciary duties of the Trustee are to preserve assets of the estate and vet claims against the estate.  Here, the Trustee could have fulfilled his statutory charge by

contemporaneously pursuing the Appeal (at no cost to the estate), vetting the other claims which he started to do during the trustee election and work cooperatively with the TSI Members to collect nearly $22 million owed to the estate.  He elected to administer the estate in a different way to serve a different agenda.  Even worse, the Trustee may let the time to collect the A/R lapse.  There is no logic or justice in that and the TSI Members reserve all rights.

### K.    The Demand Letter.

32.    The TSI Members have made demand on the Trustee for the Requested Relief.

### RELIEF REQUESTED

33.    The TSI Members hereby seek entry of an order granting them: (a) standing to prosecute the Appeal and (b) file and collect the A/R for the benefit of the estate (together, (a) and (b), the "Requested Relief").

### ARGUMENT

### I.    THE COURT SHOULD AUTHORIZE STANDING FOR THE TSI MEMBERS TO PURSUE THE REQUESTED RELIEF FOR THE BENEFIT OF THE ESTATE.

27.    In the bankruptcy context, the debtor in possession or trustee initially has the sole authority to pursue – or not pursue – claims and causes of action.[6]  However, even though a DIP or trustee may have a duty to maximize value and vet claims, a reorganizing debtor may not want

---

[6] The Third Circuit in *Artesanias Hacienda Real S.A. DE C.V., v. North Mill Capital, LLC v. Leisawitz Heller (In re Wilton Armetale, Inc.)*, 968 F.3d 273 (3d Cir. 2020) held that abandonment by a chapter 7 trustee of a pre-petition cause of action that was property of a bankruptcy estate returned the power to pursue that cause of action to the creditor.  The Third Circuit explained that upon a bankruptcy filing, most of a debtor's property is transferred to the debtor's bankruptcy estate under 11 U.S.C. § 541, and that "[a] cause of action [becomes] property of the estate if the claim existed at the commencement of the [bankruptcy] filing and the debtor could have asserted the claim on his own behalf under state law."  968 F.3d at 280.  Moreover, the Court clarified that "once a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory authority to pursue it."  *Id.*

This decision is important because it clarifies that a derivative interest in a bankruptcy estate's claims against third parties is not extinguished upon the debtor's filing for bankruptcy, but may instead be revived by the trustee's abandonment of the estate's own interests in the claims.  Here, however, the concern of TSI Members is that the value of the A/R, in whole or part, may be lost due to the statute of limitations.

to bring a preference action against an important supplier or a breach of fiduciary action against a board member.  Here, the Trustee is not pursuing the Appeal, not objecting to claims and not collecting the A/R.  The Trustee's inaction stands in direct conflict with his action plan when he was campaigning to serve as the permanent trustee.  Specific to this Motion, the Trustee has refused to move forward with a free Appeal or collect $8.2 million in A/R.

28.     Faced with this pattern of facts courts have developed the doctrine of derivative standing that allows creditors/parties in interest to step into the DIP/trustee's shoes to assert claims on behalf of the estate.  Although this is more typical in the context of a creditors' committee in a chapter 11 case, there is no reason not to apply the doctrine here.

### A.     The TSI Members Should be Afforded Derivative Standing Because they have Claims and are Aggrieved Parties.

34.     By reason of the TSI Members hard work and efforts running TSI pre-petition, the bankruptcy estate is owed nearly $22 million.  Unfortunately, the Trustee has evinced no intent to collect the A/R.  He has not filed a claim with FEMA with respect to the Change Order Receivable. He has also shut down the only SAM-registered account that TSI maintained. That is deeply troubling to the TSI Members.  The TSI Members are the one (100%) hundred percent owners of TSI and are entitled to any amount over the amount necessary to pay lawful claims of creditors in full.  *See* 11 U.S.C. §726(a)(6).  By his own statements to this Court and the IRS under oath in the Form 1065, the Trustee agrees there is nearly $22 million to collect for the benefit of the estate. Further, the Trustee has admitted that the $8.9 million in total claims against the estate may be substantially contracted.  The Trustee should not be heard to say the TSI Members are "out of money equity."

35.     Critically important to the TSI Members, every dollar the Trustee or his professionals charge the estate, and every dollar the Trustee overpays to creditors including the

Judgement Creditors, and every dollar of the A/R that the Trustee allows to lapse and become uncollectible by reason of the statute of limitations, comes at the direct expense of TSI Members. The Trustee's failure to act gives rise to claims and the TSI Members reserve all rights. *See* 11 U.S.C. §101(5).

