**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| Team Systems International, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | Re: D.I. 328 |
| | Objection Deadline: 7/12/2023<br>Hearing Date: 7/19/2023 at 1:00 p.m. |

**CHAPTER 7 TRUSTEE'S (I) PRELIMINARY OBJECTION TO THE MEMBER
DEFENDANTS' STANDING MOTION; AND (II) CROSS-MOTION TO COMPEL
MOTT AND ACOSTA TO COMPLY WITH THE CONTEMPT ORDER AND TO
ENFORCE THE AUTOMATIC STAY**

George L. Miller, solely in his capacity as the Chapter 7 Trustee (the "Trustee") for the

estate (the "Estate") of the above-captioned Debtor, hereby files this

    (i)    Preliminary Objection to the *Motion for Entry of Order Granting TSI Members
Standing to: (a) Prosecute the Appeal and (b) File Claims and Collect Certain
Accounts Receivable on Behalf of the Debtor's Estate* [D.I. 328] (the "Standing
Motion") filed by Deborah Evans Mott ("Mott"), Steven M. Acosta ("Acosta"),
Christopher Mott and John S. Maciorowski (collectively, the "Member
Defendants"); and

    (ii)    Cross-Motion for entry of an order (a) directing Mott and Acosta to comply with
the *Order with Respect to Trustee's Motion to Hold Debtor in Contempt* [D.I. 222]
and (b) prohibiting and enjoining Mott, Acosta, and each of their respective agents
and affiliates from violating the automatic stay or otherwise interfering with the
administration of the Estate.

In support of this Preliminary Objection and Cross-Motion, and in accordance with the

Court's direction at the June 14, 2023 discovery conference, the Trustee submits the *Declaration

of George L. Miller*, attached hereto as Exhibit T-1 (the "Miller Declaration").

In further support of this Preliminary Objection and Cross-Motion, the Trustee respectfully

states as follows:

## PRELIMINARY STATEMENT

1.      Since the beginning of this case, the Member Defendants have repeated a myth that the Debtor can easily recover more than $20 million due from the government and pay its creditors in full.  The Court has rejected this myth twice before when it (i) converted the Debtor's case to chapter 7[1] and (ii) granted the Trustee a preliminary injunction.[2]  The Standing Motion is the latest retelling of the Member Defendants' false narrative, which the Court should again reject.

2.      The Trustee is actively pursuing the $13.5 million claim against the Federal Emergency Management Agency ("FEMA") through contingency counsel and is actively pursuing recoveries through litigation.  Indeed, just last week, the Court approved a $1 million settlement that the Trustee negotiated with certain other defendants.

3.      The Trustee stands ready and willing to pursue any and all colorable claims on behalf of the Estate.  However, the claims and arguments by the Member Defendants have no basis in law and, to date, the Member Defendants have not pointed to any credible evidence that the $8.2 million in so-called "accounts receivable" (collectively, the "Alleged A/R") are colorable or have any merit.

4.      The Member Defendants point to a one-page chart in the Bering Straits proof of claim as evidence that FEMA owes the Estate $6.8 million (the "Alleged $6.8 Million FEMA Claim").  However, the Trustee's investigation quickly revealed that this amount and more already appear to have been paid by FEMA to the Debtor for transportation costs.  Thus, the only document that the Member Defendants have offered does not alone independently support a claim against

---

[1] *See* Memorandum Opinion at 3 [D.I. 146] (Mar. 30, 2022) ("*TSI I*").
[2] *See* Memorandum Opinion at 9 [D.I. 304] (Jan. 31, 2023) ("*TSI II*").

FEMA.[3]  The Member Defendants also failed to present evidence that the other Alleged A/R are colorable.

5.     Similarly, the Member Defendants have not cited to any authority for their extraordinary request that equity holders who are defendants in litigation brought by the Trustee should be permitted to pursue an appeal of a prepetition contract action.  None of the cases cited by the Member Defendants remotely supports granting equity holders (and defendants, with interests materially adverse to the Estate) derivative standing in chapter 7.  And none of the cases cited by the Member Defendants dealt with derivative standing for anything other than avoidance actions, which have very different considerations than a stayed appeal.  In short, the Member Defendants have failed to present any legal or factual basis for derivative standing, and the Standing Motion should be denied.[4]

6.     Two days after the Standing Motion was filed, the Member Defendants' co-counsel sent the Trustee's counsel an email stating:

> I have been informed that the $13.5 million in FEMA funds have been approved and are being held by Homeland Security.  Also, I understand that they will negotiate with you but will ultimately have no basis to withhold any of the funds, so you need not agree to accept anything less than the full amount.  If you can reach an agreement with them, they will pay immediately.
>
> Also, I have been informed that the $6.8 million amount has been approved and is also being held by Homeland Security.  If you apply for it, it will be paid to the estate quickly.

---

[3] To be clear, the Trustee has <u>not</u> made any decision regarding what amounts, if any, may be owed to the Estate by third parties.  The Trustee is merely pointing out that the Member Defendants have failed to present any credible evidence in support of their request for derivative standing.  The Trustee is continuing to investigate any potential accounts receivable and expressly reserves all rights.

[4] Given the lack of factual or legal support for the relief requested, the Trustee's counsel reached out to the Member Defendants' counsel asking that the Standing Motion be withdrawn but, as of this filing, the Standing Motion has not been withdrawn.

However, when asked for details, counsel acknowledged that the only source for this information was Deborah Mott.[5]  As of this filing, no supporting documentation, such as correspondence with FEMA or Homeland Security, has been provided to the Trustee.

7.      For the reasons discussed more fully below, in addition to seeking denial of the Standing Motion, the Trustee is also seeking entry of an order compelling Mott and Acosta to comply with the Contempt Order [D.I. 222] and enforcing the automatic stay.  While investigating the Alleged A/R, the Trustee learned that, after the case was converted to chapter 7, Mott continued to use and control the Debtor's SAM.gov, including listing herself as the sole point of contact.  Moreover, Mott and Acosta continue to use and access the Debtor's emails.  These are clear breaches of the Bankruptcy Code and the Court's prior orders that need to be remedied.

## JURISDICTION

8.      The district court has jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Cross-Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.   Pursuant to Local Bankruptcy Rule 9013-1(f), the Trustee consents to the entry of a final order by this Court with respect to the relief requested in the Standing Motion and the Cross-Motion.   The predicates for the relief requested include sections 105(a), 362, 541, and 542 of the Bankruptcy Code.

