## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| TEAM SYSTEMS INTERNATIONAL, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | **Hearing Date: 9/20/23 at 10:00 a.m. (ET)**<br>**Obj. Deadline: 8/23/23 at 4:00 p.m. (ET)**<br><br>**Re: D.I. 339** |

### OBJECTION BY THE ROSNER LAW GROUP LLC TO:

### CHAPTER 7 TRUSTEE'S MOTION FOR SANCTIONS AGAINST THE ROSNER LAW GROUP LLC PURSUANT TO FED. R. BANKR. P. 9011 AND 28 U.S.C. § 1927

The Rosner Law Group LLC ("RLG") hereby objects to the *Chapter 7 Trustee's Motion For Sanctions Against The Rosner Law Group LLC Pursuant To Fed. R. Bankr. P. 9011 and 28 U.S.C. § 1927* [D.I. 339] (the "Sanctions Motion"), and respectfully represents as follows:

### I.    PRELIMINARY STATEMENT

1.    This is an unusual dispute for a chapter 7 bankruptcy case. Chapter 7 trustees have an *affirmative* statutory duty to investigate and monetize all possible property of the estate. Chapter 7 trustees typically examine chapter 7 debtors from every angle and turn over every rock to ensure all potential assets are appropriately explored and value maximized.

2.    Here, the owners and former operators of the chapter 7 debtor repeatedly have advised the Trustee and his counsel that TSI is owed, or at least has the right to file a claim, for $8.2 million dollars from FEMA, among other federal agencies. Ordinarily, that would be very welcome news to a chapter 7 trustee, and the trustee and his counsel would work *cooperatively* with the equity owners and their counsel to harness that value. The Trustee and TSI Members' interests are entirely aligned because receipt of those funds will flow through to §726(a)(6)

distributions.  Further, the Trustee is well-situated to file and seek to collect on those federal contract claims, having retained the services of Venable LLP ("Venable") 's federal contract law practice group for that very purpose.  There is no legitimate reason for that not to have happened in this case long ago.

3.    Specifically, the TSI Members repeatedly and for more than the past year have requested that the Trustee fulfill his statutory duty and investigate and file a $6.8 million claim against FEMA.  The $6.8 million claim is plausible on its face.  The claim arises out a delivery change order that FEMA made when TSI was delivering water to Puerto Rico for victims of Hurricane Maria.  FEMA and TSI entered into a firm-fixed price contract[1] for delivery of water in break bulk.  FEMA issued a change order to the contract, requiring TSI to deliver the water in containers.  That was a material change to the cost-basis for the contract and TSI was forced to incur substantial additional transportation and related costs of approximately $6.8 million.  The TSI Members maintain the Trustee working with Venable may prepare and file a claim to recover the additional hard costs expended resulting from FEMA's delivery method change order.

4.    The details of the claim based on the Change Order are well-known to the Trustee as well as the statute of limitations for filing such claim.  The claim amount is included in the aggregate receivables filed in the Debtor's Schedules.  The first stop for any trustee administering an estate setting forth nearly $22 million in receivables would direct his expert counsel Venable to reach out and work with the equity owners to investigate and file claims to collect that amount.  That did not happen here.

---

[1] In a firm-fixed-price contract, the price is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract.  This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss.  Therefore, any change in scope of work triggers a "Change Order" if such change cause an increase in cost to the contractor.

5.      The Trustee obviously believed nearly $22 million was actually owed to the estate. He adopted that figure when preparing the Debtor's Tax Return he filed under oath with the IRS. At her deposition, well over one year ago now, Ms. Mott described the factual basis for the claim resulting from the Change Order, and Mark St. Moritz, an expert on federal contract law, testified there is a six year statute of limitations controlling when the claim must be filed (the "*6 Year SOL*").  Mr. Moritz put the Trustee on notice in year 2022 that the *6 Year SOL* expired in year 2023.  That did not prompt the Trustee to take immediate action (or any action).

6.      Having repeatedly been put on notice by the TSI Members of the nature of the claim and the *6 Year SOL,* it is axiomatic that the Trustee had an *affirmative* statutory duty to investigate this FEMA claim with Venable.  And the Trustee's statutory duty is easily discharged.  The Trustee could simply direct Venable, his subject matter expert in contract law, to work cooperatively with the TSI Members to develop a claim for the Change Order.  The scope of work in Venable's Court-approved retention includes vetting and prosecuting the additional claim the TSI Members have asserted.  Venable is already pursuing a separate $13.5 million claim against FEMA arising out of the same FEMA contract.

7.      Unfortunately, the Trustee has elected not to pair Venable with the TSI Members. Not only has it not occurred, the Trustee has *forbidden* the Venable lawyers from discussing this FEMA claim (or any matter) with the TSI Members.  Throw into the mix the *6 Year SOL* and the matter—unnecessarily—became an acute time sensitive emergency at the time the Derivative Motion was filed.

8.      Because the Trustee will not permit Venable to work with the TSI Members—the sensible and practical solution—the TSI Members have been *forced* to seek relief from the Court. And that, combined with the *6 Year SOL,* the Trustee's complete indifference to investigating the

Change Order, and RLG's lack of knowledge in federal contract law,[2] are the primary reasons RLG filed the Derivative Motion. If the claim resulting from the Change Order is valid, and it is lost because the Trustee failed to pursue it before the expiry of the *6 Year SOL*, someone will be held liable for that loss in value.

9.      The Trustee, for some unexplained reason, now claims he *disbelieves* the claim although he knows it was included in the Debtor's Schedules, saw Ms. Mott's deposition transcript, heard Mr. Moritz's expert testimony and included the amount of the claim in the Tax Return and, most significantly, had counsel expert in that subject matter guiding him at all relevant times.[3] The Trustee's response, however, has been equally disappointing and value-destructive. The Trustee affirmatively closed the only SAM.gov account maintained by TSI. That prevents TSI from receiving *any* payment from FEMA. And the Trustee now seeks to sanction RLG for bringing this matter before the Court. Just because the Trustee prefers litigation and fees to collection efforts, RLG is not acting in bad faith trying to collect $8.2 million *for the estate*.

10.     The Trustee and TSI Members are at loggerheads. Collection of the full amount of receivables owed by federal agencies to TSI in the shortest time–period is of critical importance to the TSI Members. TSI has a long record of rendering service to the federal government and a professional reputation to uphold. TSI wants the bankruptcy case to conclude as soon as practical to re-start TSI's profitable federal contracting business. During the post-conversion period alone, TSI has received over 1,000 fuel procurement orders from the Defense Logistics Agency ("DLA")

---

[2] To vet and prepare the claim, the TSI Members need to work with Venable or a firm with comparable experience in federal contract law.

[3] Even more ridiculous, the Trustee expects RLG to explain the claim to him. RLG never held itself out as expert in federal contract law (the Trustee did) and does not have the benefit of Venable's counsel.

conservatively worth about $1.5 million to TSI.[4]  Receipt of the amounts owed by FEMA is a game-changer for this estate.  It ends any further litigation of the FAC and dissolves any injunctive relief previously granted.  It should also bring an immediate halt to the Trustee's fondness for incurring litigation fees.  In a solvent estate, every dollar unnecessarily incurred by the Trustee and his professionals spent litigating is a dollar less for the TSI Members.

