# Exhibit 5

```
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3    IN RE:                        .  Chapter 7
                                    .  Case No. 22-10066 (CTG)
 4    TEAM SYSTEMS                  .
      INTERNATIONAL, LLC,           .
 5                                  .  Courtroom No. 7
                                    .  824 Market Street
 6          Debtor.                 .  Wilmington, Delaware 19801
                                    .
 7                                  .  Thursday, June 30, 2022
      . . . . . . . . . . . . . . .    10:00 a.m.
 8

 9                    TRANSCRIPT OF ZOOM HEARING
               BEFORE THE HONORABLE CRAIG T. GOLDBLATT
10                    UNITED STATES BANKRUPTCY JUDGE

11    APPEARANCES:

12    For the Chapter 7
      Trustee:                      David W. Carickhoff, Esquire
13                                  ARCHER & GREINER, PC
                                    300 Delaware Avenue
14                                  Suite 1100
                                    Wilmington, Delaware 19801
15
      For Bering Straits
16    Logistics
      Services, LLC:                William E. Chipman, Jr., Esquire
17                                  CHIPMAN BROWN CICERO & COLE, LLP
                                    Hercules Plaza
18                                  1313 North Market Street
                                    Suite 5400
19                                  Wilmington, Delaware 19801

20    (APPEARANCES CONTINUED)
      Audio Operator:               Sean Moran, ECRO
21
      Transcription Company:        Reliable
22                                  The Nemours Building
                                    1007 N. Orange Street, Suite 110
23                                  Wilmington, Delaware 19801
                                    Telephone: (302)654-8080
24                                  Email:  gmatthews@reliable-co.com

25    Proceedings recorded by electronic sound recording,
      transcript produced by transcription service.
```

1   <u>APPEARANCES (CONTINUED)</u>:

2   For Simons
    Exploration, Inc.,
3   and GPDEV, LLC:            Michael H. Moody, Esquire
                               MICHAEL H. MOODY LAW, P.A.
4                              1881-A Northwood Center Boulevard
                               Tallahassee, Florida 32303
5
                               -and-
6
                               Leonard Collins, Esquire
7                              GRAY ROBINSON, P.A.
                               301 South Bronough Street
8                              Suite 600
                               Tallahassee, Florida 32301
9

10  For Deborah Mott
    and Steven Acosta:         Kevin S. Mann, Esquire
11                             CROSS & SIMON, LLC
                               1105 North Market Street
12                             Suite 901
                               Wilmington, Delaware 19899
13
                               -and-
14
                               Richard R. Robles, Esquire
15                             LAW OFFICES OF RICHARD R. ROBLES, PA
                               Four Ambassadors, Tower II
16                             905 Brickell Bay Drive
                               Suite 228
17                             Miami, Florida 33131

18

19

20

21

22

23

24

25

1                            INDEX

2   MOTIONS:                                          PAGE

3   Agenda
    Item 1:   Application of the Chapter 7 Trustee for an       6
4             Order Authorizing Retention of Venable LLP as
              Special Counsel to the Chapter 7 Trustee
5             Effective as of May 17, 2022
              (filed on June 7, 2022) [D.I. 181]
6
              Court's Ruling:                               61
7


8


9   WITNESSES CALLED
    BY THE TRUSTEE:                                   PAGE
10
        GEORGE MILLER
11
                Direct examination by Mr. Carickhoff        24
12
                Cross-examination by Mr. Robles             28
13
                Cross-examination by Mr. Moody              42
14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2 MOTIONS:                                              PAGE

3 Agenda
  Item 2:   Motion of the Chapter 7 Trustee for Order      65
4           Finding the Debtor and its Member in Contempt
            and for Sanctions Against the Debtor and its
5           Members for Failure to Turnover Books and
            Records (filed on June 9, 2022) [D.I. 186]
6
            Court's Ruling:                               124
7

8 WITNESSES CALLED
  BY THE TRUSTEE:                                        PAGE
9
        GEORGE MILLER
10
            Direct examination by Mr. Carickhoff          67
11
            Cross-examination by Mr. Mann                 80
12

13
  WITNESSES CALLED
14 BY THE OBJECTORS:                                      PAGE

15
        STEVEN ACOSTA
16
            Direct examination by Mr. Mann                82
17
            Cross-examination by Mr. Carickhoff           91
18
            Redirect examination by Mr. Mann             105
19

20
  REBUTTAL WITNESSES CALLED
21 BY THE TRUSTEE:                                        PAGE

22      GEORGE MILLER

23          Direct examination by Mr. Carickhoff         106

24          Cross-examination by Mr. Mann                111

25 Transcriptionist's Certificate                        131

1        (Proceedings commence at 10:00 a.m.)

2              THE COURT:  Good morning.  This is Judge

3   Goldblatt.  We're on the record in In Re Team Systems

4   International, which is Case Number 22-10066.

5              We're proceeding this morning by way of Zoom.  I

6   ask, if folks would, please leave your microphones muted

7   unless you're address the Court; that, folks, when you do

8   address the Court, introduce yourself for the record each

9   time.  And finally, my preference is that folks leave their

10  cameras off unless you're either addressing the Court or wish

11  to be recognized because I find it helpful if folks signal

12  that they want to be heard by turning on their camera.

13             So, with that -- actually, before we start, why

14  don't I just say the following:

15             I know I owe you an opinion on the disputed

16  election matter.  It is a high priority.  There actually is

17  another opinion sort of in the queue ahead of it.  But I hope

18  to get something out in the near term.  For what it's worth,

19  I have made up my mind as to certain issues, but I'm still

20  thinking and reading about some others.

21             So, you know, the good news is that, under the

22  Bankruptcy Code, every Chapter 7 case has one trustee at a

23  time, and we'll -- we will proceed.

24             So, with that, let me stop talking and pass the

25  baton to Mr. Carickhoff.

1          MR. CARICKHOFF:  Good morning, Your Honor.  And

2    may it please the Court, David Carickhoff of Archer & Greiner

3    on behalf of George Miller, the interim Chapter 7 Trustee.

4          On the agenda are two items:  One is an

5    application to retain Venable and the other is a motion for

6    sanctions.  I guess, with respect to the application to

7    retain Venable, a number of the objections were that a

8    permanent trustee should be the one deciding whether or not

9    to retain Venable.  So I guess, as a gating issue, if Your

10   Honor accepts that argument, I don't think it makes sense to

11   argue about the other items.

12         THE COURT:  Right.  And no, I do think that a case

13   has one trustee at a time and Mr. Miller is the trustee.  And

14   I -- it is true that the -- that -- once we enter an order,

15   that becomes -- you know, the estate is stuck with it.  But I

16   don't think it's appropriate to defer a decision on this

17   issue.  I think that, you know, the case has one trustee at a

18   time.  Mr. Miller is the trustee, he should pursue the case,

19   but to the best of his lights, and I'm happy to proceed on

20   the motion.

21         MR. CARICKHOFF:  Thank you.  Then, with that, I

22   will proceed on the motion.

23         There were three objections that were filed.  One

24   was filed by the members of the debtor.  That objection is

25   basically we think that Venable is going to get a windfall

 1  here, and we would prefer to fund it ourselves.  So they want

 2  to pay Venable, instead of allowing Venable to proceed on a

 3  contingency fee basis.

 4         The -- just let me take a step back and kind of

 5  set the table a little bit better.  I apologize.

 6         The relief that we're seeking in the application

 7  is to retain Venable on a contingency fee basis, so that

 8  there's effectively zero cost on the bankruptcy estate, in

 9  terms of the outlay of cash.  So only in the event that

10  there's a recovery on the estate FEMA claims does Venable get

11  paid out of that recovery.  In terms of expenses, the way the

12  application reads is that the estate will pay for the

13  expenses of Venable in the pursuit of the FEMA claims.

14         Some of the objections have said, well, the

15  expenses could be excessive, they could eat up all the free

16  assets or all the existing cash in the estate.  That's

17  troublesome.  So, if Your Honor is inclined to grant the

18  application, we're happy to put in two provisions in the form

19  of order:

20         One is that the -- Venable will not seek

21  reimbursement of expenses in excess of $10,000 without

22  further order of the Court.  So we're saying -- we're

23  signaling we don't expect the expenses to be high; and, if

24  they're over 10,000, we'll come back to the Court and ask for

25  additional approval.  So I think that addresses the fear of

1  the expenses kind of eroding the estate's assets.

2          The other objection that Bearing Straits raised

3  was, well, the way the contingency fee is drafted, it could

4  potentially mean that, if the trustee is able to sell the

5  estate FEMA claims to a third party, then Venable could say,

6  well, those are -- that's cash that you received for these

7  claims, we're entitled to a portion, even though they didn't

8  recover on the litigation.

9          Venable is willing to, again, revise the order to

10  make it clear that the contingency fee would not include any

11  proceeds from the sale of the estate FEMA claims to a third

12  party.  Okay?  So I think those address the technical issues.

13          In terms of the members' objection, which is

14  really we want to fund Venable and pay them on an hourly

15  basis.  They're not offering to catch Venable up for the

16  amounts of money they're owed.  It's not clear to me that

17  they have funding sufficient to pay for the litigation to see

18  it to its conclusion.  And the way that they would do it,

19  they would seek to do it outside of the course of the

20  bankruptcy estate, and we don't think that's appropriate,

21  either.

22          In terms of the GPDEV and the Simons Exploration

23  objection, one, I think we addressed the expense issue.  And

24  then it kind of says, you know, I know we've said in, you

25  know, all of our pleadings that these claims are worthless,

 1  we still think these claims are worthless, but if they're

 2  not, Venable should not be entitled to a windfall.

 3           So I don't know how to deal with that.  We gave

 4  them a contingency fee.  We think the contingency fee is

 5  market.  And if Venable is somehow able to collect and

 6  recover on account of these claims, they should be entitled

 7  to a contingency fee for assuming that risk.

 8           So those -- that's the trustee's position.  And we

 9  think we've -- we can address the expense issue with the

10  revised form of order and we think we can address the Bering

11  Straits issue as to the third-party sale with a revised form

12  of order.  And with that, I'll let the objectors make their

13  points to Your Honor.

14           THE COURT:  Okay.  Thank you, Mr. Carickhoff.

15           Mr. Robles, your camera is on, you can proceed.

16           MR. ROBLES:  Good morning, Your Honor.  Richard

17  Robles for the equity interest holders.  We filed a limited

18  objection.

19           To make it clear, Venable is the best suited to

20  deal with this litigation, relating to these estate FEMA

21  claims.  The concern we have is the contingency fee

22  agreement.  We're talking about a contingency fee of over $6

23  million.  And it doesn't make sense, based on the cost of

24  litigating the case from the beginning to the end.

25           You can see, Your Honor, the pre-petition expenses

1  for Venable are $35,000.  They're holding a ten-thousand-

2  dollar retainer.

3          Now, if we can just go through where the case has

4  been, an appeal was filed with the contract board of appeals.

5  A response was filed.  Both parties filed for summary

6  judgment.  Both summary judgments were denied.  The only

7  thing that's left in the case is putting on the evidence and

8  having the final hearing.  So, for the remainder of this

9  case, we're talking about maybe another thirty-five, $50,000.

10  And we're talking about a six-million-dollar contingency fee

11  for something that doesn't take that much work to do.

12          So it's understanding that we don't want to use

13  funds from the estate and it's understood that we need to

14  preserve the assets of the estate.  The debtor has an

15  interest in the assets of the estate because there's an

16  obvious surplus under 726(a)(6) that they're entitled to it,

17  so -- and the surplus is way more than what's owed to the

18  creditors, so it's a large amount.  So what we're not -- what

19  we're trying to do is help the recovery of these assets and

20  help the estate by funding this.

21          So there is no issue with the equity interest

22  holders putting money into Venable's trust account, 75,000

23  can be put in right away.  If they're inquiring that the pre-

24  petition claims for Venable be paid, we can work that out, we

25  can do that, as well.  Give us the ability to pay these funds

1  into Venable's trust account.  We can fund the litigation all

2  the way through.  If we don't, then we come back to you.  But

3  it's very clear, give us a deadline, and put that money into

4  that trust account --

5           THE COURT:  So --

6           MR. ROBLES:  -- and we --

7           THE COURT:  So --

8           MR. ROBLES:  -- can move forward.

9           THE COURT:  -- Mr. Robles, let me say the

10 following:  What you say makes a measure of -- well, let me

11 say a couple of things:

12          First of all, if your client had succeeded at

13 putting on evidence at the hearing that this was likely to

14 lead to a recovery, the case wouldn't have been converted.

15 So we're here, basically, because the evidence about this

16 claim that I heard and considered in conjunction with the

17 motion to dismiss or convert was that it was speculative.

18          Now that's not to say that, you know, look, it

19 would be great if the money came into the estate.  And

20 it's -- and you know, I have no -- well, that's thing one.

21          Thing two, what you're saying about how one might

22 proceed and what is best for the estate makes some measure of

23 sense to me.  But given where we are, you know, the decision

24 about what's best for the estate is made by the first

25 instance by the trustee.  And the burden of showing that

1  you -- that we should override the trustee's business

2  judgment about what type of fee arrangement is best for the

3  estate is a very high one.

4        And so I'm not saying that, if I were the trustee,

5  I might not take you up on your offer.  But I'm not the

6  trustee, Mr. Miller is, and he's made a different decision.

7  And so I guess I'm interested in hearing from you not why you

8  think your idea is a good one, but why the -- why it's so

9  good that this should be the rare case in which a court

10  overrides the decision of the trustee about what business

11  path to pursue.  Does that question make sense?

12        MR. ROBLES:  Yes, Your Honor.  Under the rules,

13  the trustee has to go to the Court to retain its

14  professionals --

15        THE COURT:  Right.

16        MR. ROBLES:  -- so it's not a decision that the

17  trustee makes without the Court's involvement, so it's really

18  a decision of the Court.

19        THE COURT:  Well, that's --

20        MR. ROBLES:  (Indiscernible)

21        THE COURT:  Well, let me back up.  Well, to my --

22  it is true it requires court approval, and that means

23  creditors get to weigh in, and you're entitled to make

24  exactly the argument you're making.  The only point that I

25  was pushing on is that, in making the decision, I believe

1  that the standard is one that is reasonably deferential to

2  the trustee's business judgment.  And my question to you

3  really is:  How do you deal with that point?

4          MR. ROBLES:  Okay.  Your Honor, just first of all,

5  one of the points.  We were in a Chapter 11, it got

6  converted.  I'm not here to argue the points of conversion.

7  But we are in a Chapter 7 and we're here and liquidate to the

8  benefit of the estate.

9          Now, on that note, it's not sound business

10 judgment to put a burden on the estate of $6 million when it

11 can be resolved for 75,000, 125,000.  It's -- we're talking

12 about a big difference between 125,000 and $6 million.  It's

13 an unnecessary burden, especially when the funds are

14 available to pay and it's not going to affect the estate.  So

15 there -- it doesn't comply with the requirements of sound

16 business judgment if there's the funds available that are not

17 going to impede the assets of the estate.  They should -- we

18 should be able to present those funds, so that we can

19 minimize the liability to the estate.

20          THE COURT:  Okay.  I understand that position.

21          MR. ROBLES:  And the -- it just -- it's -- we're

22 talking 125,000 versus 6 million, 6 million will come out of

23 the estate when -- where 125,000 will not come out of the

24 estate, it's going to be funded by the equity interest

25 holders.  So there's no issue or any kind of burden on the

1  estate.

2        THE COURT:  Okay.  So I understand that argument.

3        So, Mr. Carickhoff, before you respond -- and I

4  certainly want to give you a chance to respond -- there were

5  also the other objectors.  And I want to see if they also

6  want a chance to be heard with respect to their objections.

7        Mr. Moody.

8        MR. MOODY:  Yes, Your Honor.  Good morning.  Thank

9  you.

10       On behalf of GPDEV and Simons, we filed an

11  objection.  As noted, we kind of view the prospect of success

12  as someone dim with respect to these claims.

13       The other issue that we have is that they're not

14  real -- this is not ordinary District Court litigation that,

15  you know, requires -- that appears to require depositions and

16  other, you know, discovery efforts that would potentially

17  become very costly and put a lot of risk on Venable.

18       So our perspective is that the trustee -- you

19  know, now that there are objections, it's sort of the

20  trustee's burden to demonstrate why the proposed contingency

21  is reasonable.  You know, the -- it's undisputed that the

22  debtor did receive up to -- I think close to $40,000 within

23  90 days of the filing of the case that could potentially be a

24  preferential or a fraudulent transfer if the work wasn't done

25  contemporaneously therewith.

1          THE COURT:  So, Mr. Moody, can I ask you that?  So

2    I saw you made that argument in your brief.  Are you aware of

3    any -- they're being retained as 327(e) counsel, not 327(a)

4    counsel, right?

5          MR. MOODY:  Correct.

6          THE COURT:  Are you aware of any case that says

7    that a firm is disqualified to serve as 327(e) counsel

8    because of a potential preference?

9          MR. MOODY:  The lang -- well, just the language of

10   327(e) says that the attorney must not hold or rep an

11   interest adverse to the debtor or the estate with respect to

12   the matter on which the attorney is to be employed.

13         THE COURT:  Right.  Is Venable being retained to

14   pursue a preference action --

15         MR. MOODY:  It --

16         THE COURT:  -- against Venable?

17         MR. MOODY:  No.  And I'm sorry to interrupt, Your

18   Honor.  They appear to be being retained to continue to

19   pursue litigation that they couldn't be sued for having

20   received a preference in order to prosecute.

21         THE COURT:  No, I understand that.  But to me,

22   that's the work of the language that separates 327(e) from

23   327(a), is that the "not hold a material adverse interest" is

24   limited in 327(e) to "with respect to the matter for which

25   they're retained," and they're not being retained to bring a

1  preference action, which is why, as I understand it, there

2  isn't any case -- I've never seen one -- and you don't cite

3  any case for the proposition that 327(e) prohibits the

4  retention of counsel who might be a defendant in an estate

5  preference action, which is why I asked you if you have such

6  a case.

7            MR. MOODY:  Yes, Your Honor.  We do not have such

8  a case.

9            THE COURT:  Okay.

10            MR. MOODY:  Our bigger issue --

11            THE COURT:  You're not going to win that argument,

12  Mr. Moody.

13            MR. MOODY:  Thank you, Your Honor.

14            Our other issue -- and I think perhaps are saying

15  that I'm not going to win.  I'm just not sure which

16  argument --

17            THE COURT:  You're not --

18            MR. MOODY:  -- (indiscernible).

19            THE COURT:  -- going to win on the preference

20  argument.  I'm --

21            MR. MOODY:  Understood.

22            THE COURT:  I want to hear the rest of what you

23  have to say.  But on the preference argument, if you had a

24  case, that would have been helpful.  But the -- in the

25  absence of one, I'm not going to be the first judge ever to

1  do this.

