## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 7 |
| TEAM SYSTEMS INTERNATIONAL, LLC, | Case No. 22-10066 (CTG) |
| Debtor. | **Hearing Date: 9/20/23 at 10:00 a.m. (ET)** |

### OBJECTION OF THE DEBTOR'S MEMBERS TO THE TRUSTEE'S MOTION PURSUANT TO BANKRUPTCY RULE 9019 TO AUTHORIZE AND APPROVE THE SETTLEMENT BETWEEN THE TRUSTEE AND THE JUDGMENT CREDITORS

Deborah Evans Mott, Steven M. Acosta, Christopher Mott and John S. Maciorowski (collectively, the "Members"), by and through their undersigned counsel, hereby submit this Objection (the "Objection") to the Motion (the "Motion") of the Chapter 7 Trustee (the "Trustee") pursuant to Fed. R. Bankr. P. 9019 Authorizing and Approving the Settlement Agreement Between the Trustee and the Judgment Creditors.

### PRELIMINARY STATEMENT

1.      The Debtor in this case filed for bankruptcy after being on the wrong end of a $6.2 million judgment arising from a breach of contract lawsuit that was tried in federal district court in Florida. The Debtor (post-judgment and pre-bankruptcy) invested in pursuit of an appeal in the United States Court of Appeals for the Eleventh Circuit. An opening brief was filed, and that brief sets out compelling grounds for reversal of the district court judgment, with the core arguments focused upon independent legal grounds that do not depend on credibility assessments or challenges to the jury's findings of fact. If even one of the core appellate challenges were to succeed, it would reduce the judgment from $6.2 million to zero, and could end the litigation

entirely (without a remand for a second trial). Debtor (through its individual members) has the opportunity to see the 11th Circuit appeal through to fruition, with the expense of a reply brief and potential oral argument being absorbed by the individual members, rather than Debtor's bankruptcy estate.

2.     Given this background, any good-faith actor in Debtor's shoes would normally leap at the chance to pursue the appeal, especially if the only alternative was a "settlement" in which Debtor's Judgment Creditors would be paid 90 cents on the dollar in fulfillment of a $6.2 million judgment that is susceptible to multiple avenues of appellate attack. Debtor has little to lose and everything to gain by pursuing the 11th Circuit appeal, especially given that the opening appellate brief is a sunk cost, and the remaining appellate work can be accomplished at no expense to Debtor. The Trustee has not articulated any sound basis, and has not identified any compelling bankruptcy or non-bankruptcy reason, to abandon the appeal and sign off on a 90% settlement. And the Trustee certainly has not articulated a compelling basis for rushing to achieve this outcome now, without allowing sufficient time for full consideration of the various factors and developments that might shape Debtor's options and leverage with respect to the adverse $6.2 million judgment. Accordingly, the Trustee's motion to approve the settlement disposing of the appeal, and saddling the estate with the obligation to pay millions of dollars, should be denied.

## **RELEVANT BACKGROUND**

3.     As the Court knows, the origin of this chapter 7 case is litigation resulting in a judgment against the Debtor in the amount of approximately $6.2 million (the "Judgment").  On or about December 29, 2021, the Debtor commenced an appeal of that Judgment in the United States Court of Appeals for the Eleventh Circuit (Case No. 21-13662) (the "Appeal"), asserting

several grounds to reverse the Judgment.  The substance of the Debtor's Appeal is discussed more fully below.

4.      On January 18, 2022, the Debtor commenced its voluntary case under Chapter 11 of the Bankruptcy Code. The Debtor's chapter 11 case never had the chance to get off the ground. Shortly after the Petition Date, Debtor's counsel abruptly withdrew leaving the Debtor without counsel for several weeks at a critical juncture in its case.

5.      On March 31, 2022, following a hearing on dismissal or conversion of the case, an order was entered converting the case from chapter 11 to chapter 7. George L. Miller (the "Trustee") was appointed as the interim chapter 7 trustee.

6.      On April 27, 2022, the Judgment Creditors each filed a proof of claim premised on the judgment, seeking an aggregate amount of approximately $6.2 million.

7.      In connection with his appointment, the Trustee commented on the pending Appeal, the Judgment and the Judgment Creditors' proofs of claim.  The Trustee acknowledged that "prosecution of the Appeal may be in the best interests of the other creditors," *see* Bankr. D.I. 177 at ¶ 28, and noted that "[i]f the Debtor's arguments in the Appeal are successful, the Debtor actually overpaid [Judgment Creditors] by at least $95,032 and would have an affirmative claim against them to recover such overpayment[,]" *id.* at ¶ 31.

