IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TEAM SYSTEMS INTERNATIONAL, LLC,<br><br>Debtor. | Chapter 7<br><br>Case No. 22-10066 (CTG)<br><br>Re: DI 339, 349, & 385 |

**SUPPLEMENTAL OBJECTION BY THE ROSNER LAW GROUP LLC TO:**

**CHAPTER 7 TRUSTEE'S MOTION FOR SANCTIONS AGAINST THE ROSNER LAW GROUP LLC PURSUANT TO FED. R. BANKR. P. 9011 AND 28 U.S.C. § 1927**

The Rosner Law Group LLC ("RLG") hereby submits this supplement to the *Objection by The Rosner Law Group LLC to: Chapter 7 Trustee's Motion For Sanctions Against The Rosner Law Group LLC Pursuant To Fed. R. Bankr. P. 9011 and 28 U.S.C. § 1927* [DI 349] (the "Objection").

**PRELIMINARY STATEMENT**

1. The TSI Members filed their chapter 11 case and chartered a course for a successful reorganization, including by: (a) securing DIP financing;[1] (b) seeking to pursue the Appeal[2] and object to other over-stated claims against the estate; (c) stating their intention to collect all amounts FEMA and other governmental agencies owed to the Debtor; and (d) proposing to fund the reorganization effort with, *inter alia*, fuel procurement orders from the Defense Logistics Agency. The TSI Members asserted (and continue to assert) that there is sufficient property already in the bankruptcy estate to pay all lawful claims against the estate in full and there is no need to incur professional fees seeking to augment the estate. Post-conversion, the Trustee initially appeared to

---

[1] *Motion to Approve Debtor In Possession Financing Filed by Team Systems International, LLC* [DI 116].
[2] *Debtors Motion for Limited Relief from Automatic Stay to Continue the Eleventh Circuit Appeal.* [DI 38].

{00037004. }
4621871.1

embrace that course of action, including acknowledging the estate's solvency, but at some point changed course. Instead of working cooperatively with the TSI Members investigating, filing and monetizing existing federal contract claims of the estate, the Trustee elected to pursue a path of time-consuming, expensive litigation against, *inter alios*, the TSI Members. The TSI Members were labelled as bad actors, out of the money equity and merely targets of the FAC. When the Trustee decided to chart this new course, the TSI Members became acutely aware that the Trustee's alternative sequencing of estate administration may lead to the absurd result of cycling cash; *i.e.*, the TSI Members would end up funding—from their own financial recovery—the Trustee's multi-million dollar litigation claims against them.

2.  The Trustee's sequencing, especially reflexively moving forward with litigation without first properly investigating, developing and filing federal contract claims that are property of the estate, caused unnecessary friction with the TSI Members and motion practice ensued. The TSI Members ran a highly profitable federal contracting business for over 22 years. They are natural allies of the Trustee in ensuring all amounts owed to the Estate are paid and all overstated claims against the Estate are vetted. The TSI Members acknowledge that the Trustee has total control over all estate property as a matter of law. But that exclusive authority has to be tempered by his fiduciary duties and affirmative obligations to all stakeholders, including the TSI Members. *E.g.,* §704(a)(4)(duty to investigate). The TSI Members do not consider themselves out of the money equity but recognize they may become out of the money equity if the Trustee fails to collect Estate claims and allows or otherwise does not object to unlawful claims against the Estate.

3.  The friction between the Trustee and TSI Members came into sharp relief with respect to the change order claim. The TSI Members described to the Trustee and his professionals well over 1.5 years ago a certain change order claim against FEMA potentially worth millions of

dollars.[3] FEMA changed the terms of its contract with TSI requiring delivery of water to victims

---

[3] *See* Transcript of Deposition of Deborah Evans Mott dated February 7, 2022, at 197:20-200:22:

