## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>TEAM SYSTEMS INTERNATIONAL, LLC,<br><br>      Debtor. | Chapter 7<br><br>Case No. 22-10066 (CTG)<br><br>**Related Docket No. 643** |

## <u>MEMORANDUM OPINION</u>

One of the subplots in this highly contentious and long-running bankruptcy case has been the status of two alleged receivables that the owners of the debtor claim are due to the estate from FEMA.[1]  The former owners (who are the movants in this contested matter) have said from the beginning that there are millions of dollars in value available to the estate if the trustee would only endeavor to collect it.  The trustee in this case has argued that he would be happy to recover any value that might be available to the estate and argues that the movants have failed to cooperate with his efforts to help collect these alleged receivables.

The movants have now moved to compel the trustee to abandon the alleged receivables, which would have the effect of returning those receivables to the prepetition debtor, and therefore make them available to the movants, as the holders of the debtor's equity.

The Court is dubious that there is any value here to be had.  But that is beside the point.  The trustee's fundamental position is that whatever value may be there

---

[1] The Federal Emergency Management Agency is referred to as "FEMA."

belongs to the estate. And the one thing that the trustee is unwilling to do is to reward the movants for their failure to cooperate by abandoning the receivables, only to have the movants go out and collect for their own benefit on claims that are owned by the bankruptcy estate.

In a rational world, if the trustee requires the cooperation of the movants in order to chase the receivables, and that cooperation cannot be obtained by compelling the debtor to meet its obligations under § 521 or through other compulsory process, the parties would negotiate some mutually acceptable arrangement for obtaining that cooperation (such as a sale of the receivables or the sharing of any recoveries). The parties have represented to the Court that they have tried but failed to reach such an arrangement. That is what it is. This Court makes no finding about what has transpired. For the purposes of this motion, the trustee is within his rights to conclude that to the extent the movants have failed to cooperate with his efforts to collect on these alleged receivables, they should not obtain the right to collect on an estate asset for their personal benefit. That is a reasonable exercise of the trustee's judgment. The motion to compel is therefore denied.

## Factual and Procedural Background

The movants in this case were the owners of the debtor, a government contractor. The Court will not reprise the long and contentious history of these proceedings, which it has addressed in a number of earlier opinions.[2] For current

---

[2] *See, e.g., In re Team Systems International*, 640 B.R. 296 (Bankr. D. Del. 2022) (ruling on motion to dismiss or convert); *In re Team Systems International*, No. 22-10066, 2022 WL 2792006 (Bankr. D. Del. July 15, 2022) (decision on contested election of chapter 7 trustee);

purposes, all that matters is that the movants are the former owners of the debtor. They assert that the estate has valuable causes of action against FEMA for work that the debtor performed before the petition date.

These causes of action were relevant to the Court's consideration of a motion to dismiss or convert that it addressed almost four years ago. The Court's explanation of the dispute over these alleged receivables, from this early stage of the case, remains instructive.

"When the debtor filed the petition, a central theme was that it was owed millions of dollars from FEMA, and a short breathing spell from its creditors' collection activity would permit it to collect on this receivable, pay its creditors in full, and resume running its government contract business in the manner it had operated for more than 20 years."[3] The Court quoted Deborah Mott, one of the movants and the first-day declarant, as saying that "FEMA owes two payments to TSI."[4] The first was "for $13.5 million for nonpayment of TSI's invoice for FEMA's reduction in the initial ordered quantity of bottled water," which was then "pending before the U.S. Civilian Board of Contract Appeals."[5] At the time, the parties had filed cross motions for summary judgment and were awaiting the Board of Contract Appeals' decision.

---

*In re Team Systems International*, No. 22-10066, 2023 WL 1428572 (Bankr. D. Del. Jan. 31, 2023) (decision granting pre-judgment asset freeze in adversary proceeding).

[3] *Team Systems*, 640 B.R. at 316-317 (internal citation omitted).

[4] *Id.* at 317 (citation omitted).

[5] *Id.*

The second payment at issue was described as a "change order claim" for approximately $6.8 million that the debtor intended to file as a result of the reduction of FEMA's order.  The Court again quoted the first-day declaration as saying that the breathing spell created by the bankruptcy "will allow for the collection of proceeds from the FEMA claims on each of these claims, providing TSI the funds to resolve the Judgment, if necessary, and emerge from this chapter 11 case as a healthier enterprise, continuing to serve the United States as a reliable contractor to important government agencies."[6]

The court noted that if "either (or both) of these multimillion-dollar payments appeared likely to be received in the short term, that would counsel in favor of giving the debtor a reasonable opportunity to take advantage of the breathing spell provided by the Bankruptcy Code in order to see if it might be in a position to pay its creditors in full and continue its business."[7]  But without purporting "to make findings with respect to either of these claims," the Court noted that based "on the evidence that was submitted, neither claim appears likely, at least in the short term, to generate a substantial recovery that will permit the debtor to confirm a plan that pays its creditors in full."[8]

With respect to the $13.5 million claim, the Court noted that the Civilian Board of Contract Appeals had (between the filing of the bankruptcy case and the hearing

---

[6] *Id.* (citation omitted).