### B.    The TSI Members Have Standing Under § 1109(b).

27.    It is well known that if a debtor in possession unjustifiably refuses to bring an avoidance action, a creditors' committee may seek "derivative standing" from the bankruptcy court to do so on behalf of the debtor. *See, e.g., Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 553 (3d Cir. 2003) ("We believe that Sections 1109(b), 1103(c)(5), and 503(b)(3)(B) of the Bankruptcy Code evince Congress's approval of derivative avoidance actions by creditors' committees, and that bankruptcy courts' equitable powers enable them to authorize such suits as a remedy in cases where a debtor-in-possession unreasonably refuses to pursue an avoidance claim."). Standing under § 1109(b) expressly include an "equity security holder." *See* 11 U.S.C. 1109(b) (provides that a "party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an **equity security holder**, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.") (**emphasis** added).

28.    Courts have applied section 1109(b) in a chapter 7 case to grant standing. *See, e.g., Claridge Assocs., LLC v. Schepis (In re Pursuit Capital Mgmt., LLC)*, 595 B.R. 631, 658 (Bankr. D. Del. 2018) (conferring derivative standing upon a creditor in a chapter 7 case filed by a Delaware LLC); *In Matter of Home Casual LLC*, 534 B.R. 350, 354 (Bankr. W.D. Wis. 2015) (conferring derivative standing upon a creditor in a chapter 7 case filed by a Wisconsin LLC); *In*

*re SGK Ventures, LLC*, 521 B.R. 842, 847 (Bankr. N.D. Ill. 2014) (LLC formed under Illinois law).

### C.    The TSI Members Have Standing Under State Law.

29.    The Trustee is the estate representative, *see* 11 U.S.C. §323, and has sole control over the Debtor and its property rights, including the right to prosecute the Appeal and file claims or otherwise collect the A/R.  The Trustee is the functional equivalent of the Debtor's board of directors.  The TSI Members have the duties of the Debtor.  *See* Bankr. D.I. 222.  On June 30, 2023, the TSI Members sent the Trustee the Demand Letter and made demand on the Trustee to pursue the Requested Relief.  To date, the Trustee has not agreed to do so.  The TSI Members have the requisite standing under applicable Delaware state law[7] to request derivative standing.

## II.    THE TSI MEMBERS HAVE ASSERTED COLORABLE CLAIMS THAT THE APPEAL SHOULD BE PROSECUTED.

30.    Delaware bankruptcy courts have generally described the procedure to obtain derivative standing as follows.  The party requesting standing must demonstrates: (i) a colorable claim; (ii) a debtor's unjustified refusal to pursue that claim; and (iii) permission of the bankruptcy court to commence the action.  *See, e.g., In re Washington Mutual, Inc.,* 461 B.R. 200, 254 (Bankr. D. Del. 2011); *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.),* 316 B.R. 141, 145 (Bankr. D. Del. 2004).  The burden is on the party requesting standing to demonstrate that the

---

[7] 6 *Del. C.* § 18-1002 provides that:

In a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action and:

(1) At the time of the transaction of which the plaintiff complains; or

(2) The plaintiff's status as a member or an assignee of a limited liability company interest had devolved upon the plaintiff by operation of law or pursuant to the terms of a limited liability company agreement from a person who was a member or an assignee of a limited liability company interest at the time of the transaction.

prerequisites have been satisfied.  *In re G-1 Holdings, Inc.,* 313 B.R. 612, 629 (Bankr. D.N.J.

2004).  As set forth below, the TSI Members have demonstrated an entitlement to the Requested

Relief.

31.    The reasons for moving forward with the Appeal are compelling.  *First*, other than

pursuing the Appeal, there is no way for the Trustee to object to the claims asserted by the

Judgment Creditors.  *Second*, if the Appeal is successful, it will reduce the aggregate claims against

the estate by, at a minimum, 70%.  *Third*, if the Appeal is not successful, the estate is no worse off

than it is now.  *Fourth*, by accepting the Offer, the Trustee will not have to expend *any* estate

assets in terms of time or professional fees vetting the Judgement Creditors' claims.  *Fifth*, the

Appeal is launched, an opening brief has been filed, and appellant counsel for TSI in the Appeal

already has been retained by the estate.  *Sixth*, the Trustee is of record claiming the Appeal has

merit and should be estopped from now denying that.  *Seventh*, because of the GPDEV and Simons

judgment against it, TSI is unable to bid on any new government contracts or earn any income

from any new contracts until the Appeal is finally adjudicated.

32.    Further, the Appeal presents a colorable claim because, among other things:

- As a matter of law, it is unlawful for the Judgment Creditors to have received a percentage commission for merely securing a government contract.  *See* 41 U.S.C. § 3901(b)(1) (the federal statute prohibits any person from "secur[ing] the contract on an agreement or understanding for a commission, percentage, brokerage, or contingent fee…."); *see also* Federal Acquisition Regulation 52.203-5(a), which was specifically incorporated into FEMA's Request for Proposal and MATOC (similarly prohibits such contingent fees, defined as "any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.").