## RELEVANT BACKGROUND

9.      On January 18, 2022 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

---

[5] A copy of this email is attached hereto as Exhibit T-10.

10.     On January 26, 2022, the Debtor filed its Schedules of Assets and Liabilities, which list, among other things, (i) the $13.5 million claim against FEMA that the Trustee is continuing to pursue; (ii) a $6.8 million amount that appears to correspond to the Alleged $6.8 Million FEMA Claim; and (iii) certain smaller amounts.[6]

11.     In March 2022, the Court conducted a three-day evidentiary hearing on the motion to dismiss or convert the case.  During that evidentiary hearing, the Member Defendants had ample opportunity to present any evidence to support the value of the Alleged A/R.  The Court found that "the evidence provided in this case indicates that both the receivables that TSI says are due for past government contracting work and the prospects for future government contracting work are **somewhere between speculative and highly dubious.**"[7]  And despite assertions by Acosta that the Debtor was going to file a $6.8 million claim with FEMA "imminently,"[8] the Court concluded that "the prepetition receivables that provide the basis for the debtor's assertion that it will be able to satisfy all creditors in full appear to be **dubious, at best**."[9]  The Court added:

> It bears emphasis, however, that this claim [the Alleged $6.8 Million FEMA Claim] arises out of events that took place in 2017 and 2018.  And as of the end of March 2022, TSI, which has suffered a $6.3 million judgment for which it was unable to post a bond, still has not asserted a claim for $6.8 million owed to it dating back more than four years.  **None of that makes much sense**.  On this record, the Court cannot and will not conclude that it is sufficiently likely that TSI will recover on the $6.8 million claim that this potential recovery provides a basis for the debtor to remain a debtor in possession.[10]

12.     Because the Member Defendants failed to show the Debtor's case was filed in good faith and failed to show that the Alleged A/R was more than dubious, and in light of the allegations

---

[6] D.I. 28, part 3, question 11. Mott signed the Schedules under penalty of perjury. *Id.* at p. 11.
[7] *TSI I* at 3 (emphasis added).
[8] *TSI I* at 35-36 (quoting Declaration of Steven Acosta, D.I. 120 ¶ 9).
[9] *TSI I* at 25.
[10] *TSI I* at 37 (emphasis added).

of misconduct both before and during the case, the Court found cause to convert the Debtor's case to chapter 7.[11]

13.    On March 31, 2022, the Court entered an order converting the Debtor's case to a case under chapter 7 of the Bankruptcy Code (the "Conversion Order").[12]  Among other things, the Conversion Order directed the Debtor "on or as soon as practicable after the Conversion Date" to "[i]mmediately turn-over to the chapter 7 trustee any and all records and estate property under their dominion, control and custody and as required by Federal Rule of Bankruptcy Procedure 1019(4) . . . ."[13]  To date, Mott and Acosta have not complied with the Conversion Order.

14.    Also on March 31, 2022, the Trustee was appointed as the Chapter 7 Trustee of the Debtor's estate and subsequently qualified as the permanent Trustee.

15.    On July 14, 2022, the Court entered an order (the "Contempt Order") granting in part the Trustee's motion to hold the Member Defendants in contempt for their failure to turn over the Debtor's books and records.[14]  Among other things, the Contempt Order (i) designated Mott and Acosta to have the duties imposed on the Debtor under the Bankruptcy Code and the Conversion Order, (ii) directed Mott and Acosta to immediately comply with all obligations imposed on the Debtor under the Bankruptcy Code and the Conversion Order, subject to contempt penalties, (iii) ordered Mott and Acosta to turn over (or identify bates numbers if already turned over) all assets, documents, and other property of the Debtor to the Trustee on or before July 13, 2022, and (iv) imposed a six-month freeze on three identified parcels of real property.[15]  In addition, the Contempt Order provided that if documents "no longer exist or never existed," then

---

[11] *TSI I* at 3-4.
[12] *See* D.I. 151.
[13] Conversion Order ¶ 3.A.
[14] D.I. 222.
[15] *See* Contempt Order ¶¶ 1, 2, 3.

both Mott and Acosta were to provide signed affidavits.[16]  To date, Mott and Acosta have failed to comply with the Contempt Order and have not provided any such affidavits.

16.     On January 10, 2023, the Trustee filed an original complaint against the Member Defendants and others, together with a motion for a preliminary injunction.[17]  As mentioned above, the Trustee has already settled with certain other defendants.

17.     On January 23, 2023, the Court conducted an evidentiary hearing on the preliminary injunction motion.

18.     On January 27, 2023, the Court entered a preliminary injunction order against the Member Defendants, among others, and on January 31, 2023, issued a Memorandum Opinion which contains detailed findings.  Notably, the Court found that "the arguments that the debtor is likely to receive tens of millions of dollars from FEMA, and the assertion that the judgment creditors' claims against the estate should be disallowed, are all arguments that this Court has considered and rejected during earlier stages of this bankruptcy case."[18]

19.     On April 6, 2023, the Trustee filed and served a First Amended Complaint.[19]  The Member Defendants have filed a partial motion to dismiss to which the Trustee will respond.

20.     On May 3, 2023, the Member Defendants filed a motion seeking stay relief, abandonment of property of the Estate, and other relief, which the Trustee has opposed.[20]  The Trustee also filed a motion for a protective order.[21]  The Trustee's counsel and the Member Defendants' counsel met and conferred on June 9, 2023.  During that conference, counsel for the

---

[16] *Id.* at ¶ 4.
[17] *See Miller v. Mott, et al.*, Adv. Proc. No. 23-50004-CTG at D.I. 1, 3, 4.
[18] *TSI II* at 31.
[19] *See Miller v. Mott, et al.*, Adv. Proc. No. 23-50004-CTG at D.I. 37.
[20] D.I. 310; 312.
[21] D.I. 314.

Member Defendants for the first time identified a one-page chart in the Bering Straits proof of claim as support for the Alleged $6.8 Million FEMA Claim.

21.     On June 13, 2023, the Member Defendants filed an objection to the Trustee's motion for a protective order (the "Protective Order Objection") which contains allegations, but not supporting documentation, regarding the Alleged A/R.[22]

22.     On June 14, 2023, the Court conducted a discovery conference, during which the Court directed the parties to exchange declarations on certain identified topics, including the Alleged A/R.  The declarations are due by July 13, 2023.  The Trustee's declaration is attached hereto as Exhibit T-1.