11.    Having exhausted all attempts to gain the Trustee's cooperation, forbidden by the Trustee to discuss TSI's Change Order claim with Venable, and with the TSI Members clamoring that they are about to lose at least $6.8 million because of the *6 Year SOL*, RLG moved for derivative standing to, *inter alia*, collect $8.2 million for the Trustee and the estate and prosecute the Appeal.  *See Motion for Entry of Order Granting TSI Members Standing to: (A) Prosecute the Appeal and (B) File Claims and Collect Certain Account Receivable on Behalf of the Debtor's Estate* [D.I. 328] (the "Derivative Motion").  If granted, prosecuting the requested relief would be *at no cost to the estate*.  The alternative for the TSI Members, watching the Trustee continue to turn a deaf and dismissive ear to their asserted claim and letting the *6 Year SOL* expire, is untenable.

12.    In response to the Derivative Motion, the Trustee did not finally accede to the TSI Members' long-standing request, and instruct Venable to vet the claim with the TSI Members to discharge his §704(a) duty and in the best interests of the estate.  Nor did the Trustee file with the Court any statement or memo *from Venable* that it had independently vetted the alleged claim based on the Change Order and found it worthless setting forth the reasons for such conclusion. Instead, Archer& Greiner, the Trustee's *bankruptcy* counsel, claims the Change Order claim has no value, and seeks to shut down any possibility of the TSI Members submitting a claim *for the*

---

[4] The Trustee has declined all such business opportunities.

*estate*.  Remarkably, the Trustee is more interested in seeking to sanction RLG than collecting $8.2 million of property of the estate or reduce the aggregate claims against the estate by over 70%.

13.     The hallmark of sanctions is "bad faith."  There is no bad faith or harassment in seeking Court permission to collect estate property with significant value when the Trustee fails to fulfill his statutory duties and act in a non-biased, neutral manner.  RLG urges the Court to view the Derivative and Sanctions Motions from a larger perspective, as a Court of equity.  The facts in this case do not justify awarding the Trustee sanctions under Rule 9011.

14.     The Derivative Motion was filed in good faith, for legitimate bankruptcy reasons: to maximize the value of the estate and expunge invalid claims against the estate.  The Derivative Motion was not filed as a litigation tactic.  To the contrary, it was filed in response to the Trustee's tactics: closing the estate's only SAM.gov account and forbidding his federal contract law experts to vet the claim for the Change Order with the TSI Members.  The Sanctions Motion seeks to shift the burden.  As a threshold matter, the Trustee should be compelled to explain why he shut down the estate's only SAM.gov account and why he did not instruct Venable in the past 18 months to vet the claim for the Change Order with the TSI Members obviating the need for both the Derivative and Sanctions Motions.

**Request for the Hearing on the Sanctions Motion to Go Forward on September 20, 2023 For the Sole Purpose of Determining it Should be Summarily Dismissed.**

15.     RLG believes the Sanctions Motion should be summarily denied at the September 20, 2023 hearing date (the "Hearing Date").  If this Court does not summarily dismiss the Sanctions Motion, RLG respectfully requests that the Court set a discovery schedule for written discovery and depositions at the Hearing Date.  The TSI Members have advised they intend to retain an expert on, among other things, federal contracting law.  That expert may be asked to opine whether the claim for the Change Order is well-grounded in fact, a necessary element to RLG's defense to

the Sanctions Motion and, if the *6 Year SOL* has expired, a necessary element of TSI's damage claim against the Trustee and his counsel.

## II.   RELEVANT BACKGROUND

### A.   Background

16.     The Debtor was engaged in the business of serving the United States government as a contractor.  Since 2001, TSI has performed government projects as a prime contractor and subcontractor in the areas of program development, financial and contacts management, tactical and specialized military training development, naval ordinance engineering, information systems design and integration, and military firearms training.  TSI has performed government projects as a prime contractor and subcontractor in the areas of program development, financial and contacts management, tactical and specialized military training development, naval ordinance engineering, information systems design and integration, and military firearms training.  TSI was awarded the role of a prime contractor on the US Navy Seaport-E contract, as well as the Uniformed Services University DoD Training and Simulation $51M IDIQ MATOC.  TSI has contracted with numerous agencies, including the FBI, U.S. Army, U.S. Navy, U.S. Customs, Border Protection, and Defense Logistics Agency and the Federal Emergency Management Agency ("FEMA").  TSI follows all regulations of the National Industrial Security Program Operating Manual for sensitive contracts and cleared members, and maintains a cost accounting system that has been approved by the Defense Contract Audit Agency.

17.     The Debtor operated profitably for over 22 years, and paid its valid creditors consistently and on time.  The Debtor has no secured debt.

### B.   The Florida Litigation

18.     Prior to and precipitating TSI's bankruptcy filing, damages against TSI were awarded to GPDEV ($2,770,855) and Simons ($2,483,722) in a Florida litigation (together, the "Judgement Creditors").   TSI timely appealed the adverse judgements entered in the Florida litigation to the United States Court of Appeals for the Eleventh Circuit (the "Appeal").  Appellate counsel was retained and filed an opening brief.

**C.     The Chapter 11 Bankruptcy Filing.**

19.     On January 18, 2022 (the "Petition Date"), TSI commenced its voluntary case under Chapter 11 of the Bankruptcy Code.  The Debtor's chapter 11 case never had the chance to get off the ground.  Shortly after the Petition Date, Debtor's counsel abruptly withdrew leaving the Debtor without counsel for several weeks at a critical juncture in its case.

20.     On March 31, 2022 (the "Conversion Date"), following a hearing on dismissal or conversion of the case (the "Conversion Hearing"), an order was entered converting the case from chapter 11 to chapter 7.  George L. Miller (the "Trustee") was appointed as the interim chapter 7 trustee.

21.     The Sanctions Motion contends that this Court "previously removed Mott and Acosta …."  Sanctions Motion at 2.  This is not correct.  To the contrary, the Court ruled that, "[p]ursuant to Fed. R. Bankr. P. 9001(5)(A), Deborah Evans Mott and Steven Acosta (the "Management Members") are hereby designated to have the duties that the Bankruptcy Code and the Conversion Order [D.I. 151] impose on the Debtor."  Contempt Order at 1 [D.I. 222].  Consistent with the fiduciary duties imposed by that order, the TSI Members repeatedly but unsuccessfully have alerted the Trustee to the existence of a valuable estate claim with respect to the Change Order and the *6 Year SOL*.

22.     As the Trustee in the Sanctions Motion freely acknowledges, "[o]n January 26, 2022, the Debtor filed its Schedules of Assets and Liabilities, listing, among other things, $21,375,000 in accounts receivable."  Sanctions Motion at 8.  That amount *includes* the claim for the Change Order.

### D.    The Trustee Previously was Enthusiastic About the Merits of the Appeal

23.     In connection with the trustee election, the Trustee objected to the claims asserted by the Judgment Creditors and represented to the Court that the Judgement Creditors held "disputed" claims as to **both** liability and amount that are subject to a "compelling" appeal.  *See Trustee's Objection to the Judgement Creditors' Claims* at D.I. 164 at ¶ 8 ("By the Appeal, the Debtor continues to dispute both the Debtor's liability on, and the amount of, the Judgments on various grounds. . . .  The Opening Brief [filed in the Appeal] details the Debtor's various disputes with respect to the Judgments and the Trustee incorporates the Opening Brief into this Preliminary Objection by reference."); *see also* June 15, 2022 Hrg. Tr. at 55: 4-16, attached hereto as **Exhibit 1** (The Trustee testified that he "think[s] [the Appeal] has merit," that he "could probably resolve these [by] settling with the creditors," and "absolutely" agree that issues on appeal should be further explored "because the mistakes are so large, you know, we're talking several million dollars.").  The Trustee has previously acknowledged that "prosecution of the Appeal may be in the best interests of the other creditors," *see* Bankr. D.I. 177 at ¶ 28, and noted that "[i]f the Debtor's arguments in the Appeal are successful, the Debtor actually overpaid [Judgment Creditors] by at least $95,032 and would have an affirmative claim against them to recover such overpayment[,]" *id.* at ¶ 31.