2          MR. MOODY:  Certainly, Your Honor.  Understood.

3          The other point we were just going to make is that

4  we think it's the trustee's burden to show the reasonableness

5  of the contingency.  Our understanding is that the contract

6  claim is really a letter.  And what we've seen at least is

7  that there is a letter drafted and written to the contract

8  board.  There's like an exchange of some letters.  There's no

9  evidence that is in the application or the declaration as to

10  how much time and expense is really required in order to

11  prosecute these claims and really what even that process is.

12  So that's the --

13          THE COURT:  Right.

14          MR. MOODY:  -- basis --

15          THE COURT:  But --

16          MR. MOODY:  -- for our --

17          THE COURT:  But Mr. Moody, aren't -- isn't it sort

18  of common sense that the weaker the claim is on the merits

19  the more reasonable it is for the estate to retain counsel as

20  a trustee, rather than on a pay-as-you-go basis.

21          MR. MOODY:  I would say that's true, Your Honor.

22          THE COURT:  And you think this claim is really

23  very weak, right?

24          MR. MOODY:  That's our understanding.

25          THE COURT:  So doesn't that support the

1  reasonableness of the trustee's judgment to retain counsel on

2  a contingency basis?

3          MR. MOODY:  Yes, it does, Your Honor.

4          THE COURT:  Okay.

5          MR. MOODY:  That's all we have.  Thank you, Your

6  Honor.

7          THE COURT:  Okay.  Thank you, Mr. Moody.

8          Mr. Carickhoff.

9          MR. CARICKHOFF:  Sure.  There was one other

10 objection.

11         THE COURT:  From Bering --

12         MR. CARICKHOFF:  It was --

13         THE COURT:  -- Straits.

14         MR. CARICKHOFF:  -- Bering Straits.

15         THE COURT:  That's true.  Let me ask counsel

16 for -- thank you for that, Mr. Carickhoff, I appreciate it.

17         Is counsel for Bering Straits here?  Mr. Chipman.

18         MR. CHIPMAN:  Your Honor, can Your Honor hear me?

19         THE COURT:  Yes, I can.  You can proceed.

20         MR. CHIPMAN:  Thank you.  Your Honor,

21 Mr. Chipman -- this is William Chipman on behalf of Bering

22 Straits.  My co-counsel was supposed to be on the phone.  I'm

23 not sure if he can dial in or not.

24         But I believe the language that Mr. Carickhoff has

25 added to the order related to the contingency not being

1  assessed upon a sale of the claims satisfies our main

2  objection.  And our other objection, Your Honor, Your Honor

3  already overruled, so I think that resolves our issues.

4        If my co-counsel wants to weigh in if I missed

5  anything, that's fine.  But otherwise, I think we're

6  resolved, Your Honor.

7        THE COURT:  Okay.  Thank you, Mr. Chipman.

8        So, Mr. Carickhoff, I don't -- look, let me say

9  the following.  I start from the premise that the trustee's

10  exercise of business judgment is entitled to some measure of

11  deference.  I -- you know, for what it's worth, Mr. Robles

12  makes -- if I were the -- a point that, if I were the

13  trustee, I may consider a good one.  But I do believe in the

14  deference to the trustee's judgment.

15        I don't actually have a record -- an evidentiary

16  record of the trustee's exercise of business judgment, and

17  I -- you know, I'll give you a chance if you want to

18  present -- you did list Mr. Miller as a witness.  If you want

19  to present evidence in support of the exercise of business,

20  judgment I think it sort of is your burden to do that.

21        MR. CARICKHOFF:  I'm happy to do that.  If I could

22  just address some of the comments made by Mr. Robles first

23  because I think that's important.

24        Just so Your Honor understands what's involved

25  here, so, before these cases filed for bankruptcy, before

1   this case filed for bankruptcy, Venable incurred about

2   seventy-eight, $79,000 worth of fees.  It was paid about

3   thirty-eight or $39,000 worth of those fees and has a ten-

4   thousand-dollar retainer.  So they're still owed, assuming

5   they get to apply the retainer, you know, roughly twenty-five

6   to $28,000.

7           The litigation that's happened to date is in the

8   Civilian Board Court of Appeals.  And based on everything

9   that has transpired in the Civilian Board of Appeals, the

10  expectation is, is that the Judge that's overseeing that is

11  going to deny the debtor's claim at that level.  And so

12  what's contemplated by Venable in its work isn't concluding

13  what's happening in the Civilian Board of Appeals.  It's

14  taking this on appeal to the Federal Circuit and prosecuting

15  that appeal in the Federal Circuit.

16          So, just so Your Honor understands what is

17  involved, it's not, oh, we're going to finish out what's left

18  in the Civilian Court of Appeals.  That's not it.  It's

19  taking it to the next level and prosecuting it in the Federal

20  Circuit.  And that's not a twenty-thousand-dollar exercise.

21  In speaking with Venable, they think it's several hundred

22  thousand dollars' worth of their times.  So, in terms of the

23  numbers that Mr. Robles was putting out, that's not the case.

24          And what's at issue currently in the Civilian

25  Board of Appeals is roughly a thirteen-million-dollar estate

1  FEMA claim, not 20 million.  We don't yet have the backup to

2  assert the twenty-million-dollar FEMA claim or an additional

3  6 million.  We've asked for that information and you'll hear

4  more about that in our sanctions motion.  But right now, the

5  only thing that's up is the thirteen-million-dollar claim.

6  And if you were looking at a contingency fee on that, it's

7  not $6 million.  So I wanted to clarify it, so that Your

8  Honor understood the numbers better.

9        I don't think that the members have several

10  hundred thousand dollars to put up to fund it.  If they did,

11  you know, we probably would have heard about it.  And if --

12  you know, I have a hard time believing anything they're going

13  to tell you, kind of given where we are and the fact that we

14  try to do something with them and that has gone nowhere and

15  it's just delay, delay, delay.

16        So, with that, I'm happy to offer Mr. Miller as a

17  witness to talk about the business judgment, if Your Honor

18  will permit.

19        THE COURT:  Okay.  I will -- I do want to give you

20  the chance to do that.  Mr. Robles has turned on his camera.

21  Let me just -- if he wants to be heard, let me give him that

22  opportunity.

23        MR. ROBLES:  Your Honor, they are grouping all of

24  these FEMA claims together, so our numbers are accurate on

25  the amount of these FEMA claims.  If you can -- they call

1  them the "estate FEMA claims" and Venable has been handling

2  them and they're doing a great job.  We don't want to -- we

3  want Venable -- we need Venable to continue doing what

4  they're doing.  Venable was involved with the debtor well

5  before this bankruptcy, and we really need to help them

6  complete their job.

7           Now offers have been made to pay this money in to

8  get it done.  And quite frankly, I'm a little confused about

9  what Mr. Carickhoff said.  But we're to fund this, give us a

10  chance to do that.  Tell us what number you need.  We'll

11  place the money into the trust account of Venable within a

12  period of time, ten days, five days.  Whatever the Court

13  requires, we'll do, so that these claims can be processed.

14           So now they're banking on there being an appeal.

15  But we don't even know if there's going to be an appeal to

16  the District Court.  That's -- there can be appeals in any

17  case.  So, for them to say, well, they're going to be an

18  appeal, now where is it going to end up, in the District

19  Court?  I -- you know, there has been no appeal filed because

20  the case hasn't been completed yet.  So why don't we get the

21  case completed?  Let's -- let us fund this, let's get this

22  done.  We're talking 125,000 versus $6 million.  It's sound

23  business judgment to take this money and use it for the

24  litigation.

25           And on another note, I think they're going to have

1  Mr. Miller testify.  But I think any evidentiary hearing is

2  going to require Venable's testimony because they're --

3  they've been involved with this claim all the way through.

4  Let's hear what they have to say.

5          THE COURT:  All right.  So I understand that.

6          Let me allow Mr. Carickhoff to proceed to put on

7  his case.  And to the extent you want to cross-examine the

8  witness, you'll be given that opportunity.

9          So, Mr. Carickhoff, you can call your witness.

10          MR. CARICKHOFF:  Your Honor, we would call George

11  Miller, the interim trustee.

12          THE COURT:  Okay.  Ms. Barksdale, can you please

13  swear the witness in?

14          THE ECRO:  Raise your right hand.

15          THE WITNESS:  Okay.

16      GEORGE MILLER, TRUSTEE'S WITNESS, AFFIRMED

17          THE ECRO:  Please state your full name and spell

18  your last name for the record.

19          THE WITNESS:  George L. Miller, M-I-l-l-e-r.

20          THE ECRO:  Thank you.

21          THE COURT:  Okay.  Mr. Carickhoff, you can

22  proceed.

23          MR. CARICKHOFF:  Thank you.

24  //

25  //

1                       DIRECT EXAMINATION

2  BY MR. CARICKHOFF:

3  Q      And Mr. Miller, what's your current role in the case?

4  A      I'm the interim Chapter 7 Trustee.

5  Q      And did you have an opportunity to view the claims that

6  are currently pending before the Civilian Board of Appeals?

7  A      I did.

8  Q      And what is your understanding of those claims?

9  A      There's roughly four claims.  One claim is before the

10  Board of Appeals at this point in time, it is the -- I'm

11  going to call it the "fee for stock" -- "restocking fee" of

12  about $12 million.

13         There are -- there's a six-million-dollar claim that

14  has not been made.  And there's another two claims that are

15  about $2 million for certain costs with respect to

16  (indiscernible) and those claims have not been made.

17  Q      Okay.  With respect to the claim that has been made in

18  front of the Civilian Board of Appeals, have you seen other

19  parties file things in this bankruptcy case talking about the

20  likelihood of success on those claims?

21  A      Yes.

22  Q      And what do those pleadings generally say?

23  A      That -- you know, that they're not worth much money.

24  Q      Okay.  And do you view these claims as risk to pursue?

25                  MR. ROBLES:  I'm going to have to object, Your

1  Honor.  He hasn't presented what these pleadings are.  He's

2  just stating that there's some kind of pleadings that Mr.

3  Miller is referring to.  He needs to show us what those

4  pleadings are that Mr. Miller is referring to.

5          THE COURT:  I'm going to overrule the objection.

6  I think, in the context of this bankruptcy case, the context

7  of that is clear enough and that the witness -- that the

8  answer is appropriate.  So you can proceed, Mr. Carickhoff.

9  I'll overrule the objection.

10          MR. CARICKHOFF:  Thank you.

11 BY MR. CARICKHOFF:

12 Q    I apologize.  I -- the question was:  Do you view those

13 claims as risky?

14 A    Oh, very risky, especially at this point in time, very,

15 very risky.

16 Q    And what do you mean by that?  Have there been things

17 said by the Judge in the Civilian Court of Appeals that would

18 make you think that?

19 A    Yes.  I have to be ready for trial on July 15th, and I

20 have probably five percent of the documents needed to

21 prosecute the -- the case for the $12 million.  And so the

22 collection of $12 million, at this point in time, is, you

23 know, not so good.

24 Q    In terms of the money that the bankruptcy estate has,

25 the cash on hand, what cash is currently available in the

1  bankruptcy estate to pay Venable on an hourly basis?

2  A     I have about $139,000.  But they would be a Chapter 7

3  administrative claim and my Chapter 7 administrative claims

4  are in excess of the $139,000, so they would be paid on a pro

5  rata basis.

6  Q     Okay.  So, presently, the estate doesn't have the cash

7  to pay Venable on an hourly basis.  Is that a fair statement?

8  A     Not in full, that is correct.

9  Q     Okay.  Okay.  So, in terms of -- do you expect to -- do

10 you expect these claims to be successful at the Civilian

11 Board of Appeals?

12 A     At the hearings that I've been to, I think the Judge

13 has prejudged the situation.  I do have a high burden of

14 evidence that has to be presented by July 15th.  And so, with

15 the current evidence that I do have because the debtors

16 have -- you know, the debtor's executives have refused to

17 turn over the records to me, sufficient records to prosecute

18 the case, it's going to be very difficult.

19        I do have experts that are going to -- potential

20 experts that are going to testify that, you know, the Judge's

21 (indiscernible) positions are not correct.  But we will be

22 prosecuting the case, per my discussions with Mr. Boland,

23 that the situation will be in front of the FEMA Court that

24 we're preparing for, you know, and so we got to put on the

25 record the evidence that we believe we're going to have to

1  have in front of the appellate court.

2  Q      So your expectation is that you're going to have to

3  appeal whatever the decision is from the Civilian Board of

4  Appeals.  Is that your understanding?

5  A      Yeah, that's the way Mr. Boland, who's the Venable

6  partner in charge, has basically portrayed the situation to

7  me.

8  Q      Okay.  Thank you.

9          MR. CARICKHOFF:  All right.  Give me a second,

10  Your Honor.

11  BY MR. CARICKHOFF:

12  Q      And have you had any discussions or dealings with the

13  members throughout the course of this bankruptcy proceeding?

14  A      Yes.

15  Q      And in terms of their ability to kind of execute on

16  something like funding litigation, what do you -- what are

17  your thoughts on their ability to execute on something like

18  that?

19  A      First of all, I think it's very suspect at best.  They

20  have a very low credibility with me at this point in time

21  because everything they told me they were going to follow

22  through on, they haven't done it.  And in -- you know, I told

23  them to give me the money now and I'll put it my escrow

24  account.  I'm not going to agree ever to have a third party

25  hold assets of the estate.  And they actually ignored that

1  request, too.

2      So it's more to the point that, if I don't -- you know,

3  the Venable firm wants to do it on a contingency basis.  I

4  think a contingency basis is really the only way to go.  At

5  this point in time, I do not believe I have the evidence,

6  other than expert witness evidence, for the $12 million.  The

7  actual hardcore evidence, documentary evidence that I think I

8  can provide, which I do not have from the debtor's records at

9  this point in time, would support a twelve-million-dollar

10  success.  It would be probably less than a million dollars,

11  but I'd still get a million dollars.  And again, that fee on

12  a million dollars would be close to what they've told me

13  would be the amount of monies that they would have to -- the

14  hours that they would have to expend to prosecute the appeal.

15  Q    Thank you.

16          MR. CARICKHOFF:  Your Honor, I don't have any

17  additional questions for Mr. Miller at this time.

18          THE COURT:  Okay.  Thank you, Mr. Carickhoff.

19          Mr. Robles, you can cross-examine the witness.

20          MR. ROBLES:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22  BY MR. ROBLES:

23  Q    Mr. Miller, now you've said this was a risky

24  proceeding.  Can you explain that a little bit?

25  A    Well, you have to bring to the Court, the Judge, she

1  wants us to provide evidence, hard, written, hardcore

2  evidence.  She was quite articulate on this matter at our

3  last hearing.  She is -- the hearing was actually supposed to

4  start today.  It has now been postponed.  And I'm reading her

5  order that it's a must-be-tried basis of July 15th.  I still

6  don't have the documentary evidence.

7      I can get the expert evidence on the restocking amount,

8  which would yield a higher amount.  But that has to be on the

9  contingency level.  She has already said it has to be hard,

10 documented expenses that have to be presented to her for her

11 to make a decision.

12     Based on my experience in the bottling industry -- and

13 my clients didn't work in the bottling industry, I don't

14 think she's correct -- but again, that would have to be at

15 the appellate level, from what her rulings have been in the

16 past.

17 Q    Now you're basing all of this on discussions with

18 Venable.  How come Venable is not here today?  If they're

19 being retained, shouldn't they be present today?

20 A    I don't think so.

21 Q    Why is that?

22 A    Because I'm the one that's retaining them.  We're not

23 prosecuting the case here today.

24 Q    Well, we're here trying to determine whether the

25 agreement that you're proposing with Venable makes sense.  So

1  shouldn't they be here to present the proceeding, to explain

2  exactly where it's going and how much things are going to

3  cost?  I mean, you're just providing information on a hearsay

4  basis.

5  A    I'm not providing any information on a hearsay basis.

6  I'm providing my experience as a trustee and my evaluation of

7  the case and why I'm hiring Venable.  I'm not asking for them

8  to explain to you my decisions.  These are my decisions, not

9  mister -- Mr. Boland's decisions.

10      I have asked for it to be done on a contingency basis.

11  And the reason it's a contingency basis is because I have no

12  source of -- no credible source of funds to prosecute this on

13  an hourly basis.  At this point in time, the fees -- even if

14  I got $250,000 in fees, I don't believe an earmarking of --

15  of the fees would be an appropriate way to administer this

16  Chapter 7.

17      So, at this point in time, I think the best way to go

18  is based on a contingency basis.  I'm getting very little

19  cooperation from your clients in trying to prosecute this

20  claim in the next 15 days.  And that puts an incredibly high

21  risk on what's going to be the success of this case.

22      If judge -- if the Judge in the case's opinion is, you

23  know, held by the appellate court, then the Venable firm is

24  lucky to get the two hundred and fifty to $300,000 that they

25  wanted you to escrow before they're going to accept anything

1  on a per-hour basis.  And I will not even offer until you --

2  you know, you want to turn over $300,000 to me, I'll give you

3  my wire transfer fund, and you can do it today.

4  Q    Is that -- so you're saying, if we transfer $300,000 to

5  your trust account today, you'll forego the contingency fee

6  agreement?

7  A    No.

8  Q    I could have sworn that's what you said.

9  A    No, I said --

10  Q    Okay.  Well, maybe --

11  A    I asked you for the -- to show us the money many times

12  and you won't show us the money, so I don't believe you have

13  the money.  I'm not making any offer to you because I don't

14  trust your clients and, you know, your clients don't have

15  that kind of money, according to them, according to them.

16  The correspondence that I have received says you have

17  $75,000, that's all you have.  And that's not even enough to

18  get, you know, moving on this case, let alone appeal it.  So

19  that's the offer I received from you fellows.  That's, you

20  say, all you got.  You may get a little bit more.  And so I'm

21  not making an offer to you for this.  I want it on a

22  contingency basis, and that's my trustee business judgment,

23  that this case should be prosecuted on a contingency basis.

24  And I'm hopeful to win the big number.  But with the

25  cooperation I'm getting from your clients as of today, I'm

1  not optimistic.

2  Q     Now the $75,000 that was offered, did you ever respond

3  saying that you'd need more than $75,000, and that the money

4  should be placed in your trust account?

5  A     I don't know what my attorney's discussions have been

6  with you with respect to that.  I told them it was

7  unacceptable, that's all.

8  Q     Okay.  But if $300,000 were placed in your trust

9  account to be used for this Venable litigation with FEMA,

10  would you accept that and forego the contingency fee

11  agreement?

12  A     No.

13  Q     And how would that make sound business sense -- how

14  would that be sound business judgment not to do that?

15  A     Because I'd have no way that that money would be in my

16  account.