8.      In fact, in connection with a disputed trustee election in this chapter 7 case, the Trustee objected to the claims asserted by the Judgment Creditors and represented to the Court that the Judgement Creditors held "disputed" claims "as to both liability and amount" that are subject to a "compelling" appeal.  (*See* Bankr. D.I. 164 at ¶ 8 ("By the Appeal, the Debtor continues to dispute both the Debtor's liability on, and the amount of, the Judgments on various grounds. . .

. The Opening Brief [filed in the Appeal] details the Debtor's various disputes with respect to the Judgments and the Trustee incorporates the Opening Brief into this Preliminary Objection by reference."); *see* Transcript of June 15, 2022 Hearing, attached hereto as Exhibit A, at 55: 4-16 (The Trustee testified that he "think[s] [the Appeal] has merit," and "absolutely" agree that issues on appeal should be further explored "because the mistakes are so large, you know, we're talking several million dollars."); Bankr. D.I. at 177 at ¶ 29 ("Despite the [Judgment Creditors'] efforts to undermine the arguments raised by the Debtor in the Appeal and Opening Brief, the Appeal is compelling").

9.    After initially twice describing the Appeal as "compelling," confirming dispute as to "the Debtor's liability on, and the amount of, the Judgments on various grounds," and characterizing the Judgment as premised on "mistakes . . . so large, you know, we're talking several million dollars," the Trustee has purposefully ignored the Appeal to date. Despite repeated urging by the Members, the Trustee has never sought to lift the stay of the Appeal or otherwise take any steps to prosecute the Appeal. As is set forth below, the Trustee also rejected, on spurious grounds, repeated offers by the Members to fund the Appeal.

10.    The Trustee's administration of this Estate has followed a path markedly different from the path he initially articulated. Rather than contemporaneously seeking to reduce the aggregate amount of claims asserted against the Estate by, among other things, moving forward with the Appeal, and seeking to file claims and collect receivables to monetize existing property of the Estate, the Trustee's focus has been entirely on preparing and prosecuting litigation including seeking injunctive relief against the Members, among others. A more detailed discussion of the Trustee's turning this solvent chapter 7 case into one of litigation against the Members instead of claims reduction and receivables collection was set forth in Adv. Pro. D.I. 62.

11.    In or around June, 2023, the Members learned publicly-available information indicating that the Federal Emergency Management Agency ("FEMA") was preparing to pay the Debtor on a claim worth approximately $13.5 million.  Presumably, the Trustee was privy to the same information.

12.    On July 21, 2023, the Trustee made the present Motion.  The Motion discloses that the Trustee and the Judgment Creditors "have agreed to resolve the Judgment Creditors' proofs of claim and the Eleventh Circuit Appeal" on terms set forth in a settlement agreement (the "Proposed Settlement").  Those terms include the Estate's payment to the Judgment Creditors, collectively, in the amount of approximately $5.6 million.  This represents payment to the Judgment Creditors of approximately 90% of their claims.

13.    The Trustee's Motion contains no explanation for the timing of the Proposed Settlement or justification for paying the Judgment Creditors 90% of their claims.  Circumstances support the conclusion that the Trustee believed a significant FEMA payment was imminent and wanted to quickly pay the Judgment Creditors nearly in full on their claims, both to reduce amounts distributed to the Members at the conclusion of this solvent chapter 7 case and to hold that amount out as justification for the Trustee's continued prosecution of the Adversary Proceeding against the Members.  Again, the same Trustee that twice characterized the Appeal as compelling and the Judgment as premised on significant "mistakes" now proposes abandoning the Appeal and paying the Judgment nearly in full.

14.    Whatever his motivations, the Trustee's Motion offers this Court only patently incorrect reasoning and conclusory platitudes to justify the Proposed Settlement.  None of the factors this Court must consider on this Motion suggest that approval of the Proposed Settlement,

especially at this time, is in the Estate's best interest.  Accordingly, the Motion should be denied
(or deferred) and the Members' Objection should be sustained.

## **ARGUMENT**

## I.    **THE MEMBERS HAVE STANDING TO OBJECT TO THE 9019 MOTION**

15.    Because the Trustee has challenged the Members' standing to take certain actions,
we address the threshold issue of the Members' standing to object to the Proposed Settlement.