> Q. TSI intends to assert a $6.8 million change order under FAR 52.243 Changes Fixed Price. What's the basis for that $6.8 million change order?
>
> A. When we initially received the task order from CLIN 002, containers were not part of the logistics plan that we bid on. We bid break bulk.
>
> We put a price in for break bulk. We had a logistics plan to move break bulk. And 30 days into it, FEMA came to us and changed the logistics plans requirements to containers. They also reduced the contract to 12 million.
>
> The problem with that is 30 days into a hurricane on -- in the Southeast and the East Coast, there were no containers available. We had to pay to go get the containers in Chicago, St. Louis, I mean, just all over, bring the containers back, in some instances take them to the water plant in New Jersey where we had staged the water to be moved to Puerto Rico because Holt terminals in New Jersey handles all of the Fiji water that comes into the United States. So they had equipment specifically designed to handle bottles of water.
>
> When FEMA changed the logistics plan, it meant we had to go get containers halfway across the country, truck them back -- now, mind you, this is a hurricane. So the trucking charges were out of sight because there were -- there was a scarcity of trucks.
>
> We then had to take some of those containers to hold terminals. They had to put the water in the containers. Then we had to find chassis, which were also a scarce resource and very expensive, load the containers on the chassis, and the chassis had to drive down to the Port of Jacksonville so that those containers could be taken by barge to the Ayala terminal because the Crowley terminal was completely backed up.
>
> In addition to that, we had to get containers to the terminal in Savannah because we had 53-foot trucks with bottled water heading to the terminal in Savannah that had to be cross-stocked, taken out of the 53-foot trucks and put into the 40-foot containers in Savannah. And then we had to get dray, which is taking it from a laydown terminal area to the barge that was also being loaded in Savannah. The cost was enormous.
>
> Then they barged them down to the Ayala terminal. The Ayala terminal then unloaded all of it, and there was a FEMA representative at the dock because they took possession of the water immediately, but they issued a CLIN 16 contract to us where they rented the containers with a daily rate.
>
> But the problem is, even though they took custody and control of the containers, we were still paying for the containers, the storage. All of those fees. And they were supposed to take it out of our daily rate, but we were upside-down on the daily rate. And once FEMA took all of the containers out of the terminal, they continued to pay that daily rate, so we were able to catch up to cover the downside.
>
> So then FEMA brought the containers back to the terminal in Ayala and left them. And at that point we had 685 containers, plus or minus some because they lost them, that we weren't getting paid for. We had to pay for those containers, to store them while we fed them back into the United States. And at that time, because there was such a glut of containers in the Jacksonville

of Hurricane Maria in containers instead of break bulk as originally agreed. This added substantial, documented costs to TSI's performance under its contract with FEMA. The respective interests of the Trustee and TSI Members are entirely aligned in investigating, developing and collecting that claim.

4. The TSI Members expected the Trustee would direct Venable, the Trustee's retained subject matter expert in federal contract claims, to reach out to the TSI Members to investigate the change order claim, identify the statute of limitations for submitting the claim to FEMA, and otherwise work cooperatively with the TSI Members to develop and timely file that claim. That expectation was entirely reasonable. ***First***, the change order claim is property of the estate, the exclusive domain of the Trustee. ***Second***, investigating, preparing and filing such claim is consistent with the Trustee's affirmative, non-delegable duty to preserve and monetize all property of the estate. *See* 11 U.S.C. §704(a). ***Third***, the Trustee retained Venable for exactly this purpose: to investigate, prepare and file all federal contract claims belonging to the estate, including the change order claim. Venable was retained on a contingency fee basis, so Venable's charge for the foregoing legal services would cost the Estate $0. ***Fourth***, filing the change order claim presented no hardship or exposure for the Trustee. The TSI Members agreed to certify the bona fides of the underlying claim, based on documents provided to the Trustee. ***Fifth***, the change order claim arises from a FEMA contract that Venable was familiar with. Venable pre-petition had filed a claim for the Debtor arising from the same contract. Adding a second claim would be relatively easy and would only increase the Trustee's bargaining power with FEMA.

5. The TSI Members' reasonable expectations never manifested. To the contrary,

---

area, we couldn't send them all at once. We had to feed them in at 50, 150, 75 every other week until the backup subsided. It cost us millions and millions and millions of dollars.

That's the basis of our change order.

upon information and belief, the Trustee actually directed Venable *not* to discuss the change order claim or any matter with the TSI Members.[4] In fact, there were no discussions between Venable and the TSI Members during the Trustee's estate administration. When RLG (not expert in federal contract law) was made aware of an impending statute of limitations with respect to the change order claim, RLG immediately shared that information and urgency with the Trustee.[5] Unfortunately, even with actual notice that a potential forfeiture of substantial Estate value was imminent, the Trustee took no action through Venable or otherwise. In the TSI Members' view, the Trustee favored litigation, and was not interested in pursuing the Estate's contract claims.