[7] *Id.*

[8] *Id.*

4

on the motion to dismiss or convert) denied the parties' cross-motions for summary judgment.  "The Board's decision holds that the mere decrease in the order is insufficient to entitle it to a restocking fee under the contract.  Rather, TSI is required to prove that it actually incurred costs for restocking the water.  And while, to repeat, this Court does not purport to make any sort of finding with respect to this issue, TSI did not present any evidence at the hearing before this Court suggesting that it actually incurred such a cost."[9]

The Court then addressed the change-order claim, noting that this claim "fares even worse."[10]  The Court noted that in a declaration filed just before the hearing, one of the movants, Steven Acosta, said that "TSI imminently intends to submit a change order claim of $6.8 million on account of a FEMA change order which reduced the overall value of TSI's 2017 bottled water contract … from $117,566,730.00 to $25,636,352.37."[11]  The Court then noted that at the hearing, "Acosta testified that TSI would be submitting this claim for the change order 'I believe, this week.'"[12]  But on cross examination the following week, Acosta admitted that the order had not been submitted, but that "[w]e believe that's going in this week."[13]  Thereafter, however, counsel for the debtor (who later withdrew from the representation) wrote to the Court on March 24, 2022 to correct that statement, noting that "the debtor's

---

[9] *Team Systems*, 640 B.R. at 317-318.

[10] *Id.* at 318.

[11] *Id.* (internal citations and quotation omitted).

[12] *Id.* (internal citations omitted).

[13] *Id.* (internal citations omitted).

government contracting lawyers had not been retained as ordinary course professionals and therefore have not engaged in post-petition work relating to this $6.8 million claim," but that the debtor "remain[s] hopeful that it will be prepared and submitted in the near term."[14]

As the Court noted back in 2022, it "bears emphasis, however, that this claim arises out of events that took place in 2017 and 2018.  And as of the end of March 2022, TSI, which has suffered a $6.3 million judgment for which it was unable to post a bond, still has not asserted a claim for $6.8 million owed to it dating back more than four years.  None of that makes much sense."[15]  The Court thus found that it "cannot and will not conclude that it is sufficiently likely that TSI will recover on the $6.8 million claim that this potential recovery provides a basis for the debtor to remain a debtor in possession."[16]  The Court accordingly converted the case to chapter 7.

In the intervening four years, what we know is that the cancellation claim has been fully litigated.  After having been rejected by FEMA, the Civilian Board of Contract Appeals affirmed the denial of the claim on February 9, 2023.[17]  The trustee then (retaining the same counsel that represented the debtor prepetition) appealed that denial to the Federal Circuit.  That court heard oral argument on July 11, 2024

---

[14] *Id.* (citations omitted).

[15] *Team Systems*, 640 B.R. at 318.

[16] *Id.*

[17] *Team Systems International, LLC v. Department of Homeland Security*, Civilian Bd. Contract Appeals 7145 (Feb. 9, 2023) (decision available at: www.cbca.gov/files/decisions/2023/SHERIDAN_02-09-23_7145__TEAM_SYSTEMS_INTERNATIONAL_LLC%20(DECISION).pdf).

and four days later issued a one-line decision affirming the Civilian Board of Contact appeals.[18]  That decision is therefore now final and non-appealable.

The change-order claim remains the subject of dispute.  The trustee has taken the position that he would happily pursue the claim if the movants would provide him sufficient information to permit him to assert it.  The movants argue that the trustee has all of the information he needs and fault the trustee for failing to act.[19]  Against this backdrop, the movants filed the present motion seeking to compel the trustee to abandon these claims under § 554(b) of the Bankruptcy Code.

## Jurisdiction

The Court has subject-matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) as a case "arising under" § 554(b) of the Bankruptcy Code.  This proceeding is a core matter on which the Court may enter final judgment under 28 U.S.C. § 157(b).  It has been referred to this Court under 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference.

## Analysis

In addition to the provision of § 554(a) of the Bankruptcy Code that authorizes a trustee to abandon property that is "burdensome to the estate" or of "inconsequential value," § 554(b) provides that on "request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property

---

[18] *Team Systems International, LLC v. Secretary of the Department of Homeland Security*, Fed. Cir. No. 2023-1556 (July 15, 2024).