- The Florida litigation should have been dismissed for lack of subject matter jurisdiction because GPDEV and Simons failed to carry their burden to prove complete diversity of citizenship.  There are citizens of California on both sides. The district court focused on an inapposite technicality regarding an LLC membership resolution, but acknowledged the "significant possibility" that it did not have jurisdiction;

- TSI should have been allowed to amend its Affirmative Defenses to include a defense of Illegal Contract, in violation of 41 U.S.C. § 3901(b)(1) and FAR 52.203-5, because it became clear during trial that GPDEV and Simons interpret the Consulting Agreement in a way that makes it illegal and unenforceable under federal law by claiming a commission for merely helping TSI secure a FEMA contract. The denial of leave to amend ultimately allowed the jury to return a verdict for commissions that GPDEV and Simons had no right to receive under the law;

- Commissions under the Consulting Agreement are expressly limited to TSI's sales of Niagara-brand bottled water.  It prohibits any modification unless in writing and signed by all parties.  The Florida court misapplied a rare legal exception to allow an oral or implied modification in spite of that clause and there was insufficient evidence to support any modification;

- The Consulting Agreement provides for commissions only on "bottled water."  In the order denying summary judgment the court erred in ruling that parol evidence would be allowed as to the meaning of the Consulting Agreement and whether it provides for a commission on drop containers.  There is no ambiguity that would require parol evidence and, under the circumstances, it would have been impossible for the parties to contemplate anything besides bottled water.  The issue never should have gone to the jury and summary judgment should have been granted;

- Assuming arguendo that GPDEV and Simons are entitled to any amount, the amounts in the judgment are erroneous.  They were based on a summary by GPDEV and Simons' expert that erroneously excluded over $1 million of expenses paid to Coakley Logistics for transporting the water to Puerto Rico and over $1 million of expenses related to Bering Straits.  It also reflected an unlawful commission for doing nothing more than securing a federal contract;

- The award of $991,498.78 of prejudgment interest should be reversed. TSI showed that only post-judgment interest should apply or that any pre-judgment interest should accrue from the date of the verdict; and

- Based on TSI's Affidavit and Motion to Recuse, which must be taken as true, the judge was required to recuse under 28 U.S.C. § 144 and 28 U.S.C. § 455(a) or (b)(1) because a reasonable person would perceive bias or prejudice. This denial directly led to various adverse rulings and the judgments.

## III.    THE TSI MEMBERS HAVE ASSERTED A COLORABLE CLAIM THAT THEY SHOULD BE PERMITTED TO COLLECT THE A/R FOR THE ESTATE.

33.    *First*, the A/R is property of the estate, and the Trustee has an affirmative fiduciary duty to preserve and monetize all property of the estate.  The Trustee is not fulfilling that duty and

the TSI Members should be permitted to do so.  **Second**, there is a statute of limitations looming, and the Trustee's failure to file a claim with FEMA for the Change Order Receivable before it is too late is, among other things, corporate waste, and a breach of the Trustee's duty of care and to be informed.    TSI Members intend to re-start TSI's business after the chapter 7 estate administration is concluded.  The failure by the Trustee to file a claim **now** for **all** A/R during his tenure and before the applicable statute of limitations (approaching) expires will severely harm TSI and the TSI Members financially. The TSI Members reserve all rights against the Trustee and his counsel for their failure to take timely action to preserve and protect TSI's assets, including all A/R. **Third**, the Trustee's collection of all or even some of the A/R could shorten the time necessary to fully administer the estate and pay lawful creditors of the estate in full.  **Fourth**, the Trustee's failure to collect property of the estate evinces an intent to administer the estate for his and his professionals' primary benefit; *i.e*., preferring to incur legal fees prosecuting the FAC instead of collecting property of the estate.  **Fifth**, in the Trustee election, the Trustee held himself out as knowledgeable about collecting government receivables and that he held the required security clearances to serve as a key manager for TSI.  **Sixth**, the Trustee has been on notice to file a claim for the $6.8 million FEMA Change Order Receivable since June 2022 but has taken no action to collect that or other receivables.  The information necessary to prepare and file a claim with FEMA has been provided to the Trustee or is otherwise a matter of public record.

34.    The TSI Members respectfully submit that cause exists for the Court to grant them the Requested Relief.  The TSI Members have made due demand on the Trustee and alleged claims that are more than colorable as they are well grounded in law and fact.  Under the circumstances of this case, the TSI Members have been precluded by the Trustee from pursuing the Requested Relief.  Therefore, this Court should authorize the TSI Members to do so.

**WHEREFORE,** the TSI Members respectfully request that the Court enter an order granting the TSI Members derivative standing to pursue the Requested Relief and such other and further relief as the Court deems just and proper.

Dated: July 5, 2023
      Wilmington, Delaware

                                          **THE ROSNER LAW GROUP LLC**

                                          */s/ Frederick B. Rosner*
                                          Frederick B. Rosner (DE #3995)
                                          Zhao Liu (DE #6436)
                                          824 N. Market Street, Suite 810
                                          Wilmington, Delaware 19801
                                          Email: rosner@teamrosner.com
                                                              liu@teamrosner.com

                                          *Counsel to the TSI Members*