## The Alleged A/R

23.     Since his appointment, the Trustee has actively worked to investigate amounts that may be owed to the Estate.

24.     For example, shortly after his appointment, the Trustee sought and obtained Court authority to employ the law firm of Venable LLP as contingency counsel to pursue the Estate's $13.5 million claim against FEMA.[23]  Under the Trustee's direction, Venable is continuing to pursue the FEMA claim, including filing an appeal to the United States Court of Appeals for the Federal Circuit, which is currently being briefed.[24]

25.     The Trustee is also investigating the Alleged A/R.  The Trustee and his professionals repeatedly requested information from the Member Defendants regarding the

---

[22] D.I. 319.
[23] D.I. 217.
[24] *Team Sys. Int'l, LLC v. Dep't of Homeland Sec.*, No. 23-1556 (Fed. Cir. 2023).

Alleged A/R.[25]  To date, however, the Member Defendants have failed to produce any credible evidence to support the Alleged A/R.[26]

26.     As discussed above, with respect to the Alleged $6.8 Million FEMA Claim, the Member Defendants cite to a one-page chart at page 65 of 76 of the proof of claim filed by Bering Straits Logistics Services, LLC (the "Bering Straits POC").[27]  That chart actually lists $6,889,632.33 in transportation costs (*i.e.*, $6.9 million, not $6.8 million).  The Bering Straits POC contains other documents which appear to show that, in the aggregate, Bering Straits billed TSI $7,586,236.92 for transportation costs (*i.e.*, $7.6 million, not $6.8 million).[28]

27.     TSI's contract with FEMA, as amended, required FEMA to pay TSI, among other things, the sum of $8,979,572.37 for transportation.[29]  Those transportation costs are included in a total contract line item amount of $18,338,852.73.  FEMA paid the $18.3 million to TSI on or about November 29, 2017.[30]  This amount is only part of the approximately $37.6 million FEMA paid to TSI between November 2017 and May 2019 referred to above.  Mott and Acosta have failed to account for all of the money TSI received from FEMA.[31]

28.     Therefore, according to the Debtor's books and records, it appears that FEMA may have paid the Debtor more for transportation costs than is listed in the Bering Straits POC.[32]

29.     Contrary to the Member Defendants' assertions, the Bering Straits POC does not contain any documentation that would support a claim against FEMA for $6.8 million, or otherwise.  According to the Debtor's books and records, FEMA may have paid TSI 100% of the

---

[25] Miller Dec. ¶ 23.
[26] Miller Dec. ¶ 23, 39.
[27] An excerpt of the relevant pages of the Bering Straits POC, starting with the chart identified by the Member Defendants, is attached hereto as Exhibit T-2.
[28] Miller Dec. ¶ 24.
[29] A copy of the FEMA contract is attached hereto as Exhibit T-3.
[30] A copy of the Debtor's bank statement reflecting this payment is attached hereto as Exhibit T-4.
[31] Miller Dec. ¶ 25.
[32] Miller Dec. ¶ 26.

contract amount, exclusive of the $13.5 million claim.  Other than pointing to a single page in the Bering Straits POC, Mott and Acosta have refused to provide any other documentation supporting the Alleged $6.8 Million FEMA Claim, such as an amendment to the contract, an invoice, correspondence with FEMA, or other documentation.[33]  Indeed, Mott and Acosta had more than two and half years between when the Debtor received its last FEMA payment and when the Debtor filed for bankruptcy to bring such a claim against FEMA and they did not.  And despite Acosta testifying that the filing of such claim was imminent in March 2022, neither Mott nor Acosta have provided any credible documentation to support any such claim as of this filing.  If the filing of such a claim was imminent, there would be credible documentation supporting it.

30.    Moreover, the Bering Straits POC was filed in the amount of $1,516,745.69, not $6.8 million or more.  This indicates that TSI already received payment from FEMA for a significant portion (or all) of the transportation costs, and Bering Straits was paid a substantial portion of their contract amount, according to the Bering Straits POC.[34]

31.    The Member Defendants also allege that the Debtor is owed approximately $1.2 million (the "$1.2M Alleged A/R") by the United States Defense Logistics Agency ("DLA").  The Debtor's Schedules do not list an approximately $1.2 million account receivable.[35]  The Member Defendants have failed and refused to turn over all documents and information related to the $1.2M Alleged A/R.  Among other things, the Member Defendants have failed to turn over (i) a copy of the claim submitted to DLA, (ii) a copy of DLA's request for more information, or (iii) a copy of

---

[33] Miller Dec. ¶ 27.
[34] Miller Dec. ¶ 28.
[35] *See generally* D.I. 28.

the Member Defendants' response submitted to DLA.[36]    Notably, the documents listed in the preceding sentence are referred to in but not attached to the Member Defendants' Demand Letter.[37]

32.    The Member Defendants further allege that the Debtor is owed approximately $198,000 by DLA (the "$198k Alleged A/R").    The Debtor's Schedules do not list an approximately $198,000 receivable.[38]  The Member Defendants have failed and refused to turn over all documents and information related to the $198k Alleged A/R.  Among other things, the Member Defendants have failed to turn over (i) the supporting documentation for the $198k Alleged A/R and (ii) the Member Defendants' communications with DLA regarding the $198k Alleged A/R, including DLA's February 27, 2023 request for information.[39] Again, the documents listed in the preceding sentence are referred to in but not attached to the Member Defendants' Demand Letter.[40]

33.    In addition, the Member Defendants allege that the Debtor is owed approximately $32,140 by DLA (the "$32k Alleged A/R").  The Debtor's Schedules do not list an approximately $32,000 account receivable.[41]  The Member Defendants have failed and refused to turn over all documents and information related to the $32k Alleged A/R.[42]  Yet again, the Member Defendants' Demand Letter implies that this information exists but it does not attach or include it.[43]

34.    The Trustee believes that that Mott, Acosta, and potentially others acting at their direction or on their behalf, have communicated with third parties regarding the Alleged A/R and/or other property of the Estate, even though they have no authority to do so.[44]

---

[36] Miller Dec. ¶ 29.
[37] Standing Motion, Ex. 1 (Demand Letter).
[38] *See generally* D.I. 28.
[39] Miller Dec. ¶ 30.
[40] Standing Motion, Ex. 1 (Demand Letter).
[41] *See generally* D.I. 28.
[42] Miller Dec. ¶ 31.
[43] Standing Motion, Ex. 1 (Demand Letter).
[44] Miller Dec. ¶ 32; *see* Exhibit T-7 (Mott email) and Exhibits T-8 & T-9 (Acosta emails).