24.     By order dated July 28, 2022, Mr. Miller was appointed to serve as the permanent chapter 7 trustee.  That was more than one year ago.

**E.    The Appeal, if Successfully Prosecuted, Could Reduce the Aggregate Amount of Claims against the Estate by over Seventy (70%) Percent.**

25.    Appellate counsel was retained by the bankruptcy estate.  [D.I. 75].  The claims asserted by the Judgement Creditors represent over seventy (70%) percent of claims against the estate and the only way to contest those claims (or put leverage on the Judgement Creditors to settle) is to prosecute the Appeal.  The undersigned has requested, on several occasions, by email and by phone, that the Trustee agree to stay relief so the Appeal may proceed.  *See, e.g.*, February 8, 2023 email, attached here to as **Exhibit 2**, March 24, 2023 email, attached hereto as **Exhibit 3**, and March 28, 2023 email, attached hereto as **Exhibit 4**.  The Trustee did not respond.

26.    Prosecution of the Appeal is in the mutual beneficial interests of the Trustee and the TSI Members.  The Trustee has an affirmative duty to vet all claims against the estate, and was enthusiastic at the time of the election to dispute the claims of the Judgement Creditors.  The Appeal is the *only* way to vet those claims.  If the Appeal is successful, additional funds become available for TSI Members, as equity stakeholders.  Post-conversion, the TSI Members repeatedly have offered to pay the full freight of appellate counsel to prosecute the Appeal *at no cost to the estate*.  The Trustee has not accepted that offer, and the Appeal remains dormant.

**F.    The Trustee Represented that he Has Experience Collecting Accounts Receivable in Federal  Contracting Work**

27.    The Trustee testified[5] he is experienced collecting accounts receivable from the federal government.  As such, the Trustee must know that to receive payment for federal contracting work, federal contractors **must** be registered in SAM.gov, a US Government database.  TSI set up a SAM-registered bank account with Artisan's Bank (the "SAM Account").  The SAM Account is TSI's only SAM registered account.  Without notice, however, the Trustee closed TSI's

---

[5] *See* June 30, 2023 Hearing Transcript, a copy of which is attached hereto as **Exhibit 5**, at 36:16-37:2.

SAM account, and swept all cash from such account.  TSI has requested that the Trustee account

for such cash but to date has received no response.  *See* **Exhibit 6**.

### G.    The Trustee has Expressly Acknowledged the Amount Owed to the Estate Pursuant for the Change Order Claim.

28.    As noted, as of the Petition Date, the Debtor's principal asset was comprised of

approximately $22 million in claims and accounts receivable owed by various federal agencies.

The Trustee has also acknowledged that amount in the Form 1065 Tax Return he filed under oath[6]

and in his testimony.  That amount includes the $6.8 million claim against FEMA.

### H.    The Trustee Retained Venable as Expert in Federal Contact Law for Collection Purposes.

29.    By Application dated June 7, 2022 [D.I. 181], the Trustee sought to retain Venable.

The Application provides:

> The services Venable may be required to render for the Trustee under this Application with respect to the Estate FEMA Claims include, **without limitation**, all legal services for the Trustee that may be necessary and proper relevant to the prosecution and resolution of the Estate FEMA Claims, including, but not limited to, the action currently pending before the Civilian Board of Contract Appeals, CBCA No. 7145, Under Contract No. HSFE70- 17-D-0021 ("CBCA No. 7145") and any subsequent appeal of the same, **and any other claim against government entities that the Trustee asks Venable to pursue and Venable agrees to pursue on a contingency basis consistent with terms set forth herein** (collectively, the "Litigation Services").

Application at 8 (**emphasis** added).  The Venable Application was approved on July 1, 2023 [D.I.

217].  Collecting the $6.8 million from FEMA for the Change Order is within the scope of

Venable's retention.

---

[6] *See* the Debtor's 2021 tax return prepared, filed and signed by the Trustee under penalty of perjury [Bankr. D.I. 282-1] (showing $21.76 million in receivables and net income of $11.76 million).

I.    **The Nearly $22 Million in Estate Receivables.**

30.    The claims and receivables aggregating nearly $22 million owed to TSI may be broken into two groups.  Group 1 is the pending FEMA receivable of $13.5 million that, together with statutory interest pursuant to the Prompt Payment Act, totals $15.5 million.   Venable is seeking to collect on that claim and the TSI Members remain hopeful that payment is forthcoming.

31.    Group 2 is comprised of approximately $8.2 million, as follows:

- A receivable in the amount of $198,000 concerning the DLA Aviation cable firing harness order.

- A receivable in the amount of $1.2 million concerning the DLA Fuel RME contract.

- A claim resulting from a change order in connection with TSI providing water to victims of Hurricane Maria in Puerto Rico for $6.8 million (estimate).[7]

---

[7] To summarize the factual basis for the change order receivable, TSI was engaged by FEMA as the prime contractor, pursuant to a firm-fixed price contact, to provide water on an emergency basis to victims of Hurricane Maria.  The MATOC required the water to be delivered "break bulk;" *i.e.,* no containers.  The quoted fixed price *included* all transportation costs. This is industry standard.

However, FEMA soon discovered the warehouses at the delivery point in Puerto Rico were damaged or destroyed and could not be used to house water delivered "break bulk."  FEMA, therefore, issued a change order. The water now had to be delivered in containers for storage purposes.  FEMA's change order presented a great logistical challenge for TSI and its subcontractor, Bering Straits. The water now had to be loaded into containers, placed on trucks and trains for delivery.   The amount of the change order is a function of the costs incurred as a result of the change in the method of delivery (as such, the "Change Order").

Bering Straits, TSI's subcontractor, was required to record an itemized list of the costs incurred as a result of the Change Order.  To submit a claim to FEMA, however, TSI required Bering Straits' itemized list to be *certified and audited*, not simply an excel spreadsheet as Bering Straits initially provided.  TSI was delayed in receiving the costs in the required verified format from Bering Straits.  In fact, TSI had to threaten Bering Straits with an audit to advance the process.  That process was not completed *until Bering Straits filed its proof of claim with this Court.*  As the TSI Members repeatedly have advised the Trustee, the Bering Straits' proof of claim provides the necessary information in the required format to submit a claim to FEMA for approximately $6.8 million. It comes as no surprise to anyone, except apparently the Trustee, that TSI is entitled to submit a claim to FEMA for reimbursement for the substantial extra costs that TSI incurred when FEMA issued the Change Order.

The claims and accounts receivable appear on the docket.  *See* Debtor's Schedules of Assets and Liabilities [Bankr. D.I. 28, Schedule A/B, Part 3, Question 11, pp. 2-3 of 11] (collectively, the "A/R").[8]

> **J.      The TSI Members Repeatedly Have Explained the Background to the Claim for the Change Order and Provided Relevant Information and Documents to the Trustee and his Counsel.**

32.      The background leading up to the Change Order repeatedly has been explained to the Trustee.  For example, in Ms. Mott's deposition testimony from February 7, 2022 (about a year and a half ago), Ms. Mott described in detail the basis for the Change Order:

Q. TSI intends to assert a $6.8 million change order under FAR 52.243 Changes Fixed Price.  What's the basis for that $6.8 million change order?