17  Q     If you gave a certain time period and the money was

18  paid into your account, wouldn't that be sufficient?

19  A     I don't have the time period for you to do this.

20  You -- you drug this on along.  I have to prosecute this, you

21  know, Monday -- or Tuesday, I'm sorry, because that's July

22  5th.  I got to start prosecuting this case.

23  Q     Well (indiscernible)

24  A     (Indiscernible) Bering, I have no records and I have no

25  money.  I need a decision today because the Court -- and

1   basically, she said, I'll give you -- since the hearing is

2   today, you don't have to start today, but you have to be

3   ready to start on July 15th.  The amount of time that we --

4   that's necessary to do this is gone at this point in time.

5   It's a contingency basis, that is my business judgment.

6   Q    Now you keep saying that no documents have been

7   provided.  Isn't it true that thousands of documents have

8   been provided to you already, including documents relating to

9   the claim with FEMA?

10  A    (Indiscernible) very little documents that have been

11  provided relating to the claim with FEMA, especially the

12  process of the claim with FEMA which we have to prosecute

13  starting July 15th.

14      I have received thousands of documents.  Most of the

15  documents that your clients have given me are the documents

16  that mister -- mister -- what's his name?  The attorney

17  for -- Mr. Collins has provided to me.  So, yeah, you're

18  going to say your client has given 35,000 pages of documents.

19  Well, it's the same 35,000 pages of documents Mr. Collins

20  has.

21      With respect to the FEMA claims that I have to

22  prosecute right now, which are hard expenses, your clients

23  have provided me virtually nothing.  The most important

24  document that I actually have that can help me is the -- is

25  the Bering Straits document, the $1.3 million, which is the

1  accrual of expenses that may be reimbursable for the

2  restocking fee.  But that, at this point in time, is the only

3  document that I have.

4       And you didn't provide it to me.  Even though it was

5  sent to your clients, according to -- according to Bering

6  Straits, you have not even provided me with that document to

7  help me in my case.

8  Q     Mr. Miller, wouldn't it make sense for the equity

9  holders, the debtor to provide these documents to you?  Isn't

10 it in their best interests that these documents be provided

11 to you?

12 A     These documents were supposed to be provided on

13 April 1st.  They have refused to say it.  This trustee has

14 said to your clients I will travel -- and this is the -- in

15 the beginning of April -- I will travel to your Florida

16 office, I will travel to your Virginia office, I will travel

17 to your Delaware office, I will personally come to those

18 offices, I will pick up all the debtor's assets, I will pick

19 up all the debtor's records, and I will prosecute this case.

20 And your clients have said, no, you are not allowed to come

21 to our facilities.

22      This is the first time in 20 years as a trustee that I

23 have -- that the debtor's representatives have rejected that

24 offer.  This is my routine bankruptcy, when I get a case, I

25 travel to the debtor's facilities.  I go there with my

1  document guy and I retrieve all the debtor's records.  I then

2  accumulate them and then I start my prosecution as soon as

3  I'm the permanent -- permanent trustee.

4       In this situation, I have to prosecute this based on

5  the Court's, you know, calendar in the FEMA claim, which is a

6  little bit before a permanent trustee will be -- you know, I

7  mean, if the Court orders me to be the permanent trustee

8  tomorrow, then I'm the permanent trustee.  If they decide on

9  the other trustee, he's probably not a permanent trustee

10 until sometime in the end of August until September, and I've

11 got to prosecute this claim well before that.

12 Q    Well, is it necessary for you to physically go to a

13 location if the documents have been sent to you through

14 Dropbox or email.  I mean, what --

15           THE COURT:  So --

16 Q    What requirement --

17           THE COURT:  -- Mr. Robles, I --

18 Q    -- (indiscernible).

19           THE COURT:  My apologies for interrupting.  So

20 this is leading a little bit into the next motion.  And to

21 some extent, access to documents bears on this motion, so

22 there is some overlap.  But I want to be clear that, you

23 know, we will address the next motion next.  What the present

24 question bears on is the decision to retain Venable on a

25 contingency basis, and I think it would be helpful if we sort

1  of stick to that question for now.

2           MR. ROBLES:  I understand --

3           THE COURT:  With that, you can --

4           MR. ROBLES:  -- Your Honor.

5           THE COURT:  With that, you can proceed,

6  Mr. Robles.

7           MR. ROBLES:  Thank you, Your Honor.

8  BY MR. ROBLES:

9  Q    Well, you had talked about the litigation and this FEMA

10 claim and the Board of Appeals.  And you say here that it's

11 very risky and you kind of evaluate this.  But you're not an

12 attorney, are you?

13 A    Am I -- no, no.  I'm an accountant.  I'm a man of, you

14 know, originalist words, yes.  I am not an attorney.

15 Q    And --

16 A    But I have experience in approximately 20,000 pieces of

17 litigation.  I am also a forensic accountant.  I am also a

18 certified fraud examiner.  I am also a certified insolvency

19 and restructuring advisor.  I've been involved in over two or

20 3,000 of my own cases.  And I've collected in excess of $500

21 million through litigation as a Chapter 7 Trustee.  So I have

22 a lot of experience evaluating claims, bringing claims, and

23 collecting very difficult assets.

24 Q    And would you agree that collecting government claims

25 is a very specialized area of law?

1  A     It's special insofar as the representation.  As far as

2  the collectability, I don't necessarily agree with that.

3        I've had discussions with Mr. Boland of Venable, I've

4  told him about the documentation problem, and he is very

5  concerned.  And that's what -- again, that -- and I am very

6  concerned.  And that is the reason why it's got to be done on

7  a contingency basis because your clients have been promising

8  from day one to give me these documents.  We're 90 days into

9  this and they've given me very little to prosecute this

10 claim, and I only have 15 more days.

11 Q     Well, you said -- you're saying Mr. Boland said this to

12 you.  But why is Mr. Boland not here to say that, why is he

13 not available to testify?

14 A     I very rarely, if ever, put my special counsel on.

15 That's my way I run my cases, that I'm the sole witness.  I

16 do not put special counsel on for an interview in a case when

17 he doesn't have the documents to make a decision on.  And

18 this wouldn't be fair for him to estimate on this.  I've been

19 advising him where we are with respect to an evidentiary

20 matter.  He is -- does not have the evidence in front of him

21 to do this, and it would not be fair to put him in a corner

22 for something that he does not have sufficient information

23 on.

24 Q     Well, that doesn't make sense because he should be

25 available to provide testimony and evidence --

1       MR. CARICKHOFF:  Your Honor, we've been through

2  this.  Mr. Miller is our witness and, at this point, it's

3  just argumentative.

4       THE COURT:  I agree.  I'm going to sustain that

5  objection.

6       Mr. Robles, you're welcome to make whatever

7  argument you want to make to me about the absence of Venable

8  to this hearing and how it relates to the trustee's ability

9  to meet his burden of proof, but I don't think there are more

10  facts to be deduced from -- by -- from continuing to ask the

11  question, the same question to the witness.  So you can

12  proceed.

13       MR. ROBLES:  Yes, Your Honor.

14  BY MR. ROBLES:

15  Q    Now, a question:  Mr. Miller, according to this

16  contingency fee agreement, there is money that has to be paid

17  out of the estate.  Isn't that correct?

18  A    Possibly.  Not right now.  It would be costs.

19  Q    Okay.  So isn't it true that the estate is going to

20  actually pay the litigation costs?

21  A    No.  Well, they'll have a claim for the litigation

22  costs, and it's going to be subject to the $139,000 that I

23  have, unless we recover more money.  And then they would get

24  the full cost pay, if we cover sufficient (indiscernible)

25  Q    So the estate is going to pay the cost of the expert

1  witnesses.  Is that correct?

2  A      Well, I don't know that yet.

3  Q      That's in the document you filed, that's in your --

4  A      We --

5  Q      -- declaration.

6  A      As contemplated at this point in time, the expert

7  witnesses will wind up having an administrative claim.

8  Q      That's not what you're stating here.  What you're

9  stating is that a claim -- okay.  Let's just back up a

10  minute.  Okay?

11          MR. CARICKHOFF:  Your Honor --

12          You're stating here --

13          MR. CARICKHOFF:  -- I addressed this at the

14  beginning of the hearing.  We were going to revise the order

15  to put in a cap of $10,000 worth of expenses; and, if it was

16  going to go over $10,000, we'd come back and get additional

17  court approval.  I don't think this line of questioning is

18  necessary because I think that change in the form of order

19  would address the issue.

20          THE COURT:  So, Mr. Robles, if -- to the extent

21  that there are additional facts that you need to adduce, I'll

22  give you the chance to continue your cross-examination.  If

23  you want -- you know, to the extent a document has been

24  filed, you're welcome to make whatever argument you want to

25  make for me about the filed document and I'll give you a

1  chance to cross-examine the witness with respect to it.  But

2  I'm not sure what you're doing is actually adducing

3  additional factual testimony, which is the point of the

4  examination.  So I'll let you continue, but I want you to be

5  mindful that, again, this isn't about sparring; it's about

6  developing facts.

7           MR. ROBLES:  I understand, Your Honor.  I don't

8  have too many more questions, but I do need these certain

9  questions answered by the witness.

10  BY MR. ROBLES:

11  Q    Mr. Miller, so that we're clear, there is a contingency

12  fee that you're proposing for 30 percent.  On top of that,

13  the estate is paying the expenses, the expert and whatever

14  costs.  Isn't that correct?

15  A    I don't understand the way you have that question

16  phrased.  Could you be more precise between -- it's got

17  several situations there and the answers are different for

18  each one.

19  Q    Okay.  You're proposing a contingency fee agreement,

20  but the estate is required to pay all costs and expenses and

21  expert witness fees.  Is that correct?

22  A    The way you have it phrased, that is correct.  But it's

23  not included in the $10,000.

24  Q    Now, in the event funds were provided to pay for these

25  -- the costs of litigation, fees and costs, wouldn't that

1   allow or provide for no expense or any liability to the

2   estate?

3   A      I don't understand your question.

4   Q      Okay.  Let me rephrase it for you.

5          If the litigation was funded by a third party, right?

6   By the equity holders.  Isn't it true that there would be no

7   expense on the estate?

8   A      Well, I don't have -- no, that's not true, not the way,

9   you know, you discussed and what I've heard what you're

10  saying.  Even the $300,000 wouldn't do that because the

11  expert fees are going to be over and above that.  It's not

12  included in the $10,000.  Those fees are going to be an

13  expense to the estate, regardless, unless you're going to say

14  your clients are now going to give me, you know, a million

15  dollars by tomorrow.  And then, all of a sudden, we got to

16  deal with that.

17         But you know, this is a moving train.  Your clients

18  haven't given us any money except (indiscernible) at all.

19  And (indiscernible) whatsoever, and haven't cooperated, quite

20  frankly, on anything.

21  Q      Well, money has been offered to you at 75,000 and you

22  haven't accepted that.  Is that correct?

23  A      That is -- that's not even a -- it's a nonstarter offer

24  as --

25  Q      (Indiscernible.)

1  A     It has been explained to you that 75,000, your thought

2  processes of how that 75,000 came about is deficient and not

3  really responsive to what this trustee believes needs to be

4  done in this case; and so, therefore, it's a nonstarter

5  offer.

6  Q     But isn't it true that you never stated what amount you

7  would require to be paid in to eliminate this contingency fee

8  requirement?

9             THE COURT:  So, Mr. Robles, I think that this

10 topic has been covered exhaustively.  So, if you've got other

11 topics you want to explore, I'll give you that chance, but I

12 don't think we need to continue on that topic.

13            MR. ROBLES:  Understood, Your Honor.  No further

14 questions.

15            THE COURT:  Okay.  Thank you.

16            Is there any other party-in-interest that would

17 like the opportunity to cross-examine Mr. Miller?  Mr. Moody.

18            MR. MOODY:  Yes, Your Honor.  Thank you.

19                      CROSS-EXAMINATION

20 BY MR. MOODY:

21 Q     Mr. Miller, I represent GPDEV and Simons.  I have a few

22 questions for you.

23       Have you ever asked for or been provided an estimate of

24 the hourly -- the hours incurred in pursuit of the FEMA

25 claims to date?

1   A      I don't understand that question.  We've already --

2   we've already incurred FEMA costs to date, and that was pre-

3   petition.  Is that what you're -- and that was like $75,000.

4   Q      Right.  But do you know how many hours were expended

5   during that pre-petition time period?

6   A      No, I'd have to look at the bills.

7   Q      Okay.  And there was some statement earlier by your

8   attorney Mr. Carickhoff that there's been additional fees

9   incurred since the date of the filing of the petition.  Are

10  you aware of what those fees are by Venable?

11  A      No --

12          MR. CARICKHOFF:  I don't believe that's what my --

13  what I had said earlier in the hearing, so I'm going to say

14  that that's a mischaracterization of what I said to the

15  Court.

16          THE COURT:  All right.  So I take it that's an

17  objection to the question on the ground that it misstates the

18  record.  Is that --

19          MR. CARICKHOFF:  Yes, that's -- yes, Your Honor.

20          THE COURT:  So, Mr. Moody, if you -- you can ask

21  the witness if he has an understanding that -- of those facts

22  without -- I don't think you need to refer to

23  Mr. Carickhoff's statement in order to ask the witness the

24  factual question that you want answered.  So why don't you

25  try that?

1          MR. MOODY:  Thank you, Your Honor.

2  BY MR. MOODY:

3  Q     Mr. Miller, have you been made aware of any additional

4  billings that Venable has incurred after the filing of the

5  petition?

6  A     As far as I know, there has been none and will be none

7  at this point in time.  He sent in a letter of resignation.

8  He did -- he did participate in the hearing -- several

9  hearings, but that's because he has not been released of his

10  obligation by the FEMA court.

11  Q     Okay.  So do you think there's a potential

12  administrative claim liability associated with that work

13  post-petition?

14  A     Not on -- not for the trustee.  I did not -- you know,

15  I -- he's got his own legal obligations and he should -- you

16  know, if he has a pre-petition claim, that's a trail from a

17  pre-petition (indiscernible) it's got nothing to do with the

18  Chapter 7 Trustee.

19  Q     Okay.  Going forward, did Venable provide you an

20  estimate of how many hours are going to be required to

21  conclude the trial-level work?

22  A     No, because we don't have the evidence right now to

23  determine how much work he's going to have to do from a

24  discovery point of view to get the evidence that we're going

25  to need to prosecute the claim.  And so, until I get the

1  information or the lack of information from the debtor

2  representatives, then that would be a material change in the

3  amount of time that would have ot be spent.

4  Q     Earlier, you referenced that Venable had served a

5  letter of resignation.  What was the reason for the letter of

6  resignation?

7  A     I don't recall.

8  Q     Do you --

9  A     I (indiscernible) just a one- or two-sentence thing,

10 we're resigning from the account.

11 Q     Do you recall having conversations previously with my

12 clients, GPDEV and Simons, referencing that the counsel for

13 Venable had withdrawn?

14 A     I don't recall that.  I may have.  I've spoken to many

15 people about this.  And I -- you know, I'm seeking to engage

16 Venable as the accountant -- I mean, as the attorney to the

17 trustee.

18 Q     Okay.  And so you've never been provided a reason for

19 the withdrawal?

20 A     We didn't ask.

21 Q     Okay.

22 A     I mean, the letter speaks for itself and I didn't ask

23 above the letter.

24 Q     Your application seeks for the estate to pay the cost

25 of the FEMA litigation.  Do you have any estimates as to what

1  the cost will be?

2  A    Not -- not today because I have to see how much work

3  that's going to have to be done by the accountant to the

4  trustee and preparation of the evidence.  We're trying to

5  reconstruct evidence that has not been supplied by the equity

6  security holders.

7  Q    Is it fair to say that the order of the FEMA court

8  essentially says that you need to come forward with evidence

9  of actual payment of restocking fees?

10 A    The way you have that -- that specific question, no,

11 that's not what the Court said.

12 Q    Okay.  What's your understanding of what the Court said

13 in its order denying the cross-motion for summary judgment?

14 A    I think I have to show the incurrence of restocking

15 fees.

16 Q    Okay.  And to date, you don't have any such evidence.

17 Is that right?

18 A    I don't (indiscernible) answer, either, to that

19 question.  No, I have certain evidence; I don't have complete

20 evidence.

21 Q    Are you familiar with the False Claims Act?

22 A    The False Claims Act?  I am.

23 Q    And have you performed any kind of analysis as to

24 whether the estate can be pursued for False Claims Act

25 violations for the pursuit of FEMA claims that turned to

1  be -- turned out to be completely without merit or with

2  reckless disregard for the truth or falsity of the

3  information presented therein?

4  A     Basically, my discussions with expert witnesses and

5  professionals in the field, I don't think that that's an

6  issue.  It always is an issue because it's litigation, but I

7  don't think this would be a false claim.  I think there would

8  be enough expert testimony and there's enough experts

9  available to say that, you know, the claims that we are going

10 to prosecute on July 15th are credible claims.

11 Q     And that kind of leads into my next question, and that

12 is:  If you are unable to receive any further evidence of

13 restocking fees, you do intend to proceed with the evidence

14 you have on hand.  Is that right?

15 A     That's correct.

16 Q     Okay.  And then it seems that you're anticipating the

17 trial court ruling against you.

18 A     That's based on my discussions with Mr. Boland.  I am

19 always an optimist and I think, if I give sufficient

20 evidence, that the Court will reconsider her positions and

21 what she has said.  And again, she has not issued an order

22 saying I'm going to lose, but I have a high burden that --

23 according -- according to what -- her review of the case.

24 But I think, if we give the proper evidence and the proper

25 experts and things like that, I'm optimistic that we will be

1  successful.  I've said that to your clients from day one.

2  Q     And if you're not successful, you intend to prosecute

3  (indiscernible)

4  A     Okay.  Someone coughed and I didn't heard that

5  question.

6              THE COURT:  That was my fault.  Apologies.

7              THE WITNESS:  I -- not a problem, Your Honor.

8  BY MR. MOODY:

9  Q     It appears that you've already decided that, if you're

10  unsuccessful, you are going to pursue an appeal of the

11  decision of the FEMA court.  Is that right?

12  A     Yes, because I think, based on expert testimony, I

13  think we have a very strong case from the expert testimony.

14  That doesn't mean it's going to carry the day.  I've had very

15  strong experts in some of my other cases and I was not

16  successful.  So I believe I have very strong expert testimony

17  that's going to be provided, expert testimony, which is

18  evidence, to the Court to support our position.  And I'm

19  hoping, hopefully, the Court at the FEMA level changes her

20  mind.  But if she doesn't change her mind, based on my

21  discussions with people who are very credible to me and

22  experts in this field, I think we have a bona fide claim at

23  the appellate level, which may or may not be successful.