16.    The Members have a significant economic interest in, and are adversely affected
by, the Proposed Settlement.  The Members have standing because the relief requested by the 9019
Motion greatly affects their individual economic and other rights.  The Members are the residual
stakeholders in what they maintain is a solvent chapter 7 estate.[1]  Assuming receipt of the $13.5
million from FEMA (which may be as high as $15.5 million pursuant to the Prompt Payment Act),
the Trustee is actually paying the Judgement Creditors with non-estate money; *i.e.*, money that
otherwise should be paid to the Members.  *See In re Remsen Partners, Ltd.*, 294 B.R. 557,
(S.D.N.Y. 2003) (non-creditor law firm was "aggrieved" and had standing to object to settlement
where it would have the "chance to have an allowed claims" if the settlement was disapproved and
"will have little or no recovery if the settlement is approved"); *In re RFE Indus., Inc.*, 283 F.3d
159, 164 (3rd Cir. 2002) (debtor had standing to object to proposed settlement where it was "clearly
adversely affected by the Settlement").

17.    The Proposed Settlement also unnecessarily and adversely affects the Members'
individual interests in other ways.  Specifically, the Members are adversely affected by the Trustee
validating the claims of the Judgement Creditors by paying those claims nearly in full.  The Debtor

---

[1] This is consistent with the Tax Return prepared and filed by the Trustee with the IRS, which showed many
millions of dollars flowing to equity holders.

had, and post-chapter 7 will continue to have, a viable business which the Members will own and intend to operate. Indeed, during the pendency of this chapter 7 case, the Defense Logistics Agency alone has offered the Debtor over 1,000 opportunities to bid on fuel fulfillment contracts.[2]  As is set forth more fully below, the Judgment represents an illegal commission payment that the Debtor is barred from paying by applicable statutes and regulations.   Abandoning the appeal and acquiescing to paying a substantial settlement amount in relation to the Judgment Creditors' claims may be unfavorably viewed by federal agencies as reflecting prior entry into an unlawful contingent fee agreement by Debtor.  That could (a) undermine the ability of the Debtor and the Members to continue securing government contracts after this chapter 7 case closes, and (b) independently place at risk prior and anticipated future payments by FEMA under contracts already fully performed by the Debtor.

18.    The Members also have standing because they are creditors of the Debtor.  As defendants in the FAC, they have potential §502(h) claims.  A contingent claim falls within the broad definition of claim at §101(5).  They also have a claim against the Trustee, his counsel and the estate for substantial financial loss if the *6 Year SOL* expires on the Trustee's watch, because the Trustee failed to properly investigate and file claims for the "Alleged A/R."[3]  These are claims either under §323(b)[4] or within the meaning of §101(5)(B) ("right to an equitable remedy for breach of performance if such breach gives rise to a right to payment . . . .").   This Court also

---

[2] The Members offered to fund the Appeal because they believe the Judgement is unlawful and should be reversed but also because they wanted to ensure that, in the event of a settlement, the settlement is structured so that the Judgment is withdrawn to avoid prejudice to the Debtor going forward.

[3] Unlike ordinary trade receivables, government receivables may increase in value over time due to the Prompt Payment Act and the Members reserve all rights.

[4] The TSI Members reserve all rights, including under the *Barton* doctrine.

afforded the Members standing to object to Archer & Greiner's interim fee application and similarly should find standing here.

19.    Finally, the Trustee acknowledged the Members' standing to make this Objection by serving notice of the Motion upon the undersigned counsel, who represent only the Members (and Addy Road, which is a defendant in the Adversary Proceeding and an affiliate of one or more Members, and is not a party to this Objection).  Rule 9019(a) directs that any motion under Rule 9019 must be served upon "creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct."  The undersigned counsel does not represent any of the parties specified in Rule 9019(a).  By providing notice of the Motion to the undersigned counsel, the Trustee acknowledged that the Members have an interest in the outcome of the Motion, and therefore have standing to make this Objection.

## II.    LEGAL STANDARDS APPLICABLE TO THE TRUSTEE'S MOTION

20.    The legal standards applicable to this Motion are not contested.  The Third Circuit established those standards in *In re Martin*, 91 F.3d 389 (3d Cir. 1996), and articulated four factors to consider when evaluating approval of a settlement under Rule 9019.  Those factors are: (1) probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the underlying litigation, and the expense, inconvenience and delay necessarily attendant to it, (4) the paramount interests of the creditors.  *See In re RFE Indus., Inc.*, 283 F.3d 159, 165 (3rd Cir. 2002) (*citing Martin*).