6. The Trustee has never provided a legitimate business reason why he failed to investigate the change order claim following the Mott deposition. The most logical and cost-free course of action would have been for the Trustee to instruct Venable to contact the TSI Members and investigate the change order claim.[6] But Venable never reached out to the TSI Members and it appears Venable made no investigation. For example, upon information and belief, Venable never concluded that, in its view, the change order change had no value to the Estate or otherwise was not worth pursuing.

7. The TSI Members were rightfully concerned that a valuable change order claim against FEMA would be lost due to the expiration of the statute of limitations. In their view, the Trustee had abdicated his fiduciary and affirmative duties to investigate the claim. The TSI Members instructed RLG to take action to protect a valuable estate asset. It was in that context the

---

[4] Remarkably, "the Trustee's counsel spoke with Bering Straits and they rejected the TSI Members' assertion that the proof of claim supports a $6.8 million receivable. Sanctions Motion at ¶44. It appears there was much discussion about the change order claim except between the right people: Venable and the TSI Members.
[5] A call placed by RLG to Venable was not returned.
[6] To the extent the Trustee claims that Archer & Greiner made the "investigation" the TSI Members dispute that and note Archer &Greiner was retained as general bankruptcy counsel, not as expert on federal contract law, and charges an hourly fee.

Standing Motion[7] was prepared as a last resort and because time was running out.[8] The purpose of the Standing Motion is entirely innocuous: to preserve property of the estate *for the Trustee*.

8. RLG reasonably expected one of several responses to the Standing Motion. The Trustee would finally direct Venable to meet and work with the TSI Members to develop and file the change order claim. That did not happen. The Trustee would agree to abandon the change order claim out of the estate if he determined, in consultation with Venable, it had no value. He did not. Or the Trustee at least would agree to let the TSI Members file a claim with FEMA *for free for the benefit of the estate*. The Trustee did not agree.

9. The Trustee's unexpected and counter-intuitive response to the Standing Motion was punitive; he instructed his bankruptcy counsel to file the Sanctions Motion.[9] In other words, the Trustee not only *wanted* to let the statute of limitations lapse with respect to the change order claim, he *wanted* to prevent the TSI Members from timely filing a claim for the Estate for free. The Court should not reward the Trustee with sanctions for pursuing a value minimizing approach

---

[7] *Motion for Entry of Order Granting TSI Members Standing to: (A) Prosecute the Appeal and (B) File Claims and Collect Certain Account Receivable on Behalf of the Debtor's Estate* [DI 328] (the "Standing Motion").

[8] The Standing Motion also addressed a colloquy with the Court, as follows:

THE COURT: This is not before me today, but just to share with you some of my preliminary thinking. How does, there's a difference to my mind between derivative standing and stay relief. Stay relief allows the appeal to go forward, but it doesn't change the party to the appeal. So how does stay relief get you what you're looking for without derivative standing, which would give rise to the question of is there such a thing as derivative standing in a chapter 7 case. A question to which I don't know the answer. Do you understand my question?
MR. ROSNER: Yeah, I do.
THE COURT: What's the answer?
MR. ROSNER: The answer is that we've been frustrated by the appeal not going forward for a year. We got a price quote from counsel, flat fee to prosecutor for 40,000. I think we attached it as an exhibit. And we think that the estate should be administered with that going forward. So, right, stay relief doesn't get there. But something less drastic than stay relief would be us funding the Trustee to move forward with counsel. I mean, that's the result I want. How am I going to get there? You're right. I went for this, I'll get this.

Tr. from hearing on June 14, 2023 at p. 37, lines 1-22. The relevant excerpt is attached hereto as **Exhibit B.**

[9] Motion For Sanctions Under USC 28 Section 1927 Attorney Liability for Excessive Costs -- *Chapter 7 Trustee's Motion For Sanctions Against The Rosner Law Group LLC Pursuant to Fed. R. Bankr. P. 9011 and 28 U.S.C. § 1927* [DI 339] (the "Sanctions Motion").

to estate administration.