[19] *See e.g.*, D.I. 645 at 6-7 (describing the back and forth between the trustee and the movants regarding the change order claim).

of the estate" that is either burdensome or of inconsequential value.[20]  The statute,
however, does not by its terms identify the standard to be applied when a party in
interest seeks to compel the abandonment of property over a trustee's objection.  A
leading treatise observes that "the party requesting abandonment has the burden of
proof," but provides little further guidance about how to resolve a dispute like the one
presented here, where the value of the asset is quite uncertain, and the trustee's
principal concern is simply in ensuring that whatever value the asset may or not may
have is realized by the estate rather than the debtor's prior equity holder.[21]

It bears note, however, that the abandonment power traces its roots to pre-
Code practice.[22]  To that end, the Supreme Court noted in 1878 that it was already a
"long recognized principle" of bankruptcy that "the assignees of a bankrupt are not,
in certain cases, bound to take property of an onerous or unprofitable character,

---

[20] 11 U.S.C. § 554(b).  As this Court recently noted, "[a]bandoned property leaves the bankruptcy estate and typically becomes property of the prepetition debtor." *In re Oldco Tire Distributors*, No. 24-12391, 2025 WL 3130700, at *4 n. 27 (Bankr. D. Del. Nov. 7, 2025).  In this sense, abandonment is "analogous to the rejection of an executory contract," which also operates to remove the asset (there, a contract) from the bankruptcy estate.  *Id.*

[21] *See generally* 5 *Collier on Bankruptcy* ¶ 554.02[4] (16th ed. 2025).

[22] *See e.g., Sparhawk v. Yerkes*, 142 U.S. 1, 13 (1891) ("[The assignee is] not bound … to accept property of an onerous and unprofitable nature, which would burden instead of benefiting the estate, and they [can] elect whether they would accept or not, after due consideration and within a reasonable time."); *Smith v. Gordon*, 22 F. Cas. 554, 556 (D. Me. 1843) ("By the bankrupt act, all the property and rights of property of the bankrupt, by force of the decree of bankruptcy, pass to the assignee by operation of law, and become vested in him as soon as it is appointed.  But though the legal title passes, he is not bound to take possession of all.  It is perfectly well settled with respect to leasehold estates, under the English bankrupt laws, that the assignee is not bound to take the lease, and charge the estate with the payment of rent." (citing *Copeland v. Stephens*, 106 Eng. Rep. 218 (K.B. 1818))).

which would burden instead of benefiting the estate; and there are numerous decisions, English and American, which support the proposition."[23]

The pre-Code practice, consistent with modern bankruptcy law, was that the power in the first instance to decide which assets to administer and which to abandon was to be made by the trustee, in the exercise of the trustee's discretion.[24]  When a party in interest challenges the trustee's decision, courts have historically deferred to the trustee's judgment, requiring a finding only that the trustee made "1) a business judgment; 2) in good faith; 3) upon some reasonable basis; and 4) within the trustee's scope of authority."[25]

It was also true, however, that under pre-Code practice parties could file motions with the Court seeking to compel abandonment over the trustee's objection. Indeed, the Supreme Court observed in *Glenny* that "if the assignee should erroneously or unwisely" exercise its discretion, "creditors may, by petition, apply to the court … to compel him to carry out their wishes."[26]  For this reason, courts have observed that "abandonment is in the discretion of the trustee, bounded only by that of the court."[27]

---

[23] *Glenny v. Langdon*, 98 U.S. 20, 31 (1878).

[24] *See First National Bank v. Lasater,* 196 U.S. 115, 118-19 (1905) (determining that the trustee is "not bound to accept property of an onerous or unprofitable character" and may "decline to take the property"); *In re K.C. Machine & Tool Co.,* 816 F.2d 238, 246 (6th Cir. 1987) ("[I]n its discretion, the trustee may abandon property to the debtor where administration thereof would not benefit the estate-the creditors."); *In re Slack*, 290 B.R. 282, 284 (Bankr. D.N.J. 2003) ("The trustee's power to abandon property is discretionary.").

[25] *Slack*, 290 B.R. at 284 (citations omitted).

[26] *Glenny*, 98 U.S. at 31.

[27] *In re Interpictures, Inc.*, 168 B.R. 526, 535 (Bankr. E.D.N.Y. 1994).

The pre-Code caselaw suggests that the power to compel a trustee to abandon property stemmed from the concern that trustees would choose to sell property in circumstances in which there would be little to no return to the bankruptcy estate, but where the trustee might nevertheless obtain fees or a commission in connection with a sale. For example, in *Seaboard National Bank v. Rogers Milk Products*, the court emphasized that it could "conceive of no benefit which the estate … could obtain … in so selling [the property], except to get fees for themselves and their attorneys."[28] The court noted that such an outcome is "shocking" and brings the system into "disrepute in the popular mind."[29] The court "condemn[ed] in no uncertain terms the practice."[30]

Congress codified this body of caselaw by enacting § 554(b) of the Bankruptcy Code.[31] Caselaw construing this provision accordingly recognizes that abandonment should be compelled in those cases where it would "help the creditors by assuring some benefit in the administration of each asset."[32] But such an outcome – a court

---

[28] 21 F.2d 414, 417 (7th Cir. 1927).