35.     The Member Defendants' filings with the Court attach or refer to documents relating to the Alleged A/R and/or other property of the Estate that were not turned over to the Trustee.  This is indicative of a pattern of the Member Defendants failing to turn over documents and information relating to the Debtor and property of the Estate as ordered by the Court.[45]

36.     At this time, the Trustee has made no determination as to whether or not to pursue any of the Alleged A/R, as the Trustee does not believe that he has been provided with sufficient evidence to make that determination.[46]  The Trustee expressly reserves all rights on behalf of himself, the Debtor, and the Estate.

<u>**The Eleventh Circuit Appeal**</u>

37.     Prior to the Petition Date, GPDEV, LLC and Simons Exploration, Inc. (together, the "Florida Judgment Creditors") obtained judgments from the United States District Court for the Northern District of Florida against TSI totaling more than $6 million.  TSI appealed to the United States Court of Appeals for the Eleventh Circuit.  That appeal was stayed when the Debtor filed for bankruptcy.[47]

38.     Following his appointment, the Trustee filed a preliminary objection to the proofs of claim filed by the Florida Judgment Creditors.  On July 15, 2022, the Court issued a *Memorandum Opinion* at docket no. 223 in the above-captioned main case which, among other things, allowed the Florida Judgment Creditors' filed proofs of claim against the Estate.[48]

39.     The Trustee has not yet sought to lift the stay of the appeal of the Florida Judgment Creditors' judgments because (i) the Estate lacks the resources to fund the litigation; (ii) the Member Defendants never made a credible offer to fund the litigation, as their so-called "offers"

---

[45] Miller Dec. ¶ 33.
[46] Miller Dec. ¶ 34.
[47] Miller Dec. ¶ 36.
[48] Miller Dec. ¶ 37.

(a) failed to identify the source or amount of funding and (b) failed to provide for funding of the entire litigation, which includes not only the Eleventh Circuit appeal but also all subsequent proceedings, including before the Florida district court and the Delaware bankruptcy court; and (iii) unless and until there are sufficient Estate assets to provide a meaningful distribution to general unsecured creditors, there is no benefit to the Estate in pursuing the appeal at this time.[49]

#### The Member Defendants Are Intentionally Interfering with Property of the Estate

40.    The Trustee believes the Member Defendants are operating and/or accessing the Debtor's electronic records and software, such as the Debtor's SAM.gov account, Debtor email accounts and other computer records.  The Trustee further believes the Member Defendants are doing so in order to intentionally interfere with his administration of the Estate as Trustee. Moreover, the Trustee believes the Member Defendants may be in possession of the Debtor's records and other assets of the Estate, in violation of the Bankruptcy Code and multiple Court orders.[50]

#### a.    SAM.gov

41.    SAM.gov is an official website of the United States government where entities can register to bid on and receive payment for U.S. federal government contracts or receive federal funds.[51]  Panel chapter 7 trustees, such as the Trustee, are not government contractors and do not use SAM.gov in the ordinary course of fulfilling their duties as trustees.[52]  The Debtor was a U.S. government contractor and is a registered entity with SAM.gov.[53]  The Debtor's registration with

---

[49] Miller Dec. ¶ 38.
[50] Miller Dec. ¶ 39.
[51] Miller Dec. ¶ 5; *see* Exhibit T-5 hereto (SAM.gov Quick Start Guide for Contract Registrations).
[52] Miller Dec. ¶ 6.
[53] Miller Dec. ¶ 7.

SAM.gov and the information contained therein belong to the Debtor[54] and, therefore, constitute property of the Estate.  11 U.S.C. § 541(a).

42.    Mott was the Entity Administrator for the Debtor's SAM.gov account.[55]    The Trustee also believes Mott maintained computer software and/or login credentials to access the Debtor's SAM.gov account.[56]  On or about February 2, 2023, *i.e.*, months <u>after</u> the Debtor's case was converted to chapter 7 and after the Trustee was appointed, Mott accessed the Debtor's SAM.gov account.  Attached hereto as <u>Exhibit T-6</u> is a printout from the SAM.gov website taken on June 15, 2023.  It shows that on February 2, 2023 at 6:25 p.m., Deborah Mott updated the Debtor's account on SAM.gov.  That printout further shows that Mott continued to list herself as the only point of contact for the Debtor in SAM.gov.  The information available at that time through SAM.gov made no mention of the Debtor's bankruptcy filing, the conversion of the case to chapter 7, or the Trustee.[57]

43.    Mott had no authority to access the Debtor's SAM.gov account post-conversion or to list herself as the sole point of contact.[58]  The Bankruptcy Code requires Mott to cede responsibility as the Debtor's Entity Administrator for SAM.gov to the Trustee, but Mott has failed to do so.[59]  Further, this Court's Conversion Order and Contempt Order require Mott to turn over responsibility as the Debtor's Entity Administrator for SAM.gov to the Trustee.[60]  However, Mott has failed to do so.

---

[54] Miller Dec. ¶ 8.

[55] Miller Dec. ¶ 9; *see* Exhibits T-6 and T-11 (printouts from SAM.gov).

[56] Miller Dec. ¶ 10.

[57] It also appears that sometime between October 19, 2021 and February 2, 2023, Mott accessed the Debtor's SAM.gov account and changed the Debtor's physical address from the Debtor's former address of 822 AIA N. Ste. 310, Ponte Vedra, Florida to an address in Prosper, Texas.  *Compare* Exhibit T-6 (page 1) to Exhibit T-11 (page 1).  Upon information and belief, Acosta lives in Prosper, Texas.  *See* First Amended Complaint, Adv. D.I. 37 at ¶ 17.  The Trustee is continuing to investigate.

[58] Miller Dec. ¶ 11.

[59] 11 U.S.C. §§ 362(a); 541(a); 542.

[60] *See* Orders at D.I. 151; 222.

44.     The Trustee is in the process of having the U.S. Government override Mott's responsibility as the Debtor's Entity Administrator in SAM.gov and place the Trustee as the Entity Administrator to obtain any payment.[61]

### b.     Debtor email accounts

45.     The Trustee believes Mott and Acosta have access to other Debtor login credentials and electronic records.  The Trustee and his professionals have repeatedly asked Mott and Acosta to turn over all of the Debtor's electronic records, but Mott and Acosta have refused to do so.[62]

46.     Earlier in the case, Mott and Acosta turned over a damaged/blank laptop computer that did not contain any of the Debtor's files or the laptop's original operating system.  The Trustee believes Mott and Acosta may have retained this operating system and/or the Debtor's electronic records on computers in Mott's or Acosta's possession, custody, or control.[63]

47.     The Trustee also believes Mott and Acosta continue to use and access Debtor email accounts.[64]  The Member Defendants have admitted as much.  For example, Exhibit G to the Member Defendants' Demand Letter is an email from the DLA to Deborah Mott dated June 7, 2023.[65]  Acosta, in particular, has continued to use a Debtor email account – sacosta@tsi-us.net – to communicate with third parties about the Debtor, its business, and property of the Estate.  Acosta has no authority to do so.[66]  A sample of Acosta's emails, dated May 22 and June 14, 2023, are attached hereto as Exhibits T-8 and T-9, respectively.  The Bankruptcy Code and the Court's prior orders already require Mott and Acosta to turn over all of the Debtor's emails to the Trustee, but to date Mott and Acosta have refused to do so.[67]

---

[61] Miller Dec. ¶ 12.
[62] Miller Dec. ¶ 13.
[63] Miller Dec. ¶ 14.
[64] Miller Dec. ¶ 15.
[65] That email is also attached hereto as Exhibit T-7.
[66] Miller Dec. ¶ 15.
[67] Miller Dec. ¶ 15; *see* 11 U.S.C. §§ 541(a), 542; *see also* Orders at D.I. 151; 222.

48.     It is high time to put a stop to the Member Defendants' games and compel their compliance with the Bankruptcy Code and the Contempt Order.

## PRELIMINARY OBJECTION TO STANDING MOTION

49.     The Member Defendants have failed to articulate any legal or factual support for their request for standing and the Standing Motion should be <u>denied</u>.

## I.    The Member Defendants Have No Right to Derivative Standing.

50.     In their Standing Motion, the Member Defendants do not cite to a single case in which a court has granted <u>equity holders</u> derivative standing in a chapter 7 case – let alone one where the chapter 11 case was converted to chapter 7 for cause.  The Member Defendants also do not cite to any case in which a court has granted any party derivative standing to pursue any litigation other than avoidance actions.

51.     The Member Defendants rely on section 1109(b) of the Bankruptcy Code.  On its face, this statute only applies to a chapter 11 case.  "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue **in a case under this chapter**." 11 U.S.C. § 1109(b) (emphasis added).  The Debtor's case was converted to chapter 7 in March 2022.  Section 1109(b) does not apply.

52.     In the Standing Motion, the Member Defendants cite to only four published decisions, none of which remotely supports their standing request.

53.     The Third Circuit's decision in *Cybergenics II* recognized that an official committee of unsecured creditors in a chapter 11 case could be granted derivative standing to

pursue <u>avoidance actions</u> on behalf of the estate.[68]  In that decision, the Third Circuit distinguished

chapter 7 cases, observing that in chapter 7, the Trustee "serves a unique role."[69]

54.      *SGK Ventures, LLC* also involved creditor committee derivative standing in a

chapter 11 case and offers no support to the Member Defendants' argument. [70]

55.      Similarly, *Pursuit Capital Management* does not support the Member Defendants'

argument.[71]  In *Pursuit Capital*, the chapter 7 trustee <u>sold avoidance actions</u> to a <u>creditor</u> and

<u>consented</u> to that creditor's derivative standing.[72]  Relying on *Cybergenics II* and the U.S. Supreme

Court's decision in *Hartford Underwriters*, Judge Silverstein rejected an argument by one of the

avoidance action defendants that the creditor-plaintiff lacked standing.[73]  Importantly, in *Pursuit*

*Capital*, (i) the chapter 7 trustee had consented, (ii) a creditor, not an equity holder, was asserting

standing, (iii) the creditor was pursuing chapter 5 avoidance actions, and (iv) the party challenging

standing was a defendant in an avoidance actions.  None of those facts is present in this case.

56.      In *Matter of Home Casual LLC*, the court authorized a creditor to pursue avoidance

actions on behalf of the chapter 7 estate against insiders of the debtor.[74]  As in *Pursuit Capital*, the

chapter 7 trustee in *Matter of Home Casual* was not opposing the standing request.

57.      No similar facts are present here.  The Trustee is <u>not</u> consenting to derivative

standing.  The Member Defendants are not creditors.  They are equity holders and defendants in

---

[68] *Official Committee of Unsecured Creditors of Cybergenics v. Chinery*, 330 F.3d 548, 553 (3d Cir. 2003) ("*Cybergenics II*") ("We believe that Sections 1109(b), 1103(c)(5), and 503(b)(3)(B) of the Bankruptcy Code evince Congress's approval of **derivative avoidance actions by creditors' committees,** and that bankruptcy courts' equitable powers enable them to authorize such suits as a remedy in cases where a debtor-in-possession unreasonably refuses to pursue an avoidance claim.") (emphasis added).

[69] *Id.* at 560 (internal citation omitted).

[70] *In re SGK Ventures, LLC*, 521 B.R. 842 (Bankr. N.D. Ill. 2014).

[71] *In re Pursuit Cap. Mgmt., LLC*, 595 B.R. 631, 658–63 (Bankr. D. Del. 2018)

[72] *Id.* at 653 ("As part of my ruling, I also concluded that Trustee's entry into the Agreement was a sound exercise of his business judgment. My ruling as well as the evidence to support it clearly reflects the Trustee's consent.").

[73] *Id.* at 658 (citing *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1 (2000) and *Cybergenics II*).

[74] *In re Matter of Home Casual LLC*, 534 B.R. 350 (Bankr. W.D. Wisc. 2015).

litigation brought by the Trustee on behalf of the Estate. The Member Defendants are not seeking derivative standing to pursue avoidance actions. Rather, they claim they want to pursue a prepetition Appeal, which has already been stayed for 18 months and is not subject to any statute of limitation or deadline like avoidance actions. They are also seeking standing to pursue the Alleged A/R, which the Trustee himself has been attempting to investigate for more than a year, but the Trustee's efforts to investigate the Alleged A/R have been impeded by Mott and Acosta.

58.     In their Standing Motion, the Member Defendants fail to disclose that a number of courts have rejected derivative standing in chapter 7.

59.     For example, in *In re Cooper*, the court rejected a creditor's request for derivative standing to pursue turnover and fraud claims.[75]   The court first distinguished derivative standing in chapter 11, observing that "in Chapter 11, there is both a textual basis and, frequently, a non-textual, equitable rationale for granting a creditors committee (and perhaps an individual creditor) derivative standing to pursue avoidance actions or other causes of action belonging to the estate."[76] The court added, "derivative standing should be viewed very differently in the Chapter 7 arena" because "there is a significant difference between Chapter 11 and Chapter 7" and "[t]he case dynamics are simply very different in Chapter 7."[77]   The Court continued:

> In Chapter 7, unlike Chapter 11, there is always a trustee in place. There is not the potential for a conflicted board of directors pulling its punches. There is not the risk of the proverbial fox guarding the henhouse. The trustee does not have the potential for conflicts of interest that a debtor-in-possession sometimes has, since the trustee has no prepetition relationship with the debtor's management, shareholders or creditors. **The trustee has a unique role as an independent fiduciary, with a completely different perspective and interest in a bankruptcy estate than either a debtor or an individual creditor. The trustee also is expected to be a gatekeeper and to exercise reasonable business judgment in deciding what actions to bring and what are not worth the expense.** In theory at least (and

---

[75] *Reed, et al. v. Cooper (In re Cooper)*, 405 B.R. 801 (Bankr. N.D. Tex. 2009).
[76] *Id.* at 809.
[77] *Id.* at 811-12.

hopefully in reality), the trustee is a fair, balanced, and experienced (not to mention bonded, *see* 11 U.S.C. § 322) official who can be depended upon to exercise good litigation judgment. Because of the unique role of a trustee, there would seem to be no equitable rationale to deviate from the Bankruptcy Code's apparent remedial scheme *vis-a-vis* avoidance actions and other estate causes of action. If creditors do not like the job the trustee is doing, they can file a motion to compel him or her to act, or a motion for removal of the trustee (11 U.S.C. § 324). In the context of such a motion, the court can scrutinize the business judgment and litigation zeal (or lack thereof) that is being exercised by the trustee. **But simply allowing a creditor—a non-statutory fiduciary—to go forward in the Chapter 7 trustee's stead could facilitate a creditor "hijacking" a Chapter 7 bankruptcy case in a manner that Congress did not envision.[78]**

60.     As the *Cooper* court rightly observed, the Trustee has a "unique role" as an "independent fiduciary" with a "different perspective" and he exercises "reasonable business judgment in deciding what actions to bring and what are not worth the expense."[79] The court in *Cooper* was unwilling to allow one creditor to "hijack" the chapter 7 in contravention of the Bankruptcy Code. How much worse it would be to allow the Member Defendants – equity holders and defendants in an adversary proceeding who stand accused of fraud and breaches of fiduciary duty – to hijack this case for the transparent purpose of derailing the litigation against them. The Member Defendants are the "proverbial foxes" and the Court should not allow them anywhere near the property of the Estate.

61.     A number of other courts have reached the same conclusion as *Cooper*. *See, e.g.*, *Larson v. Foster, et al. (In re Foster)*, 516 B.R. 537 (B.A.P. 8th Cir. 2014) (affirming bankruptcy court's order denying the estate's largest creditor derivative standing to pursue a fraudulent transfer action, even though the creditor was willing to fund the litigation, where the creditor did not obtain the chapter 7 trustee's consent); *Surf N Sun Apts., Inc. v. Dempsey*, 253 B.R. 490, 494 (M.D. Fla.

---

[78] *Id.* at 813 (emphasis added). The court also denied derivative standing because, even if it were permissible in chapter 7, the creditor had not made a "compelling case" for derivative standing. *Id.* at 814-15.

[79] *Id.*

1999) ("the Court holds that the Bankruptcy Court erred as a matter of law in granting [a judgment creditor] standing to prosecute a fraudulent transfer action on behalf of the Chapter 7 bankruptcy estate.  That power belongs to the bankruptcy trustee alone."); *In re On-Site Fuel Serv., Inc.*, No. 18-04196-NPO, 2020 WL 3703004, at *11 (Bankr. S.D. Miss. May 8, 2020) ("The Court recognizes that a chapter 7 trustee is the gatekeeper for deciding which actions to pursue on behalf of an estate and finds the bankruptcy court's analysis in *Cooper* of derivative standing in chapter 7 cases to be persuasive."); *In re Salander*, 472 B.R. 213, 220–21 (Bankr. S.D.N.Y. 2012) ("[I]n a chapter 7 case, there is no textual basis for allowing a creditor to pursue an estate claim derivatively.").

62.     In *In re WorldSpace, Inc.*, Judge Sleet of the District of Delaware affirmed an order dismissing a breach of fiduciary duty action that was filed by a party that was not a creditor of the debtor.[80]  The court observed, "[a] cause of action that is property of the estate is properly pursued by the bankruptcy trustee because it inures to the benefit of all creditors.  Permitting the chapter 7 trustee alone to pursue the estate's cause of action promotes the orderly distribution of assets in bankruptcy and comports with the fundamental bankruptcy policy of equitable distribution to all creditors that should not be undermined by an individual creditor's claim."[81]

63.     In short, there is no legal basis for the Member Defendants' request for derivative standing in this chapter 7 case and the Standing Motion should be denied.

---

[80] *In re WorldSpace, Inc.*, No. BR 08-12412 (LSS), 2016 WL 5339056, at *9 (D. Del. Sept. 22, 2016).
[81] *Id.* at *8 (internal citation and quotations omitted).

**II.    The Member Defendants' Claims are Not Colorable and Lack Merit.**

        **A.    The Eleventh Circuit Appeal**

64.    As set forth above, the Trustee has determined in the reasonable exercise of his business judgment not to seek to lift the stay with respect to the Appeal at this time.[82]  The Trustee, however, reserves the right to restart the litigation in the future.

65.    The Member Defendants argue that they should be granted standing to pursue the Appeal.  But they do not offer any facts to support this request.  Instead, the Standing Motion regurgitates legal arguments that appear to have been considered, and rejected, by the Florida district court in the prepetition litigation.  That is not evidence.

66.    The Member Defendants' "Offer" to fund the litigation was in reality a false overture.  The Member Defendants' cash has been frozen for more than five months.[83]  Despite early protestations, the Member Defendants have not taken any real steps to modify the preliminary injunction order, which remains in effect.  Without access to cash, the Member Defendants have no ability to fund the litigation.  The Member Defendants previously indicated that an unnamed third party would provide the funds.  The Trustee cannot be party to the Member Defendants' fraudulent transfers.  The Trustee has repeatedly asked the Member Defendants to identify the name, source, and amount of the funds available for litigation.  The Member Defendants have refused to do so.  This leads to the reasonable inference that the funds would come from a source that the Member Defendants do not wish to disclose, such as an as-yet unidentified John Doe Defendant that received fraudulent transfers.

67.    Further, the Member Defendants' "Offer" is not a solution at all.  Their "Offer" is only for the Appeal itself, not the subsequent proceedings which may include a second trial.  That

---

[82] Miller Dec. ¶ 38.
[83] *See* Preliminary Injunction Order at D.I. 299.

is not a proper basis to grant stay relief—the automatic stay cannot be used as a sword, only as a

shield.  Moreover, litigating the Appeal is an all-or-nothing proposition and would undermine any

possibility of a negotiated resolution.  The Member Defendants have articulated no legal or factual

basis to grant them derivative standing to pursue the Appeal.

### B.    The Alleged A/R

68.    For months, the Court and the Trustee have been bombarded with requests by the

Member Defendants seeking to have the Trustee cede administration of the Estate to them to

pursue the Alleged A/R.  The Member Defendants failed to pursue collection of the $6.8 Million

Alleged FEMA Claims since 2017.  They also appear to have failed to pursue collection of any of

the other Alleged A/R either prepetition or during the chapter 11.  As discussed at length above

and in the Miller Declaration,[84] the Trustee and his professionals have repeatedly requested that

the Member Defendants provide sufficient credible documentation, if any, to support the Alleged

A/R.  To date, the Member Defendants have utterly failed to do so.

69.    In their Standing Motion, the Member Defendants attach and quote at length from

the transcript of Mott's February 7, 2022 deposition in which Mott asserts that a FEMA change

from break bulk to containers "cost us millions and millions and millions of dollars."[85]  Even if

that were true, FEMA already paid TSI almost $9 million for transportation costs, which is _more_

than the total transportation costs listed in the Bering Straits POC, the only document the Member

Defendants have ever pointed to in support of the Alleged $6.8 Million FEMA Claim.

70.    With respect to the other Alleged A/R, the amounts currently being asserted by the

Member Defendants (without support) do not correspond to any of the accounts receivable listed

on the Debtor's Schedules, which Mott signed under penalty of perjury.  In their Demand Letter,

---

[84] Miller Dec. ¶¶ 23-34.
[85] Standing Motion, Ex. 8, Tr. 200:19-20.

the Member Defendants hint at documents—including a prepetition claim, task order, and various communications with third parties—that may potentially support one or more of the Alleged A/R. But the Member Defendants failed to attach, identify, or turn over that supporting documentation. The Member Defendants cannot be allowed to withhold the Debtor's records, falsely accuse the Trustee of not pursuing the Alleged A/R, and then seek standing to pursue the Alleged A/R using the very documents they have failed to turn over.  It is simply bad faith on the part of the Member Defendants to withhold information from the Trustee, which they were ordered to turn over, and then attempt to use that information for a litigation advantage.

71.     In their Demand Letter, the Member Defendants assert (without support) that there is an August 17, 2023 deadline to make a submission related to the $1.2M Alleged A/R.[86]  If the Member Defendants truly believe there is a deadline in just five weeks, they need to provide the Trustee with the documentation <u>immediately</u>, rather than wasting time with dilatory motion practice.  To be clear, if any deadline or statute of limitations is missed due to Mott's or Acosta's failure to turn over documents and information, which Mott and Acosta were <u>ordered to do a year ago</u>, the Trustee reserves all rights, including the right to further amend the complaint to assert additional claims against them.

72.     Additionally, through their prior course of conduct in this case, the Member Defendants have disqualified themselves from acting in any capacity for the Estate.  Recall that Mott testified at her February 7, 2022 deposition that a bank statement reflecting a $3 million wire transfer within two years prior to the Petition Date was redacted "[b]cause it had handwritten notes on it."[87]  That was false.  The bank statement was redacted to conceal the fact that the $3 million

---

[86] Demand Letter at page 6, item B (emphasis in original).
[87] Standing Motion, Ex. 8, Tr.: 113:17-23.

was transferred to Addy Road, LLC, an entity controlled by Mott.[88]  During that same deposition,

Mott testified that a $928,843.10 transfer by the Debtor to the Tunnel & Raysor law firm was for

legal services, specifically "a memo on the diversity issues in the Florida case" and "contract

review services."[89]  That too was false.  In truth, the transfer to Tunnel & Raysor was used to fund

the purchase price for a beach house in Bethany Beach, Delaware owned by Mott's entity, Addy

Road LLC.[90]  In addition, Mott signed under penalty of perjury the Debtor's Statement of Financial

Affairs, which discloses certain prepetition transfers to the other three Member Defendants but

does not disclose at least $250,000 in transfers that Mott received within one-year period prior to

the Petition Date.[91]

73.    The upshot is this.  There is no legal or factual basis for the Member Defendants'

request for derivative standing.  The Member Defendants have no legal right to standing in this

chapter 7 case and, even if they did, their prior conduct in this case disqualifies them for

representing the Estate in litigation, with respect to amounts owed to the Estate, or in any other

capacity.

74.    As the parties seeking to usurp the Trustee's statutory authority and business

judgment, the Member Defendants must make a "compelling case" that there are "colorable

claims."[92]  Not only are the Member Defendants' claims not colorable, they are <u>meritless.</u>  The

Standing Motion should be denied – it is frivolous.

---

[88] *See TSI II* at 13-14 [D.I. 304] (Jan. 31, 2023) (observing, among other things, that "[t]he information obtained [by the Trustee] in that discovery suggests that the debtor's fabrication of business records and concealment of transfers to insiders was more prevalent than the Court had previously appreciated based on the prior hearings.").
[89] Standing Motion, Ex. 8, Tr.: 30:9-25.
[90] *See TSI II* at 8-9 [D.I. 304] (Jan. 31, 2023).
[91] *See TSI II* at 14-16 [D.I. 304] (Jan. 31, 2023) (stating, among other things, that "[t]hese efforts to conceal transfers of $250,000 made to Mott in May 2021 are particularly worrisome in view of the January 2022 Statement of Financial Affairs filed in this case.").
[92] *Cooper*, 405 B.R. at 814.

**CROSS-MOTION TO**
**COMPEL COMPLIANCE WITH THE CONTEMPT ORDER**
**AND ENFORCE THE AUTOMATIC STAY**

75.     Section 105(a) of the Bankruptcy Code provides that "the court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."[93]  Section 105 further authorizes this Court to take any action "necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."[94]  Pursuant to section 105 of the Bankruptcy Code and the Court's inherent authority, this Court has the power and jurisdiction to enforce its own lawful orders.[95]

76.     Section 362(a) of the Bankruptcy Code provides, in relevant part, the filing of the Debtor's bankruptcy petition "operates as a stay, applicable to all entities, of," among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[96]

77.     Section 541(a) of the Bankruptcy Code provides, in relevant part, that the Debtor's Estate is comprised of all property of the estate "wherever located and by whomever held," including without limitation "all legal or equitable interests of the debtor in property as of the commencement of the case" and "any interest in property that the estate acquires after the commencement of the case."[97]

78.     Section 542(a) of the Bankruptcy Code provides, in relevant part, that "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the

---

[93] 11 U.S.C. § 105(a).
[94] *Id.*
[95] *See, e.g., Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (finding that a bankruptcy court retains jurisdiction to interpret and enforce its own orders); *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del. 1999) ("It is axiomatic that a court possesses the inherent authority to enforce its own orders.").
[96] 11 U.S.C. § 362(a)(3).
[97] 11 U.S.C. § 541(a)(1), (7).

trustee may use, sell, or lease under section 363 if this title, . . . shall deliver to the trustee, and account for, such property or the value of such property . . . ."[98]

79.     And section 542(e) of the Bankruptcy Code provides, in relevant part, that "after notice and a hearing, the court may order an attorney, accountant or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee."[99]

80.     Here, Mott and Acosta have flagrantly disregarded and violated their obligations under the Bankruptcy Code and this Court's orders, including the Contempt Order.  As discussed in detail above, Mott and Acosta have failed to turn over complete and accurate Debtor books and records.[100]  Mott and Acosta have retained and refused to turn over the Debtor's electronic records and software, such as the Debtor's SAM.gov account, Debtor emails, and other computer records.[101]

81.     Mott and Acosta never turned over the Debtor's computer equipment to the Trustee. Instead, Mott and Acosta turned over a damaged/blank laptop computer that did not contain any of the Debtor's files or the laptop's original operating system.  Mott and Acosta may have retained this operating system and/or the Debtor's electronic records on computers in Mott's or Acosta's possession, custody, or control.[102]

82.     Mott continued to access and control the Debtor's SAM.gov account and to list <u>herself</u> as the sole point of contact for the Debtor.[103]   Mott's refusal to turn over the Debtor's SAM.gov account to the Trustee is all the worse given Mott's prior sworn statement emphasizing

---

[98] 11 U.S.C. § 542(a).
[99] 11 U.S.C. § 542(e).
[100] *See*, *e.g.*, Miller Dec. ¶¶ 23, 29, 30, 31, 33, 39.
[101] Miller Dec. ¶ 39.
[102] Miller Dec. ¶ 14.
[103] Miller Dec. ¶¶ 9-15, 39.

its importance.  In her First Day Declaration, Mott stated that "TSI is required to register in the US Government System for Award Management ("SAM") in order to serve as a US Contractor. All payments, for all agencies, are made by the US Treasury to the contractors bank account registered in SAM. All changes in SAM are reviewed and approved by the US CAGE office before taking effect. This review is currently taking up to 75 days, and that includes bank account information."[104]  All the more reason for Mott to have turned over the SAM.gov to the Trustee promptly after conversion, as Mott was ordered to do, but which she refused to do.

83.    Mott and Acosta also continue to use and access Debtor email accounts.[105]  They certainly recognize the value of controlling the Debtor's emails, as they continue to use them for strategic litigation purposes as well as to improperly communicate with third parties about property of the Estate.[106]

84.    Mott and Acosta's continued refusal to turn over all books and records and to comply with the Conversion Order and the Contempt Order must be remedied.

## **Relief Requested**

85.    The Trustee hereby requests that the Court enter an order, substantially in the form attached hereto, (i) compelling Mott and Acosta to comply with the Contempt Order within 14 days by either turning over all Debtor books, records, emails, login credentials, and computer equity and/or executing affidavits under penalty of perjury that they have complied with the Contempt Order; and (ii) enforcing the automatic stay and prohibiting and enjoining Mott, Acosta, and each of their respective agents and affiliates from violating the automatic stay or otherwise interfering with the administration of the Estate, on pain of sanctions.

---

[104] *Declaration of Deborah Evans Mott in Support of Debtor's Chapter 11 Petition and First Day Motions* at ¶ 8 [D.I. 3].
[105] Miller Dec. ¶ 15 and Exhibit T-7.
[106] Exhibits T-8 and T-9.

## RESERVATION OF RIGHTS

86.     The relief requested herein is without prejudice to the rights of the Trustee to seek sanctions, damages, attorney's fees, or other relief as a result of Mott and Acosta's violations of the Bankruptcy Code and Court orders.  The Trustee reserves the right to take discovery of the Member Defendants with respect to the allegations in the Standing Motion.  The Trustee also reserves the right to amend, modify, or supplement this Preliminary Objection and Cross-Motion at any time prior a final hearing.  The Trustee, on behalf of himself and the Estate, reserves all rights against all parties, including without limitation the Member Defendants and their counsel.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Trustee respectfully requests that the Court enter an order, substantially in the form attached hereto, (i) denying the Member Defendants' Standing Motion in its entirety, (ii) directing Mott and Acosta to comply with the Contempt Order within 14 days, and (iii) prohibiting and enjoining Mott, Acosta, and each of their respective agents and affiliates from violating the automatic stay or otherwise interfering with the administration of the Estate, on pain of sanctions, and (iv) granting the Trustee such other and further relief as is just and proper.

Dated: July 12, 2023                       ARCHER & GREINER, P.C.

*/s/ Bryan J. Hall*
David W. Carickhoff (No. 3715)
Bryan J. Hall (No. 6285)
300 Delaware Ave., Suite 1100
Wilmington, DE 19801
(302) 777-4350
dcarickhoff@archerlaw.com
bjhall@archerlaw.com

*Counsel to the Chapter 7 Trustee*