A. When we initially received the task order from CLIN 002, containers were not part of the logistics plan that we bid on.  We bid break bulk.

We put a price in for break bulk.  We had a logistics plan to move break bulk. And 30 days into it, FEMA came to us and changed the logistics plans requirements to containers.  They also reduced the contract to 12 million.

The problem with that is 30 days into a hurricane on -- in the Southeast and the East Coast, there were no containers available.  We had to pay to go get the containers in Chicago, St. Louis, I mean, just all over, bring the containers back, in some instances take them to the water plant in New Jersey where we had staged the water to be moved to Puerto Rico because Holt terminals in New Jersey handles all of the Fiji water that comes into the United States.  So they had equipment specifically designed to handle bottles of water.

When FEMA changed the logistics plan, it meant we had to go get containers halfway across the country, truck them back -- now, mind you, this is a hurricane.  So the trucking charges were out of sight because there were -- there was a scarcity of trucks.

We then had to take some of those containers to hold terminals.  They had to put the water in the containers.  Then we had to find chassis, which were also a scarce resource and very expensive, load the containers on the chassis, and the

---

[8] Due to clerical error, the amount of the first ($198,000) and second ($1.2 million) receivable were incorrectly listed on the Schedules.  Ms. Mott later has demanded counsel to the Debtor *twice* to file an amended schedule reflecting the correct amount.

chassis had to drive down to the Port of Jacksonville so that those containers could be taken by barge to the Ayala terminal because the Crowley terminal was completely backed up.

In addition to that, we had to get containers to the terminal in Savannah because we had 53-foot trucks with bottled water heading to the terminal in Savannah that had to be cross-stocked, taken out of the 53-foot trucks and put into the 40-foot containers in Savannah.  And then we had to get dray, which is taking it from a laydown terminal area to the barge that was also being loaded in Savannah.  The cost was enormous.

Then they barged them down to the Ayala terminal.  The Ayala terminal then unloaded all of it, and there was a FEMA representative at the dock because they took possession of the water immediately, but they issued a CLIN 16 contract to us where they rented the containers with a daily rate.

But the problem is, even though they took custody and control of the containers, we were still paying for the containers, the storage.  All of those fees.  And they were supposed to take it out of our daily rate, but we were upside-down on the daily rate.  And once FEMA took all of the containers out of the terminal, they continued to pay that daily rate, so we were able to catch up to cover the downside.

So then FEMA brought the containers back to the terminal in Ayala and left them.  And at that point we had 685 containers, plus or minus some because they lost them, that we weren't getting paid for.  We had to pay for those containers, to store them while we fed them back into the United States.  And at that time, because there was such a glut of containers in the Jacksonville area, we couldn't send them all at once.  We had to feed them in at 50, 150, 75 every other week until the backup subsided.  It cost us millions and millions and millions of dollars.

That's the basis of our change order.

*See* Transcript of Deposition of Deborah Evans Mott dated February 7, 2022, attached hereto as

**Exhibit 7,** at 197:20-200:22.  This deposition testimony clearly and specifically put the Trustee

on notice that TSI had a claim for "millions and millions and millions of dollars."  The Trustee

apparently made no investigation into this claim by Venable or otherwise.

33.    TSI Member Steven Acosta also brought the issue of timely filing a claim to collect

the Change Order expenses to the attention of the Trustee and his counsel on June 16, 2022.  *See*

**Exhibit 8** attached hereto.  As far as documentation is concerned, *see* June 30, 2022 Hrg. Tr. (Ex.

5):

> Mr. Mann:    Since Mr. Miller filed the sanction motion, have you provided him any additional documents?
>
> Mr. Acosta:    We have.  We provided Bering Straits – so, Bering Straits was our subcontractor on the MATOC and I sent over all of Bering Strait's books and records.  That was their part, or their job as a subcontractor was taking care of all books and records.  I submitted all email, everything that has to do with the claim, the change order, and we've given the contracts for the DLA.

*Id.* at 88:4-12.

> Mr. Carickhoff:    Okay.  And would the company have maintained those records to be able to properly litigate those claims?
>
> Mr. Acosta:    Like I said, Bering Straits was our subcontractor, they kept all our books, the books and records on that past order and I've sent everything to you.
>
> Mr. Carickhoff:    Did you ever provide invoices from Lindsay Blee to the trustee?
>
> Mr. Acosta:    I think we did because they're a creditor.

*Id*. at 101:18-102:2.

34.    Combined with the information contained in Bering Straits' proof of claim, the TSI

Members have produced to the Trustee (working with Venable) all the documents necessary to file

a claim for the costs incurred in connection with the Change Order.

**K.    The Statute of Limitations for Filing a Claim for the Change Order**.

35.    As is the case for submitting proofs of claim or commencing causes of action, there

is a *6 Year SOL* for submitting a claim with FEMA for additional costs resulting from the Change

Order.  Upon information and belief, pursuant to Section 33.206 (Initiation of a Claim) of the

Federal Acquisition Regulation, governmental contractors like TSI have a six-year statute of

limitation to submit claims for payment against the government.  *See* 48 C.F.R. § 33.206(a)

("Contractor claims shall be submitted, in writing, to the contracting officer for a decision within 6 years after accrual of a claim, unless the contracting parties agreed to a shorter time period").[9] Because the right to file a claim with FEMA is property of the estate, and the Trustee had ample notice of the estate's claim, the Trustee had the affirmative duty to investigate the claim for the Change Order with guidance from Venable, and only the Trustee could file such claim. Upon information and belief, the Trustee has not done so, and does not intend to do so.[10] Instead, the Derivative Action and the Sanctions Motion ensued.

**L.      Due Demand on the Trustee for Derivative Standing was Made by the TSI Members.**

36.      Prior to filing the Derivative Motion, the TSI Members demanded repeatedly that the Trustee take action with respect to filing a claim for the Change Order Receivable and prosecuting the Appeal. *See, e.g.,* February 8, 2023 Email (Ex. 2) (regarding Appeal); March 22, 2023 email, attached hereto as **Exhibit 9** (regarding Change Order Receivable); March 24, 2023 email (Ex. 3) (regarding Appeal); March 28, 2023 email (Ex. 4) (regarding Appeal and Change Order Receivable); April 5, 2023 email, attached hereto as **Exhibit 10** (regarding Change Order Receivable); June 30, 2023 Demand Letter [D.I. 328-1], attached hereto (without exhibits) as **Exhibit 11**. The Demand Letter optimistically included the following invitation, "[h]opefully, a mutually agreeable arrangement can be reached before the hearing date." *See* Ex. 11 at 2. The

---

[9] The Trustee has an independent duty to protect and preserve property of the estate, including informing himself of any last date to pursue claims. In addition, the Trustee was put on notice of the *6 Year SOL* as early as March 2022. *See* March 14, 2022 Hearing Transcript, attached hereto as **Exhibit 12**, at 106:13-15 (Mr. Mark St. Moritz, the Debtor's expert witness, testified: "The actual clause is FAR 33206, which is claims. And that says that they have -- **you have six years to make a claim against the government**.") (**emphasis** added). The foregoing in no way concedes that the TSI Members had any duty to act as the Trustee's "counsel" in this matter, provide any notice or prepare any claim.

[10] The TSI Members reserve all rights.

Demand Letter and Bering Straits proof of claim provide all of the requisite information so the Trustee with Venable's assistance could prepare and file a claim with FEMA.

### M.   The Derivative Motion

37.   Having received no response from the Trustee (including even a phone call), the TSI Members filed the Derivative Motion.   In response, Archer & Greiner sent RLG a Rule 11 Letter.   David Carickhoff called[11] over in advance of sending the Rule 11 Letter "as a courtesy." The Sanctions Motion ensued.

### III.   ARGUMENT

### A.   The Sanctions Motion Should be Summarily Denied.

38.   The Court should summarily deny the Sanctions Motion.   As described herein, the Derivative Motion was filed because the Trustee failed to deploy Venable to work with the TSI Members to investigate and file a claim based on the Change Order.   Not only was it the Trustee's affirmative duty to do so, he was both aware of the claim and the compelling need to do so under the 6 Year SOL.   The focus should not be on finding excuses not to collect receivables so litigation may be pursued, the focus should be on mutual cooperation.   The Derivative Motion was filed in good faith, for proper purposes and is in the best interests of the estate.

39.   The Derivative Motion expressly serves the twin  purposes of the Bankruptcy Code: to maximize the value of the estate by investigating and, if appropriate, preparing and filing a claim for additional costs incurred as a result of the Change Order and, by prosecuting the Appeal, expunging or at least creating leverage to reduce the invalid claims of the Judgement Creditors. Equally important, if granted, the TSI Members would fund all costs associated with prosecuting the Appeal and work in concert with the Trustee and his counsel.  Finally, given the 6 Year SOL,

---

[11] *See* July 7, 2023 email, attached hereto as **Exhibit 13**.

and the Trustee's conspicuous indifference over the past year to its passing without taking action, the Derivative Motion was filed to preserve property of the estate, protect the rights of both the estate and TSI Members, and avoid forfeiture of significant value. There is no bad faith here.

40. Rule 9011 provides, in relevant part, as follows:

*Representations to the Court.* By presenting to the court . . . a written motion . . . , an attorney . . . is certifying that to the best of the person's knowledge, information and belief, formed after reasonable inquiry under the circumstances, —

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed. R. Bankr. P. 9011(b).

**B.    RLG's Conduct was Reasonable Under the Circumstances.**

41. The language of Rule 9011(b) makes clear that a court must examine a filing party's conduct and the exigent circumstances in light of "what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 94-95 (3d Cir. 1988) ("*Lingle*") (quoting Rule 11 Advisory Committee Note). A sanctions award under Rule 9011 is only appropriate when an attorney in the same position as the filing party would conclude that it is "patently clear" that the position asserted has absolutely no chance of success. *In re HBA East, Inc.*, 101 B.R. 411, 415 (Bankr. E.D.N.Y 1989) ("*HBA East*"). The evaluative standard is objective reasonableness; *i.e.,* "whether a reasonable attorney admitted to practice

before the district court would file such a document." *Endrex Invs. Inc. v. Mauna Lani Resort,*

*Inc. (In re Endrex Invs., Inc.)*, 111 B.R. 939, 946 (D. Col. 1990) ("*Endrex*"). If there exists even

"modest difficulty" in resolving the legal merits of the challenged position, then the certification

under Rule 9011 will have been satisfied and sanctions are not appropriate. *HBA East*, 101 B.R.

at 415. *See also Endrex*, 111 B.R. at 947 ("The proper standard under . . . . § 1927 is that excess

costs, expenses, or attorney's [sic] fees are imposable against an attorney personally for conduct

that, *viewed objectively,* manifests either intentional or reckless disregard of the attorney's duties

to the court.") (quoting *Braley v. Campbell,* 832 F.2d 1504, 1512 (10th Cir. 1987)).

        42.    The burden of proof on the sanctions movant is high. To prove a Rule 11 violation,

the Trustee must present clear and convincing evidence. *See Schwartz v. Rent-A-Wreck of Am.,*

*Inc. (In re Rent-A-Wreck., Inc.)*, 569 B.R. 112 (D. Del. 2019). "Courts must strive to avoid the

wisdom of hindsight in determining whether a pleading was valid when signed, and any and all

doubts must be resolved in favor of the signer." *Eastway Constr. Corp. v. New York*, 762 F.2d

243, 254 (2d Cir. 1985). Rule 11 sanctions are warranted only if "it is patently clear that a claim

has absolutely no chance of success under the existing precedents, and where no reasonable

argument can be advanced to extend, modify or reverse the law as it stands[.]" *Id.*; *see also Sci.*

*Components Corp. v. Sirenza Microdevices, Inc.*, No. 03-CV-1851 (NGG), 2007 U.S. Dist. LEXIS

27994, at *13 (E.D.N.Y. Mar. 30, 2007) ("Rule 11 sanctions are not appropriate where there is a

viable claim that is weak.") (internal citations omitted); *In re Jazz Photo Corp.*, 312 B.R. 524, 539-

40 (Bankr. D.N.J. 2004) ("Whether papers are presented for an improper purpose is judged by an

objective standard. One view of an 'improper purpose' is any purpose other than one to vindicate

substantive or procedural rights or to put claims to a proper test.") (internal citations omitted) .

43.     In addition to the legal arguments for why the Trustee is not entitled to sanctions under Rule 9011, the facts leading up to RLG filing the Derivative Motion do not merit sanctions under Rule 9011.  The objective facts known to, or reasonably believed by, RLG at the time the Derivative Motion was filed may be summarized as follows:  the filed Schedules, the Tax Return prepared by the Trustee, the Trustee's testimony in the Trustee election and discussions with the TSI Members all informed RLG that there was potentially $22 million in accounts receivable owed to the estate, including a $6.8 million claim resulting from the Change Order.   RLG's understanding of the facts and common sense also suggested a colorable claim.  TSI bid on the FEMA contract as a firm fixed price based on an agreed mode of delivery and FEMA changed the mode of delivery resulting in substantial additional costs to TSI.

44.     The Trustee retained Venable as expert in federal contract law and federal claims collection.  The scope of the retention includes filing a claim for the $6.8 million.   The Trustee testified he was *not* inclined to pursue avoidance actions until he collected the receivables.  RLG reasonably expected the Trustee would instruct Venable to meet and confer with the TSI Members about the $6.8 million claim against FEMA.  This is especially true because of the *6 Year SOL* that the Trustee was made aware of in 2022 when Mark St. Moritz testified in addition to the Trustee's own duty to inform himself of any statute of limitations in preserving property of the estate.

45.     The TSI Members advised RLG, however, that when they tried to have discussions with Venable they were advised that the Trustee forbade Venable from discussing any matters with them.  The TSI Members also advised RLG of the *6 Year SOL* and the fact that the amount of the claim is $6.8 million.  RLG advised Trustee's counsel of the *6 Year SOL.*

46.      It appeared to RLG that the Trustee had no intention of filing a claim for the Change Order.[12]  The Trustee and his bankruptcy counsel instead were intent on pursuing litigation at the expense of collecting $8.2 million.  Venable was not reaching out to the TSI Members and the Trustee's counsel never gave any indication that the Trustee was going to file a claim.  Equally troubling, during a phone conversation with David Carickhoff, Esq, the Trustee's bankruptcy attorney, Mr. Carickhoff advised that the Trustee had actually closed TSI's only SAM.gov bank account and swept all money out of that account.  RLG advised Mr. Carickhoff that he was informed that FEMA could *only* pay TSI receivables into that specific account because it was registered with SAM.gov.  RLG also advised Mr. Carickhoff that the Trustee's action of sweeping money out of a federally registered account may be a federal crime and, in any event, inquired how the Trustee expected to receive any payment for TSI from a federal agency without a SAM.gov account.  Mr. Carickhoff provided no response.

47.      The Trustee testified that the Appeal has merit and the claims of the Judgment Creditors are overstated.  The TSI Members agree.  The Appeal and opening brief were filed pre-petition and post-petition appellate counsel was retained by the bankruptcy estate.  The Appeal is the only way to challenge the claims of the Judgement Creditors.  The TSI Members advised the Trustee that they were willing to fund the full cost of prosecuting the Appeal.  The offer by the TSI Members to fund the full cost of the Appeal was communicated many times to the Trustee and his counsel but they never responded.  The Trustee's refusal to proceed with the Appeal for free appears to have no downside and raises questions:  why did the Trustee reverse course from his earlier position that the Appeal was "compelling" and the claims of the Judgement Creditors

---

[12] This is confirmed by Archer & Greiner's time entries in their Fee Application where the focus is almost entirely on litigation services.

should be substantially reduced?  Certainly, the Trustee had a legal and factual basis for those contentions when made?  And what is the downside to continuing the Appeal at no cost to the estate?  At a minimum, the Trustee would obtain leverage in any negotiations with the Judgment Creditors.  The Trustee has never responded to these or any questions about the Appeal.

C.    **The Sanctions Motion Seeks to Shift the Burden:  the Trustee Should Explain Why he has Not Satisfied his Affirmative Duty to Investigate a Viable Claim <u>that is Property of the Estate</u>.**

48.    The Sanctions Motion contends, "the TSI Members do not cite to any authority that supports granting equity holders non-consensual derivative standing to pursue non-avoidance action litigation or to administer property of the estate."  Sanctions Motion at 2.  RLG directs the Court to the term "non-consensual."  That invites the initial inquiry why the Trustee is not consenting?  Why has the Trustee not paired Venable with the TSI Members to even discuss the claim?  What bankruptcy purpose is served by the Trustee putting the estate and TSI Members in the position of potentially losing $8.2 million?  RLG's burden of establishing derivative standing is a red herring, *a hurdle the TSI Members should not have to clear*.  RLG certainly would not be forced to file the Derivative Motion if the Trustee discharged his affirmative statutory duties under §704(a).

49.    To the same effect, the Trustee contends, "[t]he Standing Motion is yet another attempt by the TSI Members to delay and obstruct the administration of the Estate and to distract the Trustee from pursuing the pending litigation against the TSI Members."  Sanctions Motion at 5.  This is entirely untrue and complete *misdirection*.  As officers of TSI, the TSI Members have a duty to bring all claims to the attention of the Trustee.  They have done that and also noted the *6 Year SOL*.  The TSI Members have done their job, and if they are permitted to work with Venable they could complete their job.  The Trustee is blocking that from happening in derogation of his affirmative duty to investigate the financial affairs of the Debtor.  RLG was *forced* to file the

Derivative Motion because the Trustee has turned a blind eye to investigating and prosecuting TSI claims and collecting TSI receivables. This is not a "distraction." Put another way, it may be a "distraction" to the Trustee who prefers to rack fees in litigation. The Trustee believes the answer is to sanction RLG; RLG believes the answer is to let the TSI Members work with Venable.

50.     The Trustee seeks to sanction RLG for filing the Derivative Motion, arguing the TSI Members lack standing. The focus on derivative standing should be big picture, not myopic. The requested relief is necessary to protect and preserve estate assets (and TSI §726(a)(6) distributions) and because the Trustee has refused to take any action. The *6 Year SOL* is looming (or even expired). Equity abhors a forfeiture. The power of this Court to fashion equitable relief is robust. This is precisely a situation where Court intervention and derivative standing is appropriate.

**D.     The TSI Members have Standing as both Equity Security Holders and Creditors.**

51.     The TSI Members have standing—either as equity security holders[13] or creditors—and should be afforded derivative standing in light of the *6 Year SOL*, and the estate's (and TSI Members') right to collect at least $6.8 million. That claim is in jeopardy of being lost because of the Trustee's complete failure to act. The TSI Members in good faith believe the estate is owed approximately $22 million in claims and receivables.[14] The lion share of $22 million should flow through to the TSI Members. It is their money; they earned it. The TSI Members, however, stand to lose many millions of dollars if the Trustee fails to file a claim for the Change Order. The TSI Members are aggrieved financial parties by any measure. The Trustee's default position in this

---

[13] Section 1109(b) defines equity holders as parties in interest.

[14] This is a not a "pie in the sky" belief. As described herein, there is sufficient indicia of a *bona fide* claim to at least pair Venable with the TSI Members to make an informed investigation.

circumstance should be to file a claim or at least permit the TSI Members to work with Venable to file a claim. The Trustee's intransigence is purposefully value destructive and far from what is expected from a neutral fiduciary. The Sanctions Motion is suspect. It remains to be explained why the Trustee is more interested in sanctioning RLG than protecting the estate's interest in $6.8 million?

52.     The TSI Members are also creditors of the estate. As defendants in the FAC, they have potential §502(h) claims. A contingent claim falls within the broad definition of claim at §101(5). They also have a claim against the Trustee, his counsel and the estate for substantial financial loss if the *6 Year SOL* expires on the Trustee's watch. That is a claim either under §323(b)[15] or within the meaning of §101(5)(B) ("right to an equitable remedy for breach of performance if such breach gives rise to a right to payment . . . ."). Further, as ongoing management members of TSI, they have derivative standing under applicable Delaware state law.

53.     Finally, this Court afforded the TSI Members standing to object to Archer & Greiner's interim fee application and should find standing here. The Court also raised the issue of derivative standing at an earlier hearing in this case and the Derivative Motion was filed, in part, to address that issue. For those reasons, the Court should find derivative standing here for the TSI Members to act for the estate because the Trustee refuses to do so.

E.     **Individual Creditors in a Chapter 7 Case May be Permitted Derivative Standing.**

54.     The relief requested is not without legal basis and, given the factual drop of this case, is not frivolous or interposed for an improper purpose. The bankruptcy court in *In re Home Casual LLC* held that:

---

[15] The TSI Members reserve all rights, including under the *Barton* doctrine.

"A trustee may be divested of this exclusive authority [to collect and reduce to money the property of the estate under *11 U.S.C. § 704(1)*] only in narrow circumstances. When (a) the trustee unjustifiably refuses a demand to pursue the action; (b) the creditor establishes a colorable claim or cause of action; and (c) the creditor seeks and obtains leave from the bankruptcy court to prosecute the action for and in the name of the trustee, then may an individual creditor or creditors' committee prosecute an action originally vested in the trustee. *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 247 & n. 14 (5th Cir. 1988); *Koch Refining*, 831 F.2d at 1346-47 & n. 9.

534 B.R. 350, 353 (Bankr. W.D. Wis. 2015) (quoting *Matter of Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990)). *See also PW Enters., Inc. v. North Dakota Racing Comm'n (In re Racing Servs., Inc.),* 540 F.3d 892 (8th Cir. 2008) (in a Chapter 7 case in which a large unsecured creditor sought to avoid the debtor's alleged preferential or fraudulent transfers to governmental entities, the Eighth Circuit held that a creditor may sue derivatively on behalf of the estate when a trustee or debtor-in-possession consents or does not formally oppose suit; the bankruptcy court must still make a finding that the suit is in the best interest of creditors and is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings); *Avalanche Mar., Ltd. v. Parekh (In re Parmetex, Inc.),* 199 F.3d 1029 (9th Cir. 1999) (same).

33.     Courts in Delaware have reached the same result. For example, the Court in *AMC Inv'rs LLC v. Eugenia VI Venture Holdings* stated:

The debtors' main argument is that the bankruptcy court misapplied the Cybergenics standard by erroneously applying its tenets to a Chapter 7 bankruptcy. The debtors, however, have failed to show that courts have interpreted the case so narrowly. To the contrary, several courts have applied Cybergenics-or its rationale—in Chapter 7 cases. *See In re Mou San Rim*, 2010 U.S. Dist. LEXIS 117458, 2010 WL 4615174, [at] *7 (D.N.J. 2010) ("While the Third Circuit has not addressed derivative standing for Chapter 7 creditors, other courts have permitted individual creditors to bring derivative avoidance actions where the Trustee has declined to do so.") (citing *In re Trailer Source, Inc. v. Jackson Truck & Trailer Repair, Inc.*, 555 F.3d 231, 243-44 (6th Cir. 2009) (finding that "there is no textual support in the Code for drawing such a distinction between the Chapter 7 and Chapter 11 contexts" and that "there are substantial policy reasons for allowing derivative standing in Chapter 7 proceedings"); *In re Racing Servs., Inc. v. North Dakota Racing Comm'n*, 540 F.3d 892, 898 (8th Cir. 2008) (holding that "derivative

standing is available to a creditor to pursue avoidance actions when it shows that a Chapter 7 trustee . . . is 'unable or unwilling' to do so"); *In re Sandenhill, Inc.*, 304 B.R. 692, 694 (E.D. Pa. 2004) ("[W]e frankly cannot imagine that the Third Circuit would employ a different rationale in a Chapter 7 matter [than it did in *Cybergenics* ]."); *see also Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004) ("Although Cybergenics did not specifically lay out the procedures that should be followed in allowing creditors derivative standing, the Third Circuit expressed its agreement with the approaches taken by the Second and Seventh Circuits." (citations omitted)).

2012 U.S. Dist. LEXIS 34677, at *5-7 (D. Del. Mar. 14, 2012). Because there is case law supporting the proposition that an individual creditor may be permitted derivative standing where a trustee refuses to act and the action is colorable, and because the TSI Members believe they are creditors and "in the money" equity holders, the Derivative Action was lodged in good faith and not for an improper purpose.

34.      This is consistent with cases addressing Rule 9011. Only if it is "patently clear" that the document in question had absolutely no chance of success are sanctions appropriate under Rule 9011. *HBA East*, 101 B.R. at 415. More specifically, it must be patently clear to a reasonable attorney (1) that the challenged document was presented for "an improper purpose" and 2) that it was frivolous and lacked any evidentiary or other support (after a reasonable opportunity is made available for discovery.) Fed. R. Bankr. P. 9011(b). The reasonableness of the pleading must be examined based on the circumstances that existed at the time the challenged paper was questioned. *Lingle*, 847 F.2d at 95. Courts should not use after-acquired knowledge and 20-20 hindsight. *Id.* at 94-95. Rule 9011 establishes a stringent requirement for the imposition of sanctions because sanctions contravene the American policy of encouraging the use of courts to settle disputes, tend to spawn unproductive satellite litigation, and increase tensions among the bar and between the bar and the courts. *Doering v. Union Cty. Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988). For these reasons, sanctions may be awarded only in the "exceptional circumstance" in

which a claim or a motion is patently unmeritorious or frivolous. *Id*. (*quoting Gaiardo v. Ethyl Corp*., 835 F.2d 479, 483 (3d Cir. 1987)).

35.     The admonition against presenting a pleading or paper for an "improper purpose" means that a litigant may not submit a pleading for "any purpose other than one to vindicate substantive or procedural rights or to put claims of a right to a proper test." *In re Jazz Photo Corp*., 312 B.R. 524, 539-40 (Bankr. D.N.J. 2004)*.* Courts in the Third Circuit properly recognize that "simplifying and isolating the 'purpose' of certain litigation tactics is not always helpful." *Id.* at 540 (*quoting Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995)).   In practice, the frivolousness inquiry subsumes the "improper purpose" analysis. *Townsend v. Holman Consulting Corp*., 929 F.2d 1358, 1362 (9th Cir. 1990) (en banc).  Courts rarely sanction a party for filing a pleading when it is objectively reasonable and nonfrivolous—even if the motivation for presenting that pleading is less than pristine. *Jazz Photo*, 312 B.R. at 539-40 (rejecting allegation that creditor's well-founded Chapter 11 petition was sanctionable because the creditor was a marketplace competitor to the debtor and wanted to run it out of business); *see also Sussman*, 56 F.3d at 459 (reversing sanctions imposed for filing a complaint in order to exert "pressure on defendant through the generation of adverse and economically disadvantageous publicity" when the complaint was well-founded in law and fact); *Resolution Trust Corp. v. Blasdell*, 154 F.R.D. 675, 682 (D. Ariz. 1993) (holding that sanctions under FRCP 11 are not appropriate when evidence suggests that the motion was filed for both proper and improper purposes).

### F.     The Derivative Motion was Filed for a Proper Purpose.

36.     The Derivative Motion was filed for no other purpose than to protect the estate's (and the TSI Members' respective interests) in collecting $8.2 million, $6.8 million of which is in jeopardy of being lost because of the *6 Year SOL* and the Trustee failed to act.  As set forth herein, RLG polled its client and made a study of the case record before filing the Derivative Motion.  *See*

*Lingle*, 847 F.2d at 95 (Rule 9011 requires determining whether counsel made a reasonable inquiry into the evidentiary support underlying a pleading and requires a court to examine five (5) factors: 1) the amount of time available to the signer for conducting the factual and legal investigation, 2) the necessity for reliance on a client for the underlying factual information, 3) the plausibility of the legal position advocated, 4) whether the case was referred to the signer by another attorney, and 5) the complexity of the legal and factual issues involved).   A pleading is unfounded and frivolous only if a reasonable attorney would conclude that it had absolutely no chance of success. *HBA East*, 101 B.R. at 415.  There is no bad faith found in trying to maximize the value of the estate.

37.    The Sanctions Motion is deficient on its face.  The Trustee has not, and cannot, come close to meeting his burden of proof.  The Exhibits provided by the Trustee are incorrect and mislabeled.  The "contract"—Exhibit 2 to the Sancitons Motion—is not the MATOC or the Task Order Contract.  It is merely a modification reducing the number of units in Contract Line Item 002, and adding Contract Line Item 0016.  It is not relevant to the basis of the Change Order Clause in the Task Order Contract.  The TSI Members have long maintained that there are nearly $22 million in claims and receivable to be filed and collected for the estate.  That amount of receivables is set forth in the Schedules.  *See* Sanctions Motion at 8.  The Trustee agrees.  At the hearing on the contested trustee election, the Trustee testified:

Q    During one or both of the phone calls, there was some discussion of the fact that you didn't believe you could pursue the insider transfers prior to the resolution of the FEMA claims.  Is that still your belief?

A     I never said that.  I could pursue the insider claims, but it would be premature. **And the reason it's premature is because we have approximately $23 million in claims against FEMA and if you collect $23 million of claims against FEMA and your judgment, you know, your judgment -- your client's judgments are about $6 million.  So, I've got $23 million in the bank, I'm writing you a check for $6 million and you're paid off.**

> And so, that's the quickest way, as a trustee – and the cheapest way, because I have now engaged a client – an attorney, who's going do it all on a contingency basis. So, there's no need for any money to recover fees and expenses, you know, chasing assets throughout the United States.

*See* June 15, 2022 Hrg. Tr. at 46:13-47:5 (**emphasis** added). The Trustee also under oath prepared and filed a Form 1065 dated September 10, 2022. The Form 1065 list total assets of $21,417,007 (trade notes and accounts receivable) and total gross non-farm income of $21,763,683. Form 1065 at 14c. The Form 1065 acknowledges and includes the claim for $6.8 million. The Trustee was put on notice of the claim for the Change Order both by Ms. Mott in her deposition and of the *6 Year SOL* by the testimony of federal contract law expert Mark St. Moritz.

### G.    The Trustee's Reliance on the Conversion/Dismissal Hearing is Misdirection.

38.    The Sanctions Motion relies on Court statements made at a hearing conducted in the context of a motion to dismiss the chapter 11 case for the proposition that filing a claim for $6.8 million with FEMA has no value. Sanctions Motion at 9. The Sanctions Motion further contends, "[d]uring that evidentiary hearing, the TSI Members had ample opportunity to present evidence to support the value of the Debtor's account receivable or business." *Id.* at 9. This argument is entirely misplaced.

39.    The issue before the Court is whether RLG should be sanctioned in seeking authority for the TSI Members to file a claim worth $6.8 million where the Trustee has failed to do so. That is a different issue from whether that claim is sufficient to sustain a reorganization effort. At the conversion hearing, the Court concluded "[o]n this record, the Court cannot and will not conclude that it is sufficiently likely that TSI will recover on the $6.8 million claim that this potential recovery provides a basis for the debtor to remain a debtor in possession." *Id.* at 9. While the TSI Members agree that a $6.8 million claim, standing alone, is not sufficient to sustain a

reorganization effort,[16] that does not mean it has no value[17] and, on the basis of that record, *not* filed with FEMA.

40.     The Sanctions Motion also contends, "[i]f the TSI Members truly believe the Alleged A/R is the path toward a creditor recovery, then they would have attached the contracts, invoices, calculations, and other supporting documents to the Standing Motion."  This is not correct for at least two reasons.  *First*, the documents were already provided, and RLG reserves the right to seek discovery and present expert evidence on this issue.  *Second*, the TSI Members are not lawyers, did not have the benefit of consulting with Venable, and should not be burdened with preparing a finished claim ready for the Trustee to file.  TSI works with law firms specializing in federal contract law to vet and file claims with federal agencies.  In fact, TSI retained Venable pre-petition to assist in the preparation and submission of the $13.5 million claim filed with FEMA. The TSI Members would again work with Venable to file the claim for the Change Order.

41.     The Trustee's focus in this case has been entirely on litigation and racking fees.  To properly investigate whether a claim for the Change Order was viable, the Trustee merely had to direct Venable to meet and confer with the TSI Members.  He chose not to.  Significantly, the Sanctions Motion is not accompanied by letter after letter on Venable letterhead directed to RLG explaining that Venable has investigated the claim for Change Order expenses and found it to be valueless and frivolous to file.  The time records attached to Archer & Greiner's recently filed interim fee application similarly do not evidence that Archer & Greiner spent any time discussing

---

[16] However, the over 1,000 fuel fulfillment orders that TSI has regularly received post-petition are more than sufficient to sustain a reorganization effort pending receipt of the $13.5 million receivable and other receivables.

[17] In the event this Court does not summarily deny the Sanctions Motion, the TSI Members intend to retain an expert on federal contracting claims who will opine, on among other things, that the $6.8 million claim resulting from the Change Order is well-grounded in fact and has value.  RLG respectfully requests that the final hearing on the Sanctions Motion be adjourned to that date and a discovery schedule be discussed on September 20, 2023.

this issue with Venable.  Neither the Trustee nor his counsel was putting pressure on the TSI Members because the 6 Year SOL was expiring because the Trustee never had any intention of preparing and filing a claim. The best that Archer & Greiner can muster is their ubiquitous footnote, ""[t]o be clear, the Trustee has not made any decision regarding what amounts, if any, may be owed to the Estate by third parties ... The Trustee is continuing to investigate any potential accounts receivable and expressly reserves all rights."  Sanctions Motion at fn. 1.  Times up. Somebody had to do something.

42.    The imposition of Rule 9011 sanctions is a discretionary matter. *In re Muma Servs*., 279 B.R. 478, 491 (Bankr. D. Del. 2002).  Equitable considerations should always guide both the initial decision to award sanctions as well as the amount of the award if sanctions are imposed. *Faraci v. Hickey-Freeman Co., Inc*., 607 F.2d 1025, 1028 (2d Cir. 1979) (holding that equitable considerations may be taken into account in the decision to award sanctions).  By imposing sanctions a court should seek to do justice in the particular case and should limit its fee award to only the amount sufficient to deter the sanctionable conduct. *In re Collins*, 250 B.R. 645, 658 (Bankr. N.D. Ill. 2000).  A court should not award unreasonable or excessive fees and should restrict any award solely to fees and costs that are a "direct result" of the challenged paper. *In re Am. Telecom Corp.*, 319 B.R. 857, 874 (Bankr. N.D. Ill. 2004)

43.    The Derivative Motion is neither frivolous, interposed for purpose of harassment or delay nor is it abusive litigation.  The Derivative Motion was filed to protect and preserve assets of the estate in the face of the Trustee's failure to act in accordance with his mandatory statutory duties.  On its face, the claim for the Change Order Receivable appears well-grounded in fact.  TSI was entirely dependent on Bering Straits, its subcontractor, to receive an itemized list of such costs in a *verified* manner.  That was not made available to TSI until Bering Straits filed its proof of

claim.  TSI has directed the Trustee and his counsel to Bering Strait's proof of claim on numerous occasions and otherwise explained or gave deposition testimony as to the background to the Change Order Receivable.

44.    The most fundamental function of any court (especially a court of equity) is to right a wrong for an aggrieved party.  And what is transpiring before this Court under the Trustee's administration of this estate is wrong and needs to be corrected.  The Trustee is engaged in value destructive conduct.  He is stepping over valuable estate property to pursue litigation and accompanying litigation fees at the expense of cooperation and collaboration with the TSI Members to collect $8.2 million.

**WHEREFORE**, RLG respectfully requests that the Court either summarily deny the Sanctions Motion, or permit RLG discovery in advance of any final hearing, and grant such other relief as is just and appropriate.

Dated: August 23, 2023  
       Wilmington, Delaware

Respectfully Submitted,

**THE ROSNER LAW GROUP LLC**

*/s/ Frederick B. Rosner*  
Frederick B. Rosner (DE Bar No. 3995)  
Zhao (Ruby) Liu (DE Bar No. 6436)  
824 N. Market Street, Suite 810  
Wilmington, DE 19801  
Tel: 302-777-1111  
Email: rosner@teamrosner.com  
Email: liu@teamrosner.com

*For The Rosner Law Group LLC*

{00036467.2 }