24  Q     Can you share with us the name of the experts you're

25  referring to?

```
1   A      No, I do not do that on an interim basis.

2   Q      Is it -- do you know if the experts you're referring to

3   are the same ones that --

4            MR. CARICKHOFF:  Your Honor --

5   Q      -- were (indiscernible).

6            MR. CARICKHOFF:  Your Honor, objection.  Now we're

7   getting into what his trial strategy is at this point.

8   That's not relevant.

9            THE COURT:  Yeah, I'm -- Mr. Moody, why is this

10  relevant to the question in front of me?

11           MR. MOODY:  Your Honor, we'll move on to the next

12  question.

13           THE COURT:  Okay.

14           MR. MOODY:  Thank you.

15  BY MR. MOODY:

16  Q      Do you know how many experts you intend to employ?

17  A      No --

18           MR. CARICKHOFF:  Again, same objection, Your

19  Honor.

20           THE COURT:  Yeah, mister --

21           MR. CARICKHOFF:  You know, now we're getting into

22  trial strategy.

23           He's already made the point that his clients don't

24  believe this claim is worth anything, so I'm still shocked

25  that they're taking the position that, oh, you know, Venable
```

1  is going to get a windfall on claims we think are worthless.

2  So I -- I just -- I don't understand it, Your Honor.

3          THE COURT:  So, Mr. Moody, what's the relevance of

4  that question to the issue in front of me?

5          MR. MOODY:  Thank you, Your Honor.

6          The application asks the estate be responsible for

7  payment of 100 percent of the costs.  The witness appeared to

8  testify that he doesn't know what that estimate of cost would

9  be and knowing the number of experts that he anticipates

10 calling might be able to give us some idea -- and their

11 hourly rates -- what the costs potentially could be.

12         THE COURT:  So, I think the witness has addressed

13 this question.  He's basically said that he's uncertain about

14 what that cost is going to be, that it depends on a number of

15 factors, and I think the relevant facts on this are

16 sufficiently developed that it's not necessary or appropriate

17 to explore that matter further, so you should move on.

18         MR. MOODY:  Thank you.

19         I don't think we have any further questions for

20 this witness, Your Honor.  Let me just check quickly to see.

21      (Pause)

22         MR. MOODY:  No, Your Honor.  We have no further

23 questions.  Thank you.

24         THE COURT:  Okay.  Thank you, Mr. Moody.

25         Is there any other -- any other party in interest

1   interested in cross-examining Mr. Miller?

2          Mr. Robles, you turned your camera on.  You've

3   already cross-examined, so if you want to be heard, let me

4   give you a chance to be heard, but you're not going to get

5   more questions yet.

6          MR. ROBLES:  Okay.  I will turn off my camera.

7   Thank you, Your Honor.

8          THE COURT:  Okay.  So, is there anyone -- okay.

9          Seeing no other party in interest interested in

10  further cross-examination, Mr. Carickhoff, do you have any

11  redirect?

12      (No verbal response)

13         THE COURT:  I'm sorry, it looked like you said

14  "no," but it wasn't audible, so I'll give you a chance to say

15  it.

16      (No verbal response)

17         THE COURT:  So, you may be muted, Mr. Carickhoff.

18  Apologies.

19      (No verbal response)

20         THE COURT:  Okay.  So, we -- now, well, I'm not

21  sure what the issue is.  Now, it looks like -- now, the

22  screen suggests you are muted.

23         Do you want to try again?

24         MR. CARICKHOFF:  Yes.  Can you hear me?

25         THE COURT:  Yeah, we can -- you're faint, but we

1  can hear you now.

2            MR. CARICKHOFF:  Okay.  No, I don't have any

3  further questions for Mr. Miller.

4            THE COURT:  Okay.  In that case, Mr. Miller, you

5  can step down and thank you for your testimony.

6            And I'm happy to hear from the parties with

7  respect to if there's further argument, based on the record

8  that was developed with respect to the motion in front of me.

9            Mr. Carickhoff, I'll let you proceed.

10            MR. CARICKHOFF:  As the testimony showed, these

11  are risky claims.  There's not sufficient cash in the estate

12  to pay Venable on an hourly basis, so a contingency-fee

13  arrangement is the best way to proceed based on the trustee's

14  business judgment.

15            In terms of the financing, the monies that were

16  initially offered by the equity holders' line, one, were

17  insufficient, and, two, kind of lacked credibility in getting

18  the financing from them.  So, based on the issues surrounding

19  potential financing and the fact that these claims need to be

20  prosecuted now, I think it's pretty clear that the trustee is

21  exercising his sound business judgment in pursuing this on a

22  contingency-fee basis.

23            And to address the issues that I think that Bering

24  Straits raised, if Your Honor is inclined to approve it, we

25  would submit a revised form of order that makes it clear that

1  the contingency fee does not apply to the sale of the

2  litigation claims to third parties and it would also make

3  clear that the expenses that the estate is paying, at this

4  point, are capped at $10,000.  And to the extent that we

5  need -- the estate needs a higher amount, we would come back

6  for additional approval.

7           THE COURT:  Okay.  Thank you, Mr. Carickhoff.

8           Let me -- Mr. Robles, let me give you a chance to

9  be heard.

10          MR. ROBLES:  Thank you, Your Honor.

11          I don't see the trustee having met their burden of

12 sound business judgment.  I don't think there's enough

13 evidence to establish that, Your Honor.

14          The thing that concerns me is credibility of

15 finance.  I'm not quite sure what that is, Your Honor, but I

16 think it's a simple solution here.  Give a certain amount of

17 days, a certain amount of time to make the payment, and if

18 the payment is not made, proceed with the contingency.  So,

19 it's a simple issue that can be resolved.  If they believe

20 there's no credibility, give us a time frame, the amount, and

21 if the money is not deposited accordingly, then you can

22 proceed with the contingency agreement.  So, there's a

23 solution to that.

24          But overall, Your Honor, the burden hasn't been

25 met.  There's no evidence being provided by Venable.  You

1  have nobody from Venable testifying as to strategy, as far as

2  the cost of strategy, not any kind of litigation strategy

3  that would be private or confidential, but information as to

4  how much this is all going to cost, how much it has costed

5  [sic], what's the chance of this going into an appeal.

6          You're hearing it from Mr. Miller, a third party,

7  you know.  They should have had Venable here to testify.

8  They're the professional being employed.  Give them a chance

9  to talk and explain, so that he can meet his burden.  I don't

10  see the trustee having met their burden here.

11          A $6 million contingency versus 125 -- 300,000 is

12  a big difference, Your Honor.

13          THE COURT:  Okay.  Thank you, Mr. Robles.

14          Anyone else want to be heard with respect to this

15  motion?

16          Mr. Moody?

17          MR. MOODY:  Thank you, Your Honor.

18          I tend to agree with Mr. Robles in that the

19  trustee has not carried his evidentiary burden to establish

20  the exercise of sound business judgment.  There have been --

21  he hasn't obtained estimates of the time or the costs that

22  are reasonably going to be necessary and the application

23  fails to identify with specificity what specific actions

24  Venable is even to go and perform.

25          We have significant concerns that there -- and

 1  it's been admitted by the trustee that there is not evidence

 2  in hand sufficient to win this case, at least today.  We have

 3  significant concerns that there could be false claims, act,

 4  or other liability blown back against the estate from the --

 5  for the pursuit of these claims and we don't believe the

 6  trustee has performed an adequate analysis of those issues to

 7  protect the estate from there being a substantial

 8  administrative claim, which would reduce the recoveries to

 9  the constituents from other viable claims that we think

10  should be pursued.

11          And it does seem like this is somewhat of a -- the

12  pursuit of these claims is delaying the pursuit of other

13  viable claims that we think could be much more lucrative.

14          So, thank you, Your Honor.

15          THE COURT:  Thank you, Mr. Moody.

16          Is there any -- let me ask this first:  Is there

17  any other party in interest that would like to be heard in

18  opposition to the motion?

19      (No verbal response)

20          THE COURT:  Okay.  Hearing no one, Mr. Carickhoff,

21  let me give you a chance to respond.

22          MR. CARICKHOFF:  Your Honor, I apologize.  It's

23  always difficult to do these hearings over Zoom.  Could Your

24  Honor give me an indulgence and allow me two minutes to call

25  my client offline and have a brief discussions before Your

1   Honor rules?

2          THE COURT:  Yes, I can.  Why don't we stand in

3   recess and we will resume at 11:15.

4          So, with that, we are in recess.  Thank you.

5          MR. CARICKHOFF:  Thank you.

6      (Recess taken at 11:08 a.m.)

7      (Proceedings resumed at 11:15 a.m.)

8          THE COURT:  We're back on the record.

9          Mr. Carickhoff?

10          MR. CARICKHOFF:  Thank you, Your Honor.  And I

11   appreciate the Court's indulgence.

12          Your Honor, the trustee would be willing to

13   further revise the proposed form of order as follows to

14   effectively allow an opportunity for the equity sponsors to

15   fund the FEMA litigation.  And what the trustee would be

16   willing to do is to revise the form of order to say that if

17   the equity sponsors fund the FEMA litigation in the amount of

18   $750,000 by July 5th, that the -- it will be an hourly

19   engagement versus a contingency fee.  So, that's what we're

20   willing to do to try to address the issues raised by the

21   equity sponsors.

22          And just to be clear, the $750,000 would be to

23   cover not just Venable's fees and costs, but experts and

24   other professionals that are needed to assist to support the

25   claims.

1                THE COURT:  Okay.  Mr. Robles?

2                MR. ROBLES:  Your Honor, if I may, I'd like to

3    confirm that first of all, asking Mr. Carickhoff:  The

4    $750,000, obviously, is not going to become part of the

5    estate, so, for an instance where maybe $300,000 is used for

6    this litigation, the remaining amount would be refunded to

7    the equity holders, correct?

8                MR. CARICKHOFF:  The $750,000 would be part of the

9    estate; it would be earmarked for the FEMA litigation.

10   That's what it's for.

11               So, what, you're asking for a refund if it doesn't

12   hit $750,000?

13               MR. ROBLES:  That's correct.

14               Say, the whole claim is resolved for $300,000,

15   shouldn't the remainder of those funds be returned to the

16   equity holders?

17               MR. CARICKHOFF:  Wouldn't they get it back if

18   there's a surplus in the estate in any event?  I think it

19   would solve itself.

20               MR. ROBLES:  Well, as an additional amount,

21   beyond, you know, the property of the estate.  So, the

22   surplus applies to the property of the estate as it exists

23   now.

24               You're asking that $750,000 be additional money

25   put into the property of the estate.  Now, funding at

1  $750,000, we can talk about that to get it funded, but how

2  you claim that the 750 should now be part of the estate and

3  not returned, without the unused portion being returned to

4  equity holders.

5           They're financing the litigation.  They're not

6  funding the estate.

7           MR. CARICKHOFF:  Can I confer with my client for

8  another brief minute or Mr. Miller can respond to that

9  directly, if he wants, if he's willing to allow the unused

10  $750,000, if any, to be returned to the equity sponsors.

11           THE COURT:  In the event that the unsecured

12  creditors essentially aren't paid in full, such that they

13  wouldn't get it back, in any event; I take it that's the

14  question?

15           MR. CARICKHOFF:  Yes.

16           THE COURT:  Okay.  Mr. Miller, this is an

17  unconventional way to do so, but in the interests of

18  efficiency, do you have a view on that?

19           MR. MILLER:  My view on that, Your Honor, is a lot

20  of that $750,000 is predicated on the cooperation of the

21  debtors in providing the trustee with the debtor's records,

22  which they have refused to do for the last three months and

23  so, their bad behavior to do that should be a reimbursement

24  to the estate if I don't have the sufficient evidence to do

25  that, so that's why I can't agree to that at this point in

1    time.  But if they decide to cooperate, which, you know,

2    we'll see in the next hearing, then I would consider

3    something like that.

4              THE COURT:  So, look, I'm disinclined to enter an

5    order that leaves this up in the air.  I think it's

6    appropriate that when we enter an order approving the

7    retention, that the terms be one or the other, though,

8    candidly, my initial reactions is that either strikes me as

9    an appropriate decision, and if Mr. Miller and the equity

10   holders can reach an arrangement -- and that's Mr. Miller's

11   judgment -- I think that that would likely be okay.  And if

12   Mr. Miller wants to proceed on a contingency basis, that's

13   would also likely be okay.  Those both, just preliminarily,

14   subject to giving everyone a chance to be heard, those both

15   strike me as rational exercises of business judgment and

16   exactly the kind of decision the trustee gets to make.

17             While I'm happy to allow some live give and take,

18   my instinct is, at the moment, why don't we proceed with the

19   next motion.  If it gives the parties a chance to talk and

20   see if they have a deal, then we can approve that deal.  And

21   if they talk and there's no deal, I'll give slightly more

22   complete reasons.  But I would grant the motion in its

23   current, you know, on a contingency basis.

24             So, before we proceed, actually, Mr. Carickhoff,

25   let me give you a chance to be heard.

1          MR. CARICKHOFF:  Okay.  I appreciate that.

2          And if Your Honor could, if we could just submit a

3   revised form of order under certification of counsel after

4   the hearing, if we're able to have that resolution with the

5   equity sponsors, we'll bake it in, and if we can't, we'll

6   submit an order that has the changes I already discussed and

7   goes forward on a contingency basis.

8          THE COURT:  Okay.  So, that seems fine.

9          Mr. Moody, let me give you a chance to be heard

10  and then I'll make whatever appropriate findings are

11  necessary in light of where we are.

12         MR. MOODY:  Understood.  Thank you, Your Honor.

13         Your concerns with this lending relationship is

14  that the funds essentially being lent back to the estate

15  either are funds that were potentially, fraudulently

16  transferred or otherwise out of the estate to begin with on

17  the one hand, and, two, could result in certain assets of

18  the -- in the hands of the debtor's principals being liened

19  up, then, and later prohibiting avoidance actions.  So, we

20  have two concerns there.

21         I am cognizant of the Grupo Mexicano opinion, but

22  the remedy that we fashioned on Venable shouldn't jeopardize

23  the other assets of the estate that could be recovered for

24  the benefit of our clients and the estate.

25         Secondly, this still doesn't resolve the concern

1  regarding the potential liability of the estate under the

2  False Claims Act.  In looking at the elements of the False

3  Claims Act violation, which appears to be a low bar, if a

4  claim is presented with deliberate ignorance of the truth or

5  falsity of the information or reckless disregard of the truth

6  or falsity of the information, a claims act -- a False Claims

7  Act cause of action could exist that would be an

8  administrative claim of the estate.  And, again, we don't

9  think the evidence is sufficient to justify the validity of

10  going forward with these claims on the current record.

11            Thank you, Your Honor.

12            THE COURT:  Okay.  So, look, here's where I am.

13  Let me just make these findings for the benefit of there

14  being a record.  I'm satisfied that based on the record in

15  front of me, the trustee would be warranted to proceed under

16  either of the paths that are being contemplated.

17            To the extent -- and there are costs and benefits

18  on both sides, and it strikes me the kind of situation that

19  is fundamentally committed to the decision of the trustee to

20  decide how to proceed in the best interests of the estate.

21  Proceeding on a contingency basis gives rise to the

22  possibility of a very large administrative liability if the

23  estate hits a homerun.  That would have to be risk-

24  discounted, for the likelihood of hitting the homerun, and

25  the testimony is the trustee has considered that, that he

1  sort risk-discounted -- this is my words, not his -- but in

2  substance, he risk-discounts the likely recovery, you know,

3  again, discounting for the risk associated to be around a

4  million dollars and concludes that that would give rise to a

5  $300,000 administrative liability to Venable.  That seems

6  like an imminently -- and that he expects the costs on an

7  hourly rate to be in that ballpark, with respect to Venable's

8  fees -- that strikes me as a reasoned exercise of his

9  judgment.

10          It sounds like the trustee is also considering the

11  possibility of reaching an arrangement in which the equity

12  funders would fund the cost of litigation in cash.  Frankly,

13  the trustee -- to the extent the trustee concludes that the

14  likelihood of that funding come through is sufficiently

15  remote, that he chooses not to proceed that way, that would

16  be within his discretion, if he decides to proceed that way.

17          It is true, as Mr. Moody points out, that that

18  could reduce the likelihood of assets being available to

19  recover on claims against the insiders; again, that's also a

20  matter that's within the trustee's judgment to decide.

21          With respect to the potential estate liability on

22  a False Claims Act, again, what we're talking about is having

23  the estate retain counsel that's knowledgeable with respect

24  to asserting claims against the Government.  And when

25  everyone asserts a claim against the Government, that's got

1   to be a concern and part of the risk calculus.  But, again, I

2   have no reason to doubt that the trustee is soundly

3   exercising his judgment in that regard.

4           I don't believe that I needed to have the counsel

5   testify.  The business judgment at issue here is the judgment

6   of the trustee and the trustee has satisfied me, based on his

7   testimony, that he has weighed the costs and benefits and

8   that where we are now on the record in front of me, he has it

9   down to two possibilities.  Either of those possibilities

10  strikes me as a decision that could rationally be reached by

11  a trustee within the range of the business judgment that a

12  trustee has and how to administer the estate.

13          So, based on the record, I would incline to grant

14  a motion following either of those paths and I would, on that

15  basis, would enter an order, provided -- and subject, of

16  course, to the clarifications that Mr. Carickhoff offered at

17  the beginning -- and would, after giving the parties an

18  opportunity to meet-and-confer about which path the trustee

19  elects and to meet-and-confer with respect to the form of

20  order, would be prepared to enter an order under

21  certification.

22          So, is there anything further on that motion?

23          MR. CARICKHOFF:  No, Your Honor.

24          MR. MOODY:  Just very briefly, Your Honor.

25          In the event of the Court deciding that there

1  needs to be another trustee election or the trustee selected

2  by the creditors is qualified and is elected, would this

3  order bind the subsequent trustee to pursue the FEMA claims

4  or bind the estate to fund expenses that someone may later

5  determine are not in the best interests of the estate?  I

6  guess --

7              THE COURT:  So, Mr. Moody, let me tell you this,

8  look, every bankruptcy -- every Chapter 7 case has one

9  trustee at a time.  Mr. Miller is now the trustee.  He is

10  making the decisions he makes.  If another trustee comes in

11  and wants to seek, you know, different relief, I'd consider a

12  motion, if and when a motion is filed, and consider the

13  standards at that time.  So, I don't think it's appropriate

14  to give an advisory ruling now about what might happen if

15  something different happens later.

16              I think my job is to -- you know, Mr. Miller is

17  the interim trustee.  He's charged with doing his best for

18  the estate and if there's another trustee, I'll deal with the

19  consequences of that if and when it happens.

20              MR. MOODY:  Thank you, Your Honor.

21              THE COURT:  Okay.  Mr. Carickhoff?

22              MR. CARICKHOFF:  Thank you, Your Honor.

23              As indicated, we'll submit an order under

24  certification of counsel once we get an opportunity to

25  confer, so thank you.

1        The next motion on the agenda is the trustee's

2   motion for sanctions and if you want to just jump right to

3   evidence, I would call George Miller as a witness.

4        THE COURT:  Okay.  So, I'm happy to proceed first

5   to the evidence and have argument after the evidence is

6   considered unless there's someone who feels the pressing need

7   to make an opening statement before we get to the evidence,

8   in which case I'll consider whether to give you that

9   opportunity.

10        Mr. Mann?

11        MR. MANN:  Good morning, Your Honor.

12        Can you hear me okay?

13        THE COURT:  I can.

14        MR. MANN:  Okay.  Great.  I'm here on behalf of

15   Ms. Mott and Mr. Acosta.  I'm tag-teaming with Mr. Robles.

16        Before we get into evidence, there's one, I guess,

17   sort of gating issue that I thought we could discuss before

18   spending time on the evidence and that's -- in our papers, we

19   indicate that the conversion order requires the debtor to do

20   certain things and that this motion is seeking to hold

21   Ms. Mott and Mr. Acosta in contempt of that order that does

22   not apply to them.  So, I thought maybe that's something we

23   should explore before we dive into any evidence, Your Honor.

24        THE COURT:  So, Mr. Mann, I understand that

25   argument.  I'd propose that we -- I'll give you the chance,

1  certainly, after we hear evidence to make that argument, but

2  I don't -- I think I'm only interested in the evidence

3  however I come out on that question.  I have some thoughts on

4  that question that we'll get to --

5              MR. MANN:  Okay.

6              THE COURT:  -- but I think we can come back to

7  that after the evidence, if that -- unless there's a --

8  anyone else who hasn't strung me to do anything else

9  beforehand.

10             MR. MANN:  That's fine with me, Your Honor.

11             THE COURT:  Okay.

12             MR. MANN:  I wanted to see if maybe we could short

13 circuit this --

14             THE COURT:  No, I appreciate it.

15             MR. MANN:  -- but we can move on.

16             THE COURT:  No, I think -- thank you, Mr. Mann.  I

17 appreciate that.  That was certainly a fair point.

18             But Mr. Carickhoff, let me give you a chance to

19 call your witness.

20             MR. CARICKHOFF:  Great.  We would call George

21 Miller.

22             THE COURT:  Let's do this again.  Mr. Miller, let

23 me ask that Ms. Barksdale swear you in, again, with respect

24 to this motion.

25             THE CLERK:  Raise your right hand.

1           GEORGE L. MILLER, TRUSTEE'S WITNESS, AFFIRMED

2                THE WITNESS:  I do.

3                THE CLERK:  Please state your full name and spell

4    your last name for the record.

5                THE WITNESS:  George L. Miller, M-i-l-l-e-r.

6                THE CLERK:  Thank you.

7                THE COURT:  Okay.  Mr. Carickhoff, you can

8    proceed.

9                MR. CARICKHOFF:  Thank you, Your Honor.

10                         DIRECT EXAMINATION

11   BY MR. CARICKHOFF:

12   Q     With respect -- that's fine -- Mr. Miller, what's your

13   role in this case?

14   A     I'm the interim Chapter 7 trustee.

15   Q     Thank you.

16         I believe you had testified earlier with respect to

17   what you typically do at the onset of a Chapter 7 engagement.

18         Can you just repeat what your normal protocol is in

19   Chapter 7 cases.

20   A     My normal protocol, with regard to a Chapter 7 case is

21   to look at a case, review it, have a discussion with debtor's

22   counsel immediately within the first 24-48 hours, ascertain

23   where the debtors operate, and then make arrangements to go

24   to the debtor's facilities with professionals, if necessary,

25   to accumulate all the books and records and computer

1  information of the debtor and take the assets that I need

2  into control -- in custody and control of myself and protect

3  the assets of the debtor immediately with (indiscernible)

4  what I call my document office.

5  Q     And did you make an offer in this case to retrieve the

6  records from the debtor in this case?

7  A     Yes, more than once.

8  Q     Okay.

9  A     And then (audio interference).

10 Q     Okay.  So, in terms of the records that you have

11 received, counsel in connection with the earlier motion, had

12 indicated that they turned over approximately 35,000 pages'

13 worth of records.

14     Did you have a general understanding of what those

15 records relate to?

16 A     Well, in first place, the answer to your question, yes.

17 But in first place, they did not turn over any original

18 records.  They provided copies of records.

19     The documents I need are original records, because I am

20 the Chapter 7 trustee and I need the debtor's original

21 records.  I received a lot of information.  Just when I'm

22 saying, "a lot," just a volume of information, not

23 necessarily responsive to my request.  I received 35,000,

24 roughly, 35,000 pages of documents that were part of the

25 litigation in Florida.  I received the exact same

1   information -- primarily the exact same information from

2   Leonard Collins, who represents some of the creditors.  I did

3   receive certain information from Mr. Acosta.  I sent an email

4   to Mr. Acosta saying, you know, it was basically a dump a

5   documents.  I asked him to help me, you know, in my review of

6   these documents, to explain them to me.  It was kind of

7   interesting -- and that was done on April 21st -- and then it

8   was totally non-responded to, and then yesterday I get an

9   email from Mr. Acosta saying, You see, I sent this stuff to

10  you, and attached to it was my email -- my trustee-assistance

11  email to him saying, you know, this is a bunch of dumped

12  stuff.  You need to explain this to me.

13       But in my going through those documents, it doesn't

14  have what I need to do for the FEMA litigation, based on what

15  the judge is basically saying in her order, you know, I think

16  it was in March of 2022.

17  Q    What kind of information do you not have that you need

18  to administer this estate?

19  A    Okay.  I have no original documentation from them.

20       There were two tax returns which were testified as

21  filed, but my investigation says they have not been filed,

22  and the Internal Revenue Service has filed a proof of claim

23  contradicting the testimony of Ms. Mott saying that she

24  filed, and the IRS says, No, you didn't file and I want

25  penalties for non -- for failure to file.

1       There are no documents supporting the amount of

2   information in those tax returns.  The tax returns are not

3   consistent with the operating agreement.  The ownership

4   percentages are all different.  There's no operating

5   agreements that were support in support of the tax returns.

6       The information in the tax returns explains expenses

7   that could be usable in the FEMA litigation, however, my

8   reading of what the judge says is I've got to supply invoices

9   or at least payment of those documents.  For example, I

10  received no documents from Bering Straits, from the debtor's

11  representatives.  I only received copies of what the --

12  Leonard Collins had served discovery on Bering Straits and

13  received from Bering Straits, and the proof of claim that

14  Bering Straits has filed in the bankruptcy.  Those are -- the

15  debtor has not provided any Bering Straits documents or any

16  original documents for Bering Straits.  I think a lot of the

17  costs, again, to Bering Straits would be useful in the FEMA

18  litigation.

19      There are no cash receipts to determine -- cash

20  receipts, journals, or evidence of what the deposits in the

21  bank statement is.  I did receive certain bank statements.

22  The bank statements have checks that are listed to be paid --

23  that are deducted and they have receipts, but it doesn't say

24  if the receipts come from FEMA or from any other course and

25  there's no original records or copies of records to support

1   that.

2       The cash disbursements are vague, at best.  There'll be

3   an identification of a check number, a check date, and an

4   amount, but then it'll say the payee is subcontractor.  It

5   doesn't tell you the name of the subcontractor.  It doesn't

6   supply the invoices of what the subcontractor was paid for.

7       And there are tens of millions of dollars of these

8   types of transactions which could be, if provided the

9   original documents, responsive to the claims being filed in

10  the FEMA matter.

11      There are no disbursements supporting -- also, all the

12  disbursements, there's no invoices that were provided

13  supporting the disbursements.  I've got the amounts being

14  deducted from the bank accounts.  I have a sheet of paper

15  that'll just tell you the check amount and the date, but it

16  gives a vague description.  It doesn't say who's paid and

17  what the services provided, which could be deductible

18  services.

19      I was provided zero canceled checks.  There are no

20  canceled checks in any of the documents, nor have they said

21  that they don't get canceled checks, which would be

22  unbelievable.  I mean, in all of my cases, you get either the

23  copy of the canceled check back in your file, which could be

24  the case back in 2018, and 2017, and 2019, and/or you get a

25  photocopy of the check attached to the statement.  The

1    statements I have do not have a photocopy of those

2    disbursements.  Those disbursements could be, with the

3    supporting documentation, evidence could be supplied to FEMA.

4         I also have to prepare the tax returns.  The tax

5    returns, you know, based on Ms. Mott's testimony, there are

6    substantial assets that have been purchased and expensed.

7         Now, my review of the tax returns and the information I

8    have, that could be as much as a million dollars in assets

9    that should have been listed on the Bankruptcy Schedule A/B.

10   Bankruptcy Schedule A/B says if you have assets, you have to

11   put the fair market value.  It doesn't say you put the tax

12   value in there.  It doesn't say you put the book value in

13   there.  It's based on fair value, and it looks like there are

14   substantial assets that the debtor acquired that are not

15   listed in the bankruptcy schedules according to the tax

16   returns and the modicum of information I have.

17        I need the documents to support all the costs of the

18   FEMA contract.  I don't have that.  Now, it may not be just

19   cash receipts, and it may not be cash disbursements, and it

20   may not just be disbursements.  It may be, you know, you have

21   compensation of the officers or the members of that.

22   There's -- you know, the tax returns -- I mean, the financial

23   records that I have and I've been able to identify through

24   Ms. Mott's testimony in a deposition or in court, as well as

25   the information provided by Mr. Collins, it appears that the

1  amounts of money in a period that was taken, she testifies

2  that it is her compensation.  The compensation doesn't agree

3  to the tax returns.  And the schedules that you have to keep

4  for the Internal Revenue Service to support that compensation

5  have not been provided by the debtor.

6       These documents are my documents.  By "my documents," I

7  mean the trustee's or the debtor's documents.  It's actually

8  the trustee's documents.  I keep asking for them.  I keep

9  getting the response, Oh, we'll give them to you in a few

10 days, and the few days never comes.

11      Tomorrow is not anything.  Tomorrow never comes.  My

12 father told me that.  He's an old World War II guy.  He just

13 says, if someone tells you "tomorrow," they're not going to

14 give it to you, because tomorrow never exists.  When it

15 becomes tomorrow, it's today, and they got to give you the

16 exact date.

17      They haven't provided me any support for any of this

18 information.  I was surprised at some of the stuff that was

19 said in the objection and I'm willing to respond to that

20 information, but at this point in time, I've made to request

21 to go get the records, which was rebuffed.  I've made a

22 request for them to turn over everything, all documents; not,

23 We'll give you a couple documents in a few days.

24      And this has been going on for 90 days and I've got a

25 July 15th date.  And, yes, I've got a $12 million claim.  I

1  think it's a *bona fide*, valid claim, but if the debtor

2  representatives keep holding these records, I may have

3  another claim against them for breach of their fiduciary

4  responsibility.  I don't want to go there.  It's not a

5  threat.  I just want my documents and I want them today.

6  Q      Thank you.

7         Can I just -- to be clear, so I think you indicated

8  that you didn't receive any cash receipts; is that correct?

9  A      I have no cash receipts records whatsoever, so I can't

10  tell you with specificity what deposit is for what contract.

11  They had numerous contracts and I can't figure out which are

12  which.

13  Q      Did you receive a general ledger?

14  A      I did not receive a general ledger.

15  Q      Did you testify any kind of trial balances?

16  A      I received no trial balances.

17  Q      And any kind of summary receipts?

18  A      No summary receipts.

19  Q      Okay.

20  A      Well, I got summary -- I got -- no, not receipts.  I

21  got summary disbursements, but I just testified on what the

22  limitations on what that discovery was.

23  Q      Okay.  How about any check registers?

24  A      No check registers.

25  Q      Okay.  Any other disbursements support?  You had

1  indicated, I think no invoices?

2  A    No, I have no paid bills, no disbursements, no cash

3  payable files, what you would call.  I have no support for

4  the compensation on how that was calculated.

5       The compensation, if you add up just what was supposed

6  to be compensation to the officers, doesn't agree to the tax

7  returns that I was provided.  So, there's a lot of questions.

8  Q    And I think you had testified that you didn't receive

9  any schedules that would kind of support the tax returns; is

10 that a fair statement?

11 A    Yes.  There are certain requirements by the Internal

12 Revenue Service of the minimum of documentation that must be

13 required by a corporation in support of its tax returns and I

14 have not received any information that would fall under that

15 category.

16 Q    All right.  And without this information, are you able

17 to even ascertain the existence of fraudulent transfer claims

18 at this point?

19 A    You would -- well, the biggest issue with the

20 fraudulent transfer claim, as I see it, is you've got to have

21 the insolvency.  So, I've got --

22 Q    Well, let's -- okay.

23      I guess, do you have the information you need to assess

24 whether there are potential fraudulent transfer claims?

25 A    I can't -- I do not have sufficient evidence to say

1  what each entity received that could be a fraudulent

2  conveyance.  Either an equity security holder or a member,

3  you know, there's no document that'll say, Oh, they received

4  $8 million.

5      You've got a document here and a document there, and so

6  therefore, you've got to bring all of your evidence before

7  you file the complaint of what they received.

8  Q    And have you been given that by the members?

9  A    I have not been given any of those documents by the

10 members.

11 Q    And with respect to this FEMA litigation that's

12 currently pending, have you received sufficient information

13 to be able to prosecute that in a fulsome way?

14 A    As I've said, I believe I've received approximately 5

15 percent of the information that I would have to prosecute

16 with the support for the expenses as requested by the Court.

17 Q    Okay.  And you had mentioned the objection that was

18 filed.

19     Do you have it in front of you, the objection filed by

20 Ms. Mott and Mr. Acosta?

21 A    I do.

22 Q    Okay.  Can you turn to paragraph 4 of that objection.

23 A    Okay.  I have it.

24 Q    Okay.  Paragraph 4 talks about the equity interest

25 holders and what they've provided to you.

1       Do you dispute anything that's in paragraph 4?

2   A      Sure.  Well, the fourth line says they've provided me

3   thousands of pages related to the debtor's assets and

4   liabilities.  Thousands of pages, because they use the word

5   "liabilities," could be true, because the majority of the

6   documentation they gave me were the same documentation that

7   Mr. Collins gave me in the litigation.

8       However, one thing that was kind of interesting that

9   was not provided to me was the expert report by the debtor.

10  Although it was not used in the Florida litigation, there is

11  an expert report that was allegedly prepared by a Big Four

12  accounting firm that would have -- could have certain of the

13  evidence that I'm seeking.

14      With respect to the assets, they have not provided --

15  they have provided a minimum of that.  You know, the

16  calculation of the assets for the, I guess, the stalking fee

17  reimbursement.

18  Q      So --

19  A      With respect to the $6 million claim, they didn't

20  supply that.  And with respect for any support for the other

21  two claims for the fuel charges, they haven't supplied any

22  information for those assets.

23      In addition, Ms. Mott has testified the debtor would

24  receive -- would purchase assets and because of the nature of

25  the contract, they would write-off the assets 100 percent

1  when purchased, but they would still have the assets.  So, it

2  looks to me like there are computers.

3      Now, in their response, Mr. Mann will say, Oh, there's

4  only one computer.  Well, you know, Mr. Acosta once told me

5  it was provided by the company.  It looks like in the

6  testimony of Ms. Mott, you know, that computer is the

7  debtor's computer, because they supplied all this stuff to

8  the members and the people who were working.

9      I can't determine that because I don't have the invoice

10  for the purchase of the computer; although, I got the

11  testimony that it was done.  And I don't have the computer

12  IDs and things like that to verify it.  But those documents,

13  you know, should exist and are in the possession of the

14  equity security holders and prior management.  These are

15  people that are managers of the -- you know, the debtor's

16  managers.

17      The 341 has not been held and so they are on the hook

18  until after the 341 meeting is held for all their conduct.

19  Q    So, just so -- let me kind of take this one step at a

20  time.

21      Are you gotten all the documents that are necessary to

22  pursue the debtor's accounts receivables?

23  A    No.

24  Q    Okay.  Turning to page 3, paragraph 7, they indicate

25  that the equity holders recently located the debtor's 2020

1   tax return.

2         Have you gotten a copy of the 2020 tax return?

3   A     I have not.  This pleading was filed seven days ago and

4   I still have not received it.

5   Q     Okay.  And in paragraph 8, it talks about the debtor

6   having a server that is somehow maintained by the Government.

7         Have you been provided with a contact person to give

8   you access to said server?

9   A     I was provided with an 800 number, but I don't have any

10  of the contact information to get access to find out access

11  to the emails.

12  Q     Okay.  And then paragraph 9 talks about property that

13  is unrelated to potential claims that the trustee could bring

14  against the owners.

15        Are you aware of an Addie Road (phonetic) entity?

16  A     I am.

17  Q     Are you aware of any funds going out of the debtor to

18  Addie Road?

19  A     Yes, Ms. Mott testified that the funds for, you know,

20  for the debtor, my recollection of her testimony is it went

21  directly from the debtor to the title company for the Addie

22  Road purchase and it was her compensation.

23  Q     Do you know what the funds were used to purchase?

24  A     To purchase real estate and that's real estate in

25  Delaware, the state of Delaware.

1  Q      Okay.  Thank you.

2         All right.  So, in sum, is it fair to say that you

3  haven't gotten fundamental records that you need to

4  administer this estate?

5  A      That's correct.

6  Q      Thank you.

7               MR. CARICKHOFF:  Nothing further, Your Honor.

8               THE COURT:  Okay.  Thank you, Mr. Carickhoff.

9               Mr. Mann, cross?

10              MR. MANN:  Yes, Your Honor, a very brief cross.

11                         CROSS-EXAMINATION

12 BY MR. MANN:

13 Q      Mr. Miller, isn't it true that you've received

14 documents from Ms. Mott and Mr. Acosta since the filing of

15 the sanctions motion?

16 A      Limited documents, correct.

17 Q      Okay.  And isn't it true that you've received an index

18 of the 35,000 documents that you referred to as a "document

19 dump" earlier?

20 A      But I have received that before and that's where I

21 responded that the documents were not responsive to my

22 request and I did not receive a response to my -- explaining

23 the documents.  I received that index, but, again, that index

24 is not responsive to what I need for the litigation.

25 Q      Okay.  And have you reviewed the documents that have

1  been provided to you since the sanctions motion was filed?

2  A     You faded out.

3  Q     Sorry about that.

4        Have you reviewed the documents that have been provided

5  to you since the sanctions motion was filed?

6  A     Yes.

7  Q     And have you reviewed the index that was provided to

8  you after the sanctions motion was filed?

9  A     Yes.

10 Q     Okay.

11        MR. MANN:  Thank you, Your Honor.  I have no

12 further questions for this witness.

13        THE COURT:  Okay.  Thank you, Mr. Mann.

14        Mr. Carickhoff, anything further, evidentiary?

15        MR. CARICKHOFF:  No, Your Honor.  I'd just reserve

16 the right to call Mr. Miller as a rebuttal witness to any

17 additional testimony.

18        THE COURT:  Okay.  Mr. Mann, do you have a witness

19 you'd like to call?

20        MR. MANN:  Sure, Your Honor.  I'd like to call

21 Steve Acosta, please.

22        THE COURT:  Okay.  Ms. Barksdale, if you could

23 swear in Mr. Acosta.

24        THE CLERK:  Raise your right hand.

25 //

1          STEVEN ACOSTA, OBJECTORS' WITNESS, AFFIRMED

2              THE WITNESS:  I do.

3              THE CLERK:  Please state your full name and spell

4    your last name for the record.

5              THE WITNESS:  Steven Acosta, A-c-o-s-t-a.

6              THE CLERK:  Thank you.

7                    DIRECT EXAMINATION

8    BY MR. MANN:

9    Q    All right.  Mr. Acosta, can you hear me okay?

10   A    Yes, sir.

11   Q    All right.  And where are you testifying from right

12   now?

13   A    I am in Prosper, Texas.

14   Q    Okay.  And is there anyone else in the room with you

15   right now?

16   A    No, sir.

17   Q    Okay.  What is your position with the debtor?

18   A    Well, there -- right now, I'm an equity member, but as

19   far as a position, I was the director of operations and a

20   facilities security officers.

21   Q    And how long were you an equity member with the debtor?

22   A    I started in January 2018.

23   Q    And do you have a government clearance related to your

24   work with the debtor?

25   A    Multiple.

1  Q    And does Ms. Mott also have a government clearance

2  related to her work with the debtor?

3  A    Yes.

4  Q    And are you familiar with the debtor's books and

5  records?

6  A    I'm familiar.

7  Q    And are you familiar with the debtor's duty to provide

8  books and records to the Chapter 7 trustee?

9  A    Yes.

10 Q    Okay.  Have you or Ms. Mott provided books and records

11 on behalf of the debtor to the Chapter 7 trustee?

12 A    Yes, we have.

13 Q    Was that done personally or through counsel?

14 A    Through counsel, to maintain chain of custody.

15 Q    And what documents were provided to the trustee, prior

16 to this filing of the sanctions motion?

17 A    All the production that we gave Robinson Cole, which

18 was the bank statements, end-of-year statement of work or

19 statement of accounts, anything that they requested that the

20 judge ordered, we gave to my office, I thought.

21 Q    Okay.  And after those documents were provided, did

22 either the trustee or the Trustee's Office make any specific

23 request to you regarding those documents?

24 A    The trustee, you know, was interested in going over

25 the -- he did offer to go to our places of business, but we

1    don't have places of business.  We had an office in Florida

2    that's since closed down because Mr. Miller (audio

3    interference) of the company (indiscernible) office is

4    closed.  We don't have an office in Virginia, but, yeah,

5    we've assisted with as much as -- I think we've been pretty

6    forthcoming.

7    Q    Did the trustee or his staff ask you to assist in

8    indexing or reviewing the documents that were produced?

9    A    Yes, we received an email right after the conversion

10   from, I believe, Ron Gellert, asking from Mr. Miller's

11   assistant -- I don't -- I forget the person's name, forgive

12   me -- to that this is what was dumped on them to please index

13   them.  And I conferred with legal counsel about creating

14   documents after the trustee has taken, you know, possession

15   of the company.

16   Q    And did you prepare or provide an index of those

17   documents to Mr. Miller or his office?

18   A    Yes, I mean, we did finally do that.

19   Q    And was that index organized by Bates number?

20   A    Yes, sir.

21   Q    Have you had discussions with Mr. Miller or his staff

22   about the documents that were provided?

23   A    I thought we were going to go through that in the 341

24   meeting and then we had the whole objection to him being the

25   trustee, so no.

1  Q     Have you reached out to Bill Homony in Mr. Miller's

2  office about the documents or about anything related to this

3  case?

4  A     Yes, and, of course, you know, in scheduling with

5  everyone, I know that Mr. Homony was out of town this past

6  week and the week prior I got an auto-responder, you know,

7  and I said, hey, I understand you're on vacation.  When you

8  get back into town, let's go over this stuff.  I'll walk you

9  through.  And I have not heard from him, but, you know,

10 vacations and with travel being messed up, I can understand,

11 you know, there's a little bit of delay.

12 Q     I want to ask about the FEMA claim.

13       How long has Venable been working on that claim?

14 A     About a year, I believe.

15 Q     And were documents provided to Venable regarding that

16 claim?

17 A     Yes.

18 Q     In his motion, the trustee has requested that you

19 provide him with, quote, certain computers, containing

20 electronic versions of the debtor's books and records.

21       Does the debtor own any computers?

22 A     The company does not own any computers.  The one

23 computer that Mr. Miller was referring to is an old, you

24 know, it was Windows 7.  We tried to update it.  It blue-

25 screened.  We tried to have it fixed.  Mr. Miller is more

1  than welcome to have it and, you know, we sent it to Best Buy

2  to get fixed, but we've no luck yet.

3  Q      And what books and records are actually contained on

4  that computer?

5  A      Everything we've supplied, but, you know, we supplied

6  hard copies.  We back up our files on hard copies, you know,

7  we're old school, and -- because computers can be hacked.

8  Q      The trustee has also requested that the debtor provide

9  historic tax returns.

10        Have either you or the debtor provided the 2018 and

11  2019 tax returns?

12  A      We provided the 2018 and 2019.  There was a Christopher

13  Mott's K-1 for 2018 was not -- I don't know how it missed the

14  scan, but we did send that off to you and submitted that to

15  you, so we have provided those.

16  Q      What's the status of the debtor's 2020 tax return?

17  A      The books are closed.  We wanted to go to a tax

18  attorney for a personal review of the K-1 and then we're

19  submitting them.

20  Q      Okay.  And has -- is there a draft of the 2020 tax

21  return?

22  A      To my knowledge, I believe there is a draft.

23  Q      And are you able to provide that draft to Mr. Miller?

24  A      I can get right on that and send it over to him as soon

25  as I can.

1  Q    Okay.  Has the debtor filed its 2021 tax return?

2  A    No.  George Miller is in charge.  He's the trustee.  We

3  filed for an extension and that's where we're at right now.

4  Q    And how far is that extension through?

5  A    October of 2022.  Yeah.

6  Q    Okay.  Did the filed tax returns include copies of the

7  trial balances?

8  A    No, they don't, I don't believe.

9  Q    Has the debtor provided, or have you or Ms. Mott

10 provided general ledgers to Mr. Miller?

11 A    We filed end-of-year statements.  I know that he would

12 like them in another format and we can do that, it's just,

13 you know, we don't want to make any moves because there's

14 been a lot of document dumps that I would say that have been

15 manipulated and we don't want to cross any lines.  So, under

16 the supervision of the trustee, we can recreate -- not

17 recreate, but we can put it into the system that he wants and

18 get the final reports.

19 Q    So, the documents related to the general ledgers that

20 Mr. Miller has requested don't actually exist; is that

21 correct?

22 A    It's in -- I believe, it's in -- again, let me be

23 clear, I'm not -- you know, Mr. Miller is overly qualified.

24      I'm not an accountant, but we do have an end-of-year

25 statement and we close out every year.

1  Q     And it's just your understanding that Mr. Miller wants

2  those documents converted to a different format?

3  A     That's my understanding.

4  Q     Since Mr. Miller filed the sanctions motion, have you

5  provided him any additional documents?

6  A     We have.  We provided Bering Straits -- so, Bering

7  Straits was our subcontractor on the MATOC and I sent over

8  all of Bering Straits' books and records.  That was their

9  part, or their job as a subcontractor was taking care of all

10 books and records.  I submitted all email, everything that

11 has to do with the claim, the change order, and we've given

12 the contracts for the DLA.

13 Q     And --

14 A     And they're not claims; they're invoices.

15 Q     Okay.  In total, how many pages of documents do you

16 think that is?

17 A     Unfortunately, because I had to go through them as

18 well, you know, three years ago when I was given them, it's,

19 I believe, around 15,000 emails, cost ledgers, everything

20 that he would want and need to successfully go out

21 (indiscernible) the FEMA claim.

22       And Mr. Carickhoff, they are pre-negotiated, liquidated

23 damages.  They are not a penalty.  And that's -- the judge is

24 correct when they were discussing.  They have a high appeal

25 right because it's not a penalty.  It's a pre-negotiated,

1  liquidated damage on a contract line on the MATOC for the

2  task order.

3  Q     So, Mr. Acosta, outside of the Bering Straits documents

4  and the tax documents that you mentioned on the index, have

5  you provided any other documents to the trustee since you

6  filed this sanctions motion?

7  A     Off the top of my head, I mean, I think that's it.  I

8  sent over, I believe, six or seven requests on the MATOC that

9  was supposedly canceled, but we kept getting requests on

10  contract line item 1, of the DLA fuel contract and Mini-job

11  Ali (phonetic), but other than that, that's about it, I

12  believe.

13  Q     The last thing I want to talk about the is debtor's

14  email.  The trustee has requested emails and access to the

15  debtor's email server.

16        Do you or Ms. Mott currently have custody, possession,

17  or control, of the debtor's historical email server?

18  A     No, sir.

19  Q     Can you explain why not.

20  A     For 21 years, TSI, even before I come on, we have never

21  paid for an email service.  We've never owned a server.  It's

22  like when Mr. Miller discussed being approved as a trustee,

23  you go through a process with the DOJ, and so clearances are

24  attached to my social.  So, all four clearances that I have

25  at varying levels, get me into, you know, it's about

1  credential and access.  So, when we have a server that we

2  have no control of that people try to get into or -- it

3  completely locks down.

4  Q    And if you provided Mr. Miller with your email

5  credentials and he tried to log in from a different IP

6  address, what would happen?

7  A    The server will lock down --

8  Q    Okay.

9  A    -- and I don't know if anything would even be

10  recoverable.

11  Q    And is there anyone that can assist Mr. Miller in

12  obtaining access to the debtor's emails?

13  A    Yeah.  We provided a phone number -- and I don't mean

14  to laugh -- but it's like, it sounds so cloak and dagger, but

15  it's not.  It's just, it's people, you know, the Government

16  protecting themselves.  So, we've done a lot of cleared

17  worked and, you know, that's where it's at.

18  Q    And last question:  Is there -- are there any documents

19  in your personal possession that are debtor documents that

20  you have not produced or are not willing to produce to

21  Mr. Miller?

22  A    Not to my knowledge, no, sir.

23  Q    And are you aware of any documents in Ms. Mott's

24  possession?

25  A    No, sir.

1  Q     Okay.  Thank you.

2            MR. MANN:  I have no further questions for this

3  witness, Your Honor.

4            THE COURT:  Okay, thank you.

5            Mr. Carickhoff, any cross-examination?

6            MR. CARICKHOFF:  Yes, please, Your Honor.

7            THE COURT:  You can proceed.

8            MR. CARICKHOFF:  Thank you.

9                      CROSS-EXAMINATION

10 BY MR. CARICKHOFF:

11 Q     Good afternoon, Mr. Acosta.  Have you provided the

12 trustee with any kind of general ledger of the company?

13 A     I believe we supplied end-of-year statements and it's

14 just not in a format, that's my take on it.  And, under your

15 guys' supervision, if you want us to put it into a different

16 format, we're more than happy to do it.

17 Q     Just so I understand what your end-of-year statement

18 is, what is your end-of-year statement?  What do you mean by

19 that?

20 A     Well, we close out the books, balance the books, close

21 it out, and have the end-of-year statement -- or some people

22 could look at it as a general ledger, but I know

23 specifically, as far as the format of it, it's not a general

24 ledger.

25 Q     Okay.  Did the company keep the general ledger to track

1  things throughout the year to be able to arrive at an end-of-

2  the-year statement?

3  A    That's what we used, the end of the statement account.

4  q    So what -- okay.  So, in terms of the end-of-the-year

5  statement, would that have things like summary of receipts,

6  check registers, who was paid what, amounts like that?

7  A    I believe so.

8  Q    Okay.  You had indicated in your objection that you had

9  the -- you located the debtors' 2020 tax returns, and I think

10  your testimony -- and if I'm mischaracterizing it, please let

11  me know, I want to have the record clear -- to your

12  knowledge, has the 2020 tax returns been filed yet?

13  A    I know that we submit it to a tax lawyer for our

14  individual review of the K-1s.  I know we wanted it filed

15  before the 4th of July weekend, but, you know, it's --

16  everyone is gone.  I mean, like Mr. Homony, you know, it's

17  just the time of year and I understand that.

18  Q    So, to answer the question, to your knowledge, has the

19  2020 tax return been filed?

20  A    I could not say that for sure, no.

21  Q    So you don't know if it's been filed or not?

22  A    You want me to assume --

23  Q    I'm asking you --

24  A    I'm telling you -- I'm telling you that the

25  information, the draft was sent to a tax attorney to review

1  for the individuals and they were to be filed, that was a

2  standing order.

3  Q    Okay.  Have you provided the trustee with a copy of the

4  2020 tax return and the supporting documentation?

5  A    As soon as we get the okay from the tax attorney, we're

6  going to ship it right over.

7  Q    Okay, but you haven't done that as of yet?

8  A    Not as of yet.

9  Q    Okay.  All right.  In terms of the -- you had mentioned

10  that there were several fuel requests that have come in, I

11  believe one of them came in around Memorial Day weekend, does

12  that sound familiar to you?

13  A    Yes.

14  Q    And do you recall receiving an email asking for the

15  underlying contracts in connection with that fuel request and

16  some other additional information, like the cost, the

17  benefit, et cetera?

18  A    Yeah.  So I'm not -- you know, I'm not a lawyer, so

19  when I look at a request -- and I pointed out that the

20  request, there's a request for security, we don't use

21  (indiscernible) but we're going to have a request and it has

22  the contract line item for the (indiscernible) and it has the

23  port.  So the information that you requested is right there

24  and we -- I don't expect you to see that right off the pot,

25  but I did point it out to you, I highlighted it and I sent it

1  to you.

2       As far as cost, making money, we're making, you know,

3  over a million dollars a year on that contract, on that port

4  alone, and we don't make -- you know, we don't gouge our

5  people.  And, you know, as far as I'm concerned, yeah, but

6  the upside is we're not leaving our boys in the wind and our

7  girls in the wind because, when those ships come in and drop

8  the personnel off, we're moving assets to position ourselves

9  with national security.  I've been on the other side of it,

10  there's nothing more frustrating in the whole world than

11  needing assets and things being, you know, held up or, hey,

12  we need fuel, we need this truck, we need this done.

13       So that to me is personal and it's like that's

14  important to me, that's the upside of supporting our

15  military.

16  Q    So you had indicated that that fuel contract, you said

17  you're making about a million dollars a year on it, what year

18  are you talking about?  Are you making money on it this year?

19  A    Negative.  We were not supplying because the -- we went

20  into Chapter 7.

21  Q    All right.  And the contract itself, did you provide

22  that contract to the trustee, the underlying contract --

23  A    Yes.

24  Q    -- with respect to the fuel?

25  A    Yes.  And I sent it separately to Bill Homony, I sent

1  both DLA contracts.  I sent the MATOC that the DLA -- the DLA

2  representative said that was canceled and they were not

3  active, but they are.  And I also sent the contract that the

4  cancellations are a part of, I sent both of them to Bill

5  Homony separately so that we can go over them and walk him

6  through.

7       And the DLA, again, those are invoices, they're not

8  claims.

9  Q    All right.  And let me just take a step back and, I

10  apologize, I probably should have asked this initially.  Your

11  position with the debtor, I think on the statement of

12  financial affairs that was filed with the Court, I think it

13  lists you and Ms. Mott as management committee members; is

14  that an accurate statement?

15  A    That is not inaccurate, that's true.

16  Q    Okay.  So what does that mean that you're a management

17  committee member?

18  A    When there's a decision to be made between members,

19  let's say a fourth member or a third member wants to pursue a

20  project, they'll submit it to the management committee, the

21  management committee will vet it, vet the process, vet what

22  it will take as far as personnel, hours, if the project is a

23  management project, you know, where in the world it is, can

24  we get assets in there, what the government needs.  And then

25  the management committee comes together, we talk about it.

1    Again, Ms. Mott is at a much higher level in analysis

2  and work on the operations side, you know, but we come

3  together and we make a sound judgment on what's best for the

4  company.

5  Q    Okay.  In terms of the business records of the company,

6  who was primarily keeping those business records?

7  A    The management committee, both, you know, Deborah Mott

8  myself, it's dependent on what part of the -- what part you

9  needed.  Like all the operations stuff that -- I don't know

10 if you've received it, but all the operation stuff between

11 Bering Straits and TSI I supplied, just recently.

12 Q    All right.

13 A    Which, by the way, will cover all of the -- all of

14 (indiscernible), so both the pre-negotiated liquidated

15 damages and it will also cover the 6.8.

16    And, Mr. Miller, I apologize, I thought I attached the

17 KPMG report.  I'd be more than happy to send that right over;

18 I have it in a file ready to go.  I did not know you didn't

19 have it, I didn't.

20 Q    What is the name of the email server or the website

21 server that you guys are using, if you know?

22 A    I don't have the address in front of me.

23 Q    So how does your email work?  You said that it's

24 somehow controlled by the Government and is this because

25 you're getting classified emails from --

1  A     We're getting confidential classified emails -- I mean,

2  and -- yeah.  So I don't like talking about it because this

3  is not necessarily the forum to do so to go in depth, but

4  it's just we don't have control of that server, we don't have

5  control of the email.  All I do is sign in, check my emails,

6  forward, like what I forwarded to you guys, and then that's

7  about it.

8       As far as maintaining emails, things like FEMA claim

9  stuff I know that we've kept in the server, but that's about

10 it.

11 Q     All right.  In terms of the accounting software that

12 the company has, are you familiar with what accounting

13 software --

14 A     Yeah, it's --

15 Q     -- the company uses?

16 A     Yeah, it's Peachtree.  I have not personally used it,

17 but DCAA, Defense Contract Audit Agency, came in and has --

18 and audited every two years, and we're down to five,

19 approving our system, as well as the Defense Contract

20 Management Agency.

21 Q     Who uses the Peachtree software; if you don't, who

22 does?

23 A     Deborah Mott was -- when a computer was in service with

24 the Peachtree software, she was the sole person, and then I

25 would read over it.

1  Q     Who has the computer with the Peachtree software on it?

2  A     I don't know if the Peachtree software is on there.

3  Like I said, the computer broke down when we tried to update

4  it to give -- and it went to blue screen.  We sent it to Geek

5  Squad and, the last I heard, it's got zero retention of

6  anything.

7  Q     And that's the only computer that this Peachtree

8  software was on?

9  A     Yes.

10 Q     It was never backed up anywhere?

11 A     The files that you have are the backup of the files.

12 Q     You indicated that the 2020 tax return was sent over to

13 the accountants to be filed.  Who is the accounting firm that

14 you gave that return to, to be filed with?

15 A     I'll have to get you the exact name, address, and

16 contact number.  I don't want to -- someone we used in

17 Virginia.  That's all I have for you, I don't have the name.

18 I don't want to guess.

19 Q     Okay.  Who is handling the finalization -- or who

20 handled the finalization of the 2020 return?

21 A     Deborah Mott and -- went over with me and the

22 management committee.

23 Q     Okay.  Does the company have any canceled checks or

24 check registers?

25 A     I thought we submitted -- I don't think we do.  Any

1   canceled checks we have, I remember from the lower -- the

2   Maria case where we were sent checks because Puerto Rico, we

3   couldn't wire money, they wouldn't -- the government wouldn't

4   allow it.  So we've had to send $500,000 checks to

5   (indiscernible) yeah, the (indiscernible) Port, who helped us

6   with offloading and loading.  So I know that there's checks

7   like that, but as far as any other checks, I think everything

8   was done by wire.

9   Q     Okay.  Do you have support for the wire disbursements?

10  A     I believe so and I think they've been turned over.  If

11  not, if we can get a list of what we don't have, I'll give

12  you more.  We've supported -- we've supplied everything that

13  we've had.

14          MR. CARICKHOFF:  Your Honor, if I could just take

15  a minute to confer with my client before ending my ability to

16  continue the cross-examination, if I could?

17          THE COURT:  Certainly.  Should we recess for five

18  minutes?

19          MR. CARICKHOFF:  That would be great, Your Honor.

20          THE COURT:  Okay.  So let's go in recess, we'll

21  come back at 12:25.  So --

22          MR. CARICKHOFF:  Thank you --

23          THE COURT:  -- we stand in recess.

24          MR. CARICKHOFF:  -- for the indulgence.  Thank

25  you.

1       (Recess taken at 12:19 p.m.)

2       (Proceedings resumed at 12:25 p.m.)

3            THE COURT:  Okay, we are back on the record.

4            Mr. Carickhoff, anything further?

5            MR. CARICKHOFF:  Yes, please, Your Honor.

6            THE COURT:  You can proceed.

7            MR. CARICKHOFF:  Thank you.

8  BY MR. CARICKHOFF:

9  Q    Mr. Acosta, in connection with the 2020 tax return that

10 we had been discussing, what information -- where did you get

11 the information to prepare the 2020 tax returns?

12 A    I'm going to have to get back to you on that one, and

13 I'll give a statement and let you know exactly how we got to

14 that and got it sent over.

15 Q    Do you know where the information came from to prepare

16 the 2020 tax return?

17 A    I know when we pulled records, we were able to pull --

18 I believe pull everything together to have reviewed.

19 Q    Where were you pulling the records from?

20 A    The hard copies that we printed out.

21 Q    And when were those hard copies prepared, if you know?

22 A    When we were getting ready to file for Chapter 11, I

23 believe.  I don't have a date on hand.

24 Q    So the end of December or January time frame, does that

25 sound about right?

1  A     That sounds about right, but I'm not going to commit to

2  a date.  I apologize.  I don't have it in front of me.

3  Q     Okay, if we could just take a step back.  So the debtor

4  was sued by GPDEV and Simons in the Florida District Court

5  in -- was that 2018/2019, does that sound --

6  A     2018.

7  Q     2018?

8  A     Yes.

9  Q     Okay.  And in connection with that litigation, the --

10  did you ever get a document preservation letter from the

11  other side?

12  A     I'd have to go to our counsel, Wayne Smith, he would be

13  able to better tell you what -- if we had any preservation

14  documents.

15  Q     Okay, but you understood that there was a litigation

16  against the company in 2018; is that a fair statement?

17  A     That is a fair statement.

18  Q     Okay.  And you understood that the nature of that

19  litigation related to costs and expenses in connection with

20  providing water to Puerto Rico?

21  A     Yes.

22  Q     Okay.  And would the company have maintained those

23  records to be able to properly litigate those claims?

24  A     Like I said, Bering Straits was our subcontractor, they

25  kept all our books, the books and records on that past order

1  and I've sent everything to you.

2  Q     Did you ever provide invoices from Lindsay Blee to the

3  trustee?

4  A     I think we did because they're a creditor.

5  Q     This computer that had the Peachtree software, you had

6  said that the computer became inoperable; when did the

7  computer become inoperable?

8  A     When Mr. Miller asked for it, we tried to upgrade it to

9  the current operating system and it went to blue screen, is

10  what I was told.

11  Q     So it became inoperable after the trustee asked you for

12  information; is that a fair statement?

13  A     Well, the original -- the original filing of this

14  case -- I'm sorry, I'm confusing Chapter 11 and Chapter 7 --

15  when we first filed, we knew we would have to get that ready

16  and it was one of those issues, I believe, that we are still

17  dealing with.

18  Q     So, just to be clear, it's your understanding that that

19  computer became inoperable after the Chapter 11 was filed?

20  A     That is what I believe happened.

21  Q     Okay.  Who has this inoperable computer right now?

22  A     I believe it's a Best Buy, I think it's in Manassas or

23  Tyson -- I can get you the address, it would be no problem.

24  Q     Who from the debtor is handling this issue?

25  A     Deborah Mott took lead on that one.

1  Q      Have you seen any kind of invoices from Best Buy or

2  anything like that, or is this only from what you've heard

3  from Deborah Mott?

4  A      I've not seen invoices.  Just we asked for a report --

5  I asked for a report, so we can push it forward because we

6  can't -- we can't pay the invoice, TSI has to pay the

7  invoice.  We ship it right to you or have it picked up and

8  you pay the invoice.

9  Q      All right.  Do you have personal knowledge that this

10 computer is inoperable or have you just heard this from

11 Deborah Mott?

12 A      I have heard this from Deborah Mott, who is -- I'll

13 just say she's a clear person, trustworthy, and never lied to

14 me ever and never lied to anybody else that I know of.

15 Q      All right.  Okay.  And the first time that you told the

16 trustee that this computer is inoperable is in your response

17 to the sanctions motion; is that a fair statement?

18 A      I know we discussed it with -- I believe we discussed

19 it with Ron Geller and I know we discussed it with current

20 counsel, personal counsel.

21 Q      Okay.

22        (Pause)

23 Q      And are the members conducting government contracting

24 services under a different entity at this point?

25 A      We're in pursuit, nothing -- we're just looking at

1  projects.

2  Q     Okay.  And do you have software to be able to manage

3  those projects?

4  A     Well, first we'd have to go through the process of bid

5  proposal.  So, when the government puts out a solicitation,

6  then we -- let's just say, you know, another company like a

7  Raytheon -- we'll use Raytheon as an example -- will go ahead

8  and they'll take the solicitation, they'll break it down, and

9  then the -- they'll say are we able to do this, yes or no,

10  and then the solicitation turns into a request for proposal,

11  and these things take six months, a year, a year and a half.

12  I've been a part of a project that took two years.  And you

13  didn't have to have everything in place as far as software,

14  so that's why on some projects we use subs that do the books,

15  just like we did with Bering Straits.

16  Q     Do you have Peachtree software now that would enable

17  you to manage any new projects that come in?

18  A     Not to my knowledge, no.

19  Q     No, okay.  All right.

20        MR. CARICKHOFF:  Your Honor, I don't have any

21  additional questions for Mr. Acosta.

22        THE COURT:  Okay.

23        Mr. Mann, any redirect?

24        MR. MANN:  Very brief, Your Honor.

25  //

1                      REDIRECT EXAMINATION

2   BY MR. MANN:

3   Q      Mr. Acosta, you mentioned that you used hard copies of

4   documents to prepare the 2020 tax returns, have those hard

5   copies been provided to Mr. Miller?

6   A      I believe so.

7   Q      Okay.

8   A      To my knowledge, I believe so, yes.

9   Q      All right, and two quick clarifications.  You mentioned

10  Maria earlier, were you referring to Hurricane Maria?

11  A      Yes, I'm sorry, Hurricane Maria.

12  Q      Okay.  And you mentioned DLA, is that referring to the

13  law firm DLA Piper or is that referring to someone else?

14  A      That is referring to the Defense Logistics Agency.

15  Q      Okay, thank you.

16          MR. MANN:  That's all the questions I have, Your

17  Honor.

18          THE COURT:  Okay.  Thank you, Mr. Mann.

19          Mr. Carickhoff, any further questions for

20  Mr. Acosta?

21          MR. CARICKHOFF:  No, Your Honor, I just have a

22  rebuttal witness.

23          THE COURT:  Okay.  Mr. Acosta, you can step off of

24  the virtual stand.  Thank you for testifying today.

25          And, Mr. Carickhoff, if you want, you're welcome

1  to call another witness.

2          MR. CARICKHOFF:  Sure.  We would call George

3  Miller.

4          THE COURT:  Okay.  Mr. Miller?  I guess -- why

5  don't we -- just to be clear, why don't we swear you again.

6  So I appreciate that we know the spelling of your name at

7  this point.  But, Ms. Barksdale, if you could swear the

8  witness?

9          THE CLERK:  Raise your right hand.

10     GEORGE L. MILLER, TRUSTEE'S REBUTTAL WITNESS, AFFIRMED

11         THE CLERK:  Please state your full name and spell

12  your last name for the record.

13         THE WITNESS:  George L. Miller, M-i-l-l-e-r.

14         THE CLERK:  Thank you.

15                       DIRECT EXAMINATION

16  BY MR. CARICKHOFF:

17  Q    Mr. Miller, did you hear the testimony that Mr. Acosta

18  just presented?

19  A    I did.

20  Q    And is there anything that he testified to that you

21  take issue with in terms of veracity?

22  A    Yes, many -- much of it.

23  Q    Can you be specific, please?

24  A    I did not receive any Lindsay Blee documents from Mr.

25  Acosta.  This is the first I heard that they were on the

1  Peachtree system.

2      The summary schedules, just so you know, being on the

3  Peachtree system, had we known that -- and of course he said

4  he printed it out as the end of the year, so the computer was

5  still operating -- the way it actually works under Peachtree

6  is you have several layers of documents.  So he gave us a

7  summary, which would say like there's -- and I'm making these

8  numbers up because I don't have the document in front of

9  me  -- it would be $20 million in sales, and then we would

10 have on the system which date and the amount and who the

11 vendor was who gave you your $20 million in sales.

12     Then, if you had expenses for, you know, shipping or

13 rental or something like that, you'd have a rent expense of

14 let's say $1.4 million -- and, again, that's just a number

15 I'm using as a stake holder -- and then you would have the

16 detail saying payee amount and check number.  And you could

17 then readily just trace that into the cash bank statements to

18 make sure what those vendors are.  None of that was provided

19 to us and we asked for that specificity.

20     Now we're being told and the first I heard about this

21 computer not working was in the pleading that was just filed

22 June 23rd, never was told before that.

23     In the meantime, I checked Mr. Homony's emails and he

24 received no emails from Mr. Acosta when he was on vacation

25 other than one that I was copied on.  And so, you know, this

1  documents being forwarded to Mr. Homony never really

2  occurred.

3       With respect to the documents provided to me by

4  Mr. Mann, it wasn't the underlying original documents like

5  what he was testifying to, that was just not true.  Had I

6  been given the Peachtree detailed statements in the beginning

7  when I asked for -- had I been given the computer, I wouldn't

8  have had this problem.  I asked for the computer, the

9  computer should have been given to me on April 1st.  Okay?

10 Or on April 2nd.

11      Now, the letter to Mr. Gellert actually was April 6th,

12 but they have an obligation to protect the assets of the

13 estate.  They weren't asked to update it.  If they destroyed

14 it, all the losses occurred because they destroyed the data

15 should be held accountable to Mr. Acosta and Ms. Mott because

16 they were not told to do any of that stuff.  They were told

17 to turn over the original records, it's quite simple, and

18 they haven't turned over the original records.  As he said,

19 he still has original records in his possession, not in my

20 possession.

21 Q    And just let me go back.  You had indicated with

22 respect to the Peachtree software, I think what Mr. Acosta

23 testified to was having an end-of-the-year statement, and I

24 think what you just explained was, in order to arrive at the

25 end-of-the-year statement, that that software would also

1  contain other items like the various expenses that were paid,

2  the receipts, and it would provide detail as to receipts and

3  expenses; is that a fair statement?

4  A    That's correct.

5  Q    Okay.  And did you ever receive any of that detail of

6  the receipts or expenses that would enable one to arrive at a

7  year-end statement?

8  A    It was asked for, but not provided.

9  Q    So you don't have that information?

10 A    No, I do not have that information.

11 Q    Okay.

12 A    And that's the exact information for the reason that I

13 filed the motion for sanctions because that is rudimentary

14 information and we keep asking for it and they don't provide

15 it -- now, I won't testify that they provided it, but they

16 haven't provided it.

17 Q    Thank you.  Is there anything else that I missed that

18 you've disputed from Mr. Acosta's testimony?

19 A    A lot of it just doesn't make sense to me about like

20 the computer not operating and the 2020 tax return.  The 2020

21 tax return was something in the litigation before this Court

22 in the Chapter 11 and had they provided it, not knowing the

23 name of the accountant that it was provided to.

24      Another thing which I thought was kind of interesting,

25 I was told by Mr. Geller that the computer was in Ponte

1   Vedra, Florida, and now I'm being told it's in Virginia at a

2   Best Buy.  So, obviously, either it was in Ponte Vedra and it

3   was moved since the Chapter 11 started because that's when I

4   said I'll fly, I'll land in Ponte Vedra, I'll be there in 45

5   minutes to pick up this information.  And they said, no, I

6   can't get it.  And then they move it to another state and

7   break the -- and allegedly the computer breaks itself.

8        This is all recoverable stuff, if there's Peachtree

9   systems on there; unless they intentionally deleted the hard

10  drive files, this is recoverable information.  Had they

11  provided it to me in April, I could have had a professional

12  download all the information and had this information readily

13  available, but they hid the ball.  As you can see in this, if

14  you look at everything that Mr. Acosta is saying, he sent me

15  the documents after -- certain documents, not complete sets

16  of documents, after we filed the motion for sanctions.

17       So this is how you get these people to respond is

18  you've got to file something with motions for sanctions.

19  Well, I think if we get a situation where we get sanctions

20  and it's like $5,000 a day, maybe they'll have an incentive

21  to get this stuff to me like right away, and that's what I'm

22  looking for in my thing is to get major sanctions against

23  these -- against Ms. Mott and Mr. Acosta.  They are the

24  managing members, they are the debtor's representatives, they

25  are the individuals who are operating this on the debtor and

1  they are still in place because the 341 has not been

2  completed.  So they are the debtor representatives and so

3  they should be sanctioned, so that myself or a successor

4  trustee could conduct the 341, but, more importantly, I've

5  got major litigation of which we had a dispute before this

6  hearing that I got to prosecute in 15 days.

7  Q     Thank you.

8              THE COURT:  Mr. Mann, any cross-examination?

9              MR. MANN:  Yes, Your Honor, just one question.

10                        CROSS-EXAMINATION

11 BY MR. MANN:

12 Q     Mr. Miller, you referred to original documents; what do

13 you mean by that?

14 A     The hard copy of the original documents.  You know,

15 like when you mail me a bill, I get a letter from you saying

16 I owe you $25,000, I want that document --

17 Q     So --

18 A     -- (indiscernible) --

19 Q     -- a scanned, emailed copy of that same document is not

20 sufficient?

21 A     No because here's what happened in this situation.  I

22 got Mr. Acosta saying that -- you know, that Leonard Collins

23 has doctored documents and when I get something that's

24 scanned, that's usually only a photocopy.  The original

25 documents is the important thing that I would have to supply

1  to the Court under certification that this is an original

2  document.  I can't rely on your clients at this point in time

3  to give me credible documents because I have the same

4  situation where Mr. Collins is saying that your clients have

5  doctored documents.  So I want the original documents so I

6  don't have to worry about documents being doctored.

7  Q      Thanks for clarification.

8            MR. MANN:  Your Honor I have no further questions

9  for this witness.

10           THE COURT:  Okay.  Mr. Carickhoff, anything

11 further evidentiary?

12           MR. CARICKHOFF:  No, Your Honor.

13           THE COURT:  Okay.  So I think that -- just to be

14 clear, is there any -- either party interested in presenting

15 any further evidence?

16           MR. MANN:  No, Your Honor.

17           THE COURT:  Okay.  Then I'm happy to hear the

18 argument.  Mr. Carickhoff, it's your motion, why don't you

19 proceed.

20           MR. CARICKHOFF:  Sure.  I think what the testimony

21 showed is that what has been produced is basically the

22 underlying litigation documents from the Florida litigation,

23 which are voluminous, but are not the kind of core documents

24 or business records that the trustee needs to administer

25 these cases.  It sounded like the software system that we

1  needed access to magically stopped working and became

2  inoperable after we made discovery requests.  The computer

3  that apparently is at issue, rather than turning that over to

4  the trustee, it's somehow been pushed off to, you know, a

5  third party.  It's just --

6          THE COURT:  So --

7          MR. CARICKHOFF:  -- you heard --

8          THE COURT:  -- can I ask you these questions?

9          MR. CARICKHOFF:  Sure.

10          THE COURT:  So in terms of things -- I hear the

11  contention that some of the testimony shouldn't be believed.

12  I'm not really sure what I do with that at this stage in

13  terms of giving you a remedy.

14          In terms of things that exist that you don't

15  have -- let me -- well, I'm not -- these are just questions,

16  I'll rule when I've ruled, but in terms of things that exist

17  that you don't have, I understand that there's the computer

18  and then there are the 2020 returns.  What I'm trying to wrap

19  my head around is whether the record shows the existence --

20  and I guess original documents, so I get those categories --

21  in terms of things that the record shows exist that you don't

22  have, is there anything else specific?

23          My only concern here is I think contempt is --

24  well, the duty to cooperate is a serious duty and not

25  something to be taken lightly, but contempt is a pretty

1  serious sanction and I want to be thoughtful.  To the extent

2  there's a dispute about what exists, it seems to me a stretch

3  to hold someone in contempt for failing to produce things

4  where it's not clear -- where there's a dispute about whether

5  it exists or doesn't exist.  But in terms of the specific

6  things that you want that you don't have, are there things

7  beyond those three categories based on this record?

8          MR. CARICKHOFF:  Yes, Your Honor.  It's the

9  documents that would allow you to arrive at the end-of-the-

10 year statement that Mr. Acosta testified to, you have to have

11 those to be able to arrive at the end-of-the-year statement

12 and we haven't been given those.

13         THE COURT:  Okay.

14         MR. CARICKHOFF:  So --

15         THE COURT:  And -- right.  And, I mean, I think

16 that what Mr. Acosta said is they determined that by working

17 off of the hard copy documents that were produced to you.

18 Now, I understand your skepticism about that testimony, but

19 isn't that what his testimony was?

20         MR. CARICKHOFF:  No.  I think his testimony was

21 that he -- what he provided was the end-of-the-year

22 statement, not that he provided the documents that would be

23 able to -- that enable you to arrive at the end-of-the-year

24 statement.

25         What I also don't understand, Your Honor, is it

1  sounded to me that Ms. Mott was the one that was handling the

2  taxes, was the one that was handling the accounting primarily

3  in terms of the end-of-the-year systems, and she's not here

4  and she's not testifying about it, and, instead, we're

5  hearing Mr. Acosta, well, you know, this is what Deborah Mott

6  told me.  Okay, that's not helpful.

7       So, you know, there's two people that were primarily in

8  charge, which was Mr. Acosta and Ms. Mott, they were the

9  managing members of the debtor, and that's why they were

10 named personally in our sanctions motion.

11              THE COURT:  Right.

12              MR. CARICKHOFF:  And we heard from Mr. Acosta and

13 he's basically deflecting that.  Well, you know, this is

14 something that Ms. Mott was handling.  I don't see here and I

15 haven't heard anything from her to say that she's produced

16 what she's supposed to produce.

17              THE COURT:  Okay.  So, Mr. Collins, despite that

18 you're not a party to this motion, I will give you a chance

19 to be heard, but first I do want to hear from the parties.

20 So if you can hold on a second.

21              So, Mr. Carickhoff, let me give you -- I sort of

22 cut you off, let me allow you to make your argument.

23              MR. CARICKHOFF:  Sure.  Everything that they keep

24 saying is we'll get this to you, we'll get this to you, we'll

25 get this to you, and that's been repeated today, it's in

1  their objection, we'll get this to you, we'll get this to

2  you.  As Mr. Miller testified, we still haven't gotten the

3  2020 tax return that they've referenced in a filing that they

4  made a week ago.  If they have it, it doesn't take a week to

5  give it to us.

6          They're intentionally dragging this out.  I think

7  there's kind of a cloud over what happened to the computer in

8  any event.  It's just -- and Your Honor has familiarity with

9  these folks from the earlier proceedings in this case and I

10  think this is more of the same and, unless there's something

11  in place that actually forces them to do something, we're

12  never going to get the records that we need to properly

13  administer the estate and prosecute estate claims.

14          THE COURT:  Okay.  Mr. Mann, what's your response?

15          MR. MANN:  Well, Your Honor, there's three main

16  issues that I want to discuss here, the first is tying back

17  to all this evidence and testimony here.

18          Mr. Acosta clearly testified that he provided

19  everything in his possession and, to the best of his

20  knowledge, Ms. Mott did.  He testified that all existing

21  documents have been provided.  If there are any specific

22  documents that we know exist that Mr. Miller does not have,

23  we will provide them.  When I asked him specifically, the

24  documents that were used to prepare the 2020 tax returns,

25  have those been provided, he testified that, yes, they were.

1           The missing computer -- or, I'm sorry, the broken

2    computer, I believe he testified that they determined that

3    that computer was broken during the course of the Chapter 11

4    case prior to Mr. Miller being appointed.

5           Mr. Miller has testified that he needs original

6    documents and that --

7           THE COURT:  So, Mr. Mann, why doesn't Mr. Miller

8    have that computer right now?

9           MR. MANN:  Your Honor, we can ship it off.

10           THE COURT:  And you're going to --

11           MR. MANN:  I don't have -- I don't --

12           THE COURT:  -- and you're going to, but my

13    question for you is, why doesn't he have it already?  I mean,

14    why doesn't the code make it really clear that he's entitled

15    to have had it by now?

16           MR. MANN:  Your Honor, I do not factually have an

17    answer for that.  I will impress upon my clients that it is

18    imperative that they provide that to Mr. Miller immediately.

19           THE COURT:  Okay.  Let me let you continue.

20           MR. MANN:  Sure, Your Honor.  Mr. Miller testified

21    that he needs original documents and that scanned documents

22    won't suffice.  I don't know really the necessity for that,

23    especially when we're here on a hearing over Zoom, everything

24    is done by email right now.  If he needs the original

25    documents and that's -- and he can't administer this case

1  based on the scanned versions that he has that we believe

2  have all the same information, then, fine, we'll get those to

3  him.

4          As far as this motion is concerned, this is a

5  motion seeking sanctions against Ms. Mott and Mr. Acosta and

6  to seek to hold them in contempt.  To be clear, Your Honor, I

7  do not represent the debtor.  The debtor has counsel, the

8  debtor's counsel did not respond to this.  I am talking only

9  about Ms. Mott and Mr. Acosta.  So this motion is seeking to

10 hold them in contempt of the conversion order.

11         So, if we go back and look at the conversion

12 order, that says, quote, "The debtor, on or as soon as

13 practical after the conversion date, shall" -- and then it

14 goes on to say what the debtor shall provide to the Chapter 7

15 trustee.

16         Additionally, Your Honor --

17         THE COURT:  Mr. Mann --

18         MR. MANN:  -- additionally -- yes, Your Honor.

19         THE COURT:  -- let me stop you there.  Do you have

20 Bankruptcy Rule 9001.5 in front of you?

21         MR. MANN:  I do not, Your Honor.  I can put that

22 in front of myself right now.

23      (Pause)

24         THE COURT:  All right.  Bankruptcy Rule 9001.5(a)

25 says that when an act is required by these rules to be

1  performed by a debtor, (a), if the debtor is a corporation,

2  debtor includes, if designated by the Court, any or all of

3  its officers, members, board of directors, or trustees, et

4  cetera.

5          What I, at the very least, am going to do today is

6  issue an order that designated Mr. Acosta and Ms. Mott as the

7  debtor for the purposes of complying with the conversion

8  order and all of the requirements of the code.  Once that's

9  done, won't that solve this issue?

10          MR. MANN:  Your Honor, yes, that would solve this

11  issue, but then we would have to go back and they would have

12  to file a new motion to hold them in contempt.  What -- I

13  don't mean to --

14          THE COURT:  I understand, I understand.

15          MR. MANN:  Yes, Your Honor.

16          THE COURT:  Look, let me --

17          MR. MANN:  Yes, Your Honor --

18          THE COURT:  -- let me be --

19          MR. MANN:  -- that would solve this problem.

20          THE COURT:  -- really clear.

21          MR. MANN:  Yes.

22          THE COURT:  Whether -- look, I view contempt, as I

23  was saying, as a remedy that is employed as a last resort and

24  not in the case of there being any ambiguity, but the

25  obligations of the debtor and going forward -- to be crystal

1  clear, that means Mr. Acosta and Ms. Mott -- need to be

2  addressed immediately.  And so we can talk more about it, but

3  my vision is to issue an order that so designates in

4  compliance with the rule and makes crystal clear that the

5  obligation to cooperate, you know, has been in place and

6  shall be complied with in its entirety immediately, and that

7  the failure to do so will subject them to contempt, and

8  period.

9         And so I, at the moment, am disinclined to say

10 every day after today is dollars X, but the clock has

11 started.  So we're talking about in substance the same thing.

12 So, if I hear in two weeks that something should have been

13 done today that wasn't done today, you're on notice, there's

14 going to be sanctions going back to today.

15         MR. MANN:  Understood, Your Honor.

16         THE COURT:  But let me give you a chance to -- I

17 cut you off.  That's where my head is at the moment.

18         MR. MANN:  Sure.

19         THE COURT:  I understand your point about the

20 difference between a person and a corporation, it is an issue

21 that the rules expressly address, and I think they provide a

22 perfectly appropriate solution to the problem.

23         MR. MANN:  Your Honor, that's perfectly fine.  If

24 Your Honor is going to make a ruling or a determination, or

25 however you want to put it, that Ms. Mott and Mr. Acosta are

1  the representatives under Rule 9001, then that's what we --

2  that's where we are.

3         As far as this contempt motion, I have much

4  respect for Mr. Carickhoff, I'm not going to tell him how to

5  do his job, but if he wanted, you know, Ms. Mott and Mr.

6  Acosta to be in front of this Court on this sort of issue, he

7  should have filed a turnover action or a 2004.  But I

8  understand Your Honor's position, so we'll move on.

9         And that actually takes us to the third point I

10 want to make, which is the proposed form of order that the

11 trustee has provided.  If Your Honor is so inclined to grant

12 the motion or enter some sort of order here, the proposed

13 form of order that the trustee has provided just goes above

14 and beyond what is necessary here.

15        The first point that I want to make, Your Honor,

16 is that, if the sanctions are awarded, it's really unclear as

17 to when the sanctions would end under this proposed form of

18 order.  The trustee's description of books and records is

19 vague enough that we could never know when the equity

20 interest holders have actually complied.  I think Your Honor

21 was going in that direction in asking Mr. Carickhoff what

22 documents exist that haven't been produced.

23        So, if Your Honor is going to enter an order, we

24 would request that it be an order that's very specific as to

25 what documents need to be provided before any -- before the

1    order is completed.

2           THE COURT:  All right.  Well, we'll come back to

3    the language of the order in a bit, but are there other

4    substantive points that on which -- I want to do this fairly,

5    make sure that --

6           MR. MANN:  Sure.

7           THE COURT:  -- these folks have points they want

8    to make that I listen.

9           MR. MANN:  Your Honor, the only other point I

10   wanted to make is relating to the real property that's

11   discussed in the motion and in the proposed form of order.

12          It's notable the trustee hasn't sought -- or

13   specifically sought documents related to those pieces of real

14   property.  They're owned by non-debtor entities or at least

15   they're titled in the name of non-debtor entities, one that's

16   not even a party to this matter.  We think it would be

17   inappropriate to -- for the Court to put any sort of

18   restriction on those properties.

19          The amount of time that the trustee has requested,

20   six months, just seems arbitrary to me.  If the point was to

21   tie up those properties so that they're still there if the

22   trustee brings a fiduciary duty claim or fraudulent transfer

23   claim against these entities -- or against Ms. Mott and Mr.

24   Acosta, six months doesn't really change anything.  I can

25   tell you from experience, Your Honor, I have fraudulent

1  transfer claims that have been going on for five years.

2          So I think the --

3          THE COURT:  Mr. Mann, what if I entered an order

4  that basically did what Mr. Carickhoff seeks with respect to

5  those properties, but provides that the period of time is

6  subject to any party's right to terminate that period or to

7  extend it?

8          MR. MANN:  Your Honor, my clients wouldn't be

9  thrilled with that, but I think that's more appropriate than

10  what was asked for.  Whether we could come back to the Court

11  and ask that that be terminated or whether that's terminated

12  upon the trustee indicating that he has received all the

13  books and records that he believes are missing, that would be

14  more appropriate, even though we do think it would be

15  inappropriate to tie up these properties at all.

16          THE COURT:  Okay, I understand that.

17          Mr. Collins, you've been waiting patiently, let

18  me -- and you're not a party to -- your client is not a party

19  to this motion, but I will give you a chance to be heard.

20          MR. COLLINS:  Thank you, Your Honor.  And I don't

21  intend on arguing the motion, I just wanted to point out an

22  issue that we do think is at issue here in terms of what

23  needs to be produced, and that is emails and access to the

24  email server of TSI.  My understanding of the testimony is

25  that Mr. Acosta either has access (indiscernible) the other

1  things that need to be turned over and that something that

2  (indiscernible) could be turned over or, if it can't be

3  turned over -- well, we have questions about why it can't be

4  turned over.

5          So we do think that the access to the entities'

6  emails is an important piece.  We would also argue that the

7  entities' bank records should be obtained and the trustee

8  should be in possession of that and that -- to the extent

9  that those items are not available, then we believe that that

10  would create liability for Mr. Acosta and Ms. Mott.

11          With that, Your Honor, we appreciate your

12  indulgence in listening to us.

13          THE COURT:  Okay.  Let me suggest the following --

14  actually, can I share my screen?

15          THE CLERK:  Yes.

16      (Pause)

17          THE COURT:  Oh, no, I'm sharing the right thing.

18          Okay.  So this -- what I'm putting out is for

19  conversation purposes.  It seems to me -- here's where I am.

20  Based on the record in front of me, I'm satisfied that it's

21  appropriate to enter an order that eliminates any ambiguity

22  with respect to the obligations of Mr. Acosta and Ms. Mott to

23  cooperate and to meet the requirements set forth in the

24  Bankruptcy Code on a debtor and in the conversion order.  So

25  what I'm proposing is an order that doesn't yet hold anyone

1  in contempt but makes really clear that we're going to

2  cooperate.

3          And this order doesn't purport to be perfect and I

4  want help from the parties in having it -- you know,

5  improving it, but the idea is to say in the first paragraph,

6  to invoke the Bankruptcy Rule and say that Mr. Acosta and Ms.

7  Mott are designated to have the duties that the code imposes

8  on the debtor; to say they shall immediately comply with all

9  of the obligations that they have.

10          I am inclined to, in light of the record, grant

11  relief with regard to the transfer or the encumbrance of the

12  real property.  I think that relief is appropriate in view of

13  the record before me, including the record of -- on the

14  motion to dismiss or convert, but with respect to Mr. Mann's

15  point about the length of time being arbitrary -- I mean, any

16  length of time is arbitrary and this would make express what

17  was, frankly, probably implicit earlier that anyone could ask

18  to shorten it or extend it based on the facts and

19  circumstances.  And not today saying, you know, dollars X per

20  day, but being really clear -- and I'm happy to make it

21  clearer -- that going backwards to today, to the extent

22  someone fails to comply with this, if someone -- in the event

23  of the failure to comply immediately, sanctions will be

24  awarded and they'll be awarded from today.

25          So that's what I'm -- and what ought to be

1  improved is, to the extent there are specific actions that we

2  know need to be taken, to specify what they are.  So, for

3  example, turning over the computer, turning over original

4  records, turning over the tax returns, to the extent someone

5  can identify the backup for the year-end statements that

6  exist that hasn't been turned over, whatever else it is --

7  and I'll give the parties a chance to talk about that first,

8  but my thought is to issue an order to that effect.

9          So let me stop talking and let me take this down

10  and hear from the parties about whether this relief is

11  appropriate.

12          MR. MANN:  Your Honor, Kevin Mann on behalf of

13  Ms. Mott and Mr. Acosta.  I understand the Court's ruling and

14  I understand what the Court wants us to do.  I did have one

15  question, a clarification question, I guess.  Your Honor did

16  indicate that you believed it was appropriate to restrict the

17  three pieces of real property.  As indicated in the trustee's

18  motion, two of those pieces of real property, I believe, are

19  owned by Ms. Mott and one is owned by an LLC.  Is it Your

20  Honor's intention to restrict all three of those or just ones

21  owned by Ms. Mott?

22          THE COURT:  I think that, to the -- I believe --

23  and Mr. Carickhoff should correct me if I've got this wrong,

24  but I believe the record indicates that all three of those

25  properties were acquired with the use of estate property and,

1  therefore, shouldn't be -- so, look, this isn't relief that I

2  grant lightly and I, you know, believe that essentially pre-

3  judgment asset freezes are generally not permitted by Grupo

4  Mexicano, a Supreme Court decision that addresses that

5  authority, but there is an exception where one can identify

6  an interest in a particular piece of property under Grupo

7  Mexicano and I believe that, applying that test, the record I

8  have before me that these -- this was property that was

9  acquired with property of the estate creates a basis to do

10  so.

11        And so my answer is, to the extent those

12  properties were acquired with -- the record suggests,

13  including the record in the motion to dismiss, that those

14  properties were acquired with property of the estate, I think

15  it's appropriate to enjoin their future alienation.

16        MR. MANN:  Your Honor, I guess my only concern

17  with that is that the owner of that property, Addy Road, LLC,

18  was not a party to this contempt and sanctions motion --

19        THE COURT:  Okay, but the record -- the record, I

20  believe, from the previous hearing is that Addy Road, LLC is

21  an LLC as to which Ms. Mott is the member; am I wrong about

22  that?

23        MR. MANN:  Your Honor, I do not -- I cannot

24  testify as to who the owners are, but if that's what the

25  record previously said, then that's what the record

1  previously said.

2           THE COURT:  Look, let me say the following.  And

3  I'm happy to -- you should add language to this order to this

4  effect that, to the extent the entry of this order is

5  inconsistent with anyone's rights under due process, they're

6  welcome to come and be heard and argue why it shouldn't apply

7  to them, and we'll sort that out at the time.  I do want --

8           MR. MANN:  Thanks for the clarification.

9           THE COURT:  -- to act within my authority, but I

10  have every reason to believe that everyone with an interest

11  in this has appropriate notice, but if I'm wrong about that,

12  I'm not prejudging anyone's rights.

13           MR. MANN:  Thank you, Your Honor, I appreciate the

14  clarification.

15           THE COURT:  Mr. Carickhoff?

16           MR. CARICKHOFF:  Your Honor, it's our

17  understanding of the record that all three of the real estate

18  properties were purchased with debtor funds.  So your

19  recollection is consistent with our understanding of the

20  record as well.

21           I think that Mr. Mann and I could probably work

22  through the order that Your Honor had put up on the screen to

23  come up with something to be submitted under certification of

24  counsel.  I have a lot of respect for Mr. Mann as well and I

25  think that we can probably put something together that is

1  consistent with Your Honor's views at this point.

2          THE COURT:  Okay.  So what we'll do is chambers

3  will send a copy of this to both of you and encourage you to

4  talk.  And you understand, I think, what I'm trying to do.

5  Both of you will do a better job of it than I did, but I

6  think that relief in this direction is, in my view,

7  appropriate based on the record before me.

8          MR. CARICKHOFF:  Thank you, Your Honor.

9          MR. MANN:  Thank you, Your Honor.  I appreciate

10  all your time today.

11          THE COURT:  This is my job.

12      (Laughter)

13          THE COURT:  Okay.  So, with that, is there any

14  other matter on which any party in interest would like to be

15  heard?

16      (No verbal response)

17          THE COURT:  Okay, hearing no one, thanks to

18  everyone for this.  I appreciate it and we stand adjourned.

19  Thank you.

20          COUNSEL:  Thank you, Your Honor.

21      (Proceedings concluded at 1:10 p.m.)

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                July 15, 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                July 15, 2022

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Coleen Rand                       July 15, 2022

18   Coleen Rand, CET-341

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25