21.    While the Court need not conduct a mini-trial in evaluating the *Martin* factors, it is required to "examine[] the Settlement under the *Martin* framework" and make findings of fact for the grant or denial of requested approval of a settlement.  *Id*.  Indeed, determination of a Rule 9019 motion "requires a bankruptcy judge to assess and balance the value of the claim that is being

compromised against the value to the estate of the acceptance of the compromised proposal." *In re Diocese of Camden, N.J.*, Case No. 20-21257 (JNP), --- B.R. ---, 2023 WL 5606992, at *7 (D.N.J Aug. 29, 2023) (quoting *Martin*).

22.     Here, the Proposed Settlement addresses a claim <u>against</u> the Debtor, and therefore the second *Martin* factor, the likely difficulties in collecting on a claim, is not relevant.  As is set forth below, each of the other three *Martin* factors weigh against approving the Proposed Settlement.

## III.   THE COURT SHOULD NOT APPROVE THE PROPOSED SETTLEMENT
### A.   Probability of Success

23.     The first *Martin* factor considers the Debtor's probability of success in the Appeal and subsequent proceedings, if any.

24.     The Debtor's Appeal Brief (attached hereto as **Exhibit B**, the "Debtor's Brief") articulates a number of grounds to overturn the Judgment, including:

25.     First, as a matter of law, it is unlawful for the Judgment Creditors to have received a percentage commission for merely securing a government contract. *See* 41 U.S.C. § 3901(b)(1) (the federal statute prohibits any person from "secur[ing] the contract on an agreement or understanding for a commission, percentage, brokerage, or contingent fee...."); *see also* Federal Acquisition Regulation 52.203-5(a), which was specifically incorporated into FEMA's Request for Proposal and MATOC (similarly prohibits such contingent fees, defined as "any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.").

26.     The Debtor should have been allowed to amend its Affirmative Defenses to include a defense of Illegal Contract, in violation of 41 U.S.C. § 3901(b)(1) and FAR 52.2035, because

the Judgment Creditors advocated interpreting the Consulting Agreement in a way that makes it illegal and unenforceable under federal law by claiming a commission for merely helping the Debtor secure a FEMA contract.[5] Instead, the District Court Judge, relying on a recollection of testimony, denied the Debtor's request to amend its Affirmative Defenses.  (Debtor's Br. at 19-20)

27.     Importantly, the illegal nature of the contract advocated by Judgment Creditors was never before the jury.  (*Id.* at 20)  In other words, because the Debtor was not permitted to amend its Affirmative Defenses, the jury was not asked to determine whether or not there was an illegal contract, and never made that determination.  Thus, reversal of the Judgment on this ground does not require reversing any jury finding that the contract was not illegal.

28.     Second, the Florida litigation should have been dismissed for lack of subject matter jurisdiction because Judgment Creditors failed to carry their burden to prove complete diversity of citizenship. There are citizens of California on both sides, and the Debtor's Operating Agreement was correctly amended by vote to add a California resident as a member, *eight months* before the Judgment Creditors filed suit.  (Debtor's Br. at 16). The district court focused on an inapposite technicality regarding an LLC membership resolution to reject the amendment, but acknowledged the "significant possibility" that it did not have jurisdiction. (*See* Debtor's Brief at 15)

29.     Third, commissions under the Consulting Agreement are expressly limited to sales of Niagara-brand bottled water. It prohibits any modification unless in writing and signed by all

---

[5] *See, e.g.,* **Exhibit C** hereto (Transcript of Judgment Creditor Testimony on August 24, 2021) at 201:25-202:20 (advocating that Judgment Creditors' introducing the Debtor to the office holding the Multiple Award Task Order Contract entitles Judgment Creditors to a 25% fee "[u]nder that MATOC or any other governmental contracts"); **Exhibit D** hereto (Transcript of Judgment Creditors' Argument on August 23, 2021) at 43:19 -47:04 (arguing that because of Judgment Creditors' efforts to secure the Debtor's contract with the government, Judgment Creditors are entitled to "25 percent of the net income")

parties. (*Id.* at 21)  The Florida court misapplied a rare legal exception to allow an oral or implied modification in spite of that clause and there was insufficient evidence to support any modification. (*Id.* at 21-28)

30.    Fourth, the Consulting Agreement provides for commissions only on "bottled water." In an order denying summary judgment the District Court erred in ruling that parol evidence would be allowed as to the meaning of the Consulting Agreement and whether it provides for a commission on drop containers.   There is no ambiguity that would require parol evidence and, under the circumstances, it would have been impossible for the parties to contemplate anything besides bottled water. The issue never should have gone to the jury and summary judgment should have been granted. (*Id* at 29-39)

31.    Fifth, assuming arguendo that Judgement Creditors are entitled to any amount, the amounts in the Judgment are erroneous. They were based on a summary by Judgment Creditors' expert that erroneously excluded over $1 million of expenses paid to Coakley Logistics for transporting the water to Puerto Rico and over $1 million of expenses related to Bering Straits. (*Id.* at 40-43)

32.    Sixth, the award of $991,498.78 of prejudgment interest should be reversed. The Debtor showed that only post judgment interest should apply or that any pre judgment interest should accrue from the date of the verdict. (*Id.* at 44-47)

33.    Significantly, reversal on any one of several grounds set forth above would <u>not</u> result in a new trial, but instead would dispose of, or significantly reduce, the Florida Judgments as a matter of law.  Thus, the Judgment will be dismissed as a matter of law, without the need for further proceedings, if the Eleventh Circuit finds that it is unlawful as a matter of law for the Judgment Creditors to have received a percentage commission for merely securing a government

contract; or that the Florida Litigation should have been dismissed for lack of subject matter jurisdiction; or that the underlying contract could not have been modified, by its own terms; or that the underlying contract unambiguously provides for payments only for "bottled water."

34.     The Judgment also can be reduced, as a matter of law and without the need for further proceedings, if the Eleventh Circuit finds that the judgment amounts are erroneous because they were based on improper expert testimony or finds that pre-judgment interest was granted inappropriately.

35.     The Trustee gives this Court no valid reason to conclude that the Appeal is unlikely to succeed.  Instead, the Trustee only engages in attacks on the Members' credibility, and offers conclusory statements concerning the Appeal's supposed lack of merit.

36.     True to form, the Trustee's criticism of the Appeal's merits rests on his assertion that the Members lack credibility.  This attack, while false, is also irrelevant to many of the issues in the Debtor's Appeal.  When the Debtor argues that payment to the Judgment Creditors under the theory advanced by the Judgment Creditors at trial would constitute an unlawful contingent fee payment, the Debtor relies upon the Judgement Creditors' own admissions and characterizations of the alleged agreement with the Debtor.  (Debtor's Br. at 17-20)  The credibility of the Members is immaterial.  When the Debtor argues that its written agreement with Judgment Creditors could not be modified orally or by implication, it relies only on caselaw, the unambiguous language of the written agreement, certain documents put forth by the Judgment Creditors, and certain conduct alleged by the Judgment Creditors.  (*Id.* at 21-28)  Again, the Member's credibility is irrelevant to this ground for the Appeal.  Consideration of other grounds for the Debtor's Appeal results in the same conclusion:  even accepting the Trustee's smears of

the Members' credibility – which themselves are false – the Appeal has a likelihood of success on any number of grounds for which the Members' credibility is entirely irrelevant.[6]

37.    Instead of offering valid reasons to criticize the Appeal, the Trustee repeatedly offers only conclusory, unsupported statements of his own assessment that the Appeal will fail and that the Proposed Settlement therefore is proper.  While this Court is not required to substitute its own judgment for the Trustee' judgment, it is required to make findings of fact concerning the probability of the Appeal's success.  The merits of the Debtor's several grounds for Appeal are evident from the Debtor's Brief.  Because the Trustee offers no valid reason to consider the Appeal unlikely to succeed, the first *Martin* factor weighs against approving the Proposed Settlement.

**B.    The Already-Commenced Appeal Will Not Result In Complex Or Expensive Litigation**

38.    The third *Martin* factor considers the complexity of the underlying litigation, and the expense, inconvenience and delay necessarily attendant to it.  None of those considerations warrants settlement with the Judgment Creditors now, by conceding 90% of the Judgment Creditors' claims.

39.    The Appeal will not be, in itself, a complex or expensive undertaking.  The Debtor already commenced the Appeal, including by filing a 63-page brief addressing all of the issues relevant to the Appeal.  The remaining work for the Appeal consists of a reply brief and,

---

[6]  The Trustee continues to make mischaracterizations in his effort to portray the Members as bad actors.  In this latest Motion, the Trustee states that "the Debtor never submitted an expert report in the Florida Litigation regarding the net income and expenses" and "assumes" this was because the expert found he could not rely on the Debtor's documents. (Trustee's Br. ¶ 24)  In fact, as evidenced in the Debtor's Brief (citing to the record), the Debtor submitted an accounting expert's report on those exact subjects.  (Debtor's Br. at 41-42)  The Trustee also claims that expenses for a Member's personal pool were passed off as business expenses in the underlying litigation.  This is not true.  Because the Debtor's documents did not characterize those expenses as bottle water expenses, they were deemed irrelevant by all parties (and the Judge) in the Florida litigation.  (*See* **Exhibit E** hereto (Transcript of April 21, 2021 Conference) at 8)  Thus the Debtor did not use those documents in the Florida litigation.  Accordingly, the Trustee's supposed reasons to criticize the merits of the Appeal are not only irrelevant, but also are false.

presumably, oral argument.  While we do not dismiss the seriousness of those tasks, the fact remains that the grounds for the Appeal have already been briefed in full, greatly reducing the complexity and expense of the Appeal going forward.

40.    Additionally, the Appeal can be completed at no cost to the Estate.  As we have briefed previously, the Members repeatedly offered to fund the entire cost of prosecuting the Appeal (provided the Members retain sole authority to settle the Appeal), and that offer still stands. The Trustee has refused to consider that offer or discuss it with Member's counsel, supposedly on the ground that this Court's existing injunctions prevent the Members from paying for the Appeal. That is not a bona fide reason to dismiss the Members' offer.  The parties can request modification of those injunctions to allow the Members to pay for the Debtor's Appeal.  Whatever the actual reason for the Trustee's refusal to even consider the Member's offer, his proffered reason clearly is not it.

41.    The Trustee raises the specter of "an expensive new trial" following the Appeal. But even the Trustee concedes that a new trial would arise only from two of the several grounds for the Debtor's Appeal.  (Trustee's Br. ¶23)  While there is a chance that the Appeal will result in further District Court proceedings, that result is hardly inevitable.  Should it arise, the Trustee can pursue a settlement reflecting risk and cost to both sides in proceeding further – and with the benefit of the Judgment being reversed in the meantime.

42.    Given the present status of the Appeal, the significant possibility that the Appeal will not result in subsequent proceedings, and the Members' offer to fund the appeal, the third *Martin* factor weighs against approval of the Proposed Settlement.

### C.    The Interests Of Other Parties

43.    While the fourth *Martin* factor is the paramount interest of creditors, that factor is not limited only to the interests of creditors.  Where, as here, the Debtor's owners have a substantial stake in the outcome of this bankruptcy case, consideration of the owners' interests "appears to be consistent with the purpose of the *Martin* test – to maximize the recovery of those to whom the [debtor] has obligations."  *RFE*, 283 F.3d at 165.

44.    The Proposed Settlement has no benefit to this Debtor's creditors or Members.  The Trustee does not even pretend that there is any such benefit, and does not address this *Martin* factor in his Motion.  Approving the Proposed Settlement at this stage of the Bankruptcy proceeding does not advance the administration of the Estate, as no administrative step hinges on the Proposed Settlement being approved.  Neither is the Proposed Settlement so advantageous to the Estate that it must be approved now, or risk being lost forever.  The Proposed Settlement saddles the Estate with the obligation to pay 90% of the Judgment.  It is not a deal that is too good for the Estate to pass up.  The Trustee gives this Court no reason that the Proposed Settlement is beneficial to the Debtor's creditors or Members, and instead offers only bromides and conclusory statements, without any substance.

45.    On the other hand, an overly-generous settlement of the Appeal and the Judgment harms the Members.  The Proposed Settlement unjustifiably reduces the amount of money that will be available to the Members at the conclusion of this solvent chapter 7 case.  That in and of itself causes the fourth *Martin* factor to weigh against approving the Proposed Settlement.

46.    Additionally, there is material risk that the Proposed Settlement will harm the Debtor and the Members' reputations and ability to secure future work from federal agencies.  The Judgment Creditors' demands for payment are justifiably characterized as a commission, and the

Judgment essentially provides for payment of that commission.  The payment of a commission to the Judgment Creditors can therefore be perceived as the Debtor's payment – albeit through the Trustee – of an unlawful commission arising from an unlawful contingent fee agreement.  To the extent Debtor or its Members are perceived to have entered into such an agreement, or acquiesced to a contingent fee payment without exhausting every legal means of challenging it, it raises the risk of competitors or potential government customers challenging the eligibility of Debtor or its Members for future federal contracts, under the Federal Acquisition Regulation ("FAR") provisions that limit contracting opportunities to "responsible" contractors (with "responsibility" deemed to include having a "satisfactory record of business ethics and integrity.")  *See* FAR 9.103 and 9.014-1. The increased risk in the procurement process extends not only to the Debtor entity that the Members hope to maintain, but also to any current or future contracting entities in which the Members have an interest. *See, e.g.,* FAR 9.104-6 (establishing government database and look-back period for responsibility determination across affiliated companies) and FAR 9.403 (establishing that individuals and contractual affiliates are subject to suspension and debarment regulations). Even if such a challenge lacked merit, the uncertainty and expense involved in responding, and establishing a record of "present responsibility", would impose significant costs on the Members.

47.    For the same reasons, the Proposed Settlement could jeopardize governmental payment of the Debtor's receivables.  Governmental agencies can withhold or claw back payments to the Debtor if those agencies believe that the Debtor is using those payments in ways that violate regulations or statutes, including by paying an unlawful commission to the Judgment Creditors. At the very least, prosecution of the Appeal and continued dispute of the Judgment can only

reassure governmental agencies that the Debtor is not seeking to use payments from the government to fund payment of an unlawful commission.

48.    This point bears emphasis. The written consulting agreement between Debtor and the Judgment Creditors offered simply to compensate the Judgment Creditors for their role in procuring a supply of bottled water from one specific supplier in the event Debtor was able to sell this same supply of bottled water to upstream federal agency customers under one or more federal contracts. Such an arrangement is not unlawful. But in Judgment Creditors' case at trial, Judgment Creditors characterized the agreement differently, insisting they had been promised what they called a "success fee" consisting of a specified percentage of all net revenue under any ensuing FEMA task orders; without limitation in relation to the nature and scope of the work being performed by Debtor and its subcontractors for FEMA; and without the Judgment Creditors themselves actually performing any subcontract work (whether by arranging a supply of water, supporting delivery, or otherwise performing tasks within the scope of a FEMA contract or task order). (*See* Debtor's Br. at 17-19.)

49.    In other words, under Judgment Creditors' interpretation of the original agreement – which surfaced after FEMA began awarding task orders under the FEMA contract - their only obligation was to help Debtor obtain or secure the award of a federal FEMA contract. And the only payment to be made by Debtor to Judgment Creditors for their services was (a) legally contingent upon Debtor successfully receiving the FEMA contract, and (b) calculated based upon a percentage of all revenue paid by FEMA for Debtors' work under the contract, rather than in relation to any actual support from Judgment Creditors in a subcontracting or teaming role.[7]    *If*

---

[7] It bears mentioning that such an interpretation is objectively unreasonable based on the actual language of the consulting agreement. A review of the relevant language in context makes clear that the agreement to provide a percentage of net revenue was limited to quantity supplied by Niagara.

*the agreement were construed in this manner*, it would constitute an unlawful contingent fee agreement in violation of FAR subpart 3.402, under which payment by Debtor of a contingent fee would place at risk *all* of Debtor's past and anticipated future revenue under the pertinent FEMA contract and task orders.

50.    By way of further explanation, FAR Subpart 3.402 establishes there is nothing wrong with Company A paying Company B to help Company A secure a government contract, *provided the obligation to pay Company B is not contingent upon Company A's success in obtaining or securing the contract.* The problem is one of incentives. "Contractors' arrangements to pay contingent fees for soliciting or obtaining Government Contracts have long been considered contrary to public policy because such arrangements may lead to attempted or actual exercise of improper influence." *See* FAR 3.402 (citing 41 U.S.C. § 3901) (also cited in Team Systems 11th Cir. Brief at 17). In furtherance of this policy, federal contractors are required to warrant that they have *not* entered into such an unlawful contingent fee agreement with any parties who may have assisted in soliciting, securing, or obtaining the contract. *See* FAR 3.402(a) (prescribing mandatory warranty against contingent fees) and FAR 52.203-5 (warranty clause disclaiming use of contingent fees, incorporated by reference or operation of law into all negotiated federal contracts).

51.    The consequences for breaching this warranty are serious. The prescribing clause (FAR 3.402(a)) and the operative contract clause (FAR 52.203-5(a)) state that for any breach or violation, "the Government shall have the right to annul this contract without liability or to deduct from the contract price or consideration, or otherwise recover, the full amount of the contingent fee." In other words, if FEMA were to conclude that Debtor had entered into a contingent fee agreement with Judgment Creditors, or had actually paid Judgment Creditors a contingent fee, FEMA could potentially seek to annul Debtor's contract, refuse any further payment to Debtor,

and potentially bring a claim to claw back some or all of the monies already paid (including at a minimum a dollar-for-dollar claim against Debtor for any contingent fee amounts voluntarily paid by Debtor to the Judgment Creditors). Given this regulatory backdrop, the Trustee's desire to abandon the pending 11th Circuit appeal, and instead voluntarily pay the Judgment Creditors millions of dollars pursuant to the Judgment Creditors' own theory that a "success fee" was owed as commission for helping Debtor obtain or secure either the FEMA contract or subsequent task orders under the contract, seems imprudent and borderline reckless.[8] There would be nothing in this scenario that would stop FEMA from bringing a claim against Debtor, citing Debtor's voluntary abandonment of its appellate rights as an implicit concession, and arguing that without regard to the subjective intent of the Debtor or the Trustee, the objective facts established that Debtor had made a prohibited contingent fee payment to the Judgment Creditors. As already noted, if FEMA were to pursue such a course, the financial consequences for the Debtor, the bankruptcy estate, and by extension the Members, could be devastating.

52.     The Trustee's motion seeking approval of the Proposed Settlement demonstrates a complete lack of understanding and indifference to the regulatory and contractual risks arising from the longstanding prohibition against contingent fees in the federal procurement arena. And there is certainly nothing in the Trustee's motion to suggest that the Trustee identified or attempted to analyze these issues, before reaching a questionable settlement that would pay the Judgment Creditors 90% of what is almost surely, on the existing record, an unlawful contingent fee award.

---

[8] Although the Judgment Creditors' position has always been grounded in its subjective interpretation of the original consulting agreement, a "success fee" contingent on the award of a task order under an existing contract would likewise constitute an illegal commission. References in the FAR to a contract are construed as including not only the original contract, but subsequent agreements in the form of task orders or modifications. *See* FAR 2.101. Therefore, the result is the same whether the Judgment Creditors' claim is based on the original consulting agreement or an alleged modification.

53.     For all of the foregoing reasons, and the Motion's lack of any discussion of the fourth *Martin* factor, that factor weighs against approving the Proposed Settlement.

## IV.     ADDITIONAL CONSIDERATIONS SHOULD THE COURT BE DISINCLINED TO DISAPPROVE THE PROPOSED SETTLEMENT

54.     For all of the reasons set forth above, disapproval of the Proposed Settlement Agreement is warranted.  If, however, the Court is disinclined to disapprove of the Proposed Settlement at this time, we respectfully contend that approval of the Proposed Settlement requires additional discovery, including as to the reasons for the Trustee's changed position concerning the Appeal and the Judgment; the reasons for the Trustee's refusal to accept the offer by the Members to pay the cost of prosecuting the Appeal; and the Trustee's reasons for pursuing the Proposed Settlement (which are not made clear in the Motion).  We understand that this Court was not inclined to adjourn this Motion to allow such discovery prior to the Motion's hearing.  In light of the Motion's lack of actual reasons to approve the Proposed Settlement, and the legal standards governing approval of the Proposed Settlement, we respectfully submit that additional discovery is necessary before the Proposed Settlement can be considered properly.

55.     Additionally, the Members renew an existing proposal for a way forward that avoids harming the Debtor and the Members while protecting the interests of the Judgment Creditors.  As the Estate collects the Debtor's receivables, the Trustee can put aside funds sufficient to pay the Judgment Creditors' claims in full.  In the meantime, the Members can prosecute the Appeal at their own cost.  If the Appeal is successful and the Judgment is reversed, the Judgment Creditors' claims will be disposed, and the money set aside for the Judgment Creditors' claims will remain in the Estate.  If the Judgment is not reversed, the Judgment Creditors' claims will be paid in full.  This proposal costs the Estate nothing and protects the interests of the relevant parties.

**WHEREFORE,** the Members respectfully request that the Court enter an Order denying the the Trustee's Motion or, alternatively, deferring resolution of that Motion for teh reasons stated herein, and such other and further relief as the Court deems just and proper.

Dated: September 8, 2023
Wilmington, Delaware

**THE ROSNER LAW GROUP LLC**

*s/ Frederick B. Rosner*

Frederick B. Rosner (DE #3995)
Zhao Liu (DE #6436)

824 N. Market Street, Suite 810
Wilmington, Delaware 19801
Email: rosner@teamrosner.com
liu@teamrosner.com

*Counsel to the Members*

**GOLENBOCK ASSOR BELL**
**& PESKOE LLP**
Michael M. Munoz (admitted *pro hac vice*)
711 Third Avenue
New York, New York 10570
mmunoz@golenbock.com

*Counsel to the Members*