10. The term sanctions connotes bad faith. There can be no bad faith found in the Standing Motion. The equity members, acting through counsel, facing a deadline, the forfeiture of valuable rights and a Trustee's refusal to investigate or act, were trying to preserve claims *for the Trustee*. What is particularly telling (and troublesome) is that Venable never voiced an opinion on the change order claim. This is not a case where Venable had reviewed the merits of the claim and had advised in writing that Venable determined it would be baseless and frivolous to file. In fact, at the time the Standing Motion was filed, there was no indication that Venable had even considered (or been asked by the Trustee to consider) the claim that, notably, would have cost the Estate $0. The Sanctions Motion is not a proper fiduciary response to an attempt to preserve property of the estate. For the reasons set forth below, the Sanctions Motion should either be withdrawn or denied.

## ARGUMENT

**A. The Sanctions Motion is Without Merit.**

11. The gist of the Sanctions Motion is that "[c]ounsel for the TSI Members cannot be permitted to force the Trustee to spend precious estate resources responding to requests that are not 'winners.'" Sanctions Motion at ¶55. This argument is misleading and has no merit. ***First***, the Trustee's assertion is based on the false presumption that the Trustee had to respond or had to incur fees responding. There were certainly many cost-free options for the Trustee. For example, the Trustee could have requested an adjournment of the Standing Motion and directed Venable to work with the TSI Members to investigate the change order claim. This approach is consistent with the Trustee's fiduciary and affirmative duties, would have fully addressed the concerns of the

TSI Members, and would have cost the Estate $0.[10] **Second**, there is no guarantee that any claim asserted by the Estate against FEMA is a "winner." No one can predict in advance with 100% confidence an expected outcome. But the Trustee retained Venable on a contingency fee basis. The Estate only pays if Venable wins. The only unacceptable scenario is retaining contingency fee counsel, preventing them from investigating the claim, and then have bankruptcy counsel unnecessarily run a bill opposing the TSI Members request to submit the change order claim for the Estate for free. **Third**, there was no need for the Trustee to respond to the Standing Motion. If granted, the TSI Members simply would have signed and filed the change order claim *for the Estate for free*. There is no harm to the Estate, only upside. The proper inquiry is why the Trustee is wasting precious Estate resources opposing the Standing Motion. **Fourth**, the Standing Motion is withdrawn. *See* DI 385. To avoid wasting "precious estate resources" the Trustee should withdraw the Sanctions Motion.

    **B. The Sanctions Motion Seeks to Shift the Burden Away from the Trustee and Venable to Investigate and Vet the Change Order Claim with the TSI Members.**

    12.    The Sanctions Motion also complains that "there was no competent evidence to demonstrate that the Alleged A/R was a colorable claim." Sanctions Motion at ¶15. This is burden shifting. The Trustee has exclusive domain over the change order claim as property of the estate.

---

[10] *See, e.g.,* Transcript of August 14 2023 hearing at p.29, lines 11-19, the relevant excerpt is attached hereto as **Exhibit C**.

Mr. Rosner:
…
I will conclude by saying, notwithstanding everything that I have said here today and the objection, all the sanctions and what not, that my clients remain ready, willing, and able to meet with the trustee, maybe through Venable counsel, to discuss the $8.2 million and the status of the case so we can stop all of this value destructive behavior and bring this case to a quick resolution, working, for the first time, cooperatively, and communicating with each other.

The Trustee retained Venable to investigate and file all potential claims against FEMA, including the change order claim. *At the latest*, Ms. Mott put the Trustee on detailed notice of the change order claim over a year and a half ago.[11] The Trustee's continuing duty to investigate and, if appropriate, file the change order claim rests with the Trustee and *never* shifted to the TSI Members. At no point from and after February 7, 2022 (Ms. Mott's deposition date) did the Trustee's affirmative and fiduciary duties to deploy Venable to investigate the change order claim disappear. Upon information and belief, the Trustee's decision not to file the change order claim was never informed by Venable's professional opinion or diligence into the matter. The Trustee should not be heard to fault the TSI Members when he affirmatively prohibited his subject matter expert from investigating the matter.

### C. The Standing Motion was Not a "Delay Tactic."

13. The Trustee claims, "[t]he Standing Motion is yet another attempt by the TSI Members to delay and obstruct the administration of the Estate and to distract the Trustee from pursuing the pending litigation against the TSI Members." Sanctions Motion at ¶5. This argument is hollow. The Standing Motion has for its purpose to bring millions of dollars into the Estate at no cost to the Estate. That is hardly obstruction. In fact, it may obviate the need for further litigation against the TSI Members. Instructing Venable, which has no involvement with the FAC, to meet and confer with the TSI Members cannot be viewed as "delay tactics." *Id*. Further, the Trustee's position is "[t]his needs to stop." *see id*., The TSI Members disagree. Until it is

---

[11] *See id* at fn. 3. It is entirely misleading for the Sanctions Motion to suggest the Trustee was suddenly jammed by the filing of the Standing Motion. *See* Sanctions Motion at ¶5. The Trustee and his professionals were well aware of the claim for quite some time. Similarly, the Sanctions Motion claims, "[t]he Trustee and his professionals have repeatedly asked the TSI Members to explain the basis for and calculation of the Alleged A/R and to turn over the supporting documents." *See* Sanctions Motion at ¶4. In fact, Venable, the Trustee's subject matter expert, **never** requested any information from or otherwise interacted with the TSI Members. When the TSI Members did prepare the change order claim for submission to FEMA for the Trustee's review and approval, it was, upon information and belief, prepared entirely with documents previously and repeatedly provided to the Trustee.

demonstrated that the TSI Members are out of the money equity, they should be afforded standing, notice and an opportunity to be heard including the right to criticize the Trustee's refusal to file the change order claim and other aspects of his estate administration.

**D. The TSI Members were Forced to Bring the Standing Motion Due to the Trustee's Lack of Action and have Standing Because their Pecuniary Interests are at Risk.**

14.   The Trustee also claims the TSI Members, as equity holders, lack standing to file the Standing Motion. Sanctions Motion at ¶12.  The TSI Members contend they have a pecuniary interest in the outcome of the chapter 7 case, including the Trustee's failure to investigate and timely file a multi-million dollar change order claim against FEMA.  *First*, the chapter 7 trustee testified in the trustee election campaign that the Estate is solvent.[12]  *Second*, the Trustee prepared and filed a federal tax return for the Estate evidencing solvency.[13]  *Third*, the Trustee has pending a claim against FEMA for $13.5 million (and perhaps worth as much as $15.5 million) that, if collected, immediately renders the estate solvent.  *Fourth*, the Trustee has pending a $32 million

---

[12] At the hearing on the contested trustee election, a question was posed about the Trustee's proposed administration of the case:

> Q     During one or both of the phone calls, there was some discussion of the fact that you didn't believe you could pursue the insider transfers prior to the resolution of the FEMA claims.  Is that still your belief?
>
> A      I never said that.  **I could pursue the insider claims, but it would be premature. And the reason it's premature is because we have approximately $23 million in claims against FEMA** and if you collect $23 million of claims against FEMA and your judgment, you know, your judgment -- your client's judgments are about $6 million.  So, I've got $23 million in the bank, I'm writing you a check for $6 million and you're paid off.
>
> And so, that's the quickest way, as a trustee – and the cheapest way, because I have now engaged a client – an attorney, who's going do it all on a contingency basis.  So, there's no need for any money to recover fees and expenses, you know, chasing assets throughout the United States.

See June 15, 2022 Hrg. Tr. (Ex. 5) at 46:13-47:5 (**emphasis** added).

[13] *See* Tax Return prepared by Trustee for TSI.

{00037004. }                                                           10

FAC against the TSI Members, among others. The TSI Members should have every right to mitigate the FAC's potential exposure by ensuring all Estate assets are investigated and monetized.[14] **Fifth**, §1109 does not define parties in interest but states that "[a] party in interest, including the debtor … a creditor, an equity security holder … may raise and appear and be heard on any issue in a case under this chapter." Courts have interpreted §1109(b) broadly[15] and the statute "invites interpretation."[16] Some courts have held that §1109(b) may be relied on to provide guidance which parties have standing in the chapter 7 context.[17] **Sixth**, the TSI Members have Constitutional standing to bring the Standing Motion. The TSI Members comprise 100% ownership of the Debtor and are not seeking to assert the rights of third parties. The TSI Members assert "(1) a concrete and particularized injury in fact, (2) that is fairly traceable to the defendant's conduct, and (3) that a favorable judicial decision would likely redress[ ]." *Artesanias Hacienda Real S.A. de CV v. North Mill Capital, LLC (In re Wilton Armetale, Inc.*), 968 F.3d 273 at **10 (3d Cir. 2020) (*citing to Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 125 (internal quotation marks omitted)). **Seventh**, as noted above, there is no cost or downside to the Estate to permit the TSI Members to file the change order claim for the Trustee. **Eighth**, the TSI Members are creditors of the Estate. As defendants in the FAC, they have potential §502(h) claims and a contingent claim falls within the broad definition of claim at §101(5). They also have

---

[14] Contrary to the Trustee's assertion, the TSI Members are not trying to "hijack this case for the transparent purpose of derailing the litigation against them." Sanctions Motion at ¶32. They instead are trying to ensure the Trustee collects all estate assets to mitigate the cost and risk of pending litigation.
[15] *See In re Teligent, Inc.*, 640 F.3d 53, 54 (2d Cir. 2011).
[16] *In re Runnels Broad, Sys., LLC*, 2009 Bankr. LEXIS 3946, *8 (Bankr. D. N.M. 2009)(citation omitted).
[17] *See, e.g., In re Canton,* 2007 Bankr. LEXIS 3352, *2 (Bankr. W.D. Wash. 2007). *See also In re RFE Indus., Inc.*, 283 F.3d 159, 164 (3rd Cir. 2002) (debtor had standing to object to proposed settlement where it was "clearly adversely affected by the Settlement"); *In re Remsen Partners, Ltd.*, 294 B.R. 557, *564 (S.D.N.Y. 2003) (in a chapter 7 case, even if §1109(b) may not apply, non-creditor law firm was "aggrieved" and had standing to object to settlement where it would have the "chance to have an allowed claims" if the settlement was disapproved and "will have little or no recovery if the settlement is approved"). *See also Truck Insurance Exchange v. Kaiser Gypsum Co. (In re Kaiser Gypsum Co.),* 60 F.4th 73 (4th Cir. Feb. 14, 2023), *cert. granted.* Section 1109(b) standing will soon be considered by the Supreme Court.

potential claims against the Trustee, his counsel and the estate for their respective failure to preserve property of the estate; *i.e.*, the change order claim. These are claims either under §323(b)[18] or within the meaning of §101(5)(B) ("right to an equitable remedy for breach of performance if such breach gives rise to a right to payment . . . ."). This Court also previously afforded the TSI Members standing to object to Archer & Greiner's interim fee application, the 9019 Motion and similarly should find standing here. *Ninth*, the public and Estate's interests are best served by having the Debtor's voice heard with respect to the Trustee's estate administration.

### E. The Sanctions Motion Misstates the Relief Sought by the Standing Motion.

15. The Sanctions Motion asserts that, by the Standing Motion, the TSI Members seek "to exercise control over accounts receivable or other estate property of the estate …" or "cede administration of the Estate to them for collection of the Alleged A/R." Sanctions Motion at ¶¶37, 40. This is certainly not the case. The TSI Members sought merely to ensure the Trustee timely filed a claim with FEMA before the statute of limitations expires, and they wish to file the claim for the Estate, not themselves.

### F. The Change Order Claim Died with a Whimper.

16. The TSI Members reasonably believed—*without* guidance from Venable or other law firm expert in federal contracting law—that the statute of limitations for submitting a claim to FEMA for the change order claim would expire on October 6, 2023. The Trustee—*with* the benefit of Venable—never disagreed with that contention or offered a different analysis (most likely because none was performed). The TSI Members, again without representation, prepared the necessary claim forms for the Trustee's review to timely park the change order claim with FEMA.

17. The exchange of emails between the Trustee and the TSI Members is attached

---

[18] The TSI Members reserve all rights, including under the *Barton* doctrine.

{00037004. }    12

hereto as **Exhibit A**.  The opening email dated 10/2/23 is from Rosner to Boland.  The email had five attachments, including the submission forms to be filed with FEMA; identified October 6, 2023 as the statute of limitations; identified (with full contact information) the Contracting Offer and Specialist with FEMA; and stated that, subject to review by the Trustee, the TSI Members were willing to sign the claim forms.  The email invited the long overdue dialogue between Venable and the TSI Members.

18.    The Rosner email was purposefully directed to Venable.  Rosner previously had called Venable but received no response.  The TSI Members repeatedly complained that they were not permitted to discuss the change order claim with Venable.  Rosner's email had as its purpose getting Venable, the subject matter expert on federal contracting law, directly involved in the discussion.  It was hard to believe that Venable would recommend against parking a claim with FEMA to preserve the Estate's rights to the change order claim.

19.    In the back and forth, there is no email from the Trustee or Venable that affirmatively states, in effect, "we have reviewed the claim, find it frivolous, without basis and should not be filed."  In fact, the Trustee's final email refusing to file the change order claim with FEMA before October 6, 2023 purports to blame the TSI Members for the failure to timely park the claim with FEMA.  Among other things, the Trustee contends "you [the TSI Members] had every opportunity to prosecute your standing motion in September and chose not to do so.  That was a decision that you and your clients made."  *See* email from David Carickhoff to Michael Munoz dated October 6, 2023 at 9:35 a.m. (the "Carickhoff Email").

20.    The Trustee's circular reasoning here is stunning.  ***First***, the Carickhoff Email is a staggering admission that the TSI Members *had* standing to prosecute (and, according to the Trustee, should have prosecuted!) the Standing Motion.  The Carickhoff Email stands in direct

{00037004. }                                    13

contrast to the Sanctions Motion that seeks to sanction RLG for merely filing the Standing Motion. The Trustee cannot have it both ways.  **Second**, the Carickhoff Email, in effect, states that RLG should have prosecuted the Standing Motion and just faced the cost of the Sanctions Motion as a risk attendant to prosecuting that motion.  This is an obstructionist's recipe for unnecessary delay, conflict and fees; it is not a fiduciary mindset by any stretch.  **Third**, the Carickhoff Email states, "[w]e are disappointed that we have asked to meet with your clients for a long time to have them explain the alleged claim and provide support for it."  In fact, Venable never requested a meeting with the TSI Members and, subject to discovery, was directed by the Trustee not to speak with any TSI Members.  **Fourth**, the Carickhoff Email ignores the Trustee's independent and affirmative duty to investigate and file the change order claim, and the Trustee had more than ample time to do so.

### G. Recent Docket Activity Moots the Standing and Sanctions Motions.

21.     Recent events and docket activity effectively have mooted the relief sought by the Standing and Sanctions Motions.  By the Standing Motion, the TSI Members sought standing to prosecute the Appeal and file the change order claim.  The immediate prospect of pursuing the Appeal is moot by reason of the Trustee's settlement with the Judgement Creditors. *See Order Granting the Motion of the Chapter 7 Trustee for Entry of an Order Pursuant to Fed. R. Bankr. P. 9019 Authorizing and Approving the Settlement Agreement Between the Trustee and the Judgment Creditors* [DI 37; filed 9/20/23](the "9019 Order"). Unless reversed on appeal or the $13.5 million FEMA claim is paid (in which case the TSI Members reserve all rights), the 9019 Order effectively moots one half of the relief sought by the Standing Motion. The Trustee's recent decision not to file the change order claim effectively moots the rest of the relief requested by the Standing Motion, and it has been withdrawn.  *See* DI 385. The undersigned respectfully submits there is no

need to pursue (or for the respective parties to incur the cost, expense and delay of discovery relating to) the Sanctions Motion in light of the foregoing and requests that it be withdrawn.

22.    The TSI Members also previously filed a *Motion for Entry of Orders: (A) Staying Prosecution of First Amended Complaint or, Alternatively, Extending Time to Answer, Move or Otherwise Respond; (B) Capping Recovery, if Any, Under First Amended Complaint; (C) Granting Relief from the Automatic Stay to Permit TSI Members to Fund Appeal to Eleventh Circuit, (D) Compelling the Trustee to Abandon the $8.2 Million Receivable; (E) Compelling Trustee to Abandon Debtors Business; and (F) Granting Related Relief* [DI 310]. For substantially the same reasons that the TSI Members have withdrawn the Standing Motion, they has also withdrawn this motion. *See* DI 385. Prosecution of the FAC is moving forward, a Scheduling Order has been entered, and that is (and should be) the focal point of the parties' attention.

**WHEREFORE,** the RLG respectfully requests that the Trustee withdraw the Sanctions Motion or the Court enter an order denying the Sanctions Motion, and grant such other and further relief as the Court deems just and proper.

Dated: October 19, 2023
      Wilmington, Delaware

**THE ROSNER LAW GROUP LLC**

*/s/ Frederick B. Rosner*
Frederick B. Rosner (DE #3995)
824 N. Market Street, Suite 810
Wilmington, Delaware 19801
Email: rosner@teamrosner.com

*Counsel to the TSI Members*