[29] *Id.*

[30] *Id. See also See K.C. Mach. & Tool*, 816 F.2d at 246 ("In enacting § 554, Congress was aware of the claim that formerly some trustees took burdensome or valueless property into the estate and sold it in order to increase their commissions. Some of the early cases condemned this particular practice in no uncertain terms, and decried the practice of selling burdensome or valueless property simply to obtain a fund for their own administrative expenses.") (citations omitted).

[31] *In re Interpictures, Inc.*, 168 B.R. at 535.

[32] *Id.* (citation omitted).

compelling abandonment – has always been recognized as "the exception, not the rule."[33]

Consistent with this history, the caselaw construing § 554(b) has generally concluded that in the absence of (a) reason to be concerned that the trustee is engaged in self-dealing; or (b) a cost to the estate of retaining ownership of the asset, courts should typically respect a trustee's decision to continue to administer an asset rather than abandon it. *In re Janmar*, for example, surveyed cases and noted that there is no duty to abandon unless "administration of the asset would cause expense to the estate."[34] Similarly, *Interpictures* recognized that, even where "the assets have been shown to be valueless and of no burden to the estate, there is always the possibility that someone may make a payment on the receivables in the future."[35] And in such a case, where holding the asset imposes no burden, but the potential for a future receivable remains (even if it may be remote), the trustee may retain an asset so that the proceeds (were they to be realized) would be distributed to creditors.[36]

The movants here assert that the trustee's "ongoing refusal to administer or abandon [the FEMA] claims in this active case delays administration, risks permanent loss of value, and incurs unnecessary costs, violating his fiduciary duties

---

[33] *Id.*

[34] *Janmar*, 4 B.R. at 10 ("Cases describing a 'duty to abandon' have invariably been decided in situations in which the evidence clearly showed that the lien exceeded the value of the collateral and administration of the asset would cause expense to the estate." (citations omitted)).

[35] *Id.*

[36] *Id.*

under 11 U.S.C. § 704(a)(1) to collect and liquidate estate property and close the estate expeditiously."[37]  The movants further argue that the FEMA claims must be abandoned to "preserve remaining estate value and prevent further harm to creditors and the estate."[38]

The Court is unpersuaded by this argument.  Nothing in the record suggests that the administration of the assets in question here imposes any expense on the bankruptcy estate.  Nor is there any suggestion that the failure to abandon these assets has harmed creditors.  At the end of the day, this dispute is simply the result of a standoff between the trustee and the movants.  The trustee has doubts (as does the Court) that there is value in these claims.  The $13.5 million claim for the reduction in FEMA's order has ended in a judgment against the estate that is now final and non-appealable.  When the movants had corporate law authority to manage the debtor, they let years go by without taking any action on the change-order claim that they contend will bring in $6.8 million.

Applying the test set out in the cases described above, there is no basis for finding that the trustee has engaged in self-dealing with respect to these claims or that the bankruptcy estate is bearing expenses associated with administering them that could be avoided through abandonment.  What is going on here is that the trustee is distrustful of the movants, whom he believes (rightly or wrongly) have failed to cooperate with his efforts to maximize value for the benefit of the estate.  And he is

---

[37] D.I. 643 at 2.

[38] *Id.* at 18.

worried, not without some reason, that he would be viewed as having fallen down on his job if he were to abandon the estate's interest in these claims, only to have the movants pull a rabbit out of a hat and find a way to obtain value in them for themselves.

The obvious solution, in circumstances such as these, would be for the parties to reach a mutually acceptable arrangement. Perhaps there is a price at which the movants would acquire the estate's rights from the trustee. Perhaps there is some arrangement that the parties might reach under which the movants would pursue the claims and the proceeds would be shared between the movants and the bankruptcy estate. All of that is up to the parties. Under the circumstances presented here, however, the Court is satisfied that it ought not permit the movants to conduct an end run around the trustee and the bankruptcy estate and obtain the assets for themselves by means of compelled abandonment under § 554(b). For the reasons described above, that tool was intended to solve a different kind of problem, and provides no reason to override the trustee's judgment on the record before this Court.

## Conclusion

For the reasons set forth above, the motion to compel abandonment will be denied. The Court will issue an appropriate order so providing.

Dated: February 18, 2026

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE